```
 1                   UNITED STATES DISTRICT COURT
 2              FOR THE NORTHERN DISTRICT OF CALIFORNIA
                          SAN JOSE DIVISION
 3

 4       UNITED STATES OF AMERICA,

 5               PLAINTIFF,              CASE NO.  CR-09-0930-EJD

 6          VS.                          SAN JOSE, CALIFORNIA

 7       MYRA HOLMES,                    MARCH 12, 2013

 8               DEFENDANT.              VOLUME 7

 9                                       PAGES 1055 - 1307

10

11                    TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE EDWARD J. DAVILA
12                  UNITED STATES DISTRICT JUDGE

13
                        A-P-P-E-A-R-A-N-C-E-S
14

15      FOR THE PLAINTIFF:    OFFICE OF THE UNITED STATES ATTORNEY
                              BY:   JOSEPH FAZIOLI
16                                  GRANT FONDO
                              150 ALMADEN BOULEVARD
17                            SUITE 900
                              SAN JOSE, CALIFORNIA 95113
18

19      FOR THE DEFENDANT:    OFFICE OF THE FEDERAL PUBLIC DEFENDER
                              BY:   DIANA GARRIDO
20                                  CYNTHIA LIE
                              160 W. SANTA CLARA STREET
21                            SUITE 575
                              SAN JOSE, CALIFORNIA 95113
22

23      OFFICIAL COURT REPORTER:    IRENE L. RODRIGUEZ, CSR, CRR
                                    CERTIFICATE NUMBER 8074
24

25          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,
        TRANSCRIPT PRODUCED WITH COMPUTER.
```

1
2
A P P E A R A N C E S: (CONT'D)

3   ALSO PRESENT:          FEDERAL BUREAU OF INVESTIGATION
                           BY:  ERIN WHITCHURCH
4                          1919 S. BASCOM AVENUE, SUITE 400
                           CAMPBELL, CALIFORNIA 95008
5
                           OFFICE OF THE UNITED STATES ATTORNEY
6                          BY:   LAKISHA HOLLIMAN, PARALEGAL
                           150 ALMADEN BOULEVARD
7                          SUITE 900
                           SAN JOSE, CALIFORNIA 95113
8
                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
9                          BY:   MARY JANE SCHNEIDER, PARALEGAL
                           160 W. SANTA CLARA STREET
10                         SUITE 575
                           SAN JOSE, CALIFORNIA 95113
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

INDEX OF PROCEEDINGS

2

3      FOR THE GOVERNMENT:

4      **CHARLES MAHER**
            DIRECT EXAM BY MR. FONDO (RESUMED)      P. 1062
5           CROSS-EXAM BY MS. GARRIDO               P. 1114
            REDIRECT EXAM BY MR. FONDO              P. 1164
6           RECROSS EXAM BY MS. GARRIDO             P. 1208
            FURTHER REDIRECT EXAM BY MR. FONDO      P. 1216

7

8      **JERRI JOHNSON**
            DIRECT EXAM BY MR. FONDO                P. 1219

9

10

11     **JAMES OERTEL**
            DIRECT EXAM BY MR. FAZIOLI              P. 1248

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1058

1

<u>INDEX OF EXHIBITS</u>

2

3

                                    IDENT.        EVIDENCE

4   GOVERNMENT'S:

5      188                                        1064
       189                                        1066
6      190                                        1068
       192                                        1070
7      229                                        1072
       195                                        1081
8      194                                        1084
       228                                        1091
9      207                                        1094
       212                                        1097
10     230 - 235                                  1228
       7                                          1254
11     8                                          1255
       13                                         1259
12     9 - 15                                     1259

13

14  DEFENDANT'S:

15     BB                                         1177

16

17

18

19

20

21

22

23

24

25

1059

```
 1     SAN JOSE, CALIFORNIA                    MARCH 12, 2013

 2                     P R O C E E D I N G S

 3        (JURY OUT AT 8:39 A.M.)

 4            THE COURT:  LET'S GO ON THE RECORD IN THE HOLMES

 5     MATTER.  THE JURY IS NOT PRESENT.

 6        I RECEIVED A COPY OF AN E-MAIL.  MR. FONDO, I THINK YOU

 7     SENT THE E-MAIL.

 8            MR. FONDO:  I DID, YOUR HONOR, LAST NIGHT.

 9            THE COURT:  DID THE DEFENSE GET THE E-MAIL?

10            MS. LIE:  YES, YOUR HONOR.

11            MS. GARRIDO:  YES.

12            THE COURT:  SO IT SOUNDS LIKE ONE OF OUR -- I'LL

13     JUST READ THIS FOR THE RECORD.  THIS IS FROM MR. FONDO AND HE

14     CC'D EVERYBODY HERE, ALL COUNSEL.

15        "DEAR CHARLES AND COUNSEL," CHARLES BEING MY CAREER CLERK,

16     "WE WANTED TO ALERT THE COURT AND DEFENSE COUNSEL THAT WITNESS

17     CHARLIE MAHER CONTACTED THE GOVERNMENT TO INFORM US THAT HE WAS

18     APPROACHED IN THE ELEVATOR BY A JUROR.  MR. MAHER INFORMED US

19     THAT AFTER THIS MORNING'S COURT SESSION, A JUROR, WHILE THE TWO

20     TRAVELLED DOWN IN THE ELEVATOR ASKED, 'CAN I ASK YOU FOR A

21     DEFINITION OF A TERM?' MR. MAHER RESPONDED 'NO, I CAN'T,' AND

22     THEN MR. MAHER APOLOGIZED FOR THE IMPOLITE.  THE JUROR

23     RESPONDED, THAT IS WHAT I THOUGHT."

24        SO ANY COMMENTS BEFORE I GO FURTHER?

25            MR. FONDO:  YOUR HONOR, JUST I TRIED TO QUOTE AS
```

```
 1    BEST I COULD.  I CAN'T SAY THAT THOSE QUOTATIONS ARE THE EXACT

 2    WORDS.  IT'S CERTAINLY THE IMPORT OF WHAT MR. MAHER SHARED WITH

 3    US.

 4               THE COURT:  DEFENSE?  ANY COMMENT?

 5               MS. GARRIDO:  NO.

 6               MS. LIE:  NO, YOUR HONOR.

 7               THE COURT:  SO WHAT I INTEND TO DO THIS MORNING,

 8    WE'LL BRING OUR JURY OUT AND I'M NOT GOING TO ASK OR IDENTIFY,

 9    UNLESS COUNSEL WANTS ME TO, MY INTENT WAS NOT TO IDENTIFY THE

10    JUROR THAT MADE THE INQUIRY, BUT RATHER I WOULD REMIND THE JURY

11    OF THE PRE-INSTRUCTIONS THAT THEY ARE NOT TO COMMUNICATE WITH

12    ANYONE, AND CERTAINLY NO ONE IS TO COMMUNICATE WITH THEM AND

13    THAT THE EVIDENCE THAT THEY'RE TO CONSIDER WILL COME IN THIS

14    COURTROOM, NOT OUTSIDE OF IT.

15         ANY OBJECTION TO THAT?

16               MR. FONDO:  NONE, YOUR HONOR.

17               MS. GARRIDO:  NO.

18               MR. FONDO:  I CERTAINLY DON'T WANT THAT JUROR TO

19    FEEL EMBARRASSED, AND IT MIGHT ACTUALLY BE A GOOD TIME TO

20    REMIND THEM OF SOME OF THE RULES OF THE ROAD, TOO.  IT'S BEEN A

21    WHILE.

22               THE COURT:  HAS IT?  ALL RIGHT.  ANYTHING FURTHER?

23               MR. FONDO:  I DON'T THINK SO, YOUR HONOR.

24               THE COURT:  AND SHOULD WE BRING THEM OUT?  AND YOUR

25    WITNESS IS HERE?
```

```
 1              MR. FONDO:  HE IS.

 2          (JURY IN AT 8:42 A.M.)

 3              THE COURT:  ALL RIGHT.  GOOD MORNING.  PLEASE BE

 4     SEATED.  THANK YOU.

 5          WE'RE ON THE RECORD IN UNITED STATES VERSUS HOLMES.  OUR

 6     JURY AND ALTERNATES ARE PRESENT.  ALL COUNSEL AND MS. HOLMES IS

 7     PRESENT.  MR. MAHER IS BACK ON THE STAND.

 8          BEFORE I HAVE YOU CONTINUE WITH YOUR DIRECT, MR. FONDO, I

 9     JUST WANTED TO REMIND THE JURY OF A COUPLE OF THINGS.  I

10     HAVEN'T BEEN AS DILIGENT OF REMINDING YOU AT EACH BREAK ABOUT

11     THE ADMONITION.  IT IS IN PLACE EACH TIME WE DO TAKE A BREAK,

12     OUR MORNING BREAKS, OUR AFTERNOON BREAKS AS WELL AS OUR BREAKS

13     FOR THE EVENING AND THE WEEKEND AND THAT ADMONITION INCLUDES

14     THE FACT THAT YOU'RE NOT TO DISCUSS THE CASE WITH ANYONE ELSE

15     OR ALLOW ANYONE ELSE TO DISCUSS THE CASE WITH YOU.

16          THE FACTS AND THE EVIDENCE THAT YOU WILL USE WHEN YOU

17     BEGIN YOUR DELIBERATIONS IN THIS CASE WILL BE THE FACTS AND

18     EVIDENCE THAT COME HERE IN THIS COURTROOM.  NOTHING OUTSIDE.

19     NOTHING TO BE CONSIDERED WHEN COURT IS NOT IN SESSION.

20          SO I'LL JUST REMIND YOU OF THAT ADMONITION.

21          ALL RIGHT.  THANK YOU.  AND WHEN I SAY I REMIND YOU OF THE

22     ADMONITION THAT IS IN PLACE, THAT IS WHAT I'M REFERENCING.

23          ALL RIGHT.  THANK YOU.  MR. FONDO, DO YOU WANT TO CONTINUE

24     YOUR EXAMINATION OF MR. MAHER?

25              MR. FONDO:  YES, YOUR HONOR.
```

```
1              THE COURT:  AND, MR. MAHER, YOU'RE STILL UNDER OATH,

2      SIR.

3          (GOVERNMENT'S WITNESS, CHARLES MAHER, PREVIOUSLY SWORN.)

4              THE WITNESS:  YES.

5                        DIRECT EXAMINATION (RESUMED)

6      BY MR. FONDO:

7      Q.   GOOD MORNING.

8      A.   GOOD MORNING.

9      Q.   I THINK WE LEFT OFF AT EXHIBIT 187.  IF YOU COULD REFER TO

10     THAT, PLEASE.  OKAY.  AND I THINK WE LEFT OFF WHERE I ASKED YOU

11     ABOUT THE CANCELLED CHECKS THAT YOU REQUESTED.

12          LET'S -- IF YOU COULD READ AFTER THE -- IT'S THE ONE,

13     TWO -- THIRD PARAGRAPH AND THE SECOND SENTENCE.  ACTUALLY, I

14     THINK WE WENT THROUGH THIS PARAGRAPH YESTERDAY AS WELL,

15     CORRECT, MR. MAHER?

16     A.   I BELIEVE WE DID.

17     Q.   ALL RIGHT.  IF WE COULD GO DOWN TO THE FOURTH PARAGRAPH,

18     THE ONE THAT STARTS IF MRS. HOLMES, AND IF YOU COULD READ THAT

19     FOR THE JURY AND EXPLAIN WHAT YOU'RE STATING HERE?

20     A.   "IF MRS. HOLMES DID NOT MAKE THE DOWN PAYMENT FROM HER OWN

21     FUNDS AND DID NOT MAKE ALL OF THE OTHER MORTGAGE PAYMENTS, THE

22     $75,000 IS LESS ATTRACTIVE THAN IT OTHERWISE MIGHT BE."

23     Q.   AND WHY WAS THAT?

24     A.   THAT GOES BACK TO WHAT WE DISCUSSED YESTERDAY ABOUT EACH

25     OWNER BEING ENTITLED TO AT LEAST AT THE START OF HALF OF THE
```

MAHER DIRECT

1    NET PROCEEDS.

2         AND IF MS. HOLMES HAD MADE ALL OF THE PAYMENTS AND THE

3    DOWN PAYMENT, AN ACCOUNTING DECIDED BY THE BANKRUPTCY COURT

4    WOULD CERTAINLY TIP IN HER FAVOR.

5         ON THE OTHER SIDE, IF THE PAIGES HAD MADE ALL OF THOSE

6    PAYMENTS, THE ACCOUNTING WOULD TIP TOWARDS THE BANKRUPTCY SIDE.

7    SO THE BANKRUPTCY ESTATE WOULD BE ENTITLED TO MORE THAN HALF.

8    Q.   IF YOU COULD READ THE LAST PARAGRAPH, PLEASE, AND LET US

9    KNOW WHAT THAT MEANS?

10   A.   "WITH RESPECT TO YOUR SUGGESTION THAT SHE WOULD HAVE TO

11   SUE HER PARENTS, I BELIEVE SUCH A LAWSUIT WOULD BE PROHIBITED

12   BY THE AUTOMATIC STAY.  IN MY OPINION THAT THREAT IS OF LITTLE

13   CONSEQUENCE."

14   Q.   AND WHAT IS AN AUTOMATIC STAY?

15   A.   WHEN ONE OF THE PRIME PURPOSES OF THE BANKRUPTCY CASE IS

16   TO PROTECT DEBTORS FROM CREDITORS WHO MIGHT BE TRYING TO

17   COLLECT MONEY AND SO THE BANKRUPTCY CODE IMPOSES A STAY OF ALL

18   ACTIONS AGAINST THE DEBTOR AUTOMATICALLY, AND THAT'S WHAT WE

19   REFER TO AS THE AUTOMATIC STAY.  AND SO SOMEONE WOULD HAVE TO

20   GO TO THE BANKRUPTCY COURT AND ASK PERMISSION TO GET AN

21   EXCEPTION FROM THE STAY TO PROCEED WITH ANY KIND OF A LAWSUIT

22   AGAINST THE DEBTOR.

23   Q.   I'D LIKE TO REFER YOU TO EXHIBIT 188, PLEASE.

24   A.   OKAY.

25   Q.   DO YOU RECOGNIZE THIS DOCUMENT?

1    A.   I DO.

2    Q.   AND GENERALLY WHAT IS IT?

3    A.   THE PREVIOUS EXHIBIT WAS A LETTER THAT I WROTE ON

4    OCTOBER 31ST, AND THIS IS A LETTER FROM MR. LIEDERMAN,

5    MS. HOLMES'S ATTORNEY, THE FOLLOWING DAY, NOVEMBER 1ST OF 2005.

6         AND HE'S IN EFFECT ACKNOWLEDGING THAT I WROTE THAT LETTER.

7              MR. FONDO:  YOUR HONOR, AT THIS TIME WE MOVE INTO

8    EVIDENCE EXHIBIT 188.

9              MS. GARRIDO:  SUBMIT IT.

10             THE COURT:  IT'S RECEIVED.

11        (GOVERNMENT'S EXHIBIT 188 WAS RECEIVED IN EVIDENCE.)

12   BY MR. FONDO:

13   Q.   ALL RIGHT.  WHAT IS THE DATE OF THIS LETTER?

14   A.   NOVEMBER 1, 2005.

15   Q.   THIS IS A LITTLE OVER A WEEK OF YOUR LETTER WHERE YOU

16   ASKED FOR DOCUMENTATION; IS THAT CORRECT?

17   A.   NO.  IT'S ONE DAY.  IT'S THE NEXT DAY.

18   Q.   YOU'RE RIGHT.  I APOLOGIZE.  ALL RIGHT.  IF YOU COULD READ

19   THE FIRST SENTENCE -- THAT FIRST HALF OF THE SENTENCE THERE,

20   PLEASE?

21   A.   "I WILL ENCOURAGE MS. HOLMES TO OBTAIN THE DOCUMENTATION

22   INDICATED."

23   Q.   LET ME STOP YOU THERE.  WHAT WAS YOUR UNDERSTANDING OF

24   WHAT HE WAS TELLING YOU?

25   A.    THAT HE UNDERSTOOD I REQUESTED MORE DOCUMENTS AND HE WOULD

1      ASK MS. HOLMES TO PROVIDE THEM.

2      Q.   AND SPECIFICALLY HE ASKED FOR CANCELLED CHECKS SHOWING

3      THAT IF MS. HOLMES HAD MADE THOSE PAYMENTS, YOU ASKED FOR

4      CANCELLED CHECKS TO SHOW THAT YOU MADE THE MORTGAGE PAYMENTS?

5      A.   THAT'S CORRECT.

6      Q.   AND YOU ASKED FOR BACKUP OR CHECKS RELATING TO THE DOWN

7      PAYMENT OF MOONRACKER; CORRECT?

8      A.   THAT'S CORRECT.

9      Q.   AS OF THIS DATE OF THIS LETTER, HAD YOU RECEIVED ANY OF

10     THAT BACKUP?

11     A.   NO.

12     Q.   THE END OF THAT FIRST PARAGRAPH, IF YOU COULD READ THAT

13     LAST SENTENCE?

14     A.   BEGINNING "HOWEVER"?

15     Q.   CORRECT?

16     A.   "HOWEVER, I'M CONCERNED THAT WE'RE LOSING THE OPPORTUNITY

17     TO SETTLE THIS MATTER."

18     Q.   I WANT TO REFER YOU TO EXHIBIT 189, PLEASE.  COULD YOU

19     GENERALLY DESCRIBE TO THE JURY WHAT THIS IS?

20     A.   THIS IS A LETTER DATED NOVEMBER 30, 2005, THAT I WROTE TO

21     MR. LIEDERMAN.

22          MR. FONDO:  YOUR HONOR, AT THIS TIME WE MOVE INTO

23     EVIDENCE EXHIBIT 189.

24          MS. GARRIDO:  SUBMIT IT.

25          THE COURT:  IT'S RECEIVED.

```
 1              (GOVERNMENT'S EXHIBIT 189 WAS RECEIVED IN EVIDENCE.)

 2      BY MR. FONDO:

 3      Q.   ALL RIGHT.  SO YOU SENT THIS LETTER ON NOVEMBER 30TH,

 4      2005?

 5      A.   YES.

 6      Q.   AND WHY DID YOU SEND THIS LETTER?

 7      A.   I HAD NOT HEARD ANYTHING FROM MR. LIEDERMAN AND SINCE HIS

 8      NOVEMBER 1ST LETTER TO ME AND JUST ABOUT A MONTH HAD PAST AND I

 9      WAS WRITING A FOLLOW UP TO SEE WHAT WAS GOING ON.

10      Q.   OKAY.  AND DURING THAT PERIOD FROM HIS LETTER OF

11      NOVEMBER 1ST TO THIS LETTER OF NOVEMBER 30TH, 2005, DID YOU

12      RECEIVE ANY PHONE CALLS FROM MR. LIEDERMAN?

13      A.   NO.

14      Q.   AND NO CORRESPONDENCE?

15      A.   NO CORRESPONDENCE.

16      Q.   AND ANY CONTACT AT ALL?

17      A.   NO.

18      Q.   ALL RIGHT.  LET'S GO THROUGH YOUR LETTER FOR A MOMENT.

19           THE SECOND -- IF YOU COULD READ THE SECOND SENTENCE IN

20      THAT LETTER, PLEASE?

21      A.   "AS I ASKED IN THAT LETTER, I WOULD APPRECIATE COPIED

22      CHECKS SHOWING THE PAYMENTS MS. HOLMES HAS MADE, INCLUDING THE

23      DOWN PAYMENT."

24      Q.   SO, AGAIN, YOU'RE ASKING FOR THESE CHECKS PURPORTEDLY

25      SHOWING MS. HOLMES MAKING THESE PAYMENTS?
```

1    A.   CORRECT.

2    Q.   I WANT TO REFER YOU TO -- WELL, LET ME -- AS OF THIS DATE

3    NOVEMBER 30TH, 2005, WHAT, IF ANY, HAD MR. LIEDERMAN OR THE

4    DEFENDANT TOLD YOU ABOUT THE REFINANCING OF 312 MOONRACKER

5    DRIVE?

6    A.   NOTHING.

7    Q.   SO YOU HAD NO IDEA?

8    A.   NO IDEA.

9    Q.   YOU DIDN'T GRANT PERMISSION FOR THAT, DID YOU?

10   A.   NO.

11   Q.   AND WERE YOU AWARE IF THE BANKRUPTCY COURT HAD GRANTED

12   PERMISSION FOR THAT?

13   A.   NO.

14   Q.   "NO" MEANING THAT THE COURT DID NOT GRANT PERMISSION?

15   A.   NO, THAT THE COURT DIDN'T AUTHORIZE ANYTHING OR WAS I

16   AWARE OF ANYTHING THAT THE COURT HAD DONE.

17   Q.   LET'S GO TO EXHIBIT 190, PLEASE.  DO YOU RECOGNIZE THIS

18   DOCUMENT?

19   A.   I DO.

20   Q.   AND WHAT IS IT?

21   A.   IT'S A LETTER THAT I WROTE TO MR. LIEDERMAN ON

22   DECEMBER 28, 2005.

23   Q.   AND JUST VERY GENERALLY WHAT DOES THE LETTER RELATE TO?

24   A.   THE LETTER RELATES TO INSURANCE COVERAGE AT 312 MOONRACKER

25   DRIVE, AND I SEE THERE'S A TYPO IN THE ADDRESS AND THERE WAS --

1    THE TRUSTEE HAD RECEIVED NOTICE THAT THE INSURANCE HAD BEEN

2    CANCELLED AND THE TRUSTEE WAS CONCERNED THAT THERE WAS NO

3    INSURANCE COVERAGE.

4              MR. FONDO:  YOUR HONOR, AT THIS TIME WE MOVE INTO

5    EVIDENCE EXHIBIT 190.

6              MS. GARRIDO:  SUBMIT IT.

7              THE COURT:  IT'S RECEIVED.

8         (GOVERNMENT'S EXHIBIT 190 WAS RECEIVED IN EVIDENCE.)

9    BY MR. FONDO:

10   Q.   SO THIS LETTER IS DATED DECEMBER 28TH, 2005.  BETWEEN YOUR

11   PRIOR LETTER OF NOVEMBER 30TH, 2005, AND DECEMBER 28TH, 2005,

12   HAD YOU RECEIVED ANY COMMUNICATIONS FROM MR. LIEDERMAN?

13   A.   NO.

14   Q.   DID YOU RECEIVE ANY OF THE BACKUP DOCUMENTATION

15   PURPORTEDLY SUPPORTING MRS. HOLMES'S CLAIMS RELATING TO THE

16   DOWN PAYMENT OR THE MORTGAGE PAYMENTS ON 312 MOONRACKER DRIVE?

17   A.   NO.

18   Q.   HAD HE CONTACTED YOU IN ANY WAY?

19   A.   NO.

20   Q.   WERE YOU AWARE OF WHETHER MR. -- DID MS. HOLMES, TO YOUR

21   KNOWLEDGE, CONTACT YOU IN ANY WAY?

22   A.   NO.

23   Q.   ALL RIGHT.  AND AS OF THIS DATE HAD ANYBODY INFORMED YOU

24   THAT THE PROPERTY AT 312 MOONRACKER DRIVE HAD BEEN REFINANCED

25   BY MS. HOLMES?

MAHER DIRECT

1    A.    NO.

2    Q.    WERE YOU AWARE OF ANY FILINGS IN THE BANKRUPTCY COURT

3    SEEKING PERMISSION TO REFINANCE THE PROPERTY OR TRANSFER THE

4    PROPERTY?

5    A.    NO.

6    Q.    AND WHAT NOTICE, IF ANY, HAD YOU RECEIVED FROM

7    MR. LIEDERMAN THAT MS. HOLMES HAD THE PROPERTY TRANSFERRED TO

8    HER FROM MR. PAIGE?

9    A.    I HAD NO NOTICE.

10    Q.    ALL RIGHT.  LET'S WALK THROUGH THIS LETTER IF WE CAN.  SO

11    WHY WERE YOU CONCERNED ABOUT THE NOTICE OF CANCELLATION OF

12    INSURANCE?

13    A.    I WAS AFRAID THAT WE HAD AN UNINSURED PROPERTY AND IF

14    THERE WAS SOME KIND OF A FIRE, THAT THERE WOULDN'T BE INSURANCE

15    TO COVER THE DAMAGE OR IF THERE WAS SOME OTHER KIND OF CALAMITY

16    THAT WOULD DAMAGE THE PROPERTY OR IF SOMEONE HAD HURT

17    THEMSELVES, LIABILITY TYPE OF PROBLEM.

18    Q.    AND WHY WAS THAT A CONCERN TO YOU AS COUNSEL FOR THE

19    TRUSTEE, THE PRIVATE TRUSTEE?  EXCUSE ME.

20    A.    BECAUSE THE ONE BANKRUPTCY ESTATE OWNS HALF OF THAT

21    PROPERTY, AND IT WOULD CERTAINLY LOSE VALUE IF IT WAS NOT ABLE

22    TO OBTAIN THE INSURANCE PROCEEDS TO CORRECT DAMAGE BECAUSE A

23    BURNED HOUSE IS WORTH LESS THAN A HOUSE THAT ISN'T BURNED.

24    Q.    I'D LIKE TO REFER YOU TO EXHIBIT 190.

25         THE COURT:  190?

1          MR. FONDO:  I'M SORRY, 192.

2     Q.   DO YOU RECOGNIZE THIS DOCUMENT?

3     A.   I DO.

4     Q.   AND WHAT IS IT?

5     A.   IT'S A LETTER THAT I WROTE TO MR. LIEDERMAN ON

6     JANUARY 13TH, 2006.

7          MR. FONDO:  YOUR HONOR, AT THIS TIME WE MOVE INTO

8     EVIDENCE EXHIBIT 192.

9          MS. GARRIDO:  SUBMIT IT.

10         THE COURT:  IT'S RECEIVED.

11    (GOVERNMENT'S EXHIBIT 192 WAS RECEIVED IN EVIDENCE.)

12    BY MR. FONDO:

13    Q.   ALL RIGHT.  IF YOU COULD READ THE FIRST SENTENCE OF THAT

14    LETTER, PLEASE?

15    A.   MRS. HOLMES HAS NOT RESPONDED TO MY LETTER OF DECEMBER 28,

16    2005, REGARDING THE LAPSE OF THE INSURANCE COVERAGE FOR 312

17    MOONRACKER DRIVE.

18    Q.   AND THAT'S THE LETTER WE WERE JUST REFERRING TO; IS THAT

19    CORRECT?

20    A.   THAT'S CORRECT.

21    Q.   AND HAD YOU RECEIVED ANY COMMUNICATION FROM MR. LIEDERMAN

22    RESPONDING TO YOUR LETTER OF DECEMBER 28TH?

23    A.   NO.

24    Q.   AT THIS POINT HAD YOU RECEIVED ANY COMMUNICATIONS AT ALL

25    RESPONDING TO YOUR LETTER OF NOVEMBER 30TH, RELATING TO REQUEST

MAHER DIRECT

```
1    FOR CANCELLED CHECKS OR PROOF FOR OTHER PAYMENT?

2    A.   NO.

3    Q.   WHAT, IF ANYTHING, HAD MR. LIEDERMAN TOLD YOU AS OF

4    JANUARY 13TH, 2006, ABOUT MS. HOLMES HAVING THE PROPERTY

5    TRANSFERRED TO HER FROM LEONARD PAIGE?

6    A.   NOTHING.

7    Q.   AND WHAT, IF ANYTHING, HAD MR. LIEDERMAN COMMUNICATED TO

8    YOU ABOUT MS. HOLMES SPENDING THE PROCEEDS OF THE REFINANCING?

9    A.   NOTHING.  I DIDN'T KNOW THERE WAS A REFINANCING.

10   Q.   AND WHAT, IF ANYTHING, DID YOU SEE IN THE BANKRUPTCY COURT

11   FILINGS INDICATING MS. HOLMES SEEKING PERMISSION TO DO -- TO

12   REFINANCE THE PROPERTY AND HAVE THE PROPERTY TRANSFERRED TO

13   HER?

14   A.   NOTHING.

15   Q.   AND YOU WOULD GET NOTICE, AM I CORRECT, ELECTRONICALLY IF

16   ANY FILINGS WERE MADE IN THE BANKRUPTCY MATTER?

17   A.   YES.

18   Q.   AND IS IT YOUR PRACTICE TO READ ALL OF THE FILINGS THAT

19   COME THROUGH TO YOUR OFFICE?

20   A.   YES.

21   Q.   I WANT TO REFER YOU TO EXHIBIT 229, PLEASE.  I THINK IT

22   WILL BE YOUR LAST BINDER.

23        DO YOU RECOGNIZE THIS DOCUMENT?

24   A.   I DO.

25   Q.   AND WHAT IS IT?
```

1    A.   IT'S WHAT IS CALLED A CASE MANAGEMENT CONFERENCE

2    STATEMENT.  THE COURT HAS PERIODIC CASE MANAGEMENT CONFERENCES,

3    AND THE PLAINTIFF AND DEFENDANT ARE REQUIRED TO FILE A

4    STATEMENT WHERE THE CASE STANDING FROM THE DEFENDANTS OR THE

5    PLAINTIFFS'S PERSPECTIVE AND THAT'S WHAT THIS DOCUMENT IS.

6              MR. FONDO:  YOUR HONOR, AT THIS TIME WE MOVE INTO

7    EVIDENCE EXHIBIT 229.

8              MS. GARRIDO:  SUBMIT IT.

9              THE COURT:  IT'S RECEIVED.

10          (GOVERNMENT'S EXHIBIT 229 WAS RECEIVED IN EVIDENCE.)

11   BY MR. FONDO:

12   Q.   SO AM I CORRECT, MR. MAHER, THIS IS ESSENTIALLY AN UPDATE

13   OF THE STATUS OF THE TRUSTEE VERSUS MYRA HOLMES?

14   A.   YES, IT IS.

15   Q.   AND THIS WAS FILED BY MS. HOLMES'S ATTORNEY; CORRECT?

16   A.   YES.

17   Q.   I WANT TO REFER YOU TO THAT FIRST SENTENCE WHICH SAYS

18   "DEFENDANT, MYRA HOLMES, BY HER UNDERSIGNED ATTORNEY

19   RESPECTFULLY REPRESENTS."  SO THIS IS A FILING ON BEHALF OF

20   MS. HOLMES?

21   A.   YES, IT IS.

22   Q.   AND I WANT TO REFER YOU TO PARAGRAPH 5 OF THE CASE

23   MANAGEMENT STATEMENT THAT WAS FILED WITH THE COURT.  WHAT WAS

24   THE DATE THAT IT WAS FILED WITH THE COURT?

25   A.   JANUARY 18TH, 2006.

1    Q.   OKAY.  AND IF YOU COULD READ PARAGRAPH 5, PLEASE?

2    A.   "THE DEFENDANT MADE TO THE TRUSTEE A CASH OFFER TO SETTLE

3    THIS MATTER.  THE TRUSTEE HAS NEITHER REJECTED THIS OFFER NOR

4    MADE A COUNTEROFFER SINCE THEN AND HAS REPEATEDLY ASKED FOR

5    MORE INFORMATION ON AN INFORMAL BASIS."

6    Q.   WAS IT CORRECT THAT YOU HAD NOT ACCEPTED THE OFFER AT THIS

7    POINT?

8    A.   YES, IT IS.

9    Q.   AS OF THE FILING OF JANUARY 18TH, 2006, HAD YOU RECEIVED

10   ANY OF THE ADDITIONAL DOCUMENTATION THAT YOU HAD REQUESTED?

11   A.   NO.

12   Q.   AND AS OF THE FILING OF JANUARY 18TH, 2006, THE FILING OF

13   THIS DOCUMENT, HAD YOU RECEIVED ANY RESPONSE FROM MR. LIEDERMAN

14   RELATING TO THE SETTLEMENT OFFER?

15   A.   NO.

16   Q.   IS THERE ANYWHERE IN THIS -- PLEASE TAKE A LOOK AT THIS

17   DOCUMENT FILED BY MR. LIEDERMAN, MRS. HOLMES'S COUNSEL, ON

18   JANUARY 18TH, 2006.  IS THERE ANY STATEMENT IN THERE UPDATING

19   THE COURT THAT MYRA HOLMES HAD THE PROPERTY TRANSFERRED FROM

20   HER FATHER, LEONARD PAIGE?

21   A.   NO.

22   Q.   AND WOULD A TRANSFER FROM LEONARD PAIGE TO MYRA HOLMES

23   BEEN PROPER GIVEN THAT LEONARD PAIGE'S INTEREST IN THE PROPERTY

24   WAS ACTUALLY THE ESTATE'S PROPERTY NOW?

25   A.   NO.

1        MS. GARRIDO:  OBJECTION.  IT CALLS FOR A LEGAL

2   CONCLUSION.

3        THE COURT:  IF YOU COULD LAY A FOUNDATION.

4        MR. FONDO:  CERTAINLY.

5   Q.   WHO WERE THE TWO OWNERS OF THAT PROPERTY AT THIS TIME AS

6   OF THE FILING OF THE BANKRUPTCY BY LEONARD PAIGE IN 2002, WHO

7   WERE THE OWNERS OF THAT PROPERTY?

8   A.   MS. HOLMES AND THE BANKRUPTCY ESTATE OF MR. AND

9   MRS. PAIGE.

10   Q.   ALL RIGHT.  BASED ON YOUR UNDERSTANDING AS COUNSEL, WAS

11   PERMISSION EVER GRANTED FROM THE BANKRUPTCY COURT TO PERMIT THE

12   TRANSFER OF THE PROPERTY FROM LEONARD PAIGE TO MYRA HOLMES?

13   A.   NO.

14   Q.   AND WHAT WAS YOUR UNDERSTANDING AS TO WHY PERMISSION WOULD

15   BE NEEDED TO DO THAT IF IT WAS PERMISSIBLE AT ALL?

16   A.   BECAUSE A SALE REQUIRES COURT APPROVAL ON NOTICE TO

17   CREDITORS.

18   Q.   OKAY.  WAS IT -- WHAT WAS YOUR UNDERSTANDING AS TO WHETHER

19   IT WAS MR. PAIGE'S TO TRANSFER AT ALL?

20   A.   AT THE TIME OF THE TRANSFER HE HAD NO AUTHORITY WHATSOEVER

21   BECAUSE THE CASE HAD BEEN CONVERTED TO A CHAPTER 7 CASE, AND

22   THE TRUSTEE ASSUMED CONTROL OF ALL ASSETS OF THE BANKRUPTCY

23   ESTATE.

24        AND THIS ONE HALF INTEREST WAS ONE OF THOSE ASSETS.

25   Q.   OKAY.  AND WHO WAS THE ULTIMATE BENEFICIARY OF THE ASSETS

```
 1    OF THE ESTATE?

 2    A.   THE CREDITORS.

 3    Q.   AND THE CREDITORS ARE PEOPLE WHO ARE OWED MONEY BY

 4    MR. PAIGE; IS THAT CORRECT?

 5    A.   THAT'S CORRECT.

 6    Q.   AND GOING BACK TO EXHIBIT 229.

 7              THE COURT:  SO EXCUSE ME.  RULING ON THE OBJECTION

 8    THEN, THIS PORTION OF THE ANSWER WILL REMAIN.  I THINK THERE

 9    WAS AN ANSWER THAT WAS GIVEN PREVIOUSLY BY THIS WITNESS AND A

10    ONE WORD ANSWER, AND I THINK IT WAS A "NO."  THAT WILL BE

11    STRICKEN, BUT THIS ANSWER WILL REMAIN.

12    BY MR. FONDO:

13    Q.   LOOKING AT DEFENDANT'S CASE MANAGEMENT CONFERENCE OF --

14    STATEMENT OF JANUARY 18TH, 2006.  WAS THERE ANY STATEMENTS IN

15    HERE BY MR. LIEDERMAN THAT MYRA -- THAT LEONARD PAIGE HAD

16    TRANSFERRED THE PROPERTY TO MYRA HOLMES?

17    A.   NO.

18    Q.   AND WAS THERE ANY DISCLOSURE TO THE BANKRUPTCY COURT IN

19    THIS LETTER THAT MYRA HOLMES HAD REFINANCED THE PROPERTY?

20    A.   NO.

21    Q.   AND WAS THERE ANY DISCLOSURE IN THIS LETTER -- EXCUSE

22    ME -- IN THIS CASE MANAGEMENT STATEMENT TO THE COURT THAT

23    MYRA HOLMES HAD STARTED SPENDING THAT MONEY?

24    A.   NO.

25    Q.   THIS ALSO IS -- STRIKE THAT.
```

```
 1            I WANT TO REFER YOU TO EXHIBIT 193, PLEASE.

 2                 MS. GARRIDO:  I'M SORRY, COUNSEL.  WHAT EXHIBIT

 3       NUMBER?

 4                 MR. FAZIOLI:  193.

 5                 MR. FONDO:  193.

 6                 THE WITNESS:  I'M THERE FINALLY.

 7       BY MR. FONDO:

 8       Q.   OKAY.  DO YOU RECOGNIZE THAT DOCUMENT?

 9       A.   I DO.

10       Q.   AND I'M JUST GOING TO DIRECT YOU TO THE FIRST TWO PAGES OF

11       EXHIBIT 193.  WHAT ARE THE FIRST TWO PAGES OF EXHIBIT 193?

12       A.   THIS IS A MOTION FOR AN ORDER GRANTING SUMMARY JUDGMENT ON

13       ONE OF THE CLAIMS IN THE COMPLAINT THAT I FILED ON BEHALF OF

14       THE TRUSTEE.

15       Q.   AND THAT'S THE TRUSTEE VERSUS MYRA HOLMES?

16       A.   YES.  IT IS THE COMPLAINT FOR AUTHORITY TO SELL FREE AND

17       CLEAR OF HER INTEREST.

18       Q.   OKAY.  AND WHY DID YOU FILE THIS SUMMARY JUDGMENT MOTION?

19       A.   IT HAD BEEN SINCE I HAD ASKED FOR DOCUMENTATION AND I HAD

20       RECEIVED NOTHING IN RETURN AND VERY LITTLE RESPONSE EVEN TO MY

21       LETTERS OF CONCERN ABOUT THE INSURANCE.

22       Q.   SO WHY THEN DID YOU FEEL IT WAS NECESSARY TO PROCEED WITH

23       THIS MOTION?

24       A.   THE TRUSTEE REALLY HAD MADE NO PROGRESS IN SETTLING THE

25       MATTER.  HE HAD NOT RECEIVED THE DOCUMENTS I REQUESTED ON HIS
```

MAHER DIRECT

1    BEHALF AND WE HAD TO MOVE THE CASE ALONG AND SO WE FILED THE

2    MOTION FOR SUMMARY JUDGMENT TO DO THAT.

3    Q.   MR. MAHER, WAS THIS A DOCUMENT THAT YOU HAD STARTED TO

4    DRAFT PRIOR TO MS. HOLMES'S $75,000 SETTLEMENT OFFER?

5    A.   YES.

6    Q.   AND WHY DID YOU CONTINUE TO DRAFT IT AND FILE IT AT THAT

7    TIME?

8            MS. GARRIDO:  OBJECTION, ASKED AND ANSWERED.

9            THE COURT:  OVERRULED.

10           THE WITNESS:  WE -- I HAD STARTED -- I NEEDED TO DO

11   MORE WORK ON IT AND THEN WE HAD THE SETTLEMENT OFFER, AND I WAS

12   OPTIMISTIC THAT WE WOULD BE ABLE TO SETTLE THE CASE AND I

13   DIDN'T WANT TO SPEND EXTRA MONEY DOING A MOTION FOR SUMMARY

14   JUDGMENT IF IT MIGHT BE MOOTED OUT.

15   BY MR. FONDO:

16   Q.   AND WHAT WAS THE DATE THAT YOU FILED THIS MOTION FOR

17   SUMMARY JUDGMENT?

18   A.   JANUARY 20TH, 2006.

19   Q.   I'D LIKE TO REFER YOU TO EXHIBIT 195, PLEASE.

20       YOUR HONOR, I APOLOGIZE.  IF I COULD MOVE INTO EVIDENCE,

21   PLEASE, EXHIBIT 193-1 AND 193-2.

22           MS. GARRIDO:  YOUR HONOR, I OBJECT ON GROUNDS OF

23   HEARSAY AND RELEVANCE AND IF WE MAY APPROACH, I HAVE AN

24   ADDITIONAL OBJECTION.

25           THE COURT:  OKAY.  LET ME SEE COUNSEL.

```
1              (SIDE-BAR CONFERENCE ON THE RECORD.)

2              MS. GARRIDO:  YES, I BELIEVE THAT THIS IS GOING TO

3      AN ULTIMATE ISSUE.  I NOTED THAT THE GOVERNMENT IN THEIR

4      EXHIBIT LIST DOES HAVE ALSO THE ORDER GRANTING SUMMARY

5      JUDGMENT, WHICH I BELIEVE IS INAPPROPRIATE FOR THIS JURY TO

6      CONSIDER OR EVEN TO SPECULATE ON THE BASIS OF THIS MOTION WAS

7      FILED AS TO WHETHER A JUDGE ULTIMATELY GRANTED THAT.

8          I THINK IT'S JUST INAPPROPRIATE, AND I DON'T SEE THE

9      RELEVANCE OF THEIR MOTION FOR SUMMARY JUDGMENT.

10             MR. FONDO:  SO, YOUR HONOR, WE HAVE NO INTENTION OF

11     SUBMITTING THE ACTUAL GRANTING OF THE ORDER.  WE'RE ASKING IF

12     IT ULTIMATELY WAS GRANTED AND THE PURPOSE WAS TO SHOW THE

13     TRUSTEE WAS ACTING IN RESPONSE TO A LACK OF RESPONSE.

14             THE COURT:  SO THAT'S IN EVIDENCE ALREADY.  THERE IS

15     TESTIMONY.  WHY DO YOU NEED THE ACTUAL DOCUMENT IN?

16             MR. FONDO:  JUST TO SHOW THE DATE, YOUR HONOR, AND

17     TO SHOW THAT IT WAS FILED.

18             THE COURT:  WELL, I THINK THAT'S IN EVIDENCE ALREADY

19     THAT HE DID PREPARE THIS, AND HE SPOKE ABOUT THE REASONS HE

20     NEEDED TO DO IT ACTUALLY AND THE DELAY THAT CAUSED THEN THE

21     NEED TO FILE IT.

22         I THINK THE JURY NEEDS TO ACTUALLY SEE THE MOTION ITSELF,

23     AND I RESPECT THE FACT THAT YOU HAVE ONLY ASKED FOR THE FIRST

24     TWO PAGES, NOT THE POINTS AND AUTHORITIES AND SUPPORT THEREOF.

25             SO THE JURY KNOWS THAT HE FILED AND YOU CAN CERTAINLY ASK
```

```
 1      HIM QUESTIONS ABOUT -- CONTINUE TO ASK HIM QUESTIONS ABOUT HIS

 2      REASONS AND WHAT THE MOTION IS.

 3          BUT I THINK THE ACTUAL DOCUMENT ITSELF, I DON'T THINK THE

 4      JURY NEEDS THAT TO UNDERSTAND THE PROCESS HERE.  SO I'M NOT

 5      GOING TO ALLOW THEM TO HAVE THAT.

 6          NOW, THAT GETS TO ALSO ANY SUBSEQUENT DOCUMENT.  YOU'RE

 7      NOT GOING TO ATTEMPT TO GET THE ORDER IN OR EVIDENCE THAT THE

 8      COURT GRANTED HIS SUMMARY JUDGMENT.

 9              MR. FONDO:  CORRECT, YOUR HONOR.

10              THE COURT:  OKAY.  IS THERE GOING TO BE ANY OTHER

11      TALK ABOUT THE SUMMARY JUDGMENT MOTION?

12              MR. FONDO:  THERE WILL BE IN THE CONTEXT THAT

13      DEFENSE COUNSEL FILED A REQUEST FOR EXTENSION OF TIME AND

14      THERE'S INFORMATION IN THERE THAT WE THINK IS RELEVANT TO

15      THIS -- TO THE FACTS OF --

16              THE COURT:  OKAY.  I SEE.  WELL, GO AHEAD.

17              MR. FAZIOLI:  PART OF THE RELEVANCE IS AS TO THE

18      DATE OF THE SUMMARY JUDGMENT MOTION AND THERE'S A COMMUNICATION

19      THAT TAKES PLACE BETWEEN MR. MAHER AND MR. LIEDERMAN SEVERAL

20      DAYS AFTERWARDS, AND WE'RE ABOUT TO GET INTO THAT IS AN

21      INFERENCE THAT COULD BE DRAWN.

22              THE COURT:  SURE.

23              MR. FAZIOLI:  THAT CONVERSATION IS INSTIGATED BY THE

24      FILING OF THE MOTION A COUPLE OF DAYS LATER.  SO THE DATE WE

25      WANT --
```

MAHER DIRECT

```
1              THE COURT:  WE HAVE THE DATE THAT IT WAS FILED.

2              MR. FONDO:  THAT'S CORRECT.

3              THE COURT:  AND SO YOU'LL BE PERMITTED TO FOLLOW

4    CHRONOLOGICALLY THE HISTORY OF THAT MOTION.  I DON'T THINK THEY

5    ACTUALLY NEED TO SEE THE ACTUAL DOCUMENT ITSELF.

6         OKAY.  ANYTHING FURTHER?

7              MS. GARRIDO:  NO, YOUR HONOR.

8              THE COURT:  I DID WANT TO ASK, YOU FILED YOUR MOTION

9    TO RECONSIDER.  DID YOU WANT A RULING BEFORE YOU BEGIN YOUR

10   EXAMINATION OF THIS WITNESS?

11             MS. GARRIDO:  NOT NECESSARILY.

12             THE COURT:  ANYTHING ELSE?

13             MR. FAZIOLI:  IS THE MOTION FOR REEXAMINATION ABOUT

14   THE PAGE?

15             THE COURT:  YES.

16             MR. FAZIOLI:  WE'RE WORKING ON A WRITTEN RESPONSE

17   FOR THAT.  WE CAN RESPOND ORALLY IF THAT'S NECESSARY TO DO

18   TODAY BUT ALTERNATIVELY WE'RE WORKING ON SOMETHING TO BE FILED

19   TODAY OR TOMORROW MORNING.

20             THE COURT:  THAT'S WHY I ASKED NOW I DIDN'T KNOW IF

21   THE DEFENSE WANTED A RULING ON THAT BEFORE THE EXAMINATION OF

22   THIS WITNESS OR ANY OTHERS BUT IT SOUNDS LIKE NOT.

23             MS. GARRIDO:  NO.

24             THE COURT:  GOOD.  GREAT.  OKAY.  THANK YOU.

25          (END OF DISCUSSION AT SIDEBAR.)
```

1          THE COURT:  THANK YOU, COUNSEL.  SO, LET'S SEE, YOU

2    ASKED -- 193 WILL NOT BE RECEIVED AT THIS POINT.

3    BY MR. FONDO:

4    Q.   MR. MAHER, SO THIS -- YOUR MOTION FOR SUMMARY JUDGMENT WAS

5    FILED ON JANUARY 20TH, 2006; CORRECT?

6    A.   YES.

7    Q.   I WANT TO REFER YOU TO EXHIBIT 195, PLEASE.  IF YOU COULD

8    TAKE A MOMENT TO LOOK AT THAT EXHIBIT.

9    A.   OKAY.

10   Q.   LET ME KNOW WHEN YOU'VE HAD A CHANCE TO REVIEW IT.

11   A.   I HAVE REVIEWED IT.

12   Q.   DO YOU RECOGNIZE THAT DOCUMENT?

13   A.   I DO.

14   Q.   AND WHAT IS IT?

15   A.   IT'S A LETTER THAT I WROTE TO MR. LIEDERMAN ON JANUARY 23,

16   2006, IN RESPONSE TO A FAX THAT HAD COME IN, THAT MAY HAVE COME

17   IN, IN THE EVENING OF JANUARY 22ND, BUT I SAW IT WHEN I GOT

18   INTO THE OFFICE ON JANUARY 23RD.

19          MR. FONDO:  YOUR HONOR, AT THIS TIME WE MOVE INTO

20   EVIDENCE EXHIBIT 195.

21          MS. GARRIDO:  SUBMIT IT.

22          THE COURT:  IT'S RECEIVED.

23     (GOVERNMENT'S EXHIBIT 195 WAS RECEIVED IN EVIDENCE.)

24   BY MR. FONDO:

25   Q.   YOU MENTIONED THAT YOU RECEIVED A FAX ON JANUARY -- OR THE

1    FAX WAS DATED JANUARY 21ST, AND YOU ACTUALLY SAW IT ON THE

2    23RD.

3         DO YOU REMEMBER JUST THE GENERAL GIST OF WHAT THAT FAX

4    WAS?

5    A.   MY RECOLLECTION WAS THAT IT WAS JUST A HANDWRITTEN FAX

6    WITH THE NAME OF ALLSTATE INSURANCE GROUP OR COMPANY AND A

7    POLICY NUMBER.

8    Q.   SO RELATED TO THIS INSURANCE ISSUE THAT YOU HAD BEEN

9    REQUESTING FROM MR. LIEDERMAN?

10   A.   THAT'S CORRECT.

11   Q.   AS OF THE DATE OF THIS JANUARY 23RD -- LET ME ACTUALLY GO

12   TO THIS SECOND PARAGRAPH -- THIRD PARAGRAPH.  EXCUSE ME.

13        COULD YOU READ THE FIRST THREE SENTENCES?

14   A.   "GIVEN YOUR CLIENT'S LACK OF COOPERATION WITH THE TRUSTEE,

15   A REQUEST FOR A CONTINUANCE IS AN UNFAIR REQUEST.  YOU AND YOUR

16   CLIENT HAVE BEEN UNRESPONSIVE TO THE TRUSTEE'S INQUIRIES OVER

17   THE PAST THREE MONTHS.  YOU HAVE NOT EVEN REPLIED TO MY LETTERS

18   REGARDING A VERY SERIOUS ISSUE OF EXPIRATION OF INSURANCE

19   COVERAGE AND THE TRUSTEE'S NEED FOR A NO LOSS STATEMENT IN

20   ORDER TO PUT INSURANCE IN PLACE."

21   Q.   ALL RIGHT.  LET ME GO TO THE SENTENCE THAT SAYS, "YOU AND

22   YOUR CLIENT HAVE BEEN UNRESPONSIVE TO THE TRUSTEE'S INQUIRIES

23   OVER THE PAST THREE MONTHS."  WHAT DOES THAT REFER TO?

24   A.   THAT REFERS TO MY LETTER OF OCTOBER 31ST IN WHICH I HAVE

25   ASKED FOR DOCUMENTATION OF THE PAYMENTS THAT MS. HOLMES HAD

1      REPRESENTED THAT SHE MADE REGARDING THIS PROPERTY.

2      Q.   AND THAT'S EXHIBIT 187; IS THAT CORRECT?

3      A.   YES, IT IS.

4      Q.   SO AS OF OCTOBER 31ST, 2005, YOU HAD NOT RECEIVED ANY

5      FURTHER DOCUMENTATION; IS THAT CORRECT?

6      A.   WELL, THAT'S WHY I MADE THE REQUEST.

7      Q.   YES.  AND SO SINCE THAT DATE?

8      A.   THAT'S CORRECT, SINCE THAT DATE I HAD NOT RECEIVED

9      ANYTHING.

10     Q.   AS OF THE SENDING OF THIS LETTER, HAD YOU BEEN -- WHAT, IF

11     ANYTHING, HAD MR. LIEDERMAN TOLD YOU ABOUT THE TRANSFER OF THE

12     PROPERTY AT 312 MOONRACKER DRIVE TO MYRA HOLMES?

13     A.   NOTHING.

14     Q.   AS OF THE DATE THAT YOU SENT THIS LETTER, AS OF THE TIME

15     YOU SENT THIS LETTER, WHAT, IF ANYTHING, HAD YOU BEEN TOLD

16     ABOUT MYRA HOLMES REFINANCING THE PROPERTY?

17     A.   NOTHING.

18     Q.   WHAT, IF ANYTHING, HAD YOU BEEN TOLD BY MR. LIEDERMAN OR

19     ANYONE ABOUT MYRA HOLMES SPENDING THE MONEY FROM THE

20     REFINANCING?

21     A.   NOTHING.

22     Q.   AS OF JANUARY 23RD, 2006, WERE THERE ANY FILINGS BY

23     MR. LIEDERMAN OR ANYONE ELSE ON MYRA HOLMES'S BEHALF RELATING

24     TO THE TRANSFER OF THE PROPERTY?

25     A.   NO.

1    Q.   WERE THERE ANY FILINGS BY MR. PAIGE RELATING TO THE

2    TRANSFER OF 312 MOONRACKER DRIVE?

3    A.   NO.

4    Q.   I WANT TO REFER YOU TO EXHIBIT 195, PLEASE.  I'M SORRY.

5    194.  WHAT IS THIS EXHIBIT?  DO YOU RECOGNIZE THIS EXHIBIT?

6    A.   I DO.

7    Q.   AND JUST VERY GENERALLY, WHAT IS IT?

8    A.   IT'S A FAX COVER SHEET WHICH ENCLOSED A LETTER FROM

9    MR. LIEDERMAN LATER ON ABOUT JANUARY 23, AND EXHIBITS TO THAT

10   LETTER.

11   Q.   AND THIS WAS A FAX COVER SHEET THAT YOU SENT TO JOHN

12   RICHARDSON, THE PRIVATE TRUSTEE?

13   A.   YES.

14          MR. FONDO:  YOUR HONOR, AT THIS TIME WE MOVE INTO

15   EVIDENCE EXHIBIT 194.

16          MS. GARRIDO:  SUBMIT IT.

17          THE COURT:  IT'S RECEIVED.

18      (GOVERNMENT'S EXHIBIT 194 WAS RECEIVED IN EVIDENCE.)

19   BY MR. FONDO:

20   Q.   ALL RIGHT.  AND IT SAYS UNDER -- IS THIS YOUR HANDWRITING?

21   A.   IT IS.

22   Q.   AND UNDER USER CLIENT MATTER, CAN YOU READ FOR THE JURY

23   WHAT THAT IS, WHAT THAT SAYS?

24   A.   EVEN I ALMOST CAN'T READ IT.  PAIGE AND GRANT DEED AND NEW

25   DEED OF TRUST.

```
 1    Q.   AND WHAT DID THAT REFER TO?

 2    A.   THAT REFERRED TO THAT MR. LIEDERMAN FAXED TO ME A GRANT

 3    DEED AND A DEED OF TRUST THAT WERE RECORDED IN NOVEMBER OF

 4    2005.

 5    Q.   OKAY.  AND WHEN WAS THE, WHEN WAS THE -- LET'S GO NEXT TO

 6    THE LETTER, WHICH IS 194-2.  AND THIS IS A FAX THAT YOU

 7    RECEIVED FROM MR. LIEDERMAN ON JANUARY 23, 2006?

 8    A.   YES.

 9    Q.   AND IF YOU COULD READ UNDER MESSAGE WHAT IT SAYS, PLEASE?

10    A.   "PER YOUR REQUEST ATTACHED IS THE TITLE REQUEST RECEIVED

11    TODAY."

12    Q.   AND TODAY IS JANUARY 23, 2006; CORRECT?

13    A.   THAT'S CORRECT.

14    Q.   AND WHO IS IT SENT BY?

15    A.   IT'S SENT BY PETER LIEDERMAN, ATTORNEY FOR MYRA HOLMES.

16    Q.   COULD YOU TELL THE JURY JUST GENERALLY WHAT IS ATTACHED TO

17    MR. LIEDERMAN'S LETTER?

18    A.   THERE ARE TWO DOCUMENTS.  ONE IS CALLED A GRANT DEED.

19    Q.   AND LET ME STOP YOU THERE.  IS THAT A PAGE --

20    EXHIBIT 194-3?

21    A.   IT IS.

22    Q.   OKAY.

23    A.   AND DO YOU WANT ME TO DESCRIBE WHAT IT IS?

24    Q.   JUST WHAT YOU UNDERSTOOD IT TO BE?

25    A.   AND IT'S A GRANT DEED PURPORTING TO TRANSFER AN INTEREST
```

1    IN 312 MOONRACKER DRIVE FROM LEONARD PAIGE TO MYRA HOLMES.

2    Q.   AND YOU SAY, "PURPORTING TO."  WHY IS THAT?

3    A.   BECAUSE MR. PAIGE DIDN'T HAVE THE AUTHORITY TO MAKE A

4    TRANSFER AT THAT TIME.

5    Q.   HE DID NOT HAVE THE AUTHORITY TO TRANSFER 312 MOONRACKER

6    DRIVE TO HIS DAUGHTER?

7    A.   THAT'S CORRECT.

8    Q.   ALL RIGHT.  AND THEN THE NEXT PAGE, EXHIBIT 194.  JUST

9    TELL ME WHAT IS THIS DOCUMENT?

10   A.   THIS IS A DEED OF TRUST IN FAVOR OF BANK.

11   Q.   AND DOES THAT ALSO RELATE TO THE REFINANCING OF THE

12   PROPERTY?

13   A.   YES, IT DOES.

14   Q.   WHEN WAS THE -- OR HOW -- WELL, WHEN WAS THE FIRST TIME

15   THAT YOU BECAME AWARE THAT LEONARD PAIGE HAD PURPORTED TO

16   TRANSFER HIS INTEREST IN MOONRACKER DRIVE TO HIS DAUGHTER

17   MYRA HOLMES?

18   A.   WHEN I READ THIS GRANT DEED, MR. LIEDERMAN AND I HAD A

19   PHONE CALL IN WHICH HE SAID THAT MYRA HOLMES WAS NOW THE OWNER

20   OF THE PROPERTY, BUT I DIDN'T KNOW UNTIL I READ THIS HOW IT WAS

21   SUPPOSED TO HAVE HAPPENED.

22   Q.   OKAY.  AND YOU MENTIONED A PHONE CALL.  DID THE PHONE CALL

23   HAPPEN BEFORE THIS FAX CAME?

24   A.   YES.

25   Q.   OKAY.  AND CAN YOU TELL THE JURY DID IT HAPPEN THE SAME

1    DAY?

2    A.  YES.

3    Q.  AND CAN YOU TELL THE JURY WHO WAS ON THE PHONE CALL AND

4    WHAT WAS DISCUSSED?

5    A.  MR. LIEDERMAN AND I WERE THE ONLY PEOPLE ON THE PHONE CALL

6    AND HE -- I WAS -- I HAD CONTACTED HIM ABOUT THE INSURANCE

7    ISSUE AGAIN AND HE TOLD ME THAT I DIDN'T HAVE TO WORRY AND THAT

8    THE PROPERTY WAS INSURED AND THAT MYRA HOLMES WAS THE OWNER 100

9    PERCENT OF THE PROPERTY.

10   Q.  WAS THAT NEWS TO YOU?

11   A.  YES.

12   Q.  AND WHY WAS THAT NEWS TO YOU?

13   A.  ONE, IT VIOLATED EVERY --

14          MS. GARRIDO:  OBJECTION, VAGUE AND 403.

15          THE COURT:  DO YOU WANT TO LAY A FOUNDATION?

16          MR. FONDO:  OKAY.

17   Q.  SO MR. LIEDERMAN TOLD YOU THE PROPERTY HAD BEEN

18   OBTAINED --

19          THE COURT:  I'LL SUSTAIN THE OBJECTION.  PARDON ME.

20   AND LAY A FOUNDATION IF YOU CAN.

21   BY MR. FONDO:

22   Q.  SO YOU HAD A PHONE CONVERSATION WITH MR. LIEDERMAN;

23   CORRECT?

24   A.  YES.

25   Q.  AND WHAT DID HE TELL YOU IN THAT PHONE CALL?

1    A.    HE TOLD ME THAT THE TRUSTEE DIDN'T NEED TO WORRY ABOUT

2    INSURANCE ANYMORE, THAT THE PROPERTY WAS INSURED, AND THAT

3    MYRA HOLMES NOW OWNED THE WHOLE PROPERTY.

4    Q.    AND DID HE TELL YOU HOW THAT HAPPENED?

5    A.    I DON'T RECALL WHETHER HE TOLD ME HOW IT DID OR NOT.

6    Q.    AND HOW WAS HIS TONE WHEN HE WAS TELLING YOU THIS?

7    A.    I WOULD SAY HE WAS A LITTLE SHEEPISH.

8    Q.    WHAT DO YOU MEAN SHEEPISH?

9    A.    I THINK HE WAS A LITTLE EMBARRASSED TO BE BRINGING THIS

10   TOPIC UP AFTER ALL OF THE DISCUSSIONS WE HAD ABOUT SETTLING THE

11   LAWSUIT.

12   Q.    AND WAS THIS THE FIRST TIME THAT MR. LIEDERMAN TOLD YOU

13   ANYTHING ABOUT A TRANSFER OF 312 MOONRACKER DRIVE?

14   A.    YES.

15   Q.    WHAT, IF ANYTHING, DID MR. LIEDERMAN TELL YOU ABOUT WHAT

16   MYRA HOLMES WAS DOING WITH THE MONEY FROM THE REFINANCE?

17   A.    NOTHING.

18   Q.    WHAT, IF ANYTHING, DID MR. LIEDERMAN SAY TO YOU TO TRY TO

19   JUSTIFY THE TRANSFER?

20   A.    NOTHING.

21   Q.    WHAT WAS YOUR REACTION AFTER HE TOLD YOU THAT THE PROPERTY

22   HAD BEEN TRANSFERRED?

23            MS. GARRIDO:   OBJECTION, RELEVANCE.

24            THE COURT:   OVERRULED.

25            THE WITNESS:   I WAS ANGRY AND STUNNED.

1      BY MR. FONDO:

2      Q.   AND WHY WERE YOU ANGRY AND STUNNED?

3               MS. GARRIDO:  OBJECTION, RELEVANCE.

4               THE COURT:  OVERRULED.

5               THE WITNESS:  THIS HAD NEVER HAPPENED IN MY,

6      ROUGHLY, 20 YEARS BEFORE THAT, AND IT'S NEVER HAPPENED SINCE

7      THAT SOMEONE WOULD DO THIS.

8      BY MR. FONDO:

9      Q.   DO WHAT?

10     A.   TRANSFER AN ESTATE ASSET IN A 363 SITUATION.

11     Q.   I WANT TO REFER YOU TO EXHIBIT 228, PLEASE.  LET ME KNOW

12     IF YOU RECOGNIZE THAT DOCUMENT.

13          228?

14     A.   228?

15     Q.   228.  ALL RIGHT.  DO YOU RECOGNIZE THIS DOCUMENT?

16     A.   I DO.

17     Q.   AND WHAT IS IT?

18     A.   IT'S A REQUEST FOR A CONTINUANCE OF THE HEARING OF THE

19     SUMMARY JUDGMENT MOTION THAT I HAD FILED ON JANUARY 20TH.

20     Q.   AND WHO FILED IT?

21     A.   MR. LIEDERMAN, MS. HOLMES'S ATTORNEY.

22               MR. FONDO:  YOUR HONOR, AT THIS TIME WE MOVE INTO

23     EVIDENCE EXHIBIT 228.

24               MS. GARRIDO:  ONE MINUTE, YOUR HONOR.  I'LL OBJECT

25     ON RELEVANCE AND THE GROUNDS PREVIOUSLY ADDRESSED AT SIDE-BAR.

```
1              MR. FONDO:  YOUR HONOR, THERE ARE -- MAY I ADDRESS?

2              THE COURT:  YES.

3              MR. FONDO:  CERTAINLY.  THERE ARE CERTAIN ADMISSIONS

4    BY MYRA HOLMES'S ATTORNEY AS TO WHAT TOOK PLACE HERE AND THAT'S

5    CERTAINLY RELEVANT TO THESE PROCEEDINGS.

6              THE COURT:  WELL, LET ME HAVE YOU EXPLORE THAT ON

7    EXAMINATION OF THIS WITNESS TO SEE IF A FOUNDATION CAN BE LAID

8    FOR THE RECEIPT OF THE DOCUMENT ITSELF.

9    BY MR. FONDO:

10   Q.   MR. MAHER, MR. LIEDERMAN WAS THE ATTORNEY FOR MYRA HOLMES;

11   CORRECT?

12   A.   YES.

13   Q.   AND WHEN HE FILED THIS DOCUMENT, HE WAS HER ATTORNEY;

14   CORRECT?

15   A.   YES.

16   Q.   AND AS HER ATTORNEY, HE'S REPRESENTING HER IN THESE

17   PROCEEDINGS; CORRECT?

18   A.   THAT'S CORRECT.

19   Q.   AND AS PART OF -- AND DID HE MAKE CERTAIN REPRESENTATIONS

20   IN THIS EX PARTE REQUEST OF THE COURT RELATING TO WHAT HAD

21   HAPPENED WITH SOME OF THE NEGOTIATIONS BETWEEN YOU OR THE

22   ESTATE AND MYRA HOLMES AND IN PARTICULAR PARAGRAPH 2, EXCUSE

23   ME, PAGE 2, LINES 13 THROUGH 18?

24   A.   YES.

25             MR. FONDO:  YOUR HONOR, AT THIS TIME WE MOVE INTO
```

```
 1    EVIDENCE EXHIBIT 228.

 2              MS. GARRIDO:  SAME OBJECTIONS, YOUR HONOR.

 3              THE COURT:  THANK YOU.  IT WILL BE PERMITTED OVER

 4    YOUR OBJECTION.

 5         (GOVERNMENT'S EXHIBIT 228 WAS RECEIVED IN EVIDENCE.)

 6    BY MR. FONDO:

 7    Q.   I'D LIKE TO -- THE FIRST PAGE, PLEASE.  SO THIS IS A

 8    DOCUMENT WE HAVE BEEN TALKING ABOUT, CORRECT, 228?

 9    A.   YES.

10    Q.   AND IT WAS FILED BY MR. LIEDERMAN ON FEBRUARY 1ST, 2006?

11    A.   YES.

12    Q.   AND LET'S GO TO THE SECOND PAGE, PLEASE, AND IF YOU COULD

13    BRING UP THE THIRD FULL PARAGRAPH.  JUST THE THIRD FULL ONE.

14    CORRECT, THAT ONE.

15         STARTING WITH THE SECOND SENTENCE OF THAT THIRD PARAGRAPH,

16    IF YOU COULD READ THAT FOR THE JURY, PLEASE?

17    A.   "IN THE COURSE OF ATTEMPTING TO NEGOTIATE A SETTLEMENT,

18    MS. HOLMES PROVIDED SOME DOCUMENTS TO MR. CHARLES MAHER, THE

19    ATTORNEY OF THE TRUSTEE.  HOWEVER, MS. HOLMES'S CEASE TO ASSIST

20    IN THIS PROCESS WHEN IT APPEARED THAT NO COMMITMENT COULD BE

21    MADE TO ACCEPT A PARTICULAR OFFER REGARDLESS OF WHAT WAS

22    PROVIDED."

23    Q.   IS THAT STATEMENT CONSISTENT WITH YOUR UNDERSTANDING OF

24    THE LACK, COMPLETE LACK OF RESPONSE TO YOUR REQUEST FOR

25    ADDITIONAL DOCUMENTATION?
```

1    A.   NO.

2              MS. GARRIDO:  OBJECTION, RELEVANCE.

3              THE COURT:  OVERRULED.  THE ANSWER WILL REMAIN.

4              THE WITNESS:  NO.

5    BY MR. FONDO:

6    Q.   AND WHEN YOU SAY, "NO," WHAT DO YOU MEAN NO?

7    A.   I MEAN IT WASN'T CONSISTENT WITH WHAT I UNDERSTOOD.  I

8    DIDN'T KNOW WHY SHE HADN'T RESPONDED TO THE REQUEST FOR MORE

9    DOCUMENTS.

10   Q.   OKAY.  BUT SHE HAD STOPPED -- SHE HAD NOT RESPONDED AT

11   ALL; CORRECT?

12   A.   THAT'S CORRECT.

13   Q.   AND AS OF THE DATE OF THIS FILING FEBRUARY 1ST, 2006, THEY

14   STILL HAD NOT PROVIDED ANY ADDITIONAL DOCUMENTATION; CORRECT?

15   A.   THAT'S CORRECT.

16   Q.   I WANT TO REFER YOU TO PAGE 4 OF EXHIBIT 228, THE LAST

17   PARAGRAPH.  JUST THE LAST PARAGRAPH.  IF YOU COULD READ THAT

18   FOR THE JURY AND JUST STOP WHEN YOU GET TO THE LAST WORD TO

19   ALLOW MS. HOLLIMAN TO CATCH UP WITH YOU.

20   A.   GOING TO THE NEXT PAGE OR --

21   Q.   IF YOU COULD STOP AND JUST READ WHAT THAT LAST HALF OF THE

22   PARAGRAPH ON PAGE 4 TO THE JURY AND THEN JUST STOP.  AND THEN

23   MS. HOLLIMAN CAN CATCH UP WITH YOU.

24   A.   I UNDERSTAND.  "IT IS NOTED THAT ON JANUARY 23, 2006, ON

25   HIS OWN INVESTIGATION RESULTING FROM THE SUMMARY JUDGMENT

1    MOTION, MR. LIEDERMAN LEARNED THAT MR. LEONARD PAIGE HAD FILED

2    A GRANT DEED PURPORTING TO CEDE TO MYRA HOLMES HIS INTEREST TO

3    THE 312 MOONRACKER DRIVE PROPERTY ON NOVEMBER 14TH, 2005, A

4    MONTH BEFORE THE INSURANCE THAT HAD BEEN IN MR. PAIGE'S NAME

5    WAS CANCELLED.  MR. LIEDERMAN IMMEDIATELY RELAYED THIS TITLE

6    INFORMATION TO MR. MAHER."

7    Q.   YOU CAN STOP THERE.  SO MR. LIEDERMAN FILED THIS TELLING

8    THE COURT THAT HE HAD FIRST LEARNED ABOUT THIS TRANSFER ON

9    JANUARY 23RD, 2006?

10   A.   THAT'S WHAT IT SAYS.

11   Q.   OKAY.  AND WAS JANUARY 23RD, 2006, THE FIRST TIME THAT HE

12   TOLD YOU ABOUT THIS TRANSFER?

13   A.   YES.

14   Q.   I'D LIKE TO REFER YOU TO EXHIBIT 207, PLEASE.  DO YOU

15   RECOGNIZE EXHIBIT 207?

16   A.   I DO.

17   Q.   AND WHAT IS IT?

18   A.   IT'S A COMPLAINT THAT I FILED TO INVALIDATE THE TRANSFER

19   OF THE ONE HALF INTEREST TO MYRA HOLMES.

20   Q.   AND WHY DID YOU FILE A COMPLAINT TO INVALIDATE THE

21   TRANSFER TO MYRA HOLMES?

22   A.   BECAUSE THE -- TO INVALIDATE THE TRANSFER, YOU HAVE TO

23   POST-PETITION TRANSFER, MEANING AFTER THE BANKRUPTCY WAS FILED,

24   YOU HAVE TO USE SECTION 549 OF THE BANKRUPTCY CODE TO DO THAT.

25   Q.   OKAY.  SO YOU WERE TRYING TO VOID WHAT MRS. HOLMES HAD

1     DONE?

2     A.   THAT'S CORRECT, TO BRING THAT HALF INTEREST BACK TO THE

3     BANKRUPTCY ESTATE.

4     Q.   AND THIS IS A SECOND COMPLAINT THAT WAS FILED AGAINST

5     MS. HOLMES; CORRECT?

6     A.   YES.

7     Q.   AND WHO IS THE PLAINTIFF IN THIS CASE?

8     A.   THE BANKRUPTCY TRUSTEE JOHN RICHARDSON.

9     Q.   AND WHO IS THE DEFENDANT?

10    A.   MYRA HOLMES.

11    Q.   I WANT TO REFER YOU TO PAGE 7 OF EXHIBIT 207.  THIS IS A

12    -- WAIT ONE MOMENT.  PAGE 7 OF 207.

13         SORRY.  YOUR HONOR, AT THIS TIME WE MOVE INTO EVIDENCE

14    EXHIBIT 207.

15              MS. GARRIDO:  SUBMIT IT.

16              THE COURT:  IT'S RECEIVED.

17         (GOVERNMENT'S EXHIBIT 207 WAS RECEIVED IN EVIDENCE.)

18    BY MR. FONDO:

19    Q.   NOW, THIS IS A SIMILAR COVER SHEET, IS IT NOT, THAT WAS

20    FILED WITH THE FIRST COMPLAINT THAT YOU FILED IN APPROXIMATELY

21    JULY OF 2005; CORRECT?

22    A.   YES.

23    Q.   AND UP AT THE TOP IT SAYS THE PLAINTIFF IS JOHN

24    RICHARDSON, TRUSTEE?

25    A.   IT DOES.

1    Q.   AND THE DEFENDANT IS MYRA HOLMES?

2    A.   YES.

3    Q.   AND SO THESE ARE THE TWO PARTIES TO THIS; CORRECT?

4    A.   THAT'S CORRECT.

5    Q.   AND THEN IN THE MIDDLE THERE WHERE IT SAYS NATURE OF SUIT?

6    A.   YES.

7    Q.   AND DO YOU SEE THAT?

8    A.   I DO.

9    Q.   OKAY.  AND WAS THERE A BOX CHECKED HERE?

10   A.   YES.

11   Q.   AND WHAT IS THAT BOX?

12   A.   THE BOX IS NUMBER 454 TO RECOVER MONEY OR PROPERTY AND

13   THEN THERE'S ANOTHER BOX FOR DAMAGES FOR VIOLATION OF THE

14   AUTOMATIC STAY AND THEN FOR OBJECTION TO CLAIM.

15   Q.   AND THEN WHY ARE YOU MAKING A CLAIM FOR VIOLATION OF THE

16   AUTOMATIC STAY?

17   A.   THE TRUSTEE BELIEVED THAT THE ACT OF TRANSFERRING THE

18   PROPERTY WAS AN ACT TO GAIN CONTROL OF PROPERTY IN THE

19   BANKRUPTCY ESTATE, WHICH IS A STATUTORY VIOLATION AND IT WOULD

20   BE AN AUTOMATIC STAY.

21        MS. GARRIDO:  OBJECT TO THE LEGAL CONCLUSIONS AND

22   OPINION BEING OFFERED.

23        THE COURT:  I'LL STRIKE THE LAST SENTENCE, BUT YOU

24   CAN ASK ANOTHER QUESTION.

25

1    BY MR. FONDO:

2    Q.   OKAY.  WHY WAS IT YOUR UNDERSTANDING -- WAS IT YOUR

3    UNDERSTANDING THAT MR. PAIGE AND MYRA HOLMES HAD VIOLATED THE

4    AUTOMATIC STAY?

5            MS. GARRIDO:  OBJECTION, RELEVANCE.  IT CALLS FOR A

6    LEGAL CONCLUSION, ULTIMATE ISSUE AND LEADING.

7            THE COURT:  WELL, YOU WILL BE PERMITTED TO ASK A

8    QUESTION ABOUT REGULATIONS PER THE IN LIMINE RULING.  SO IF YOU

9    WANT TO REPHRASE YOUR QUESTION, YOU CAN DO THAT.

10   BY MR. FONDO:

11   Q.   IS THERE A PROVISION RELATING TO AUTOMATIC STAYS IN THE

12   BANKRUPTCY COURT?

13   A.   YES.

14   Q.   AND GENERALLY WHAT DO THEY PROVIDE?

15   A.   IT'S SECTION 362.  IT PREVENTS CREDITORS FROM CONTINUING

16   TO PURSUE DEBTORS.  IT ALSO INCLUDES SEEKING TO OBTAIN CONTROL

17   OF AN ASSET.  IT PREVENTS A DEBTOR WHO IS NOT IN POSSESSION OF

18   HIS OR HER ASSETS FROM EXERTING CONTROL OVER PROPERTY OF THE

19   ESTATE AS WELL.

20   Q.   SO THIS COMPLAINT SEEKS TO VOID THAT TRANSFER; CORRECT?

21   A.   THAT'S CORRECT.

22   Q.   DO YOU RECALL WHETHER MS. HOLMES FILED AN ANSWER TO THIS

23   COMPLAINT?

24   A.   I BELIEVE SHE DID.

25   Q.   AND IF YOU COULD LOOK AT EXHIBIT 212, PLEASE.

```
1     A.   I'M THERE.

2     Q.   AND WHAT IS THIS?

3     A.   THIS IS MYRA HOLMES'S ANSWER TO THE COMPLAINT.

4          MR. FONDO:  YOUR HONOR, AT THIS TIME WE MOVE INTO

5     EVIDENCE EXHIBIT 212, PARTY ADMISSION.

6          MS. GARRIDO:  SUBMIT IT.

7          THE COURT:  IT'S RECEIVED.

8     (GOVERNMENT'S EXHIBIT 212 WAS RECEIVED IN EVIDENCE.)

9     BY MR. FONDO:

10    Q.   SO, AGAIN, CAN YOU DESCRIBE FOR THE JURY WHAT AN ANSWER

11    IS?

12    A.   AN ANSWER IS A DOCUMENT THAT ADMITS OR DENIES THE

13    ALLEGATIONS MADE IN THE COMPLAINT AND PUTS AT ISSUE CERTAIN

14    ALLEGATIONS.  IT PRESERVES THE DEFENDANT'S RIGHT TO BE HEARD IN

15    COURT AND TO HAVE THE MATTER DECIDED BY A COURT.

16    Q.   LET'S LOOK AT PARAGRAPH 8, THE ANSWER, PLEASE.  AND THAT

17    IS ON PAGE 2 OF EXHIBIT 212.  ALL RIGHT.  COULD YOU READ THAT

18    FOR THE JURY, PLEASE?

19    A.   "DEFENDANT ADMITS THE PARTS OF ALLEGATION 8 STATING THAT

20    AT THE TIME THE DEBTORS FILED THEIR CHAPTER 11 PETITION,

21    DEBTOR, LEONARD PAIGE, HELD A JOINT TENANT INTEREST IN THE

22    MOONRACKER PROPERTY AND THAT THE SAME INTEREST EXISTED AT THE

23    TIME THE CHAPTER 11 WAS CONVERTED TO A CHAPTER 7 CASE."

24    Q.   ALL RIGHT.  I'D LIKE TO DIRECT YOUR ATTENTION TO

25    EXHIBIT 10, PLEASE.
```

1          THE COURT:  I'M SORRY?

2          THE WITNESS:  TO EXHIBIT?

3     BY MR. FONDO:

4     Q.   I'M SORRY.  TO PARAGRAPH 10.

5     A.   "DEFENDANT ADMITS ALLEGATION 10."

6     Q.   LET'S GO BACK TO EXHIBIT 207 AND IF YOU COULD READ FOR THE

7     JURY, IT'S ON PAGE 2, WHAT ALLEGATION 10 IS.  AND LET'S JUST

8     WAIT FOR ONE MOMENT.

9     A.   "ON JULY 5, 2005, PLAINTIFF FILED A COMPLAINT AGAINST THE

10    DEFENDANT FOR A JUDGMENT AUTHORIZING HIM TO SELL THE PROPERTY

11    FREE AND CLEAR OF HER ONE HALF INTEREST UNDER 1 U.S.C. SECTION

12    363(H), THE SALE COMPLAINT."

13    Q.   LET'S GO BACK TO -- AND WE CAN STAY ON THE COMPLAINT FOR A

14    MOMENT.  BUT LET'S GO BACK TO 212, MYRA HOLMES'S ANSWER.  IF

15    YOU COULD LOOK AT PARAGRAPH 12.

16         IS IT CORRECT THAT SHE -- AND IT SAYS THE DEFENDANT ADMITS

17    THE FIRST AND SECOND AND THIRD SENTENCES OF ALLEGATION 12 ONLY?

18    A.   YES.

19    Q.   AND SO DOES THAT MEAN THAT SHE'S ADMITTING THE FIRST THREE

20    SENTENCES OF THE PARAGRAPH OR THE ALLEGATIONS IN PARAGRAPH 12?

21    A.   YES.

22    Q.   AND LET'S GO BACK TO PARAGRAPH 12 OF THE COMPLAINT ON

23    EXHIBIT 207-2.  IF YOU COULD READ THE ADMITTED SENTENCES, THE

24    SENTENCE THAT MYRA HOLMES HAS ADMITTED ARE TRUE?

25    A.   "ON AUGUST 26TH, 2005, THE DEFENDANT FILED HER ANSWER TO

1    THE SALE COMPLAINT.  IN HER ANSWER, THE DEFENDANT ADMITTED

2    PLAINTIFF'S ALLEGATIONS THAT ON THE DATE THE DEBTORS FILED

3    THEIR CHAPTER 11 PETITION, DEBTOR, LEONARD PAIGE, WAS ON RECORD

4    AS OWNING A ONE HALF INTEREST AS JOINT TENANT IN THE PROPERTY

5    WITH MS. HOLMES AND THAT THE ONE HALF INTEREST WAS PROPERTY OF

6    THE BANKRUPTCY ESTATE."

7    Q.   SORRY.  GO AHEAD.

8    A.   "DISCUSSIONS ENSUED BETWEEN PLAINTIFF AND DEFENDANT."

9    Q.   OKAY.  SO I WANT TO GO BACK TO THAT PRIOR SENTENCE, THE

10   END OF THAT SENTENCE.

11        SO THE DEFENDANT IS ADMITTING THAT ONE HALF INTEREST OF

12   MOONRACKER DRIVE WAS THE PROPERTY OF THE ESTATE; CORRECT?

13   A.   YES.

14   Q.   ALL RIGHT.  I WANT TO GO TO PARAGRAPH 13 OF THIS

15   COMPLAINT.  IN IT YOU ALLEGE, BASED ON INFORMATION AND BELIEF,

16   THAT THE DEBTORS MADE THE DOWN PAYMENT AND MANY, IF NOT ALL, OF

17   THE MORTGAGE PAYMENTS BEFORE THE CHAPTER 11 CASE WAS CONVERTED

18   TO A CHAPTER 7 PROCEEDING AND MADE SEVERAL MORTGAGE PAYMENTS

19   AFTER THEIR BANKRUPTCY CASE WAS CONVERTED TO A CHAPTER 7.

20        WHAT DID YOU MEAN BY PARAGRAPH 13?

21   A.   I MEANT THAT THE DEBTORS HAD ACTUALLY MADE THE PAYMENTS

22   MS. HOLMES HAD REPRESENTED SHE HAD MADE.

23   Q.   AND YOU'RE TALKING ABOUT?

24   A.   MORTGAGE PAYMENTS AND THE DOWN PAYMENT.

25   Q.   MOST OF THE DOWN PAYMENT; CORRECT?

```
 1    A.   YES.

 2    Q.   ALL RIGHT.  WHAT WAS THE BASIS OF THIS INFORMATION AT THAT

 3    TIME?  WHAT WAS THE BASIS OF THAT STATEMENT?

 4    A.   IT WAS BASED ON THE BANK DOCUMENTS THAT WE HAD.  IT WAS

 5    BASED ON MS. HOLMES'S FAILURE TO PROVIDE ANY EVIDENCE OVER A

 6    THREE-MONTH PERIOD THAT SHE HAD MADE ANY PAYMENTS.

 7    Q.   YOU SAID "BANK DOCUMENTS."  WHAT IS BANK DOCUMENTS?

 8    A.   BANK STATEMENTS AND CANCELLED CHECKS THAT THE TRUSTEE HAD

 9    OBTAINED FROM LEONARD PAIGE.

10    Q.   AND WHAT DID THE RECORDS SHOW?

11    A.   THEY SHOWED THAT --

12         MS. GARRIDO:  I WOULD OBJECT AS TO HEARSAY AND

13    FOUNDATION.

14         THE COURT:  DO YOU WANT TO LAY A FOUNDATION FOR THE

15    RECORD?

16         MR. FONDO:  CERTAINLY.

17    Q.   AS PART OF YOUR INVESTIGATION AND THE TRUSTEE'S

18    INVESTIGATION INTO WHETHER MRS. HOLMES WAS TELLING THE TRUTH

19    ABOUT HAVING MADE ALL OF THOSE PAYMENTS, DID YOU SEEK CERTAIN

20    INFORMATION?

21    A.   YES.

22    Q.   OKAY.  AND WHAT DID THAT INFORMATION INCLUDE?

23    A.   THE INFORMATION INCLUDED DOCUMENTATION OF PAYMENTS THAT

24    SHE HAD MADE.  THERE WAS A LIST OF PAYMENTS THAT SHE HAD MADE

25    BUT NO BACKUP DATA.  SO I WAS LOOKING FOR BANK STATEMENTS,
```

```
 1    COPIES OF CHECKS THAT SHE HAD MADE TO THE MORTGAGE COMPANY, A

 2    DOWN PAYMENT WOULD HAVE BEEN A CHECK TO A TITLE COMPANY.  I WAS

 3    LOOKING FOR THAT KIND OF DOCUMENTS.

 4    Q.  AND DID YOU FIND ANY OF THAT?

 5    A.  NO.

 6    Q.  AND DID YOU FIND ANY RECORDS -- WERE ANY RECORDS PROVIDED

 7    TO YOU AND THE TRUSTEE RELATING TO THE MORTGAGE PAYMENTS THAT

 8    LEONARD PAIGE AND CARRIE PAIGE PAID ON 312 MOONRACKER?

 9    A.  BY THIS TIME WE HAD BANK RECORDS FOR APPROXIMATELY A

10    SIX-MONTH PERIOD AND FOUR OF THOSE MONTHS HAD PAYMENTS ON THE

11    MOONRACKER DRIVE MORTGAGE.

12         MS. GARRIDO:  I'LL OBJECT TO THE LATER PART OF THAT

13    ANSWER AS CONSTITUTING HEARSAY AND VIOLATING CONFRONTATION, DUE

14    PROCESS, RIGHT TO A FAIR TRIAL.

15         THE COURT:  OVERRULED.

16    BY MR. FONDO:

17    Q.  LET'S GO BACK TO THE ANSWER AGAIN.  YOU CAN STAY WHERE YOU

18    ARE.  AND THIS IS MYRA HOLMES'S ANSWER, EXHIBIT 212.  IF YOU

19    COULD READ FOR THE JURY PARAGRAPH 14, WHAT THE DEFENDANT SAYS

20    IN RELATION TO THE ALLEGATION IN PARAGRAPH 14?

21    A.  "DEFENDANT ADMITS THAT PLAINTIFF'S COUNSEL INFORMALLY MADE

22    THESE REQUESTS."

23    Q.  OKAY.  LET'S GO BACK TO THE COMPLAINT THAT YOU FILED AND

24    PARAGRAPH 14.  WHAT DOES PARAGRAPH 14 SAY?

25    A.  "PLAINTIFF REQUESTED THAT THE DEFENDANT PRODUCE EVIDENCE
```

1    TO SUPPORT HER STATEMENTS THAT SHE HAD MADE THE DOWN PAYMENT

2    AND THE MORTGAGE PAYMENTS."

3    Q.   I WANT TO GO TO PARAGRAPH 15.  IF YOU COULD READ THAT AND

4    TELL THE JURY WHAT YOU MEANT BY THIS?

5    A.   I'M SORRY, IN EXHIBIT 212?

6    Q.   I'M SORRY.  207, PARAGRAPH 15.

7    A.   "THE DEFENDANT DID NOT PROVIDE ADEQUATE DOCUMENTATION TO

8    SUPPORT HER ASSERTION."

9    Q.   I'D LIKE TO GO TO PARAGRAPH 17, PLEASE.  IS IT CORRECT

10   THAT YOU ASSERT IN PARAGRAPH 17 THAT -- I'LL JUST REREAD IT,

11   SORRY.  PARAGRAPH 17 OF EXHIBIT 207, "PLAINTIFF IS INFORMED AND

12   BELIEVES AND ON THAT BASIS ALLEGES THAT THE DEFENDANT INDUCED

13   LEONARD PAIGE TO EXECUTE A NOVEMBER 14TH, 2005, A GRANT DEED

14   CONVEYING THE ESTATE'S INTEREST IN THE PROPERTY TO HER," IS

15   THAT CORRECT?

16   A.   YES.

17   Q.   AND DID YOU MAKE THIS -- DID YOU HAVE THIS BELIEF BASED AT

18   LEAST IN PART ON YOUR PERSONAL OBSERVATIONS OF LEONARD PAIGE

19   WHEN YOU MET WITH HIM IN OCTOBER OF 2005?

20   A.   YES.

21   Q.   FURTHER DOWN IN THAT PARAGRAPH I'M GOING TO GO TO LINE 19

22   OF PAGE 3.  YOU MAKE THE ASSERTION "DID SO WILLFULLY" -- I'M

23   SORRY.  MAYBE WE SHOULD JUST READ THAT LAST SENTENCE OF

24   PARAGRAPH 17.

25   A.   "PLAINTIFF IS INFORMED AND BELIEVES THAT BY THE TRANSFER

1    THE DEFENDANT ACTED TO OBTAIN POSSESSION OF PROPERTY OF THE

2    ESTATE AND OF PROPERTY FROM THE ESTATE AND ACTED TO EXCEED

3    CONTROL OVER PROPERTY OF THE ESTATE AND DID SO WILLFULLY AND

4    WITH FULL KNOWLEDGE OF THE BANKRUPTCY CASE AND THE BANKRUPTCY

5    ESTATE'S OWNERSHIP OF THE ONE HALF INTEREST IN THE PROPERTY.

6    Q.   NOW, WHY DO YOU SAY THAT SHE WILLFULLY AND WITH FULL

7    KNOWLEDGE DID THAT?

8    A.   THIS GOES BACK TO THE VIOLATION OF THE AUTOMATIC STAY

9    CLAIM.

10   Q.   AND DID YOU HAVE A BASIS -- AT THE TIME THAT YOU FILED

11   THIS COMPLAINT THERE HAD BEEN A LOT OF CORRESPONDENCE BETWEEN

12   YOU AND HER LAWYER; CORRECT?

13   A.   YES.

14   Q.   AND SHE HAD FILED AN ANSWER; CORRECT?

15   A.   YES.

16   Q.   AND THE FACT THAT SHE HAD FILED AN ANSWER, PROVIDED SOME

17   LIMITED DOCUMENTATION, THERE WAS SIGNIFICANT CORRESPONDENCE

18   BETWEEN THE TWO PARTIES REGARDING A RESOLUTION, WHAT WAS YOUR

19   UNDERSTANDING OF HER KNOWLEDGE OF THE FACT THAT THE BANKRUPTCY

20   ESTATE OWNED MR. PAIGE'S INTEREST?

21          MS. GARRIDO:  OBJECTION.  SPECULATION.  IMPROPER

22   OPINION AS TO ANOTHER'S KNOWLEDGE.

23   BY MR. FONDO:

24   Q.   LET ME REPHRASE THIS --

25          THE COURT:  YOU'RE WITHDRAWING THE QUESTION AND

1    ASKING ANOTHER?

2         MR. FONDO:  I'M GOING TO REPHRASE IT, YEAH.

3    Q.  WHAT WAS THE BASIS FOR YOUR MAKING THIS STATEMENT THAT SHE

4    KNEW IN PARAGRAPH 17?

5         MS. GARRIDO:  I'LL OBJECT AS TO THE RELEVANCE AND

6    SPECULATION.  LACK OF PERSONAL KNOWLEDGE.

7         THE COURT:  OVERRULED.  YOU CAN ANSWER.

8         THE WITNESS:  THERE WERE ADMISSIONS IN WRITING IN

9    THE ANSWER TO THE FIRST COMPLAINT.  THERE WERE ADMISSIONS AND

10   CORRESPONDENCE FROM MR. LIEDERMAN AND THERE WERE ALSO THESE,

11   LIKE IN THE CASE MANAGEMENT CONFERENCE STATEMENTS AND PERHAPS

12   IN THE OTHER DOCUMENT THAT WAS 228, THERE WERE ADMISSIONS THAT

13   THE ESTATE WOULD HAVE.

14   BY MR. FONDO:

15   Q.  MYRA HOLMES'S ADMISSIONS?

16   A.  MYRA HOLMES'S ADMISSIONS.

17   Q.  LET'S LOOK AGAIN AT THE ANSWER AND I REFER YOU TO

18   PARAGRAPH 18 OF DEFENDANT'S ANSWER, IT'S EXHIBIT 212.  COULD

19   YOU READ FOR THE JURY WHAT THE DEFENDANT'S RESPONSE IS?

20   A.  "DEFENDANT ADMITS ALLEGATION 18."

21   Q.  SO THAT'S THE ALLEGATION IN THE COMPLAINT; CORRECT?

22   A.  YES.

23   Q.  AND LET'S GO TO EXHIBIT 207, THE COMPLAINT, AND IF YOU

24   COULD READ FOR THE JURY WHAT DEFENDANT ADMITTED IN PARAGRAPH

25   18?

1     A.   "THE DEFENDANT CASED (SIC) THE GRANT DEED TO BE RECORDED

2     IN THE OFFICIAL RECORDS OF SOLANO COUNTY ON NOVEMBER 21, 2005."

3     Q.   AND WHAT IS THE GRANT DEED THAT YOU'RE REFERRING TO?

4     A.   THE GRANT DEED IS THE FIRST OF THE DOCUMENTS THAT

5     MR. LIEDERMAN FAXED TO ME ON JANUARY 23RD.

6     Q.   AND I WANT TO GO BACK TO EXHIBIT 212, PAGE 3, MS. HOLMES'S

7     ANSWER TO THE COMPLAINT.  COULD YOU READ PARAGRAPH 19 FOR THE

8     JURY OR HOW SHE RESPONDS TO YOUR PARAGRAPH 19, THE COMPLAINT'S

9     PARAGRAPH 19?

10    A.   "THE DEFENSE ADMITS ALLEGATION NUMBER 19, WHICH IS A

11    STATEMENT OF LAW AND COURT RECORD."

12    Q.   LET'S GO BACK TO EXHIBIT 207, THE COMPLAINT, AND IF YOU

13    COULD READ FOR THE JURY WHAT MS. HOLMES ADMITTED?

14    A.   "NO ORDER OF THE BANKRUPTCY COURT OR PROVISION OF THE

15    BANKRUPTCY CODE AUTHORIZED THE TRANSFER TO THE DEFENDANT."

16    Q.   AND WHAT DID YOU MEAN BY THAT?

17    A.   I MEANT THAT NO ONE HAD SOUGHT A COURT ORDER AUTHORIZING

18    THE TRANSFER TO MS. HOLMES, AND THERE'S NO PROVISION IN THE

19    BANKRUPTCY CODE THAT WOULD AUTHORIZE IT.

20    Q.   LET'S GO TO PARAGRAPH 6, PLEASE.  THIS IS PAGE 24 ON --

21              THE COURT:  I'M SORRY, WHICH EXHIBIT?

22              MR. FONDO:  SO 207 -- ACTUALLY, LET'S GO TO 212

23    FIRST, PARAGRAPH 25.

24    Q.   AND, AGAIN, THIS IS THE ANSWER?

25    A.   "THE DEFENDANT ADMITS THE TWO CONTENTIONS IN ALLEGATION

1    25."

2    Q.   IF YOU COULD READ FOR THE JURY IN 207 OF THE COMPLAINT

3    WHAT THE DEFENDANT IS ADMITTING IN PARAGRAPH 25?

4    A.   "THE DEFENDANT WAS AWARE OF THE BANKRUPTCY CASE AND HAD

5    ADMITTED IN HER ANSWER TO THE SALE COMPLAINT THE ONE HALF

6    INTEREST IN THE PROPERTY WAS PROPERTY OF THE BANKRUPTCY

7    ESTATE."

8    Q.   AND THE SALE COMPLAINT IS THE JULY 2005 COMPLAINT THAT WAS

9    FILED AGAINST HER; IS THAT CORRECT?

10   A.   THAT'S CORRECT.

11   Q.   I WANT TO GO TO PARAGRAPH 56, PLEASE, OF THE COMPLAINT,

12   EXHIBIT 207.  COULD YOU READ THAT FOR THE JURY.

13   A.   "THE DEFENDANT WILLFULLY OBTAINED THE SIGNATURE OF GRANT

14   DEED ON NOVEMBER 14TH, 2005, AND CAUSED THE GRANT DEED TO BE

15   RECORDED IN THE OFFICIAL RECORDS OF SOLANO COUNTY ON

16   NOVEMBER 21, 2005."

17   Q.   I WANT TO REFER YOU TO 212, PLEASE, THAT'S THE ANSWER AND

18   SPECIFICALLY TO PAGE 4.  ARE YOU THERE YET?

19   A.   YES.

20   Q.   AND I'M SORRY, 212-4.  IT WILL BE THE BOTTOM PARAGRAPH.

21   STARTING WITH THE SECOND SENTENCE IN THE BOTTOM PARAGRAPH.

22   COULD YOU READ THE NEXT TWO SENTENCES, PLEASE, OF WHAT MS. --

23   IN MYRA HOLMES'S ANSWER?

24   A.   BEGINNING "THE TRANSFER"?

25   Q.   YES.

1    A.   "THE TRANSFER OF TITLE WAS MADE BY LEONARD PAIGE TO

2    DEFENDANT, CO-TENANT, WITHOUT CONSIDERATION.  WHEN IT WAS

3    LEARNED BY THE DEFENDANT'S ATTORNEY, IT WAS IMMEDIATELY

4    DISCLOSED TO THE COURT AND TO THE TRUSTEE."

5    Q.   LET ME GO BACK TO THE FIRST SENTENCE IT SAYS, "THE

6    TRANSFER OF TITLE WAS MADE BY LEONARD PAIGE TO THE DEFENDANT,

7    HIS CO-TENANT, WITHOUT CONSIDERATION."

8         DO YOU HAVE ANY IDEA WHAT "WITHOUT CONSIDERATION" MEANS?

9    A.   WITHOUT PAYMENT.

10             THE COURT:  YOU SAID DEFENDANT.

11             MR. FONDO:  I'M SORRY, CO-TENANT.  IF YOU COULD

12   REPEAT YOUR ANSWER, PLEASE.

13             THE WITNESS:  WITHOUT CONSIDERATION MEANS WITHOUT

14   PAYMENT.

15   BY MR. FONDO:

16   Q.   SO MEANING THAT LEONARD PAIGE -- OR THE DEFENDANT DID NOT

17   MAKE ANY PAYMENT FOR THIS TRANSFER?

18   A.   OR MORE IMPORTANTLY TO THE TRUSTEE.

19   Q.   OKAY.  AND SO WHY WHEN YOU SAY MORE IMPORTANTLY TO THE

20   TRUSTEE, WHY WAS IT IMPORTANT THAT NO MONEY WAS PAID TO THE

21   ESTATE?

22   A.   BECAUSE THE ESTATE OWNED THE HALF INTEREST AND NOT

23   LEONARD PAIGE.

24   Q.   AND AS OF THE DATE OF THIS COMPLAINT HAD THE ESTATE

25   RECEIVED ANY MONEY FROM THE REFINANCING OF THE PROPERTY AT 312

```
 1    MOONRACKER DRIVE?

 2    A.   NO.

 3    Q.   WERE YOU AWARE OF WHETHER LEONARD PAIGE EVER RECEIVED ANY

 4    MONEY FROM THE REFINANCING OF THE PROPERTY?

 5              MS. GARRIDO:  OBJECTION.  IT LACKS PERSONAL

 6    KNOWLEDGE.

 7              THE COURT:  ARE YOU ASKING IF HE HAS PERSONAL

 8    KNOWLEDGE?

 9    BY MR. FONDO:

10    Q.   DO YOU HAVE PERSONAL KNOWLEDGE OF WHETHER MR. -- WAS IT

11    IMPORTANT FOR YOU AS THE ATTORNEY FOR THE TRUSTEE TO DETERMINE

12    WHETHER LEONARD PAIGE HAD RECEIVED ANY MONEY FROM THIS

13    TRANSFER?

14    A.   YES.

15    Q.   AND WAS IT IMPORTANT FOR YOU AS THE ATTORNEY FOR THE

16    TRUSTEE TO LEARN WHETHER LEONARD PAIGE HAD RECEIVED ANY OF THE

17    REFINANCING PROCEEDS?

18    A.   YES.

19    Q.   OKAY.  HOW DID YOU GO ABOUT -- WERE YOU ABLE TO ULTIMATELY

20    LEARN THE ANSWER TO THOSE QUESTIONS TO YOUR SATISFACTION?

21    A.   YES, TO MY SATISFACTION.

22    Q.   AND HOW WAS IT THAT YOU -- SO, FIRST OF ALL, DID HE

23    RECEIVE ANY MONEY?

24    A.   NOT TO MY KNOWLEDGE.

25              MS. GARRIDO:  OBJECTION, FOUNDATION, LACKS PERSONAL
```

MAHER DIRECT

```
1     KNOWLEDGE, HEARSAY.

2              THE COURT:  OVERRULED.

3              THE WITNESS:  NOT TO MY KNOWLEDGE.

4     BY MR. FONDO:

5     Q.   AND HOW WAS IT THAT YOU LEARNED THAT LEONARD PAIGE DID NOT

6     RECEIVE ANY MONEY FOR THE TRANSFER AND ANY MONEY RELATING TO

7     THE REFINANCING AT 312 MOONRACKER DRIVE?

8     A.   I ASKED HIS ATTORNEY MR. MCLAUGHLIN.

9     Q.   AND WHAT DID HIS ATTORNEY TELL YOU --

10             MS. GARRIDO:  OBJECTION, HEARSAY.

11             THE COURT:  SUSTAINED.

12             MS. GARRIDO:  AND I'LL MOVE TO STRIKE THE PREVIOUS

13    ANSWER.

14             THE COURT:  THE PREVIOUS ANSWER IS STRICKEN.

15    BY MR. FONDO:

16    Q.   WELL, DURING THE COURSE OF YOUR INVESTIGATION AS TO WHAT

17    HAPPENED HERE, RIGHT, BECAUSE BEFORE JANUARY 23RD, YOU DIDN'T

18    KNOW ANY OF THIS; IS THAT CORRECT?

19    A.   THAT'S CORRECT.

20    Q.   AND WAS IT YOUR DUTY AS AN ATTORNEY TO GO FIND OUT, HEY,

21    WHAT HAPPENED HERE?

22    A.   YES.

23             MS. GARRIDO:  OBJECTION.  ASKED AND ANSWERED.

24             THE COURT:  OVERRULED.

25    BY MR. FONDO:
```

1    Q.   AND WHY WAS IT IMPORTANT FOR YOU TO LEARN WHAT TOOK PLACE

2    WITH THE TRANSFER OF THIS PROPERTY AND THE REFINANCING OF THIS

3    PROPERTY?

4              MS. GARRIDO:  OBJECTION, VAGUE AND ASKED AND

5    ANSWERED.

6              THE COURT:  OVERRULED.

7              THE WITNESS:  THE VALUE OF THE ESTATE'S INTEREST WAS

8    BEING DEPLETED AND TO THE EXTENT THAT I COULD FIND OUT WHERE

9    THAT MONEY WENT AND GET A -- REPLENISH THE ESTATE.

10   BY MR. FONDO:

11   Q.   AT THE POINT OF THIS COMPLAINT, THE DATE THAT THE

12   COMPLAINT WAS FILED, HAD MR. LIEDERMAN TOLD YOU ANYTHING ABOUT

13   MS. HOLMES SPENDING THE MONEY?

14   A.   NO.

15   Q.   AND DID HE PROVIDE -- OTHER THAN THE GRANT DEED AND THE

16   TRANSFER DEED, DID HE PROVIDE ANY OTHER DOCUMENTATION RELATING

17   TO THIS TRANSFER OR THE REFINANCING?

18   A.   NO.

19   Q.   SO YOU HAD TO GO AND INVESTIGATE IT ON YOUR OWN?

20   A.   YES.

21   Q.   OKAY.  AND WAS IT IMPORTANT FOR YOU TO UNDERSTAND WHETHER

22   LEONARD PAIGE HAD RECEIVED ANY MONEY FROM THIS TRANSFER?

23   A.   YES, IT WAS.

24   Q.   AND WAS IT IMPORTANT FOR YOU TO UNDERSTAND WHETHER

25   LEONARD PAIGE HAD RECEIVED ANY MONEY FROM THE REFINANCING?

1    A.   YES.

2    Q.   AND WHY WAS THAT?

3    A.   BECAUSE, ONE, I THINK MR. PAIGE WOULD HAVE TURNED IT OVER

4    IF HE HAD.

5              MS. GARRIDO:  OBJECTION, SPECULATION.  MOVE TO

6    STRIKE.

7              THE COURT:  I THINK IT'S NONRESPONSIVE TO THE

8    QUESTION.

9              THE WITNESS:  IT WAS IMPORTANT FOR US TO FOLLOW THE

10   MONEY.

11   BY MR. FONDO:

12   Q.   OKAY.  AND DID YOU FOLLOW THE MONEY AS TO LEONARD PAIGE?

13   A.   YES.

14   Q.   AND DID YOU AT ANY POINT COME TO YOUR SATISFACTION AS A

15   RESULT OF WHETHER ANY MONEY HAD BEEN TRANSFERRED TO

16   LEONARD PAIGE?

17   A.   I COULD FIND NO EVIDENCE IF ANY MONEY HAD BEEN.

18             MS. GARRIDO:  OBJECTION.  SAME OBJECTION BASED ON

19   THE IMPROPER HEARSAY.

20             THE COURT:  OVERRULED.

21   BY MR. FONDO:

22   Q.   AND LET'S ACTUALLY GO TO MRS. HOLMES'S ANSWER ON PAGE

23   212-4.  WHEN MS. HOLMES ANSWERED THE TRANSFER OF THE TITLE WAS

24   MADE TO LEONARD PAIGE, THE DEFENDANT, HIS CO-TENANT, WITHOUT

25   CONSIDERATION, THAT WAS WITHOUT MONEY; RIGHT?

MAHER DIRECT

1    A.    YES.

2    Q.    AND SO IS MRS. HOLMES'S ANSWER TO YOUR COMPLAINT ABOUT

3    WHERE SHE STATED MR. PAIGE GOT NOTHING FROM THIS TRANSFER, WAS

4    THAT CONSISTENT WITH YOUR INVESTIGATION?

5    A.    YES.

6    Q.    JUST ONE MOMENT.   TO YOUR KNOWLEDGE HAS THE BANKRUPTCY

7    ESTATE EVER RECEIVED ANY OF THESE REFINANCING PROCEEDS?

8    A.    NO, IT HAS NOT.

9            MR. FONDO:   NOTHING FURTHER AT THIS TIME.

10           THE COURT:   DO YOU HAVE CROSS-EXAMINATION,

11   MS. GARRIDO?

12           MS. GARRIDO:   YES.

13           THE COURT:   ALL RIGHT.   LET'S TAKE OUR MORNING BREAK

14   NOW, LADIES AND GENTLEMEN, 15 MINUTES.

15       (RECESS FROM 9:57 A.M. UNTIL 10:09 A.M.).

16       (JURY OUT.)

17           THE COURT:   WE'RE ON THE RECORD OUTSIDE OF THE

18   PRESENCE OF THE JURY.   COUNSEL IS PRESENT AND MS. HOLMES IS

19   PRESENT.   THE JURY IS NOT PRESENT.

20       DID YOU WANT TO BRING SOMETHING UP?

21           MR. FONDO:   YES, YOUR HONOR.   I SHOULD HAVE RAISED

22   IT THIS MORNING.   RELATING TO THE CROSS, WE JUST WANTED TO

23   ADDRESS THE ISSUE ABOUT JOHN RICHARDSON'S REVIEW AND THE

24   DISCLOSURE TO THE DEFENSE.

25       I WANT TO MAKE SURE -- THE GOVERNMENT PREVIOUSLY WITH THE

```
1    CROSS-EXAMINATION OF ANOTHER WITNESS, MICHELLE GADKER, REFERRED

2    TO -- THE DEFENSE, SORRY, REFERRED TO IT AS A GRAND JURY

3    DOCUMENT AND ALSO IMPLIED IT CAME FROM THE GOVERNMENT AND

4    VERSUS A THIRD PARTY, ET CETERA.

5         SO WE WANT TO MAKE SURE THE REPRESENTATIONS, IF ANY,

6    RELATING TO THIS DOCUMENT ARE ACCURATE AND NOT AS IMPLYING

7    COMING FROM THE GOVERNMENT OR SOMETHING OF THAT NATURE.

8              THE COURT:  OKAY.

9              MR. FONDO:  WE ALSO, YOUR HONOR, WANT TO MAKE SURE

10   THAT THIS WAS OBVIOUSLY A SENSITIVE AREA, AND I WANT TO MAKE

11   SURE THE COURT RULED ON IT, THE STATEMENTS OR

12   MISREPRESENTATIONS MADE IN HERE ARE NOT OVERSTATED.

13             THE COURT:  DO YOU HAVE AN EXTRA COPY OF THE

14   DOCUMENT?

15             MR. FONDO:  I HAVE A COPY HERE.  I DON'T KNOW IF

16   IT'S NECESSARILY AN EXTRA COPY.  WE CAN HAVE SOMEONE RUN

17   DOWNSTAIRS AND MAKE A COPY.

18             THE COURT:  I PROBABLY SHOULD HAVE A COPY.

19             MR. FONDO:  WE'LL RUN DOWN AND DO THAT.

20             THE COURT:  IT'S JUST AS EASY FOR ME -- WE HAVE A

21   COPY MACHINE BEHIND ME HERE.

22             MR. FAZIOLI:  THIS IS THE LETTER THAT WAS SUBMITTED

23   AND THEN THE DISCLOSURE.

24             THE COURT:  MS. GARRIDO, ANY COMMENT?

25             MS. GARRIDO:  NO.
```

```
 1              MR. FONDO:  THANK YOU, YOUR HONOR.

 2         (PAUSE IN PROCEEDINGS.)

 3              THE COURT:  LET ME JUST ASK COUNSEL ONE THING.  BACK

 4    ON THE RECORD.  WE SHOULD START THINKING ABOUT YOUR JURY

 5    INSTRUCTIONS, AND IF YOU HAVE PROPOSED JURY INSTRUCTIONS AT

 6    LEAST PUTTING THOSE TOGETHER, COLLECTING THOSE SO THAT WE CAN

 7    BEGIN REVIEW OF THOSE.

 8         WE CAN TALK MORE ABOUT THAT.

 9         (JURY IN AT 10:15 A.M.)

10              THE COURT:  WE'RE BACK ON THE RECORD.  THE JURY IS

11    PRESENT.  ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT AGAIN.

12         MS. GARRIDO.

13              MS. GARRIDO:  THANK YOU, YOUR HONOR.
```

**CROSS-EXAMINATION**

```
15    BY MS. GARRIDO:

16    Q.  MR. MAHER, YOU WERE JUST ASKED A QUESTION ABOUT WHETHER

17    THE BANKRUPTCY ESTATE EVER RECEIVED PROCEEDS FROM THE

18    REFINANCE.

19         YOU WERE ABLE TO ANSWER THAT QUESTION BECAUSE YOU'RE VERY

20    FAMILIAR WITH THE ACCOUNTING OF THE ESTATE; CORRECT?

21    A.  I'M FAMILIAR WITH IT -- I'M FAMILIAR WITH -- I DON'T THINK

22    I CAN GIVE YOU A YES OR NO ANSWER ON THAT.

23         I'M FAMILY WITH PARTICULAR ASPECTS OF THE ACCOUNTING.

24    Q.  AND YOU REVIEWED A GREAT MAJORITY OF THE ACCOUNTING;

25    CORRECT?
```

```
 1     A.   COULD YOU DEFINE "ACCOUNTING."

 2     Q.   THE RECEIPTS, THE DISBURSEMENTS, THE AMOUNTS --

 3     A.   NO, NO, I DON'T REVIEW A GREAT DEAL OF IT.

 4     Q.   YOU WORK FAIRLY CLOSELY WITH JOHN RICHARDSON, THE TRUSTEE;

 5     CORRECT?

 6     A.   I'M HIS ATTORNEY.  SO ON LEGAL MATTERS, YES.

 7     Q.   AND HE'S ALSO AN ATTORNEY; CORRECT?

 8     A.   NO.

 9     Q.   YOU HAVE WORKED WITH HIM FOR OVER 20 YEARS?

10     A.   YES, JUST ABOUT, MAYBE 22.

11     Q.   AND HE USUALLY EMPLOYS YOU WHEN HE'S A TRUSTEE ON A CASE;

12     CORRECT?

13     A.   VERY USUALLY.

14     Q.   AND ABOUT WHAT PERCENTAGE OF CASES THAT HE'S A TRUSTEE DO

15     YOU THINK THAT YOU'RE COUNSEL ON THOSE MATTERS?

16     A.   I DON'T REALLY KNOW, BUT A VERY HIGH PERCENTAGE.

17     Q.   AND AT THE TIME YOU WERE WORKING WITH HIM ON THE PAIGE

18     BANKRUPTCY, YOU WERE WORKING WITH HIM ON OTHER MATTERS; IS THAT

19     CORRECT?

20     A.   YES.

21     Q.   AND DO YOU KNOW APPROXIMATELY HOW MANY?

22     A.   AT THE TIME, NO.

23     Q.   AND MR. RICHARDSON IS GENERALLY THE TRUSTEE FOR ABOUT A

24     THOUSAND CASES A YEAR GIVE OR TAKE?

25     A.   I THINK THAT VARIES WITH THE CASE FILINGS, AND IT'S
```

MAHER CROSS

```
 1    CERTAINLY POSSIBLE.

 2    Q.   AND WHAT YOU?  ABOUT HOW MANY CASES ARE YOU COUNSEL FOR

 3    THE TRUSTEE ON A REGULAR BASIS?

 4    A.   THIS TRUSTEE OR ANY TRUSTEE?

 5    Q.   ANY TRUSTEE?

 6    A.   PROBABLY 40 TO 60 EACH YEAR.

 7    Q.   AND WHEN MR. RICHARDSON APPROACHED YOU TO WORK WITH HIM ON

 8    THE PAIGE BANKRUPTCY, ONE OF THE FIRST THINGS YOU DID WAS CHECK

 9    FOR CONFLICTS; CORRECT?

10    A.   YES.

11    Q.   AND YOU FOUND SOMETHING THAT WAS IMPORTANT ENOUGH TO

12    MENTION TO THE COURT?

13    A.   I MAY HAVE.  I HAVEN'T LOOKED AT MY EMPLOYMENT APPLICATION

14    IN QUITE SOME TIME.

15    Q.   OKAY.  WOULD IT REFRESH YOUR RECOLLECTION?

16              THE COURT:  COULD YOU GET CLOSER TO THE MIKE?

17              THE WITNESS:  YES.

18              MS. GARRIDO:  IF I MAY APPROACH THE WITNESS, YOUR

19    HONOR?

20              THE COURT:  YES.

21    BY MS. GARRIDO:

22    Q.   IF YOU COULD TAKE A MOMENT TO REVIEW THAT AND LET US KNOW

23    WHEN YOU'RE FINISHED?

24    A.   I'VE READ IT.

25    Q.   DO YOU RECOGNIZE THIS DOCUMENT THAT I'VE HANDED TO YOU?
```

1    A.   I DO.

2    Q.   AND IS THIS YOUR DECLARATION IN SUPPORT OF

3    MR. RICHARDSON'S APPLICATION TO EMPLOY YOU AS COUNSEL ON THE

4    PAIGE BANKRUPTCY MATTER?

5    A.   THAT'S CORRECT.

6         MS. GARRIDO:  AT THIS TIME I WOULD ASK TO MOVE

7    EXHIBIT BB INTO EVIDENCE.

8         MR. FONDO:  NO OBJECTION, YOUR HONOR.

9         THE COURT:  IT'S RECEIVED WITHOUT OBJECTION.

10        (DEFENDANT'S EXHIBIT BB WAS RECEIVED IN EVIDENCE.)

11   BY MS. GARRIDO:

12   Q.   AND ON THE SECOND PAGE, PARAGRAPH A, IF WE COULD BLOW THAT

13   UP, YOU DISCLOSED TO THE COURT THAT YOUR FIRM AT THAT TIME

14   LUCE, FORD REPRESENTED WELLS FARGO; CORRECT?

15   A.   YES.

16   Q.   AND WELLS FARGO WAS THE BIGGEST CREDITOR OF THE PAIGES'S

17   BANKRUPTCY; CORRECT?

18   A.   NO.  I THINK THE DEPARTMENT OF LABOR MIGHT HAVE BEEN ON

19   BEHALF OF THE PENSION.

20   Q.   AND THAT HAD TO DO WITH THE PAIGES'S CORPORATE BANKRUPTCY

21   PRIMARILY; CORRECT?

22   A.   YES.

23   Q.   AND -- BUT WITH RESPECT TO THE PERSONAL BANKRUPTCY IN

24   WHICH YOU WERE BEING HIRED AS COUNSEL IN THIS PARTICULAR

25   PLEADING HERE, YOU -- WELLS FARGO WAS THE BIGGEST CREDITOR;

MAHER CROSS

1    CORRECT?

2    A.    NO.   THE DEPARTMENT OF LABOR FILED ITS CLAIM IN BOTH CASES

3    AND MR. PAIGE HAD PERSONAL LIABILITY BECAUSE HE DIDN'T OVERSEE

4    THE FUNDING OF THE PENSION PLAN AND SO THERE WERE ABOUT 300

5    EMPLOYEES WHOSE PENSION PLANS WERE NOT FUNDED AND I THINK THE

6    CLAIMS ARE ABOUT A MILLION 125.

7    Q.    AND YOU THINK THAT A MILLION 125 IS MORE THAN 2.5 MILLION?

8    A.    THE CLAIM BY THIS -- YOU'RE RIGHT ABOUT THAT, BUT THE

9    CLAIM HAD BEEN REDUCED SIGNIFICANTLY I THINK BY THE TIME THAT

10   WE GOT EMPLOYED.   WELLS FARGO WAS A VERY LARGE CREDITOR, NO

11   QUESTION.

12   Q.    AT SOME POINT YOU ACTUALLY OBJECTED TO THE DEPARTMENT OF

13   LABOR FILING A CLAIM IN THE PERSONAL BANKRUPTCY OF THE PAIGE

14   ESTATE; CORRECT?

15   A.    THE CLASSIFICATION OF IT.

16   Q.    AND THAT DEBT AROSE AS A RESULT OF PAIGE'S CORPORATE

17   BANKRUPTCY?

18   A.    CORRECT.

19   Q.    PAIGE'S SECURITY SERVICE.   AND WITH RESPECT TO THE

20   PERSONAL BANKRUPTCY, THE WELLS FARGO CLAIM WAS ABOUT 2 AND A

21   HALF MILLION?

22   A.    THE ASSET OF THE CHAPTER 11, YES.

23   Q.    AND THAT WAS MOSTLY SECURED BUT SOME UNSECURED, TRUE?

24   A.    NO.   IT WAS ALL UNSECURED AND IT WAS BASED ON A GUARANTY

25   OF CORPORATE DEBT.

1    Q.   WELLS FARGO WAS ALSO THE BANK THAT WAS SERVICING THE LOAN

2    ON THE MOONRACKER PROPERTY AT THAT TIME; CORRECT?

3    A.   I DON'T RECALL IF IT WAS OR NOT.

4    Q.   AND SO YOUR FIRM REPRESENTED WELLS FARGO AT THE TIME?

5    A.   YES, IN OTHER MATTERS.

6    Q.   PRIMARILY IN PROBATE MATTERS?

7    A.   CORRECT.

8    Q.   AND WHAT OTHER KINDS OF MATTERS?

9    A.   I DON'T RECALL IF THERE WERE ANY.  THERE MUST HAVE BEEN

10   SOME OTHERWISE WE WOULDN'T HAVE USED THAT LANGUAGE.

11   Q.   YOUR FIRM HAD ALSO PREVIOUSLY REPRESENTED WELLS FARGO ON

12   OTHER MATTERS; CORRECT?

13   A.   I BELIEVE SO, YES.

14   Q.   AND WHAT OTHER KINDS OF MATTERS WERE THOSE?

15   A.   I DON'T RECALL.

16   Q.   MR. MAHER, YOU BILL THE ESTATE FOR YOUR TIME; CORRECT?

17   A.   YES.

18   Q.   AND YOU CALCULATED YOUR RATE ON AN HOURLY BASIS?

19   A.   YES.

20   Q.   AND INITIALLY THAT WAS SOMEWHERE BETWEEN 260 AND 425 --

21   I'LL WITHDRAW THAT QUESTION.

22   A.   WELL, IT WAS MY --

23   Q.   YOU WERE BILLING FOR TIME THAT YOU PERSONALLY SPENT AS

24   WELL AS OTHER PERSONNEL WITHIN YOUR FIRM; CORRECT?

25   A.   IF THEY WORKED ON THE CASE, YES.

```
1    Q.   AND THAT RANGE WAS INITIALLY BETWEEN 260 TO 425 AN HOUR;

2    CORRECT?

3    A.   THAT SOUNDS ABOUT RIGHT.  IF THAT'S WHAT THE APPLICATION

4    SAYS, IT'S RIGHT.

5    Q.   AND YOU INITIALLY STATED YOUR OWN BILLING TO BE $395 PER

6    HOUR?

7    A.   I THINK THAT WAS IN 2005.  2004 I THINK WAS A LITTLE BIT

8    LESS.

9    Q.   BUT WHEN YOU REQUESTED APPROVAL FROM THE COURT TO BILL,

10   YOU WERE REQUESTING $365 AN HOUR FOR YOUR PERSONAL TIME; TRUE?

11   A.   THAT'S CORRECT.

12   Q.   AND BY THE TIME YOU ACTUALLY STARTED BILLING, YOUR HOURLY

13   RATE HAD INCREASED TO $445 PER HOUR?

14   A.   NO.  I THINK I ACTUALLY STARTED BILLING AT THE END OF

15   NOVEMBER 2004, WHICH WOULD HAVE BEEN AT THAT RATE.

16   Q.   AND WOULD IT REFRESH YOUR RECOLLECTION TO TAKE A LOOK AT

17   YOUR FIRST APPLICATION FOR REIMBURSEMENT?

18   A.   YES.

19   Q.   IF I MAY APPROACH THE WITNESS?

20        THE COURT:  AND THIS IS TO REFRESH THE WITNESS'S

21   RECOLLECTION AS TO YOUR PREVIOUS QUESTION.

22        MS. GARRIDO:  YES.

23   Q.   I'M SPECIFICALLY REFERRING YOU TO PAGE 18 OF 20.

24   A.   OKAY.

25   Q.   DID YOUR RATE RANGE BETWEEN 365 AND 445 PER HOUR?
```

1    A.   YES, OVER THIS TIME PERIOD.

2    Q.   AND THE FINAL 103 HOURS YOU BILLED AT $445 PER HOUR?

3    A.   DURING CALENDAR YEAR 2006, YES.

4    Q.   AND THAT WAS MOST OF THE WORK THAT YOU DID DURING THAT

5    TIME PERIOD; CORRECT?  ABOUT TWO-THIRDS?

6    A.   ON THIS -- I DON'T UNDERSTAND THE QUESTION.  THAT MOST OF

7    THE WORK WAS DONE IN 2006, MOST OF THE HOURS, YES, BASED ON

8    THIS.

9    Q.   AND MOST OF THE WORK THAT YOU DID, ABOUT TWO THIRDS OF THE

10   WORK YOU DID AT THAT TIME PERIOD WAS BILLED AT $445 PER HOUR?

11   A.   CORRECT.

12   Q.   AND DURING THAT TIME PERIOD YOU BILLED TOTAL FOR YOUR FIRM

13   $67,000, $67,404.06?

14   A.   THAT'S CORRECT.

15   Q.   AND THAT WAS FOR A TOTAL OF 161 HOURS AND A THIRD?

16   A.   YES.

17   Q.   AND YOU ALSO BILLED AN ADDITIONAL $3,394.50 IN EXPENSES;

18   TRUE?

19   A.   YES.

20   Q.   AND YOU'VE BILLED THE ESTATE SEVEN TIMES SO FAR OR --

21   SORRY -- SIX TIMES DURING YOUR REPRESENTATION?

22   A.   THAT'S PROBABLY ABOUT RIGHT.

23   Q.   AND THE MONEY YOU BILL GETS APPROVED?

24   A.   YES.

25   Q.   AND IT GETS PAID OUT TO YOU WHETHER OR NOT THE CREDITORS

1    GET PAID OR NOT; CORRECT?

2    A.   THAT'S CORRECT.

3    Q.   AND MANY CREDITORS ONLY GET A VERY SMALL PORTION GENERALLY

4    IN BANKRUPTCY OF WHAT THEY WERE INITIALLY OWED; CORRECT?

5    A.   THAT'S CORRECT.

6    Q.   BUT AS LONG AS THERE'S MONEY IN THE ESTATE, YOU GET PAID

7    EVERYTHING YOU BILL; TRUE?

8    A.   NO, THAT'S NOT TOTALLY TRUE.  BANKRUPTCY COURT COULD CUT

9    THE FEES OR I COULD EXERCISE BILLING DISCRETION AND CUT THE

10   FEES MYSELF.

11   Q.   DID YOU DO SO IN THIS CASE?

12   A.   NO, I DIDN'T.

13   Q.   AND DID THE BANKRUPTCY COURT CUT YOUR FEES IN THIS CASE?

14   A.   NO.

15   Q.   SO IN THE PRIORITY SCHEME WHERE SECURED CREDITORS GO FIRST

16   AND UNSECURED NEXT, AND YOU'RE AHEAD OF THE LINE; CORRECT?

17   A.   NO.  I MEAN, IF YOU WANT TO CLARIFY THAT QUESTION, SECURED

18   CREDITORS GET PAID AND IF THERE'S MONEY LEFT OVER I'M FIRST

19   ALONG WITH ALL OF THE OTHER CHAPTER 7 TRUSTEE ANYBODY ELSE HAS

20   TO PAY.

21   Q.   AND THE TRUSTEE, HIS ROLE IS TO PROTECT THE UNSECURED

22   CREDITORS; TRUE?

23   A.   IT'S TO PROTECT ALL CREDITORS.

24   Q.   SO HE'S THERE TO WORK FOR ALL OF THE SECURED CREDITORS?

25   A.   TO AN EXTENT, YES.

```
1    Q.   YOUR SECOND BILLING OCCURRED ON NOVEMBER 14TH, 2007, AND

2    YOU BILLED AN AMOUNT OF $23,905, TRUE?

3    A.   IT COULD BE.  I HAVEN'T SEEN THAT FEE APPLICATION IN QUITE

4    SOME TIME.

5    Q.   AND I'M GOING TO ASK YOU ABOUT ALL OF YOUR FEE

6    APPLICATIONS.  WOULD IT REFRESH YOUR RECOLLECTION TO HAVE ALL

7    OF THEM?

8    A.   I BELIEVE SO.

9    Q.   THANK YOU.  IF I COULD HAVE GG, JJ, LL, TT, AND DB.

10   SORRY.  IT'S A LOT OF PAPER.

11        REFERRING FIRST TO GG.  THE TOTAL BILLING FOR YOUR FIRM

12   WAS $23,905 FOR 55 AND A THIRD HOURS; TRUE?

13   A.   23,905 FOR THE FEES AND $1,360 FOR THE EXPENSES.

14   Q.   AND THAT WAS BILLED ON NOVEMBER 14TH, 2007?

15   A.   YES.

16   Q.   AND THEN REFERRING TO JJ, THAT WAS BILLED ABOUT A YEAR

17   LATER ON NOVEMBER 24TH, 2008?

18   A.   YES.

19   Q.   AND THE TOTAL THERE WAS $13,384 FOR 28 AND TWO-THIRDS

20   HOUR?

21   A.   YES.

22   Q.   AND ANOTHER $1,360 FOR EXPENSES?

23   A.   YES.

24   Q.   AND YOUR RATE WAS GOING UP AS WELL, CORRECT, YOUR PERSONAL

25   RATE?
```

MAHER CROSS

1    A.    I'M JUST CHECKING.  YES.

2    Q.    YOU WERE NOW BILLING BETWEEN 450 TO 475 PER HOUR?

3    A.    THAT'S RIGHT.

4    Q.    YOUR FOURTH APPLICATION FOR REIMBURSEMENT WAS SUBMITTED ON

5    OCTOBER 22ND, 2009?

6    A.    YES.

7    Q.    AND THAT WAS A TOTAL AMOUNT OF $35,286.75?

8    A.    YES.

9    Q.    AND FOR A LITTLE OVER TWO WEEKS WORTH OF WORK, WORTH OF

10   HOURS, 81.65 HOURS?

11   A.    YES, FOR EVERYBODY WHO WORKED ON IT, YES.

12   Q.    AND THERE WAS AN ADDITIONAL $3,253 IN EXPENSES?

13   A.    YES.

14   Q.    AND YOUR PERSONAL RATE CONTINUED TO INCREASE.  YOU WERE

15   NOW CHARGING $485 PER HOUR?

16   A.    RIGHT, $10 MORE.

17   Q.    THE FIFTH APPLICATION FOR REIMBURSEMENT OCCURRED ON

18   OCTOBER 18TH, 2010?

19   A.    YES.

20   Q.    AND THE TOTAL BILLING FOR YOUR FIRM WAS $15,288?

21   A.    YES.

22   Q.    AND THAT WAS FOR 32 HOURS?

23   A.    YES.

24   Q.    AND AN ADDITIONAL $347 IN EXPENSES?

25   A.    YES.

```
 1    Q.   AND YOUR PERSONAL RATE, AGAIN, INCREASED TO BETWEEN $485

 2    AND $490 PER HOUR?

 3    A.   YES.

 4    Q.   YOUR SIXTH APPLICATION FOR FUNDS WAS SUBMITTED ON

 5    OCTOBER 31ST, 2011?

 6    A.   YES.

 7    Q.   AND IT WAS $5,859 FOR 11.7 HOURS?

 8    A.   YES.

 9    Q.   AN ADDITIONAL $1,695 IN EXPENSES?

10    A.   YES.

11    Q.   AND YOUR PERSONAL HOURLY RATE HAD NOW INCREASED TO $510

12    PER HOUR; TRUE?

13    A.   YES.

14    Q.   YOU BILLED ABOUT A TOTAL OF ABOUT $161,000 ON THE PAIGE

15    BANKRUPTCY, TRUE, EXCLUDING EXPENSES?

16    A.   I THINK THAT'S ABOUT RIGHT.

17    Q.   ABOUT $25,000 IN EXPENSES IN ADDITION TO THAT?

18    A.   IF I ADDED -- IF YOU ARE REPRESENTING THAT THAT'S THE SUM

19    OF THE EXPENSE NUMBERS, YES.

20    Q.   AND ABOUT TWO-THIRDS OF YOUR TOTAL BILLING WAS SPENT

21    DEALING WITH THE MOONRACKER PROPERTY; TRUE?

22    A.   ABOUT THAT.

23    Q.   ARE YOU CHARGING THE ESTATE FOR YOUR TIME RIGHT NOW?

24    A.   NO.

25    Q.   FOR PREPARATION AND FOR TESTIMONY?
```

1    A.   I DON'T KNOW EXACTLY WHAT YOU MEAN BY "PREPARATION FOR

2    TESTIMONY."

3    Q.   WERE YOU ASKED TO REVIEW CERTAIN DOCUMENTS BEFORE COMING

4    TO COURT?

5    A.   I WASN'T ASKED TO REVIEW ANYTHING.

6    Q.   DID YOU DO ANYTHING IN ORDER TO PREPARE FOR YOUR TIME

7    HERE?

8    A.   I DID IT.  I WASN'T ASKED.

9    Q.   AND DID YOU RECORD FOR THAT TIME?

10   A.   I RECORDED MY TIME, BUT IT HASN'T BEEN BILLED.

11   Q.   AT SOME POINT PETER LIEDERMAN ACTUALLY FILED AN OBJECTION

12   TO HOW MUCH MONEY YOU WERE CHARGING THE ESTATE; CORRECT?

13   A.   HE FILED ON OBJECTION TO AT LEAST ONE.

14   Q.   REFERRING YOU TO EXHIBIT MM.  IS THAT A -- IS THAT THE

15   PLEADING WHERE MR. LIEDERMAN OBJECTED TO YOUR FOURTH

16   APPLICATION FOR IN TERM COMPENSATION?

17   A.   YES.

18   Q.   AND THAT WAS FILED WITH THE BANKRUPTCY COURT?

19   A.   THIS DOESN'T HAVE THE FILING DATA AT THE BOTTOM OF THE

20   PAGE, BUT I ASSUME IT WAS.

21   Q.   DO YOU RECALL SEEING THAT DOCUMENT?

22   A.   I RECALL THAT HE OBJECTED TO A FEE APPLICATION A FEW YEARS

23   AGO.

24   Q.   AND DO YOU RECALL RESPONDING TO IT?

25   A.   I'M SURE I DID.

1    Q.   NOW, JOHN RICHARDSON ALSO BILLED THE ESTATE FOR HIS TIME;

2    CORRECT?

3    A.   WELL, HE DID AN INTERIM REPORT AND REQUESTED COMPENSATION

4    AND HE'S SUPPOSED TO REPORT HIS HOURS BUT HE'S NOT PAID ON AN

5    HOURLY RATE BASIS.

6    Q.   RIGHT.  HIS FEES ARE CALCULATED AS A PERCENTAGE; TRUE?

7    A.   YES.

8    Q.   AND THAT'S A TOTAL OF RECEIPTS AND DISBURSEMENTS?

9    A.   DISBURSEMENTS.

10   Q.   AND COULD YOU TELL THE JURY WHAT THAT MEANS?

11   A.   THAT MEANS IF A TRUSTEE PAYS MONEY TO SOMEBODY OTHER THAN

12   THE DEBTOR THAT HE'S ENTITLED TO A SMALL COMMISSION ON IT.  I

13   THINK FOR THIS CASE IT WAS 3 PERCENT FOR AMOUNTS OVER -- IT'S

14   FRONT LOADED.  SO THE FIRST 50,000 IT'S A HIGHER PERCENTAGE,

15   AND AFTER THAT IT'S 3 PERCENT, I BELIEVE, FOR THIS CASE.

16   Q.   AND INITIALLY IT'S A MUCH HIGHER PERCENTAGE; TRUE?

17   A.   YES.

18   Q.   LIKE 25 PERCENT?

19   A.   FOR THE FIRST 50, 10 PERCENT OF THE NEXT 45.

20   Q.   AND IN CALCULATING THAT FEE, HE'S SUPPOSED TO INCLUDE ONLY

21   DISBURSEMENTS THAT OCCURRED AFTER THE CONVERSION TO CHAPTER 7,

22   CORRECT?

23   A.   MONEY HE'S DISBURSED.  IF HE RECEIVED MONEY INTO THE

24   ESTATE FROM THE CHAPTER 11, HE'S ENTITLED TO COMPENSATION FOR

25   THAT.

1    Q.   HE'S NOT ENTITLED TO ANY COMPENSATION THAT WAS RECEIVED BY

2    THE CHAPTER 11 ESTATE?

3    A.   IF THERE WAS MONEY TURNED OVER OR ASSETS TURNED OVER AND

4    HE DISBURSED THAT MONEY, HE'S ENTITLED TO A COMMISSION ON IT.

5    Q.   ENTITLED TO THE COMMISSION OF WHAT HE RECEIVES AFTER THE

6    CONVERSION TO THE CHAPTER 7 ESTATE?

7    A.   WELL, THERE'S A CHAPTER 11 ESTATE AND THERE'S A CHAPTER 7

8    ESTATE.

9         AND IF THERE'S MONEY OR ASSETS IN THE CHAPTER 11 ESTATE,

10   THEY GO IMMEDIATELY TO THE CHAPTER 7.

11        AND IF HE USES THAT MONEY TO DISTRIBUTE TO PERSONS OTHER

12   THAN THE DEBTOR, HE'S ENTITLED TO A COMMISSION.  AND SO IF

13   THERE WAS A BANK ACCOUNT WITH $100,000 IN IT, AND HE ULTIMATELY

14   DISBURSED IT TO CREDITORS, HE'S ENTITLED TO A COMMISSION ON

15   THAT.

16   Q.   AND ANY DISBURSEMENTS PRIOR TO THAT POINT, PRIOR TO THE

17   CONVERSION, HE'S NOT ENTITLED TO A PERCENTAGE OF THAT?

18   A.   IF YOU CAN GIVE ME AN EXAMPLE BECAUSE I'M NOT SURE WHERE

19   YOU'RE GOING.

20   Q.   OKAY.  IF I COULD HAVE EXHIBITS Z, X, AND S.  LET ME REFER

21   YOU TO SOMETHING THAT YOU TESTIFIED ABOUT YESTERDAY, THE DEL

22   MONTE PROPERTY.

23   A.   UH-HUH.

24   Q.   THIS WAS ONE OF THE PAIGES'S PROPERTY; CORRECT?

25   A.   CORRECT.

MAHER CROSS

1    Q.   AND THAT WAS LOCATED AT 3074, THAT WAS THE ADDRESS?

2    A.   THAT WAS THE ADDRESS.

3    Q.   OKAY.  AND THAT SOLD PRIOR TO THE CONVERSION TO CHAPTER 7?

4    A.   YES.

5    Q.   AND THE CONVERSION TO CHAPTER 7 TOOK PLACE ON

6    SEPTEMBER 30TH, 2004?

7    A.   ABOUT THAT TIME.  I THOUGHT IT WAS A DAY OR TWO LATER.

8    Q.   IF YOU NEED TO REFRESH YOUR RECOLLECTION AS TO THE EXACT

9    DATE, YOU CAN REFER TO GOVERNMENT'S EXHIBIT 166.  DO YOU NEED

10   TO REFRESH YOUR RECOLLECTION?

11   A.   I'M LOOKING AT ONE OF MY FEE CONVERSIONS.  IT SAYS IT WAS

12   DATED OCTOBER 1, 2004.

13   Q.   AND THE ORDER REFERENCED THAT THE CONVERSION SHOULD TAKE

14   PLACE AS OF SEPTEMBER 30TH, 2004?

15   A.   THAT COULD BE.  THAT COULD BE.

16   Q.   NOW, IN THIS CASE MR. RICHARDSON IN SUBMITTING HIS BILL

17   INCLUDED THE ENTIRE SALE PRICE OF THE DEL MONTE PROPERTY AND

18   ALL OF THE PAYMENTS FROM ESCROW EVEN THOSE THAT HAD OCCURRED

19   PRIOR TO THE CONVERSION OF CHAPTER 7; CORRECT?

20   A.   I'M NOT FAMILIAR WITH THIS E-MAIL FROM HIM HERE.  I THINK

21   THAT'S WHAT HE'S SAYING.

22        MR. FONDO:  OBJECTION.  THE WITNESS IS SAYING -- IT

23   LACKS FOUNDATION.  THE WITNESS HAS SAID HE'S NOT FAMILIAR WITH

24   THE E-MAIL.

25        THE COURT:  WELL, THIS HAS NOT BEEN OFFERED INTO

```
1    EVIDENCE YET.  SO YOU CAN ASK YOUR NEXT QUESTION.

2            MS. GARRIDO:  THANK YOU.

3    Q.  DID YOU -- ARE YOU AWARE THAT IN EXHIBIT Z MR. RICHARDSON

4    FIRST SUBMITTED A BILL FOR $59,575; CORRECT?

5    A.  I DON'T RECALL THE DOCUMENT BUT THIS LOOKS AUTHENTIC

6    CERTAINLY, AND I SEE THE NUMBER 59,570.

7    Q.  AND HE WAS REQUIRED TO ADJUST THAT DOWNWARD TO $46,745,

8    REFERRING TO EXHIBIT S?

9            MR. FONDO:  OBJECTION, YOUR HONOR, LACK OF

10   FOUNDATION.

11           THE COURT:  IF YOU'RE GOING TO USE THE DOCUMENTS TO

12   REFRESH THE WITNESS'S RECOLLECTION, YOU SHOULD ASK HIM THE

13   QUESTION FIRST.

14       IF YOU CAN ANSWER THE QUESTION, SIR, THEN YOU SHOULD USE

15   THE DOCUMENT TO REFRESH YOUR RECOLLECTION.  SO LET'S KIND OF DO

16   IT IN THAT ORDER.

17           THE WITNESS:  I DON'T HAVE A RECOLLECTION OF IT.  IF

18   I CAN LOOK AT THIS DOCUMENT?

19           MS. GARRIDO:  YES, PLEASE DO SO.

20           THE WITNESS:  WHAT IS HANDWRITTEN --

21           THE COURT:  EXCUSE ME.  THE DOCUMENT IS USED TO

22   REFRESH YOUR RECOLLECTION.

23           THE WITNESS:  I JUST DON'T RECALL THIS DOCUMENT.  ON

24   THE OTHER HAND, I DON'T HAVE ANY REASON TO BELIEVE IT'S NOT

25   AUTHENTIC.
```

MAHER CROSS

1           THE COURT:  SO EXCUSE ME.  THE DOCUMENT IS NOT IN

2    EVIDENCE.  IT'S USED TO REFRESH YOUR RECOLLECTION ONLY.

3           THE WITNESS:  OKAY.

4           THE COURT:  IF IT DOESN'T REFRESH YOUR RECOLLECTION,

5    YOU CAN INDICATE.  IF IT DOES, YOU CAN INDICATE.

6           THE WITNESS:  IT DOESN'T.

7           THE COURT:  THE REFERENCE TO THE DOCUMENT ITSELF IS

8    NOT IN EVIDENCE, AND IT CAN'T BE USED FOR EVIDENTIARY PURPOSES

9    OTHER THAN TO REFRESH YOUR RECOLLECTION.

10           THE WITNESS:  IT DOESN'T REFRESH MY RECOLLECTION.  I

11    JUST DON'T REMEMBER.

12    BY MS. GARRIDO:

13    Q.  DID MR. RICHARDSON DISCUSS WITH YOU HAVING BEEN CONTACTED

14    BY KAREN MUIR OF THE U.S. TRUSTEE'S OFFICE?

15           MR. FONDO:  OBJECTION, YOUR HONOR.  TO THE EXTENT

16    THAT COUNSEL IS SEEKING ATTORNEY-CLIENT COMMUNICATIONS, I JUST

17    WANT TO MAKE SURE WE DON'T --

18           THE COURT:  YOUR QUESTION WAS WHETHER OR NOT THE

19    WITNESS HAD BEEN CONTACTED BY ANOTHER LAWYER?

20           MS. GARRIDO:  BY JOHN RICHARDSON, THE TRUSTEE IN

21    THIS CASE.

22           THE COURT:  REGARDING THIS CASE?

23           MS. GARRIDO:  YES, REGARDING THE BILLING.

24           THE COURT:  THIS PARTICULAR BILLING?

25           MS. GARRIDO:  YES.

```
1               THE COURT:  YOU CAN ANSWER THAT WHETHER OR NOT YOU

2     WERE CONTACTED.

3               THE WITNESS:  ON THIS PARTICULAR QUESTION I DON'T

4     RECALL WHETHER HE DID OR NOT.

5     BY MS. GARRIDO:

6     Q.  IF THE TRUSTEE INFLATES HIS DISBURSEMENTS AND RECEIPTS AND

7     GETS MORE MONEY THAN DUE, THAT MONEY COMES FROM THE CREDITOR;

8     TRUE?

9     A.  ASSUMING ALL OF THOSE FACTS, THAT WOULD BE CORRECT, BUT I

10    DON'T KNOW IF THOSE FACTS ARE CORRECT.

11    Q.  AND ANY MONEY THAT GOES TO THE TRUSTEE REDUCES THE AMOUNT

12    THAT THE CREDITORS CAN RECOVER; CORRECT?

13    A.  THAT'S CORRECT.

14    Q.  AND THE SAME THING FOR THE FEES AND THE EXPENSES THAT YOU

15    CHARGE THAT REDUCES THE AMOUNT THAT THE CREDITORS CAN RECOVER;

16    TRUE?

17    A.  THAT'S CORRECT.

18    Q.  ON THE DEBTOR'S INITIAL SCHEDULE A LISTED A VALUATION OF

19    THE MOONRACKER PROPERTY AS $365,000; CORRECT?

20    A.  I THINK THAT'S CORRECT, BUT I'D LIKE TO LOOK AT THE

21    DOCUMENT TO MAKE SURE.

22    Q.  SURE.  THAT'S GOVERNMENT'S EXHIBIT 161.

23    A.  YES, 365.

24    Q.  AND THAT WAS AS OF MAY 28TH, 2002?

25    A.  TECHNICALLY IT SHOULD HAVE BEEN AS OF THE PETITION DATE,
```

1    APRIL 26TH.

2    Q.   OKAY.  AND WITHIN THAT SAME DOCUMENT IT'S NOTED THAT WELLS

3    FARGO HAS A SECURED CLAIM AS TO THE MORTGAGE ON THAT PARTICULAR

4    PROPERTY; TRUE?

5    A.   YES.

6    Q.   AND WHEN THIS DOCUMENT, GOVERNMENT'S EXHIBIT 161, THE

7    SCHEDULES OF THE DEBTORS, WHEN THAT WAS PREPARED, YOU HAD

8    NOTHING TO DO WITH THAT; CORRECT?

9    A.   CORRECT.

10   Q.   OKAY.  YOU DIDN'T EVEN KNOW THAT THIS CASE EXISTED AT THAT

11   POINT; TRUE?

12   A.   THAT'S CORRECT.

13   Q.   AS OF MAY 20TH, 2004, THE DEBTORS IN THEIR SUMMARY OF

14   FINANCIAL STATUS AND THEIR BALANCE SHEET THEY STILL LIST THE

15   AMOUNT OF 365,000; IS THAT TRUE?  AND THAT WOULD BE AT

16   EXHIBIT 163.

17   A.   YES.

18   Q.   NOW, AT THE TIME THAT YOU WERE HIRED TO BE COUNSEL ON THE

19   CASE, YOU KNEW THAT THE HIGHER THE VALUATION OF THE PROPERTY,

20   THE MORE THAT YOU COULD DEMAND FROM THE CO-TENANT; CORRECT?

21   A.   NO.

22   Q.   YOU DIDN'T KNOW THAT?

23   A.   IT ASSUMES I WOULD DEMAND MONEY FROM THE CO-TENANT.

24   Q.   OKAY.  YOU KNEW THAT THE HIGHER THE MARKET, THE HIGHER THE

25   VALUE OF THE HOME, THE MORE THE ESTATE COULD POTENTIALLY BE

1    ENTITLED TO?

2    A.   THAT'S CORRECT.

3    Q.   AND I'D LIKE TO REFER YOU TO GOVERNMENT'S EXHIBIT 170.

4    THESE ARE THE AMENDED SCHEDULES.

5         NOW, THESE WERE FILED IN BANKRUPTCY COURT ON JANUARY 18TH,

6    2005; IS THAT CORRECT?

7    A.   CORRECT.

8    Q.   AND THAT'S RIGHT AFTER YOU WERE HIRED ON THE CASE?

9    A.   YEAH, IT WAS THREE WEEKS OR SO AFTER THE COURT -- I THINK

10   THAT'S RIGHT.

11   Q.   OKAY.  AND THIS DOCUMENT WAS ALSO GENERATED JUST A FEW

12   MONTHS AFTER MR. RICHARDSON WAS APPOINTED; TRUE?

13   A.   YES.

14   Q.   AND THIS IS NOT IN THE SAME FORMAT -- WELL, IT DOESN'T

15   APPEAR TO HAVE BEEN IMPORTED FROM THE ORIGINAL AT GOVERNMENT'S

16   EXHIBIT 161; TRUE?

17   A.   I DON'T KNOW WHAT "IMPORTED" MEANS.

18   Q.   MEANING THE SAME TEMPLATE WAS USED?

19   A.   IT LOOKS LIKE THE FORM HAS CHANGED.

20   Q.   OKAY.  AND THE CAPTION ALSO HAS A TYPO.  MS. PAIGE'S NAME

21   IS NOW LISTED AS CARRIER B. PAIGE INSTEAD OF CARRIE B. PAIGE?

22   A.   YES.

23   Q.   AND THIS IS SOMETHING THAT THE TRUSTEE PREPARED?

24   A.   NO.

25   Q.   AND THAT YOU PREPARED?

MAHER CROSS

```
1    A.   NO.

2    Q.   AND THIS IS NOT SIGNED BY MR. PAIGE OR MS. PAIGE; CORRECT?

3    A.   INDIVIDUAL FORMS ARE NOT SIGNED.  THERE'S USUALLY A PAGE

4    AT THE BACK AND BY THIS TIME THEY'RE USING ELECTRONIC

5    SIGNATURES.  THIS WOULD HAVE BEEN FILED BY MR. MCLAUGHLIN,

6    THEIR ATTORNEY.

7    Q.   YOU DON'T HAVE ANY PERSONAL KNOWLEDGE AS TO WHO ACTUALLY

8    FILED THIS, TRUE, AS YOU'RE LOOKING AT IT RIGHT NOW?

9    A.   AS I'M LOOKING AT IT RIGHT NOW, NO.

10   Q.   AND THERE IS NO SIGNATURE PAGE HERE, ELECTRONIC OR

11   OTHERWISE?

12   A.   NOT ON THIS, NO.

13   Q.   OKAY.  AND IN CONTRAST, 161, THE ORIGINAL PETITION

14   ACTUALLY CONTAINED A SIGNATURE PAGE ON PAGE 29 OF 29?

15   A.   YES.

16   Q.   WELL, THAT'S A SIGNATURE ON A DIFFERENT DOCUMENT BUT

17   THERE'S 19 --

18   A.   PAGE 19 HAS THEIR SIGNATURES.

19   Q.   SO THEIR SIGNATURE APPEARS AT LEAST TWICE WITHIN

20   GOVERNMENT'S EXHIBIT NUMBER 161?

21   A.   YES.

22   Q.   AND NOWHERE WITHIN 170?

23   A.   CORRECT.

24   Q.   ON THE FIRST PAGE OF 170, THE MOONRACKER DRIVE PROPERTY IS

25   CHARACTERIZED, WHAT IT STATES THERE IS THAT DEBTOR HAS A
```

```
 1    ONE-HALF INTEREST IN THIS SINGLE FAMILY RESIDENCE, PROPERTY IS

 2    OCCUPIED BY DEBTOR'S DAUGHTER?

 3    A.   CORRECT.

 4    Q.   AND YOU TESTIFIED YESTERDAY THAT AT THAT POINT YOU KNOW

 5    THAT ONLY LEONARD PAIGE IS ON THE TITLE WITH MS. HOLMES AND NOT

 6    MS. PAIGE, CARRIE PAIGE; CORRECT?

 7    A.   AT WHAT TIME ARE YOU ASKING?  WHAT TIMEFRAME?

 8    Q.   WELL, WHEN YOU WERE TESTIFYING ABOUT THIS PARTICULAR

 9    DOCUMENT, WHAT YOU STATED WAS THAT AT THE TIME THAT YOU WERE

10    REVIEWING THAT, YOU KNEW AT THIS POINT THAT ONLY LEONARD PAIGE

11    AND NOT CARRIE PAIGE WAS ON TITLE TO THE MOONRACKER PROPERTY;

12    IS THAT CORRECT?

13    A.   I DON'T THINK THAT'S WHAT I SAID.  WE ULTIMATELY -- I

14    ULTIMATELY FIGURED OUT THAT IT WAS JUST MR. PAIGE AND IT DID

15    SAY DEBTOR, SINGULAR, AND I DIDN'T KNOW WHETHER THAT WAS

16    ANOTHER TYPO OR WHAT.  I ASSUMED THAT IT WAS JUST

17    LEONARD PAIGE.

18    Q.   AND THAT IS DIFFERENT THAN HOW TITLE ON ALL OF HIS OTHER

19    PROPERTIES WERE HELD; TRUE?

20    A.   YES.

21    Q.   AND ALL OF THE OTHER PROPERTY TITLES HAD CARRIE PAIGE AND

22    LEONARD PAIGE JOINT OWNING?

23    A.   YES.

24    Q.   NOW, THIS AMENDED SCHEDULE HAS A MARKET VALUE FOR THE HOME

25    OF 500,000?
```

```
 1      A.   YES.

 2      Q.   AND YOU HAVE NO IDEA WHERE THAT NUMBER CAME FROM?

 3      A.   CORRECT.

 4      Q.   AND THAT WAS AS OF JANUARY 18TH, 2005?

 5      A.   YES.

 6      Q.   MR. RICHARDSON DIDN'T EVEN MOVE TO HIRE A REALTOR UNTIL

 7      MARCH OF 2005; CORRECT?

 8      A.   I THINK THAT WAS ABOUT THE RIGHT TIME.

 9      Q.   OKAY.  SO YOU DIDN'T HAVE ANY OFFICIAL INPUT AS TO THE

10      MARKET VALUE OF THE HOME IN JANUARY OF 2005?

11      A.   NO.

12      Q.   AS OF JANUARY 24TH, 2005, THE BANKRUPTCY WAS DISCHARGED;

13      CORRECT?

14      A.   NO.

15      Q.   NO?

16      A.   NO.  THE PAIGES RECEIVED A DISCHARGE.

17      Q.   OKAY.  THE PAIGES RECEIVED THEIR BANKRUPTCY DISCHARGE ON

18      JANUARY 24TH, 2005?

19      A.   YES, THAT'S CORRECT.

20      Q.   THAT MEANS A FRESH START FOR THEM, THEIR DEBTS ARE

21      FORGIVEN; CORRECT?

22      A.   CORRECT.

23      Q.   BUT FOR YOU AND MR. RICHARDSON THE WORK IS JUST BEGINNING,

24      FAIR TO SAY?

25      A.   YES.
```

MAHER CROSS

1    Q.   NOW, AT GOVERNMENT'S EXHIBIT 175, OR RATHER LET'S MOVE TO

2    176.  BOTH YOU AND MR. RICHARDSON WROTE LETTERS IN PART

3    ADDRESSING THE MARKET VALUE OF THE HOME ON JUNE 17TH, 2005;

4    CORRECT?

5    A.   YES.

6    Q.   AND YOU -- DID YOU DRAFT MR. RICHARDSON'S LETTER?

7    A.   I DID.

8    Q.   AND YOU ALSO WROTE YOUR OWN DIRECTLY TO MR. LIEDERMAN?

9    A.   YES.

10   Q.   AND BOTH OF YOU REFERRED TO THE MARKET VALUE OF THE HOME

11   TO BE $600,000?

12   A.   YES.

13   Q.   AND WHAT WAS THAT BASED ON?

14   A.   INPUT FROM THE REALTOR.

15   Q.   WHEN HAD YOU HAD A CONVERSATION WITH HER?

16   A.   I DIDN'T.

17   Q.   YOU HAD THIS INFORMATION THROUGH MR. RICHARDSON?

18   A.   YES.

19   Q.   WHEN HAD MR. RICHARDSON TOLD YOU ABOUT THIS?

20   A.   THAT WOULD BE PRIVILEGE, BUT I DON'T RECALL WHEN HE TOLD

21   ME.

22   Q.   BUT ON OCTOBER 6TH, 2005, I THINK GOVERNMENT'S EXHIBIT 183

23   YOU WROTE TO THE REALTOR RENA ACASIO, CORRECT?

24   A.   YES.

25   Q.   AND CAN I BRING THAT UP, 183, GOVERNMENT'S EXHIBIT 183.

```
 1      AND IF WE CAN JUST HIGHLIGHT THE FULL FINAL PARAGRAPH BEGINNING

 2      "I WOULD APPRECIATE IT."

 3           IF YOU COULD READ THAT PARAGRAPH?

 4    A.   "I WOULD APPRECIATE"?

 5    Q.   YES.

 6    A.   "I WOULD APPRECIATE IF YOU WOULD LET ME KNOW, ONE, THE

 7      PRICE AT WHICH YOU WOULD LIST THE PROPERTY; TWO, THE PRICE AT

 8      WHICH YOU WOULD EXPECT THE PROPERTY TO SELL; AND, THREE, THE

 9      PRICE YOU BELIEVE YOU WOULD GET IF YOU HAD ONLY ONE-HALF

10      INTEREST TO SELL, I.E., WITH MS. HOLMES REMAINED THE OTHER

11      CO-OWNER."

12    Q.   SO YOU'RE ASKING HER AT THIS POINT WHAT PRICE SHE WOULD

13      LIST THE PROPERTY AT?

14    A.   FOR PURPOSES OF THE MOTION I WAS PREPARING.

15    Q.   OKAY.  AND THE $600,000 FIGURE THAT YOU INCLUDED IN YOUR

16      JUNE 17TH, 2005, LETTER, THAT WAS THE BASIS OF YOUR OPENING

17      BID, FAIR TO SAY?

18    A.   THE OFFER WE MADE TO ACCEPT 175,000, YES.

19    Q.   OKAY.  AND THAT OPENING BID IS SORT OF SETTING THE TONE

20      FOR THE NEGOTIATION, IS THAT ALSO FAIR TO SAY?

21    A.   NO, I DON'T THINK IT'S FAIR TO SAY.

22    Q.   DO YOU THINK THAT NEGOTIATIONS SHOULD BE PURSUED IN GOOD

23      FAITH?

24    A.   YES.

25    Q.   AND INCLUDING AN EVALUATION THAT WAS BASED ON SOME REAL
```

MAHER CROSS

1     CRITERIA?

2     A.   YES.

3     Q.   WERE YOU AWARE OR DID YOU BECOME AWARE AT ANY POINT THAT

4     WORLD SAVINGS BANK DID AN ACTUAL APPRAISAL OF THE PROPERTY IN

5     NOVEMBER OF 2005?

6     A.   NO.

7     Q.   DID YOU EVER COMMISSION AN ACTUAL APPRAISAL?

8     A.   NO.

9     Q.   AND DID MR. RICHARDSON TO YOUR KNOWLEDGE EVER COMMISSION

10    AN ACTUAL APPRAISAL?

11    A.   NOT TO MY KNOWLEDGE.

12    Q.   TO YOUR KNOWLEDGE DID MS. ACASIO COMMISSION AN ACTUAL

13    APPRAISAL?

14    A.   NOT TO MY KNOWLEDGE.

15    Q.   AND ON JANUARY 20TH, 2006, MS. ACASIO VALUED THE PROPERTY

16    AT 575,000; CORRECT?

17    A.   I DON'T RECALL.  IS THERE AN EXHIBIT?

18    Q.   YES.  EXHIBIT 193, AND THAT'S FOUND IN HER DECLARATION.

19    AND THAT'S AT THE VERY END OF THE EXHIBIT, DOCUMENT NUMBER

20    13-5?

21    A.   I'VE GOT IT.  YES, THAT'S CORRECT, 575,000.

22    Q.   SO, AGAIN, AS OF JANUARY 20TH, 2006, MS. ACASIO MADE A

23    DETERMINATION THAT THE PROPERTY WOULD BE LISTED FOR $575,000,

24    AND SHE WOULD EXPECT IT TO SELL FOR APPROXIMATELY THAT AMOUNT;

25    CORRECT?

MAHER CROSS

1    A.   THAT'S WHAT SHE SAYS.

2    Q.   AND SHE ACTUALLY EXECUTED THAT DECLARATION ON

3    JANUARY 20TH, 2006?

4    A.   YES.

5    Q.   AND THE DECLARATION WAS FILED ON JANUARY 20TH, 2006?

6    A.   YES.

7    Q.   SHE STATED THAT THAT WAS BASED ON HER KNOWLEDGE OF THE

8    MARKET IN VALLEJO, CALIFORNIA?

9    A.   YES.

10   Q.   AND WHICH IN TURN WAS BASED ON WHAT SHE STATES HERE AS

11   THREE YEARS OF EXPERIENCES OF SELLING PROPERTIES IN CONTRA

12   COSTA AND SOLANO COUNTIES?

13   A.   YES.

14   Q.   AND, NOW, IN FACT, MS. ACASIO WAS BASED IN EAST CONTRA

15   COSTA COUNTY; CORRECT?

16   A.   YES.

17   Q.   AND NEARLY AN HOUR AWAY FROM VALLEJO?

18   A.   I DON'T KNOW.

19   Q.   AND WOULD YOU AGREE THAT THAT'S AS DISTANT IN MILES IN

20   MARKET AS IS SANTA CRUZ FROM SAN JOSE?

21   A.   I CAN'T ANSWER THAT.  I DON'T KNOW.  IT COULD BE.

22   Q.   DID YOU RESEARCH MS. ACASIO'S CREDENTIALS BEFORE SEEKING

23   LEAVE FROM THE COURT TO HIRE HER?

24   A.   I DIDN'T SEEK LEAVE.

25   Q.   THE TRUSTEE DID?

MAHER CROSS

1    A.   THE TRUSTEE DID.

2    Q.   AND DO YOU KNOW WHETHER HE RESEARCHED HER CREDENTIALS WITH

3    RESPECT TO HER KNOWLEDGE OF THE MARKET IN VALUE?

4    A.   I DON'T KNOW WHETHER HE DID.

5    Q.   YOU KNOW THAT HE HAD A PERSONAL WORKING RELATIONSHIP WITH

6    MS. ACASIO, CORRECT?

7    A.   NO.  I KNEW HE HAD EXPERIENCE WITH HER INVOLVING ANOTHER

8    CASE THAT INVOLVED PROPERTY IN OAKLEY.

9    Q.   AND IN OAKLEY, WHICH IS IN EAST CONTRA CONTRA COUNTY WHERE

10   SHE RESIDED?

11   A.   YES.

12   Q.   AND SO YOU'RE AWARE THAT MR. RICHARDSON WORKED WITH

13   MS. ACASIO BEFORE?

14   A.   SHE WAS ON THE OTHER SIDE I THINK.

15   Q.   AND THIS FILING THAT MS. ACASIO'S DECLARATION WAS APART

16   OF, THAT WAS A FILING?

17   A.   CORRECT.

18   Q.   AND YOU DIDN'T ATTACH AN APPRAISAL TO THAT FILING;

19   CORRECT?

20   A.   NO.

21   Q.   AND YOU DIDN'T EVEN ATTACH COMPS TO THAT; CORRECT?

22   A.   THAT WOULDN'T HAVE BEEN APPROPRIATE.

23   Q.   AND ARE COMPS AN APPROPRIATE THING TO LOOK AT IN

24   DETERMINING THE MARKET VALUE OF THE HOME?

25   A.   THIS WASN'T NECESSARILY TRYING TO ESTABLISH THE MARKET

1    VALUE OF THE HOME.  IT WAS A DIFFERENT KIND OF COMPLAINT.

2    Q.   OKAY.  AND YOU DID, THOUGH, IN TERMS OF YOUR NEGOTIATIONS

3    WITH MS. HOLMES THROUGH HER ATTORNEY, MR. LIEDERMAN, YOU DID

4    THINK THAT IT WAS IMPORTANT TO KNOW WHAT THE MARKET VALUE OF

5    THE HOME WAS, CORRECT?

6    A.   YES.

7    Q.   AND BECAUSE THAT WOULD MAKE A BIG DIFFERENCE IN TERMS OF

8    HOW MUCH YOU BELIEVED THE ESTATE WAS ENTITLED TO?

9    A.   YES.

10   Q.   AND DID YOU EVER LOOK AT ANY COMPS IN ORDER TO DETERMINE

11   THE MARKET VALUE OF THE HOME?

12   A.   NO.

13   Q.   WHAT ARE COMPS?

14   A.   THEY ARE PROPERTIES THAT MIGHT BE CONSIDERED COMPARABLE TO

15   THE ONE THAT IS BEING PROPOSED TO SELL.

16   Q.   OKAY.  AND THAT INCLUDES HOUSES IN THAT SAME NEIGHBORHOOD

17   THAT ARE COMPARABLE THAT HAVE SOLD RECENTLY, CORRECT?

18   A.   IT WOULD INCLUDE THEM, YES.

19   Q.   AND SO THAT WAY YOU COULD GET A GENERAL IDEA OF WHAT THE

20   MARKET IS DOING AND WHAT THE HOME WOULD SELL FOR?

21   A.   YES.

22   Q.   YOU TESTIFIED YESTERDAY THAT YOU WERE SEEKING TO RECOVER

23   SOME, SOME EQUITY OR PROCEEDS FROM THE MOONRACKER PROPERTY TO

24   HELP PAY OFF CREDITORS; IS THAT CORRECT?

25   A.   THAT'S CORRECT.

MAHER CROSS

1    Q.    AND EVEN IF YOU SOLD MOONRACKER AND RECOVERED HALF OF THE

2    PROCEEDS OR IF MS. HOLMES BOUGHT OUT THE INTEREST IN THE

3    MOONRACKER PROPERTY, THERE STILL WOULDN'T BE ENOUGH TO PAY OFF

4    ALL OF THE CREDITORS; CORRECT?

5    A.    THAT'S CORRECT.

6    Q.    THERE STILL WOULDN'T BE NEARLY ENOUGH TO SATISFY ALL OF

7    THE DEBT THAT MR. PAIGE HAD ACCUMULATED?

8    A.    THAT'S CORRECT.

9    Q.    NOW, THE FIRST OFFER THAT YOU MADE WAS $175,000 FOR

10   MS. HOLMES TO BUY OUT THE ESTATE'S SHARE; CORRECT?

11   A.    THAT'S CORRECT.

12   Q.    AND BASED ON A $600,000 MARKET VALUE?

13   A.    THAT'S CORRECT.

14   Q.    AND YOU KNEW AT THE TIME THAT THAT REPRESENTED MORE THAN

15   50 PERCENT OF THE PROPERTY VALUE, CORRECT, THE $175,000?

16   A.    NO.

17   Q.    WERE YOU INTERVIEWED BY AN F.B.I. AGENT ON JULY 12TH,

18   2012?

19   A.    I CAN'T BE SURE ABOUT THE DATE, BUT THE TIME IS CORRECT.

20   Q.    AND DO YOU RECALL ASKING OR GIVING A STATEMENT ABOUT

21   WHETHER OR NOT THE $175,000 WAS MORE THAN 50 PERCENT OF THE

22   PROPERTY VALUE?

23   A.    NO.

24   Q.    WOULD IT REFRESH YOUR RECOLLECTION TO REVIEW A REPORT OF

25   YOUR STATEMENT?

MAHER CROSS

```
 1      A.    SURE.

 2                  MS. GARRIDO:  IF I MAY APPROACH?

 3                  THE COURT:  YES.

 4      BY MS. GARRIDO:

 5      Q.    I'M JUST REFERRING YOU TO THE UNDERLINED PORTION.

 6      A.    THIS IS JUST NOT ACCURATE.  I COULD GO THROUGH THE MATH

 7      FOR YOU IF YOU WOULD LIKE.

 8      Q.    SO YOU NEVER TOLD THE AGENT THAT THE 175,000 REPRESENTED

 9      MORE THAN THE PROPERTY'S VALUE?

10      A.    I DON'T RECALL SAYING ANYTHING LIKE THAT.  IT'S NOT

11      MATHEMATICALLY CORRECT.

12      Q.    SO IT WAS ON JUNE 17TH, 2005, THAT YOU MADE THE FIRST

13      OFFER OF $175,000 AND LESS THAN ONE MONTH LATER ON JULY 5TH,

14      2005, YOU FILED AN ADVERSARY PROCEEDING TO SELL THE HOME;

15      CORRECT?

16      A.    HAD AUTHORITY TO SELL THE HOME.

17      Q.    YOU WANTED TO FORCE THE SALE OF THE HOME REGARDLESS OF

18      MS. HOLMES BEING THERE; IS THAT CORRECT?

19      A.    THAT'S NOT REALLY AN ACCURATE REPRESENTATION.

20      Q.    AND YOU DIDN'T WANT TO FORCE THE SALE OF THE HOME?

21      A.    NO.  ACTUALLY, I DIDN'T WANT TO FORCE THE SALE OF THE

22      HOME.

23      Q.    BUT YOU FILED THIS PROCEEDING, ADVERSARY PROCEEDING

24      NONETHELESS; CORRECT?

25      A.    YES.
```

MAHER CROSS

1    Q.   AND YOU DO THINGS LIKE THAT TO GET PEOPLE'S ATTENTION;

2    CORRECT?

3    A.   I THINK MS. HOLMES AND HER ATTORNEY -- THEIR ATTENTION WAS

4    ALREADY HAD.

5    Q.   DID YOU TELL THE AGENT THAT YOU SPOKE WITH ON JULY 19TH,

6    2012, THAT YOU DO THINGS SUCH AS FILING ADVERSARY PROCEEDINGS

7    TO GET PEOPLE'S ATTENTIONS?

8    A.   I DID PROBABLY SAY THAT, AND I HAVE DONE THAT IN THE PAST.

9    Q.   AND YOU TESTIFIED YESTERDAY THAT IN THIS TYPE OF A

10   SITUATION IF A NON-DEBTOR/CO-OWNER, THE NON-DEBTOR/CO-OWNER HAS

11   A RIGHT OF FIRST REFUSAL, CORRECT?

12   A.   YES.

13   Q.   AND THAT MEANS IF THE COURT APPROVES YOUR REQUEST TO SELL

14   THE HOME, REGARDLESS OF THE FACT THAT THEY ARE LIVING THERE AND

15   HAVE BEEN LIVING THERE HOWEVER MANY YEARS THEY CAN MATCH, THEY

16   CAN MATCH -- IF YOU FIND A BUYER, THEY CAN MATCH THE BUYER'S

17   OFFER; CORRECT?

18   A.   THAT'S A LITTLE DIFFERENT THAN THAT, BUT THAT'S

19   ESSENTIALLY CORRECT.

20   Q.   AND IF SHE CANNOT MATCH THAT, THEN SHE'S JUST OUT OF LUCK?

21   A.   IF SHE DOESN'T PAY WHAT THE TRUSTEE CAN GET FOR THE SALE

22   OF THE ESTATE, SHE WILL BE OUT OF LUCK.

23   Q.   AND OUT OF THE HOME?

24   A.   IF IT WAS THE HOME.

25   Q.   MR. LIEDERMAN COMMUNICATED AN OFFER TO YOU ON OCTOBER 7,

1    2005, OF $75,000?

2    A.   THAT'S CORRECT.

3    Q.   AND YOU CAME TO AN AGREEMENT WITH MR. LIEDERMAN THAT THAT

4    $75,000 WOULD BE ENOUGH TO SETTLE AS LONG AS SHE HAD PAID THE

5    DOWN PAYMENTS AND THE MORTGAGE PAYMENTS; CORRECT?

6    A.   NO.

7    Q.   DID YOU SPEAK WITH AN F.B.I. AGENT GREGORY FINE ON

8    FEBRUARY 27, 2009?

9    A.   I SPOKE WITH MR. FINE ABOUT THIS CASE SOME TIME IN THE

10   PAST.  I DON'T KNOW IF THAT WAS THE DAY OR MONTH.  IT COULD BE.

11   Q.   AND DURING ONE OF YOUR CONVERSATIONS WITH AGENT FINE, DID

12   YOU TELL HIM THAT YOU CAME TO AN AGREEMENT WITH MR. LIEDERMAN

13   THAT $75,000 WOULD BE ENOUGH TO SETTLE AS LONG AS MS. HOLMES

14   PAID THE DOWN PAYMENTS AND MORTGAGE PAYMENTS?

15   A.   NO.

16   Q.   DO YOU THINK REVIEWING HIS REPORT WOULD REFRESH YOUR

17   RECOLLECTION, OR DID YOU NOT SAY THAT?

18   A.   NO, I'M SURE THAT IS NOT WHAT I SAID.

19   Q.   THE $75,000 OFFER THAT MR. LIEDERMAN EXTENDED, YOU DID NOT

20   COMMUNICATE THAT TO THE CREDITORS, CORRECT?

21   A.   NO.

22   Q.   YOU DIDN'T COMMUNICATE ANY OF THE OFFERS THAT

23   MR. LIEDERMAN MADE TO YOU OVER THE COURSE OF THE NEGOTIATIONS

24   TO THE CREDITORS OF THE BANKRUPTCY ESTATE?

25   A.   NO, I DIDN'T.

MAHER CROSS

```
 1    Q.   SO YOU HAD NO IDEA WHETHER OR NOT THAT $75,000 WOULD HAVE

 2    BEEN ACCEPTABLE TO THEM OR NOT?

 3    A.   IT'S A DIFFICULT QUESTION TO ANSWER BECAUSE IT ASSUMES

 4    THAT A TRUSTEE WOULD COMMUNICATE NEGOTIATIONS STEP BY STEP TO

 5    CREDITORS, WHICH IS NOT THE CASE.

 6    Q.   I'VE JUST HANDED YOU WHAT HAS BEEN MARKED AS DEFENSE

 7    EXHIBIT RRR.  DO YOU RECOGNIZE THAT DOCUMENT?

 8    A.   YES.

 9    Q.   AND IS THAT A LETTER FROM MR. LIEDERMAN TO YOU DATED

10    JANUARY 25TH, 2006?

11    A.   YES -- I'M SORRY.  YES, IT IS.

12              MR. FONDO:  OBJECTION, YOUR HONOR.  HEARSAY.

13              THE COURT:  WELL, JUST IDENTIFYING THE DOCUMENT IS

14    NOT.

15              MR. FONDO:  YOUR HONOR, WE'RE OBJECTING TO THE

16    CONTENTS OF THE LETTER.

17              THE COURT:  YOU CAN ASK YOUR NEXT QUESTION.

18              MS. GARRIDO:  THANK YOU.

19    Q.   IN THE LETTER MR. LIEDERMAN INDICATED TO YOU THAT HE

20    UNDERSTOOD YOUR --

21              MR. FONDO:  OBJECTION, YOUR HONOR.

22              THE COURT:  LET HER FINISH THE QUESTION.

23              MR. FONDO:  I THINK SHE'S STATING HEARSAY.

24              THE COURT:  ARE YOU READING HIM THE CONTENTS OF THE

25    LETTER?
```

 1            MS. GARRIDO:  I'M ASKING THE WITNESS ABOUT HIS

 2     UNDERSTANDING OF THE LETTER, THE ONGOING NEGOTIATIONS OF

 3     MR. LIEDERMAN, ALL OF WHICH HAS BEEN THE SUBJECT OF THE

 4     GOVERNMENT'S EVIDENCE.

 5            THE COURT:  ARE YOU READING FROM THE LETTER?  ARE

 6     YOU JUST GOING TO ASK HIM THE QUESTIONS THAT YOU JUST

 7     INDICATED?

 8            MS. GARRIDO:  I CAN JUST ASK HIM THE QUESTION.

 9            THE COURT:  OKAY.

10     BY MS. GARRIDO:

11     Q.   DID MR. LIEDERMAN INDICATE TO YOU THAT HE BELIEVED THAT

12     THE $75,000 OFFER HE HAD EXTENDED TO YOU ON OCTOBER 7TH, 2005,

13     HAD BEEN CONDITIONALLY ACCEPTED BY YOU?

14     A.   IT DOESN'T REALLY SAY THAT.

15            THE COURT:  THE QUESTION, SIR, IS NOT REFERENCING

16     THE LETTER, IT'S WHETHER OR NOT HE HAD SAID THAT TO YOU.

17            THE WITNESS:  I'M SORRY.  COULD YOU ASK THE QUESTION

18     FOR ME AGAIN?  I APOLOGIZE.

19     BY MS. GARRIDO:

20     Q.   DID MR. LIEDERMAN, IN HIS COMMUNICATIONS TO YOU, INDICATE

21     THAT HE BELIEVED YOU HAD CONDITIONALLY ACCEPTED HIS $75,000

22     OFFER?

23     A.   YES.

24            MR. FONDO:  OBJECTION, YOUR HONOR.  HEARSAY.

25            MS. GARRIDO:  THE RULE OF COMPLETENESS, YOUR HONOR.

```
 1              THE COURT:  THE RULE OF COMPLETENESS FOR?

 2              MS. GARRIDO:  FOR ALL OF THE LETTERS AND NEGOTIATION

 3    BACK AND FORTH AND TO PROVIDE A FULL PICTURE FOR THE JURY OF

 4    ALL OF THE LETTERS GOING BACK AND FORTH AND NOT JUST ONE --

 5              THE COURT:  EXCUSE ME.  IF YOU'RE ASKING ABOUT

 6    WHETHER OR NOT THIS PARTICULAR DOCUMENT HAS BEEN INTRODUCED BY

 7    THE GOVERNMENT, AND, THEREFORE, IS A COMPLETE DOCUMENT SHOULD

 8    COME IN, THAT'S ONE THING, BUT IF IT'S AS TO GET OTHER

 9    DOCUMENTS IN THAT MIGHT OR MIGHT NOT BE RELEVANT TO THE

10    CONVERSATION, THAT'S SOMETHING DIFFERENT.

11         SO WHICH IS THIS?

12              MS. GARRIDO:  YOUR HONOR, THIS IS PART OF THE ENTIRE

13    UNIVERSE OF NEGOTIATION AND CORRESPONDENCE BETWEEN MR. MAHER

14    AND MR. LIEDERMAN.  IT'S NECESSARY TO PROVIDE A COMPLETE

15    PICTURE UNDER THE RULE OF COMPLETENESS TO THE JURY ABOUT THE

16    SUBSTANCE OF ALL OF THOSE NEGOTIATIONS.

17              MR. FONDO:  YOUR HONOR, THESE ARE NOT RELATED TO

18    NEGOTIATIONS.  THIS IS AFTER THE FACT, YOUR HONOR.

19              MS. GARRIDO:  NEGOTIATIONS WERE CONTINUING ON AND

20    THE GOVERNMENT HAS INTRODUCED MULTIPLE LETTERS BACK AND FORTH

21    BETWEEN MR. MAHER AND MR. LIEDERMAN.

22              MR. FAZIOLI:  YOUR HONOR, THOSE LETTERS ARE ADMITTED

23    PURSUANT TO THE EXCEPTION OF THE HEARSAY RULE APPLICABLE IN

24    THIS CASE TO THE DOCUMENTS.

25              THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION.  YOU
```

MAHER CROSS

```
1      CAN ASK YOUR NEXT QUESTION.

2      BY MS. GARRIDO:

3      Q.   ON JUNE 5TH, 2006, MR. LIEDERMAN INDICATED ANOTHER OFFER

4      AMOUNT TO YOU FOR A HIGHER AMOUNT; CORRECT?

5           MR. FONDO:  OBJECTION, YOUR HONOR, AS TO RELEVANCE.

6      ARE WE GOING TO GO --

7           THE COURT:  DO YOU HAVE A DOCUMENT TO REFERENCE,

8      MS. GARRIDO?

9           MS. GARRIDO:  YES, GOVERNMENT'S EXHIBIT NUMBER 216.

10          MR. FONDO:  YOUR HONOR, THE GOVERNMENT IS HAPPY TO

11     GO TO EVENTS PAST THE DATE OF THE INDICTMENT BUT THERE'S A --

12          MS. GARRIDO:  GOVERNMENT'S EXHIBIT 215.  SORRY.

13          THE COURT:  215.

14          MR. FONDO:  WHICH HAS NOT BEEN ADMITTED, YOUR HONOR.

15          THE COURT:  I UNDERSTAND.

16       (PAUSE IN PROCEEDINGS.)

17          THE COURT:  YOU'RE ASKING THAT THE ENTIRE 215 BE

18     ADMITTED?  FOUR PAGES IN 215.

19          MS. GARRIDO:  YES, I CAN MAKE AN OFFER OF PROOF

20     LATER AT SIDE-BAR.  I CAN MOVE ON FROM QUESTIONING AT THIS

21     TIME, BUT I'M SEEKING TO INTRODUCE THE WHOLE UNIVERSE OF

22     NEGOTIATION DOCUMENTS AND NOT JUST THIS ONE PARTICULAR

23     DOCUMENT.

24          MR. FONDO:  YOUR HONOR, IF I MAY?  ONE, HEARSAY;

25     TWO, THIS IS BEYOND THE OUTSIDE OF THE SCOPE OF THE ALLEGATIONS
```

MAHER CROSS

1    HERE.

2        THERE ARE A LOT OF -- I MEAN, WE COULD GO ON FOR A LONG

3    TIME ABOUT WHAT TOOK PLACE AFTER APRIL OF 2005.

4            THE COURT:  ALL RIGHT.  IF YOU CAN MOVE ON TO

5    ANOTHER AREA, LET'S DO THAT THEN AND WE'LL RESERVE CONVERSATION

6    THEN ABOUT THESE EXHIBITS.

7            MS. GARRIDO:  THAT'S FINE.

8    Q.  YOU TESTIFIED EARLIER ABOUT THE CANCELLATION OF INSURANCE

9    AND THAT YOU LEARNED ABOUT THAT SOME TIME IN DECEMBER OR

10   JANUARY?

11   A.  DECEMBER OF 2005.

12   Q.  DECEMBER OF 2005?

13   A.  CORRECT.

14   Q.  AND YOU DID RECEIVE INFORMATION AT SOME POINT THAT THE

15   HOUSE WAS INSURED UNDER A NEW POLICY AND ALLSTATE POLICY;

16   CORRECT?

17   A.  YES, AT SOME POINT.

18   Q.  AND DID THE ESTATE START PAYING HALF OF THE ALLSTATE

19   INSURANCE?

20   A.  NO.

21   Q.  AND HAD THE ESTATE BEEN PAYING HALF OF THE PREVIOUS

22   INSURANCE POLICY?

23   A.  WE DIDN'T KNOW THAT THERE WAS AN INSURANCE POLICY -- WELL,

24   NO, THAT'S NOT TRUE.  NO, WE HADN'T.  WE HADN'T.

25   Q.  HAD THE ESTATE BEEN CONTRIBUTING TO -- DIRECTLY TO HALF OF

```
 1      THE MORTGAGE PAYMENT?

 2      A.    DURING THE CHAPTER 11 AND DURING PART -- WELL, DURING

 3      CHAPTER 11, YES, THE ESTATE WAS PAYING ALL OF THE PAYMENTS.

 4      Q.    DURING THE CHAPTER 11?

 5      A.    DURING THE CHAPTER 7 THE TRUSTEE WAS NOT MAKING THOSE

 6      PAYMENTS.

 7      Q.    I'M SORRY.  AFTER CONVERSION TO CHAPTER 7 THE TRUSTEE DID

 8      NOT MAKE ANY PAYMENTS TO THE MORTGAGE?

 9      A.    THAT'S CORRECT.

10      Q.    DID THE TRUSTEE PAY 50 PERCENT OF THE IMPROVEMENTS?

11      A.    WHICH IMPROVEMENTS?

12      Q.    ANY IMPROVEMENTS?

13      A.    I DON'T KNOW OF ANY IMPROVEMENTS.  SO, NO, IF THERE WERE

14      NO IMPROVEMENTS, THERE WERE NO IMPROVEMENTS.  NO.

15      Q.    AND UPKEEP, DID THE TRUSTEE PAY HALF OF UPKEEP ON THE

16      HOME?

17      A.    I KNOW THAT'S NOT A LEGAL TERM, BUT CAN YOU TELL ME WHAT

18      YOU MEAN?

19      Q.    MAINTENANCE ON THE HOME?

20      A.    LIKE PAINT?

21      Q.    YEAH.

22      A.    NO.

23      Q.    AFTER CONVERSION TO CHAPTER 7, WHAT PAYMENTS, IF ANY, DID

24      THE TRUSTEE IN THIS CASE MAKE TO 312 MOONRACKER?

25      A.    TO MY KNOWLEDGE, NONE.
```

1    Q.   IN YOUR LETTER, I BELIEVE IT WAS ADMITTED INTO EVIDENCE,

2    GOVERNMENT'S EXHIBIT 190, YOU INDICATE THAT THE ESTATE WOULD

3    PAY FOR HALF OF THE COST OF INSURANCE, THAT THIS COST SHOULD BE

4    BORN EQUALLY BY MS. HOLMES AND THE ESTATE, BUT YOU NEVER

5    ACTUALLY PAID HALF OF THE ESTATE OR HALF OF THE INSURANCE COST;

6    CORRECT?

7    A.   TECHNICALLY CORRECT.

8    Q.   MR. MAHER, YOU'VE BEEN PRACTICING BANKRUPTCY LAW FOR QUITE

9    A LONG TIME?

10   A.   IT SURE SEEMS LIKE IT.

11   Q.   ABOUT HOW MANY YEARS?

12   A.   SINCE 1997.  SO ALMOST 26 YEARS.

13   Q.   YOU GENERALLY SEE THE SAME GROUP OF ATTORNEYS PRACTICING

14   IN THAT AREA?

15   A.   THERE ARE A LOT OF FACES.  IT'S A RELATIVELY SMALL AREA,

16   YES.

17   Q.   AND YOU'RE USED TO DEALING WITH ATTORNEYS IN BANKRUPTCY

18   LAW; CORRECT?

19   A.   WELL, I'M USED TO DEALING WITH BOTH.

20   Q.   PRIOR TO HANDLING THE PAIGE BANKRUPTCY, YOU NEVER MET

21   MR. LIEDERMAN; CORRECT?

22   A.   NO.

23   Q.   AND YOU DIDN'T KNOW HIS REPUTATION, BUT YOU DIDN'T THINK

24   IT COULD BE GOOD, TRUE?

25   A.   I DIDN'T THINK THAT.

```
1     Q.   YOU DIDN'T --

2     A.   I DIDN'T KNOW WHAT HIS REPUTATION WOULD BE.  I HAD NO WAY

3     OF KNOWING.

4     Q.   AND DID YOU TELL THE F.B.I. AGENT THAT YOU DIDN'T, ON

5     JUNE 12TH, 2012, THAT YOU DIDN'T THINK THAT HIS REPUTATION

6     COULD BE GOOD?

7     A.   I DON'T RECALL IF I MADE THAT STATEMENT, NO.

8     Q.   OKAY.  MIGHT IT REFRESH YOUR RECOLLECTION TO TAKE A LOOK

9     AT A REPORT?

10    A.   CERTAINLY.

11    Q.   I'M REFERRING YOU SPECIFICALLY TO THE HIGHLIGHTED PORTION.

12    A.   I MADE A SARCASTIC COMMENT.

13              THE COURT:  SO THE QUESTION IS WHETHER OR NOT THIS

14    IS -- HAVING REVIEWED THE DOCUMENT WHETHER OR NOT YOUR

15    RECOLLECTION IS REFRESHED.

16              THE WITNESS:  NO, IT IS NOT.

17    BY MS. GARRIDO:

18    Q.   OKAY.  BUT YOU BELIEVE THAT YOU MAY HAVE HAD SOME

19    SARCASTIC THINGS TO SAY ABOUT MR. LIEDERMAN?

20    A.   I MAY HAVE MADE THAT SARCASTIC COMMENT.

21    Q.   OKAY.  HE DIDN'T SEEM QUALIFIED IN BANKRUPTCY LAW TO YOU,

22    DID HE?

23    A.   HE WASN'T WELL VERSED IN BANKRUPTCY IN MY OPINION.

24    Q.   WELL, AT THE VERY BEGINNING OF YOUR INTERACTIONS WITH HIM,

25    HE IMMEDIATELY EXPRESSED HIS OUTRAGE THAT SOMEBODY, A
```

```
1    NON-DEBTOR/CO-OWNER COULD BE -- COULD HAVE THEIR HOUSE SOLD;

2    CORRECT?

3              MR. FONDO:  OBJECTION.  HEARSAY, YOUR HONOR.

4              THE COURT:  SUSTAINED.

5              MS. GARRIDO:  IT GOES TO BIAS, YOUR HONOR.

6              THE COURT:  BIAS OF THIS WITNESS?

7              MS. GARRIDO:  YES.

8              THE COURT:  AS TO THE BIAS FOR -- AS AGAINST

9    MR. LIEDERMAN?

10             MS. GARRIDO:  YES.

11             THE COURT:  THIS IS MR. LIEDERMAN'S COMMENT TO THIS

12   WITNESS?

13             MS. GARRIDO:  CORRECT.

14             THE COURT:  SO I'LL ALLOW THE QUESTION TO BE

15   ANSWERED.  IT'S NOT OFFERED FOR THE TRUTH OF THE MATTER

16   ASSERTED, LADIES AND GENTLEMEN.  IT'S MERELY OFFERED TO

17   ESTABLISH, IF AT ALL, THIS WITNESS BORE ANY BIAS TOWARDS THE

18   DECLARANT, MR. LIEDERMAN.

19             MS. GARRIDO:  THANK YOU.

20             THE WITNESS:  HE -- THE TRUSTEE WAS TRYING TO SELL

21   THE PROPERTY, AND HIS CLIENT HAD AN OWNERSHIP AND INTEREST, AND

22   I DON'T RECALL EXACTLY IF IT WAS OUTRAGE.  I THINK HE

23   QUESTIONED WHETHER A TRUSTEE COULD DO IT.

24   BY MS. GARRIDO:

25   Q.   OKAY.  DID YOU REFER TO IT AS OUTRAGE WHEN YOU SPOKE WITH
```

1    AN F.B.I. AGENT ON JANUARY -- I'M SORRY -- JULY 19TH, 2012?

2    A.   WAS THAT WHEN I MADE THE SARCASTIC REMARK?

3    Q.   YES.

4    A.   I MUST HAVE BEEN IN SOME MOOD.  I MAY HAVE USED OUTRAGE.

5    Q.   AND DID YOU ALSO CHARACTERIZE MR. LIEDERMAN'S REACTION AS

6    OUTRAGE THAT SOMEBODY IN BANKRUPTCY COULD NOT LOSE THEIR

7    PROPERTY EVEN IN SOME OF YOUR BILLING PAPERWORK THAT YOU

8    SUBMITTED TO THE COURT?

9    A.   IF I WROTE IT DOWN, THEN THOSE ARE ACCURATE

10   REPRESENTATIONS.

11   Q.   WE'LL FIND THAT LATER.  MR. LIEDERMAN REPEATEDLY EXPRESSED

12   TO YOU THAT HE THOUGHT THIS WAS AN UNCONSTITUTIONAL TAKING;

13   CORRECT?

14   A.   HE ONE TIME FILED A PLEADING IN WHICH HE MADE THAT

15   ARGUMENT.

16   Q.   OKAY.  AND THAT'S NOT SOMETHING IN YOUR VIEW THAT AN

17   EXPERIENCED BANKRUPTCY ATTORNEY WOULD DO; CORRECT?

18   A.   THAT'S CORRECT.

19   Q.   THE ESTATE'S RIGHT TO RECOVER SOME FUNDS FROM THIS

20   PROPERTY WAS NOT A RELATIVELY -- IT'S NOT A PARTICULARLY

21   CONTROVERSIAL PROVISION OF LAW; CORRECT?

22   A.   THAT'S CORRECT.

23   Q.   YOU HAD TO INFORM MR. LIEDERMAN OF WHAT THE MOTIONS

24   PRACTICE CYCLE WAS, CORRECT?

25   A.   TWENTY-EIGHT DAYS VERSUS THIRTY-FIVE DAYS?

```
 1    Q.   RIGHT.

 2    A.   YES.

 3    Q.   AND THAT WAS IN ONE OF THE LETTERS THAT WE VIEWED EARLIER

 4    THIS MORNING?

 5    A.   IT MAY HAVE BEEN.

 6    Q.   IN EXHIBIT 195.

 7    A.   YES.

 8    Q.   AND SO HE APPEARED TO BE NOT WELL VERSED NOT ONLY AS TO

 9    BLACK LETTER LAW BUT ALSO AS TO THE PROCEDURAL ASPECTS OF

10    FILING PAPERS IN BANKRUPTCY COURT?

11    A.   I WOULDN'T GO THAT FAR.  I THINK HE WAS CONFUSING IT WITH

12    DISTRICT COURT PRACTICE.

13    Q.   TO YOUR KNOWLEDGE IS THAT WHERE HE NORMALLY PRACTICED?

14    A.   NO, IT ISN'T, BUT IT'S CONSISTENT WITH DISTRICT COURT

15    PRACTICE.

16    Q.   IN SOME OF HIS CORRESPONDENCE TO YOU HE APPEARED TO BE

17    ASKING YOU FOR LEGAL ADVICE?  IS THAT FAIR TO SAY?

18    A.   I DON'T RECALL THAT.

19    Q.   WHAT ABOUT EXHIBIT 188?

20    A.   THE FIRST SENTENCE IN PARAGRAPH PHOTOGRAPH 2?

21    Q.   YES.

22    A.   IT LOOKS LIKE A RHETORICAL QUESTION TO ME.

23    Q.   WELL, HE LATER ACTUALLY RELIED ON YOUR STATEMENTS ABOUT

24    THE STATE OF THE LAW IN HIS PLEADINGS TO THE COURT, IS THAT

25    FAIR TO SAY?
```

1    A.   NO, I DON'T THINK THAT'S THE CASE.

2    Q.   AND DO YOU ACTUALLY THINK THAT HE CONFUSED YOU WITH THE

3    COURT?

4    A.   NO.

5    Q.   AND DID YOU TELL THE F.B.I. AGENT THAT HE MAY HAVE

6    CONFUSED YOU WITH THE COURT?

7    A.   I DON'T KNOW IF I DID OR NOT.  IF THERE'S A REFERENCE

8    WHERE HE MADE SOME COMMENT, THEN YOU CAN DRAW THAT TO MY

9    ATTENTION.

10   Q.   WELL, I CAN SHOW YOU THE REPORT OF YOUR JULY 2012

11   INTERVIEW WITH THE F.B.I. AGENT IF YOU WOULD LIKE TO REVIEW

12   THAT IF IT MAY REFRESH YOUR RECOLLECTION?

13   A.   I'M NOT SURE IT WILL, BUT SURE.

14        THE COURT:  THIS IS AS TO THE QUESTION OF WHETHER OR

15   NOT THIS WITNESS SAID A STATEMENT TO THIS PERSON?

16        MS. GARRIDO:  YES, AND WHETHER OR NOT THAT WAS HIS

17   BELIEF THAT MR. LIEDERMAN WAS CONFUSING HIM WITH THE COURT.

18        MR. FONDO:  WELL, YOUR HONOR, I THINK THE WITNESS

19   SAID -- IF SHE CAN SHOW HIM WHAT THAT SPECIFIC REFERENCE WAS,

20   THAT MIGHT REFRESH HIS MEMORY.

21        THE COURT:  WELL, YOU CAN USE ANY DOCUMENT, ANYTHING

22   TO REFRESH A RECOLLECTION.  HE'S REVIEWING THIS DOCUMENT NOW,

23   AND WE'LL SEE IF IT REFRESHES HIS RECOLLECTION.

24        THE WITNESS:  I DON'T REMEMBER.  THERE COULD BE SOME

25   DOCUMENT THAT LED ME TO THE CONCLUSION LIKE THAT, BUT I DON'T

MAHER CROSS

1    REALLY REMEMBER THAT STATEMENT.

2    BY MS. GARRIDO:

3    Q.   OKAY.  YOU DON'T RECALL SAYING THAT TO THE AGENT?

4    A.   I DON'T RECALL, BUT I REALLY DON'T RECALL WHETHER I DID OR

5    DIDN'T.

6    Q.   AT ONE POINT IN ONE LETTER YOU TOLD MR. LIEDERMAN THAT HE

7    SHOULD DO SOME HOMEWORK ON BANKRUPTCY LAW, TRUE?

8    A.   JANUARY 25TH, 2006.

9    Q.   YOU HAVE A VERY GOOD RECOLLECTION OF THAT STATEMENT?

10   A.   I WAS VERY ANGRY AT THAT PERIOD IN TIME.

11   Q.   AND MR. LIEDERMAN WOULD IGNORE CERTAIN CORRESPONDENCE,

12   CORRECT?

13   A.   I DON'T HAVE ANY WAY OF KNOWING WHETHER HE WAS IGNORING

14   ANYTHING.

15   Q.   WELL, YOU MADE SOME OVERTURES TO UNDUE THE GRANT DEED,

16   CORRECT, AND TO DROP THE ADVERSARY PROCEEDING?

17   A.   I MADE THOSE OVERTURES?

18   Q.   YES.

19   A.   YES.

20   Q.   AND HE NEVER RESPONDED TO THOSE OVERTURES; CORRECT?  AND I

21   CAN REFER YOU SPECIFICALLY TO GOVERNMENT'S EXHIBIT 213.

22   A.   IT'S TRUE THAT HE DIDN'T RESPOND, BUT I DON'T KNOW THE

23   REASON.

24   Q.   OKAY.  AND YOU WERE ACTUALLY OFFERING TO DROP THE ENTIRE

25   ADVERSARY PROCEEDING IF HE WOULD JUST AGREE TO VOID THE

MAHER CROSS

```
1    TRANSFER?

2    A.   THE SECOND ONE, YES.

3    Q.   AND HE AT ONE POINT WENT AND CONTACTED THE CREDITOR WELLS

4    FARGO DIRECTLY?

5              MR. FONDO:  OBJECTION, YOUR HONOR.  WE'RE GETTING

6    WAY PAST THE SCOPE OF ANYTHING RELEVANT TO THIS.

7              THE COURT:  THE RELEVANCE OF THIS?

8              MS. GARRIDO:  YOUR HONOR, AGAIN, IT'S NOT FOR THE

9    TRUTH BUT RATHER FOR BIAS.

10             MR. FONDO:  I THINK THIS EVENT TOOK PLACE --

11             MS. GARRIDO:  AND THE EFFECT ON THIS WITNESS.

12             MR. FONDO:  YOUR HONOR, IF THIS -- I THINK THIS

13   EVENT TOOK PLACE WELL AFTER THESE EVENTS THAT TOOK PLACE HERE

14   AND THERE MAY BE SOME DOORS THAT ARE OPENED IF SHE PROCEEDS

15   WITH THIS.

16             THE COURT:  CAN YOU MOVE ON TO ANOTHER TOPIC AND CAN

17   YOU RETURN TO THIS?

18   BY MS. GARRIDO:

19   Q.   YOU TESTIFIED EARLIER THAT LEONARD PAIGE HAD NO AUTHORITY

20   TO TRANSFER THE PROPERTY?

21   A.   THAT'S CORRECT.

22   Q.   OKAY.  THERE'S A SIMPLE WAY TO PREVENT ANY DEBTOR FROM

23   TRANSFERRING THE PROPERTY; CORRECT?

24   A.   NO.  I DON'T KNOW WHAT YOU HAVE IN MIND.

25   Q.   THE FILING OF THE BANKRUPTCY PETITION?
```

1    A.   YES.

2    Q.   AND WHEN YOU ACTUALLY GET A BANKRUPTCY PROCEEDING, WHEN A

3    BANKRUPTCY PROCEEDING STARTS, YOU CAN TAKE THAT PETITION AND

4    RECORD IT IN EVERY REAL LOCATION WHERE THE DEBTOR OWNS REAL

5    ESTATE; CORRECT?

6    A.   YES, YOU CAN DO THAT.

7    Q.   AND THAT'S COMMON PRACTICE?

8    A.   IT'S NOT UNCOMMON, BUT IT DOESN'T HAPPEN IN EVERY CASE.

9    Q.   AND IT'S COMMON PRACTICE FOR MR. RICHARDSON?

10   A.   IT MAY BE.

11   Q.   OKAY.  AND THE EFFECT OF DOING THAT, FOR EXAMPLE, TAKING

12   THE BANKRUPTCY PETITION IN THE PAIGES'S CASE, TAKING IT OVER TO

13   SOLANO COUNTY WHERE THE MOONRACKER PROPERTY WAS AND RECORDING

14   IT THERE IN THE RECORDER'S OFFICE IS THAT ANYONE WHO GOES AND

15   TRIES TO EFFECT A GRANT DEED, ANY SORT OF DEED PURPORTING TO

16   TRANSFER THAT PROPERTY, THEY'RE NOT GOING TO BE ALLOWED TO DO

17   IT?

18   A.   IF THERE'S AN ESTABLISHED ESCROW, THAT'S CORRECT.

19   Q.   OKAY.  AND SO IT NEVER -- IF THE SIMPLE STEP OF RECORDING

20   THE BANKRUPTCY PETITION HAD BEEN TAKEN IN THIS CASE, THIS GRANT

21   DEED NEVER COULD HAVE OCCURRED?

22   A.   NO, I THINK THAT'S CORRECT.

23   Q.   THE TRANSFER, IT HAS BEEN REFERRED TO AS VOID, BUT, IN

24   FACT, IT'S VOIDABLE; TRUE?

25   A.   THAT'S CORRECT.

1    Q.   AND CAN YOU EXPLAIN THE DIFFERENCE?

2    A.   THE DIFFERENCE IS WHEN SOMETHING IS VOID FROM THE START

3    MEANS IT'S ABSOLUTELY NO GOOD.  WHEN IT'S AVOIDABLE IT MEANS IT

4    CAN BE INVALIDATED IN EFFECT.

5    Q.   OKAY.  AND SO IN THIS PARTICULAR CASE IT WAS NOT

6    AUTOMATICALLY VOID, BUT IT WOULD HAVE BEEN IF THE BANKRUPTCY

7    PETITION HAD BEEN FILED AND RECORDED IN SOLANO COUNTY?

8    A.   THAT'S --

9              THE COURT:  DID YOU UNDERSTAND THE QUESTION?

10             THE WITNESS:  I THINK I UNDERSTOOD THE QUESTION, BUT

11   I THINK IT CALLS FOR A LEGAL CONCLUSION THAT NOT -- I DON'T

12   THINK IT'S -- MAYBE YOU SHOULD ASK IT IN A DIFFERENT WAY.

13   BY MS. GARRIDO:

14   Q.   OKAY.  THE TRANSFER FROM MR. PAIGE TO MS. HOLMES WAS NOT

15   AUTOMATICALLY VOID?

16   A.   THAT'S MY VIEW, YES.

17   Q.   SO YOU HAD TO TAKE THE STEPS OF FILING THE ADVERSARY

18   PROCEEDING UNDER 549(H) TO VOID THAT TRANSFER; CORRECT?

19   A.   THAT'S CORRECT.

20             MS. GARRIDO:  I HAVE NOTHING FURTHER AT THIS TIME

21   PENDING FURTHER SIDE-BAR.

22             THE COURT:  OKAY.  DO YOU HAVE ANY REDIRECT?

23             MR. FONDO:  I WILL, YES, YOUR HONOR.

24   /  /  /

25   /  /  /

1      **REDIRECT EXAMINATION**

2      BY MR. FONDO:

3      Q.   MR. MAHER, DEFENSE COUNSEL ASKED YOU ABOUT WHO THE BIGGEST

4      CREDITORS WERE IN THE PAIGES PERSONAL BANKRUPTCY; CORRECT?

5      A.   YES.

6      Q.   AND YOU MENTIONED THAT ONE OF THEM WAS THE DEPARTMENT OF

7      LABOR BECAUSE LEONARD PAIGE DID NOT PAY HIS PENSION PLAN

8      CONTRIBUTIONS; CORRECT?

9      A.   WELL, IT'S A LITTLE MORE COMPLICATED THAN THAT.

10     Q.   WELL, IF YOU WOULD EXPLAIN YOUR ANSWER.

11     A.   MR. PAIGE OWNED A CORPORATION AND THE CORPORATION THAT HAD

12     EMPLOYEES AND THERE WAS A PENSION BENEFIT PLAN, AND IT WASN'T

13     FULLY FUNDED.  AND THE PERSON IN CHARGE OF THE PURSE STRINGS

14     HAS PERSONAL LIABILITY FOR NOT FUNDING THOSE PLANS AND SO THE

15     DEPARTMENT OF LABOR FILED A CLAIM IN BOTH CASES.

16     Q.   AND WHEN YOU SAY, "NOT FULLY FUNDED," WHAT DO YOU MEAN IT

17     WAS NOT FULLY FUNDED?

18     A.   IT MEANT THAT CONTRIBUTIONS BY THE CORPORATION TO THESE

19     PENSION PLANS FOR THESE EMPLOYEES WERE NOT MADE.

20     Q.   AND THEY WERE SUPPOSED TO BE MADE?

21     A.   AND THEY WERE SUPPOSED TO BE MADE.

22     Q.   AND IT WAS EMPLOYEES OF THE PAIGES BUSINESS PENSION?

23     A.   YES, PAIGES SECURITY SERVICES, I THINK IT WAS CALLED.

24     Q.   OKAY.  AND SO THESE -- SO THERE WAS A CLAIM THEN AGAINST,

25     AM I CORRECT, THAT THERE WAS A CLAIM THEN AGAINST THE PAIGES'S

```
 1     PERSONAL BANKRUPTCY FOR THOSE PAYMENTS THAT WERE SUPPOSED TO

 2     HAVE BEEN MADE BUT WERE NOT PAID?

 3     A.   CORRECT.

 4     Q.   AND WHEN YOU RECOVER -- YOU MENTIONED CREDITORS BEFORE.

 5     WHEN YOU RECOVER ASSETS IN THIS BANKRUPTCY ESTATE, ARE THOSE

 6     EMPLOYEES'S PENSION PLANS ONE OF THE POTENTIAL RECIPIENTS OF

 7     ASSETS THAT GET RECOVERED BY THE TRUSTEE?

 8     A.   YES.

 9     Q.   AND IN THIS CONTEXT WHAT WAS -- WERE ALL OF THE DEBTS PAID

10     OFF?

11     A.   NO.

12     Q.   DEFENSE COUNSEL ALSO ASKED YOU WHETHER THE 312 MOONRACKER

13     DRIVE PROPERTY WOULD ESSENTIALLY HAVE MADE THE DIFFERENCE UP

14     BETWEEN THE PAIGES'S PERSONAL DEBTS AND THE CREDITOR'S CLAIMS.

15     DO YOU RECALL THAT?

16     A.   I DO.

17     Q.   OKAY.  AND IN THIS CONTEXT IT WOULD NOT HAVE MADE UP THE

18     DEBT; CORRECT?

19     A.   THAT'S CORRECT.

20     Q.   AND WOULD IT HAVE HELPED?

21     A.   YES.

22     Q.   AND ARE YOU AWARE OF ANY -- WHAT PROVISION, IF ANY, IN THE

23     BANKRUPTCY CODE ALLOWS A FATHER TO TRANSFER, OR PURPORT TO

24     TRANSFER, AN ASSET OF THE ESTATE TO HIS DAUGHTER IF THAT ASSET

25     IS NOT SUFFICIENT ENOUGH TO COVER ALL OF HIS DEBTS?
```

1    A.   THERE'S NO SUCH PROVISION.

2    Q.   I WANTED TO CLARIFY SOMETHING, TOO.  DEFENSE COUNSEL SPENT

3    SOME TIME WITH YOU ON YOUR FEES.  THESE FEES ARE ALL APPROVED

4    BY THE COURT; CORRECT?

5    A.   YES.

6    Q.   AND SHE WALKED YOU THROUGH A BUNCH OF THESE APPLICATIONS.

7         IS -- CAN YOU DESCRIBE THE BILLING INFORMATION GENERALLY

8    THAT YOU PROVIDE TO THE COURT WHEN YOU SUBMIT THESE

9    APPLICATIONS?

10   A.   I DRAFT A NARRATIVE THAT EXPLAINS IN PRETTY GENERAL TERMS

11   THE SERVICES THAT WERE GIVEN AND THEN ALL OF MY TIME RECORDS

12   ARE ATTACHED, ALL OF THE DETAIL.

13   Q.   AND WHAT IS A TIME RECORD?

14   A.   A TIME RECORD IS WHEN I DO A TASK AND IT TAKES A CERTAIN

15   AMOUNT OF TIME, I DESCRIBE THE TASK BRIEFLY AND THEN I PUT IN

16   AN AMOUNT OF TIME LIKE .1 HOUR AND .2 HOURS.

17   Q.   AND SO YOU BREAK YOUR TIME ENTRIES DOWN BY .1?

18   A.   YES.

19   Q.   AND THAT'S WHAT, LIKE EVERY SIX MINUTES.  AND SO FOR EVERY

20   SIX MINUTES INCREMENTS, YOU WRITE DOWN WHAT YOU HAVE DONE?

21   A.   THAT'S CORRECT, ALTHOUGH IF THE TASK TAKES 20 MINUTES,

22   THAT WOULD BE A .4.

23   Q.   OKAY.  AND THAT IS ALL SUBMITTED TO THE BANKRUPTCY COURT;

24   CORRECT?

25   A.   YES.

```
 1      Q.   AND WHO HAS THE AUTHORITY TO REVIEW THESE -- I'M SORRY.

 2      DOES THE BANKRUPTCY COURT HAVE THE OPPORTUNITY TO REVIEW THESE?

 3      A.   YES.

 4      Q.   AND WHAT ABOUT CREDITORS?

 5      A.   CREDITORS HAVE THE OPPORTUNITY TO AS WELL.

 6      Q.   AND WHICH OF YOUR BILLS WERE APPROVED BY THE BANKRUPTCY

 7      COURT?

 8      A.   ALL OF THE ONES THAT HAVE BEEN SUBMITTED.

 9      Q.   COULD YOU GIVE A SENSE OF WHAT PERCENTAGE OF YOUR FEES

10      RELATED TO ATTENDING TO AND DEALING WITH 312 MOONRACKER?

11      A.   WELL, DEFENSE COUNSEL ESTIMATED ABOUT TWO-THIRDS, AND I

12      THINK THAT'S ABOUT RIGHT.

13      Q.   SO YOU SAID TWO-THIRDS.  SO ROUGHLY TWO-THIRDS OF THE FEES

14      OF THIS ESTATE WERE SPENT ON LITIGATION ISSUES RELATING TO AND

15      MOSTLY IN PART THE TRANSFER OF THIS PROPERTY OR PART?

16      A.   WELL, I WOULD SAY THE WHOLE THING.  I HAVEN'T BROKEN IT

17      DOWN.

18      Q.   IF THE PARTIES HAD BEEN ABLE TO MAKE AND REACH A

19      RESOLUTION IN THE FALL OF 2005, WHAT IMPACT, IF ANY, WOULD THAT

20      HAVE HAD ON THE FEES THAT ULTIMATELY WERE GENERATED RELATING TO

21      THE 312 MOONRACKER DRIVE?

22      A.   A VERY SIGNIFICANT IMPACT.  THE FEES WOULD HAVE BEEN MUCH

23      LESS.

24      Q.   AND IS THAT ONE OF THE REASONS OR WHAT -- CAN YOU TELL THE

25      JURY WHAT SOME OF THE REASONS ARE THAT YOU, AS AN ATTORNEY IN
```

1    THE ESTATE, GENERALLY PREFER TO RESOLVE CASES VERSUS LITIGATE

2    THEM?

3    A.   LITIGATION IS VERY EXPENSIVE AND IF YOU CAN GET A

4    REASONABLE BENEFIT AND AVOID LITIGATION, SOMETIMES IT'S A

5    STRAIGHT TRADE.

6    Q.   ANY MONEY THAT IS -- WHAT IS THE IMPACT TO THE CREDITORS

7    OF THIS ESTATE OF MYRA HOLMES TAKING OUT MONEY FROM THE

8    PROPERTY IN VIA REFINANCE PROCEEDS AND SPENDING THEM ON THINGS

9    OTHER THAN PAYMENTS TO THE CREDITORS?

10              MS. GARRIDO:  OBJECTION, VAGUE.

11              THE COURT:  DID YOU UNDERSTAND THE QUESTION?

12              THE WITNESS:  I DO.  IT MEANT THAT WE HAVE ABOUT

13   $175,000 LESS TO PAY OFF THE CREDITORS.

14   BY MR. FONDO:

15   Q.   DEFENSE COUNSEL WALKED THROUGH A COUPLE OF THESE SCHEDULES

16   SO LET'S TAKE A LOOK AT EXHIBIT 161.  AND I WANT TO REFER YOU

17   TO PAGE 5, PLEASE.

18   A.   OKAY.

19   Q.   NOW, DEFENSE COUNSEL ASKED YOU ABOUT THE OWNERSHIP

20   INTEREST IN THESE PROPERTIES AND HOW THEY WERE TITLED, CORRECT?

21   A.   YES.

22   Q.   AND LET'S GO TO THE PROPERTY AT 338 MICHAEL DRIVE IN

23   MARINA.

24   A.   YES.

25              MS. GARRIDO:  OBJECTION, RELEVANCE.

MAHER REDIRECT

```
 1                   THE COURT:  OVERRULED.

 2      BY MR. FONDO:

 3      Q.   WHOSE NAME WAS THIS PROPERTY IN?

 4      A.   LEONARD AND CARRIE PAIGE.

 5      Q.   AND DID THE ESTATE ULTIMATELY OBTAIN ANY PROCEEDS FROM

 6      THIS PROPERTY?

 7      A.   NO.

 8      Q.   WHY NOT?

 9                   MS. GARRIDO:  OBJECTION, RELEVANCE.

10                   THE COURT:  OVERRULED.

11                   THE WITNESS:  WE -- THE TRUSTEE LOOKED AT THE

12      PROPERTY AND HIRED A BROKER TO HELP THEM SELL IT AND THEN IT

13      WAS VERY CLEAR THAT WE WERE GOING TO HAVE TO ENGAGE IN A LOT OF

14      LITIGATION TO DEAL WITH IT.  AND SO THE TRUSTEE DECIDED THAT

15      THE EXPENSE WASN'T JUSTIFIED.

16      Q.   AND WHY WAS THERE A LOT -- WHAT WAS THE POTENTIAL

17      LITIGATION ISSUE?

18                   MS. GARRIDO:  I'M GOING TO OBJECT AS TO RELEVANCE

19      AND OUTSIDE OF THE SCOPE OF CROSS AND REQUEST A SIDE-BAR.

20                   THE COURT:  THE ACTUAL NATURE OF THE LITIGATION IS

21      NOT PARTICULARLY RELEVANT.  IF THERE WAS LITIGATION, I THINK

22      YOU HAVE ALREADY ACHIEVED THAT, BUT THE ACTUAL NATURE OF THE

23      LITIGATION, ABSENT ANYTHING MORE.

24                   MR. FONDO:  WELL, YOUR HONOR, I'M HAPPY TO DISCUSS

25      WITH THE COURT ON THE SIDE.  I THINK THERE IS SOME RELEVANCE TO
```

1        THAT, YOUR HONOR.

2                THE COURT:  LET'S DO THAT.

3            (SIDE-BAR CONFERENCE ON THE RECORD.)

4                THE COURT:  WE'RE AT SIDE-BAR.

5                MR. FONDO:  YOUR HONOR, THERE WAS -- THIS PROPERTY

6    WAS IN THE TITLE OF THE PAIGES AFTER THE TRUSTEE CONTACTED THIS

7    DAUGHTER, THE DAUGHTER OF LEONARD PAIGE ABOUT THIS PROPERTY.

8                THE COURT:  THE DEFENDANT IN THIS CASE?

9                MR. FONDO:  NO.  A WARRANTY DEED CAME UP.  AND

10   ULTIMATELY AS A RESULT OF THAT WARRANTY DEED WHERE THERE WAS A

11   TRANSFER OF THE PROPERTY -- SO AS A PART OF THAT WARRANTY DEED

12   IT TRANSFERRED THE PAIGES'S INTEREST IN THE PROPERTY TO THE

13   DAUGHTER AND THAT ULTIMATELY PREVENTED THE ESTATE FROM

14   RECEIVING ANY ASSETS OF IT.

15       THAT TRANSFER TOOK PLACE IN -- ROUGHLY WELL BEFORE THE

16   BANKRUPTCY ESTATE.

17       SO BY DOING THIS TRANSFER THE TRUSTEE SUSPECTED THAT THERE

18   WAS SOME IMPROPRIETY, BUT THEY DECIDED NOT TO GO FORWARD WITH

19   IT.  THAT TRANSFER ULTIMATELY VOIDED THE TRUSTEE'S ABILITY TO

20   SELL THIS PROPERTY.  IT'S VERY SIMILAR HERE IN THE SENSE THAT

21   THERE WAS A TRANSFER THAT TOOK PLACE BY THE OTHER SISTER AND,

22   AGAIN, IN AN ATTEMPT TO TAKE THE PROPERTY HERE.  SO WE DO THINK

23   IT'S RELEVANT.

24                MS. GARRIDO:  WELL, IT SOUNDS TO ME THAT IT'S GOING

25   TO BE BAD CHARACTER EVIDENCE AS TO THE SISTER AND HER ACTS AND

```
 1    THEN BEING IMPEDED TO MS. HOLMES.  SO I'M CONCERNED ABOUT THE

 2    PREJUDICIAL IMPACT IF THE JURY ASSOCIATES THE INTERACTIONS OF

 3    HER SISTER OF WHAT WAS GOING ON IN HER PERSONAL CASE, IT'S

 4    ABSOLUTELY NOT RELEVANT FOR ANY OTHER PURPOSE.  SO I THINK IT'S

 5    IMPERMISSIBLE.

 6              THE COURT:  SO DO YOU WANT TO RESPOND TO THAT?  I DO

 7    HAVE SOME CONCERN IF YOU'RE GOING TO BRING IN SOME OTHER

 8    ANCILLARY, NOTWITHSTANDING IT'S THE SAME FAMILY AND THERE ARE

 9    SUSPICIONS THAT THERE MAY HAVE BEEN SOME OF THE SAME THING IN

10    ESSENCE, AND THAT MAY TAINT THIS DEFENDANT IN HER CASE.  IF

11    IT'S GOING -- YOU WOULDN'T ARGUE THAT THIS IS A FAMILY PRACTICE

12    OR SOMETHING LIKE THAT, OF COURSE, BUT NONETHELESS IT COULD

13    GIVE RISE TO OPINION THAT WOULD CAST THE DEFENDANT IN AN UNFAIR

14    LIGHT GIVEN THESE TRANSFERS.  THAT'S THE CONCERN I HAVE.

15              MR. FONDO:  WELL, YOUR HONOR, IF THAT DAUGHTER WAS

16    NOT PROSECUTED AND THE TRUSTEE DID NOT LITIGATE THAT ISSUE SO

17    IT'S NOT GOING AS TO, YOU KNOW, BAD ACTS BY THE SISTER BUT

18    RATHER INFORMATION THAT, YOU KNOW, BY DOING, AND BY HAVING A

19    TRANSFER OF PROPERTY FROM PARENTS TO THE DAUGHTER THAT CAN

20    PREVENT THE LOSS OF PROPERTY.

21              THE COURT:  SURE.  I'M PAUSING BECAUSE I'M CURIOUS

22    WHETHER OR NOT IF THE PAIGES THEMSELVES, HUSBAND AND WIFE,

23    ENGAGED IN SOME TYPE OF A TRANSACTION THAT YOU'RE GOING TO

24    ARGUE THAT THE PAIGES THEMSELVES DID THIS TO SHIELD THE

25    PROPERTY.
```

MAHER REDIRECT

1              IS THAT --

2                   MR. FONDO:  I'M NOT GOING TO GO THAT FAR IN THE

3    CONTEXT OF SAYING, YOU KNOW, WHY THAT TRANSFER DEED WAS DONE.

4    IT'S JUST THE FACT THAT THERE WAS A WARRANTY DEED AND IT WAS --

5    THE EFFECT OF THAT BY THAT TRANSFER HAPPENING IT PREVENTED THE

6    TRUSTEE FROM ATTACHING TO THAT ASSET OR ULTIMATELY DECIDING NOT

7    TO LITIGATE.

8                   THE COURT:  I SEE.

9                   MS. GARRIDO:  YOUR HONOR, MY UNDERSTANDING IS THAT

10   THE REASON WHY THEY DECIDED NOT TO LITIGATE IS BECAUSE THERE

11   SIMPLY WASN'T ENOUGH EQUITY IN THE PROPERTY TO MAKE IT

12   WORTHWHILE AND SO ANY SORT OF VOUCHING OR BUTTRESSING THAT

13   THEY'RE ATTEMPTING TO DO TO LEND MORE CREDIBILITY TO THEIR

14   DESIRE TO GO AFTER MS. HOLMES IN THIS PARTICULAR CASE FOLLOWING

15   A GRANT DEED, THE NATURE OF THE DEED WAS VERY DIFFERENT AS

16   WELL, BUT THE DANGER IS VERY HIGH THAT THE JURY WILL COMPLETE

17   THE TWO AND HOLD THE ACTIONS OF ONE SISTER AGAINST THE OTHER

18   AND ONE HAS NOTHING TO DO WITH THIS.

19        IT'S A TOTALLY DIFFERENT TYPE OF DEED.  IT WAS RECORDED

20   AFTER THE FACT, BUT THE DATE ON THE DEED WAS PRE-PETITION.  AND

21   SO THERE'S SOME PRETTY SIGNIFICANT DIFFERENCES, BUT I THINK THE

22   DANGER REMAINS SIGNIFICANTLY HIGH THAT THE JURY WILL HOLD IT

23   AGAINST MS. HOLMES UNFAIRLY.

24                   MR. FONDO:  I THINK ONE CORRECTION.  I THINK THERE

25   WAS EQUITY IN THE PROPERTY.  I DON'T BELIEVE THE DECISION TO

1    PROCEED WAS BASED ON LACK OF EQUITY.  IT WAS BASED ON THE COST

2    OF LITIGATION, THE LIKELIHOOD OF SUCCESS AND WHETHER THERE WAS

3    ENOUGH EQUITY TO JUSTIFY ALL OF THE EXPENDITURES.

4         MR. FAZIOLI:  I HAVE ONE OTHER POINT.  ALTHOUGH IT'S

5    DIFFERENT SISTERS, BOTH INVOLVING THE PAIGES IN TERMS OF THE

6    TRANSFER AND THAT IS TO TAKE INTO ACCOUNT.

7         THE COURT:  AND I RECOGNIZE -- FIRST OF ALL, I DON'T

8    THINK THIS IS VOUCHING.  I DON'T GET THE SENSE OF THAT, BUT I

9    DO HAVE SOME CONCERNS ABOUT BRINGING IN THE POSSIBLE CONDUCT OF

10   THE OLDER, YOUNGER, THE SIBLING, WHATEVER, WHO CONDUCTED

11   SIMILAR TRANSACTIONS.  I THINK THAT MIGHT INFECT THIS CASE

12   UNTOWARDLY.  SO I'M NOT GOING TO PERMIT YOU TO ASK SPECIFICALLY

13   ABOUT THAT.

14      I THINK THE EVIDENCE NOW IS -- THE RECORD NOW IS THAT,

15   THAT DIDN'T GO FORWARD FOR WHATEVER REASON BUT THAT'S BLANK.

16   BUT TO GET IN AND ALLOW THE JURY TO KNOW THAT THE SISTER

17   ENGAGED IN SIMILAR CONDUCT, I DON'T THINK THERE'S A WAY TO

18   SANITIZE THAT.

19      SO I THINK IT'S PROBLEMATIC.

20         MR. FAZIOLI:  DOES THE COURT CONSIDER IT PROBATIVE

21   AS TO AN ISSUE THAT SOMETHING THAT MAY BE ARGUED BY THE DEFENSE

22   AS TO THE PAIGES OR LEONARD PAIGE'S MOTIVATIONS AND THE

23   TRANSFER DEED THAT'S AT ISSUE WITH MYRA HOLMES?

24         THE COURT:  WELL, IT COULD COME IN.  I MEAN, IF

25   THERE IS SOME OTHER EVIDENCE.  THAT'S WHY I ASKED ABOUT THE

1    PAIGES ENGAGED IN THIS THEMSELVES.

2        IF THERE IS SOME OTHER EVIDENCE THAT THE PAIGES MAY HAVE

3    ENGAGED IN THIS THAT COULD OPEN THE DOOR FOR SOMETHING ELSE --

4    I KNOW THE DEFENSE HAS SAID THIS WAS HIS INTENT AND THE

5    FATHER'S INTENT, AND I KNOW WE HAVE HAD SOME DISCUSSION ABOUT

6    THAT, AND I'M NOT SURE THAT'S WHERE THIS GOES OR NOT, BUT IF

7    THAT DOOR IS OPENED, THEN CERTAINLY IT MIGHT COME IN THEN IN

8    THAT REGARD.

9        I'M NOT SURE THAT'S HELPFUL TO YOU, BUT OKAY.  THANK YOU.

10       SO WHAT WE'LL BREAK IN ABOUT -- I DON'T KNOW HOW MUCH YOU

11   HAVE.  WE'LL PROBABLY BREAK AT NOON, AND WE'LL HAVE TO COME

12   BACK AND THEN I'LL PROBABLY HAVE THEM COME BACK AT 1:30 AND

13   MAYBE WE CAN TALK AT FIVE OR TEN AFTER 1:00 ABOUT THESE OTHER

14   MATTERS.  DOES THAT SOUND GOOD?

15            MR. FONDO:  GOOD.

16            THE COURT:  THANK YOU, COUNSEL.

17       (END OF DISCUSSION AT SIDE-BAR.)

18   BY MR. FONDO:

19   Q.   SO, MR. MAHER, RELATING TO THE 338 MARINA DRIVE PROPERTY,

20   ULTIMATELY YOU DID NOT PURSUE THAT ASSET; CORRECT?

21   A.   THAT'S CORRECT.

22   Q.   DEFENSE COUNSEL REFERRED TO AN OBJECTION THAT

23   MR. LIEDERMAN FILED AGAINST YOUR FEES.  WAS HIS OBJECTION

24   UPHELD BY THE COURT?

25   A.   NO, IT WASN'T.

1    Q.   WOULD YOU TAKE A LOOK AT EXHIBIT 170.  DO YOU RECALL

2    DEFENSE COUNSEL ASKING YOU A NUMBER OF QUESTIONS ABOUT WHO

3    FILED THIS AND WHOSE SIGNATURE AND WHETHER THERE WAS A

4    SIGNATURE ON THIS DOCUMENT?

5    A.   YES.

6    Q.   AND WHO TYPICALLY FILES, IN YOUR EXPERIENCE, AN AMENDED

7    SCHEDULE A REAL PROPERTY FOR DEBTOR?

8    A.   THE DEBTOR'S ATTORNEY.

9    Q.   AND DO YOU HAVE ANY REASON TO BELIEVE THAT THE DEBTOR'S

10   ATTORNEY DID NOT FILE THIS DOCUMENT?

11   A.   NO.

12   Q.   AND WHO ARE THE PEOPLE WHO FILL OUT THE INFORMATION ON THE

13   AMENDED SCHEDULE A?

14   A.   THE DEBTORS ARE SUPPOSED TO.

15   Q.   WITH THE ASSISTANCE OF COUNSEL SOMETIMES?

16   A.   YES.

17   Q.   I WANT TO DIRECT YOUR ATTENTION TO EXHIBIT 176.  I WANT TO

18   REFER TO THE THIRD PARAGRAPH, PLEASE, IN THAT LETTER.

19   A.   "THE TRUSTEE WROTE"?

20   Q.   CORRECT.  NOW, WHEN DEFENSE COUNSEL WAS ASKING YOU ABOUT

21   VALUATIONS AND SHE SAID, YOU KNOW, DIDN'T YOU SAY THAT $175,000

22   WAS MORE THAN 50 PERCENT, AND THEN YOU OFFERED, CORRECT, THAT

23   YOU WERE HAPPY TO EXPLAIN THE ACCOUNTING ON THAT?

24   A.   YES.

25   Q.   WOULD YOU MIND DOING THAT FOR THE JURY ON THAT AND WHAT

```
1     THE ACCOUNTING IS THAT IS OFFERED?

2     A.   THE BANK LOAN WAS $180,000, ROUGHLY, AND SO 600 MINUS 180

3     IS 420.  AND SO THE GROSS DIVIDED AT 50 PERCENT WOULD BE 210

4     EACH.

5          SO WE OFFERED TO ACCEPT $35,000 LESS THAN THAT BECAUSE WE

6     ALSO ACCOUNTED FOR ESTIMATED COST OF SALE.

7     Q.   SO SHE, BASED ON YOUR ESTIMATE BY HER PAYING $175,000, SHE

8     WOULD HAVE BEEN PAYING LESS THAN 50 PERCENT OF THE VALUE?

9     A.   YES.

10    Q.   AND THIS WAS AN INITIAL SETTLEMENT OFFER; CORRECT?

11    A.   YES.

12    Q.   WAS THERE ANYTHING PREVENTING MS. HOLMES FROM RESPONDING

13    TO THE SETTLEMENT OFFER?

14    A.   NO.

15    Q.   DEFENSE COUNSEL ALSO ASKED YOU ABOUT THE VALUATION HERE OF

16    $600,000.  ARE YOU A REAL ESTATE AGENT?

17    A.   NO, I'M NOT.

18    Q.   AND WHAT EXPERIENCE GENERALLY DO YOU HAVE VALUING REAL

19    ESTATE?

20    A.   NONE.

21    Q.   THERE WAS A RENA ACASIO WHO WAS RETAINED; CORRECT?

22    A.   YES.

23    Q.   AND WHAT WAS THE PURPOSE OF HER BEING RETAINED BY THE

24    TRUSTEE IN THIS CASE?

25    A.   TO ASSIST THEM IN THE SALE OF THE PROPERTY.
```

1    Q.   OKAY.

2    A.   AND TO -- AND WHEN WE GOT TO LITIGATION, TO PROVIDE

3    VALUES.

4    Q.   WAS THERE ANYTHING PREVENTING -- WHAT, IF ANYTHING,

5    PREVENTED MYRA HOLMES FROM SENDING YOU AN APPRAISAL AS A

6    RESPONSE TO SAY, HEY, YOU KNOW WHAT, YOU OVERVALUED THE

7    PROPERTY?

8    A.   NOTHING.

9    Q.   WHAT, IF ANYTHING, PREVENTED MYRA HOLMES OR HER ATTORNEY

10   FROM SENDING YOU COMPS TO SAY, HEY, I THINK YOU OVERVALUED THE

11   PROPERTY?

12   A.   NOTHING.

13   Q.   IF THEY HAD DONE THAT, WHAT WOULD YOUR RESPONSE HAVE BEEN?

14   A.   WE WOULD HAVE CONSIDERED IT.

15   Q.   I'D LIKE TO REFER YOU TO EXHIBIT 184 AND SPECIFICALLY THE

16   SECOND PAGE OF 184, THE LAST PARAGRAPH.

17        SORRY.  IT'S PAGE 3, 184-3.  PAGE 2 OF THE LETTER BUT PAGE

18   3 OF THE EXHIBIT?

19   A.   I SEE.

20   Q.   DO YOU SEE WHERE IT SAYS "THIRD"?

21   A.   YES.

22   Q.   ALL RIGHT.  AND THEN IT SAYS -- IF YOU COULD READ THAT

23   LAST SENTENCE, PLEASE?

24   A.   THE ONE BEGINNING WITH "THIRD"?

25   Q.   YEAH?

1    A.   "ADDITIONALLY, MS. HOLMES HAS EVIDENCE THAT THE APPRAISAL

2    PROPOUNDED BY THE TRUSTEE'S AGENT IS EXAGGERATED BY ABOUT

3    10 PERCENT FURTHER LOWERING THE BENEFIT OF A FORCED SALE."

4    Q.   SO IT APPEARS THAT MS. HOLMES GOT AN APPRAISAL; CORRECT?

5            MS. GARRIDO:  OBJECTION, CALLS FOR PERSONAL

6    KNOWLEDGE.

7    BY MR. FONDO:

8    Q.   LET ME REPHRASE.  WHAT WAS YOUR UNDERSTANDING WHEN

9    MR. LIEDERMAN SAID THAT "ADDITIONALLY, MS. HOLMES HAS EVIDENCE

10   THAT THE APPRAISAL PROPOUNDED BY THE TRUSTEE'S AGENT IS

11   EXAGGERATED BY ABOUT 10 PERCENT"?

12           MS. GARRIDO:  OBJECTION TO THE RELEVANCE OF HIS

13   UNDERSTANDING.

14           THE COURT:  OVERRULED.

15           THE WITNESS:  JUST THAT MS. HOLMES HAD SOMETHING TO

16   STATE THAT THE VALUE THAT WE HAD STATED WAS OFF.

17   BY MR. FONDO:

18   Q.   WAS THAT EVER SHARED WITH YOU?

19   A.   NO.

20           THE COURT:  LET'S TAKE OUR NOON RECESS NOW BEFORE

21   YOU MOVE INTO ANOTHER AREA.  FOLKS, I'M GOING TO ASK YOU TO

22   COME BACK AT 1:30, PLEASE, 1:30, AND I'LL REMIND YOU OF THE

23   ADMONITION THAT IS IN PLACE.  SO DO HAVE A GOOD LUNCH, AND

24   WE'LL SEE YOU BACK AT 1:30.  WE'LL BE IN RECESS.

25           (LUNCH RECESS TAKEN.)

1              **AFTERNOON SESSION**

2        (JURY OUT AT 1:21 P.M.)

3              THE COURT:  LET'S GO ON THE RECORD IN THE U.S. V.

4    HOLMES MATTER.  COUNSEL IS PRESENT AND THE JURY IS NOT PRESENT.

5        I WANT TO MEET WITH THE LAWYERS TO GO OVER, I THINK,

6    MS. GARRIDO, YOUR COMMENTS ABOUT DOUBLE R OR TRIPLE R.  AND

7    YOUR CLIENT IS ALSO PRESENT FOR THE RECORD.

8        AND THERE WAS A HEARSAY OBJECTION AND YOU HAD RAISED I

9    THINK IT WAS FEDERAL RULE OF EVIDENCE 106 RESPONSE.

10             MS. GARRIDO:  AS I WAS INDICATING, I THINK THE

11   ENTIRE COURSE OF CONVERSATIONS BETWEEN MR. LIEDERMAN AND

12   MR. MAHER ARE RELEVANT, AND THE GOVERNMENT INTRODUCED IT.  AND

13   I BELIEVE IT'S IMPORTANT FOR THE JURY TO HEAR, PARTICULARLY IN

14   LIGHT OF MR. MAHER'S TESTIMONY BOTH TODAY AND YESTERDAY, IF I'M

15   NOT MISTAKEN, THAT HE MUCH PREFERRED TO SETTLE MATTERS AND

16   WANTS TO AVOID LITIGATION BECAUSE IT'S MORE EXPERIENCE.

17       AND SO I THINK IT'S CERTAINLY RELEVANT AT THE VERY LEAST

18   TO IMPEACH HIM THAT THERE WERE SEVERAL OFFERS MADE THROUGH

19   MR. LIEDERMAN, NONE OF WHICH RESULTED IN ANY SORT OF

20   SETTLEMENT, AND HE CONTINUED TO PURSUE LITIGATION NONETHELESS

21   REGARDLESS OF ALL OF THE OFFERS.

22       IT ALSO TIES INTO HIS RELATIONSHIP WITH MR. LIEDERMAN AND

23   HOW IT AFFECTS HIS CREDIBILITY HERE IN COURT.  AGAIN,

24   REGARDLESS OF WHEN THESE INTERACTIONS TOOK PLACE, THEIR SORT OF

25   LONG-TERM DISDAIN THAT MR. MAHER SHOWS TOWARDS MR. LIEDERMAN IS

1    BIAS AND RELEVANT TO THE JURY'S CONSIDERATION OF THE WITNESS TO

2    CREDIBLY RECOUNT HIS INTERACTIONS WITH MR. LIEDERMAN AND THE

3    IMPORT OF THOSE INTERACTIONS.

4         SO I -- WITH REGARD TO ANY NEGOTIATIONS THAT THEY WERE

5    HAVING, I DON'T THINK IT'S ACTUALLY HEARSAY.  THEY'RE BASICALLY

6    LEGAL, VERBAL ACTS NOT INTRODUCED FOR THEIR TRUTH BUT RATHER TO

7    SHOW THE PROCESS OF THE NEGOTIATION AND HOW THAT AFFECTED THE

8    STATE OF MIND OF THE PARTIES.

9              THE COURT:  THE STATE OF MIND OF WHICH PARTIES?

10             MS. GARRIDO:  MR. MAHER, THE WITNESS.

11             THE COURT:  AND HIS STATE OF MIND IS AT ISSUE?

12             MS. GARRIDO:  BECAUSE HE'S BEEN TESTIFYING ABOUT HIS

13   STATE OF MIND THROUGHOUT THE ENTIRE TESTIMONY AND WHY HE TOOK

14   CERTAIN ACTIONS, WHY HE FILED CERTAIN FILINGS.

15        MY RELEVANCY OBJECTIONS WERE ALWAYS OVERRULED ON THOSE

16   PARTICULAR POINTS.  SO THE WITNESS WAS PERMITTED TO OPINE AT

17   LENGTH ABOUT WHY HE TOOK CERTAIN ACTIONS.  SO HIS STATE OF MIND

18   IS CERTAINLY RELEVANT, AND THE JURY IS ENTITLED TO HEAR THAT HE

19   HAD A VERY SIGNIFICANT AND CERTAINLY DISDAIN AND DISLIKE FOR

20   MR. LIEDERMAN IN THOSE PROCEEDINGS.

21             THE COURT:  DIDN'T YOU ASK HIM THAT QUESTION?

22             MS. GARRIDO:  YES, BUT I WAS CUT OFF WHEN I WENT

23   BEYOND A CERTAIN TIME PERIOD.  SO I WOULD LIKE TO CONTINUE WITH

24   THAT LINE OF QUESTIONING AND FINISH THAT LINE OF QUESTIONING.

25        I WOULD ALSO LIKE TO FINISH MY LINE OF QUESTIONING WITH

1    REGARD TO THE EXTENT OF THE NEGOTIATIONS AND THE OFFERS THAT

2    WERE MADE.

3            THE COURT:  OKAY.  ANYTHING ELSE?

4            MS. GARRIDO:  NO, YOUR HONOR.

5            MR. FONDO:  CERTAINLY AS TO THE BIAS, SHE CAN ASK

6    MR. MAHER WHETHER HE HAD ANY BIAS AGAINST HIM OR WHETHER HE

7    DISLIKED HIM OR DID HE HATE HIM OR WAS HE OUT TO GET HIM?  HE

8    CAN CERTAINLY ASK THOSE QUESTIONS.

9        I DON'T THINK THERE'S ANY EVIDENCE OF BIAS IN THIS CASE

10   AND, IN FACT -- SO I DON'T THINK THERE'S ANY EVIDENCE OF THAT.

11           FURTHER, AS FAR AS THE SETTLEMENT NEGOTIATIONS, I THINK

12   WHAT DEFENSE COUNSEL IS TALKING ABOUT IS THROUGH 2006, 2008,

13   2007, THERE WERE SETTLEMENT NEGOTIATIONS.  IF SHE STARTS

14   OPENING THOSE DOORS, THAT'S GOING TO GET INTO THE FORECLOSURE

15   ISSUE THAT THE DEFENSE COUNSEL ASKED TO STAY OUT OF BECAUSE

16   CERTAINLY RELEVANT TO THESE ISSUES WERE THE FACT THAT

17   MS. HOLMES STOPPED MAKING PAYMENTS AND THAT THE TRUSTEE HAD TO

18   GO IN AND INCUR ADDITIONAL COSTS TO STOP PEOPLE COMING IN, YOU

19   KNOW, THE BANK FROM FORECLOSING ON THE PROPERTY.

20       THERE IS ALL OF THESE COMMUNICATIONS -- A LOT OF THESE

21   COMMUNICATIONS POST-DATE WHEN DEFENSE -- I MEAN, MR. LIEDERMAN

22   SAID THERE'S NO DEAL.  HE'S NEVER OFFERED -- HE MADE AN OFFER,

23   AND IT'S IN THE CASE MANAGEMENT CONFERENCE.

24       SO ANYTHING BEYOND, CERTAINLY ANYTHING BEYOND THE DATE OF

25   THE INDICTMENT IS WELL -- IS IRRELEVANT TO WHAT IS GOING ON

```
1      HERE, AND IT'S CERTAINLY GOING TO OPEN A LOT OF DOORS.

2          WE'RE GOING TO BE HERE FOR A LONG TIME IF WE'RE GOING TO

3      TALK ABOUT MEDIATIONS, COURT APPOINTED FORCED MEDIATIONS, AND

4      THE ESTATE, VALUE OF THE PROPERTY, FORECLOSURES, ET CETERA.

5              MR. FAZIOLI:  YOUR HONOR, AS TO SOME OF THE

6      COMMUNICATIONS THAT TOOK PLACE BEFORE THE -- WITHIN THE TIME

7      PERIOD OF THE INDICTMENT, I KNOW THE DEFENSE MADE AN ARGUMENT

8      THAT THERE IS SOME SORT OF UNIVERSAL COMMUNICATIONS, AND IT ALL

9      SHOULD GET IN UNDER THE RULE OF COMPLETENESS.

10         THE RULE APPLIES TO A PARTICULAR DOCUMENT, AND DOES NOT

11     APPLY TO A SERIES OF DOCUMENTS, NUMBER ONE.

12         NUMBER TWO, TO THE EXTENT THAT THE GOVERNMENT HAS SOUGHT

13     TO INTRODUCE A LETTER OR STATEMENT THAT WAS MADE BY

14     MR. LIEDERMAN, IT'S ADMISSIBLE AS AN EXCEPTION TO THE HEARSAY

15     RULE AS BOTH AN ADMISSION OF AN AGENT BUT ALSO AS THE ADMISSION

16     OF THE PARTY OPPONENT.

17         THE LETTERS THAT THEY'RE SEEKING TO INTRODUCE ARE NOT

18     NECESSARILY ADMISSIBLE ON THAT GROUNDS IF THEY'RE BEING

19     INTRODUCED BY THE DEFENDANT.

20         AND IN SOME INSTANCES SOME OF THESE LETTERS HAVE ATTACHED

21     DECLARATIONS FROM MYRA HOLMES.  AND TO THE EXTENT THAT THE

22     DEFENDANT IS GOING TO SEEK TO INTRODUCE THAT, THAT IS

23     RESPECTFULLY HEARSAY AND TO SOME EXTENT SELF-SERVING HEARSAY

24     AND NOT WITHIN THE EXCEPTION, AND THAT'S PART OF THE

25     GOVERNMENT'S OBJECTION TO INTRODUCING THAT.
```

1          MS. GARRIDO:  YOUR HONOR, I DISAGREE ANY DOORS WOULD

2     BE OPENED BY THE LINE OF QUESTIONING THAT I WOULD PROPOSE,

3     WHICH IS VERY LIMITED, WHICH WOULD PROBABLY TAKE LESS THAN

4     TEN MINUTES TOTAL TO COMPLETE.

5          THE COURT:  WHAT AREA ARE YOU SPEAKING OF?

6          MS. GARRIDO:  SPECIFICALLY THE LINE OF QUESTIONING

7     ABOUT THE NEGOTIATIONS THAT OCCURRED.

8          THE COURT:  ARE THESE --

9          MS. GARRIDO:  AND THE OFFERS THAT WERE MADE AND

10    OFFERS TO SETTLE.

11         THE COURT:  POST-INDICTMENT TIME?

12         MS. GARRIDO:  THE LETTER THAT I WAS PROHIBITED FROM

13    GETTING INTO WAS JANUARY 25TH, 2006.  AND TO THE EXTENT THAT

14    THEY INTRODUCE THE CASE MANAGEMENT STATEMENT WHICH BEARS

15    DIRECTLY ON THIS LETTER, THIS LETTER SHOULD BE ADMITTED UNDER

16    THE RULE OF COMPLETENESS.

17         THE COURT:  SO DOES THE RULE OF COMPLETENESS MAKE

18    ADMISSIBLE EVIDENCE THAT IS OTHERWISE INADMISSIBLE?

19         MS. GARRIDO:  YES.

20         THE COURT:  IT DOES?

21         MS. GARRIDO:  WELL, I DON'T SEE WHY THIS WOULD BE

22    INADMISSIBLE.  THIS IS PARTICULARLY HIS DISCUSSION OF.

23         THE COURT:  IS IT A HEARSAY DOCUMENT?  ASSUMING IT'S

24    A HEARSAY DOCUMENT, WHAT IS THE EXCEPTION?

25         MS. GARRIDO:  YOUR HONOR, THIS IS ADMISSIBLE --

```
1    FIRST OF ALL, AN OFFER THAT IS MADE I DON'T BELIEVE IS HEARSAY.

2         THE SIMPLE ACT OF MAKING AN OFFER IS NOT AN OUT-OF-COURT

3    STATEMENT IN THE STRICT SENSE OF THE WORD FOR HEARSAY PURPOSES.

4    I BELIEVE IT'S A LEGAL ACT RATHER THAN ACTUAL HEARSAY.

5         SO TO THE EXTENT THAT THEY'RE HAVING NEGOTIATIONS AND

6    DISCUSSING OFFERS, THEN I DON'T THINK THAT THAT NECESSARILY

7    CONSTITUTES HEARSAY.

8         I THINK IT'S NOT NECESSARILY BEING OFFERED FOR THE TRUTH

9    BUT TO IMPEACH THE WITNESS.  AND ALSO WITH REGARD TO THE RULE

10   OF COMPLETENESS, I BELIEVE IT ABSOLUTELY WOULD, IF ONE HEARSAY

11   STATEMENT GETS IN BECAUSE THE GOVERNMENT INTRODUCES IT, AND IF

12   THERE'S ANOTHER HEARSAY STATEMENT THAT DIRECTLY BEARS ON THAT

13   AND IS PART OF THAT SAME COMMUNICATION, CERTAINLY THE RULE OF

14   COMPLETENESS ALLOWS FOR THE RULE OF COMPLETENESS OF THAT

15   ADDITIONAL PIECE OF HEARSAY AS WELL.

16             THE COURT:  IN THE SAME DOCUMENT?

17             MS. GARRIDO:  I DON'T THINK IT'S LIMITED TO THE SAME

18   DOCUMENT.  THAT'S NOT --

19             THE COURT:  ISN'T THAT THE RULE OF COMPLETENESS

20   INITIALLY IS, IS TO DESIGN TO PROTECT IS THAT ONE PARTY GETS IN

21   A CERTAIN PORTION OF A DOCUMENT AND THE RULE OF COMPLETENESS,

22   RULE OF FAIRNESS WOULD ALLOW THE OTHER SIDE TO GET IN PORTIONS

23   OF THE SAME DOCUMENT?  THAT'S THE START OF IT I THINK IS TO GET

24   THE PORTIONS OF THE SAME DOCUMENT SO THE JURY HAS A COMPLETE

25   PICTURE, IF YOU WILL, OF THE ENTIRETY THE DOCUMENT, THE
```

```
 1        STATEMENT.  I MEAN, I THINK THAT'S THE STARTING POINT OF THE
 2        RULE OF COMPLETENESS.
 3             AND THEN I THINK GOING FURTHER, AND I SUPPOSE THE ARGUMENT
 4        CAN BE, WELL, THERE ARE OTHER DOCUMENTS SEPARATE THAT PERTAIN
 5        TO THE CONVERSATION, THAT THOSE SHOULD COME IN, THOSE
 6        STATEMENTS, WHATEVER THEY ARE, FOR EXPANDING, IF YOU WILL, RULE
 7        OF COMPLETENESS.
 8             AND MY SENSE IS THAT IS THE SECOND CATEGORY WHERE YOU'RE
 9        SPEAKING OF HERE BY GETTING THIS SECONDARY LETTER IN TRIPLE R,
10        WHICH WAS SEPARATE AND APART FROM THE GOVERNMENT'S LETTER THAT
11        WAS INTRODUCED.
12             MS. GARRIDO:  WELL, I RESPECTFULLY DISAGREE ABOUT
13        THE CHARACTERIZATION OF BEING AN EXPANSION OF THE RULE OF
14        COMPLETENESS.  I THINK IT'S ENCOMPASSED WITHIN THE RULE OF
15        COMPLETENESS BECAUSE IT'S PART OF THE SAME ONGOING DISCUSSION
16        ABOUT SETTLEMENT NEGOTIATION.
17             THE COURT:  OKAY.  ANYTHING ELSE?
18             MR. FONDO:  THERE'S NO OFFER MADE HERE.  THIS IS
19        JUST TALKING ABOUT HISTORIC.
20             THE COURT:  YOU'RE REFERRING TO TRIPLE R?
21             MR. FONDO:  CORRECT.  SO THIS IS NOT AN OFFER BEING
22        MADE.  FURTHER, THERE IS DOUBLE HEARSAY IN THIS LETTER TALKING
23        ABOUT WHAT OTHERS HAVE SAID OR THOUGHT, NOR DO I THINK YOU CAN
24        IMPEACH.  IT'S HEARSAY TO IMPEACH A WITNESS WHO DIDN'T WRITE
25        THE LETTER.
```

```
 1              MR. FAZIOLI:  AND RELATED TO THE DOUBLE HEARSAY

 2    ARGUMENT IT IS TECHNICALLY BEING OFFERED FOR THE TRUTH OF THE

 3    SECOND LEVEL OF THE HEARSAY, WHICH IS THE REFERENCE ABOUT

 4    MR. LIEDERMAN'S WRITING TO MR. MAHER ABOUT MR. MAHER INDICATING

 5    TO HIM WHAT HE UNDERSTOOD TO BE A CONDITIONAL ACCEPTANCE.

 6         THIS LETTER WOULD BE PRESENTED FOR THE TRUTH OF THAT

 7    SECOND MATTER, WHICH IS THAT MR. MAHER DID, IN FACT,

 8    COMMUNICATE THE ORIGINAL ACCEPTANCE.  IT IS DOUBLE HEARSAY, AND

 9    IT DOESN'T HAVE ANY ADDITIONAL RELIABILITY AS TO SOME OF THE

10    OTHER MATERIALS THAT WERE PRESENTED AS ADMISSIONS OF AGENTS AND

11    SHOULD NOT BE PERMITTED, YOUR HONOR.

12              THE COURT:  THE LETTER ALSO HAS REFERENCES TO OTHER

13    THINGS OTHER THAN THE $75,000 OFFER.

14         THE LAST PARAGRAPH SPEAKS OF MR. PAIGE GIVING THE GRANT

15    DEED TO MS. HOLMES, A DOCUMENT DULY RECORDED AND RESPECTED BY

16    REPUTABLE LENDING INSTITUTIONS.  I THINK HE REFERENCES,

17    MR. LIEDERMAN DOES, THE WORD "REPREHENSIBLE," THAT MR. MAHER, I

18    THINK, COMMUNICATED IN THE LETTER TO MR. LIEDERMAN.

19         THAT'S CERTAINLY NOT SOMETHING YOU'RE SEEKING TO GET IN;

20    IS THAT RIGHT?

21              MS. GARRIDO:  YOUR HONOR, I WAS SEEKING TO ADMIT THE

22    ENTIRE EXHIBIT.  I CAN CERTAINLY QUESTION, IF THE COURT ADMITS

23    SOME OF IT AND NOT PART OF IT, WE CAN POTENTIALLY REDACT, BUT I

24    DO THINK IT'S PART OF AN ONGOING COMMUNICATION.  I BELIEVE THAT

25    THE GOVERNMENT HAS BEEN PERMITTED TO INTRODUCE SUBSTANTIAL
```

1    HEARSAY.

2         THERE HAVE BEEN CERTAINLY STATEMENTS THAT WERE NOT PART OF

3    AN AGENCY THEORY AS IN THE CASE OR IN ONE OF THE PLEADINGS

4    WHERE MR. LIEDERMAN APPARENTLY STATED THAT HE WAS NOT AWARE OF

5    THE GRANT DEED.  THAT'S CERTAINLY NOT SOMETHING THAT SHOULD BE

6    INTRODUCED UNDER AN AGENCY THEORY.  AND MR. MAHER'S LETTERS

7    THEMSELVES ARE HEARSAY.  THAT HAS ALL BEEN RECEIVED INTO

8    EVIDENCE, NONETHELESS, AND CERTAINLY IN ORDER TO EFFECTUATE

9    MRS. HOLMES'S RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW, TO

10   THE EXTENT THAT THERE ARE OTHER COMMUNICATIONS THAT ARE PART OF

11   THAT CONTINUING CONVERSATION, THEY SHOULD ALL BE PROVIDED TO

12   THE JURY.

13        THE COURT:  THANK YOU.  THAT REMINDS ME OF

14   SOMETHING.  WHEN YOU MAKE AN OBJECTION, YOU HAVE MADE

15   OBJECTIONS, MS. GARRIDO, INDICATING EXCEPTIONS, I SUPPOSE, AND

16   YOU HAVE INDICATED A RIGHT TO A FAIR TRIAL AND A RIGHT TO DUE

17   PROCESS, AND I'M NOT SURE WHAT SECTION OF THE FEDERAL RULES OF

18   EVIDENCE THAT YOU'RE REFERENCING WHEN YOU MAKE THOSE

19   STATEMENTS.

20        MS. GARRIDO:  THAT'S A CONSTITUTIONAL ARGUMENT, YOUR

21   HONOR, THE FIFTH AND SIXTH UNITED STATES CONSTITUTION.

22        THE COURT:  I SEE.  DO YOU HAVE A SPECIFIC RULE OF

23   EVIDENCE THAT APPLIES TO THOSE OBJECTIONS?

24        MS. GARRIDO:  I BELIEVE THAT THOSE RULES THAT ARE IN

25   THE AMENDMENTS TO THE CONSTITUTION CERTAINLY INTERACT WITH THE

```
 1    RULES OF EVIDENCE SUCH AS THE RULE OF CONFRONTATION.  AND, YOU

 2    KNOW, I HAVE MADE SEVERAL CONFRONTATION OBJECTIONS AS WELL.

 3    THOSE ARE CONSTITUTIONAL OBJECTIONS.

 4        I BELIEVE THAT WHEN, FOR EXAMPLE, MR. MAHER BEGINS GOING

 5    ON AT LENGTH ABOUT BANK RECORDS THAT HE HAS LOOKED AT AND

 6    CHECKS THAT HE HAS RECEIVED, THE FACT THAT I HAVE NO ABILITY

 7    WHATSOEVER TO CROSS-EXAMINE THE ACTUAL AUTHORS OF THOSE CHECKS

 8    AND AUTHORS OF THOSE BANK RECORDS AND THAT THE INFORMATION HAS

 9    BEEN RECEIVED AND PROVIDED WITHOUT ANY FOUNDATION AS TO WHERE

10    THE BANK RECORDS CAME FROM, HOW THEY WERE RECEIVED, WHETHER

11    THERE WAS A CUSTODIAL DECLARATION, ALL OF THOSE THINGS

12    CERTAINLY ARE OF CONSTITUTIONAL DIMENSION, AND THAT'S WHY I'M

13    MAKING THOSE OBJECTIONS, YOUR HONOR.

14            THE COURT:  ALL RIGHT.  THANK YOU.  AS TO THE RULE

15    OF COMPLETENESS, I'M GOING TO SUSTAIN THE OBJECTION.  I DON'T

16    THINK THE RULE OF COMPLETENESS ALLOWS FOR ADMISSIBILITY OF

17    EVIDENCE THAT IS OTHERWISE INADMISSIBLE.

18        IF THERE ARE SPECIFIC SECTIONS OF DOCUMENTS THAT YOU FEEL

19    THAT HAVE NOT BEEN ADMITTED, LETTERS, PORTIONS OF LETTERS THAT

20    YOU THINK SHOULD BE REVISITED AND THEN ALLOWED TO -- THOSE

21    PORTIONS ALLOWED TO BE PRESENTED TO THE JURY, WE CAN CERTAINLY

22    LOOK AT THOSE.

23        YOU WOULD BE ABLE TO EXAMINE THE WITNESS, MR. MAHER, ABOUT

24    HIS -- I THINK YOU USED THE WORD "DISDAIN" HE MIGHT HAVE FOR

25    MR. LIEDERMAN, AND I'LL ALLOW YOU TO PURSUE THAT LEST ANY BIAS
```

```
 1    HE MIGHT HAVE.
 2         PURSUING THE TOTALITY OF NEGOTIATIONS SUCH THAT THEY WERE
 3    IN REGARDS TO THE SALE OF THIS PARTICULAR HOME OR THE BUYOUT,
 4    OR NOT BUYOUT, I JUST DON'T -- I'M USING THE RULE OF
 5    COMPLETENESS WITH THESE DOCUMENTS, I DON'T FIND THAT'S
 6    APPROPRIATE AT THIS TIME.  SO I'M NOT GOING TO PERMIT THESE
 7    DOCUMENTS TO BE USED FOR THAT PURPOSE.
 8         ANYTHING FURTHER?
 9              MS. GARRIDO:  WOULD I BE PERMITTED TO IMPEACH THE
10    WITNESS'S STATEMENT THAT HE WOULD ALWAYS PREFER TO SETTLE
11    VERSUS LITIGATE WITH THE FACT THAT HE RECEIVED MULTIPLE
12    ADDITIONAL OFFERS TO SETTLE FROM MS. HOLMES?
13              THE COURT:  THE FACT THAT HE -- I'M SORRY?
14              MS. GARRIDO:  RECEIVED MULTIPLE ADDITIONAL
15    SETTLEMENT OFFERS WHICH DID NOT AT ALL CURTAIL HIS LITIGATION?
16              THE COURT:  MR. FONDO?
17              MR. FONDO:  YOUR HONOR, ONE, I THINK THE TRUSTEE
18    MAKES THE DECISION, NOT THE ATTORNEY, WHETHER TO SETTLE THE
19    MATTER OR NOT.
20         BUT, TWO, IN ADDITION -- SO WE'RE TALKING THERE ARE
21    MULTIPLE OFFERS GOING THROUGH HERE AND THEY CONTINUE, I THINK,
22    THROUGH PROBABLY 2008, 2009, 2010.
23         SO I DON'T KNOW WHICH OFFER SHE'S REFERRING TO, AND I'M
24    NOT SURE WHAT RELEVANCE AN OFFER THAT TOOK PLACE AFTER THE
25    TRANSFER HAS TO WHETHER OR NOT MRS. HOLMES COMMITTED FRAUD
```

1    HERE.

2              MR. FAZIOLI:  IN ADDITION, THE WAY THE QUESTION CAN

3    BE POSED CAN SIMPLY BE A WAY OF PRESENTING HEARSAY, LIKE ISN'T

4    IT TRUE THAT MR. LIEDERMAN TOLD YOU X, Y, AND Z, AND,

5    THEREFORE, THAT WOULD RAISE THE SAME ISSUES AS PRESENTING A

6    DOCUMENT THAT SAID THE SAME THING.

7              THE COURT:  SO YOU'RE SEEKING TO IMPEACH HIM,

8    MR. MAHER, ON HIS STATEMENT THAT HE ALWAYS PURSUES -- WOULD

9    LIKE TO PURSUE SETTLEMENT AS OPPOSED TO LITIGATION?

10             MS. GARRIDO:  CORRECT, YOUR HONOR.

11             THE COURT:  AND I WONDER HOW IMPORTANT THAT IS TO

12   THE ENTIRETY OF THE CASE?

13             MS. GARRIDO:  WELL, I'M JUST A BIT DISMAYED RIGHT

14   NOW TO HEAR FROM COUNSEL THAT THEY BELIEVE THAT IT'S THE

15   TRUSTEE THAT MAKES THAT DECISION AND NOT THIS WITNESS SINCE

16   THEY HAVE GONE OUT OF THEIR WAY TO GET THIS WITNESS TO TESTIFY

17   AT LENGTH ABOUT WHETHER OR NOT HE WOULD PREFER TO SETTLE RATHER

18   THAN LITIGATE AND ISN'T THAT YOUR DEFAULT OPTION ESSENTIALLY

19   AND THAT'S WHAT YOU PREFER TO BE DOING, IT'S ESSENTIALLY

20   LITIGATE.

21        AND THEY'RE TRYING TO ESTABLISH HIM AS SOMEBODY WHO NOT

22   ONLY MAKES THAT DECISION BUT SOMEBODY WHO HAS EVERY REASON IN

23   THE WORLD NOT TO GO AFTER SOMEBODY LIKE MS. HOLMES AND TRY TO

24   ESSENTIALLY ALLOW THE WITNESS TO VOUCH FOR HIS OWN DECISIONS

25   NOT TO SETTLE.  SO I THINK IT IS IMPORTANT, AND I THINK IT'S

MAHER REDIRECT

1    COMPLETELY IMPORTANT AND VERY IMPORTANT.

2          THE COURT:  AND SO IF YOU'RE PERMITTED TO PURSUE

3    THAT AS BIAS, MS. GARRIDO, WHAT I DON'T WANT TO HAPPEN IS TO

4    GET INTO ALL OF THE OTHER LITIGATION THAT IS NOT GERMANE TO THE

5    CRIMINAL CHARGES HERE AND IT SOUNDS LIKE THIS CASE DIDN'T

6    SETTLE UNTIL 2010.

7          MR. FONDO:  IT'S NEVER SETTLED, YOUR HONOR.

8          MR. FAZIOLI:  NEVER.

9          MS. GARRIDO:  WELL, THERE WERE A FINITE NUMBER OF

10   OFFERS THAT WERE MADE.  IT'S NOT LIKE THIS WOULD BE A VERY LONG

11   OR EXTENSIVE LINE OF QUESTIONING.

12         THE COURT:  WELL, YOU CAN ASK HIM QUESTIONS ABOUT --

13   AND THIS IS AS TO THE SPECIFIC POINT AND WHAT YOU'RE SAYING IS

14   THAT YOU WANT TO IMPEACH HIM WHEN HE SAYS, "I ALWAYS LIKE TO

15   SETTLE."

16      AND YOU WANT TO IMPEACH HIM IN THIS CASE BY SAYING THAT

17   YOU TOOK AN EXTRAORDINARY AMOUNT OF TIME AND THIS CASE STILL

18   HAS NOT SETTLED.  AND IN ESSENCE THAT'S THE POINT THAT YOU WANT

19   TO MAKE TO IMPEACH HIS STATEMENT THAT HE ALWAYS LIKES TO

20   SETTLE?

21         MS. GARRIDO:  YOUR HONOR, ACTUALLY THE POINT THAT I

22   WOULD LIKE TO MAKE IS THAT THE WITNESS HAS RECEIVED SPECIFIC

23   OFFERS AT SEVERAL POINTS ALONG THE PROCESS AND HAS IN NO CASE

24   ACCEPTED ANY OFFER OR DONE ANYTHING TO INDICATE HIS WILLINGNESS

25   OR DESIRE TO SETTLE BUT RATHER HAS PURSUED LITIGATION

1      WHOLEHEARTEDLY IN THIS CASE.

2              THE COURT:  WELL, YOU KNOW, YOU PROCEED AT YOUR OWN

3      PERIL BECAUSE YOU MIGHT NOT GET THE ANSWER YOU WANT, PARDON ME,

4      AND THAT MIGHT OPEN THE DOOR TO HAVE HIM, PERHAPS, SPEAK ABOUT

5      WE HEARD A LITTLE BIT ABOUT HIS OPINION OF LACK OF

6      COOPERATIVENESS FROM THE OTHER SIDE AND THOSE TYPES OF THINGS.

7          AND THAT MAY OPEN THE DOOR TO HIM BEING PERMITTED TO

8      SPEAK AS TO AT LEAST HIS OPINION OF THOSE THINGS AND PERHAPS

9      ATTRIBUTE THEM TO YOUR CLIENT THAT MIGHT NOT BE APPROPRIATE.

10             MS. GARRIDO:  YOUR HONOR, I DON'T THINK THAT THAT

11     SHOULD OPEN THE DOOR TO ANY SUCH THING IN HIS OPINIONS

12     PERSONALLY OF MY CLIENT.

13         I'M SURE THEY'RE LESS THAN FLATTERING BUT --

14             THE COURT:  WE DON'T KNOW THAT.  EXCUSE ME.  WE

15     DON'T KNOW THAT.

16         AND WHAT I WAS SPEAKING OF THERE WAS A QUESTION PUT TO THE

17     WITNESS AND AN ANSWER.

18         THE QUESTION WAS:  WAS THERE COOPERATIVENESS FROM THAT

19     SIDE?

20         AND I THINK HIS ANSWER WAS, NO, THEY WERE LESS THAN

21     COOPERATIVE.

22             MS. GARRIDO:  AND IN MY VIEW AT THAT POINT THE

23     GOVERNMENT VIOLATED THEN THE COURT'S RULING ABOUT RENA ACASIO

24     AND ABOUT WHETHER THERE WOULD BE TESTIMONY ABOUT HER ATTEMPTS

25     TO MARKET THE PROPERTY WHICH OCCURRED WELL AFTER THE CHARGING

1    PERIOD AND THAT WAS BOOTSTRAPPED IN THROUGH MR. MAHER, A

2    WITNESS WHO HAD NO PERSONAL KNOWLEDGE OR WAS NOT A WITNESS OR

3    PART OF.

4         SO THAT'S WHAT HE WAS TALKING ABOUT, IF I RECALL, IN TERMS

5    OF MS. HOLMES'S LACK OF COOPERATION IS THAT SHE DID NOT

6    COOPERATE WITH THE SALE OF THE PROPERTY FROM MR. ACASIO.

7             MR. FONDO:  YOUR HONOR, I THINK IT MISSTATES THE

8    EVIDENCE.

9             THE COURT:  I THINK HE SPOKE ABOUT UNCOOPERATIVENESS

10   EARLIER.  MY POINT IS THAT THIS IS EXACTLY WHAT HAPPENS WHEN

11   YOU CRACK OPEN THE DOOR A LITTLE BIT, THEN WE START GETTING

12   INTO ALL OF THESE OTHER THINGS THAT ARE PERIPHERAL TO THE REAL

13   IMPORTANT ISSUES IN THE CASE.

14        I'LL PERMIT YOU TO ASK SOME QUESTIONS AGAIN ABOUT THIS

15   WITNESS'S CREDIBILITY AND, EXCUSE ME, HIS VIEW JUST TOWARDS

16   MR. LIEDERMAN.

17        NOW, YOU ALSO WANT TO BE ABLE TO ASK HIM QUESTIONS TO

18   IMPEACH HIM WHEN HE SAYS I ALWAYS LIKE TO SETTLE.  AND YOU WANT

19   TO BRING IN EVIDENCE THAT, IN FACT, HE DIDN'T SETTLE THIS CASE

20   I SUPPOSE.

21        SO THE JURY SHOULD, THEREFORE, FIND HIS VERACITY LESS

22   BECAUSE HE DIDN'T SETTLE THIS CASE.  I'LL PERMIT YOU SOME

23   LEEWAY BUT NOT TO THE EXTENT THAT WE'RE GOING TO GET INTO ALL

24   OF THESE OTHER OFFERS AND THINGS.

25        I THINK YOU CAN ASK GENERAL THINGS ABOUT DESPITE EFFORTS

 1       THIS CASE DID NOT SETTLE, WHICH IS CONTRARY TO HIS STATEMENT

 2       THAT HE ALWAYS LIKES TO SETTLE OR SOMETHING LIKE THAT.

 3           I'M NOT TELLING YOU WHAT TO ASK, BUT I'M CERTAINLY GOING

 4       TO AFFORD YOU AN OPPORTUNITY TO PROBE THAT AREA.

 5               MR. FONDO:  YOUR HONOR, JUST FOR THE RECORD, IF SHE

 6       DOES INTEND TO GO INTO THIS, I THINK THAT OPENS THE DOOR TO ASK

 7       WHY DID YOU SETTLE THAT MATTER?

 8               THE COURT:  IT POTENTIALLY COULD.

 9               MR. FONDO:  AND JUST FOR THE RECORD, I THINK SOME OF

10       THOSE ANSWERS ARE GOING TO BE THERE'S CRIMINAL PROCEEDINGS; I

11       THINK THIS WOMAN COMMITTED FRAUD; I THINK SHE COMMITTED A

12       CRIME; THERE WAS FORECLOSURE; SHE STOLE MONEY.

13           SO I THINK IF SHE STARTS ASKING, AS SOON AS SHE SAYS WHY

14       DIDN'T YOU -- YOU DIDN'T SETTLE THIS MATTER, DIDN'T YOU, I

15       THINK I'M ENTITLED TO ASK FOR ALL OF THE REASONS EVERY SINGLE

16       TIME WHY HE DID NOT SETTLE THAT MATTER.

17               THE COURT:  I'D LIKE TO AVOID THAT IF WE CAN,

18       MS. GARRIDO, BUT I DON'T WANT TO DEPRIVE YOU OF THE

19       OPPORTUNITY, IF YOU FEEL THIS IS AN IMPORTANT POINT, TO IMPEACH

20       THE WITNESS AS TO HIS DESIRE TO SETTLE CASES AND HIS INABILITY,

21       FOR WHATEVER REASON, TO SETTLE THIS ONE.

22           I'LL ALLOW YOU TO PROBE THAT.  BUT, AGAIN, I HAVE

23       INDICATED SOME CAUTION THAT HE MIGHT SAY SOMETHING THAT YOU

24       DON'T LIKE AND HE MIGHT SAY SOMETHING THAT THE GOVERNMENT

25       DOESN'T LIKE, I DON'T KNOW.

```
1              MS. GARRIDO:  YOUR HONOR, IF THE COURT IS RULING

2    THAT MY QUESTIONS ABOUT HIS INABILITY TO SETTLE THE CASE

3    SPECIFICALLY WITH RESPECT TO SEVERAL OFFERS THAT WERE RECEIVED

4    AND REJECTED, THAT OPENS THE DOOR TO THIS WITNESS'S OPINIONS

5    ABOUT WHETHER OR NOT MS. HOLMES COMMITTED FRAUD, WHICH IS THE

6    ULTIMATE ISSUE FOR THE JURY TO DECIDE, THEN I OBVIOUSLY WILL

7    NOT ASK THOSE QUESTIONS.

8              THE COURT:  I THINK IF YOU ASK, AND MY UNDERSTANDING

9    OF MR. FONDO'S COMMENTS WERE, IF YOU ASK HIM AN OPEN ENDED

10   QUESTION, "WHY DIDN'T YOU SETTLE THIS CASE?" HE MAY SAY, WELL,

11   THERE WAS A CRIMINAL CASE PENDING, AND I COULDN'T SETTLE, THOSE

12   TYPES OF THINGS.

13        I SUPPOSE YOU COULD ASK HIM, WELL, THERE WERE EFFORTS,

14   CONTINUING EFFORTS MADE, AND IT DIDN'T SETTLE NOTWITHSTANDING

15   YOUR COMMENT THAT YOU LIKE TO SETTLE.

16        BUT ULTIMATELY, YOU SEE, THAT BEGS FOR THE QUESTION, WHY

17   DIDN'T HE SETTLE?

18              MS. GARRIDO:  AND, YOUR HONOR, I DON'T THINK IT DOES

19   BEG FOR THAT QUESTION.  I THINK THAT WOULD OPEN THE DOOR TO THE

20   WITNESS'S IMPERMISSIBLE OPINIONS ABOUT THE ULTIMATE ISSUES IN

21   THIS CASE, AND SO I DON'T THINK THAT THE ONE NECESSARILY HAS

22   ANYTHING TO DO WITH THE OTHER.

23        RIGHT NOW THE WITNESS HAS JUST BEEN ALLOWED TO OPINE AT

24   LENGTH ABOUT HOW HE WANTS TO SETTLE AND THAT'S THE BEST COURSE,

25   AND THAT'S WHAT HE WANTS TO DO AND HE AVOIDS LITIGATION.
```

```
1        AND I'M SEEKING TO DO A VERY SIMPLE IMPEACHMENT OF THAT
2    AND NOT TO GET INTO HIS REASONS FOR SETTLING OR NOT SETTLING.
3        BUT IF THE COURT IS RULING THAT THAT OPENS THAT DOOR, THEN
4    OBVIOUSLY I CERTAINLY COULD NOT IN GOOD CONSCIENCE ALLOW THAT
5    KIND OF EVIDENCE TO COME IN AGAINST MS. HOLMES.
6        THE COURT:  WELL, WHAT I'M SAYING IS THAT I'LL ALLOW
7    YOU TO ASK THOSE QUESTIONS, MS. GARRIDO.  YOU CAN ASK THOSE
8    QUESTIONS, BUT AS I SAID, YOU PROCEED AT YOUR OWN PERIL.  I
9    DON'T KNOW WHAT HE'S GOING TO SAY.  SO I LEAVE IT TO YOUR GOOD
10   EXPERIENCE TO FASHION A QUESTION THAT YOU THINK IS APPROPRIATE.
11       MS. GARRIDO:  YOUR HONOR, IF THE COURT IS SAYING
12   THAT THE WITNESS THAT THE GOVERNMENT COULD THEN FOLLOW UP AND
13   SAY, WELL, WHY DIDN'T YOU SETTLE AS AN OPEN ENDED QUESTION
14   WITHOUT ANY ADMONISHMENT TO THE WITNESS ABOUT THE COURT'S
15   RULINGS ABOUT ULTIMATE ISSUES FOR THE JURY AND INTENT AND SO ON
16   AND SO FORTH, AGAIN, I HAVE NO CHOICE BUT TO NOT ASK HIM ANY
17   QUESTIONS AT ALL ON THAT TOPIC AND THAT'S WHY I'M SEEKING A
18   RULING FROM THIS COURT AS TO WHETHER OR NOT THAT DOOR IS GOING
19   TO BE OPENED.
20       CERTAINLY THERE COULD BE A RULING THAT THAT DOOR IS NOT
21   GOING TO BE OPENED AND THAT THE WITNESS IS TO BE ADVISED BEFORE
22   TAKING THE STAND THAT HE'S NOT TO DISCUSS HIS REASONS AND
23   PERSONAL OPINIONS ABOUT MS. HOLMES AND REASONS FOR NOT SETTLING
24   THE CASE.
25       THE COURT:  WELL, SOMETIMES WHEN WE DO THIS WE TRY
```

1    TO FASHION THE REMEDIES SUCH THAT THE WITNESS WHO IS NOT IN THE

2    COURTROOM AND DOESN'T KNOW ANYTHING ABOUT THIS, WE RESTRICT

3    SEVERELY ANY TESTIMONY THAT HE OR SHE MIGHT OFFER IN THIS CASE.

4         MS. GARRIDO, I'LL ALLOW YOU TO PURSUE THE QUESTION AGAIN

5    ABOUT HIS, AND THIS IS -- YOU WANT TO IMPEACH HIM, HIS

6    STATEMENTS AND "I LIKE TO SETTLE," AND YOU BELIEVE YOU CAN

7    IMPEACH HIM ON THAT, AND THAT'S IMPORTANT FOR YOUR CASE TO

8    IMPEACH THIS WITNESS'S STATEMENT THAT HE LIKES TO SETTLE

9    BECAUSE YOU BELIEVE THAT YOU HAVE EVIDENCE THAT, WELL, ACTUALLY

10   HE DOESN'T.  AND AT LEAST IN THIS CASE IT DIDN'T SETTLE, AND

11   YOU WOULD LIKE TO IMPEACH HIS STATEMENT THAT HE LIKES TO

12   SETTLE.

13        ALL RIGHT.  I'LL ALLOW YOU TO DO THAT.  YOU CAN DO THAT.

14   THAT'S FINE.

15        YOU HAVE HEARD THE CONCERNS THAT I HAVE ABOUT GETTING INTO

16   ALL OF THESE OTHER AREAS THAT I THINK ARE INAPPROPRIATE.  AND I

17   PUT IT TO YOU, CHARGE YOU TO ASK THE APPROPRIATE QUESTION TO

18   AVOID OPENING THE DOOR AND THAT'S WHAT EXPERIENCED COUNSEL DO

19   AND IT WILL FALL ON YOUR SHOULDERS, I SUPPOSE, TO FASHION A

20   QUESTION LIKE THAT.

21        MS. GARRIDO:  YOUR HONOR, I'M CONFIDENT THAT I COULD

22   ASK THE WITNESS QUESTIONS IN A WAY THAT WOULD NOT LEAD HIM TO

23   BEGIN OPINING OPENLY.  AND IF HE BEGAN TO, I WOULD CERTAINLY

24   MAKE AN OBJECTION AS TO NONRESPONSIVENESS AND ASK THE COURT TO

25   INTERVENE, BUT WHAT I'M SEEKING NOW IS A RULING THAT THE

1   GOVERNMENT MAY NOT FOLLOW UP BY ASKING AN OPEN ENDED WHY DID

2   YOU NOT SETTLE?

3              THE COURT:  WELL, I CAN'T ANSWER THAT -- I CAN'T

4   MAKE A RULING UNTIL WE HEAR THE WITNESS'S TESTIMONY.

5       I THINK THE GOVERNMENT KNOWS THAT'S NOT SOMETHING THAT I

6   WANT, BUT I'M NOT GOING TO HAMSTRING THEM EITHER IF THE DOOR IS

7   OPENED FOR WHATEVER REASON.  AND I THINK YOU UNDERSTAND,

8   PERHAPS YOU DON'T, AND IF YOU DON'T I'LL TRY TO EXPAND IT.

9              MS. GARRIDO:  I THINK I UNDERSTAND, YOUR HONOR.  I

10  THINK I'M AT AN UNFORTUNATE SITUATION THAT IS A BIT OF A

11  HOBSON'S CHOICE AND GIVEN THE INABILITY TO AT THIS POINT

12  PROCEED WITH THE ASSURANCE THAT THE WITNESS WILL NOT BE ALLOWED

13  TO OPENLY OPINE ABOUT HIS OPINIONS OF MS. HOLMES, ABOUT HIS

14  OPINIONS ABOUT WHETHER MS. HOLMES COMMITTED FRAUD, AND THE

15  OTHER RELATED REASONS FOR NOT SETTLING THE CASE THAT MR. FONDO

16  JUST REFERRED TO, I CANNOT PROCEED WITH THAT LINE OF

17  QUESTIONING.

18             THE COURT:  WELL, WHAT I HAVE INDICATED TO BOTH OF

19  YOU IS THAT I DON'T WANT THAT TO COME OUT.

20      THE GOVERNMENT MAY FEEL THAT IF YOU ASK QUESTIONS THAT

21  OPEN THE DOOR, THEY'LL BE PERMITTED TO DO THAT, AND I SUPPOSE

22  WHAT WE COULD DO IS FOLLOWING YOUR EXAMINATION OF THIS WITNESS,

23  MR. FONDO, IF YOU WANTED TO ASK THE COURT THE PARAMETERS OF

24  YOUR EXAMINATION, WE CAN DO THAT OUTSIDE OF THE PRESENCE OF THE

25  JURY.  THAT MIGHT BE HELPFUL TO YOU, MS. GARRIDO.

MAHER REDIRECT

```
 1              MR. FONDO:  THAT'S FINE.  WE DON'T THINK THE WITNESS

 2    WOULD BE OPINING.  THE WITNESS WOULD BE STATING WHY HE DID OR

 3    DID NOT DO SOMETHING AND OUR POSITION WOULD BE SHE OPENED THAT

 4    DOOR WHEN SHE SAID YOU DIDN'T SETTLE THIS, DID YOU?

 5              MR. FAZIOLI:  THERE'S ALSO BEEN AN ARGUMENT ABOUT

 6    THE WITNESS HAS BEEN OPINING ABOUT THAT SUBJECT, AND WE WOULD

 7    DISAGREE.  WE HAVE NOT PRESENTED HIM AS AN EXPERT.  WE DO NOT

 8    THINK THAT HE'S PRESENTING OPINION TESTIMONY.

 9              THE COURT:  MS. GARRIDO, YOU WILL BE PERMITTED TO

10    PURSUE THAT LEVEL AND THAT LINE OF IMPEACHMENT QUESTION OF THE

11    WITNESS IF YOU WISH TO DO THAT.

12         SHOULD WE BRING THE WITNESS AND THE JURY BACK IN?

13              MR. FONDO:  YES.

14              MS. GARRIDO:  YES.

15              THE COURT:  WHAT ABOUT JURY INSTRUCTIONS WHILE WE DO

16    THAT?  ANY IDEA WHEN YOU WANT TO SUBMIT SOME AT LEAST

17    PRELIMINARY INSTRUCTIONS I SHOULD LOOK AT?

18              MR. FONDO:  SOON I IMAGINE, YOUR HONOR.

19              MS. GARRIDO:  WE CAN SHOOT FOR TOMORROW.  THAT WOULD

20    BE ASPIRATIONAL.

21              MR. FAZIOLI:  SHOULD WE DISCUSS THE SCHEDULE?

22              THE COURT:  WE'LL DO THAT -- DO YOU HAVE ANOTHER

23    WITNESS TODAY?

24              MR. FONDO:  WE DO, YOUR HONOR.  TWO MORE.

25              MS. GARRIDO:  YOUR HONOR, I THINK WE'RE BACK ON
```

Case 5:09-cr-00930-EJD   Document 237   Filed 10/30/13   Page 146 of 254

1    SCHEDULE, BACK ON TRACK.

2         IF THE COURT WOULD BE WILLING TO START AT 9:00 O'CLOCK FOR

3    THE REMAINDER OF OUR SCHEDULE, I'M SURE THE JURY WOULD

4    APPRECIATE THAT.  THESE ARE LONG DAYS OF DENSE TESTIMONY.

5         THE COURT:  LET'S TALK ABOUT THIS AFTERNOON.  WE'LL

6    PROBABLY BREAK AT QUARTER TILL THIS AFTERNOON, AND WE'LL REVIEW

7    OUR SCHEDULE AND SEE WHERE WE ARE AT.  I WAS THINKING OF

8    ADVANCING IT TO 6:30.

9         MR. FAZIOLI:  JUDGE ALSUP STARTS AT 7:30.

10        THE COURT:  I KNOW.  JUST SO BY ORDER, MR. FONDO,

11   YOU'LL FINISH YOUR REDIRECT AND THEN THERE WOULD BE RECROSS

12   PURSUANT TO OUR DISCUSSION.

13        MS. GARRIDO:  YES, THANK YOU.

14        (JURY IN AT 1:59 P.M.)

15        THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD.

16   ALL PARTIES PREVIOUSLY PRESENT ARE PRESENT ONCE AGAIN.

17        OUR JURY AND ALTERNATES ARE PRESENT.

18        WOULD YOU LIKE TO CONTINUE WITH YOUR EXAMINATION,

19   MR. FONDO?

20        MR. FONDO:  YES, YOUR HONOR.  THANK YOU.

21   Q.   MR. MAHER, I'D LIKE TO REFER YOU TO EXHIBIT 176, PLEASE.

22   A.   YES.

23   Q.   IF YOU COULD JUST BRIEFLY REMIND THE JURY WHAT THIS IS --

24   WELL, LET ME DIRECT YOUR ATTENTION TO PARAGRAPH 2.

25        IT SAYS, "I ENCLOSED FOR YOU, FOR YOUR FILE A PHOTOCOPY OF

1    THE CLAIMS DOCKET IN THE BANKRUPTCY CASE."

2         DEFENSE COUNSEL ASKED YOU ABOUT CREDITORS IN THIS CASE;

3    CORRECT?

4    A.   YES.

5    Q.   AND THAT'S THE BANKRUPTCY OF LEONARD -- THE CHAPTER 7

6    BANKRUPTCY OF LEONARD PAIGE AND CARRIE PAIGE; CORRECT?

7    A.   THAT'S CORRECT.

8    Q.   AND I WANT TO TAKE YOU TO PAGE 3 OF EXHIBIT 176.

9    A.   OKAY.

10   Q.   WHAT IS -- IF WE COULD GO TO PAGE 3, PLEASE.  WHAT IS THIS

11   DOCUMENT THAT YOU ATTACHED TO YOUR LETTER TO MR. LIEDERMAN ON

12   JUNE 17TH, 2005?

13   A.   THIS IS CALLED A CLAIMS REGISTER AND IN IT ARE ALL CLAIMS

14   THAT WERE FILED IN THE LEONARD AND CARRIE PAIGE BANKRUPTCY CASE

15   AS OF THE DATE OF THIS DOCUMENT WHICH LOOKS LIKE THE 17TH OF

16   JUNE 2005.

17   Q.   AND DO THESE INCLUDE -- I THINK COUNSEL MENTIONED A BANK;

18   CORRECT?

19   A.   YES.

20   Q.   AND DOES IT ALSO -- WE ALSO HAD DISCUSSION PREVIOUSLY

21   ABOUT THE PENSION OR THE EMPLOYEES WHO HAD PENSION CLAIMS?

22   A.   WELL, THERE ARE INDIVIDUAL EMPLOYEES WHO HAD WAGE CLAIMS

23   THAT WERE NOT PROPERLY ASSERTED IN THIS CASE AND THE DEPARTMENT

24   OF LABOR FILED A CLAIM ON BEHALF OF ALL OF THE EMPLOYEES WITH

25   PENSION ISSUES.

1    Q.   SO THAT CLAIM WAS RELATED TO THE PENSION?

2    A.   CORRECT.

3    Q.   AND THAT WAS AN UNSECURED CLAIM?

4    A.   IT WAS FILED AS A PRIORITY CLAIM.

5    Q.   AND WHAT DID IT ULTIMATELY END UP BEING?

6    A.   WHAT HAPPENED WAS THE TRUSTEE ASSERTED THAT IT WASN'T

7    ENTITLED TO A PRIORITY OVER UNSECURED CLAIMS AND FILED A CLAIM

8    OBJECTION AND ULTIMATELY REACHED AN AGREEMENT WITH THE

9    DEPARTMENT OF LABOR THAT THAT WAS CORRECT.

10   Q.   YOU WERE ALSO ASKED QUESTIONS ABOUT WHEN YOU GET PAID IN

11   THIS PROCESS.  AND I WASN'T SURE IT WAS QUITE CLEAR ABOUT WHEN

12   YOU GET PAID IN THIS PROCESS.

13        SO IF YOU COULD EXPLAIN WHERE YOU GET PAID VERSUS, FOR

14   INSTANCE, SECURED CREDITORS?

15   A.   SECURED CREDITORS HAVE WHAT IS CALLED A SECURITY INTEREST

16   IN AN ASSET, LIKE A DEED OF TRUST THAT WE HAVE BEEN TALKING

17   ABOUT, AND NO TRUSTEE CAN PENETRATE THAT.

18        SO IF THE PROPERTY IS SOLD SUBJECT TO A DEED OF TRUST,

19   THAT DEBT GETS PAID FIRST BECAUSE THERE'S NO MONEY LEFT OVER TO

20   PAY ANYBODY AND THEN NOBODY GETS PAID, INCLUDING THE LAWYERS OR

21   THE TRUSTEE.

22   Q.   AND IS THAT TYPICAL IN BANKRUPTCY?  THAT DOESN'T JUST

23   APPLY TO YOU, DOES IT?

24   A.   NO.  IT APPLIES TO EVERYBODY.

25   Q.   OKAY.  DEFENSE COUNSEL IN HER CROSS-EXAMINATION ASKED YOU

1    ABOUT IF MS. HOLMES COULD NOT MATCH THE PRICE OF THE SALE OF

2    THE PROPERTY, SHE WOULD HAVE TO LEAVE THE PROPERTY.  DO YOU

3    RECALL THAT QUESTION?

4    A.   YES.

5    Q.   AND MS. HOLMES HAD AN OPTION TO FILE SOMETHING WITH THE

6    BANKRUPTCY COURT TO FILE A HARDSHIP; CORRECT?

7    A.   SHE HAD THE ABILITY TO DISPUTE THE CLAIM.  IT'S A

8    BALANCING OF HARDSHIP, AND SHE COULD SHOW A GREATER HARDSHIP,

9    WHICH COULD DEFEAT THE TRUSTEE'S CLAIM.

10   Q.   AND DEFEAT THE CREDITOR'S CLAIM?

11   A.   YES.

12   Q.   AND WHO ULTIMATELY DECIDES WHETHER MS. HOLMES IS CORRECT

13   OR THE ESTATE AND CREDITORS ARE CORRECT?

14   A.   THE BANKRUPTCY JUDGE.

15   Q.   AND THAT WAS AN OPTION AVAILABLE TO HER HERE; CORRECT?

16   A.   YES.

17   Q.   AND, IN FACT, DO YOU RECALL WHETHER SHE ASSERTED IN ONE OF

18   HER ANSWERS WHETHER OR NOT SHE HAD A HARDSHIP?

19   A.   I BELIEVE SHE DID AND IN ANSWER I KNOW THERE WAS IN A

20   LETTER.

21   Q.   DEFENSE COUNSEL ASKED YOU WHETHER YOU HAD COMMUNICATED TO

22   THE CREDITORS THE $75,000 OFFER.  DO YOU RECALL THAT LINE OF

23   QUESTIONING?

24   A.   I DO.

25   Q.   AND WHY DIDN'T YOU IMMEDIATELY FORWARD THIS OFFER TO THE

1    CREDITORS?

2    A.   BECAUSE IT REALLY -- IT'S JUST AN OFFER AND IT'S NOT

3    ANYTHING THAT HAS BEEN ACCEPTED.  IT'S NOT A CONTRACT.  IT'S

4    ALSO CONFIDENTIAL UNTIL THERE REALLY IS A DEAL.  AND SO

5    NEGOTIATIONS TO PRODUCE AND DEAL AND THAT'S WHEN THE CREDITORS

6    ARE GIVEN NOTICE WHAT THE TRUSTEE HAS AGREED TO SUBJECT TO THE

7    CONDITION OF COURT APPROVAL.

8    Q.   IN YOUR PRACTICE WHEN AN INITIAL OFFER IS MADE, HOW OFTEN

9    DO YOU IMMEDIATELY SHARE THAT WITH THE CREDITORS?

10   A.   NEVER.

11   Q.   OKAY.  AND WHY IS THAT?

12   A.   ONE, IT COULD BE A COMPLETELY POINTLESS EXERCISE, AND,

13   TWO, THE CREDITORS DON'T REALLY NEED TO BE INVOLVED IN

14   STEP-BY-STEP NEGOTIATIONS.  THEY'RE ENTITLED TO KNOW WHAT THE

15   TRUSTEE HAS COMMITTED THE ESTATE TO SUBJECT, AGAIN, TO COURT

16   APPROVAL, AND THEY HAVE THE RIGHT TO OBJECT.

17   Q.   AND, IN FACT, I WANT TO REFER YOU TO EXHIBIT 176 AGAIN,

18   THAT'S THE JUNE 17TH, 2005, LETTER THAT YOU SENT TO

19   MR. LIEDERMAN.

20        DO YOU RECALL THAT LETTER?

21   A.   YES.

22   Q.   AND YOU SAID IN THE LAST PARAGRAPH, IF MS. HOLMES OFFERS

23   TO PAY THE PRICE FOR THE SUM THAT YOU OFFERED, FOR THAT SUM,

24   THE TRUSTEE WILL USE HIS BEST EFFORTS TO OBTAIN BANKRUPTCY

25   COURT APPROVAL; CORRECT?

1        A.   YES.

2        Q.   AND THAT INCLUDES GETTING APPROVAL OF THE CREDITORS, TOO?

3        A.   YES, IT DOES.  ALTHOUGH THEY HAVE A CHANCE TO OBJECT

4        RATHER THAN TO APPROVE.

5        Q.   DEFENSE COUNSEL ALSO ASKED YOU ABOUT THE PAYMENTS TOWARDS

6        THE PROPERTY AT 312 MOONRACKER.  AND YOU MADE A STATEMENT, I

7        BELIEVE, CORRECT ME IF I'M WRONG, THAT DURING THE CHAPTER 11

8        BANKRUPTCY PROCEEDING IT WAS YOUR UNDERSTANDING THAT THE PAIGES

9        HAD MADE ALL OF THOSE MORTGAGE PAYMENTS; CORRECT?

10       A.   YES.

11       Q.   AND APPROXIMATELY HOW LONG WAS THE CHAPTER 11 BANKRUPTCY

12       PROCEEDING FOR THE PAIGES?

13       A.   OH, 28 MONTHS OR 29 MONTHS.

14       Q.   AND SO FOR 28 TO 29 MONTHS THE PAIGES MADE THOSE PAYMENTS?

15       A.   YES.

16       Q.   AND ARE THE ASSETS OF THE PAIGES ACTUALLY ASSETS OF THE

17       ESTATE?

18       A.   YES.

19       Q.   AND SO WAS THAT ESSENTIALLY ESTATE MONEY THAT WAS BEING

20       USED TO PAY THOSE CHAPTER 11 -- I'M SORRY -- TO PAY THAT

21       MORTGAGE?

22       A.   YES.

23       Q.   AND FOR APPROXIMATELY HOW LONG DID THOSE MORTGAGE PAYMENTS

24       CONTINUE BY THE PAIGES WHEN THE PROPERTY -- OR WHEN THE ESTATE

25       CONVERTED FROM A CHAPTER 11 TO A CHAPTER 7?

```
1            MS. GARRIDO:  OBJECT AS CALLING FOR HEARSAY AND

2     FOUNDATION AND LACK OF PERSONAL KNOWLEDGE, CONFRONTATION, DUE

3     PROCESS.

4            THE COURT:  DO YOU WANT TO LAY A FOUNDATION AS TO

5     WHETHER OR NOT THIS WITNESS CAN TRACK THOSE SUBSEQUENT PAYMENTS

6     THAT YOU ASKED ABOUT?

7     BY MR. FONDO:

8     Q.  I WANT TO REFER YOU TO A PARTICULAR LETTER THAT YOU WROTE.

9     LET'S GO TO EXHIBIT 187, PLEASE.

10            THE COURT:  ARE YOU WITHDRAWING THE PREVIOUS

11    QUESTION?

12            MR. FONDO:  YES.

13    Q.  I WANT TO REFER YOU TO A LETTER ON EXHIBIT 187 FOR 2006 --

14    I'M SORRY, 2005.

15        DID YOU MAKE THE STATEMENT TO MR. LIEDERMAN THAT YOU

16    BELIEVED THAT THESE FOUR MORTGAGE PAYMENTS WERE PAID BY THE

17    PAIGES?

18    A.  YES.

19    Q.  AND WHAT TIME PERIOD IN RELATION TO THE CHAPTER 11 VERSUS

20    CHAPTER 7 BANKRUPTCY WERE THESE FOUR PAYMENTS MADE?

21    A.  AFTER THE CONVERSION TO CHAPTER 7.

22    Q.  DO YOU KNOW FROM THE TIME THAT THE PAGES -- HOW MUCH, IF

23    ANY, RENT DID MYRA HOLMES PAY TO THE ESTATE FOR BEING AT 312

24    MOONRACKER DRIVE FROM THE TIME THAT THE PAIGES FILED CHAPTER 11

25    BANKRUPTCY THROUGH NOVEMBER 2005?
```

1    A.   I DON'T HAVE ANY PERSONAL KNOWLEDGE OF THAT.  TO THE BEST

2    OF MY KNOWLEDGE NONE.

3              MS. GARRIDO:  I'M GOING TO OBJECT AND MOVE TO STRIKE

4    THE LAST PORTION.  THE WITNESS JUST STATED HE HAD NO PERSONAL

5    KNOWLEDGE.

6              THE COURT:  THE ANSWER WILL BE STRICKEN.  THE

7    PREVIOUS ANSWER WILL BE STRICKEN.

8    BY MR. FONDO:

9    Q.   MR. MAHER, YOU'RE AWARE OF PAYMENTS THAT ARE MADE TO THE

10   ESTATE; CORRECT?

11   A.   I'M NOT AWARE OF ALL PAYMENTS THAT ARE MADE TO THE ESTATE.

12   Q.   ANY PAYMENTS THAT MRS. HOLMES MAY OR MAY NOT HAVE MADE,

13   WOULD SHE -- WHAT, IF ANY, OPPORTUNITY WOULD SHE HAVE TO

14   PRESENT THAT TO THE BANKRUPTCY COURT ONCE THE PROPERTY WAS --

15   THE 312 MOONRACKER PROPERTY WAS EITHER SOLD OR RESOLVED?

16   A.   THERE WOULD HAVE BEEN AN ACCOUNTING OF SOME SORT, AND IF

17   THE TRUSTEE AND MRS. HOLMES DIDN'T REACH AGREEMENT, IT WOULD BE

18   A DISPUTE DECIDED BY THE BANKRUPTCY COURT AND THEY WOULD HAVE

19   LOADS OF OPPORTUNITY TO PRESENT EVIDENCE.

20   Q.   DEFENSE COUNSEL ASKED YOU ABOUT YOUR STATEMENT DO YOUR

21   HOMEWORK IN RELATION TO A LETTER THAT YOU HAD SENT.  DO YOU

22   RECALL THAT STATEMENT OR HER QUESTION?

23   A.   YES.

24   Q.   AND YOU STATED THAT YOU WERE ANGRY.  WHY WERE YOU ANGRY?

25              MS. GARRIDO:  OBJECTION, RELEVANCE.

```
1               THE COURT:  OVERRULED.

2               THE WITNESS:  I -- NOTHING LIKE THIS HAD EVER

3      HAPPENED TO ME.  I THOUGHT THAT THE TRUSTEE HAD BEEN ACTING IN

4      GOOD FAITH AND --

5               MS. GARRIDO:  OBJECTION, VOUCHING.

6               THE COURT:  EXCUSE ME.  I'LL STRIKE THAT LAST

7      ANSWER.  YOU CAN CONTINUE WITH YOUR ANSWER.  I'LL STRIKE THAT

8      LAST.

9               THE WITNESS:  I THOUGHT MY NEGOTIATIONS WITH

10     MR. LIEDERMAN WERE PROCEEDING ON A GOOD FAITH BASIS, AND I WAS

11     REALLY QUITE SHOCKED THAT THIS HAPPENS WHERE I FIND OUT

12     TWO MONTHS AFTER THE FACT THAT THE PROPERTY HAS BEEN

13     TRANSFERRED, AND I WAS MIFFED.

14     BY MR. FONDO:

15     Q.  WHAT INFORMATION, IF ANY, DID YOU HAVE THAT MR. LIEDERMAN

16     KNEW ABOUT THIS TRANSFER BEFORE HE CALLED YOU ON JANUARY 23RD,

17     2006?

18     A.  I DIDN'T HAVE ANY INFORMATION THAT HE KNEW.

19               MR. FONDO:  NOTHING FURTHER, YOUR HONOR.

20               THE COURT:  CROSS-EXAMINATION.

21                      RECROSS-EXAMINATION

22     BY MS. GARRIDO:

23     Q.  MR. MAHER, WHEN NEGOTIATIONS ARE ONGOING REGARDING YOUR

24     PROPERTY IN ONE OF YOUR BANKRUPTCY CASES, YOU DON'T APPRISE THE

25     CREDITORS OF THAT?
```

```
1    A.   THIS IS GENERALLY SPEAKING?

2    Q.   RIGHT.

3    A.   I DON'T -- COULD YOU RESTATE THE QUESTION.

4    Q.   IF YOU'RE IN THE MIDST OF NEGOTIATIONS OVER A PARTICULAR

5    PIECE OF PROPERTY OF THE ESTATE, YOU DON'T APPRISE THE

6    CREDITORS OF THE ESTATE AS TO THE STATUS OF THOSE NEGOTIATIONS?

7    A.   IF YOU MEAN WE RECEIVED AN OFFER AND BLANK DOLLARS AND WE

8    COUNTERED AT Y DOLLARS, THAT SORT OF THING?

9    Q.   RIGHT.

10   A.   NO.

11   Q.   AND THAT IS -- THAT'S SOMETHING THAT YOU NEVER DO?

12   A.   TO SEND OUT A NOTICE GENERALLY TO ALL CREDITORS OF WHERE

13   WE ARE IN A PARTICULAR NEGOTIATION, I DON'T THINK I HAVE EVER

14   DONE IT.

15   Q.   OKAY.  AND AN EXPERIENCED BANKRUPTCY ATTORNEY WOULD KNOW

16   THAT'S SOMETHING THAT YOU NORMALLY DON'T DO?

17   A.   YES.

18   Q.   AND MR. LIEDERMAN CONFRONTED YOU ABOUT NOT PROVIDING

19   INFORMATION ABOUT SETTLEMENT OFFERS TO THE CREDITORS; CORRECT?

20   A.   THERE -- DID I WRITE A LETTER TO THAT EFFECT?

21   Q.   I'M SPECIFICALLY REFERRING TO DEFENSE EXHIBIT RRR IF THAT

22   WILL REFRESH YOUR RECOLLECTION.  PLEASE REVIEW THAT --

23   A.   OKAY.  I'M JUST --

24   Q.   -- FINAL PARAGRAPH ON THE FIRST PAGE, AND LET US KNOW IF

25   THAT REFRESHES YOUR RECOLLECTION.
```

1      A.   MY COPY IS NOT MARKED BUT JANUARY 25TH, 2006.

2      Q.   YES.

3      A.   HE DOES SAY THAT.

4           THE COURT:  AGAIN --

5           THE WITNESS:  IT DOES REMIND ME.  IT REFRESHES MY

6      RECOLLECTION.

7           THE COURT:  THE DOCUMENT IS NOT IN EVIDENCE.

8      ANYTHING THE DOCUMENT SAYS IS NOT IN EVIDENCE.  SO THAT'S

9      STRICKEN.  THE LAST PORTION OF YOUR ANSWER IS STRICKEN.

10          THE WITNESS:  I APOLOGIZE.  IT REFRESHES MY

11     RECOLLECTION THAT HE DID SAY THAT.

12          MS. GARRIDO:  OKAY.

13     Q.   AND SPECIFICALLY HE DID SAY THAT MEANING THAT HE

14     CONFRONTED YOU ABOUT WHETHER OR NOT YOU HAD SHARED THE $75,000

15     OFFER WITH THE CREDITORS?

16          MR. FONDO:  OBJECTION, HEARSAY, YOUR HONOR.

17          THE COURT:  SUSTAINED.

18     BY MS. GARRIDO:

19     Q.   WE HAD TALKED EARLIER ABOUT WHETHER OR NOT MR. LIEDERMAN

20     HAD INITIALLY EXPRESSED OUTRAGE ABOUT THE IDEA THAT A

21     NON-DEBTOR COULD LOSE THEIR HOME.

22          AND IN EXHIBIT DD?

23     A.   IS THAT ONE OF THE FEE APPLICATIONS?

24     Q.   IT IS.  IT IS THE FIRST FEE APPLICATION, AND I'LL ASK YOU

25     TO REVIEW PAGE 7 OF 20.

1          MR. FONDO:  EXCUSE ME.  COUNSEL, WHICH EXHIBIT IS

2     IT?

3          MS. GARRIDO:  DD.  AT PAGE 7 OF 20, LINES 6 THROUGH

4     9.

5          MR. FONDO:  EXCUSE ME, COUNSEL.  I'M NOT SURE WE

6     HAVE THAT.  I APOLOGIZE.  I DO HAVE IT.

7     BY MS. GARRIDO:

8     Q.   SO I HAD ASKED YOU EARLIER WHETHER YOU HAD REPRESENTED TO

9     THE COURT WHETHER MR. LIEDERMAN HAD EXPRESSED OUTRAGE AND

10    HAVING READ THAT NOW DID YOU EXPRESS THAT TO THE COURT?

11    A.   I DID.

12    Q.   AND AS YOU TESTIFIED EARLIER, WHEN HE EXPRESSED OUTRAGE TO

13    YOU, YOU EXPLAINED TO HIM THE BANKRUPTCY CODE THAT ALLOWED THE

14    ESTATE TO PROCEED IN THIS MANNER; CORRECT?

15    A.   I BELIEVE I DID, YES.

16    Q.   AND THIS EXPLANATION YOU FELT WAS APPARENTLY MEANINGLESS

17    TO MR. LIEDERMAN?

18    A.   THAT'S WHAT I WROTE THERE AS WELL.

19    Q.   AND YOU WROTE THAT BECAUSE THAT'S WHAT YOU WERE FEELING AT

20    THE TIME; IS THAT CORRECT?

21    A.   THAT'S CORRECT.

22    Q.   MR. LIEDERMAN AT SOME POINT DURING THE NEGOTIATION

23    CONTACTED THE CREDITOR DIRECTLY; CORRECT?

24    A.   I BELIEVE HE --

25          MR. FONDO:  OBJECTION, YOUR HONOR, AS TO TIME AND

MAHER RECROSS

```
1     RELEVANCE.

2             THE COURT:  WHY DON'T YOU -- CAN YOU INDICATE A TIME

3     FOR THIS CONTACT.

4             MS. GARRIDO:  I CAN.  IN NOVEMBER OF 2006 OR OCTOBER

5     OF 2006.

6             THE COURT:  I'LL ALLOW YOU TO ANSWER THAT.

7             THE WITNESS:  I RECALL THAT HE CONTACTED, I FORGET

8     WHICH FIRM IT WAS, THE JEFF HERNANDEZ FIRM, ON BEHALF OF WELLS

9     FARGO BANK.  IS THAT RIGHT?

10    BY MS. GARRIDO:

11    Q.  YES.  WOULD YOU LIKE TO REVIEW THE DOCUMENT TO REFRESH

12    YOUR RECOLLECTION?

13    A.  YES.

14    Q.  IF YOU CAN PLEASE REVIEW WHAT HAS BEEN MARKED AS DEFENSE

15    XXX AND LET US KNOW WHEN YOU'RE FINISHED.

16    A.  I DON'T THINK THIS IS THE COMMUNICATION THAT I WAS

17    REFERRING TO.  THIS IS -- SUSAN UECKER WAS INVOLVED IN THIS,

18    AND SHE WAS A MEDIATOR THAT WE USED.

19            THE COURT:  AGAIN, SIR, LET'S NOT REFER TO THE

20    DOCUMENT.

21            THE WITNESS:  I'M SORRY.

22            THE COURT:  THAT'S QUITE ALL RIGHT.

23        DO YOU HAVE A QUESTION FOR THE WITNESS?

24            THE WITNESS:  I RECALL THAT THERE WAS SOME

25    COMMUNICATION AT SOME POINT BY MR. LIEDERMAN WITH ROBERT KAPLAN
```

MAHER RECROSS

1      OR ONE OF THE ATTORNEYS IN HIS OFFICE.  THAT FIRM REPRESENTED

2      WELLS FARGO.  I DON'T REMEMBER EXACTLY WHEN IT WAS, BUT THIS

3      WAS NOT THE DOCUMENT THAT WOULD REFRESH ME.

4      BY MS. GARRIDO:

5      Q.   OKAY.  IF YOU COULD ACTUALLY JUST TAKE A LOOK ON THE

6      SECOND PAGE AT THE PARAGRAPH ABOUT THE BOTTOM THIRD OF THE PAGE

7      BEGINNING WITH "CERTAINLY."

8            THE COURT:  AND THE QUESTION TO THIS WITNESS IS, IS

9      MR. LIEDERMAN CONTACTING THE CREDITOR DIRECTLY?

10           MS. GARRIDO:  CORRECT.  AND I'M JUST ASKING IF HE

11     WOULD REVIEW THIS SO THAT I COULD ASK HIM SPECIFIC QUESTIONS

12     ABOUT THAT OCCURRENCE.

13           THE COURT:  WELL, I THINK THAT WAS THE QUESTION.

14           THE WITNESS:  THE ANSWER IS I DO RECALL THAT

15     MR. LIEDERMAN CONTACTED COUNSEL FOR WELLS FARGO BANK AT SOME

16     POINT.

17     BY MS. GARRIDO:

18     Q.   OKAY.  AND THAT WAS SOMETHING THAT WAS -- YOU CONSIDERED

19     TO BE VERY INAPPROPRIATE; CORRECT?

20     A.   NO.  I WOULD CONSIDER IT TO BE VERY ANNOYING.

21     Q.   VERY ANNOYING.  OKAY.  SO HE ANNOYED YOU BY DOING THAT?

22     A.   IT -- IT'S LIKE -- YEAH, HE ANNOYED ME BY DOING IT.

23     THAT'S NOT THE FIRST TIME OR THE LAST TIME THAT SOMEONE ANNOYED

24     ME.

25           THE COURT:  CAN YOU GET A LITTLE CLOSER TO THE

```
 1    MICROPHONE?  THANK YOU.

 2    BY MS. GARRIDO:

 3    Q.   DID YOU CONSIDER THAT TACTIC TO BE UNDERHANDED?

 4    A.   I DID A LITTLE BIT, YES.

 5    Q.   AND DID THAT CAUSE YOU TO QUESTION MR. LIEDERMAN?

 6    A.   NO.

 7    Q.   DID THAT CAUSE YOU TO CEASE ALL NEGOTIATION WITH

 8    MR. LIEDERMAN?

 9    A.   NO.

10    Q.   DID YOU WRITE THE E-MAIL MESSAGE THAT IS REPRESENTED ON

11    PAGE 3?

12              THE COURT:  OF EXHIBIT?

13              MS. GARRIDO:  OF EXHIBIT XXX.

14              THE WITNESS:  WHICH PART OF IT?  IT'S A BIG PAGE.

15    BY MS. GARRIDO:

16    Q.   THE MESSAGE FROM CHARLES MAHER SENT ON NOVEMBER 1ST, 2006?

17    A.   AT 4:49?

18    Q.   YES.

19    A.   WE CUT OFF NEGOTIATIONS.

20              THE COURT:  THE QUESTION WAS DID YOU --

21              THE WITNESS:  THIS CAUSED ME TO CEASE NEGOTIATIONS.

22    WE RESUMED NEGOTIATIONS AT A LATER TIME.

23    BY MS. GARRIDO:

24    Q.   BUT FOR A TIME THAT CAUSED YOU TO CEASE NEGOTIATIONS?

25    A.   YES.
```

1    Q.   AND BECAUSE YOU CONSIDERED HIS TACTIC TO BE UNDERHANDED AT

2    BEST?

3    A.   I THINK THAT'S WHAT I WROTE.

4    Q.   YOU MENTIONED IN MEDIATION YOU MADE FUN OF MR. LIEDERMAN

5    TO A MEDIATOR --

6             MR. FONDO:  OBJECTION -- SORRY.

7    BY MS. GARRIDO:

8    Q.   -- THAT HE CAME TO LIFE AND EXECUTED A STIPULATION TO YOUR

9    APPOINTMENT.  DO YOU RECALL AN E-MAIL TO THAT EFFECT?

10   A.   NO.

11            MR. FONDO:  OBJECTION, YOUR HONOR, RELEVANCE.

12            THE COURT:  I'LL ALLOW THE ANSWER TO REMAIN.

13            MS. GARRIDO:  WOULD IT REFRESH YOUR RECOLLECTION --

14            THE COURT:  YOU CAN ASK ANOTHER QUESTION.

15   BY MS. GARRIDO:

16   Q.   WOULD IT REFRESH YOUR RECOLLECTION TO REVIEW AN E-MAIL?

17   A.   YES.  YES, THIS WAS TWO YEARS LATER.

18   Q.   SO YOU DID MAKE FUN OF HIM TO THAT MEDIATOR?

19   A.   I DON'T KNOW IF THAT'S MAKING FUN.

20            MR. FONDO:  OBJECTION, YOUR HONOR.  NOW WE'RE WELL

21   BEYOND THE TIME PERIOD.  WE OBJECT AS TO RELEVANCE.

22            THE COURT:  I'LL ALLOW THIS, BUT YOU CAN MOVE ON,

23   MS. GARRIDO.

24            MS. GARRIDO:  THANK YOU.

25   Q.   HAVE YOU RESENTED HAVING TO DEAL WITH MR. LIEDERMAN?

1    A.   NO.

2    Q.   AND IN EXECUTING YOUR BILLING YOU WOULD WRITE THINGS LIKE

3    REVIEWED SNOTTY LETTER FROM MR. LIEDERMAN, REVIEWED SMART-ALECK

4    LETTER FROM MR. LIEDERMAN?

5    A.   THERE WERE A COUPLE.

6    Q.   YOU DIDN'T RESENT HAVING TO SPEND YOUR TIME REVIEWING HIS

7    SNOTTY, SMART-ALECK LETTERS?

8    A.   NO.

9         MS. GARRIDO:  I HAVE NOTHING FURTHER.

10        THE COURT:  REDIRECT?  REDIRECT.

11                    **FURTHER REDIRECT EXAMINATION**

12   BY MR. FONDO:

13   Q.   DEFENSE COUNSEL ASKED YOU REGARDING PRAISING CREDITORS OF

14   SETTLEMENT NEGOTIATIONS.  IS IT CORRECT THAT YOU ONLY PRAISE

15   CREDITORS WHEN YOU HAVE AGREEMENT BETWEEN THE PARTIES?

16   A.   WITH A GENERAL NOTICE, YES.  IF A CREDITOR CALLED AND

17   ASKED IF WE WERE DOING SOMETHING, IT WOULD SORT OF DEPEND ON

18   THE CIRCUMSTANCE, BUT I WOULD PROBABLY GIVE SOME INFORMATION.

19   I WOULDN'T WITHHOLD INFORMATION FROM A CREDITOR WHO CALLED.

20   Q.   OKAY.  THROUGH APRIL OF 2005, DID YOU EVER NOTIFY THE

21   CREDITORS HERE THAT A DEAL HAD BEEN REACHED BETWEEN THE ESTATE

22   AND MYRA HOLMES RELATING TO 312 MOONRACKER DRIVE?

23   A.   NO.

24   Q.   AND WHY WAS THAT?

25   A.   BECAUSE THERE WASN'T A DEAL.

```
 1      Q.   I'M SORRY.  THROUGH APRIL OF '06?

 2      A.   NO.

 3      Q.   THANK YOU.

 4              MS. GARRIDO:  NOTHING FURTHER, YOUR HONOR.

 5              THE COURT:  MAY THIS WITNESS BE EXCUSED?

 6              MR. FONDO:  YES, YOUR HONOR.

 7              MS. GARRIDO:  YES, YOUR HONOR, BUT SUBJECT -- WELL,

 8      I SHOULD QUALIFY THAT SUBJECT TO THE PENDING RULING ON THE

 9      DEFENSE MOTION.

10              MR. FONDO:  YOUR HONOR, WE NEED TO HAVE A SIDE-BAR

11      AGAIN.  I'M NOT AWARE.

12              THE COURT:  I THINK -- LET'S HAVE A SIDE-BAR.

13           (SIDE-BAR CONFERENCE ON THE RECORD.)

14              MS. GARRIDO:  I'M REFERENCING OUR MOTION TO ADMIT

15      THE DECLARATION OF LEONARD PAIGE AS LONG AS THERE'S GOING TO BE

16      NO -- AS LONG AS THERE WILL BE A STIPULATION AS TO THE FACT

17      THAT IT WAS FILED IN THE BANKRUPTCY PROCEEDING, WE CAN JUST

18      ADMIT IT AND READ IT IN WITHOUT THE WITNESS, THAT WOULD BE

19      FINE.

20              MR. FONDO:  ABSOLUTELY NOT.  YOUR HONOR HAS

21      SPECIFICALLY ASKED IF THAT WAS GOING TO BE AN ISSUE WITH THIS

22      WITNESS AND DEFENSE COUNSEL SAID NO.

23              THE COURT:  SO I'LL EXCUSE HIM SUBJECT TO RECALL.

24      IT MAY BE THAT HE HAS TO COME BACK AND BE SUBPOENAED BY SOMEONE

25      BUT OTHERWISE HE'S EXCUSED.
```

```
1              MS. GARRIDO:  THANK YOU.

2              THE COURT:  THANK YOU, COUNSEL.

3         (END OF DISCUSSION AT SIDE-BAR.)

4              THE COURT:  SO, SIR, I WILL EXCUSE YOU NOW.  IT MAY

5    BE THAT YOU WILL BE RECALLED AT SOME TIME IN THE FUTURE FOR

6    FURTHER EXAMINATION.

7              THE WITNESS:  ALL RIGHT.  THANK YOU VERY MUCH, YOUR

8    HONOR.

9              THE COURT:  YOU'RE WELCOME.

10             MR. FONDO:  YOUR HONOR, MAY THE GOVERNMENT CALL OUR

11   NEXT WITNESS?

12             THE COURT:  YES.

13             MR. FONDO:  THE GOVERNMENT CALLS JERRI JOHNSON.

14             THE COURT:  SIR, IF YOU WOULD COME FORWARD, OUR

15   COURTROOM DEPUTY HAS A QUESTION FOR YOU.

16        (GOVERNMENT'S WITNESS, JERRI JOHNSON, WAS SWORN.)

17             THE WITNESS:  I DO.

18             THE COURT:  PLEASE HAVE A SEAT HERE, SIR, AND MAKE

19   YOURSELF COMFORTABLE.  YOU CAN ADJUST THE CHAIR AND THE

20   MICROPHONE AS YOU NEED.  I'LL ENCOURAGE YOU TO SPEAK DIRECTLY

21   INTO THE MICROPHONE.

22        WHEN YOU ARE COMFORTABLE, COULD YOU PLEASE STATE YOUR NAME

23   AND THEN SPELL IT, PLEASE.

24             THE WITNESS:  MY NAME IS JERRI JOHNSON, J-E-R-R-I,

25   J-O-H-N-S-O-N.
```

```
 1              THE COURT:  COUNSEL.

 2              MR. FONDO:  THANK YOU, YOUR HONOR.

 3                       DIRECT EXAMINATION

 4     BY MR. FONDO:

 5     Q.   MR. JOHNSON, GOOD AFTERNOON.

 6     A.   GOOD AFTERNOON.

 7     Q.   WHERE DO YOU WORK?

 8     A.   I WORK FOR THE F.B.I.

 9     Q.   AND IN WHAT POSITION DO YOU HOLD THERE?

10     A.   I'M A FORENSIC ACCOUNTANT.

11     Q.   AND WHAT IS A FORENSIC ACCOUNTANT?

12     A.   WE REVIEW THE FINANCIAL ANALYSIS, BANK STATEMENTS, AND

13     PERFORM ANALYSIS ALONG THE WAY.

14     Q.   AND DO YOU WORK WITHIN A PARTICULAR GROUP WITHIN THE

15     F.B.I.?

16     A.   YES.  I WORK BASICALLY WITH THE FORENSIC ACCOUNTING SQUAD,

17     AND WE SUPPORT A LOT OF THE WHITE COLLAR CRIMES.

18     Q.   AND WHAT DOES F.B.I. STAND FOR, AND WHAT DOES IT GENERALLY

19     DO?

20     A.   THE F.B.I. STANDS FOR THE FEDERAL BUREAU OF INVESTIGATION

21     AND WE PERFORM -- WE INVESTIGATE INFRACTIONS AGAINST THE

22     GOVERNMENT.

23     Q.   CRIMES?

24     A.   CRIMES.

25     Q.   AND HOW LONG HAVE YOU BEEN WITH THE F.B.I.?
```

1     A.   THREE AND A HALF YEARS.

2     Q.   AND COULD YOU PLEASE GIVE THE JURY JUST A GENERAL OVERVIEW

3     OF YOUR PROFESSIONAL BACKGROUND?

4     A.   I'M A -- I'VE BEEN A FINANCIAL PROFESSIONAL ANALYSIS SINCE

5     1973.  I HAVE BEEN IN VARIOUS POSITIONS OF AUDITING,

6     MANAGEMENT, TREASURY, AND LASTLY A FINANCIAL ACCOUNTANT, AS A

7     FORENSIC ACCOUNTANT WITH THE F.B.I.

8          I HAVE MY C.P.A., ALTHOUGH IT'S INACTIVE, AND I'M A

9     CERTIFIED FORENSIC EXAMINER.  AND I HAVE A MASTER'S IN BUSINESS

10    ADMINISTRATION AS WELL.

11    Q.   COULD YOU BE CERTAIN TO SPEAK IN THE MIKE, OTHERWISE IT'S

12    A LITTLE HARD TO HEAR YOU.

13         AND WHAT IS YOUR EDUCATIONAL BACKGROUND?

14    A.   MY EDUCATIONAL BACKGROUND, I HAVE A BUSINESS

15    ADMINISTRATION DEGREE AND A CONCENTRATION IN ACCOUNTING FROM

16    SAN JOSE STATE UNIVERSITY.  AND I HAVE AN M.B.A. FROM GOLDEN

17    GATE UNIVERSITY.

18    Q.   AND WHAT WAS THE FOCUS THERE?

19    A.   JUST BUSINESS ADMINISTRATION.

20    Q.   AND YOU MENTIONED YOU'RE A CERTIFIED FRAUD EXAMINER.  WHAT

21    IS THAT?

22    A.   A CERTIFIED FRAUD EXAMINER, WE'RE A PROFESSIONAL

23    ORGANIZATION THAT IS BASICALLY INVOLVED WITH ALL VARIOUS KINDS

24    OF FRAUD.

25    Q.   DO YOU HAVE TRAINING AND EXPERIENCE IN FINANCIAL ANALYSIS

JOHNSON DIRECT

```
1    IN FRAUD?

2    A.   YES, I DO.

3    Q.   AND WHAT TYPE OF TRAINING AND EXPERIENCE -- WHAT TYPE OF

4    TRAINING DO YOU HAVE?

5    A.   THE F.B.I. SENT ME TO A SIX-WEEK COURSE AFTER I WAS WITH

6    THE BUREAU FOR A YEAR, AND I HAVE TAKEN SEVERAL CONTINUING

7    PROFESSIONAL EDUCATIONAL COURSES REQUIRED TO MAINTAIN MY

8    CERTIFIED FRAUD EXAMINATION OR CERTIFIED FRAUD CERTIFICATE.

9    Q.   AND APPROXIMATELY HOW MANY INVESTIGATIONS HAVE YOU BEEN --

10   DONE FORENSIC ACCOUNTING WORK WHILE AT THE F.B.I.?

11   A.   BETWEEN 10 AND 15.  I DON'T KNOW EXACTLY.

12   Q.   AND WHAT TYPE OF DATA OR WHEN YOU DO FORENSICS ANALYSIS,

13   WHAT TYPE OF DATA DO YOU LOOK AT?

14   A.   WE RELY HEAVILY UPON BANK STATEMENTS AND THE DATA THAT WE

15   SUBPOENA FROM BANKS INCLUDING CHECKS, DEPOSIT SLIPS, WIRE

16   TRANSFERS, ALL OF THE DATA THAT COMES FROM THE BANK WITH A

17   SUBPOENA.

18   Q.   AND LET'S TALK A BIT ABOUT THE FINANCIAL DATA IN THIS

19   CASE.

20        DID THERE COME A TIME WHEN YOU WERE ASKED TO PREPARE

21   CHARTS IN CONNECTION WITH YOUR TESTIMONY TODAY?

22   A.   YES, THERE WAS.

23   Q.   AND THAT WAS AT THE REQUEST OF MYSELF AND MY COLLEAGUE

24   MR. FAZIOLI; CORRECT?

25   A.   THAT'S CORRECT.
```

```
 1    Q.   AND DID YOU REVIEW ANY DOCUMENTS IN CONNECTION WITH THE

 2    PREPARATION OF THOSE CHARTS?

 3    A.   YES, I DID.

 4    Q.   AND JUST GENERALLY WHAT TYPES OF DOCUMENTS DID YOU REVIEW?

 5    A.   I REVIEWED BANKING STATEMENTS, CHECKS, DEPOSIT SLIPS,

 6    TRANSFERS, ENTER BANK TRANSFERS, WIRE TRANSFERS, THE FINANCIAL

 7    TITLE CORPORATION TITLE PACKAGE.

 8    Q.   AND LET ME STOP YOU FOR A SECOND.  YOU MENTIONED BANK

 9    RECORDS.  WHOSE BANK RECORDS DID YOU LOOK AT?

10    A.   THOSE BANK RECORDS FOR BANK RECORDS THAT BELONG TO

11    MYRA HOLMES, SOME OF THEM WERE MYRA HOLMES DBA, DOING BUSINESS

12    AS, STAR PARTNERS.

13    Q.   AND THERE WERE OTHERS?

14    A.   AND THERE WERE OTHERS AND TWO CHECKING ACCOUNTS AS WELL.

15    Q.   AND YOU MENTION TITLE COMPANIES FILE AND WHAT SPECIFIC,

16    WHAT FILE DID THAT RELATE TO?

17    A.   THAT RELATED TO 312 MOONRACKER DRIVE UP IN VALLEJO.

18    Q.   AND DID YOU ALSO HAVE AN OPPORTUNITY TO REVIEW TWO LOAN

19    APPLICATIONS SUBMITTED OR UNIFORM LOAN APPLICATIONS SUBMITTED

20    BY MYRA HOLMES?

21    A.   YES, I DID.  ONE WAS SIGNED ON THE 11TH OF OCTOBER OF 2005

22    AND THE OTHER WAS SIGNED ON NOVEMBER 14TH OF 2005.

23    Q.   I'D LIKE TO HAVE YOU TAKE A LOOK AT EXHIBITS 126 THROUGH

24    142 THAT HAVE PREVIOUSLY BEEN ADMITTED IN EVIDENCE.

25         AND IF YOU COULD TELL THE JURY WHEN YOU REVIEWED AND
```

1    RELIED UPON THESE EXHIBITS FOR YOUR ANALYSIS AND YOUR CHARTS

2    TODAY?  AND COULD YOU ALSO TELL THE JURY GENERALLY WHAT THESE

3    EXHIBITS ARE?

4    A.   THE FIRST EXHIBIT IS A DECLARATION CONCERNING BANK RECORDS

5    THAT IDENTIFIES THE RECORDS THAT THE BANK --

6    Q.   I'M SORRY, SIR.  IF YOU COULD START WITH EXHIBIT 126.

7    A.   I'M SORRY.  126 IS THE BUSINESS SIGNATURE CARD FOR

8    MYRA HOLMES DOING BUSINESS AS STAR PARTNERS, AND THEN 127 IS

9    THE BANK STATEMENT JANUARY 31ST, '05 BANK STATEMENT.

10   Q.   AND TO SPEED THINGS ALONG, IF YOU COULD LOOK AT THE

11   REMAINDER OF EXHIBITS 127 THROUGH 142 AND LET THE JURY KNOW

12   WHETHER YOU HAVE REVIEWED THESE IN PREPARATION OF THE CHARTS

13   AND YOUR TESTIMONY AND THEN I'LL ASK YOU JUST GENERALLY WHAT

14   THOSE EXHIBITS ARE?

15   A.   YES.  I'VE REVIEWED THESE AS PART OF MY ANALYSIS.

16   Q.   ALL RIGHT.  AND, JUST GENERALLY, WHAT ARE THESE DOCUMENTS?

17   A.   THESE ARE THE BANK ACCOUNT STATEMENTS FOR MYRA HOLMES DBA

18   STAR PARTNERS SECURITY SERVICES.

19   Q.   FOR APPROXIMATELY WHAT TIME PERIOD?

20   A.   FROM JANUARY OF '05 THROUGH APRIL OF '06.

21   Q.   THANK YOU.  COULD YOU NEXT GO TO EXHIBITS 145 THROUGH 150.

22   AND LET THE JURY KNOW IF YOU REVIEWED THESE BANK RECORDS AS

23   PART OF YOUR ANALYSIS?

24   A.   YES, I REVIEWED THESE BANK RECORDS AS PART OF MY ANALYSIS.

25   Q.   AND JUST TO BE CLEAR, THIS IS RELATING TO THE CHARTS THAT

JOHNSON DIRECT

```
 1    YOU PREPARED; CORRECT?

 2    A.   THAT'S CORRECT.

 3    Q.   AND YOU REVIEWED MORE THAN JUST THESE DOCUMENTS; CORRECT?

 4    A.   CORRECT.

 5    Q.   OKAY.  ALL RIGHT.  SO I WANT MY QUESTIONS TO FOCUS ON FOR

 6    THE CHARTS TODAY.

 7         ALL RIGHT.  AND COULD YOU TELL THE JURY, PLEASE, WHAT

 8    GENERALLY EXHIBITS 145 THROUGH 150 ARE?

 9    A.   145 THROUGH 150 ARE BASICALLY THE BANK STATEMENTS FOR

10    MYRA HOLMES.

11    Q.   FOR WHICH ACCOUNT AND FOR WHICH TIME PERIOD?

12    A.   PARDON ME?

13    Q.   FOR WHICH ACCOUNT?

14    A.   31513384-3.

15    Q.   THANK YOU.  AND FOR WHAT TIME PERIOD?

16    A.   THE TIMEFRAME WAS STATEMENT ENDING 12-14-05 THROUGH

17    4-14-06.

18    Q.   AND WAS THERE A REASON THAT YOU STARTED -- GOING BACK TO

19    EXHIBIT 46, WAS THERE A REASON THAT YOU STARTED WITH THIS TIME

20    PERIOD FOR THIS ACCOUNT?

21    A.   YES, THERE WAS.  THIS WAS WHEN THE ACCOUNT WAS FIRST

22    OPENED.

23    Q.   THANK YOU.  I'D LIKE TO REFER YOU NEXT TO EXHIBITS 152 TO

24    155, PLEASE.  AND IF YOU COULD TELL THE JURY WHETHER YOU

25    REVIEWED THESE, EXCUSE ME, FOR YOUR ANALYSIS TODAY?
```

1    A.   YES, I REVIEWED THESE EXHIBITS AS PART OF MY ANALYSIS.

2    Q.   AND JUST GENERALLY FOR THE JURY, WHAT ARE EXHIBITS 152

3    THROUGH 155?

4    A.   EXHIBITS 152 TO 155 ARE MYRA HOLMES'S SAVINGS ACCOUNT.

5    Q.   AND FOR WHAT TIME PERIOD?

6    A.   THE TIME PERIOD FROM 11-22-05 THROUGH MARCH 31ST, '06.

7    Q.   AND WAS THERE A REASON THAT YOU STARTED WITH NOVEMBER

8    22ND, 2005, FOR THIS ACCOUNT?

9    A.   YES, BECAUSE THAT'S WHEN THE ACCOUNT WAS FIRST OPENED.

10   Q.   I'D LIKE TO HAVE YOU TAKE A LOOK AT EXHIBITS 157 THROUGH

11   159, PLEASE.

12   A.   OKAY.

13   Q.   DID YOU REVIEW THESE EXHIBITS IN PREPARATION OF YOUR

14   CHARTS TODAY?

15   A.   YES, I REVIEWED THESE EXHIBITS IN THE PREPARATION OF MY

16   FINANCIAL ANALYSIS.

17   Q.   AND THANK YOU.  THAT'S PROBABLY A BETTER WAY TO PUT IT.

18        AND WHAT ARE THESE EXHIBITS?

19   A.   THESE EXHIBITS ARE MYRA HOLMES'S DBA STAR PARTNERS

20   SECURITY SERVICES SAVINGS ACCOUNT.

21   Q.   AND FOR WHAT TIME PERIOD?

22   A.   THE TIME PERIOD FROM 11-22-05 THROUGH 6-30-06.

23   Q.   AND WAS THERE A REASON THAT YOU STARTED YOUR REVIEW OF

24   THIS ACCOUNT ON NOVEMBER 22ND, 2005?

25   A.   YES, I DID BECAUSE THAT'S WHEN THE ACCOUNT WAS OPENED.

1    Q.   AND I'D LIKE TO HAVE YOU TAKE A LOOK AT EXHIBIT NUMBER 58,

2    PLEASE, WHICH HAS BEEN PREVIOUSLY ADMITTED INTO EVIDENCE.

3         CAN YOU TELL THE JURY WHETHER YOU REVIEWED THAT FOR YOUR

4    FINANCIAL ANALYSIS?

5    A.   YES, I REVIEWED THIS EXHIBIT AS PART OF MY ANALYSIS.

6    Q.   OKAY.  AND WHAT GENERALLY IS EXHIBIT 58?

7    A.   IT'S THE TITLE LOAN PACKAGE FROM THE FINANCIAL TITLE

8    COMPANY.

9    Q.   OKAY.  AND FOR WHAT PROPERTY IS THE TITLE FILE?  IS THAT

10   WHAT IT IS?

11   A.   YES, IT'S THE TITLE FILE.

12   Q.   AND FOR WHAT PROPERTY IS THAT?

13   A.   THIS IS FOR 312 MOONRACKER DRIVE IN VALLEJO.

14   Q.   AND FOR APPROXIMATELY WHAT TIME PERIOD?

15   A.   THE LOAN APPLICATION WAS SIGNED ON THE 14TH OF NOVEMBER,

16   2005.

17   Q.   OKAY.  SO IT RELATES TO THAT TITLE FILE RELATING TO THE

18   APPLICATION THAT WAS FILED -- THAT WAS SIGNED ON THE 14TH OF

19   2005?

20   A.   CORRECT.

21   Q.   I ALSO WANT YOU TO TAKE A LOOK AT EXHIBIT 18, PLEASE, AND

22   LET ME KNOW WHETHER YOU REVIEWED THIS IN PREPARATION FOR YOUR

23   CHART A COUPLE -- ONE OR TWO OF YOUR CHARTS.

24   A.   YES, I REVIEWED EXHIBIT 18 AS PART OF MY ANALYSIS.

25   Q.   AND WHAT IS EXHIBIT 18?

1    A.   EXHIBIT 18 IS A UNIFORM RESIDENTIAL LOAN APPLICATION.

2    Q.   FOR -- WHO SIGNED IT AS THE BORROWER?

3    A.   MYRA HOLMES SINGED THE APPLICATION ON THE 11TH OF

4    OCTOBER 2005.

5    Q.   I'D LIKE TO HAVE YOU TAKE A LOOK AT EXHIBIT 43 AND TELL

6    THE JURY WHETHER YOU EXAMINED THIS AS PART OF YOUR PREPARATION

7    OF SOME CHARTS FOR TODAY?

8    A.   YES, I REVIEWED EXHIBIT 43 AS PART OF MY ANALYSIS.

9    Q.   AND WHAT IS EXHIBIT 43?

10   A.   EXHIBIT 43 IS A UNIFORM RESIDENTIAL LOAN APPLICATION OF

11   THE PROPERTY AT 312 MOONRACKER DRIVE IN VALLEJO, AND IT WAS

12   SIGNED BY MYRA HOLMES ON THE 14TH OF NOVEMBER 2005.

13   Q.   COULD YOU PLEASE LOOK AT EXHIBITS 230 TO 235.  I'M GOING

14   TO ASK YOU A QUESTION ABOUT THEM, BUT IF YOU WOULD JUST LOOK AT

15   THEM.

16   A.   OKAY.  I HAVE THAT ONE.

17   Q.   AND WHO PREPARED THESE CHARTS?

18   A.   I DID.

19   Q.   AND YOU ALSO MET WITH MYSELF AND MR. FAZIOLI AS WELL?

20   A.   YES.

21   Q.   AND DO THESE EXHIBITS ACCURATELY SUMMARIZE INFORMATION

22   CONTAINED IN THE WESTAMERICA BANK ACCOUNT RECORDS THAT YOU

23   PREVIOUSLY REFERRED TO?

24   A.   YES, THEY DID.

25   Q.   DO THEY ACCURATELY SUMMARIZE INFORMATION CONTAINED IN THE

1    FINANCIAL TITLE COMPANY RECORDS THAT YOU PREVIOUSLY DISCUSSED?

2    A.   YES, THEY DID.

3    Q.   AND DO THEY ALSO REFLECT INFORMATION IN THE TWO UNIFORM

4    RESIDENTIAL LOAN APPLICATIONS THAT YOU PREVIOUSLY DISCUSSED IN

5    EXHIBIT 42 AND 43?

6    A.   YES.

7              MR. FONDO:  YOUR HONOR, AT THIS TIME THE GOVERNMENT

8    MOVES INTO EVIDENCE GOVERNMENT'S EXHIBIT 230 THROUGH 235.

9              MS. GARRIDO:  SUBMIT IT.

10             THE COURT:  YOU HAVE COPIES OF THESE?

11             MS. GARRIDO:  YES.

12        (GOVERNMENT'S EXHIBIT 230 - 235 WAS RECEIVED IN EVIDENCE.)

13             MR. FONDO:  YOUR HONOR, PERMISSION TO PASS THESE

14   EXHIBITS TO THE JURY?

15             THE COURT:  WHAT IS THE SIZE?

16             MR. FONDO:  THERE'S JUST FIVE -- SIX INDIVIDUAL

17   PAGES.

18             THE COURT:  ANY OBJECTION?

19             MS. GARRIDO:  NO, YOUR HONOR.

20             THE COURT:  THEY WILL BE PUBLISHED TO THE JURY NOW.

21        DO YOU HAVE ADDITIONAL COPIES?

22             MR. FONDO:  I THINK IT'S IN YOUR BINDER, YOUR HONOR,

23   EXHIBITS 230 THROUGH 235.

24   Q.   ALL RIGHT.  IF WE COULD PUBLISH FOR THE JURY EXHIBIT 230,

25   PLEASE.  THIS WAS ONE OF THE CHARTS THAT YOU PREPARED; CORRECT?

1    A.   THAT IS CORRECT.

2    Q.   ALL RIGHT.  AND WHAT GENERALLY DOES THIS CHART SHOW?

3    A.   THIS CHART SHOWS THE TOTAL MONTHLY DEPOSITS PRIOR TO THE

4    REFINANCING.

5    Q.   WHICH REFINANCING?

6    A.   REFINANCING OF THE 312 MOONRACKER DRIVE RESIDENCE IN

7    VALLEJO.

8    Q.   OKAY.  AND SO YOU SAY MYRA HOLMES TOTAL MONTHLY DEPOSITS.

9    MONTHLY DEPOSITS FROM WHAT?

10   A.   THESE ARE TOTAL MONTHLY DEPOSITS FROM HER BANK STATEMENTS

11   OF THE STAR PARTNERS BANKING ACCOUNT FROM THE MONTHS

12   JANUARY 31ST, 2005, THROUGH OCTOBER 31ST, 2005, AND FROM

13   11-1-2005 TO 11-14-2005.

14   Q.   AND SO THESE SHOW ALL OF THE DEPOSITS THAT WERE MADE INTO

15   HER -- SO YOU MENTIONED ONE ACCOUNT.  IS THERE A REASON WHY YOU

16   MENTIONED ONLY ONE ACCOUNT?

17   A.   AT THE TIME THIS WAS THE ONLY ACCOUNT THAT EXISTED.

18   Q.   AT WESTAMERICA TO YOUR KNOWLEDGE?

19   A.   CORRECT.

20   Q.   AND THAT'S MYRA HOLMES ACCOUNT; CORRECT?

21   A.   IT'S MYRA HOLMES DOING BUSINESS AS STAR PARTNERS SECURITY

22   SERVICES.

23   Q.   OKAY.  I'D LIKE TO LOOK AT THE BOTTOM HERE, THE BOTTOM OF

24   THIS CHART.  COULD YOU DESCRIBE FOR THE JURY WHAT THAT

25   REPRESENTS?

1      A.   THESE ARE THE MONTHLY TOTAL DEPOSITS FOR EACH MONTH FROM

2      THE PERIODS JANUARY THROUGH OCTOBER OF 2005 AND THE FIRST HALF

3      OF NOVEMBER OF 2005.

4      Q.   OKAY.  AND LET'S FOCUS ON THE HIGHEST ONE.  WHICH MONTH IS

5      THE HIGHEST?

6      A.   THE HIGHEST MONTH WOULD BE AUGUST 31ST.

7      Q.   2005?

8      A.   2005.

9      Q.   OKAY.  AND SO WHEN YOU SAY TOTAL MONTHLY DEPOSITS, WHAT

10     DOES THAT MEAN FOR THAT STATEMENT, THAT BANK STATEMENT

11     AUGUST 31ST, 2005?

12     A.   IT MEANS THAT ON AUGUST 31ST, 2005, THROUGHOUT THE MONTH,

13     ALL OF THE DEPOSITS THAT WERE MADE IN THAT MONTH WERE SUMMED UP

14     AND REPORTED.

15     Q.   AND SO YOU ADDED THEM ALL UP?

16     A.   I ADDED THEM ALL UP.

17     Q.   OKAY.  AND WHAT -- FOR OCTOBER 31ST, 2005, APPROXIMATELY

18     HOW MUCH DID ALL OF THE DEPOSITS PUT INTO MYRA HOLMES'S BANKING

19     ACCOUNT OR DOING BUSINESS AS WESTAMERICA -- I'M SORRY --

20     MYRA HOLMES DOING BUSINESS AS STAR PARTNERS ACCOUNT HAVE IN

21     TOTAL DEPOSITS?

22     A.   JUST A LITTLE OVER $3,800.

23     Q.   AND THAT WAS BASED ON YOUR REVIEW OF HER BANK STATEMENTS,

24     THAT WAS THE HIGHEST?

25     A.   YES, IT WAS, THAT WAS THE HIGHEST MONTHLY TOTAL.

1    Q.   COULD YOU TELL THE JURY WHAT THE RED LINE IS UP TOP THERE

2    AT $15,000, WHAT THAT REPRESENTS?

3    A.   THE $15,000 RED LINE IS THE MONTHLY INCOME CLAIMED ON THE

4    UNIFORM RESIDENTIAL LOAN APPLICATION FOR 312 MOONRACKER DRIVE

5    IN VALLEJO, CALIFORNIA.

6    Q.   BASED ON YOUR REVIEW OF MYRA HOLMES WESTAMERICA BANK

7    ACCOUNT AT THAT TIME, HOW CLOSE DID SHE GET AT ANY POINT AT

8    HAVING DEPOSITS NEAR $15,000?

9    A.   IT WAS NEVER CLOSE.

10   Q.   AND THESE ARE NOT BALANCES, CORRECT?   THESE ARE JUST TOTAL

11   DEPOSITS?

12   A.   CORRECT.

13   Q.   I'D LIKE TO REFER YOU TO EXHIBIT 231, PLEASE.   COULD YOU

14   DESCRIBE FOR THE JURY WHAT EXHIBIT 231 IS, PLEASE, WHAT IT

15   SHOWS?

16   A.   231 IS MYRA HOLMES'S BANK ACCOUNT BALANCES PRIOR TO

17   REFINANCING AND IT WAS NEVER CLOSE TO THE $15,000 SHOWN ON THE

18   URLA.

19   Q.   NEVER CLOSE TO THE WHAT?

20   A.   I'M SORRY, TO THE AMOUNT SHOWN ON THE UNIFORM RESIDENTIAL

21   LOAN APPLICATION DATED 11-14-2005 AND SIGNED BY MYRA HOLMES THE

22   SAME DAY.

23   Q.   AND IS THAT ALSO TRUE FOR THE OCTOBER 2005 UNIFORM

24   RESIDENTIAL LOAN APPLICATION?

25   A.   THAT IS CORRECT.

1    Q.   AND WHERE DID YOU GET THE DATA?  LET'S FOCUS ON THE BOTTOM

2    GREEN NUMBER.  WHERE DID YOU GET THE DATA FOR THAT?

3    A.   THE DATA FROM THE BOTTOM LINE WAS OBTAINED FROM THE STAR

4    PARTNERS SECURITIES SERVICES CHECKING ACCOUNT FROM 1-1-2005 TO

5    11-14-2005.

6    Q.   AND WHAT DOES IT SHOW -- WHAT DID YOUR REVIEW OF HER BANK

7    ACCOUNT STATEMENTS SHOW AS TO WHAT HER DAILY BALANCE WAS FROM

8    JANUARY 1, 2005, THROUGH NOVEMBER 14TH, 2005?

9    A.   COULD YOU REPEAT THE QUESTION, PLEASE.

10   Q.   SURE.  JUST GENERALLY, WHAT DID YOUR ANALYSIS OF HER BANK

11   STATEMENT SHOW AS TO WHAT HER DAILY BALANCE WAS FROM

12   JANUARY 1ST, 2005, THROUGH NOVEMBER 14TH, 2005?

13   A.   WITH THE EXCEPTION OF IF ONE LOOKED AT THE CHART, THE

14   DAILY BALANCES WERE LESS THAN $3,000.

15   Q.   SO YOU MENTIONED THAT ONE BLIP THERE.  WAS THAT -- THAT'S

16   JUST OVER 3,000?

17   A.   THAT'S ABOUT ALMOST $3,100.

18   Q.   AND THAT WAS THE HIGHEST HER BALANCE, HER BANK ACCOUNT

19   BALANCE REACHED DURING THE ENTIRETY OF THAT TIME PERIOD FROM

20   JANUARY 1ST, 2005, THROUGH NOVEMBER 14TH, 2005?

21   A.   THAT'S CORRECT.

22   Q.   THERE'S ANOTHER -- AND ANOTHER RED LINE ON THIS EXHIBIT,

23   231.  COULD YOU DESCRIBE FOR THE JURY WHAT THIS RED LINE

24   REPRESENTS?

25   A.   THIS RED LINE REPRESENTS THE $15,000 BALANCE AND THE

1    UNIFORM REIMBURSEMENT LOAN AGREEMENT.

2    Q.   YOU MEAN THE UNIFORM RESIDENTIAL --

3    A.   UNIFORM RESIDENTIAL LOAN APPLICATION.

4    Q.   LOAN APPLICATION.  DO YOU WANT TO TAKE SOME WATER FOR A

5    SECOND?

6    A.   THANK YOU.

7    Q.   ALL RIGHT.  THE RED LINE RELATES TO THE LOAN BALANCE

8    CLAIMED ON THE TWO LOAN APPLICATIONS THAT WERE SIGNED BY

9    MYRA HOLMES?

10   A.   YES, YES.

11   Q.   AND DID HER DAILY BALANCE EVER GET CLOSE TO $15,000?

12   A.   IT NEVER GOT CLOSER THAN IT WAS SHOWN HERE.  IT NEVER GOT

13   ABOVE 6,000.  JUST BARELY ABOVE 3,000.

14   Q.   I'M SORRY, WHAT?

15   A.   IT NEVER GOT CLOSE TO 6,00 BUT BARELY ABOVE 3,000.

16   Q.   SO THE HIGHEST POINT WAS JUST ABOVE 3,000, CORRECT?

17   A.   YES.

18   Q.   AND LET'S GO TO EXHIBIT 232, PLEASE.  JUST GENERALLY WHAT

19   DOES EXHIBIT 232 SHOW?

20   A.   EXHIBIT 232 SHOWS THAT MYRA HOLMES USED REFINANCING

21   PROCEEDS TO PAY OFF HER DEBTS.

22   Q.   I WANT TO WALK THROUGH THIS.  WHAT WAS THE INFORMATION

23   THAT YOU RELIED UPON WHEN PUTTING EXHIBIT 232 TOGETHER?

24   A.   I RELIED UPON INFORMATION CONTAINED IN THE TITLE FILE FROM

25   FINANCIAL TITLE COMPANY.

1    Q.   AND THAT'S EXHIBIT 58 THAT WE DISCUSSED PREVIOUSLY?

2    A.   CORRECT.

3    Q.   AND DID YOU ALSO REVIEW MYRA HOLMES'S BANKS ACCOUNTS?

4    A.   AND MYRA HOLMES BANK ACCOUNTS AS WELL.

5    Q.   AND LET'S LOOK AT THE FIRST COLUMN WHERE IT SAYS VENDOR

6    AND COULD YOU JUST PLEASE TELL THE JURY WHAT THAT IS?

7    A.   THE COLUMN LABELLED VENDOR ARE THOSE PEOPLE AND CREDITORS

8    TO MYRA HOLMES.

9    Q.   AND THEN THERE'S AN ORIGINAL AMOUNT.  WHAT DOES THE

10   ORIGINAL AMOUNT REPRESENT?

11   A.   THAT'S THE ORIGINAL AMOUNT THAT MYRA HOLMES OWED THOSE

12   CREDITORS.

13   Q.   AND AM I CORRECT THAT THOSE ARE CREDITORS IN THE TITLE

14   FILE?

15   A.   YES.

16   Q.   AND LET'S GO TO THE THIRD COLUMN AND THERE'S TITLE COMPANY

17   ACTION AND THERE'S TWO DIFFERENT TYPES, PAID DEBT AND CHECK

18   ISSUED AND VOIDED.  WHAT DOES PAID DEBT REFER TO?

19   A.   PAID DEBT REFERS TO THE TITLE COMPANY MAKING DIRECT

20   PAYMENT TO THE CREDITOR FOR THE AMOUNTS OF MONEY SHOWN IN THE

21   COLUMN.

22   Q.   AND HOW IS THAT PAYMENT MADE WHEN YOU SAY "DIRECT

23   PAYMENT"?

24   A.   THAT PAYMENT WAS MADE BY CHECKS AND ALL OF THE CHECKS WERE

25   ISSUED ON THE 21ST OF NOVEMBER 2005.

1    Q.   AND THEN THE SECOND KIND OF DESCRIPTION THAT YOU HAVE IN

2    THERE IS CHECK ISSUED AND VOIDED.   WHAT DOES THAT MEAN?

3    A.   THOSE LINE ITEMS ARE LINE ITEMS THAT MYRA HOLMES

4    NEGOTIATED WITH THE CREDITORS TO HAVE RELIEF FROM THE ORIGINAL

5    AMOUNT AND THE AMOUNT THAT WAS AGREED UPON IS SHOWN IN THE

6    COLUMN ENTITLED DEBT HOLMES PAID OFF THE NEGOTIATIONS.

7    Q.   OKAY.   LET'S STICK WITH THE TITLE COMPANY ONE FOR A

8    MINUTE.

9         SO THE CHECK WAS ISSUED AND VOIDED.   WAS THAT ON

10   DECEMBER 7TH?

11   A.   THE CHECK WAS ISSUED ON 21ST OF NOVEMBER 2007, AND IT WAS

12   VOIDED ON DECEMBER 7TH, 2007.

13   Q.   AND THERE WAS -- AND WHEN YOU SAY, "VOIDED," THAT MEANS

14   THAT THESE CHECKS WERE VOIDED; CORRECT?

15   A.   CORRECT.

16   Q.   AND IS THERE A REFERENCE ON A PARTICULAR DOCUMENT THAT

17   KIND OF SUMMARIZED IN THE TITLE FILE, THAT KIND OF SUMMARIZES

18   THIS TRANSACTION, THESE VOIDING OF THESE CHECKS?

19   A.   YES, THE FINAL DISBURSEMENT REPORT.

20   Q.   AND WHAT IS THE DATE OF THAT?   IS THAT DECEMBER 7TH?

21        YOU CAN'T REMEMBER?   THAT'S OKAY.   LET'S LOOK AT THE

22   BOTTOM NUMBER 7,611.48?

23   A.   CORRECT.

24   Q.   AND WHAT IS THAT THE TOTAL OF?

25   A.   THAT'S THE TOTAL OF THE ORIGINAL AMOUNT PAID TO THE --

```
 1      THAT THE TITLE COMPANY PAID DIRECTLY TO THE CREDITORS.

 2      Q.   OKAY.  AND THIS WAS PART OF THAT REFINANCING?

 3      A.   YES, IT IS.

 4      Q.   AND THEN THE COLUMN TO THE RIGHT IS THE REDUCED AMOUNT

 5      THAT WAS NEGOTIATED?

 6      A.   THAT IS CORRECT.

 7      Q.   LET'S GO TO EXHIBIT 233, PLEASE.  WHAT DOES EXHIBIT 233

 8      SHOW?

 9      A.   EXHIBIT 233 SHOWS THAT MYRA HOLMES DIRECTLY RECEIVED

10      $147,904.54 FROM THE REFINANCING PROCESS.

11      Q.   AND THERE ARE THREE ENTRIES THERE.  YOU DON'T NEED TO GO

12      INTO THE ACCOUNT NUMBER, BUT IF YOU COULD BRIEFLY DESCRIBE WHAT

13      THESE THREE ENTRIES SHOW AND WHAT HAPPENED?

14      A.   THE FIRST ENTRY IS DATED 11-21-2005 FOR $131,110.44.  IT

15      WAS A WIRE TO MYRA A. HOLMES FROM THE FINANCIAL TITLE COMPANY,

16      AND IT WAS WIRED TO STAR PARTNERS CHECKING ACCOUNT.

17      Q.   AND THEN WHAT ABOUT THE SECOND TRANSACTION?

18      A.   THE SECOND TRANSACTION IS A CHECK PAYABLE TO MYRA HOLMES

19      THAT WAS DEPOSITED ON THE 9TH OF DECEMBER 2005, OF $15,483 AND

20      IT WENT TO MYRA HOLMES'S SAVINGS ACCOUNT.

21      Q.   AND THIS CHECK FOR $15,483, THAT WAS PAID FROM FINANCIAL

22      TITLE COMPANY TO MYRA HOLMES?

23      A.   THAT IS CORRECT.

24      Q.   AND HOW DOES THAT CHECK AMOUNT RELATE TO THE CHECKS ISSUED

25      AND VOIDED ON THE PRIOR EXHIBIT 232?
```

1    A.   THE $15,483 AMOUNT WOULD RELATE TO ALL ITEMS FROM SPIEGEL

2    DOWN TO MAYROBINSONSMAY, AND SO ALL OF THESE ITEMS THAT HAD

3    CHECKS ISSUED AND VOIDED WOULD TOTAL UP TO $15,483.

4    Q.   AND SO THERE'S A THIRD ENTRY HERE.  IF YOU COULD DESCRIBE

5    FOR THE JURY ON EXHIBIT 233 WHAT THIS THIRD ENTRY IS?

6    A.   THIS IS A CHECK ALSO FROM THE FINANCIAL TITLE COMPANY FOR

7    $147.10 DEPOSITED ON THE 17TH OF FEBRUARY 2006 PAYABLE TO MYRA

8    A. HOLMES, AND IT WAS DEPOSITED IN MYRA A. HOLMES'S CHECKING

9    ACCOUNT.

10   Q.   DO YOU KNOW WHAT THE $147.10 RELATES TO?

11   A.   IT WAS A REIMBURSEMENT FOR OVERPAYMENT OF TAXES TO THE

12   CITY OF VALLEJO.

13   Q.   I'D LIKE TO MOVE YOU TO OR REFER YOU TO EXHIBIT 234,

14   PLEASE.  WHAT DOES EXHIBIT 234 SHOW?

15   A.   234 IS A PIE CHART INDICATING HOW MYRA HOLMES SPENT THE

16   $147,040.54 IN REFINANCING PROCEEDS.

17   Q.   AND WHAT IS THE BIGGEST ENTRY HERE?

18   A.   THE BIGGER ENTRY IS CASH.

19   Q.   AND HOW MUCH IS THAT?

20   A.   $68,772.67.

21   Q.   SO THAT'S THE AMOUNT OF CASH THAT WAS PULLED OUT FROM THE

22   $147,000?

23   A.   THAT'S CORRECT.

24   Q.   AND THIS IS CASH.  AND WHAT IS -- WHERE DID THE FINANCIAL

25   INFORMATION COME FROM THAT YOU RELIED UPON FOR EXHIBIT 234?

1     WHAT BANK STATEMENT?  WHAT BANK DOCUMENTS?

2     A.   WHAT BANK DOCUMENTS?  ALL FOUR BANK DOCUMENTS COVERED STAR

3     PARTNERS SECURITY SERVICES ACCOUNT, CHECKING ACCOUNT,

4     MYRA HOLMES CHECKING ACCOUNT, MYRA HOLMES SAVINGS ACCOUNT, AND

5     STAR PARTNERS SECURITY SERVICES SAVINGS ACCOUNT.

6     Q.   AND SO THOSE ARE THE FOUR BANK ACCOUNTS THAT WE PREVIOUSLY

7     WALKED THROUGH WHEN YOU SAID YOU REVIEWED THOSE STATEMENTS;

8     CORRECT?

9     A.   CORRECT.

10    Q.   ALL RIGHT.  SO WHAT DID YOU COUNT AS -- WERE THERE

11    DIFFERENT TYPES OF CASH THAT YOU OR CASH ENTRIES THAT YOU

12    INCLUDED IN THE $68,772.67 PIE SLICE?

13    A.   THERE WERE BASICALLY THREE TYPES OF SLICES TO THE PIECE OF

14    PIE.  ONE WOULD BE WHEN YOU WITHDRAW CASH FROM THE BANK; THE

15    OTHERS WOULD BE CHECKS MADE OUT TO CASH; AND THE THIRD WOULD BE

16    WITHDRAWALS FROM ATM MACHINES.

17    Q.   AND LET'S TALK ABOUT THE CHECKS FOR A SECOND THAT HAVE

18    CASH WRITTEN ON THEM.  SO THESE WERE CHECKS THAT MYRA HOLMES

19    SIGNED THAT SAID CASH ON THEM?

20    A.   THAT IS CORRECT.

21    Q.   ALL RIGHT.  AND WHEN I SAY "MYRA HOLMES SIGNED," IT

22    APPEARS TO BE HER SIGNATURE ON THOSE CHECKS, RIGHT?

23    A.   THAT IS CORRECT.

24    Q.   ALL RIGHT.  NOW, IS IT TRUE THAT SOME OF THOSE CHECKS HAVE

25    CERTAIN ENTRIES OR DESCRIPTION IN THE "FOR" SECTION ON THE

JOHNSON DIRECT

1    CHECK?

2    A.   THAT IS CORRECT.

3    Q.   AND WHEN THERE WAS SUCH A DESCRIPTION, HOW DID YOU TREAT

4    THAT CHECK?

5    A.   I TREATED THAT CHECK AS CASH.

6    Q.   WHY WAS THAT?

7    A.   BECAUSE THAT'S HOW THE CHECK WAS DRAWN, MADE OUT TO.  AND

8    ONCE IT'S CASHED, I HAVE NO IDEA HOW THE MONEY IS TO BE SPENT.

9    Q.   OKAY.  LET'S GO TO THE NEXT LARGEST PIECE OF THIS PIE.

10   COULD YOU READ FOR THE JURY THE SECOND LARGEST PIECES OF THE

11   PIE?

12   A.   JACQUIE PAIGE HEARD, JAMES HEARD, LISA HEARD, JEREMY

13   HOLMES, $28,400.

14   Q.   AND YOU LUMPED THESE NAMES TOGETHER AT MY REQUEST;

15   CORRECT?

16   A.   THAT'S CORRECT.

17   Q.   AND IN WHAT FORM DID THIS $28,400 GO TO THESE INDIVIDUALS?

18   AND WHAT I MEAN BY THAT IS CHECK?  CASH?  HOW DID THAT GO?

19   A.   THEY WERE CHECKS MADE OUT TO THE VARIOUS INDIVIDUALS

20   SHOWN.

21   Q.   TO THOSE INDIVIDUALS SHOWN.  AND SOMETIMES WAS THERE MORE

22   THAN ONE CHECK TO AN INDIVIDUAL?

23   A.   YES, THERE WERE.

24   Q.   AND, NOW, ON SOME OF THOSE CHECKS, TOO, THEY HAD CERTAIN

25   ENTRIES, TOO?

1    A.    THAT'S CORRECT.

2    Q.    IN THE "FOR" SECTION?

3    A.    YES.

4    Q.    AND HOW DID YOU TREAT THOSE CHECKS WHEN PUTTING TOGETHER

5    EXHIBIT 234?

6    A.    I TREATED THOSE CHECKS AS TO WHOEVER THEY WERE MADE

7    PAYABLE TO.

8    Q.    AND COULD YOU TELL THE JURY APPROXIMATELY HOW MUCH MONEY

9    WAS PAID -- HOW MUCH THE TWO PIECES OF PIE TOTAL FOR CASH PLUS

10   JACQUIE PAIGE HEARD, JAMES HEARD, LISA HEARD, AND JEREMY

11   HOLMES?

12   A.    $97,172.67.

13   Q.    SO OVER $97,000 WENT TO CASH TO THESE INDIVIDUALS?

14   A.    THAT'S CORRECT.

15   Q.    AND THAT'S FROM THE REFINANCING PROCEEDS FROM 312

16   MOONRACKER?

17   A.    THAT'S CORRECT.

18   Q.    LET'S GO TO ANOTHER SLICE OF THE PIE.  LET'S GO TO VARIOUS

19   DOLLAR ITEMS.  COULD YOU TELL THE JURY WHAT THIS MEANS?

20   A.    VARIOUS SMALL DOLLAR ITEMS, ARE THOSE ITEMS THAT WERE LESS

21   THAN $2,000.

22   Q.    COULD YOU IDENTIFY FOR THE JURY JUST SOME EXAMPLES OF WHAT

23   THESE ITEMS WERE?

24   A.    THERE WERE SEVERAL ITEMS.  THERE WAS ONE FOR HOME DEPOT,

25   ORCHARD SUPPLY, A GARAGE DOOR, THERE WERE OTHER ONES FOR

JOHNSON DIRECT

```
 1      DEPARTMENT STORES, NORDSTROM'S, MERVYNS, MARSHALS, ROSS,

 2      WALMART.  THEY WERE FROM GAS, SUPPLIES, BEAUTY SUPPLIES,

 3      PERSONAL SUPPLIES, CIGARETTES.  THERE WAS ONE MADE OUT TO THE

 4      CASINO AT SAN PABLO.  SO THERE WERE DIFFERENT TYPES OF ITEMS.

 5      Q.   NOW, WHEN YOU WERE LOOKING THROUGH MYRA HOLMES'S BANK

 6      RECORDS, IS IT CORRECT THAT THE STATEMENTS EACH HAVE THE --

 7      SORRY.

 8           WHEN YOU WERE LOOKING FOR MYRA HOLMES'S BANK ACCOUNTS, AND

 9      I REFER TO THOSE FOUR BANK ACCOUNTS THAT WE HAVE BEEN TALKING

10      ABOUT AT WESTAMERICA BANK, WERE THERE SOME CHECKS THAT YOU

11      COULD NOT READ WHO THEY WERE?

12      A.   YES, THERE WERE.

13      Q.   AND WHERE DID THOSE GO INTO?

14      A.   I ALSO PUT THOSE UNDER VARIOUS SMALL DOLLAR ITEMS.  THEY

15      FIT THE CATEGORY.  THEY WERE ALL UNDER $2,000.

16      Q.   BUT YOU COULDN'T TELL NECESSARILY WHO THEY WERE WRITTEN

17      TO?

18      A.   CORRECT.

19      Q.   AND LET'S GO TO THE NEXT ITEM AND START GOING AROUND IN A

20      CIRCLE NOW.  COULD YOU EXPLAIN FOR THE JURY WHAT NETWORK

21      PURCHASE AND WHAT THAT IS AND HOW MUCH?

22      A.   NETWORK PURCHASE FOR $3,429.50 IS THE IDENTIFICATIONS THAT

23      WERE SHOWN ON THE BANK STATEMENTS FOR VARIOUS ITEMS.

24      Q.   AND FOR WHAT PLACE?  I'M SORRY.  DID YOU READ THE ADDRESS?

25      DID I MISS THAT?
```

1    A.    NETWORK PURCHASE AT GLOBAL, CALIFORNIA, 14455 HIGHWAY 16

2    IN BROOKS, CALIFORNIA.

3    Q.    AND, NOW, AM I CORRECT THAT THERE WERE ALSO ATM

4    WITHDRAWALS FROM GLOBAL, CALIFORNIA, 14455 HIGHWAY 16?

5    A.    THAT'S CORRECT.

6    Q.    ARE THOSE INCLUDED IN THE NETWORK PURCHASE PART OR ARE

7    THOSE INCLUDED IN THE CASH?

8    A.    THOSE ARE INCLUDED IN THE CASH.

9    Q.    AND THAT'S BECAUSE THEY WERE ATM WITHDRAWALS?

10   A.    THAT'S CORRECT.

11   Q.    AND WHAT IS THE NEXT ITEM THAT SAYS SPIEGEL, WHAT IS THAT?

12   A.    SPIEGEL, THIS IS THE NEGOTIATED PAYMENT AS WE DISCUSSED

13   EARLIER MADE AS A REDUCTION FROM THE CREDITOR'S ORIGINAL

14   AMOUNT.

15   Q.    AND SO THESE ARE CHECKS THAT YOU WROTE TO SPIEGEL?

16   A.    CORRECT.

17   Q.    AND THAT WERE IN MYRA HOLMES'S CHECKING?

18   A.    IT WAS A CHARGE FOR SPIEGEL.

19   Q.    OKAY.  ALL RIGHT.  THANK YOU FOR THE CLARIFICATION.

20         AND THE NEXT ENTRY SAYS, MORTGAGE, $3,815.50?

21   A.    THAT WAS THREE PAYMENTS THAT WERE IDENTIFIED IN THE BANK

22   STATEMENTS AS MORTGAGE PAYMENTS.

23   Q.    AND THERE'S ANOTHER -- WHAT IS THE NEXT ENTRY GOING

24   AROUND?  I'M SORRY.

25   A.    OFFICES OF CURTIS O'BARNES.

1    Q.   FOR HOW MUCH?

2    A.   $4,000.

3    Q.   AND WHAT IS THE NEXT ENTRY, PLEASE?

4    A.   CRAIG TORRES FOR $4,550.

5    Q.   NOW, THERE WAS MORE THAN ONE CHECK TO MR. TORRES; IS THAT

6    CORRECT?

7    A.   THAT'S CORRECT.

8    Q.   AND WERE THERE TIMES THAT THE ENTRIES IN THE "FOR" SECTION

9    OF THOSE CHECKS WRITTEN FROM MYRA HOLMES'S OR STAR PARTNERS'S

10   ACCOUNT TO CRAIG TORRES?

11   A.   YES, THERE WERE.

12   Q.   AND HOW DID YOU TREAT THOSE CHECKS WITH ENTRIES ON THEM?

13   A.   I TREATED THEM AS CHECKS TO CRAIG TORRES BECAUSE THAT'S

14   WHO THE CHECKS WERE MADE PAYABLE TO.

15   Q.   AND THERE'S A FINAL ENTRY THAT SAYS MYRA HOLMES'S CHECKING

16   AND STAR PARTNERS'S CHECKING $8,981.96.  WHAT IS THAT?

17   A.   THOSE ARE TRANSFERS FROM OTHER ACCOUNTS TO MYRA HOLMES

18   CHECKING AND TO STAR PARTNERS CHECKING ACCOUNT.

19   Q.   AND WHEN YOU SAY, "OTHER ACCOUNTS" ARE YOU REFERRING TO

20   ONE OF THE OTHER FOUR ACCOUNTS THAT WE HAVE BEEN TALKING ABOUT?

21   A.   YES, I AM, OF THE OTHER FOUR MYRA HOLMES'S CHECKING

22   ACCOUNTS, YES.

23   Q.   IN YOUR ANALYSIS OF THE FOUR BANK ACCOUNTS THAT

24   MYRA HOLMES MAINTAINED AT WESTAMERICA BANK, DID YOU SEE THAT

25   MONEY -- ANY MONEY GOING OUT TO ANY OTHER BANK ACCOUNTS OUTSIDE

1    OF WESTAMERICA?

2    A.   NO, I DID NOT.

3    Q.   DID YOU SEE ANY OF THAT MONEY GOING TO ANY OTHER BANK

4    ACCOUNTS WITHIN WESTAMERICA OTHER THAN THOSE FOUR ACCOUNTS?

5    A.   NO, I DID NOT.

6    Q.   ALL RIGHT.  BASED ON YOUR REVIEW OF THE CHECKS WRITTEN AND

7    THE DEBITS AND THINGS OF THAT NATURE IN THE FOUR WESTAMERICA

8    BANK ACCOUNTS, HOW MUCH MONEY, IF ANY, DID YOU SEE THAT WAS

9    DIRECTED TO LEONARD PAIGE?

10   A.   I SAW NONE GOING TO LEONARD PAIGE.

11   Q.   AND IN YOUR REVIEW OF THESE FINANCIAL RECORDS, THE CHECKS,

12   THE STATEMENTS, THE DEBITS, ET CETERA, HOW MUCH MONEY, IF ANY,

13   DID YOU SEE THAT WAS PAID TO THE BANKRUPTCY ESTATE FOR

14   LEONARD PAIGE?

15   A.   I SAW NONE GOING TO THE BANKRUPTCY ESTATE OF

16   LEONARD PAIGE.

17   Q.   I'D LIKE TO -- YOU KNOW, WE HAVE BEEN TALKING ABOUT THESE

18   FOUR WESTAMERICA BANK ACCOUNTS; CORRECT?

19   A.   CORRECT.

20   Q.   AND YOU PREVIOUSLY SAID THREE WERE STARTED, I BELIEVE YOU

21   SAID AROUND NOVEMBER 22ND, 2005; IS THAT CORRECT?

22   A.   THAT'S CORRECT.

23   Q.   AND HOW DOES THAT RELATE TO THE DATE OF THE REFINANCING?

24   A.   THE REFINANCE HAPPENED ON 11-21-2005.

25   Q.   AND THAT'S WHEN THE MONEY WAS THE FIRST -- IF YOU COULD

1    CLARIFY WHAT TOOK PLACE ON NOVEMBER 21ST, 2005?

2    A.   THAT WAS WHEN THE MONIES WERE FIRST WIRED FROM THE

3    FINANCIAL TITLE COMPANY TO MYRA HOLMES DBA STAR PARTNERS

4    SECURITY SERVICES ACCOUNT.

5    Q.   OKAY.  AND AFTER THAT MONEY WAS WIRED, THAT'S WHEN THESE

6    THREE OTHER ACCOUNTS WERE CREATED WITH WESTAMERICA BANK?

7    A.   THAT'S CORRECT.

8    Q.   I WANT YOU TO TAKE A LOOK AT EXHIBIT 235, PLEASE.  WHAT

9    DOES THIS CHART SHOW?

10   A.   THIS CHART SHOWS THE COMBINED DAILY BALANCE OF ALL OF

11   MYRA HOLMES'S WESTAMERICA BANK ACCOUNTS FROM 1-1-05 THROUGH

12   4-5-06.

13   Q.   AND THAT INCLUDES NOT ONLY -- AND DOES THAT INCLUDE THE

14   MONEY FROM FINANCIAL -- THAT WAS SENT AS PART OF THE

15   REFINANCING?

16   A.   YES, IT DOES.

17   Q.   AND IT ALSO INCLUDES ANY OTHER DEPOSITS?

18   A.   YES, IT DOES.

19   Q.   I WANT TO LOOK AT THE BOTTOM PART.  WHAT DOES THIS CHART

20   SHOW FROM JANUARY 1ST, 2005, UNTIL IT SPIKES UP?

21   A.   MINIMAL BALANCES.

22   Q.   AND THESE ARE WESTAMERICA BANK ACCOUNTS.  AT THIS TIME

23   THERE WAS ONLY ONE; IS THAT CORRECT?

24   A.   THAT'S CORRECT.

25   Q.   AND WHAT CAUSES THIS HUGE SPIKE HERE IN EXHIBIT 235?

JOHNSON DIRECT

1    A.   ON 11-21-2005 THERE WAS $131,410.44 WIRED FROM FINANCIAL

2    TITLE COMPANY.

3    Q.   AND THEN THERE'S ANOTHER -- I ASKED YOU ALSO TO IDENTIFY

4    WHAT -- WHEN THAT BALANCE -- WHEN THE ACCOUNT BALANCE,

5    COLLECTED ACCOUNT BALANCES DROP BELOW $75,000; CORRECT?

6    A.   THAT'S CORRECT.

7    Q.   AND WHEN DID THAT HAPPEN?

8    A.   THAT HAPPENED ON 11-28-2005.

9    Q.   AND DID IT EVER GO BACK UP ABOVE $75,000?

10   A.   IT NEVER WENT BACK UP.

11   Q.   SO IN A WEEK APPROXIMATELY HOW MUCH MONEY WAS SPENT BY

12   MYRA HOLMES?

13   A.   APPROXIMATELY $60,000.

14   Q.   AND THAT'S FROM NOVEMBER 21ST TO NOVEMBER 28TH?

15   A.   CORRECT.

16   Q.   AND I ALSO ASKED YOU TO PROVIDE WHAT THE BALANCE WAS AS OF

17   JANUARY 23RD, 2006; IS THAT CORRECT?

18   A.   THAT'S CORRECT.

19   Q.   AND WHAT WAS THE BALANCE OF ALL OF MYRA HOLMES'S BANK

20   ACCOUNTS AT THAT TIME?

21   A.   IT WAS $32,147.71.

22   Q.   NOW, THERE'S A SLIGHT BLIP IT SEEMS TO BE AROUND THE

23   DECEMBER TIMEFRAME WHERE IT KIND OF SORT OF CREEPS UP BACK UP

24   FOR A SECOND.  DO YOU KNOW WHAT THAT IS?

25   A.   THAT WAS THE DEPOSIT OF THE 12,483 THAT MYRA HOLMES

1    RECEIVED AS PART OF THE RENEGOTIATION SETTLEMENT.

2    Q.   DO YOU MEAN 15,000?

3    A.   15,000.

4    Q.   AND THEN YOU SEE -- THE LINE STARTS GOING DOWN, DOWN,

5    DOWN, DOWN, DOWN, DOWN TOWARDS THE BOTTOM.  WHAT DOES THAT

6    SHOW?

7    A.   IT SHOWS THAT THE DAILY BALANCE KEPT DECLINING AND

8    DECLINING AND DECLINING AND AT 4-1-2006 IT WAS ALMOST TO ZERO.

9    Q.   AND THAT WAS ALL FOUR ACCOUNTS?

10   A.   ALL FOUR ACCOUNTS.

11   Q.   DOES THIS CHART REFLECT ALL OF THE MONEY FROM FINANCIAL

12   TITLE COMPANY THAT SHE RECEIVED AS PART OF THAT REFINANCING ON

13   NOVEMBER -- EXCUSE ME -- THE REFINANCE OF MOONRACKER OF

14   NOVEMBER OF 2005?

15   A.   YES, IT DOES.

16        MR. FONDO:  NO MORE QUESTIONS.  THANK YOU.

17        THE COURT:  CROSS-EXAMINATION?

18        MS. GARRIDO:  I HAVE NO QUESTIONS OF THIS WITNESS,

19   YOUR HONOR.

20        THE COURT:  MAY THIS WITNESS BE EXCUSED?

21        MS. GARRIDO:  YES, YOUR HONOR.

22        MR. FONDO:  YES.

23        THE COURT:  THANK YOU.  YOU MAY STAND DOWN, SIR.

24     DOES THE GOVERNMENT HAVE ANOTHER WITNESS TO CALL?

25        MR. FAZIOLI:  THE UNITED STATES CALLS JAMES OERTEL.

```
1              THE COURT:  FOLKS, IF YOU WANT TO STAND UP, WE'LL

2    PROBABLY TAKE OUR BREAK JUST A LITTLE PAST 3:30.

3              MR. FONDO:  YOUR HONOR, CAN I RETRIEVE THE CHARTS?

4              THE COURT:  YES, YOU CAN, 230 THROUGH 235.  SIR, IF

5    YOU WOULD COME FORWARD, PLEASE.  AND IF YOU COULD STAND JUST

6    OVER HERE FACING OUR COURTROOM DEPUTY WHILE YOU RAISE YOUR

7    RIGHT HAND, SHE HAS A QUESTION FOR YOU.

8         (GOVERNMENT'S WITNESS, JAMES OERTEL, WAS SWORN.)

9              THE WITNESS:  YES, I DO.

10             THE COURT:  LET ME INVITE YOU TO HAVE A SEAT HERE,

11   FIRST.  AND ADJUST THE CHAIR AND MICROPHONE.  I WOULD ENCOURAGE

12   YOU TO SPEAK DIRECTLY INTO THE MICROPHONE IF YOU WOULD, PLEASE.

13   WHEN YOU ARE COMFORTABLE, WOULD YOU STATE YOUR NAME AND SPELL

14   IT, PLEASE.

15             THE WITNESS:  MY NAME IS JAMES OERTEL.  THE LAST

16   NAME IS SPELLED O-E-R-T-E-L.

17             THE COURT:  THANK YOU.  COUNSEL.

18                     DIRECT EXAMINATION

19   BY MR. FAZIOLI:

20   Q.  GOOD AFTERNOON, MR. OERTEL.  COULD YOU PLEASE TELL THE

21   JURY WHERE YOU WORK?

22   A.  I WORK FOR THE INTERNAL REVENUE SERVICE.

23   Q.  ALSO KNOWN AS THE I.R.S.?

24   A.  YES.

25   Q.  AND WHAT IS YOUR POSITION WITH THE I.R.S.?
```

1    A.   I'M A REVENUE AGENT.

2    Q.   AND HOW LONG HAVE YOU BEEN AN I.R.S. REVENUE AGENT?

3    A.   TWENTY-SIX YEARS.

4    Q.   AND WHAT ARE SOME OF YOUR PROFESSIONAL RESPONSIBILITIES AS

5    AN I.R.S. REVENUE AGENT?

6    A.   BASICALLY I AUDIT DIFFERENT TYPES OF INCOME TAX RETURNS TO

7    DETERMINE IF THEY'RE ACCURATE OR NOT.

8    Q.   AND IN YOUR 26 YEARS AS AN I.R.S. REVENUE AGENT, HAVE YOU

9    HAD AN OPPORTUNITY TO REVIEW A SUBSTANTIAL NUMBER OF INDIVIDUAL

10   INCOME TAX RETURNS?

11   A.   YES.

12   Q.   AND WHAT ABOUT ALSO CORPORATE INCOME TAX RETURNS?

13   A.   YES.

14   Q.   AND IS IT PART OF YOUR PROFESSIONAL RESPONSIBILITIES AS AN

15   I.R.S. REVENUE AGENT TO BE KNOWLEDGEABLE ABOUT I.R.S. RULES AND

16   REGULATIONS?

17   A.   YES.

18   Q.   AND DO YOU HAVE PREVIOUS EXPERIENCE AS AN ACCOUNTANT?

19   A.   YES.

20   Q.   AND HAVE YOU PREVIOUSLY TESTIFIED BEFORE?

21   A.   YES.

22   Q.   ABOUT HOW MANY TIMES HAVE YOU TESTIFIED?

23   A.   I THINK THIS IS MY NINTH TIME.

24   Q.   AND IN WHAT CONTEXT DO YOU TESTIFY?

25   A.   IN FEDERAL DISTRICT COURT BOTH CIVIL AND CRIMINAL AND IN

OERTEL DIRECT

```
1    THE U.S. TAX COURT.

2    Q.   AND HAVE YOU GENERALLY TESTIFIED BEFORE IN CONNECTION WITH

3    YOUR WORK AS AN I.R.S. REVENUE AGENT?

4    A.   YES, I HAVE.

5    Q.   AND HAVE YOU HAD AN OPPORTUNITY IN PREPARING YOUR

6    TESTIMONY FOR THIS CASE TO PREPARE TAX RETURNS AND DOCUMENTS

7    RELATED TO THE DEFENDANT MYRA HOLMES?

8    A.   YES.

9    Q.   AND AS WELL AS TAX RETURNS RELATED TO HER SECURITY

10   BUSINESS?

11   A.   YES.

12        MR. FAZIOLI:  YOUR HONOR, AT THIS TIME I WOULD LIKE

13   TO READ A STIPULATION INTO THE RECORD THAT THE PARTIES HAVE

14   ENTERED INTO REGARDING INTERNAL REVENUE RECORDS.

15        THE COURT:  MAY I SEE THE STIPULATION?

16        MR. FAZIOLI:  YES.

17   (PAUSE IN PROCEEDINGS.)

18        THE COURT:  LADIES AND GENTLEMEN, YOU'RE ABOUT TO

19   HEAR A STIPULATION THAT THE LAWYERS HAVE AGREED TO AND THIS

20   RELATES TO CERTAIN EVIDENCE THAT THE LAWYERS HAVE STIPULATED

21   THAT CAN BE RECEIVED INTO EVIDENCE.

22        THAT MEANS THAT THIS EVIDENCE, WHEN IT'S CALLED UPON, THE

23   PARTIES HAVE AGREED THAT YOU CAN RECEIVE IT, AND YOU WILL

24   RECEIVE IT DURING YOUR DELIBERATIONS.

25        MR. FAZIOLI:  THIS WILL TAKE A MINUTE, BUT LET ME
```

1251

OERTEL DIRECT

1       READ TO YOU THE STIPULATION.

2               TRIAL STIPULATION NUMBER FOUR, INTERNAL REVENUE RECORDS.

3               UNITED STATES OF AMERICA AND MYRA HOLMES HEREBY STIPULATE

4       TO THE FOLLOWING FACTS AS NOT IN DISPUTE:

5               1.  THE DOCUMENT MARKED FOR IDENTIFICATION AS EXHIBIT 7

6       (STATEMENT OF RECORD 2004 MH 4748) IS A CERTIFIED PUBLIC RECORD

7       OF THE INTERNAL REVENUE SERVICE AND IS ADMISSIBLE AS SUCH UNDER

8       FEDERAL RULE OF EVIDENCE 902(4).

9               NUMBER 2.   THE DOCUMENT MARKED FOR IDENTIFICATION AS

10      EXHIBIT 8 (I.R.S. TRANSCRIPT 2004, MH 4769) IS A CERTIFIED

11      PUBLIC RECORD OF THE INTERNAL REVENUE SERVICE AND IS ADMISSIBLE

12      UNDER FEDERAL RULE OF EVIDENCE 902(4).

13              NUMBER 3.   THE DOCUMENT MARKED FOR IDENTIFICATION AS

14      EXHIBIT 9 (I.R.S. TRANSCRIPT, TAX YEAR 2005, MH 4761 TO 4764)

15      IS A CERTIFIED PUBLIC RECORD OF THE INTERNAL REVENUE SERVICE

16      AND ADMISSIBLE AS SUCH UNDER FEDERAL RULE OF EVIDENCE 902(4).

17              4.  THE DOCUMENT MARKED FOR IDENTIFICATION AS EXHIBIT 10

18      (I.R.S. TRANSCRIPT, TAX YEAR 2006, MH 4765 TO 4766) IS A

19      CERTIFIED PUBLIC RECORD OF THE INTERNAL REVENUE SERVICE AND IS

20      ADMISSIBLE AS SUCH UNDER FEDERAL RULE OF EVIDENCE 902(4).

21              5.  THE DOCUMENT MARKED FOR IDENTIFICATION AS EXHIBIT 11

22      (FEDERAL TAX RETURN OF MYRA HOLMES, TAX RETURN 2005, MH 4749 TO

23      4759) IS A CERTIFIED PUBLIC RECORD OF THE INTERNAL SERVICE AND

24      IS ADMISSIBLE AS SUCH UNDER FEDERAL RULE OF EVIDENCE 902(4).

25              6.  THE DOCUMENT MARKED FOR IDENTIFICATION AS EXHIBIT 12

OERTEL DIRECT

1    (FEDERAL TAX RETURN OF MYRA HOLMES, TAX YEAR 2006, MH 4785 TO

2    4792) IS A CERTIFIED PUBLIC RECORD OF THE INTERNAL REVENUE

3    SERVICE AND IS ADMISSIBLE AS SUCH UNDER FEDERAL RULE OF

4    EVIDENCE 902(4).

5        7.  THE DOCUMENT MARKED FOR IDENTIFICATION AS EXHIBIT

6    NUMBER 13 (FEDERAL TAX RETURN OF PARTNERS SECURITY SERVICES FOR

7    THE TAX YEAR 2004, MH 4767 TO 4770) IS A CERTIFIED PUBLIC

8    RECORD OF THE INTERNAL REVENUE SERVICE AND IS ADMISSIBLE AS

9    SUCH UNDER FEDERAL RULE OF EVIDENCE 902(4).

10       8.  THE DOCUMENT MARKED FOR IDENTIFICATION AS EXHIBIT

11   NUMBER 14 (FEDERAL TAX RETURN OF STAR PARTNERS SECURITIES

12   SERVICES -- SORRY -- FEDERAL TAX RETURN OF STAR PARTNERS

13   SECURITY PARTNERS, INC., FOR TAX YEAR 2005, MH 4771 TO 4776) IS

14   A CERTIFIED PUBLIC RECORD OF THE INTERNAL REVENUE SERVICE AND

15   IS ADMISSIBLE AS SUCH UNDER FEDERAL RULE OF EVIDENCE 902(4).

16       LASTLY, 9.  THE DOCUMENT MARKED FOR IDENTIFICATION AS

17   EXHIBIT 15 (TAX PARTNERS SECURITY PARTNERS, INC., FOR TAX YEAR

18   2006, MH 4777 TO 4782) IS A CERTIFIED PUBLIC RECORD OF THE

19   INTERNAL REVENUE SERVICE AND ADMISSIBLE UNDER FEDERAL RULE OF

20   EVIDENCE 902(4).

21       IT IS SO STIPULATED, JOSEPH FAZIOLI AND GRANT FONDO,

22   ASSISTANT UNITED STATES ATTORNEYS, DIANA GARRIDO, COUNSEL FOR

23   MYRA HOLMES, AND MYRA HOLMES, THE DEFENDANT, ALL DATED 2/21/13.

24           THE COURT:  MS. GARRIDO, ANY OBJECTION TO THE

25   READING OF THE STIPULATION?

```
 1              MS. GARRIDO:  NO, YOUR HONOR.

 2     BY MR. FAZIOLI:

 3     Q.   BACK IN THE YEAR 2004, WHAT WAS THE INCOME THRESHOLD FOR

 4     FILING AN INDIVIDUAL TAX RETURN?

 5     A.   IF YOU WERE A SINGLE PERSON, IT WOULD HAVE BEEN 7950.

 6     Q.   AND DID MYRA HOLMES -- SO IF SOMEONE MADE $7,950, THEY

 7     WERE REQUIRED TO FILE AN INDIVIDUAL TAX RETURN FOR TAX YEAR

 8     2004; CORRECT?

 9     A.   IF THEY WERE SINGLE, YES.

10     Q.   DID MYRA HOLMES FILE AN INDIVIDUAL INCOME TAX RETURN IN

11     2004?

12     A.   NO, SHE DID NOT.

13     Q.   AND HOW DO YOU KNOW THIS?

14     A.   I SAW A LACK OF RECORD CERTIFICATE.

15     Q.   AND LET ME DRAW YOUR ATTENTION TO -- THERE SHOULD BE SOME

16     BINDERS IN FRONT OF YOU.  THE FIRST BINDER IN FRONT OF YOU

17     SHOULD HAVE A SERIES OF EXHIBITS, AND I WOULD ASK YOU TO TAKE A

18     LOOK AT WHAT HAS BEEN MARKED AS GOVERNMENT'S EXHIBIT 7.

19          DO YOU RECOGNIZE GOVERNMENT'S EXHIBIT 7?

20     A.   YES, I DO.

21     Q.   AND WHAT DO YOU RECOGNIZE IT TO BE?

22     A.   THIS IS CALLED A CERTIFICATION OF LACK OF RECORD.

23     Q.   AND WHO IS THE INDIVIDUAL THAT THE RECORDS WERE BEING

24     SEARCHED FOR?

25     A.   MYRA HOLMES.
```

OERTEL DIRECT

```
 1              MR. FAZIOLI:  YOUR HONOR, AT THIS TIME THE UNITED

 2    STATES WOULD MOVE GOVERNMENT'S EXHIBIT 7 INTO EVIDENCE.

 3              MS. LIE:  NO OBJECTION.

 4              THE COURT:  IT'S RECEIVED WITHOUT OBJECTION.

 5          (GOVERNMENT'S EXHIBIT 7 WAS RECEIVED IN EVIDENCE.)

 6              MR. FAZIOLI:  PLEASE PUBLISH EXHIBIT 7.

 7    Q.   SO COULD YOU PLEASE BLOW UP TO WHERE IT SAYS PERIOD.  SO

 8    THIS IS EXHIBIT 7.  COULD YOU EXPLAIN THE INFORMATION THAT IS

 9    PUT FORWARD HERE IN EXHIBIT 7?

10    A.   THIS IS THE DOCUMENT FROM THE I.R.S. AND WHAT IT DOES IS

11    THAT IT CERTIFIES THAT SOMEONE FROM THE I.R.S., I BELIEVE IT

12    WOULD BE PROBABLY SOMEONE FROM ONE OF THE SERVICE CENTERS, HAS

13    REVIEWED ALL OF THE I.R.S. RECORDS AND HAS DETERMINED THAT

14    THERE WAS NO INDIVIDUAL INCOME TAX RETURN FILED BY MYRA HOLMES

15    FOR THE TAX YEAR 2004.

16    Q.   AND THERE'S A TAX IDENTIFICATION NUMBER LISTED THERE ON

17    THE CERTIFICATION OF LACK OF RECORD; CORRECT?

18    A.   YES.

19    Q.   AND THERE'S A NUMBER THERE.  IT SAYS SSN.  IS THAT A

20    NUMBER STARTED IN 658, IS THAT A SOCIAL SECURITY NUMBER?

21    A.   YES.

22    Q.   AND IS THERE AN ADDRESS LISTED THERE FOR THE INDIVIDUAL

23    THAT THEY WERE SEARCHING FOR?

24    A.   YES, IT IS.

25    Q.   AND WHAT IS THE ADDRESS?
```

1    A.   312 MOONRACKER DRIVE, VALLEJO, CALIFORNIA 94590.

2    Q.   AND THE PERIOD DECEMBER 31ST, 2004, DOES THAT MEAN THE

3    I.R.S. LOOKED TO SEE IF THERE WAS A TAX RETURN FOR 2004 AND

4    THERE WASN'T ANY; IS THAT CORRECT?

5    A.   CORRECT.

6    Q.   LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED AS

7    GOVERNMENT'S EXHIBIT 8?

8    A.   OKAY.

9    Q.   AND DO YOU RECOGNIZE WHAT GOVERNMENT'S EXHIBIT 8 IS?

10   A.   YES.

11   Q.   AND WHAT IS GOVERNMENT'S EXHIBIT 8?

12   A.   THIS IS ANOTHER I.R.S. DOCUMENT, AND BASICALLY THIS IS THE

13   TYPE OF TRANSCRIPT YOU WOULD SEE TO SHOW WHAT TYPES OF INCOME A

14   TAXPAYER WOULD HAVE IN A PARTICULAR YEAR.

15   Q.   SO THIS IS AN I.R.S. RECORD RELATED TO A PARTICULAR

16   INDIVIDUAL; CORRECT?

17   A.   YES.

18   Q.   AND WHO IS THE INDIVIDUAL THAT THIS RECORD IS RELATED TO?

19   A.   MYRA A. HOLMES.

20        MR. FAZIOLI:  YOUR HONOR, AT THIS TIME THE UNITED

21   STATES WOULD MOVE GOVERNMENT'S EXHIBIT 8 INTO EVIDENCE.

22        MS. LIE:  NO OBJECTION.

23        THE COURT:  IT'S RECEIVED.

24   (GOVERNMENT'S EXHIBIT 8 WAS RECEIVED IN EVIDENCE.)

25

OERTEL DIRECT

 1    BY MR. FAZIOLI:

 2    Q.   SO I THINK YOU SAID SOMETHING ABOUT THIS BEING A

 3    TRANSCRIPT.  AND CAN YOU WALK THE JURY THROUGH SOME OF THE

 4    INFORMATION ON THIS EXHIBIT 8?

 5    A.   WELL, STARTING AT THE TOP IT'S FOR -- WELL, IT SAYS

 6    TY 2004.

 7    Q.   AND WHAT IS THE SIGNIFICANCE OF THAT?

 8    A.   THAT'S TAX YEAR 2004.  AND THEN IT SHOWS WHAT TYPE OF

 9    DOCUMENT IT IS, A 1099G WHICH MEANS THAT IT WAS -- THAT IT IS A

10    1099 THAT CAME FROM A GOVERNMENT AGENCY.

11    Q.   MEANING THE INFORMATION ON THIS AGENCY CAME FROM A

12    GOVERNMENT AGENCY?

13    A.   YES.

14    Q.   OKAY.  SO WHAT IS A 1099G, FOR EXAMPLE?

15    A.   WELL, A 1099G WILL TELL YOU WHAT KINDS OF -- FOR EXAMPLE,

16    NON-WAGE INCOME YOU COULD RECEIVE FROM A GOVERNMENT AGENCY.

17    Q.   SO THIS TRANSCRIPT REFLECTS INFORMATION THAT THE I.R.S.

18    RECEIVED IN TAX YEAR 2004 RELATED TO MYRA HOLMES?

19    A.   WE WOULD HAVE RECEIVED IT IN 2005, BUT IT PERTAINS TO

20    2004.

21    Q.   AND IT SAYS THAT THERE'S A PAYEE ENTITY DATA.  CAN YOU

22    EXPLAIN WHAT THAT MEANS, DATA, I MEAN?

23    A.   PAYEE ENTITY DATA, THAT MEANS THE PERSON WHO RECEIVED THE

24    MONEY.

25    Q.   ALL RIGHT.  SO THIS IS A DOCUMENT THAT IS COMMUNICATING TO

OERTEL DIRECT

```
1     THE I.R.S. THAT SOMEONE RECEIVED MONEY IN TAX YEAR 2004;

2     CORRECT?

3     A.   CORRECT.

4     Q.   AND WHO IS THE PERSON WHO RECEIVED THE MONEY?

5     A.   MYRA HOLMES.

6     Q.   AND THE ADDRESS?

7     A.   312 MOONRACKER DRIVE, VALLEJO, CALIFORNIA, 94590.

8     Q.   AND THERE'S ALSO A SOCIAL SECURITY NUMBER WHICH MATCHES

9     FROM THE CERTIFICATE OF LACK OF RECORD; CORRECT?

10    A.   THE SOCIAL SECURITY NUMBER ON EXHIBIT 7, THE LACK OF

11    RECORD, IS THE SAME AS THE ONE ON EXHIBIT 8.

12    Q.   OKAY.  AND IT SAYS PAYOR ENTITY DATA, AND IT SAYS

13    EMPLOYMENT DEVELOPMENT DEPARTMENT.  DO YOU SEE THAT?

14    A.   YES.

15    Q.   AND WHAT IS THE SIGNIFICANCE OF THAT INFORMATION?

16    A.   THE EMPLOYMENT DEVELOPMENT DEPARTMENT IS THE CALIFORNIA

17    STATE ORGANIZATION THAT PAYS OUT UNEMPLOYMENT COMPENSATION.

18    Q.   SO WHAT IS THE SIGNIFICANCE OF THE INFORMATION THAT IS

19    HERE ON EXHIBIT 8?

20    A.   WELL, BASICALLY WHAT THIS IS SAYING IS THAT MYRA HOLMES

21    RECEIVED UNEMPLOYMENT COMPENSATION FOR 2004 IN THE AMOUNT OF

22    $1,320.

23    Q.   AND, NOW, IT SAYS UP THERE AT THE TOP RIGHT OF THIS

24    EXHIBIT A, IT SAYS PAGE 1 OF 1.  DO YOU SEE THAT?

25    A.   YES.
```

OERTEL DIRECT

1    Q.   AND IF MYRA HOLMES HAD RECEIVED -- HAD RECEIVED INCOME

2    FROM AN EMPLOYER IN 2004 AND THAT -- AND INCOME HAD BEEN

3    REPORTED TO THE I.R.S., WOULD IT BE ON THIS TRANSCRIPT?

4    A.   YES.

5    Q.   AND IS THERE ANY INDICATION ON THIS TRANSCRIPT FOR TAX

6    YEAR 2004 THAT MYRA HOLMES RECEIVED ANY INCOME FROM AN EMPLOYER

7    IN 2004?

8    A.   NO, THERE IS NOT.  IT SAYS PAGE 1 OF 1.  SO THIS WOULD BE

9    THE ONLY PERSON OR GROUP OR AGENCY THAT WOULD HAVE PAID HER

10   MONEY AND REPORTED IT TO THE I.R.S.

11   Q.   AND THAT'S THE EDD, THE 1320 NUMBER ON EXHIBIT 8?

12   A.   THAT'S CORRECT.

13   Q.   AND LET ME SHOW YOU TO WHAT HAS BEEN MARKED AS

14   GOVERNMENT'S EXHIBIT 13.

15   A.   OKAY.

16   Q.   AND HAVE YOU HAD AN OPPORTUNITY TO REVIEW GOVERNMENT'S

17   EXHIBIT 13?

18   A.   YES.

19   Q.   AND IS -- WHAT IS GOVERNMENT'S EXHIBIT 13?

20   A.   EXHIBIT 13 IS A 2004 FEDERAL CORPORATE INCOME TAX RETURN.

21   Q.   AND WHAT IS THE NAME OF THE ENTITY, THE CORPORATION THAT

22   THE INCOME TAX RETURN IS BEING SUBMITTED FOR?

23   A.   THE NAME IS PARTNERS SECURITY SERVICES, INC.

24   Q.   AND ON PAGE 3 OF EXHIBIT 13, THERE'S A THING THAT SAYS

25   STATEMENT TO, AND IT SAYS 50 OR MORE OWNERS; CORRECT?

OERTEL DIRECT

1    A.   CORRECT.

2    Q.   AND THERE'S ONLY ONE INDIVIDUAL THAT IS LISTED AS A

3    50 PERCENT OR MORE OWNER OF THE CORPORATION THAT IS THIS --

4    THAT IS RELATED TO THIS TAX RETURN EXHIBIT 13; CORRECT?

5    A.   THAT'S CORRECT.  IT SAYS MYRA HOLMES IS THE 100 PERCENT

6    OWNER.

7             MR. FAZIOLI:  YOUR HONOR, AT THIS TIME THE UNITED

8    STATES WOULD MOVE GOVERNMENT'S 13 INTO EVIDENCE.

9             MS. LIE:  PER STIPULATION.

10            THE COURT:  IT'S RECEIVED.

11       (GOVERNMENT'S EXHIBIT 13 WAS RECEIVED IN EVIDENCE.)

12            MR. FAZIOLI:  PER THE REFERENCE TO THE STIPULATION

13   AT THIS TIME I THINK I WOULD CONFIRM THAT GOVERNMENT'S

14   EXHIBIT 9 TO 15 WOULD BE ADMITTED INTO EVIDENCE.

15            THE COURT:  THEY WILL BE ADMITTED.

16            MS. LIE:  THAT'S FINE.

17       (GOVERNMENT'S EXHIBITS 9 - 15 WERE RECEIVED IN EVIDENCE.)

18   BY MR. FAZIOLI:

19   Q.   SO IF YOU COULD PUBLISH EXHIBIT 13.  WOULD YOU BLOW UP AT

20   THE TOP WHAT THE TITLE IS ON THE TOP OF EXHIBIT 13?  SO WHAT IS

21   THE NUMBER ON THIS FORM?

22   A.   THIS IS FORM 1120A.

23   Q.   AND WHAT IS THE TITLE OF THE FORM?

24   A.   U.S. CORPORATION SHORT FORM INCOME TAX RETURN.

25   Q.   AND FOR WHICH -- WHAT IS THE TAX YEAR WE'RE TALKING ABOUT

OERTEL DIRECT

1    HERE?

2    A.   2004.

3    Q.   AND WHAT IS A U.S. CORPORATION SHORT FORM TAX RETURN?

4    A.   WHAT THEY MEAN BY "SHORT FORM" IS THAT IF YOU QUALIFY, YOU

5    CAN FILE JUST A SHORT FORM, WHICH MEANS THAT IT'S NOT AS

6    LENGTHY AS THE LONG FORM WHICH WOULD BE A FORM 1120.

7    Q.   AND ARE THERE CERTAIN CATEGORISTICS OF A CORPORATION THAT

8    MAKE IT -- ARE THERE CERTAIN ASPECTS OF A CORPORATION IN 2004,

9    THAT WOULD HAVE MADE IT ABLE TO FILE A SHORT FORM TAX RETURN AS

10   OPPOSED TO A LONG FORM TAX RETURN, SO TO SPEAK?

11   A.   YES, THERE ARE.  IF A CORPORATION HAD GROSS RECEIPTS AND

12   TOTAL ASSETS OF $500,000 OR LESS, THEN IN 2004 YOU CAN USE THE

13   SHORT FORM.

14   Q.   BUT IF THE CORPORATION HAD GROSS RECEIPTS OR ASSETS OF

15   $500,000 OR MORE, IT COULD NOT FILE THIS TAX RETURN IN 2004;

16   CORRECT?

17   A.   THAT'S CORRECT, YOU WOULD HAVE TO USE THE REGULAR FORM

18   1120.

19   Q.   AND DO YOU SEE UP AT THE TOP THERE'S AN ADDRESS, THERE'S A

20   CORPORATE NAME AND AN ADDRESS AT THE TOP OF 13.  COULD YOU READ

21   THAT FOR THE RECORD, PLEASE?

22   A.   PARTNERS SECURITY SERVICES, INC., 312 MOONRACKER DRIVE,

23   VALLEJO, CALIFORNIA.

24   Q.   AND THERE'S AN EMPLOYER I.D. NUMBER AND THAT'S THE BOX

25   THAT SAYS B.  AND CAN YOU READ WHAT THAT NUMBER IS?

1    A.   THE EMPLOYER I.D. NUMBER IS 943399536.

2    Q.   AND THEN THERE'S A DATE THAT THIS CORPORATION WAS

3    INCORPORATED.  AND WHAT DOES IT SAY ON THIS RETURN?

4    A.   JANUARY 28TH, 2000.

5    Q.   AND THEN NEXT TO THAT THERE'S A BOX THAT SAYS D, TOTAL

6    ASSETS, SEE INSTRUCTIONS.  DO YOU SEE THAT?

7    A.   YES.

8    Q.   AND WHAT IS THE INFORMATION THAT IS BEING SOUGHT SAYING D,

9    TOTAL ASSETS, SEE INSTRUCTIONS?

10   A.   THAT'S WHERE THE PREPARER OF THE RETURN SHOULD PUT DOWN

11   THE TOTAL AMOUNT OF ASSETS THAT THE CORPORATION ITSELF OWNED.

12   Q.   AND ON THIS RETURN THE PARTNERS SECURITY SERVICE 2004,

13   WHAT WAS THE TOTAL ASSETS LISTED FOR PARTNERS SECURITY SERVICE

14   FOR THE TAX YEAR 2004?

15   A.   ZERO.

16   Q.   SO -- AND THEN JUMPING DOWN TO THE BOTTOM OF THIS PAGE.

17   IF YOU COULD BLOW UP THE SIGNATURE BOX AT THE BOTTOM.

18        AND THERE'S A SIGNATURE THERE, CORRECT?

19   A.   CORRECT.

20   Q.   AND THEN THERE'S A DATE NEXT TO IT.  IT SAYS -- WHAT IS

21   THE DATE THAT APPEARS TO BE NEXT TO THE SIGNATURE?

22   A.   IT LOOKS LIKE IT'S 4-1-05.

23   Q.   AND THEN THERE'S A TITLE THAT'S NEXT TO IT; CORRECT?

24   A.   CORRECT.

25   Q.   AND IT SAYS SIGNATURE OF OFFICER.  THAT'S THE -- THAT'S

OERTEL DIRECT

1    TYPED RIGHT UNDERNEATH THE SIGNATURE; CORRECT?

2    A.   YES.

3    Q.   AND ABOVE WHERE IT SAYS SIGNATURE OF OFFICER AND THE

4    SIGNATURE, THERE'S AN ADMONITION THERE.  DO YOU SEE THAT?

5    A.   YES.

6    Q.   AND CAN YOU READ WHAT THAT ADMONITION IS RIGHT ON THAT

7    SIGNATURE OF THE PERSON WHO SIGNED THE RETURN?

8    A.   "UNDER PENALTIES OF PERJURY I DECLARE THAT I HAVE EXAMINED

9    THIS RETURN, INCLUDING ACCOMPANYING SCHEDULES AND STATEMENTS,

10   AND TO THE BEST OF MY KNOWLEDGE AND BELIEF IT IS TRUE, CORRECT,

11   AND COMPLETE.  DECLARATION OF PREPARER OTHER THAN TAXPAYER IS

12   BASED ON ALL INFORMATION OF WHICH PREPARER HAS ANY KNOWLEDGE."

13   Q.   OKAY.  AND THEN IF YOU DON'T MIND PULLING BACK FOR A

14   SECOND.

15        BEFORE WE GET INTO SOME MORE OF THE ADDITIONAL NUMBERS ON

16   THIS DOCUMENT, THERE'S A BLUE TYPE THAT SAYS CERTIFIED TRUE

17   COPY.  DO YOU SEE THAT?

18   A.   YES, I DO.

19   Q.   AND IS THAT A CERTIFICATION THAT COMES WHEN THE I.R.S.

20   PRODUCES THESE RECORDS?

21   A.   YES.

22   Q.   AND SO JUMPING UP AGAIN TO SOME OF THE NUMBERS ON

23   EXHIBIT 13 -- ACTUALLY, LET'S GO TO PAGE 13-2 -- I'M SORRY.

24   YOU INDICATED THAT ON PAGE 13-3 THE ONLY PERSON THAT IS LISTED

25   AS AN OWNER FOR THIS CORPORATION WAS MYRA HOLMES; CORRECT?

```
 1    A.   CORRECT.

 2    Q.   AND SO LET'S LOOK AT THE TOP WHERE IT SAYS INCOME.

 3    A.   OKAY.

 4    Q.   COULD YOU PLEASE BLOW UP THE SECTION OF THE 2004 RETURN

 5    THAT SAYS INCOME.

 6         AND WHAT IS REPORTED AS THE GROSS RECEIPTS FOR SALES FOR

 7    PARTNERS SECURITY SERVICES, INC., IN 2004?

 8    A.   THERE WERE NONE.

 9    Q.   AND WHAT REPORTS -- AND THERE'S A LIST OF OTHER TYPES OF

10    POTENTIAL INCOME FOR A CORPORATION; CORRECT?

11    A.   CORRECT.

12    Q.   AND CAN YOU GO THROUGH A COUPLE OF THOSE?  WHAT ARE SOME

13    OF THOSE OTHER TYPES OF INCOME THAT CORPORATIONS COULD HAVE AS

14    WOULD BE REPORTED ON THIS RETURN?

15    A.   INTEREST, RENTS, ROYALTIES, CAPITAL GAINS.

16    Q.   ALSO COST OF GOODS SOLD?

17    A.   COST OF GOODS SOLD IS A DEDUCTION.

18    Q.   AND THEN GROSS PROFITS AS WELL?

19    A.   YES.

20    Q.   AND ALL OF THE INCOME FIGURES ADD UP TO A NUMBER FOR THE

21    TOTAL INCOME; CORRECT?

22    A.   THAT'S CORRECT.

23    Q.   AND WHAT WAS THE REPORTED TOTAL INCOME FOR PARTNERS

24    SECURITY SERVICES IN 2004?

25    A.   ZERO.
```

OERTEL DIRECT

1    Q.   NOW, THE NEXT SECTION OF THIS PAGE IS A LIST FOR

2    DEDUCTIONS; CORRECT?

3    A.   CORRECT.

4    Q.   AND THE LINE 12 INDICATES ONE OF THE DEDUCTIONS IS

5    COMPENSATION OF OFFICERS; CORRECT?

6    A.   CORRECT.

7    Q.   AND THE ONLY OFFICER THAT IS LISTED ON THIS TAX RETURN IS

8    MYRA HOLMES?

9    A.   THAT'S RIGHT.

10   Q.   AND WHAT IS REPORTED AS COMPENSATION OF OFFICERS ON LINE

11   12 OF EXHIBIT 13?

12   A.   THERE IS NONE.

13   Q.   AND THEN THERE'S A COUPLE OF OTHER DEDUCTIONS.  THE NEXT

14   ONE SAYS SALARY AND WAGES.  DO YOU SEE THAT?

15   A.   YES.

16   Q.   AND WHAT WAS REPORTED AS THE SALARY AND WAGES AS A

17   DEDUCTION FOR THIS CORPORATION IN 2004 IN EXHIBIT 13?

18   A.   THERE WAS NOTHING REPORTED.

19   Q.   AND, NOW, WHAT DOES IT SAY FOR LINE -- BUT THERE ARE SOME

20   DEDUCTIONS THAT ARE LISTED; CORRECT?

21   A.   CORRECT.

22   Q.   AND CAN YOU WALK THROUGH SOME OF THE DEDUCTIONS THAT ARE

23   LISTED ON THE FIRST PAGE OF EXHIBIT 13?

24   A.   THE FIRST DEDUCTION SHOWN IS LINE 16 FOR RENT IN THE

25   AMOUNT OF $6,000, AND THEN THE NEXT ONE IS LINE 17, TAXES AND

OERTEL DIRECT

1    LICENSES IN THE AMOUNT OF $1,800.

2    Q.   AND THEN KEEP GOING.

3    A.   AND THEN THERE ARE NO OTHER AMOUNTS UNTIL LINE 22, OTHER

4    DEDUCTIONS.

5    Q.   AND THEN LINE 22 ARE OTHER DEDUCTIONS.  WHAT DOES IT SAY

6    ON THE RIGHT SIDE OF THE LINE?

7    A.   IT SAYS SEE STATEMENT 1 AND THEN IT GIVES THE TOTAL OF

8    22,248.

9    Q.   AND THEN IF YOU DON'T MIND GOING TO THE THIRD PAGE OF THIS

10   DOCUMENT, THIS IS EXHIBIT 13, PAGE 3?

11   A.   I HAVE IT.

12   Q.   SO PAGE 1 OF THIS EXHIBIT INDICATES THAT THERE'S $22,248

13   IN OTHER DEDUCTIONS ON WHAT IS REFERRED TO AS A STATEMENT 1;

14   CORRECT?

15   A.   CORRECT.

16   Q.   AND IT'S THIS PAGE, THE THIRD PAGE, IS THIS THE

17   ITEMIZATION OF THOSE DEDUCTIONS?

18   A.   YES, IT IS.

19   Q.   AND THEY'RE LISTED THERE; CORRECT?

20   A.   YES, THEY ARE.

21   Q.   AND WHAT ARE SOME OF THE CATEGORIES THAT ARE LISTED IN

22   TERMS OF THE DEDUCTIONS THAT WERE TAKEN FOR THIS CORPORATION IN

23   2004?

24   A.   THE FIRST FEW ARE ACCOUNTING, ADVERTISING, AUTO AND TRUCK,

25   EDUCATION, TRAINING, INSURANCE.

OERTEL DIRECT

1       Q.    AND IT GOES ON FOR A NUMBER OF OTHER DEDUCTIONS; CORRECT?

2       A.    YES.

3       Q.    WEB PAGE AND THAT TYPE OF THING?

4       A.    YES.

5       Q.    AND MARKETING EVENTS, $1,200?

6       A.    YES.

7       Q.    AND THE TOTAL AMOUNT OF THE DEDUCTIONS THAT ARE LISTED

8       HERE ON STATEMENT 1 IS $22,000; CORRECT?

9       A.    YES, IT COMES TO THE SAME TOTAL THAT IS ON PAGE 1.

10      Q.    SO LET'S GO TO PAGE 1.  SO IF YOU CAN BLOW UP OTHER

11      DEDUCTIONS WHERE IT SAYS DOWN TO THE BOTTOM OF THE PAGE.

12            SO NO INCOME IS REPORTED THIS YEAR; IS THAT CORRECT?

13      A.    THAT'S CORRECT.

14      Q.    AND YOU ADD UP THE DEDUCTIONS AND THE TAXES AND LICENSES

15      AND THE RENTS AND THE OTHER DEDUCTIONS AND THEN THERE'S A

16      TOTAL.  WHAT IS THE TOTAL NUMBER OF DEDUCTIONS FOR THE YEAR?

17      A.    30,048.

18      Q.    SO WHAT WAS THE TAXABLE INCOME FOR THIS YEAR FOR THIS

19      CORPORATION?

20      A.    WELL, THE TAXABLE INCOME WAS ACTUALLY A LOSS OF 30,048.

21      Q.    AND DID THE CORPORATION PAY ANY TAXES THAT YEAR?

22      A.    NO, IT DID NOT.

23      Q.    AND THEN DRAWING YOUR ATTENTION TO THE SECOND PAGE OF

24      EXHIBIT 13 THERE'S A PART 2 THAT IS CALLED OTHER INFORMATION?

25      A.    YES.

OERTEL DIRECT

1    Q.   AND WOULD YOU PLEASE BLOW UP THAT SECTION THAT SAYS OTHER

2    INFORMATION?

3         AND DO YOU SEE UNDER IT SAYS, IT SAYS -- WHAT DOES IT SAY

4    UNDER 1, SUBPOINT 1 UNDER OTHER INFORMATION?

5    A.   FIRST IT GIVES THE ACTIVITY CODE, THE I.R.S. GIVES EACH

6    TYPE OF BUSINESS A NUMERICAL CLASSIFICATION AND THERE IT'S

7    541,990 AND THEN THE BUSINESS ACTIVITY IS SECURITY AND THEN THE

8    PRODUCT AND SERVICE IS SECURITY GUARDS.

9    Q.   AND WHAT DOES IT SAY FOR QUESTION 2?

10   A.   CAN I JUST READ IT?

11   Q.   YES.

12   A.   AT THE END OF THE YEAR DID ANY INDIVIDUAL, PARTNERSHIP,

13   ESTATE OR TRUST OWN, DIRECTLY OR INDIRECTLY, 50 PERCENT OR MORE

14   OF THE CORPORATION'S LOADING STOCK AND IT GIVES THE ANSWER,

15   YES.

16   Q.   AND THEN THAT STATEMENT 2, THAT'S WHAT WE'RE TALKING ABOUT

17   BEFORE, THAT INDIVIDUAL IS MYRA HOLMES; CORRECT?

18   A.   CORRECT.

19   Q.   AND THE NEXT STATEMENT, WHAT WAS THE AMOUNT OF TAXES AND

20   INTEREST THAT WAS RECEIVED OR ACCRUED DURING 2004 FOR THIS

21   CORPORATION?

22   A.   NONE.

23   Q.   AND WHAT WAS THE TOTAL AMOUNT OF CASH DISTRIBUTIONS AND

24   THE BOOK VALUE OF PROPERTY DISTRIBUTIONS OTHER THAN CASH MADE

25   DURING THE TAX YEAR?

1       A.   NONE.

2       Q.   BRING THE LAST QUESTION ABOUT THIS DOCUMENT, BUT ON THE

3       RIGHT-HAND SIDE IN THE MIDDLE THERE'S 7?

4       A.   I SEE IT.

5       Q.   AND A QUESTION ABOUT THE CORPORATION'S TOTAL RECEIPTS.

6       AND WHAT IS THAT QUESTION AND THE ANSWER?

7       A.   IT ASKS IF THE CORPORATION'S TOTAL RECEIPTS AND ASSETS FOR

8       THE YEAR WERE LESS THAN $250,000 AND IT'S ANSWERED, YES.

9       Q.   AND IF THE ANSWER -- AND WHAT DOES IT SAY AFTER THAT?

10      A.   IF THE ANSWER IS, YES, THE CORPORATION IS NOT REQUIRED TO

11      COMPLETE PARTS 3 AND 4 BELOW.

12      Q.   AND THERE'S ACTUALLY SORT OF A CHART BELOW IT AND IT SAYS

13      BALANCE SHEET FOR BOOKS; CORRECT?

14      A.   CORRECT.

15      Q.   SO IF THE CORPORATION HAS ASSETS THAT ARE $250,000 OR

16      MORE, THEY WOULD BE REQUIRED PURSUANT TO THE TAX RULES TO FILL

17      OUT THAT BALANCE SHEET; CORRECT?

18      A.   THAT'S RIGHT.

19      Q.   AND THAT WASN'T FILLED OUT FOR THIS PARTICULAR RETURN?

20      A.   NO, IT'S NOT FILLED OUT BECAUSE IT SAYS IN 7 THAT YOU

21      DON'T NEED TO BECAUSE IT'S LESS THAN 250.

22      Q.   ALL RIGHT.  DRAWING YOUR ATTENTION TO -- ACTUALLY, I'M

23      SORRY.  ONE MORE QUESTION ABOUT THIS DOCUMENT.  EXHIBIT 13,

24      PAGE 4?

25      A.   OKAY.

OERTEL DIRECT

1    Q.   AND WHAT IS THIS -- IS THIS PART OF THE DOCUMENTS THAT THE

2    I.R.S. HAS IN CONNECTION WITH THIS CORPORATE TAX RETURN?

3    A.   YES.  THIS APPEARED TO BE A PHOTOCOPY OF THE ENVELOPE THAT

4    THE I.R.S. RECEIVED THE TAX RETURN AT.

5    Q.   AND IF YOU TAKE A FIRST PAGE OF THE CORPORATE TAX RETURN,

6    EXHIBIT 13, AND THEN THE RETURN ADDRESS, CAN YOU MAKE OUT THE

7    ADDRESS WHICH THIS ENVELOPE ON THE RETURN WHICH WAS MAILED?

8    A.   IT'S FUZZY, BUT IT LOOKS LIKE IT SAYS 312 MOONRACKER

9    DRIVE, VALLEJO, CALIFORNIA.

10   Q.   AND THERE'S A POSTAGE PAID ON THE TOP RIGHT-HAND SIDE OF

11   THIS ENVELOPE?

12   A.   CORRECT.

13   Q.   AND IS THERE A CITY WHERE THE POSTAGE WAS PAID?

14   A.   THAT'S ALSO VALLEJO.

15   Q.   DRAWING YOUR ATTENTION TO GOVERNMENT'S EXHIBIT 11.

16            THE COURT:  LET'S TAKE OUR NOON -- EXCUSE ME -- OUR

17   AFTERNOON RECESS FOR ABOUT 15 MINUTES, AND THEN WE'LL DELVE

18   INTO THE EXHIBIT.  SO WE'LL BE IN RECESS.

19        (RECESS FROM 3:45 P.M. UNTIL 4:01 P.M.)

20            THE COURT:  WE'RE BACK ON THE RECORD.  ALL PARTIES

21   ARE PRESENT.  WE NEED OUR WITNESS BACK.

22        MR. FAZIOLI, WOULD YOU LIKE TO CONTINUE?

23            MR. FAZIOLI:  BEFORE I CONTINUE WITH THE WITNESS,

24   I'D LIKE TO READ TWO MORE STIPULATIONS INTO THE RECORD.

25   THEY'RE VERY BRIEF, MUCH SHORTER THAN THE LAST TWO, AND I CAN

1      SHOW THEM TO THE COURT.

2             THE COURT:  THAT'S ALL RIGHT.

3             MR. FAZIOLI:  TRIAL STIPULATION THREE READS:

4      "UNITED STATES AND DEFENDANT MYRA HOLMES HEREBY STIPULATE

5      TO THE FOLLOWING FACTS AS NOT IN DISPUTE:

6      "NUMBER 1.  THE DOCUMENT MARKED FOR IDENTIFICATION AS

7      EXHIBIT 3, DEED OF TRUST MH 5301 TO 5320, IS A CERTIFIED PUBLIC

8      RECORD RECORDED IN OFFICIAL RECORDS, SOLANO COUNTY, CALIFORNIA,

9      AND ADMISSIBLE AS SUCH UNDER FEDERAL RULE OF EVIDENCE 902(4).

10      "2.  THE DOCUMENT MARKED FOR IDENTIFICATION AS EXHIBIT 4,

11      GRANT DEED MH 5321 TO 5323, IS A CERTIFIED PUBLIC RECORD

12      RECORDED IN OFFICIAL RECORDS, SOLANO COUNTY, CALIFORNIA AND IS

13      ADMISSIBLE AS SUCH UNDER FEDERAL RULE OF EVIDENCE 902(4).

14      "3.  THE DOCUMENT MARKED FOR IDENTIFICATION AS EXHIBIT 5,

15      PRELIMINARY CHANGE OF OWNERSHIP RECORD MH 6383 TO 6384, IS A

16      CERTIFIED PUBLIC RECORD RECORDED IN SOLANO COUNTY ASSESSORS

17      RECORDERS OFFICE, SOLANO COUNTY, CALIFORNIA, AND ADMISSIBLE IS

18      AS SUCH UNDER FEDERAL RULE OF EVIDENCE 902(4).

19      "IT IS SO STIPULATED SIGNED JOSEPH FAZIOLI, GRANT FONDO,

20      ASSISTANT U.S. ATTORNEYS, AND DIANA GARRIDO, COUNSEL FOR MYRA

21      HOLMES, MYRA HOLMES, THE DEFENDANT, ALL SIGNED ON FEBRUARY

22      28TH, 2013."

23             LASTLY STIPULATION NUMBER FIVE.

24      "THE UNITED STATES OF AMERICA AND DEFENDANT MYRA HOLMES

25      HEREBY STIPULATE TO THE FOLLOWING FACTS AS NOT IN DISPUTE:

1      "WORLD SAVINGS BANK WAS FEDERALLY INSURED BY THE FEDERAL

2   DEPOSIT INSURANCE CORPORATION FROM JANUARY 1ST, 2005, THROUGH

3   DECEMBER 31ST, 2006.

4      "IT IS SO STIPULATED SIGNED JOSEPH FAZIOLI, GRANT FONDO,

5   ASSISTANT UNITED STATES ATTORNEYS, DIANA GARRIDO, COUNSEL FOR

6   MYRA HOLMES, AND MYRA HOLMES, THE DEFENDANT, ALL DATED

7   FEBRUARY 21ST, 2013."

8           THE COURT:  ANY OBJECTION TO READING OF THE

9   STIPULATIONS?

10           MS. GARRIDO:  NO, YOUR HONOR.

11           THE COURT:  ALL RIGHT.  LADIES AND GENTLEMEN, AGAIN,

12   THESE ARE STIPULATIONS THAT THE PARTIES HAVE AGREED TO AND THIS

13   EVIDENCE WOULD BE ADMISSIBLE AND YOU WILL HAVE IT FOR YOUR

14   DELIBERATIONS.

15      MR. FAZIOLI.

16   BY MR. FAZIOLI:

17   Q.   SO, MR. OERTEL, CAN YOU DRAW YOUR ATTENTION TO WHAT HAS

18   BEEN MARKED AS GOVERNMENT'S EXHIBIT 11?

19   A.   I HAVE IT.

20   Q.   AND WHAT IS GOVERNMENT'S EXHIBIT 11?

21   A.   THIS IS THE 1040 FORM U.S. INDIVIDUAL INCOME TAX RETURN

22   FOR MYRA HOLMES FOR 2005.

23   Q.   SO THIS IS MYRA HOLMES'S TAX RETURN FOR 2005; CORRECT?

24   A.   YES.

25   Q.   AND WHAT IS LISTED AS THE -- AS THE ADDRESS ON THIS

1    RETURN?

2    A.   312 MOONRACKER DRIVE, VALLEJO, CALIFORNIA 94590.

3    Q.   AND WHAT DID MS. HOLMES INDICATE AS HER FILING STATUS?

4    A.   SINGLE.

5    Q.   AND, AGAIN, THE SAME SOCIAL SECURITY NUMBER THAT WE HAVE

6    SEEN ON THESE PRIOR DOCUMENTS; CORRECT?

7    A.   YES.

8    Q.   AND THIS IS THE SAME SOCIAL SECURITY NUMBER -- LET'S

9    ACTUALLY JUMP TO PAGE -- THE SECOND PAGE OF THIS DOCUMENT.

10   A.   OKAY.

11   Q.   AND CAN YOU BLOW UP AT THE BOTTOM WHERE IT SAYS, "SIGN

12   HERE."  SO IT SAYS THIRD PARTY DESIGNEE; CORRECT?

13   A.   YES.

14   Q.   AND IT SAYS DO YOU WANT TO KNOW THE PERSON WHO DISCUSSED

15   THIS WITH THE I.R.S., AND IT SAYS DAVID DOMINGUEZ; CORRECT?

16   A.   YES.

17   Q.   AND THERE'S A PHONE NUMBER THERE AND IT MATCHES THE PHONE

18   NUMBER FOR PAID PREPARER'S PHONE NUMBER AT THE BOTTOM; CORRECT?

19   A.   CORRECT.

20   Q.   AND THERE'S A SIGNATURE THERE ABOVE THAT WHERE IT SAYS

21   "SIGN HERE"?

22   A.   RIGHT.

23   Q.   AND THERE'S A SIGNATURE AND THERE'S ALSO A DATE?

24   A.   CORRECT.

25   Q.   AND SO WHEN DID MS. HOLMES SIGN THIS -- APPEAR TO HAVE

OERTEL DIRECT

```
1     SIGNED THIS TAX RETURN?

2     A.   DECEMBER 13TH, 2007.

3     Q.   AND WHAT DID MS. HOLMES LIST AS HER OCCUPATION ON THIS TAX

4     RETURN?

5     A.   RECRUITMENT.

6     Q.   AND, AGAIN, THERE'S AN ADMONITION, IT'S IN PRETTY SMALL

7     TEXT, BUT IT'S RIGHT ABOVE MS. HOLMES'S SIGNATURE.  CAN YOU

8     READ WHAT THAT ADMONITION IS?

9     A.   "UNDER PENALTIES OF PERJURY I DECLARE THAT I HAVE EXAMINED

10    THIS RETURN AND ACCOMPANYING SCHEDULES AND STATEMENT AND TO THE

11    BEST OF MY KNOWLEDGE AND BELIEF THEY ARE TRUE, CORRECT, AND

12    COMPLETE.  DECLARATION OF PREPARER OTHER THAN TAXPAYER IS BASED

13    ON ALL INFORMATION OF WHICH PREPARER HAS ANY KNOWLEDGE."

14    Q.   OKAY.  SO CAN YOU PLEASE JUMP BACK TO THE FIRST PAGE OF

15    THIS DOCUMENT.  AND CAN YOU PLEASE BLOW UP THE SECTION OF

16    MS. HOLMES'S 2005 TAX RETURN THAT SAYS INCOME.

17         AND WHAT DOES LINE 7 SAY?

18    A.   LINE 7 IS THE LINE WHERE YOU REPORT YOUR WAGES, SALARIES,

19    AND TIPS.

20    Q.   AND IT SAYS ATTACH FORMS W-2; CORRECT?

21    A.   CORRECT.

22    Q.   AND WHAT IS THE AMOUNT THAT MS. HOLMES LISTED FOR HER

23    WAGES, SALARIES, AND TIPS IN 2005?

24    A.   $6,097.

25    Q.   AND, NOW, THIS TAX RETURN INDICATES THAT MS. HOLMES'S WAGE
```

1    AND INCOME IN 2005 CAME FROM TWO SOURCES.  CAN I DRAW YOUR

2    ATTENTION TO PAGE 11-9 OF THIS RETURN.

3    A.   OKAY.

4    Q.   COULD YOU PLEASE BLOW THAT UP.  AND IS THIS ONE OF THE TWO

5    SOURCES OF MS. HOLMES'S WAGE AND INCOME IN 2005?

6    A.   YES, IT IS.

7    Q.   AND WHAT IS THIS FORM THAT IS HERE ON 11-9?

8    A.   THIS IS THE FORM W-2 FOR TAX YEARS 2005.  THIS IS THE FORM

9    THAT AN EMPLOYER SENDS SOMEONE TO SHOW HOW MUCH THEY HAVE

10   EARNED AND HOW MUCH THEY HAVE WITHHELD IN TAXES.

11   Q.   SO JUST FOR THE -- JUST TO BE CLEAR, A W-2 FORM IS A FORM

12   THAT AN EMPLOYER CREATES WHEN SOMEONE WORKS FOR THAT EMPLOYER;

13   CORRECT?

14   A.   CORRECT.

15   Q.   AND THEY PROVIDE -- AT THE END OF THE YEAR FOR A

16   PARTICULAR TAX YEAR THEY PROVIDE A COPY OF THAT W-2 TO THAT

17   EMPLOYEE; CORRECT?

18   A.   YES.

19   Q.   AND DO THEY SUPPLY IT TO OTHER ENTITIES?

20   A.   YES, TO THE I.R.S.

21   Q.   AND THIS IS MS. HOLMES'S 2005 W-2 AND WHO IS THE EMPLOYER,

22   NAME, AND ADDRESS?

23   A.   IT'S THE UNIVERSITY OF CALIFORNIA IN SAN FRANCISCO.  IT'S

24   THE PAYROLL OFFICE UCSF, BOX 0812 SAN FRANCISCO, CALIFORNIA.

25   Q.   AND WHOSE LIST -- AND ON THIS W-2 THAT WAS WITH

1     MS. HOLMES'S APPLICATION, WHO IS LISTED AS THE EMPLOYEE FOR THE

2     EMPLOYEES NAME, ADDRESS AND --

3     A.   THAT'S MYRA HOLMES.

4     Q.   AND, AGAIN, THE MOONRACKER DRIVE ADDRESS; IS THAT CORRECT?

5     A.   THAT'S CORRECT.

6     Q.   AND WHAT DOES IT SAY UNDERNEATH IT THAT THERE'S A VERY

7     SMALL TEXT THAT SAYS THIS INFORMATION, AND CAN YOU READ WHAT

8     THAT SAYS?

9     A.   THIS INFORMATION IS BEING PROVIDED TO THE INTERNAL REVENUE

10    SERVICE.  IF YOU'RE REQUIRED TO FILE A TAX RETURN, A NEGLIGENCE

11    PENALTY OR OTHER SANCTION MAY BE IMPOSED ON YOU IF THIS INCOME

12    IS TAXABLE AND YOU FAILED TO REPORT IT.

13    Q.   AND THEN CAN YOU BACK UP A LITTLE BIT.  THERE'S A WAGES --

14    THE RIGHT SIDE.  THERE'S A WAGES BOX AND SOME OTHER BOXES

15    THERE, CORRECT?

16    A.   CORRECT.

17    Q.   AND SO IT SAYS WAGES, TIPS, AND OTHER COMPENSATION; RIGHT?

18    A.   RIGHT.

19    Q.   AND WHAT IS LISTED THERE?

20    A.   IN BOX 1 IT SHOWS THAT THE WAGES WERE $5,922.30.

21    Q.   AND BUT DOWN ON THE BOTTOM IT SAYS MEDICARE WAGES AND IT'S

22    A BIT HIGHER ABOUT 500 OR SO DOLLARS HIGHER.  WHY IS THAT

23    HIGHER?

24    A.   BECAUSE AS I BELIEVE THE REASON IS EMPLOYEES FOR THAT

25    ORGANIZATION WOULD ONLY HAVE TO PAY MEDICARE TAXES AND NOT

```
 1     SOCIAL SECURITY TAXES.

 2     Q.    AND SO THERE'S A CERTAIN AMOUNT OF INCOME THAT IS

 3     WITHHELD, CORRECT, THE 309 NUMBER?

 4     A.    CORRECT.

 5     Q.    BUT ESSENTIALLY THIS IS INDICATING THAT SHE MADE

 6     REPORTABLE WAGES OF $5,922.30?

 7     A.    CORRECT.

 8     Q.    AND SHE REPORTED THOSE PAGES ON HER 2005 RETURN; CORRECT?

 9     A.    CORRECT.

10     Q.    AND LET'S MOVE TO THE NEXT PAGE OF THIS EXHIBIT 11-10.

11     AND IS THIS THE SECOND W-2 THAT WAS ATTACHED TO MS. HOLMES'S

12     2005 TAX RETURN?

13     A.    YES.

14     Q.    AND SO THIS IS -- AND CAN YOU PLEASE BLOW UP -- MAYBE THE

15     LEFT SIDE.  AGAIN, THIS IS ANOTHER W-2 FORM.  AND WHO IS LISTED

16     AS THE EMPLOYER HERE THAT IS REPORTING THIS INCOME OF

17     MS. HOLMES FOR TAX YEAR 2005?

18     A.    A1 SECURITY, INCORPORATED.

19     Q.    AND WHAT IS THE ADDRESS?

20     A.    4175 BONILLO DRIVE, NUMBER 1, SAN DIEGO, CALIFORNIA,

21     92115.

22     Q.    AND WHO IS LISTED AGAIN AS THE EMPLOYER NAME AND ADDRESS?

23     A.    MYRA A. HOLMES, 312 MOONRACKER DRIVE, VALLEJO, CALIFORNIA.

24     Q.    SO WE HAVE TWO W-2'S THAT ARE ATTACHED TO THIS TAX RETURN.

25     IT'S THE ONE FOR THE U.C. FOR 5,922 AND THEN THIS OTHER ONE FOR
```

1    A1; CORRECT?

2    A.   CORRECT.

3    Q.   AND SO THEN IF YOU JUMP BACK TO PAGE 1 OF 2005.  AND THOSE

4    TWO NUMBERS, THAT'S WHAT ADDS UP TO THE 6097 NUMBER THAT'S AT

5    THE FRONT; CORRECT?

6    A.   CORRECT, THOSE NUMBERS ADD UP TO $6,097.

7    Q.   NOW, THAT $6,000 IN WAGES WAS NOT THE ONLY INCOME THAT

8    MS. HOLMES REPORTED IN 2005; CORRECT?

9    A.   CORRECT.

10   Q.   AND THERE'S ABOUT $485 IN PENSION AND ANNUITIES THAT IS

11   REPORTED ON LINE 16B; RIGHT?

12   A.   CORRECT.

13   Q.   AND WHAT DOES IT SAY FOR LINE 21?

14   A.   LINE 21 IS OTHER INCOME AND THEN TO LIST THE TYPE AND

15   AMOUNT IT SAYS SEE STATEMENT.

16        AND THE AMOUNT LISTED THERE IS $11,808.

17   Q.   AND LET ME DRAW YOUR ATTENTION TO WHAT HAS BEEN MARKED TO

18   THE FOURTH PAGE OF THIS DOCUMENT, 11-4.

19   A.   OKAY.

20   Q.   AND CAN YOU PLEASE HIGHLIGHT THE TOP OF THAT DOCUMENT.  SO

21   MS. HOLMES ON LINE 21 INDICATED THAT SHE HAD ABOUT $11,808 IN

22   INCOME; CORRECT?

23   A.   CORRECT.

24   Q.   AND IT SAID SEE STATEMENT?

25   A.   RIGHT.

OERTEL DIRECT

```
1    Q.   AND IS THIS THE STATEMENT THAT IS BEING REFERRED TO HERE?

2    A.   YES, IT IS.

3    Q.   AND THIS LISTS $11,808 IN INCOME; CORRECT?

4    A.   YES.

5    Q.   AND IT'S BROKEN UP INTO TWO CATEGORIES?

6    A.   YES.

7    Q.   AND WHAT ARE THE TWO CATEGORIES THAT MS. HOLMES REPORTED

8    ON HER RETURN?

9    A.   GAMBLING WINNINGS AND CANCELLATION OF DEBT.

10   Q.   LET ME -- LET'S GO TO THE NEXT PAGE OF THIS DOCUMENT,

11   11-5.  COULD YOU BLOW THIS UP.

12        AND WHAT IS THIS DOCUMENT IN GENERAL?  IT SAYS 1099C IN

13   THE TOP RIGHT.

14   A.   THIS IS A DOCUMENT TELLING A TAXPAYER HOW MUCH SOMEONE HAS

15   CANCELLED, AND HOW MUCH DEBT SOMEONE HAS CANCELLED FOR THEM.

16   Q.   AND THEN WHAT IS THE NAME OF THE CREDITOR THAT IS LISTED

17   UP THERE ON THE TOP LEFT AND THE ADDRESS?

18   A.   MBIA, 101 CROSSWAYS PARK WEST, WOODBURY, NEW YORK.

19   Q.   AND THEN THE DEBTOR'S NAME IS MYRA HOLMES; CORRECT?

20   A.   CORRECT.

21   Q.   AND THEN IT'S VALLEJO, CALIFORNIA?

22   A.   YES.

23   Q.   AND THEN THE DATE OF CANCELLED 11-30-05?

24   A.   YES.

25   Q.   AND WHAT IS THE AMOUNT OF DEBT CANCELLED?
```

OERTEL DIRECT

1    A.   2,256.48.

2    Q.   AND WHAT DOES IT SAY UNDER B, COPY FOR DEBTOR?

3    A.   IT SAYS, THAT "THIS IS IMPORTANT TAX INFORMATION AND IS

4    BEING FURNISHED TO INTERNAL REVENUE SERVICE.

5        "IF YOU ARE REQUIRED TO FILE A RETURN, A NEGLIGENT PENALTY

6    OR OTHER SANCTION MAY BE IMPOSED UPON YOU IF TAXABLE INCOME

7    RESULTS FROM THIS TRANSACTION AND THE I.R.S. DETERMINES THAT IT

8    HAS NOT BEEN REPORTED."

9    Q.   OKAY.  SO LET'S JUMP TO THE NEXT PAGE.  ACTUALLY LET'S GO

10   TO 11-4.  THIS IS THE STATEMENT ASSOCIATED WITH LINE 1.

11       SO WE HAVE GONE THROUGH THE CANCELLATION OF DEBT.  THAT'S

12   THE 20,256 NUMBER; CORRECT?

13   A.   YES.

14   Q.   AND THERE'S ANOTHER NUMBER FOR $11,552 FOR GAMBLING

15   WINNINGS; CORRECT?

16   A.   RIGHT.

17   Q.   THAT LEAVES US TO PAGE -- LET'S JUMP TO 11-6 OF THE 2005

18   RETURN.

19   A.   OKAY.

20   Q.   AND IS THIS WHAT IS KNOWN AS A W-2G?

21   A.   YES, IT IS.

22   Q.   AND WHAT IS A W-2G?

23   A.   A W-2G IS WHAT A CASINO OR OTHER GAMBLING ESTABLISHMENT

24   WOULD SEND TO SOMEONE WHO HAS WON MONEY GAMBLING.

25   Q.   AND COULD YOU BLOW UP ON THE RIGHT THIRD IT HAS W-2G

1    INSTRUCTIONS.  AND CAN YOU READ WHAT IT SAYS UNDER INSTRUCTIONS

2    TO WINNER?

3    A.   "BOX 1, THE PAYOR MUST FURNISH A FORM W-2G TO YOU IF YOU

4    RECEIVE, 1, $600 OR MORE IN GAMBLING WINNINGS AND THE PAYOR IS

5    AT LEAST 300 TIMES OR --" YEAH.  "THE PAYOR IS AT LEAST 300

6    TIMES THE AMOUNT OF THE WAGER EXCEPT WINNING BINGO, KENO, AND

7    SLOT MACHINES."

8    Q.   KEEP READING THROUGH THAT ENTIRE BOX 1.

9    A.   "2.  $1,200 OR MORE IN GAMBLING WINNINGS FROM BINGO OR

10   SLOT MACHINES;

11        "3.  $1,500 OR MORE IN PROCEEDS, THE AMOUNT OF WINNINGS

12   LESS THE AMOUNT OF THE WAGER, FROM KENO;

13        "4.  ANY GAMBLING WINNINGS SUBJECT TO FEDERAL INCOME TAX

14   WITHHOLDING.  GENERALLY REPORT ALL GAMBLING WINNINGS ON THE

15   OTHER INCOME LINE OF FORM 1040.  YOU CAN DEDUCT GAMBLING LOSSES

16   AS AN ITEMIZED DEDUCTION, BUT YOU CANNOT DEDUCT MORE THAN YOUR

17   WINNINGS.

18        "KEEP AN ACCURATE RECORD OF YOUR WINNINGS AND LOSSES AND

19   BE ABLE TO PROVE THOSE AMOUNTS WITH RECEIPTS, TICKETS,

20   STATEMENTS OR SIMILAR ITEMS THAT YOU HAVE SAVED."

21   Q.   OKAY.  NOW, LET'S BACK UP AND LET'S GO TO THE PARTICULAR

22   INFORMATION THAT IS ON THIS W-2G.

23        NOW, THERE'S TWO OF THESE W-2G'S RIGHT NEXT TO EACH OTHER

24   AND ONE SAYS COPY B AT THE BOTTOM AND THE OTHER SAYS COPY C?

25   A.   YEAH, THEY'RE BOTH THE SAME THING.

1    Q.   BUT THEY'RE RELATED TO ONE -- IT APPEARS THAT THEY'RE

2    RELATED TO ONE TRANSACTION; CORRECT?

3    A.   YEAH.

4    Q.   AND WHY DON'T WE, JUST TO SAVE TIME, WHY DON'T WE BLOW UP

5    THE RIGHT HAND -- THE MIDDLE ONE WHICH SAYS COPY.  AND YOU SEE

6    UNDER BOX 1 WHAT IS LISTED AS THE GROSS WINNINGS?

7    A.   $3,125.

8    Q.   AND THE DATE UNDER 4?

9    A.   THAT'S 8-5-2005.

10   Q.   AND WHAT IS LISTED AS THE PAYOR'S NAME, ADDRESS, AND ZIP

11   CODE?

12   A.   IT'S CASINO SAN PABLO, 13255 SAN PABLO AVENUE, SAN PABLO,

13   CALIFORNIA.

14   Q.   AND THE WINNER'S TAXPAYER I.D. NUMBER?

15   A.   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.

16   Q.   AND THEN THERE'S A REFERENCE TO WINDOW?

17   A.   YES, IT'S WINDOW NUMBER 2.

18   Q.   AND THEN THERE'S A FIRST I.D. AND SECOND I.D. THERE, TOO,

19   CORRECT?

20   A.   RIGHT.

21   Q.   AND THE SECOND I.D. APPEARS TO BE A BIRTHDATE?

22   A.   YEAH, AND NUMBER 11 WOULD BE THE CALIFORNIA I.D. NUMBER;

23   AND THEN NUMBER 12 IS THE DATE OF BIRTH ON THAT.

24   Q.   AND WHO IS LISTED AS THE WINNER HERE ON THIS W-2G?

25   A.   MYRA HOLMES.

1    Q.   AND THE ADDRESS?

2    A.   312 MOONRACKER DRIVE, VALLEJO, CALIFORNIA.

3    Q.   AND WHAT DOES IT SAY UNDER THAT, THERE'S AN ADMONITION?

4    A.   "UNDER PENALTIES OF PERJURY I DECLARE TO THE BEST OF MY

5    KNOWLEDGE AND BELIEF THE NAME, ADDRESS, AND TAXPAYER

6    IDENTIFICATION NUMBER THAT I HAVE FURNISHED CORRECTLY IDENTIFY

7    ME AS THE RECIPIENT OF THIS PAYMENT AND ANY PAYMENTS FROM

8    IDENTICAL WAGES AND THAT NO OTHER PERSON IS ENTITLED TO ANY

9    PART OF THESE PAYMENTS."

10   Q.   AND THEN THERE'S A SIGNATURE THERE; CORRECT?

11   A.   THAT'S RIGHT.

12   Q.   AND IT'S DATED 8-5-05?

13   A.   RIGHT.

14   Q.   AND THEN AT THE BOTTOM IT SAYS THAT THIS TAX INFORMATION

15   IS BEING FURNISHED TO THE INTERNAL REVENUE SERVICE; CORRECT?

16   A.   CORRECT.

17   Q.   AND THIS DOCUMENT W-2G, IS THIS CREATED IN THE COURSE OF

18   IF SOMEONE WINS OVER A CERTAIN AMOUNT THEN IT'S REPORTED TO THE

19   I.R.S.?

20   A.   THAT'S RIGHT.

21   Q.   AND DIRECTING YOUR ATTENTION, AND WE'LL GO A LITTLE

22   QUICKER THROUGH THIS TO 11-8.  AND, AGAIN, THIS IS ANOTHER

23   W-2G; CORRECT?

24   A.   RIGHT.

25   Q.   ALSO FROM CASINO SAN PABLO?

OERTEL DIRECT

1    A.   RIGHT.

2    Q.   COULD YOU BLOW UP THAT MIDDLE SECTION THE COPY C FROM

3    WINNER'S RECORDS AND WHAT IS THE GROSS AMOUNT OF WINNINGS FROM

4    THIS W-2G?

5    A.   $1,426.64.

6    Q.   AND WHAT IS THE DATE OF THESE WINNINGS?

7    A.   IT'S 8-5-2005.

8    Q.   AND THAT'S, IN FACT, THE SAME DATE THAT IS REFERENCED ON

9    THE OTHER W-2G THAT WE JUST LOOKED AT; RIGHT?

10   A.   THAT'S RIGHT.

11   Q.   AND THE PAYOR ADDRESS?

12   A.   SAME ADDRESS, CASINO, SAN PABLO, 13255 SAN PABLO AVENUE,

13   SAN PABLO, CALIFORNIA.

14   Q.   AND WHO WAS THE WINNER OF THESE?

15   A.   MYRA HOLMES, 312 MOONRACKER DRIVE, VALLEJO.

16   Q.   AND THE SAME DECLARATION AND SIGNATURE IS AT THE BOTTOM OF

17   THIS W-2G AS WELL; CORRECT?

18   A.   THAT'S RIGHT.

19   Q.   AND THEN JUMP TO THE PAGE BEFORE, WHICH IS 11-C.  AND IS

20   11-C ANOTHER W-2G RELATED TO GAMBLING WINNINGS?

21   A.   YES, IT IS.

22   Q.   AND, AGAIN, CAN YOU BLOW UP THE MIDDLE SECTION?

23        AND WHAT WAS THE GROSS WINNINGS ON THIS W-2G?

24   A.   $5,000.

25   Q.   AND WHAT WAS THE DATE OF THESE WINNINGS?

OERTEL DIRECT

1        A.    11-23-2005.

2        Q.    SO THIS MONEY WAS WON ON 11-23-2005 ACCORDING TO THIS

3        W-2G?

4        A.    THAT'S RIGHT.

5        Q.    AND WHAT IS THE PAYOR NAME AND ADDRESS AND ZIP CODE THAT

6        IS LISTED THERE?

7        A.    THAT'S CACHE CREEK CASINO RESORT, P.O. BOX 65, 14455

8        HIGHWAY 16, BROOKS, CALIFORNIA.

9        Q.    AND WHAT IS THE ZIP CODE?

10       A.    95606.

11       Q.    AND THEN THERE'S A TAXPAYER I.D. NUMBER, AND THIS IS

12       MRS. HOLMES'S SOCIAL SECURITY NUMBER; IS THAT CORRECT?

13       A.    THAT'S RIGHT.

14       Q.    AND THEN THERE'S A FIRST I.D. AND SECOND I.D.?

15       A.    THAT'S RIGHT.  IT LOOKS TO BE THE SAME AS ON THE OTHER

16       ONES.

17       Q.    AND THE WINNER ON THIS W-2G?

18       A.    MYRA HOLMES OF 312 MOONRACKER DRIVE IN VALLEJO.

19       Q.    AND THEN THERE'S -- THERE'S AN ADMONITION AND THERE'S NO

20       SIGNATURE, BUT IS THERE A DATE THAT SEEMS TO BE WRITTEN ON THE

21       RIGHT-HAND SIDE OF THIS?

22       A.    11-23.

23       Q.    LET'S JUMP BACK TO PAGE 11-1.  AND THEN LET'S BLOW UP THE

24       SECTION FOR INCOME.

25             AND ALL OF THE WAY TO THE BOTTOM IF YOU DON'T MIND.  SO

1    MS. HOLMES LISTED $6,097 IN WAGES, SALARIES AND TIPS; CORRECT?

2    A.   RIGHT.

3    Q.   AND THEN ON LINE 7 IT TALKS ABOUT WAGES, SALARIES, AND

4    TIPS AND THESE ARE SOME OF THE VARIOUS FORMS OF INCOME THAT ARE

5    REQUIRED TO BE REPORTED ON AN INDIVIDUAL INCOME TAX FORM;

6    RIGHT?

7    A.   RIGHT.

8    Q.   WAGES, SALARIES, TIPS?

9    A.   RIGHT.

10   Q.   AND WHAT ABOUT A HOUSING ALLOWANCE FROM AN EMPLOYER MADE

11   AS A SUBSTITUTION FOR WAGES, WOULD THAT BE INCOME FOR PURPOSES

12   OF THIS RETURN?

13   A.   YES.

14   Q.   AND WHAT ABOUT A PAYMENT OF MORTGAGE EXPENSES AS A

15   SUBSTITUTE FOR WAGES?

16   A.   YES, IT WOULD ALSO HAVE TO BE REPORTED ON LINE 7.

17   Q.   AND DID THIS 2005 INDIVIDUAL TAX RETURN REPORT ANY INCOME

18   AS PAYMENT OF HOUSING EXPENSES AS A SUBSTITUTE FOR WAGES?

19   A.   YOU'D HAVE TO KNOW WHAT IS INCORPORATED IN THE WAGE LINES

20   OF --

21   Q.   BUT THAT WOULD BE IT, CORRECT, SIMPLY THE $6,000?

22   A.   CORRECT.

23   Q.   NOTHING BEYOND THAT?

24   A.   THAT'S RIGHT.

25   Q.   THERE'S NOTHING ON THESE TAX RETURNS RELATED TO WAGES OR

1    ANYTHING LIKE THAT; CORRECT?

2    A.   THAT'S RIGHT.

3    Q.   AND THEN IF YOU LOOK AT IT, IT SAYS CERTIFIED TRUE COPY

4    AND THIS IS SIMPLY THE I.R.S. CERTIFICATION; CORRECT?

5    A.   THAT'S RIGHT, THE I.R.S. CERTIFIES THAT THIS IS A TRUE

6    COPY OF THE ORIGINAL.

7    Q.   AND SO HER ADJUSTED GROSS INCOME IS $18,390?

8    A.   YES.

9    Q.   SO LET'S JUMP TO THE NEXT PAGE, PLEASE.  AND CAN YOU BLOW

10   UP THE TOP.  HER AMOUNT CARRIES OVER.  HER ADJUSTED INCOME IS

11   $18,390?

12   A.   RIGHT.

13   Q.   AND SHE'S ENTITLED TO TAKE CERTAIN ITEMIZED DEDUCTIONS,

14   CORRECT, AND THAT'S LISTED ON LINE 40?

15   A.   THAT'S RIGHT.

16   Q.   AND WHAT IS THE AMOUNT LISTED FOR ITEMIZED DEDUCTIONS?

17   A.   $24,145.

18   Q.   AND IF YOU DON'T MIND GOING TO NUMBER 2 OF THIS EXHIBIT OF

19   THIS 2005 TAX RETURN.  I'M SORRY.  I WOULD JUMP TO PAGE 3,

20   SCHEDULE ITEMIZED DEDUCTIONS.

21   A.   OKAY.

22   Q.   SO SHE LISTS THE ITEMIZED DEDUCTIONS HERE; CORRECT?

23   A.   THAT'S RIGHT.

24   Q.   AND SOME OF THEM ARE TAXES PAID, CORRECT, ABOUT $2,000?

25   A.   RIGHT.

OERTEL DIRECT

```
1    Q.   AND THERE'S ALSO AN INTEREST PAID IN THE AMOUNT OF
2    $12,379; CORRECT?
3    A.   RIGHT, THAT'S MORTGAGE INTEREST.
4    Q.   AND LET'S GO TO THE BOTTOM THERE'S OTHER MISCELLANEOUS
5    DEDUCTIONS?
6    A.   OKAY.
7    Q.   AND CAN YOU BLOW UP THE SECTION AT THE BOTTOM THAT SAYS
8    OTHER MISCELLANEOUS DEDUCTIONS.  AND IS THERE AN ENTRY AFTER 27
9    UNDER OTHER MISCELLANEOUS DEDUCTIONS?
10   A.   RIGHT.  IT'S FOR GAMBLING LOSSES IN THE AMOUNT OF $9,552.
11   Q.   OKAY.  THAT'S EQUAL TO THE AMOUNT OF THE INCOME THAT WAS
12   REPORTED; CORRECT?
13   A.   RIGHT.  BECAUSE YOU CAN DEDUCT YOUR GAMBLING LOSSES BUT
14   ONLY UP TO THE AMOUNT OF YOUR GAMBLING WINNINGS.
15   Q.   SO GOING BACK TO PAGE 11 -- QUICKLY, BACK ON PAGE 11.  BY
16   THE WAY, QUICKLY JUMPING BACK TO PAGE 11-1, THERE'S NO --
17   THERE'S A LINE THERE THAT INDICATES BUSINESS INCOME OR LOSS;
18   CORRECT?
19   A.   RIGHT, THAT'S LINE 12.
20   Q.   AND WHAT DID MS. HOLMES REPORT AS BUSINESS INCOME IN 2005?
21   A.   THERE ISN'T ANY.
22   Q.   OKAY.  SO THEN JUMPING TO THE NEXT PAGE OF THIS 2005
23   RETURN.  SHE'S GOT $18,390 IN INCOME, ABOUT $24,000 INDUCTIONS.
24       WHAT IS THE TAXABLE INCOME THAT IS LISTED ON LINE 43?
25   A.   THE TAXABLE INCOME IS LISTED AS ZERO, BUT ACTUALLY IT'S A
```

OERTEL DIRECT

1    NEGATIVE $8,955.

2    Q.   AND THERE'S ALSO LISTED FOR OTHER TAXES.  IS THERE ANY

3    SELF-EMPLOYMENT TAX THAT IS REPORTED ON HERE?

4    A.   NO.  LINE 58 IS BLACK.

5    Q.   SO TO SORT OF CUT TO THE END, WHAT IS THE ULTIMATE AMOUNT

6    THAT IS EITHER PAID OR IS EITHER REFUNDED THAT MS. HOLMES HAD

7    TO SUBMIT IN 2005?

8    A.   WELL, SHE HAD TOTAL TAX OF $49.  SHE HAD $406 OF TAXES

9    WITHHELD, AND SHE WAS DUE A REFUND OF $357.

10   Q.   OKAY.  SO LET'S GO TO GOVERNMENT'S EXHIBIT 14.  WHAT IS

11   GOVERNMENT'S EXHIBIT 14.  IF YOU BLOW UP THE TOP?

12   A.   THIS IS FORM 1120 U.S. CORPORATION INCOME TAX RETURN FOR

13   THE YEAR 2005.

14   Q.   AND WHAT IS THE NAME OF THE COMPANY THAT IS LISTED HERE?

15   A.   IT'S STAR, IT LOOKS LIKE A COMMA, PARTNERS SECURITY

16   PARTNERS, INC.

17   Q.   AND THE ADDRESS OF THIS COMPANY, THIS CORPORATION?

18   A.   312 MOONRACKER DRIVE IN VALLEJO.

19   Q.   AND THE CITY OR TOWN?  THE CITY OR TOWN IS VALLEJO?

20   A.   RIGHT.

21   Q.   AND THIS IS A SLIGHTLY DIFFERENT NAME OF A COMPANY THAN

22   THE ONE THAT MS. HOLMES SUBMITTED ON THE 2004 APPLICATION;

23   CORRECT?  IF YOU COMPARE EXHIBIT 13 TO 14 THE NAME OF COMPANY

24   IS SLIGHTLY DIFFERENT; CORRECT?

25   A.   YEAH.  FOR 2004 IT SHOWS THE NAME IS PARTNERS SECURITY

1    SERVICES AND THEN FOR 2005 IT'S CALLED STAR PARTNERS SECURITY

2    PARTNERS.

3    Q.   BUT THERE ARE SOME COMMONALITY BETWEEN THOSE TWO CORPORATE

4    RETURNS; CORRECT?  IT'S THE SAME ADDRESS; CORRECT?

5    A.   IT'S THE SAME ADDRESS, AND IT'S THE SAME EMPLOYER AND

6    IDENTIFICATION NUMBER AND DATE AND INCORPORATED.

7    Q.   BUT THE TWO ENTITIES HAVE DIFFERENT NAMES BUT THE SAME

8    IDENTIFICATION NUMBER AND INCORPORATED; CORRECT?

9    A.   RIGHT.

10   Q.   AND THAT IDENTIFICATION NUMBER THAT IS ON THE 2005 RETURN

11   FOR STAR PARTNERS SECURITY SERVICE IS 943399536; CORRECT?

12   A.   THAT'S CORRECT.

13   Q.   AND WHAT IS AN EMPLOYER IDENTIFICATION NUMBER FOR PURPOSES

14   OF A TAX RETURN?

15   A.   AN EMPLOYER IDENTIFICATION NUMBER IS ESSENTIALLY KIND OF

16   LIKE A BUSINESS'S SOCIAL SECURITY NUMBER.  IT'S THE NUMBER

17   GIVEN BY THE GOVERNMENT TO DESIGNATE IT FOR TAXES AND OTHER

18   PURPOSES.

19   Q.   SO THE NUMBER THAT THE GOVERNMENT GAVE FOR TAXES AND OTHER

20   PURPOSES FOR STAR PARTNERS SECURITY SERVICE IS THE NUMBER THAT

21   STARTS IN 94 AND ENDS IN 6; CORRECT?

22   A.   RIGHT.

23   Q.   AND I'D LIKE TO DRAW YOUR ATTENTION QUICKLY, IF YOU COULD

24   BRING UP ANOTHER EXHIBIT THAT HAS BEEN PREVIOUSLY ADMITTED INTO

25   EVIDENCE AND MARKED AS GOVERNMENT'S EXHIBIT 126.

1    A.    OKAY.

2    Q.    AND DO YOU SEE AT THE TOP THAT THIS IS A DOCUMENT THAT

3    RELATES TO WESTAMERICA BANK; CORRECT?

4    A.    RIGHT.

5    Q.    AND IT SAYS FOR SOLE PROPRIETORSHIP AND THERE'S A

6    SIGNATURE THERE; CORRECT?

7    A.    YES.

8    Q.    AND UNDER AUTHORIZED SIGNERS IT SAYS MYRA HOLMES?

9    A.    YES.

10   Q.    AND IT'S A -- THIS IS A SIGNATURE CARD FOR A WESTAMERICA

11   BANK; CORRECT?

12   A.    THAT'S CORRECT.

13   Q.    AND ON IT ABOVE MS. HOLMES'S SIGNATURE THERE'S A REFERENCE

14   TO TAXPAYER IDENTIFICATION NUMBER OF PROPRIETOR, PARTNERSHIP,

15   CORPORATION, LODGE OR ASSOCIATION; CORRECT?

16   A.    THAT'S CORRECT.

17   Q.    AND I TAKE IT THOSE ARE ALL OF THE ENTITIES THAT ARE GIVEN

18   TAX NUMBERS?

19   A.    YEAH.  WHATEVER TYPE OF BUSINESS YOU HAVE, YOU CAN GET AN

20   EMPLOYER IDENTIFICATION NUMBER.

21   Q.    SO THE EMPLOYER IDENTIFICATION NUMBER HERE ON GOVERNMENT'S

22   EXHIBIT 126, THE ONE THAT STARTS WITH 94 AND ENDS IN 6, THAT'S

23   THE SAME EMPLOYER IDENTIFICATION NUMBER THAT IS ON MS. HOLMES'S

24   2005 CORPORATE TAX RETURN; RIGHT?

25   A.    THAT I.D. NUMBER IS THE SAME AS ON THE 2004 AND THE 2005

OERTEL DIRECT

1      CORPORATE RETURN.

2      Q.   OKAY.  IF WE COULD PLEASE GO BACK TO GOVERNMENT'S

3      EXHIBIT 14, PLEASE.

4           IF YOU COULD BLOW UP AT THE BOTTOM OF THIS, THE 2005

5      CORPORATE TAX RETURN FOR THE -- ACTUALLY IF YOU COULD BLOW UP

6      THE SMALL SECTION AT THE BOTTOM WHERE IT SAYS SIGN HERE.  AND,

7      AGAIN, THERE'S A SIMILAR ADMONITION.  I'M NOT GOING TO ASK YOU

8      TO WALK THROUGH THE ENTIRE THING, BUT THERE'S A SIMILAR

9      ADMONITION ON THIS CORPORATE TAX RETURN THAT IS BEING SIGNED

10     UNDER PENALTY OF PERJURY; CORRECT?

11     A.   RIGHT.

12     Q.   AND THERE'S A SIGNATURE AFTERWARDS?

13     A.   RIGHT.

14     Q.   AND THERE'S A TITLE NEXT TO THE DATE OF THE RETURN;

15     CORRECT?

16     A.   CORRECT.

17     Q.   AND WHAT IS THE DATE OF THIS RETURN?

18     A.   THIS IS 6-16-08.

19     Q.   AND WHAT IS THE TITLE THAT IS LISTED THERE?

20     A.   CEO.

21     Q.   SO LET'S JUMP UP TO THE TOP HALF, MAYBE THE TOP HALF OF

22     THIS DOCUMENT.

23          MUCH LIKE THE 2004 RETURN, IF YOU SEE AT THE TOP RIGHT ONE

24     OF THE QUESTIONS THAT IS ASKED ABOUT THIS CORPORATION FOR 2005,

25     DO YOU SEE THAT LITTLE BOX ON THE TOP RIGHT THAT SAYS, "TOTAL

1    ASSETS"?

2    A.   RIGHT.

3    Q.   AND WHAT DID MS. HOLMES LIST AS THE TOTAL ASSETS FOR STAR

4    PARTNERS SECURITY -- I'M SORRY.  WHAT DID MS. HOLMES LIST AS

5    THE TOTAL ASSETS FOR STAR PARTNERS SECURITY PARTNERS, INC., FOR

6    TAX YEAR 2005?

7    A.   ZERO.

8    Q.   AND WHAT DID SHE LIST AS THE GROSS RECEIPTS OR SALES FOR

9    STAR PARTNERS SECURITIES -- STAR PARTNERS SECURITY PARTNERS,

10   INC., 2005?

11   A.   $11,452.

12   Q.   AND THERE'S A GROSS PROFIT AGAIN OF $11,452?

13   A.   THAT'S RIGHT.

14   Q.   AND IS THERE ANY OTHER INCOME LISTED THAN THAT GROSS

15   RECEIPTS OR SALES?

16   A.   NO, THERE IS NOT.

17   Q.   AND SO THAT WINDS UP WITH A TOTAL INCOME OF $11,452;

18   CORRECT?

19   A.   CORRECT.

20   Q.   THERE ARE ALSO DEDUCTIONS THAT ARE LISTED ON THIS

21   CORPORATE INCOME TAX RETURN?

22   A.   RIGHT.

23   Q.   AND WHAT DOES IT SAY ON LINE 12 FOR POSSIBLE DEDUCTIONS

24   FOR STAR PARTNERS SECURITY PARTNERS, INC., FOR 2005?

25   A.    IT SHOWS THE COMPENSATION OF OFFICERS IS ZERO.

OERTEL DIRECT

1    Q.   AND SO -- AND THEN THE NEXT ONE WHERE IT SAYS SALARIES AND

2    WAGES, WHAT DID MS. HOLMES LIST AS SALARY AND WAGES IN TERMS OF

3    DEDUCTIONS IN 2005?

4    A.   THAT'S ALSO ZERO.

5    Q.   BUT THERE ARE SOME DEDUCTIONS; CORRECT?

6    A.   CORRECT.

7    Q.   LIKE LINE 14, REPAIRS AND MAINTENANCE?

8    A.   RIGHT, THAT'S IN THE AMOUNT OF $132.  THERE'S SOME RENTS

9    OF 838, AND THEN IT LOOKS LIKE THERE ARE NOT ANY OTHER

10   DEDUCTIONS UNTIL LINE 26 FOR OTHER DEDUCTIONS.

11   Q.   AND WHAT IS THE AMOUNT FOR LINE 6?

12   A.   $7,130.

13   Q.   AND IT SAYS ATTACHED SCHEDULE; CORRECT?

14   A.   RIGHT.

15   Q.   AND CAN YOU JUMP TO 14-5 WITHIN THIS CORPORATION INCOME

16   TAX RETURN.  AND ARE THESE THE OTHER DEDUCTIONS THAT MS. HOLMES

17   LISTED ON HER 2005 CORPORATE INCOME TAX RETURN?

18   A.   YES.

19   Q.   AND THESE ARE SOME VARIOUS CATEGORIES?

20   A.   YES.

21   Q.   BANK CHARGES, SUPPLIES, ET CETERA, CORRECT?

22   A.   RIGHT.

23   Q.   AND THERE'S A DEDUCTION FOR TOTAL MEALS AND ENTERTAINMENT

24   OF $22; CORRECT?

25   A.   RIGHT, BUT YOU'RE LIMITED TO ONLY 50 PERCENT OF IT, THAT'S

1    WHY THEY CUT IT DOWN TO 11.

2    Q.   SO AN $11 DEDUCTION FOR THAT?

3    A.   RIGHT.

4    Q.   AND YOU ADD UP THESE VARIOUS CATEGORIES.  I'M NOT GOING TO

5    ASK YOU TO WALK THROUGH EACH OF THEM, BUT YOU ADD UP THESE

6    VARIOUS CATEGORIES FOR DEDUCTIONS, AND THIS IS THE 7130 NUMBER

7    THAT APPEARS ON THE FRONT; CORRECT?

8    A.   CORRECT.

9    Q.   AND PLEASE JUMP BACK TO PAGE 14-1, PLEASE.  AND IF YOU

10   COULD BLOW UP THE SECOND HALF OF THE DOCUMENT.  ACTUALLY A

11   LITTLE BIT MORE.  THE BOTTOM HALF.

12       SO MS. HOLMES IS REPORTING INCOME OF 11,452 AND THEN SHE'S

13   REPORTING DEDUCTIONS OF $8,100; CORRECT?

14   A.   RIGHT, IF YOU ADD THOSE UP IT COMES TO THAT.

15   Q.   AND THEN THAT -- WHAT DOES THAT LEAVE AS THE TAXABLE

16   INCOME BEFORE NET OPERATING LOSS DEDUCTION AND SPECIAL

17   DEDUCTIONS?

18   A.   $3,352.

19   Q.   DID MS. HOLMES CLAIM A NET OPERATING LOSS DEDUCTION IN

20   2005?

21   A.   YES, SHE DID ON LINE 29 EQUAL TO LINE 28.

22   Q.   AND SO WHAT RESULTED TO BE -- WHAT WAS THE ULTIMATE

23   TAXABLE INCOME FOR THIS CORPORATION IN 2005?

24   A.   ZERO.

25   Q.   AND, THEREFORE, WHAT WAS THE TAX DUE THAT YEAR?

OERTEL DIRECT

1    A.   ZERO.

2    Q.   AND WERE ANY TAX PAYMENTS MADE IN 2005 FOR THIS

3    CORPORATION?

4    A.   NO, THERE WERE NOT.

5    Q.   LET'S GO TO GOVERNMENT'S EXHIBIT 12.  AND IS GOVERNMENT'S

6    EXHIBIT 12 -- AGAIN, BLOW UP AT THE TOP.  IS THIS MS. HOLMES'S

7    INDIVIDUAL INCOME TAX RETURN FOR 2006?

8    A.   YES, IT IS.

9    Q.   AND WHAT IS THE NAME AND THE ADDRESS AT THE TOP?

10   A.   MYRA HOLMES, 312 MOONRACKER DRIVE, VALLEJO, CALIFORNIA.

11   Q.   AND WHAT DID SHE LIST AS HER FILING STATUS?

12   A.   SINGLE.

13   Q.   AND IF YOU JUMP TO THE BOTTOM OF THIS DOCUMENT, THE SECOND

14   PAGE, 12-2.  AND IF YOU CAN BLOW UP THE BOTTOM PART WHERE IT

15   SAYS THIRD PARTY DESIGNEE AND SIGN HERE.

16        NOW, THERE'S NOT A HANDWRITTEN SIGNATURE ON THIS DOCUMENT;

17   CORRECT?

18   A.   THAT'S CORRECT.

19   Q.   AND DO YOU UNDERSTAND WHY THAT MAY NOT HAVE BEEN?

20   A.   WELL, THIS LOOKS LIKE IT WAS FILED ELECTRONICALLY AND FOR

21   AN ELECTRONICALLY FILED RETURN, WELL, YOU'RE NOT GOING TO HAVE

22   A SIGNATURE ON AN ELECTRONICALLY FILED RETURN.

23   Q.   OKAY.  YOUR REVIEW OF THIS EXHIBIT INDICATES THAT THIS WAS

24   AN ELECTRONICALLY FILED RETURN?

25   A.   RIGHT.

1    Q.   AND THEN THERE'S ALSO A PERSON WHO IS LISTED AS THE PAID

2    PREPARER FOR MRS. HOLMES'S 2006 INDIVIDUAL INCOME TAX RETURN;

3    CORRECT?

4    A.   RIGHT.  THAT'S DAVID DOMINGUEZ.

5    Q.   AND WHAT IS THE FIRM NAME THAT IS LISTED THERE?

6    A.   LIBERTY TAX SERVICE.

7    Q.   IN VALLEJO, CALIFORNIA?

8    A.   THAT'S RIGHT.

9    Q.   AND IF YOU WOULD ACTUALLY TAKE A LOOK AT GOVERNMENT'S

10   EXHIBIT 11, WHICH IS THE 2005 RETURN, AND GOVERNMENT'S

11   EXHIBIT 12, WHICH IS THE 2006 RETURN.  MR. DOMINGUEZ IS LISTED

12   ON BOTH RETURNS; CORRECT?

13   A.   THAT'S RIGHT.

14   Q.   AND, AGAIN, WHAT IS LISTED AS THE OCCUPATION HERE?  WHAT

15   DID MS. HOLMES LIST AS HER OCCUPATION IN THE 2006 RETURN?

16   A.   STORE WORKER.

17   Q.   AND THEN LET'S JUMP BACK TO THE FIRST PAGE OF GOVERNMENT'S

18   EXHIBIT 12.  AND CAN YOU BLOW UP THE SECTION THAT SAYS INCOME.

19   AND WHAT DID MS. HOLMES LIST FOR WAGES, SALARIES, AND TIPS FOR

20   THE TAX YEAR 2006?

21   A.   $17,447.

22   Q.   AND THIS TAX RETURN INDICATES THAT THAT WAGE CAME FROM ONE

23   SOURCE; CORRECT?

24   A.   UM --

25   Q.   IF YOU TAKE A LOOK AT PAGE 12-4?

OERTEL DIRECT

```
 1      A.   RIGHT.  THERE'S ONE W-2 IN THE AMOUNT OF THAT SAME WAGE.

 2      Q.   CAN YOU BLOW THAT UP FOR ME, PLEASE.  AND WHO WAS HER

 3      EMPLOYER?

 4      A.   THE DEFENSE FINANCE.

 5      Q.   AND THE ADDRESS IS INCLUDED IN OHIO; CORRECT?

 6      A.   RIGHT.

 7      Q.   $17,447 FOR WAGES?

 8      A.   RIGHT.

 9      Q.   AND HER NAME AND ADDRESS IS LISTED BELOW THERE; RIGHT?

10      A.   RIGHT.

11      Q.   AND LET'S JUMP BACK TO THE FIRST PAGE OF EXHIBIT 12.  AND

12      THERE IS NO INCOME LISTED.  IF YOU BLOW UP THAT INCOME SECTION,

13      THERE'S THE $3 IN TAXABLE INCOME AND CREDITS; RIGHT?

14      A.   RIGHT.

15      Q.   IS THERE ANY BUSINESS INCOME LOSS LISTED THERE?

16      A.   NO, IT'S BLANK.

17      Q.   AND WHAT ABOUT LINE 21?

18      A.   LINE 21 IS OTHER INCOME, AND THAT SHOWS AN AMOUNT OF

19      $2,500.

20      Q.   AND CAN YOU JUMP TO WHAT HAS BEEN SHOWN AS PAGE 12-3 OF

21      THIS EXHIBIT.

22      A.   OKAY.

23      Q.   AND IT SAYS HERE AT THE TOP TRANSCRIPT, T-R-P-R-T, PRINT,

24      DO NOT PROCESS.  WHAT IS THE SIGNIFICANCE OF THAT?

25      A.   THAT'S THE ABBREVIATION OF THE TYPE OF TRANSCRIPT THAT YOU
```

OERTEL DIRECT

```
 1    CAN PRINT FROM THE I.R.S. DATABASE.  IT'S CALLED A T-R-P-R-T.

 2    THAT'S JUST THE JARGON FOR IT.

 3    Q.   SO WHAT IS THIS DOCUMENT, 12-3?

 4    A.   THIS WOULD BE THE THIRD PAGE OF THE ELECTRONICALLY FILED

 5    RETURN.

 6    Q.   OKAY.

 7    A.   WHICH SHOWS THE OTHER INCOME FROM LINE 21.

 8    Q.   AND WHAT IS LISTED THERE ON LINE 21 FOR OTHER INCOME?

 9    A.   GAMBLING WINNINGS $2,500.

10    Q.   AND CAN YOU JUMP TO PAGE 3, PLEASE.  AND THIS IS ANOTHER

11    FORM W-2G THAT WE TALKED ABOUT CORRECT?

12    A.   RIGHT.

13    Q.   AND THIS IS SIMILAR TO WHAT WE TALKED ABOUT BEFORE, RIGHT?

14    A.   RIGHT, IT'S THE SAME THING.

15    Q.   AND WHAT IS THE NAME AND ADDRESS AND ON THIS W-2G?

16    A.   SAME ADDRESS, CASINO SAN PABLO, 13255 SAN PABLO AVENUE,

17    SAN PABLO, CALIFORNIA.

18    Q.   AND WHO WAS THE OWNER?

19    A.   MYRA HOLMES, 312 MOONRACKER DRIVE IN VALLEJO.

20    Q.   AND WHAT WAS THE AMOUNT OF THE GROSS WINNINGS?

21    A.   $2,500.

22    Q.   AND ON THE FURTHER RIGHT IT INDICATES THAT THIS

23    INFORMATION WAS BEING FURNISHED TO THE INTERNAL REVENUE

24    SERVICE; RIGHT?

25    A.   THAT'S RIGHT.
```

1    Q.   AND LET'S GO BACK TO PAGE 12-1.

2         SO IF YOU BLOW UP THE SECTION ON INCOME.  HER INCOME IN

3    2006 IT'S THE 17,447 THAT SHE MADE FROM THE ONE EMPLOYER;

4    CORRECT?

5    A.   RIGHT.

6    Q.   AND IT'S THE $2,500 IN GAMBLING WINNINGS; CORRECT?

7    A.   RIGHT.

8    Q.   AND IT ADDS UP TO A LITTLE ALMOST UNDER $20,000; RIGHT?

9    A.   RIGHT.

10   Q.   AND WAS ANY REPORTED SORT OF HOUSING ALLOWANCE OR ANYTHING

11   LIKE THAT?

12   A.   I DON'T KNOW WHAT IS MADE UP OF THE AMOUNT ON THE W-2, BUT

13   THE AMOUNT IS ONLY 17,447.

14   Q.   AND -- BUT THAT'S ALSO NOT FROM -- THAT'S FROM THAT ENTITY

15   THAT IS LISTED IN CLEVELAND, OHIO, THAT IS LISTED ON THAT W-2?

16   A.   RIGHT, THAT'S DEFENSE FINDINGS.

17   Q.   AND THEN SHE HAS IN ADDITION TO THE 19,000 -- SHE HAS A

18   TOTAL ADJUSTED GROSS INCOME OF 19,950; CORRECT?

19   A.   RIGHT.

20   Q.   AND SO LET'S JUMP TO THE SECOND PAGE.  AND CAN YOU BLOW UP

21   AT THE TOP AND DOES SHE CLAIM ITEMIZED DEDUCTIONS ON THIS

22   RETURN?

23   A.   YES, SHE DOES IN THE AMOUNT OF $21,238.

24   Q.   AND IF YOU DON'T MIND JUMPING TO PAGE 12-5?

25   A.   OKAY.

1    Q.   WHAT IS PAGE 12-5?

2    A.   12-5 IS THE SCHEDULE A FOR WHERE YOU LIST ALL OF YOUR

3    ITEMIZED DEDUCTIONS AND THAT'S FOR YOUR TAX YEAR 2006.

4    Q.   SO THERE'S SOME MEDICAL EXPENSES LISTED ABOUT A THOUSAND

5    DOLLARS; CORRECT?

6    A.   ACTUALLY ALL OF THE EXPENSES ARE 2006.  THERE'S A

7    LIMITATION AND IT COMES TO ABOUT 1,164.

8    Q.   AND SHE PAID -- LET ME ACTUALLY -- I'LL WITHDRAW THAT.

9         LET ME TRY TO MOVE THROUGH THIS.  LET ME JUMP TO THE

10   BOTTOM IT SAYS JOB EXPENSES AND CERTAIN MISCELLANEOUS

11   DEDUCTIONS.  DO YOU SEE THAT?

12   A.   RIGHT.

13   Q.   AND DO YOU SEE WHERE IT SAYS LINE 20?

14   A.   YES.

15   Q.   IT SAYS UNREIMBURSED EMPLOYEE EXPENSES?

16   A.   YES.

17   Q.   AND DID SHE TAKE AS A DEDUCTION ANY UNREIMBURSED EMPLOYEE

18   EXPENSES?

19   A.   NO, SHE DID NOT.

20   Q.   AND THEN THERE'S OTHER MISCELLANEOUS DEDUCTIONS THAT'S

21   LISTED ON LINE 27?

22   A.   RIGHT.  THAT'S GAMBLING LOSSES IN THE AMOUNT OF $2,500.

23   Q.   SO SHE TOOK A DEDUCTION FOR GAMBLING LOSSES IN TAX YEAR

24   2006 AS WELL; CORRECT?

25   A.   RIGHT.

OERTEL DIRECT

1    Q.   AND THAT'S LEADS TO THE TOTAL ITEMIZED DEDUCTIONS OF

2    $21,238?

3    A.   YES.

4    Q.   SO LET'S JUMP BACK TO THE PAGE 12-2.  SO IF YOU LOOK AT

5    THE TOP THE ADJUSTED GROSS TAX IS ABOUT 19,950?

6    A.   RIGHT.

7    Q.   AND THE ITEMIZED DEDUCTIONS ARE ABOUT 21,000?

8    A.   RIGHT.

9    Q.   AND WHAT DID THAT LEAVE IN TERMS OF THE DELTA BETWEEN

10   THOSE TWO NUMBERS?

11   A.   THE DIFFERENCE THERE IS $1,288.

12   Q.   AND WHAT IS THE SIGNIFICANCE OF THE NEXT NUMBER?

13   A.   LET'S SEE.  THAT'S HER PERSONAL EXEMPTION AND THAT GIVES A

14   TAXABLE INCOME OF A NEGATIVE 4,588.

15   Q.   AND THEN IT GOES DOWN TO PAYMENTS.  SO WHAT WE'RE SEEING

16   IS THAT THE DEDUCTIONS ARE MORE THAN THE INCOME; CORRECT?  AND

17   THEN YOU ADD THE EXEMPTION SO THE TAXABLE INCOME IS ACTUALLY

18   NEGATIVE FOR THE YEAR?

19   A.   THAT'S RIGHT.

20   Q.   AND THEN YOU GET TO PAYMENTS.  AND IF YOU BLOW UP THAT

21   SECTION AT THE BOTTOM THAT SAYS PAYMENTS.  AND WHAT WAS THE

22   TOTAL AMOUNT OF INCOME TAX WITHHELD IN 2006?

23   A.   $2,067.

24   Q.   AND WHAT WAS ULTIMATELY THE AMOUNT OF EITHER TAX SHE PAID

25   OR RECEIVED AFTER FILING THIS RETURN?

OERTEL DIRECT

1     A.   $2,097.

2               THE COURT:  IS THAT A PAYMENT OR A REFUND?

3               THE WITNESS:  THERE WERE TOTAL PAYMENTS OF $2,097

4     AND ALL OF THAT WAS REFUNDED TO HER.

5     BY MR. FAZIOLI:

6     Q.   SO DRAWING YOUR ATTENTION THEN TO GOVERNMENT'S EXHIBIT 15.

7     AND WHAT IS THIS DOCUMENT, GOVERNMENT'S EXHIBIT 15?

8     A.   THIS IS THE FORM 1120 U.S. CORPORATION INCOME TAX RETURN

9     FOR TAX YEAR 2006.

10    Q.   AND WHAT IS THE ENTITY THAT IS SUBMITTING THIS -- WHAT IS

11    THE CORPORATION THAT IS DISCUSSED IN THIS RETURN?

12    A.   STAR PARTNERS SECURITY PARTNERS, INC.

13    Q.   AND THAT'S THE SAME EMPLOYER IDENTIFICATION ON THE TOP

14    RIGHT THAT WE HAVE BEEN TALKING ABOUT BEFORE IN CONNECTION WITH

15    THESE OTHER TAX RETURNS BUT ALSO THE WESTAMERICA ACCOUNT;

16    CORRECT?

17    A.   THAT'S CORRECT.

18    Q.   AND THE ONE STARTING IN 94 AND ENDING IN 6?

19    A.   YES.

20    Q.   SAME DATE OF INCORPORATION?

21    A.   SAME DATE AND SAME ADDRESS AND SAME -- NO ASSETS.

22    Q.   AND THERE'S ALSO A SIGNATURE AT THE BOTTOM; CORRECT?

23    A.   YES, IT IS.

24    Q.   AND THE DATE ON THAT IS?

25    A.   6-16-08.

OERTEL DIRECT

1    Q.   AND IF YOU TAKE A LOOK AT 14 AND 15, THEY'RE ACTUALLY

2    SIGNED ON THE SAME DAY, 2005 AND 2006 RETURNS ARE SIGNED ON THE

3    SAME DATE?

4    A.   6-16-08 AND 6-16-08, THAT'S RIGHT.

5    Q.   AND THERE'S A TITLE THAT INDICATES CEO?

6    A.   CORRECT.

7    Q.   AND THE SAME ADMONITION THAT THIS IS UNDER PENALTY OF

8    PERJURY; IS THAT RIGHT?

9    A.   RIGHT.

10   Q.   AND GOING TO THE TOP GROSS RECEIPTS AND SALES FOR THE

11   INCOME SECTION.  WHAT DID MS. HOLMES REPORT AS THE GROSS

12   RECEIPTS FOR SALES OF STAR PARTNERS FOR TAX YEAR 2006?

13   A.   $10,768.

14   Q.   AND THE GROSS PROFIT IS THE SAME AMOUNT?

15   A.   SAME AMOUNT.

16   Q.   SO THE TOTAL INCOME OF $10,768; CORRECT?

17   A.   YES.

18   Q.   AND THEN THIS NEXT SECTION THAT IS DEDUCTIONS, WOULD YOU

19   BLOW THAT UP, PLEASE.  AND WHAT DID MS. HOLMES REPORT AS THE

20   COMPENSATION OF THE OFFICERS OF STAR PARTNERS?

21   A.   NOTHING.

22   Q.   AND IN 2006?

23   A.   NOTHING.

24   Q.   CORRECT.  AND WHAT ABOUT SALARIES AND WAGES LESS

25   EMPLOYMENT CREDIT?

OERTEL DIRECT

1    A.   NO, THERE'S NOTHING LISTED.

2    Q.   BUT THERE WERE SOME DEDUCTIONS THAT MS. HOLMES CLAIMED ON

3    STAR PARTNERS IN 2006; RIGHT?

4    A.   RIGHT.  REPAIRS AND MAINTENANCE 25; RENTS OF 1,125; TAXES

5    AND LICENSES OF 25; AND THEN NOTHING ELSE UNTIL LINE 26, OTHER

6    DEDUCTIONS OF 7,812.

7    Q.   AND THEN YOU'VE GOT THE TOTAL -- YOU'VE GOT OTHER

8    DEDUCTIONS AND THEN IT MAKES REFERENCE TO LINE 26; CORRECT?

9    A.   RIGHT.

10   Q.   AND SO IF YOU DON'T MIND JUMPING TO PAGE 15-5?

11   A.   OKAY.

12   Q.   AND CAN YOU BLOW THAT UP, PLEASE.  ARE THESE THE OTHER

13   DEDUCTIONS THAT MS. HOLMES CLAIMED FOR STAR PARTNERS SECURITY

14   FOR THE TAX YEAR 2006?

15   A.   THAT'S CORRECT.

16   Q.   AND, AGAIN, WHAT ARE SOME OF THESE CATEGORIES?

17   A.   THERE'S TRAVELS, MEALS, ENTERTAINMENT, THERE'S AUTO,

18   COMPUTER, INSURANCE, TELEPHONE, THINGS LIKE THAT BUT --

19   Q.   GO AHEAD.

20   A.   BUT THEY ALL COME DOWN TO EQUAL IT SHOWS THE 7,812.

21   Q.   AND THIS DOCUMENT ACTUALLY, AND THERE'S A SCHEDULE K IF I

22   JUMP TO PAGE 15-3, AND IT SAYS OTHER INFORMATION.

23   A.   YES.

24   Q.   AND IF YOU BLOW UP THAT SECTION AND THE LEFT RIGHT

25   UNDERNEATH THE SCHEDULE K.

OERTEL DIRECT

```
 1     A.   OKAY.

 2     Q.   AND IT SAYS BUSINESS ACTIVITY CODE AND THEN SECURITY AND

 3     SERVICES; CORRECT?

 4     A.   RIGHT.

 5     Q.   AND QUICKLY JUMPING BACK TO 15-1.  SO MS. HOLMES REPORTED

 6     THAT THE TOTAL INCOME FOR STAR PARTNERS SECURITY SERVICES WAS

 7     $17,800?

 8     A.   CORRECT.

 9     Q.   AND THE TOTAL DEDUCTIONS WERE $8,987, CORRECT?

10     A.   THAT'S RIGHT.

11     Q.   AND SO THAT LEFT SOME -- AT LINE 28 THERE WAS SOME TAXABLE

12     INCOME BEFORE NET OPERATING LOSS AND DEDUCTIONS; IS THAT

13     CORRECT?

14     A.   THAT'S CORRECT.

15     Q.   AND DID MS. HOLMES CLAIM A NET OPERATING LOSS DEDUCTION?

16     A.   YES, THE 1,781.  AND SO THAT GIVES HER A TAXABLE INCOME OF

17     ZERO.

18     Q.   AND IF YOU PULL DOWN TO THE BOTTOM.

19          DID MS. HOLMES PAY ANY TAX ON OR DID THE CORPORATION PAY

20     ANY TAX, STAR PARTNERS SECURITY PARTNERS, INC., AS REFLECTED ON

21     THIS REPORT?

22     A.   NO, THERE'S NOT.

23     Q.   AND WAS -- SO THERE WAS NO TAX PAID; CORRECT?

24     A.   THAT'S RIGHT.

25               MR. FAZIOLI:  I HAVE NO FURTHER QUESTIONS FOR THIS
```

```
1      WITNESS.

2              THE COURT:  CROSS-EXAMINATION?

3              MS. LIE:  NO THANK YOU, YOUR HONOR.

4              THE COURT:  MAY THIS WITNESS BE EXCUSED?

5              MS. LIE:  YES.

6              THE COURT:  YOU CAN STAND DOWN.

7              THE WITNESS:  THANK YOU.

8              THE COURT:  CAN I JUST SEE COUNSEL AT SIDE-BAR FOR A

9      MOMENT?

10         (SIDE-BAR CONFERENCE ON THE RECORD.)

11             THE COURT:  I JUST WANT TO TALK ABOUT TIMING.  YOU

12     RAISED A 9:00 O'CLOCK TIME.  DO YOU COME FROM --

13             MS. GARRIDO:  SAN FRANCISCO.

14             THE COURT:  OH, THAT'S NOT TOO BAD.  WHERE ARE WE?

15             MR. FAZIOLI:  I THINK WE NEED TO CONFER, BUT I THINK

16     I THINK WE'RE PREPARED TO REST OUR CASE.

17             THE COURT:  ALL RIGHT.

18             MS. LIE:  WE'RE ALSO TRYING TO PARE DOWN OUR CASE AS

19     WELL SO WE CAN TRY TO PUT ON EVIDENCE TOMORROW AND -- WE'RE

20     GOING TO TRY TO PUT ON OUR CASE TOMORROW AND HOPEFULLY FINISH

21     TOMORROW, BUT IF NOT, CONTINUE INTO THURSDAY.

22             THE COURT:  OKAY.  SHOULD WE START AT 9:00 O'CLOCK?

23     DOES THAT MAKE SENSE FOR YOU?

24         ANY OBJECTION?

25             MR. FONDO:  NO OBJECTION.
```

OERTEL DIRECT

1           THE COURT:  OKAY.  LET'S DO THAT.  WE'LL COME BACK

2     AT 9:00 -- IT'S HIGHLY LIKELY THAT YOU'LL REST?

3           MR. FAZIOLI:  YES.

4           THE COURT:  OKAY.  WHY DON'T WE -- I'LL TELL THEM

5     JUST BECAUSE TIMING IS SO DIFFICULT HERE, I'LL TELL THEM WE'LL

6     PROBABLY GET STARTED A LITTLE AFTER 9:00 BECAUSE THERE MAY BE

7     SOME THINGS THAT YOU NEED TO TALK ABOUT REGARDING WITNESSES.

8     I'M JUST GUESSING THAT THERE MIGHT BE SOME DISCUSSION ABOUT

9     THAT.

10          OKAY.  ALL RIGHT.

11          THANK YOU, COUNSEL.

12          (END OF DISCUSSION AT SIDE-BAR.)

13          THE COURT:  FOLKS, WE'RE GOING TO TAKE OUR EVENING

14    RECESS NOW, AND I'M GOING TO ASK YOU TO COLLECT YOURSELVES.  I

15    THINK WE CAN -- HOPEFULLY WE CAN CALL YOU AND HAVE YOU COME

16    INTO COURT AT ABOUT 9:15.  SO IF YOU WOULD GATHER BY 9:00

17    O'CLOCK TOMORROW, NOT 8:30, 9:00 O'CLOCK, I THINK WE CAN GET

18    YOU STARTED BY 9:15.  I THINK WE ARE ON SCHEDULE, COUNSEL.  IT

19    SOUNDS LIKE WE'RE MOVING APPROPRIATELY SO.

20          MR. FONDO:  THAT'S FINE.

21          THE COURT:  SO I JUST NEED TO TALK TO THE LAWYERS A

22    LITTLE BIT TOMORROW MORNING ABOUT SOME OTHER FINAL MATTERS.

23          SO HAVE A GOOD EVENING.  WE'LL SEE YOU TOMORROW.  WE'LL BE

24    IN RECESS.

25          (COURT CONCLUDED AT 4:58 P.M.)

1

2

3                        CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16    _____
      IRENE RODRIGUEZ, CSR, CRR
      CERTIFICATE NUMBER 8076

17

18         DATED:  OCTOBER 29, 2013

19

20

21

22

23

24

25