1

UNITED STATES DISTRICT COURT

2

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

3

4     UNITED STATES OF AMERICA,

5              PLAINTIFF,              CASE NO.  CR-09-0930-EJD

6       VS.                           SAN JOSE, CALIFORNIA

7     MYRA HOLMES,                     MARCH 13, 2013

8              DEFENDANT.              VOLUME 8

9                                      PAGES 1308 - 1526

10

11                  TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE EDWARD J. DAVILA

12              UNITED STATES DISTRICT JUDGE

13

A-P-P-E-A-R-A-N-C-E-S

14

15    FOR THE PLAINTIFF:    OFFICE OF THE UNITED STATES ATTORNEY

BY:   JOSEPH FAZIOLI

16                          GRANT FONDO

150 ALMADEN BOULEVARD

17                          SUITE 900

SAN JOSE, CALIFORNIA 95113

18

19    FOR THE DEFENDANT:    OFFICE OF THE FEDERAL PUBLIC DEFENDER

BY:   DIANA GARRIDO

20                          CYNTHIA LIE

160 W. SANTA CLARA STREET

21                          SUITE 575

SAN JOSE, CALIFORNIA 95113

22

23    OFFICIAL COURT REPORTER:    IRENE L. RODRIGUEZ, CSR, CRR

CERTIFICATE NUMBER 8074

24

25         PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY,

TRANSCRIPT PRODUCED WITH COMPUTER.

A P P E A R A N C E S: (CONT'D)


ALSO PRESENT:              FEDERAL BUREAU OF INVESTIGATION
                           BY:  ERIN WHITCHURCH
                           1919 S. BASCOM AVENUE, SUITE 400
                           CAMPBELL, CALIFORNIA 95008

                           OFFICE OF THE UNITED STATES ATTORNEY
                           BY:   LAKISHA HOLLIMAN, PARALEGAL
                           150 ALMADEN BOULEVARD
                           SUITE 900
                           SAN JOSE, CALIFORNIA 95113

                           OFFICE OF THE FEDERAL PUBLIC DEFENDER
                           BY:   MARY JANE SCHNEIDER, PARALEGAL
                           160 W. SANTA CLARA STREET
                           SUITE 575
                           SAN JOSE, CALIFORNIA 95113

1310

1

INDEX OF PROCEEDINGS

2

3      FOR THE DEFENDANT:

4

**MYRA HOLMES**
5          DIRECT EXAM BY MS. GARRIDO              P. 1381
           CROSS-EXAM BY MR. FAZIOLI               P. 1440

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

INDEX OF EXHIBITS

2

3

                                          IDENT.        EVIDENCE
4       GOVERNMENT'S:

5       236                                              1502
        237                                              1503
6       238                                              1504

7

8       DEFENDANT'S:

9       M                                                1387
        U                                                1399
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      SAN JOSE, CALIFORNIA                    MARCH 13, 2013

 2                    P R O C E E D I N G S

 3          (JURY OUT AT 9:21 A.M.)

 4              THE COURT:  WE'RE ON THE RECORD IN UNITED STATES

 5      VERSUS HOLMES.  COUNSEL AND MS. HOLMES IS PRESENT.  THE JURY IS

 6      NOT PRESENT.

 7          WE'LL BRING THEM OUT MOMENTARILY.  ANYTHING THAT COUNSEL

 8      WOULD LIKE TO ADDRESS BEFORE WE BRING OUR JURY OUT?

 9              MR. FAZIOLI:  YES, YOUR HONOR.  THERE WERE A COUPLE

10      OF ISSUES THAT WE WANTED TO RAISE.

11          ONE IS THAT WE HAVE FILED OUR OPPOSITION TO THE DEFENSE'S

12      RENEWED MOTION TO ADMIT THE HEARSAY DECLARATION OF

13      LEONARD PAIGE.  WE ARE HAPPY TO DISCUSS THAT AT THIS TIME OR AT

14      A TIME THAT IS CONVENIENT TO THE COURT.

15          WE DO THINK THAT IT'S IMPORTANT WHEN THE DEFENSE IS

16      PRESENTING ITS CASE THAT IT NOT BE ALLOWED TO GET INTO THE

17      HEARSAY STATEMENTS OF LEONARD PAIGE BOTH IN TERMS OF THAT

18      DOCUMENT BUT ALSO IN TERMS OF SOME OF THE OTHER WITNESSES THAT

19      HAVE BEEN PROFFERED BY THE DEFENSE, NUMBER ONE.

20          NUMBER TWO, THE SECOND ISSUE IS THAT THERE HAS BEEN

21      REPRESENTED THAT THERE WILL BE A NUMBER OF CHARACTER WITNESSES

22      THAT WOULD COME, OR OTHER WITNESSES OTHER THAN THE DEFENDANT

23      WHO ARE GOING TO TESTIFY.

24          WE HAVE CONCERNS UNDER 105 ABOUT WHAT THE PROPER SCOPE OF

25      THEIR TESTIMONY WOULD BE AND BASED ON SOME OF THE REPORTS THAT
```

1    WE WERE PROVIDED ABOUT THOSE WITNESSES, IT DOES SEEM LIKE SOME

2    OF THE AREAS OR THEIR ANTICIPATED AREAS OF TESTIMONY ARE

3    OUTSIDE OF THE SCOPE OF SOME OF THE COURT'S IN LIMINE ORDERS

4    ARE NOT REALLY APPROPRIATE AREAS FOR CHARACTER TESTIMONY, AND

5    WE WOULD WANT TO FLUSH THAT OUT BEFORE THEY CAME IN AND TOOK

6    THE STAND.

7        THIRD, WE JUST RECEIVED FOR THE FIRST TIME A LIST OF SOME

8    DEFENSE EXHIBITS.  I'M NOT ENTIRELY SURE WHAT THE FOUNDATIONAL

9    BASIS IS FOR SOME OF THESE BUT LOOKING AT THEM RIGHT NOW, SOME

10   OF THEM WOULD SEEM OBJECTIONABLE, AND WE DON'T KNOW IF IT WOULD

11   BE EASIER TO SORT OF WALK THROUGH THEM NOW TO TRY TO REGISTER

12   OUR OBJECTIONS OR GET A SENSE OF WHETHER THIS IS SOMETHING THAT

13   SHOULD BE ALLOWED OR NOT AS OPPOSED TO HAVE CONSTANT SIDE-BARS

14   DURING TESTIMONY IN PART BECAUSE WE DIDN'T RECEIVE THIS UNTIL

15   THIS MORNING.

16       AND, LASTLY, THERE WAS THIS INTERESTING MOTION THAT WAS

17   FILED REGARDING THE STATEMENT I MADE IN THE COURSE OF

18   ADVOCATING WHETHER THE EXPERT IS GOING TO SOMEHOW GOING TO BE

19   EVIDENCE.  WE WOULD OBJECT TO THAT, AND WE THINK THAT'S

20   SOMETHING THAT SHOULD BE FLUSHED OUT, FRANKLY, AS IT WOULD

21   INFORM OTHER ASPECTS OF THE CASE.  ALTHOUGH WE THINK IT'S

22   MERITLESS FOR A NUMBER OF DIFFERENT REASONS.

23           THE COURT:  OKAY.  YOU JUST RECEIVED EXHIBITS TODAY.

24   DID WE RECEIVE EXHIBITS?  DID WE GET A BINDER?

25           THE CLERK:  YES.

1          THE COURT:  WE RECEIVED THAT THIS MORNING AS WELL?

2          THE CLERK:  YES.

3          MR. FAZIOLI:  FRANKLY, IT WOULD BE HELPFUL TO HAVE A

4    LITTLE TIME TO REVIEW THESE BEFORE THE TESTIMONY BEGINS, BUT

5    WE'LL DO IT NOW.

6          THE COURT:  DO YOU INTEND TO INTRODUCE THESE

7    EXHIBITS OR USE THESE IN YOUR CASE?

8          MS. GARRIDO:  YES.

9          THE COURT:  HOW MUCH TIME DO YOU NEED?

10          MR. FAZIOLI:  I THINK POSSIBLY 20 MINUTES OR HALF AN

11    HOUR MIGHT BE HELPFUL.

12          THE COURT:  WELL, I THINK IT'S APPROPRIATE TO ALLOW

13    EITHER SIDE TO REVIEW DOCUMENTS AND PARTICULARLY IN THIS CASE

14    BEFORE ANY TESTIMONY IS GIVEN REGARDING THIS.

15          MR. FAZIOLI:  AND IF I MAY SUGGEST SOMETHING IN

16    LIGHT OF THE NATURE, WE HAVE BEEN REQUESTED RECIPROCAL

17    DISCOVERY NUMEROUS TIMES OVER THE PAST SEVERAL YEARS, AND THESE

18    ARE MATERIALS THAT WE'RE JUST GETTING THIS MORNING.

19      I THINK IT MIGHT BE HELPFUL BEFORE WE REVIEW THESE

20    MATERIALS TO POSSIBLY GET A BRIEF OFFER OF PROOF FROM THE

21    DEFENSE ABOUT WHAT THESE EXHIBITS ARE BEING INTENDED FOR, AND

22    THEN WE CAN CONSIDER THAT AND COME BACK AND RAISE A QUESTION OF

23    WHETHER WE HAVE ANY SORT OF OBJECTIONS.

24      OTHERWISE WE'RE SIMPLY SPECULATING ABOUT WHAT THESE

25    DOCUMENTS ARE INTENDED FOR.

1        HAD THESE BEEN PROVIDED AHEAD OF TIME, WE WOULD HAVE HAD

2   AN OPPORTUNITY TO LOOK AT IT AND POSSIBLY OBJECT, BUT WE'RE

3   JUST GETTING THEM RIGHT NOW.

4        THE COURT:  COUNSEL?

5        MS. LIE:  YOUR HONOR, EXHIBITS A THROUGH J ARE ALL

6   TAKEN FROM DISCOVERY THAT HAS BEEN PROVIDED TO US BY THE

7   GOVERNMENT.

8        A NUMBER OF THESE WERE IDENTIFIED DURING THE EXAMINATION

9   OF VARIOUS GOVERNMENT WITNESSES, AND WE WOULD BE MOVING TO

10  ADMIT THEM AT THIS TIME, INCLUDING ON AN UNRELATED POINT

11  EXHIBIT F, WHICH PREVIOUSLY HAD BEEN OBJECTED TO BY THE

12  GOVERNMENT.  I UNDERSTAND THAT THE GOVERNMENT IS WITHDRAWING

13  ITS OBJECTION AT THIS TIME.

14       AS FAR AS K, N, Q, R, S, THESE ARE ESSENTIALLY

15  PHOTOGRAPHIC MATERIALS THAT HAVE BEEN PROVIDED BY MS. HOLMES'S

16  FAMILY.  THEY DON'T CONTAIN MUCH IN THE WAY OF ACTUAL

17  INFORMATION, IF ANYTHING.  I THINK THEY WILL BECOME RELEVANT

18  DURING THE TESTIMONY OF DEFENSE WITNESSES FOR A VARIETY OF

19  REASONS TO BOLSTER FACTUAL TESTIMONY THAT THEY PROVIDE AND THAT

20  SORT OF THING, BUT I DON'T THINK THAT THERE'S GOING TO BE

21  ANYTHING PARTICULARLY CONTROVERSIAL ABOUT THE CONTENT OF THEM,

22  WHETHER OR NOT THE GOVERNMENT CONSENTS TO THEIR ADMISSIBILITY.

23       L LIKEWISE WAS A DOCUMENT FROM THE GOVERNMENT'S EXHIBITS

24  16, WHICH HAS ALREADY BEEN ADMITTED.

25       P LIKEWISE FROM -- O AND P BOTH FROM GOVERNMENT'S

```
 1        EXHIBIT 58, WHICH HAS PREVIOUSLY BEEN ADMITTED.

 2             AND THEN M IS A DOCUMENT THAT WE RECEIVED LAST WEEK FROM

 3        THE CITY AND COUNTY OF SAN FRANCISCO.  IT'S SIMPLY BUSINESS

 4        REGISTRATION DATA REFLECTING THE REGISTRATION OF MS. HOLMES'S

 5        BUSINESS.

 6             WE E-MAILED THAT A FEW DAYS AGO TO GOVERNMENT COUNSEL

 7        ALONG WITH THE DECLARATION OF CUSTODIAN OF RECORDS.

 8             YOUR HONOR, I WOULD ALSO INDICATE THAT MS. SCHNEIDER HAD

 9        SENT OVER DIGITAL COPIES OF ALL OF THESE, INCLUDING THE ONES

10        THAT HAD BEEN PREVIOUSLY ADMITTED AS GOVERNMENT'S EXHIBIT OR

11        PREVIOUSLY BEEN REFERENCED DURING EXAMINATION OF GOVERNMENT

12        WITNESSES BY THE DEFENSE TO THE GOVERNMENT, ALBEIT LATE

13        YESTERDAY.  I WOULD ALSO NOTE THAT IT HAS NOT BEEN UNCOMMON FOR

14        THE DEFENSE TO BE RECEIVING INFORMATION SUCH AS THE DOCUMENTS

15        PREPARED BY MR. JOHNSON ON A SIMILAR SCHEDULE.

16             THESE, IN CONTRAST, ARE NOT TEXT HEAVY DOCUMENTS OR DATA

17        HEAVY DOCUMENTS IN ANY WAY.

18                  THE COURT:  MR. JOHNSON PREPARED THE CHARTS; RIGHT?

19                  MS. LIE:  THAT'S CORRECT.

20                  THE COURT:  AND I THINK YOU MADE INQUIRY ABOUT THOSE

21        EARLIER, AND I ASKED THE GOVERNMENT AND AT THAT TIME THEY HAD

22        NOT BEEN PREPARED; IS THAT RIGHT?

23                  MR. FAZIOLI:  WE PROVIDED MATERIALS AND

24        SPREADSHEETS.  MR. JOHNSON TESTIFIED YESTERDAY AND ON TUESDAY,

25        AND WE PROVIDED MATERIALS AND SPREADSHEETS ON SUNDAY EVENING.
```

```
 1      WE THEN PROVIDED THE ACTUAL EXHIBITS THAT MR. JOHNSON WAS GOING

 2      TO TESTIFY TO ON MONDAY, AND WE ALSO INDICATED TO DEFENSE

 3      COUNSEL THAT IF THEY NEEDED SOME TIME TO REVIEW THOSE CHARTS,

 4      THAT WE WOULD BE OPEN TO GIVING THEM AN OPPORTUNITY TO DO THAT.

 5           AND AS I UNDERSTAND IT THERE WAS NO OBJECTION RAISED TO

 6      THE TIMING ISSUE IN THAT REGARD.  GOVERNMENT COUNSEL DID NOT

 7      RECEIVE THESE MATERIALS UNTIL THIS MORNING.  AND I --

 8              THE COURT:  WELL, WITH THE EXPLANATION OF MS. LIE

 9      REGARDING THESE, THAT SHOULD ASSIST YOU IN YOUR REVIEW OF THEM

10      THIS MORNING I TAKE IT?

11              MR. FAZIOLI:  IT SHOULD.  IT SHOULD.  AND I THINK WE

12      CAN TRY TO REVIEW THESE EXPEDITIOUSLY AND THEN COME BACK AND

13      DISCUSS POTENTIAL OBJECTIONS AT THAT POINT.

14              THE COURT:  OKAY.  ARE YOU GOING TO REST THIS

15      MORNING?  DO YOU HAVE ANY ADDITIONAL WITNESSES TO CALL, THE

16      GOVERNMENT?

17              MR. FAZIOLI:  NO.

18              THE COURT:  AND THEN YOU HAVE WITNESSES AVAILABLE TO

19      CALL NOW?

20              MS. GARRIDO:  YES.

21              THE COURT:  AND WOULD YOUR WITNESSES NECESSARILY BE

22      EXAMINED REGARDING ANY OF THESE EXHIBITS?

23              MS. GARRIDO:  YES.

24              THE COURT:  ALL RIGHT.  WELL, LET'S TELL OUR JURY

25      WE'LL HAVE UNTIL 10:00 O'CLOCK, AND WE'LL BREAK UNTIL 10:00
```

```
1      O'CLOCK.  IT'S NOW 9:30.  AND WE'LL HAVE TO TELL THEM THAT

2      WE'LL RESUME AT 10:00 O'CLOCK.  WE'LL HAVE TO GIVE THE

3      GOVERNMENT AN OPPORTUNITY TO REVIEW THESE DOCUMENTS.

4           IN THE INTERIM, LET'S TALK ABOUT OTHER ISSUES.  THERE'S A

5      MOTION THAT I THINK I RECEIVED THIS MORNING FROM THE DEFENSE TO

6      INTRODUCE A STATEMENT THAT WAS MADE BY MR. FAZIOLI DURING A

7      HEARING IN REGARDS TO EVIDENCE HERE.  AND YOU'RE SEEKING, THE

8      DEFENSE IS, IS SEEKING TO INTRODUCE THAT AS A STATEMENT OF A

9      PARTY OPPONENT?

10               MS. GARRIDO:  THAT'S CORRECT.

11               THE COURT:  WHO IS ARGUING THAT?

12               MS. LIE:  I WILL.

13               THE COURT:  OKAY.  WHAT ELSE WOULD YOU LIKE ME TO

14     KNOW IN FAVOR OF THAT MOTION?

15               MS. LIE:  YOUR HONOR, I'M PREPARED TO SUBMIT IT

16     ON -- WELL, I THINK THAT OUR BRIEFING COVERS IT ESSENTIALLY.  I

17     DO BELIEVE UNDER THE CIRCUMSTANCES THAT THIS IS INFORMATION

18     THAT IS AS CLEARLY A STATEMENT OF A PARTY OPPONENT AS ANYTHING

19     THAT WE HAVE HAD IN THIS CASE OTHER THAN STATEMENTS OF

20     MS. HOLMES'S PERSONALLY ELSEWHERE.

21          I THINK THAT THE GOVERNMENT MADE NOTE OF THE ISSUE OF

22     THE -- THE RELEVANCE OF THE AGENCY RELATIONSHIP BETWEEN

23     COUNSEL.  IN THEIR ARGUMENT IT WAS MR. LIEDERMAN AND THEIR

24     CLIENT AND POINTED OUT, IN FACT, THAT STATEMENTS OF COUNSEL

25     WERE PROPERLY ATTRIBUTED TO THE PARTY BEING REPRESENTED.
```

1          AND IN THIS CASE WE HAVE ESSENTIALLY THE IDENTICAL, THE

2     IDENTICAL SITUATION.

3          THE FACTS OF THE -- THE FACT OF THE STATEMENT IS READILY

4     ASCERTAINABLE AS IS, YOU KNOW, ANY READ BACK THAT IS AVAILABLE

5     TO THE JURY OR TO THE COURT UPON REQUEST AND CERTAINLY A COMMON

6     OCCURRENCE.

7          AND THE RELEVANCE OF THAT STATEMENT GOES DIRECTLY TO ONE

8     OF THE DISPUTED ELEMENTS AND A PARTICULAR FACTOR THAT THE

9     GOVERNMENT HAS MADE MUCH OF WHICH IS WHETHER THE ADVERSARY

10    PROCEEDING THAT WAS INITIATED BY THE TRUSTEE WOULD BE CONSTRUED

11    AS A LAWSUIT.

12         I THINK THAT THE VERY FACT THAT THE GOVERNMENT WAS

13    INSISTING INITIALLY UPON PRESENTING EXPERT TESTIMONY AND ITS

14    ARGUMENTS IN FAVOR OF THAT ARE ABSOLUTELY FAIR GAME FOR THE

15    JURY TO BE APPRISED OF BECAUSE IT DOES GO TO THE FACTOR OF --

16    ONE OF THE FACTORS THAT THEY WILL BE CALLED UPON TO DECIDE.

17              THE COURT:  OKAY.  DOES THE GOVERNMENT WISH TO BE

18    HEARD?

19              MR. FAZIOLI:  WE THINK THE ARGUMENT IS COMPLETELY

20    MERITLESS FOR HALF A DOZEN REASONS.  IF THE COURT WOULD WISH US

21    TO GO THROUGH THOSE REASONS?

22              THE COURT:  WELL, I'LL GIVE YOU AN OPPORTUNITY TO

23    PUT YOUR OBJECTIONS, IF YOU HAVE THEM, ON THE RECORD.

24              MR. FAZIOLI:  YES.  A COUPLE OF THINGS.  FIRST OF

25    ALL, THE ARGUMENTS OF COUNSEL ARE NOT AN ASSERTION OF FACT,

1    AND, THEREFORE, NOT AN 802 -- 801(D)(2) ADMISSION.

2         TO THE EXTENT THAT THIS ARGUMENT WOULD GET ANY KIND OF

3    CREDENCE, THE GOVERNMENT SHOULD BE EQUALLY JUSTIFIED IN

4    INTRODUCING STATEMENTS MADE BY DEFENSE ATTORNEYS AT ANY

5    PRETRIAL HEARING TO THE JURY.

6         THE DEFENSE HAS NOT SUBMITTED A TRANSCRIPT OF WHAT WAS

7    ACTUALLY SAID.  I THINK THERE WAS A CONCERN THAT THERE MAY BE A

8    MISCHARACTERIZATION OF WHAT WAS SAID IN THE GOVERNMENT'S

9    POSITION BY TAKING A SENTENCE POTENTIALLY OUT OF CONTEXT.

10        TO THE EXTENT THAT IT'S MY RECOLLECTION, WITHOUT THE

11   BENEFIT OF THE TRANSCRIPT, IS THAT THE DISCUSSION ABOUT THIS

12   WAS MADE IN THE DISCUSSION OF WHY A LAYMEN JUROR WOULD BENEFIT

13   FROM EXPERT TESTIMONY REGARDING A 363(H) LAWSUIT.

14        THAT IS DIFFERENT IN KIND FROM ANY SORT OF CONCESSION THAT

15   THIS DEFENDANT WAS CONFUSED ABOUT THIS 363(H) LAWSUIT.

16        THE STATEMENT WAS CERTAINLY NOT WHAT ARE CATEGORIZED IN

17   SOME OF THE CASE LAW AS ASSERTIONS OF FACT THAT ARE THE

18   EQUIVALENT OF A TESTIMONY STATEMENT BY THE UNITED STATES.  IT'S

19   APPLES AND ORANGES.  I THINK TO SOME EXTENT THIS IS

20   MISCATEGORIZING WHAT WAS SAID IN THE CONTEXT OF WHAT WAS SAID.

21        THE GOVERNMENT WAS NOT ALLOWED TO PRESENT THE EXPERT

22   OPINION ANYWAY.  THE COURT DECIDED THAT WE WERE NOT ALLOWED TO

23   PRESENT THE EVIDENCE FROM AN EXPERT THAT A 363(H) COMPLAINT WAS

24   A LAWSUIT.

25        SO THE STATEMENT THAT WAS MADE BY THE GOVERNMENT IN

1    ADVOCACY HAS NO RELEVANCE.  EVEN IF WE HAD BEEN ABLE TO PRESENT

2    THAT TESTIMONY AND MAKE THAT OPINION, THE STATEMENT BY THE

3    PROSECUTOR WOULD HAVE NO PROBATIVE VALUE UNDER RULE 401.

4         TO ADMIT A STATEMENT BY A PROSECUTOR THAT WAS MADE IN THE

5    COURSE OF ADVOCATING FOR A PARTICULAR ISSUE, TO ADMIT THAT AS

6    EVIDENCE WOULD BE COMPLETELY CONTRARY TO THE LETTER AND PURPOSE

7    OF THE INSTRUCTION THAT THIS COURT WOULD MAKE TO THE COURT THAT

8    WHAT PROSECUTORS SAY IS NOT EVIDENCE.

9         YOU WOULD HAVE A CIRCUMSTANCE WHERE ONE FRAGMENT WOULD BE

10   EVIDENCE BUT OTHER THINGS THAT ARE SAID ARE NOT EVIDENCE.  IT'S

11   CONTRARY TO THE PURPOSE OF THE INSTRUCTION, AND IT WOULD BE

12   CONFUSING.

13        THE CASES THAT THE DEFENDANT CITES GENERALLY INVOLVE

14   PROSECUTORIAL ARGUMENTS IN A PRIOR JURY TRIAL THAT WERE MADE TO

15   A JURY THAT WERE INCONSISTENT WITH THE GOVERNMENT'S THEORY IN A

16   CONSISTENT TRIAL, NOT STATEMENTS THAT WERE MADE OUTSIDE OF THE

17   PRESENCE OF THE JURY.

18        THERE WOULD BE A SUBSTANTIAL CHILLING EFFECT AND OTHER

19   EFFECTS BY USING IT AS EVIDENCE AGAINST THE GOVERNMENT A

20   STATEMENT, OR OTHER PARTIES, MADE DURING THE COURSE OF

21   LITIGATION OUTSIDE OF THE PRESENCE OF THE JURY.

22        THERE'S A CASE LAW.  THERE IS A CASE UNITED STATES VERSUS

23   KENDRICK AND IT'S AN ELEVENTH CIRCUIT CASE, 682 F.3D 974, 2012,

24   AND THERE IS ALSO THE DELOACH CASE ON THE ELEVENTH CIRCUIT.

25   THERE ARE A LOT OF DIFFERENT PROCEDURAL HURDLES THAT ARE

```
1        NECESSARY TO INTRODUCE A PROSECUTOR'S STATEMENT AND NONE OF

2        WHICH APPEAR TO BE MET HERE.

3             AND, FINALLY, IF THERE EVEN WEREN'T SUCH PROCEDURAL

4        HURDLES FOR INTRODUCING A PROSECUTOR'S STATEMENT IN EVIDENCE,

5        THE MERE RULE 403 ANALYSIS WOULD MERIT THE EXCLUSION OF THE

6        STATEMENT.  IT HAS NO PROBATIVE VALUE.  AND IT WOULD BE HIGHLY

7        CONFUSING AND WASTING OF TIME.

8             THERE'S CASE LAW THAT DISCUSSES ABOUT HOW THE JURY COULD

9        BE CONFUSED ABOUT AN ESTOPPEL EFFECT AND EVEN IF THE STATEMENT

10       WAS INTRODUCED, THE GOVERNMENT WOULD BE ENTITLED TO AN

11       OPPORTUNITY TO EXPLAIN AWAY THE DEFENDANT'S INFERENCE IS FROM A

12       STATEMENT WHICH WOULD REQUIRE THAT THE JURY BE INFORMED OF THE

13       EVIDENCE INTRODUCED AND THE ARGUMENTS MADE AT THE PRIOR TRIAL,

14       WHICH WOULD BE UNDULY TIME-CONSUMING AND MIGHT CREATE A

15       SITUATION WHICH GOVERNMENT COUNSEL WOULD HAVE TO BE MAKING AN

16       ARGUMENT EXPLAINING A PIECE OF EVIDENCE REGARDING WHAT THEY

17       MADE.

18            FOR THAT AND OTHER REASONS THE MOTION IS COMPLETELY

19       MERITLESS AND SHOULD BE DENIED.

20                 THE COURT:  MS. LIE, DO YOU HAVE A RESPONSE, IF YOU

21       WISH?

22                 MS. LIE:  YOUR HONOR, THE GOVERNMENT'S ARGUMENT THAT

23       THE STATEMENT WASN'T EVIDENCE AT THE TIME IT WAS MADE IT WAS

24       ARGUMENT AND NOT EVIDENCE AT THE TIME IT WAS MADE, AND,

25       THEREFORE, IT CAN'T BECOME EVIDENCE LATER ON IS BELAYED BY THE
```

1        CASES THAT ARE CITED BY THE DEFENSE IN THOSE PAPERS.

2            IN THOSE SITUATIONS, NOTWITHSTANDING THE FACT THAT IT'S A

3        PRIOR JURY TRIAL, IT'S NONETHELESS ARGUMENT OF COUNSEL, AND IN

4        THAT PROCEEDING WAS NOT EVIDENCE AT THAT TIME BUT BECAME

5        EVIDENCE BY VIRTUE OF ITS RELEVANCE IN A LATER PROCEEDING.

6            WE HAVE EXACTLY THE SAME COMMENT HERE.  THE FACT THAT IT

7        WAS MADE IN A CONTEXT OF ARGUING ABOUT WHAT A LAY JUROR WOULD

8        BELIEVE DOESN'T PROVIDE A BASIS FOR DISTINGUISHING ITS

9        RELEVANCE AS TO MS. HOLMES AND THE ELEMENT THAT THE JURY IS

10       GOING TO BE CALLED UPON TO DECIDE AS TO MS. HOLMES.

11           IT IS A CIRCUMSTANCE WHERE THERE IS NO BASIS AND THERE

12       WILL BE NO BASIS AFTER THE PRESENTATION OF THE GOVERNMENT'S

13       CASE TO DISTINGUISH MS. HOLMES'S GENERAL KNOWLEDGE AND

14       FAMILIARITY WITH BANKRUPTCY LAW FROM THE SITUATION OF A TYPICAL

15       JUROR.

16           AND SO IF THAT'S A FOUNDATIONAL CONCERN THAT THE

17       GOVERNMENT HAS THAT THERE MIGHT POTENTIALLY BE EVIDENCE THAT

18       WOULD DISTINGUISH MS. HOLMES AND ESTABLISH SOME EXPERTISE, I

19       CAN PRESENT IT TO THE COURT THAT WE WILL NOT BE PROFFERING ANY

20       SUCH EVIDENCE AND THE GOVERNMENT WILL BE HARD PRESSED TO ELICIT

21       SUCH EVIDENCE FROM ANY OF THE DEFENSE WITNESSES.

22           AND SO AT THIS POINT I UNDERSTAND THE GOVERNMENT'S

23       DISCOMFORT ABOUT THEIR STATEMENTS BEING USED AGAINST THEM, AND

24       I RESPECT THAT, HOWEVER, THERE'S NOTHING ABOUT THEIR FACTUAL

25       ASSERTION IN THE COURSE OF ARGUMENT THAT THIS INFORMATION, THEY

1    RECOGNIZE, WOULD BE HARD FOR A LAYPERSON TO UNDERSTAND AND THIS

2    IS A DISTINCTION BETWEEN THE ADVERSARY PROCEEDING UNDER THE

3    BANKRUPTCY CODE VERSUS AN ACTUAL LAWSUIT THAT THIS WOULD BE A

4    CONCEPT THAT REQUIRES EXPERT EXPLICATION, SOMETHING ABOUT THAT

5    FACTUAL ASSERTION THAT IS SOMEHOW PROTECTED BECAUSE IT WAS MADE

6    DURING THE COURSE OF ARGUMENT IF IT IS, IN FACT, RELEVANT TO

7    THE ISSUE AT HAND.

8        AND THE ONLY BARRING OF ADMISSIBILITY IS REALLY WHETHER

9    IT'S HEARSAY OR NOT, AND IT'S CLEARLY NOT GIVEN THE

10   RELATIONSHIP BETWEEN THE AGENCY AND GOVERNMENT COUNSEL AND THE

11   GOVERNMENT GENERALLY AND THE READY ASCERTAINMENT OF THE CONTENT

12   OF THE STATEMENT.

13       YOU'RE CORRECT, WE DO NOT HAVE A TRANSCRIPT OF IT.  WE

14   WON'T HAVE A TRANSCRIPT OF DEFENSE WITNESS OR GOVERNMENT

15   WITNESS TESTIMONY THAT THE JURY MIGHT ASK TO BE READ BACK.

16       TO THE EXTENT THAT THE GOVERNMENT QUESTIONS OUR RECITATION

17   OF THE STATEMENT AND OUR CHARACTERIZATION OF IT, THEY'RE

18   CERTAINLY WELCOME TO NOTE WHAT THEY THINK IS INCORRECT ABOUT

19   THIS OTHER THAN MERELY THE CONTEXT.  AND I'M NOT HEARING THAT

20   FROM THEM.

21           THE COURT:  ALL RIGHT.  THANK YOU.  WELL, IT'S AN

22   INTERESTING MOTION, AND I CERTAINLY UNDERSTAND WHY THE DEFENSE

23   WOULD BRING THE MOTION.  I DON'T THINK IT FITS, THE FACTS THAT

24   YOU INDICATED IN THE PLEADINGS DON'T FIT, THE FOUR CORNERS OF

25   OUR LAWSUIT HERE AND WHAT HAS HAPPENED IN OUR CASE HERE.

```
 1          IN ESSENCE THERE WAS A HEARING REGARDING WHETHER OR NOT

 2     THE GOVERNMENT'S EXPERT WOULD BE PERMITTED TO TESTIFY AND AS TO

 3     WHAT ISSUES AND THE STATEMENTS, ALBEIT NOT SPECIFIC IN YOUR

 4     MOTION, BUT YOU GENERALLY TALK ABOUT WHAT MR. FAZIOLI HAD SAID,

 5     OR WHAT YOU BELIEVE THE DEFENSE BELIEVES HE SAID, AND THOSE

 6     STATEMENTS IN THE CONTEXT OF ADVOCATING THE COURT TO ALLOW THEM

 7     TO PUT ON CERTAIN EVIDENCE.

 8          THE DEFENSE ADVOCATED AGAINST THAT, AND THE DEFENSE WON

 9     THAT ISSUE.  AND I DIDN'T ALLOW THE GOVERNMENT TO GO FORWARD

10     WITH THAT PARTICULAR EVIDENCE AS EXPERT EVIDENCE.

11          I DON'T THINK THE COMMENTS IN THE CONTEXT OF THAT COLLOQUY

12     REGARDING THAT PARTICULAR ISSUE REALLY FOLLOW THE CONTEXT IN

13     THE FOUR SQUARES OF CASES THAT YOU CITE.  I THINK THEY'RE

14     DIFFERENT CIRCUMSTANCES HERE.

15          COUNSEL ARE ENTITLED TO CHANGE THEIR MINDS ABOUT THEIR

16     EVIDENCE, CHANGE THEIR ARGUMENTS IN THE MIDDLE OF THE CASE,

17     PERHAPS, AND TO ALLOW EITHER SIDE TO THEN GET THAT EVIDENCE IN

18     UNDER THOSE CIRCUMSTANCES.

19          I THINK IT HAPPENS.  AND IT DOES, UNDER A 403 ANALYSIS,

20     CREATE A SITUATION WHERE IT WOULD BE MORE TIME-CONSUMING AND

21     CERTAINLY CONFUSING TO A JURY TO ALLOW COUNSEL TO THEN ARGUE

22     THE MERITS OF THOSE CASES IN THEIR CLOSING ARGUMENTS AS WELL AS

23     TO HAVE THE COURT MANIFEST AND CREATE INSTRUCTIONS THAT WOULD

24     TRY TO CREATE SOME CLARITY TO THOSE, AND I THINK FOR 403

25     PURPOSES, IF NOTHING ELSE.  SO I'LL RESPECTFULLY DECLINE YOUR
```

```
 1        INVITATION TO PERMIT THAT.  THANK YOU VERY MUCH.

 2             NOW, LET'S MOVE ON TO THE DECLARATION OF MR. PAIGE, AND

 3        THERE WAS A DOCUMENT FILED TO REVISIT THAT ISSUE.  PREVIOUSLY

 4        THIS ISSUE HAD BEEN BEFORE THE COURT, AND THE COURT INDICATED

 5        ITS REASONS.  I THINK THIS WAS DURING IN LIMINE MOTIONS, AND I

 6        HAD INDICATED REASONS AT THAT TIME WHY THAT STATEMENT WOULD NOT

 7        BE ADMISSIBLE AND THE DEFENSE INTRODUCED THE RENEWED MOTION TO

 8        ADMIT THE HEARSAY DECLARATION.

 9             ANYTHING FURTHER AS TO DEFENSE MOTION?

10             MS. GARRIDO:  YES, YOUR HONOR.  WITH REGARD TO THE

11        GOVERNMENT'S OPPOSITION THAT I RECEIVED THIS MORNING, THE

12        GOVERNMENT IS ARGUING THAT THE DECLARATION IS INADMISSIBLE

13        BECAUSE IT LACKS INDICIA OF RELIABILITY, BUT ALL OF THE REASONS

14        THAT THEY SET FORTH IS ACTUALLY ARGUMENT WHY THE HEARSAY

15        STATEMENTS OF LEONARD PAIGE THAT THEY THEMSELVES INTRODUCED

16        ALSO LACK RELIABILITY.

17             THE STATEMENTS THAT WERE INTRODUCED THROUGH COUNSEL IN THE

18        PLEADINGS WERE PART OF A BANKRUPTCY PROCEEDING, A COURT MATTER,

19        AND SO THE ARGUMENTS WOULD APPLY EQUALLY FOR WHY THEIR OWN --

20        WHY THEIR OWN EVIDENCE OUGHT NOT TO HAVE BEEN ADMITTED.

21             THE COURT:  SO THE DISTINCTION SEEMS TO BE THAT THE

22        BANKRUPTCY FILINGS ARE FORM FILINGS.  IS THIS WHAT YOU'RE

23        REFERENCING?

24             MS. GARRIDO:  I'M REFERRING TO THE BANKRUPTCY FILING

25        AS WELL AS I BELIEVE THERE WAS A CASE MANAGEMENT STATEMENT THAT
```

1   WAS ENTERED INTO EVIDENCE THAT CONTAINS THE STATEMENTS OF

2   MR. PAIGE, AND THOSE WERE ADMITTED OVER OBJECTION.  THERE ARE A

3   NUMBER OF FILINGS, ACTUALLY, THAT WERE ADMITTED THAT PURPORT TO

4   CONTAIN THE STATEMENTS OF LEONARD PAIGE.

5       AND EVEN ONE THAT WASN'T EVEN SIGNED BY HIM THAT HAS BEEN

6   ATTRIBUTED TO HIM.

7       AND SO --

8           THE COURT:  ONE OF THE FILINGS IN THE BANKRUPTCY

9   CASE ITSELF?

10          MS. GARRIDO:  YES.

11          THE COURT:  HIS BANKRUPTCY CASE?

12          MS. GARRIDO:  CORRECT.  AND I THINK ALSO ACCORDING

13  TO THE DECLARATION THAT HAS BEEN SUBMITTED IN OUR PRETRIAL

14  MOTION TO DISMISS SPECIFICALLY THE DECLARATION OF DR. HEUVLEIN,

15  THE TREATING DOCTOR FOR MR. PAIGE, IT WAS NOT UNTIL LONG AFTER

16  EXECUTION OF THE DECLARATION THAT MR. PAIGE'S DEMENTIA

17  PROGRESSED TO A POINT WHERE HE WAS NO LONGER COMPETENT TO MAKE

18  LEGAL DECISIONS.

19      SO AT THE TIME THAT HE EXECUTED THE DECLARATION, WHICH WAS

20  ON JULY 14TH, 2006, HE WAS CERTAINLY COMPETENT TO EXECUTE THIS

21  TYPE OF DECLARATION.  SO I THINK THAT ARGUMENT FALLS FLAT.

22      AND I THINK WHERE THE GOVERNMENT HAS INTRODUCED AN

23  EXTENSIVE AMOUNT OF MR. PAIGE'S HEARSAY THROUGH THE BANKRUPTCY

24  FILINGS, THE DEFENSE SHOULD BE ENTITLED TO IMPEACH THOSE

25  STATEMENTS.

1        IF MR. PAIGE HAS LISTED, FOR EXAMPLE, THE MOONRACKER

2    PROPERTY AND OWNING A HALF INTEREST, IT DOESN'T GIVE THE FULL

3    PICTURE WITHOUT HIS DECLARATION THAT HE EXECUTED AND SIGNED

4    HIMSELF THAT, THAT WASN'T THE FULL STORY, THE FACT THAT HE HAD

5    50 PERCENT TITLE.

6        SO IT WOULD HELP THE JURY OBVIOUSLY CONTEXTUALIZE IT.  IT

7    INTENDS TO IMPEACH THE DECLARATIONS THAT WERE OFFERED BY THE

8    GOVERNMENT.

9        AND I THINK THIS DOES REALLY -- I THINK THIS DOES REALLY

10   IMPACT MS. HOLMES'S RIGHTS TO CONFRONTATION, TO A FAIR TRIAL,

11   TO DUE PROCESS OF LAW WHERE WE OBVIOUSLY HAVE LITIGATED THE

12   ISSUE ABOUT MR. PAIGE'S UNAVAILABILITY AND HOW THE DELAY IN

13   BRINGING THIS CASE IMPACTED THE DEFENSE'S ABILITY TO CALL HIM

14   AS A WITNESS TO EXPLAIN THESE STATEMENTS.

15       SO AS A MATTER OF FAIRNESS TO MS. HOLMES, CERTAINLY I

16   THINK IT'S APPROPRIATE TO ALLOW THE DECLARATION IN AND TO

17   PROVIDE THE NEEDED CONTEXT TO THE STATEMENT THAT -- THE

18   STATEMENTS THAT THE GOVERNMENT HAS INTRODUCED.

19            THE COURT:  THANK YOU.  DOES THE GOVERNMENT WISH TO

20   BE HEARD?

21            MR. FAZIOLI:  YES, YOUR HONOR.  THIS IS -- YET AGAIN

22   WE'RE DISCUSSING THIS PARTICULAR DOCUMENT FOR I THINK PERHAPS

23   THE THIRD TIME.

24       THIS ISSUE HAS BEEN DISCUSSED AT GREAT LENGTH BEFORE, AND

25   THE COURT HEARD A COUPLE OF DISCUSSIONS ABOUT IT, AND THE COURT

1    SHOULD EXCLUDE IT AND IT SHOULD DO SO FOR A COUPLE OF REASONS.

2         EVEN PUTTING ASIDE THE CASE LAW THAT THIS WAS AN ISSUE

3    THAT WAS RESOLVED AND RESOLVED AT THE FEBRUARY 23RD, 2013

4    PRETRIAL CONFERENCE.  IT SHOULD -- IT LACKS ANY INDICIA OF

5    RELIABILITY.

6         IT WAS CREATED BY LEONARD PAIGE, AN INDIVIDUAL THAT AT THE

7    TIME IN JULY OF 2006 THERE WAS NO DISPUTE THAT HE WAS SUFFERING

8    FROM DEMENTIA AT THE TIME.  THAT FACT STANDING BY ITSELF MAKES

9    THIS DECLARATION LACKING IN RELIABILITY.

10        THE DECLARATION ALSO CONTAINS A FACTUAL ERROR.  THERE'S

11   ALSO A REFERENCE BY MR. PAIGE ABOUT THE LACK OF MEMORY, ABOUT

12   HIM NOT RECALLING ABOUT IT.

13        BEFORE YOU EVEN GET TO THESE OTHER ARGUMENTS, THAT'S A

14   QUESTION THAT PUTS INTO QUESTION ABOUT THE RELIABILITY.

15        FURTHERMORE, AS WE INDICATED, TO THE EXTENT THAT THE

16   DEFENSE HAS SUCCESSFULLY MOVED IN LIMINE TO PREVENT THE

17   GOVERNMENT FROM MAKING ANY REFERENCE TO THE FACT THAT MR. PAIGE

18   HAD ANY DEMENTIA, IT WOULD BE UNFAIR AND CONFUSING TO THE JURY

19   TO ALLOW THEM TO INTRODUCE A DECLARATION FROM THAT TIME PERIOD

20   FOR THE TRUTH OF THE MATTERS ASSERTED IN THAT DECLARATION.

21        IF IT WAS ADMITTED, THE GOVERNMENT WOULD BE ON THE ONE

22   HAND FACED WITH A DECLARATION FROM A PERSON THAT THEY CANNOT

23   CROSS-EXAMINE, WHILE AT THE SAME TIME TO BE ABLE TO PRESENT TO

24   THE JURY THE CONTEXT OF THE FACT THAT THE PERSON WHO SUBMITTED

25   THE DECLARATION HAD DEMENTIA AT THE TIME AND UNABLE TO MAKE AN

1    ARGUMENT POTENTIALLY THAT THIS DECLARATION MAY HAVE BEEN

2    INDUCED JUST AS RELATED TO THE ISSUE OF THE PRIOR TRANSFER.

3    THAT'S THE -- THE DEFENSE TO SOME EXTENT SHOULD NOT BE ABLE TO

4    HAVE IT BOTH WAYS IN THAT REGARD.

5         IT ALSO LACKS INDICIA OF RELIABILITY TO THE EXTENT IT WAS

6    MADE TO SUPPORT AND FURTHER THE PAIGES'S INTEREST IN THE

7    BANKRUPTCY PROCEEDING RELATING TO THE FRAUDULENT RECEIPT OF

8    THIS PROPERTY.

9         IT'S MUCH DIFFERENT IN TERMS OF THE INDICIA OF RELIABILITY

10   OF THE STATEMENTS THAT HE MADE HERETOFORE IN THE CONTEXT OF A

11   BANKRUPTCY PROCEEDING WHERE HE MAY NOT HAVE BEEN AS ILL AND

12   WHERE THERE'S A MUCH HIGHER INDICIA OF RELIABILITY FOR THOSE

13   STATEMENTS THAN IT WAS FOR SOMETHING THAT HE'S SUBMITTING IN

14   SUPPORT OF HIS DAUGHTER'S INTEREST IN THE PROPERTY, SOMETHING

15   HE CREATED IN THE COURSE OF THE LITIGATION, WHICH IS ARGUABLY

16   DIFFERENT FROM THE BANKRUPTCY FILINGS THAT WERE PREVIOUSLY

17   ADMITTED.

18        THE BANKRUPTCY FILINGS WERE ALSO ADMITTED IN LARGE EXTENT

19   BECAUSE THERE WAS A DISCUSSION OF MR. MAHER AND WITH RESPECT TO

20   HIS ACTIONS AND INTERACTIONS IN SUPPORT OF THE DEFENDANT, AND

21   IT'S RELEVANT TO EXPLAIN THE NATURE OF THE CASE AND RELEVANT TO

22   EXPLAIN ABOUT HOW THE DEFENDANT'S ACTIONS FRUSTRATED THE

23   PURPOSES OF THE BANKRUPTCY CODE.

24        AS PUT FORWARD IN OUR FILINGS, THE DECLARATION DID NOT

25   HAVE A PURPOSE OR TO EFFECT OR ESTABLISH AN INTEREST IN THE

1    PROPERTY AS I PUT DOWN THERE.  IT'S LAID OUT.  I'M NOT GOING TO

2    SUMMARIZE ALL OF THOSE ARGUMENTS AGAIN, BUT IT DOES NOT HAVE A

3    PURPOSE OF AN EFFECT OF AN INTEREST IN THE PROPERTY.  MR. PAIGE

4    PURPORTED TO TRANSFER HIS INTEREST IN THE PROPERTY AT THE TIME

5    HE SUBMITTED THIS DECLARATION.

6         THIS IS IN CONTRAST TO THE FILINGS THAT WERE MADE IN THE

7    BANKRUPTCY PROCEEDINGS, WHICH ALTHOUGH THOSE ITEMS WERE, IN

8    FACT, ASPECTS OF THE BANKRUPTCY ESTATE, THOSE ARE PROBABLY MORE

9    SQUARELY WITHIN ITS EXCEPTION -- THE STATEMENTS THAT MR. PAIGE

10   MADE IN CONNECTION WITH THE SCHEDULES AND OTHER THINGS WITHIN

11   THE BANKRUPTCY PROCEEDING, THOSE ARE MUCH CLOSER OR WITHIN THE

12   EXCEPTION FOR STATEMENTS AFFECTING AN INTEREST IN PROPERTY AS

13   OPPOSED TO A DECLARATION WHICH IS SUBMITTED AFTER A FRAUDULENT

14   TRANSFER OF THAT INTEREST IN WHICH MR. PAIGE HAS PURPORTED TO

15   ESSENTIALLY GET RID OF HIS INTEREST IN THAT PROPERTY, THAT A --

16   THAT AN EX POST DECLARATION TALKING ABOUT THAT PROPERTY CANNOT

17   BE CONSIDERED A STATEMENT ABOUT THE INTEREST IN THE PROPERTY

18   BECAUSE HE DOES NOT HAVE ONE ANYMORE.

19        WE DISTINGUISH THE LIVESTOCK CASE.  IT'S INADMISSIBLE FOR

20   THE ALLEGED EFFECT ON MS. HOLMES.  THERE'S NOTHING INDICATED IN

21   THE DECLARATION THAT IT HAD A PARTICULAR EFFECT ON MS. HOLMES.

22   IT IS, AGAIN, IS SIMPLY AN ATTEMPT TO BRING IN HEARSAY AND IT'S

23   ALSO INADMISSIBLE UNDER 806.

24        IT'S NOT RELEVANT TO MR. PAIGE'S CREDIBILITY IN THIS

25   REGARD.  THIS IS JUST MORE NEWLY INVENTED -- THIS IS THREE

1       ADDITIONAL THEORIES ABOUT WHY THE DEFENSE SHOULD BE ABLE TO GET

2       IN DECLARATIONS AND STATEMENTS OF MR. PAIGE.

3           THIS IS AN ISSUE THAT WAS DISCUSSED.  IT WAS DISCUSSED AT

4       THE FEBRUARY 12TH PRETRIAL CONFERENCE.  IT WAS DISCUSSED IN THE

5       CONTEXT OF THE INDICTMENT FOR PRE-INDICTMENT DELAY.  IT'S

6       HEARSAY.  IT SHOULD NOT -- THIS PARTICULAR DECLARATION SHOULD

7       NOT BE ALLOWED AS EVIDENCE, AND THE COURT SHOULD ALSO LIMIT

8       TESTIMONY ABOUT MR. PAIGE'S STATEMENTS THAT COMES OUT FROM

9       OTHER WITNESSES AS THAT STATEMENT IS -- THOSE STATEMENTS ARE

10      HEARSAY AND NOT PARTICULARLY RELIABLE IN GENERAL BUT ALSO IN

11      THE PARTICULAR CONTEXT OF STATEMENTS MADE TO THE FAMILY MEMBER

12      BY SOMEONE WHO WAS SUFFERING FROM AN ILLNESS, AN ILLNESS THAT

13      NOTWITHSTANDING THE FACT THAT BASED ON THE JURY INSTRUCTION,

14      THE DEFENSE APPARENTLY WANTS TO MAKE THIS ILLNESS AN ISSUE IN

15      THE JURY INSTRUCTIONS WHICH WE WOULD OBJECT TO.

16          WE HAVE BEEN PREVENTED FROM GETTING INTO THIS TOPIC DURING

17      THE TRIAL, AND WE THINK IT'S INAPPROPRIATE TO GET INTO

18      MR. PAIGE'S STATEMENTS WITHOUT OUR BEING ABLE TO GET INTO THE

19      ENTIRE STORY.

20          SO I'M WILLING TO SUBMIT THAT UNLESS THE COURT HAS ANY

21      ADDITIONAL QUESTIONS.

22              MS. GARRIDO:  YOUR HONOR, BRIEFLY.  TO THE EXTENT

23      THAT THE COURT HAS ANY CONCERNS ABOUT THE PREPARATION OF THAT

24      DECLARATION AND STATE OF MIND AT THAT TIME, WHETHER OR NOT WHAT

25      HE WAS DISCUSSING WAS TRUSTWORTHY, WE WOULD BE MORE THAN HAPPY

1    TO PRESENT PETER LIEDERMAN AS A WITNESS.  IT'S MY UNDERSTANDING

2    THAT HE'S THE ONE WHO TOOK THAT DECLARATION FROM MR. PAIGE AND

3    SUBMITTED IT AS PART OF HIS PLEADINGS.

4        WE CAN DO A SHORT HEARING OUTSIDE OF THE PRESENCE OF THE

5    JURY AND SO MR. LIEDERMAN CAN EXPLAIN THE METHOD OF PREPARATION

6    AND WHAT MR. PAIGE'S STATE OF MIND WAS AT THE TIME AND SO ON

7    AND SO FORTH.

8        AND WE'RE NOT INTENDING BY PRESENTING THAT DECLARATION TO

9    GET INTO MR. PAIGE'S STATE OF MIND AT THE TIME BUT RATHER HIS

10   STATEMENTS WHICH BEAR DIRECTLY ON THE STATEMENTS THAT THE

11   GOVERNMENT HAS INTRODUCED WITH RESPECT TO HOW HE VIEWED THE

12   PROPERTY AT 312 MOONRACKER.

13           THE COURT:  DOES THE GOVERNMENT INTRODUCE THAT IN

14   LIGHT OF THE EXHIBITS, MR. PAIGE'S PLEADINGS, AND HIS,

15   MR. PAIGE'S BANKRUPTCY?  IS THAT WHAT YOU'RE REFERRING TO?

16           MS. GARRIDO:  YES.

17           THE COURT:  OKAY.  WELL, THANK YOU VERY MUCH.  SO I

18   NOTE YOU MADE AN ARGUMENT, THE DEFENSE DID, THAT THIS IS A

19   STATEMENT IN REGARDS TO AN INTEREST IN PROPERTY.

20       AND I LOOKED AT THAT, AND I DON'T THINK THAT IT IS.  AND

21   THOSE STATEMENTS, AND I THINK YOU CITE A CASE BOULWARE, I THINK

22   IS THE CASE YOU CITE, I THINK IT'S IN YOUR PLEADINGS, THAT

23   EXCEPTION AND THOSE DOCUMENTS AND AT LEAST THAT CASE SUGGEST

24   ARE TYPICALLY DOCUMENTS IN ALL OF THE DEEDS AND REAL DOCUMENTS

25   THAT INVOLVE PROPERTY AND PROPERTY INTEREST.

1           THIS IS A DECLARATION FILED, WE KNOW WHAT IT IS, BY

2     MR. PAIGE IN SUPPORT OF -- IN HIS BANKRUPTCY CASE IN AN

3     ADVERSARY PROCEEDING TO SUPPORT HIS DAUGHTER IT APPEARS.

4           THOSE -- THE EXCEPTIONS FOR THESE OTHER DEEDS AND THOSE

5     TYPES OF DOCUMENTS ARE -- IT SEEMS TO ME THAT THIS DECLARATION

6     DOES NOT FIT INTO THE DECLARATION OF DISPOSITIVE DOCUMENTS.

7           TRUSTWORTHINESS IS ALWAYS A FACTOR THAT HAS TO BE

8     CONSIDERED IN THESE TYPES OF ISSUES.  THIS IS WHAT CAN BE

9     CATEGORIZED AS A SELF-SERVING DECLARATION FILED IN SUPPORT OF

10    THE DECLARANT'S DAUGHTER'S INTEREST.  IT'S OUTSIDE THE TYPICAL

11    DOCUMENTS THAT ARE INTRIGUED AND CALLED UPON BY THIS STATUTE.

12          I DON'T THINK IT FITS IN THAT EXCEPTION.

13          YOU ALSO SUGGEST THAT THIS WOULD ALLOW FOR ATTACKING AND

14    SUPPORTING THE WITNESS'S CREDIBILITY.

15          AND WHEN WE HAD OUR IN LIMINE MOTIONS, I WENT THROUGH THE

16    DECLARATION, AND I DON'T SEE ANY REASON TO DISTURB THAT IN

17    LIMINE ORDER.

18          THERE WERE, AND I WENT THROUGH SPECIFICS, I THINK, AS BEST

19    I COULD, ABOUT THE CONTENTS OF THE DECLARATION AND HOW THEY FIT

20    AT THAT TIME AND NOW WHAT THE DEFENSE WANTED THEM TO OR

21    PERCEIVED THEM FOR THEIR ADMISSIBILITY, AND I WENT THROUGH

22    THOSE AND I FOUND THAT YOU'RE ASKING FOR AN INTERPRETATION, THE

23    DEFENSE WAS, WHEN YOU SUGGESTED IN YOUR IN LIMINE MOTION AN

24    INTERPRETATION THAT REALLY WASN'T, IT WAS OUTSIDE OF WHAT THIS

25    DECLARATION ACTUALLY SAID.

```
1         FOR EXAMPLE, THERE WAS, I THINK, THERE WAS SOME DISCUSSION
2    ABOUT WHETHER OR NOT MS. HOLMES HAD A HALF INTEREST OR NOT, AND
3    THE DECLARATION SPEAKS TO SOME HELP THAT HE PROVIDED, MR. PAIGE
4    PROVIDED, FOR THE HOUSE.  HE COULD NOT RECALL SPECIFICS.  THE
5    DECLARATION DOESN'T INDICATE SPECIFICS.  THERE'S NO
6    RECOLLECTION ABOUT DOWN PAYMENT.  AND I THINK THAT THE PURPOSE,
7    AT LEAST IN LIMINE WAS, TO SHOW THAT SHE HAD A GREATER INTEREST
8    IN THE PROPERTY.
9         AND THE DECLARATION IS -- IT DOESN'T SPEAK SPECIFICALLY TO
10   THAT.  I RECALL WE HAD A DISCUSSION ABOUT THAT.
11        SO I DON'T SEE THAT IT REALLY DOES ATTACK OR SUPPORT THIS
12   WITNESS'S CREDIBILITY IN THAT REGARD.
13        IT DOESN'T SEEM THAT IT WOULD FIT THAT.  IT'S NOT A
14   CONTEMPORANEOUS DECLARATION.  I CAN INCORPORATE BY REFERENCE
15   THE COURT'S FINDINGS PREVIOUSLY MADE, AND I SEE NO REASON TO
16   DISTURB THE COURT'S PREVIOUS ORDER, NOTWITHSTANDING THE
17   DEFENDANT'S MOTION.
18        SO THE DEFENDANT'S MOTION IS DENIED.
19        MS. GARRIDO:  YOUR HONOR, I'M SORRY.  MAY I JUST
20   SUPPLEMENT VERY BRIEFLY?  THERE'S ONE ASPECT I FAILED TO
21   ADDRESS IN MY ARGUMENT FOR THE PURPOSE OF THE RECORD.
22        I BELIEVE THAT THE DECLARATION OF LEONARD PAIGE IS
23   INCONSISTENT WITH THE EVIDENCE THAT THE GOVERNMENT HAS
24   INTRODUCED THROUGH THE HEARSAY TESTIMONY DELIVERED BY MR. MAHER
25   THAT MR. LEONARD PAIGE PAID THE MORTGAGE ON THE MOONRACKER
```

```
1      PROPERTY BECAUSE THE DECLARATION DIRECTLY ADDRESSES THAT HE

2      PAID PART OF THE MORTGAGE BUT THAT REPRESENTED REPAYMENT OF

3      SALARY OWED TO MS. HOLMES.  AND SO --

4             THE COURT:  BUT MR. MAHER DIDN'T TESTIFY ABOUT THE

5      REPAYMENT OR ANYTHING, DID HE?

6             MS. GARRIDO:  HE TESTIFIED REGARDING SEVERAL CHECKS

7      THAT HE SAW THAT HE KNOWS THAT MR. PAIGE MADE ON THE PROPERTY.

8          HE ALSO TESTIFIED THAT HE BELIEVED THAT MR. PAIGE MADE

9      THE MORTGAGE PAYMENTS ON THE HOME UNTIL CONVERSION TO CHAPTER 7

10     AND THAT TESTIMONY WAS ADMITTED OVER OBJECTION.

11        SO CERTAINLY --

12            THE COURT:  I DO RECALL THAT, YES.

13            MS. GARRIDO:  YES.  SO CERTAINLY TO THE EXTENT THAT

14     THOSE HEARSAY STATEMENTS OF MR. PAIGE HAVE BEEN ADMITTED TO THE

15     JURY THROUGH MR. MAHER.

16            THE COURT:  I'M SORRY.  THE HEARSAY STATEMENTS OF

17     MR. PAIGE?

18            MS. GARRIDO:  YES, HIS WRITING OF A CHECK AND THEN

19     THAT -- I BELIEVE THAT CHECK IS HEARSAY THAT MR. MAHER HAS

20     TESTIFIED ABOUT.

21        THIS DECLARATION IS INCONSISTENT WITH THE TESTIMONY OF

22     MR. MAHER, AND THE FACE OF THE CHECKS THEMSELVES ESSENTIALLY

23     WHICH PURPORT TO PAY THE ENTIRETY OF THE MORTGAGE WHEREAS THE

24     TRUTH IS THAT MR. PAIGE WAS PAYING THAT AS REPAYMENT OF SALARY

25     AND NOT OUT OF HIS OWN POCKET OUT OF HIS OWN FUNDS.
```

1          THE COURT:  WAS THERE TESTIMONY THAT PAIGE WAS PAID?

2          MS. GARRIDO:  YES.

3          THE COURT:  NOT LEONARD PAIGE BUT THE PAIGES?

4          MS. GARRIDO:  OKAY.

5          THE COURT:  MAYBE THAT DOESN'T MAKE A DIFFERENCE?

6          MS. GARRIDO:  I'M NOT SURE THAT IT DOES, YOUR HONOR.

7          THE COURT:  OKAY.

8          MS. GARRIDO:  THANK YOU.

9          MR. FAZIOLI:  WE DON'T AGREE THAT'S A BASIS FOR

10    ADMITTING THIS, AND WE'VE BEEN OVER THIS SEVERAL TIMES.

11          THE COURT:  WELL, THANK YOU.  YOU'VE MADE YOUR

12    RECORD.  THANK YOU.  AND THE COURT'S DECISION WILL REMAIN.

13       SO YOU NEED SOME TIME TO REVIEW THESE?

14          MR. FAZIOLI:  WE NEED AT LEAST, I'D SAY AT LEAST

15    HALF AN HOUR TO REVIEW IT AND THEN I THINK WE SHOULD PROBABLY

16    TO -- I ANTICIPATE WE'LL HAVE SOME OBJECTIONS TO SOME OF THESE

17    EXHIBITS THAT WE SHOULD TALK ABOUT AHEAD OF TIME TO AVOID

18    MULTIPLE SIDE-BARS.  I DON'T KNOW IF YOU WANT TO COME BACK IN

19    AN HOUR.

20          THE COURT:  WELL, IT'S 10:00 O'CLOCK NOW.

21       I HATE TO KEEP THE JURY -- THEY'RE IN THE JURY ROOM NOW.

22    I HATE TO KEEP THEM IN THE JURY ROOM FOR AN HOUR.  THEY GOT

23    HERE AT 9:00 O'CLOCK, IF NOT BEFORE.  I WONDER IF IT MAKES

24    SENSE TO RELEASE THEM AND HAVE THEM COME BACK AT 1:00 O'CLOCK.

25          MR. FAZIOLI:  I THINK THAT MIGHT MAKE SENSE, YOUR

```
 1    HONOR.

 2              MS. GARRIDO:  YOUR HONOR, THE TRUTH IS THAT I THINK

 3    VERY FEW OF THESE THEY HAVEN'T SEEN BEFORE.  I'M NOT SURE WHY

 4    AN ENTIRE MORNING WOULD BE NECESSARY TO REVIEW THESE EXHIBITS,

 5    BUT IF THE COURT -- IF THAT'S HOW THE COURT WANTS TO PROCEED.

 6    THERE'S A COUPLE OF OTHER MATTERS THAT I WANTED TO RAISE BEFORE

 7    THE COURT AND PERHAPS WE CAN ADDRESS THOSE AS WELL.

 8              THE COURT:  OKAY.  WELL, LET'S DO THAT.

 9         LET'S -- MS. GARCIA, DO YOU WANT TO INFORM THE JURY THAT

10    THEY SHOULD COME BACK AT 1:00 O'CLOCK?

11         THE OTHER ISSUES YOU WANT TO ADDRESS, MS. GARRIDO, DO YOU

12    WANT TO DO THOSE NOW OR DO THEY RELATE TO THE GOVERNMENT'S

13    EXHIBITS THAT THEY RECEIVED THIS MORNING?

14              MS. GARRIDO:  THEY DO NOT RELATE TO THE EXHIBITS.

15    THE FIRST HAS TO DO WITH A WITNESS I'M GOING TO BE CALLING

16    PERHAPS TOMORROW AT THIS RATE.  AMMAR SAHELI.

17         IN THE STATEMENT THAT WE PROVIDED TO THE GOVERNMENT

18    MR. SAHELI STATED THAT HE HAD A MISDEMEANOR CONVICTION FROM

19    WHEN HE WAS 19 YEARS OLD, AND I JUST WANT TO MOVE TO EXCLUDE

20    THAT AND ANY OTHER IMPEACHMENT THAT THE GOVERNMENT MAY HAVE AS

21    TO DEFENSE WITNESSES THAT HAVE APPEARED ON THEIR WITNESS LIST.

22              MR. FONDO:  I'M NOT SURE WHAT THE LAST STATEMENT WAS

23    BUT AS TO THIS PARTICULAR WITNESS, WE DO NOT INTEND TO

24    CROSS-EXAMINE HIM ABOUT HIS MISDEMEANOR.

25              THE COURT:  OKAY.
```

1          MS. GARRIDO:  I WOULD ASK THAT NO OTHER PRIOR BAD

2     ACTS OR CONVICTIONS BE USED FOR CROSS-EXAMINATION PURPOSES.  I

3     HAVE NOT RECEIVED NOTICE THAT THE GOVERNMENT INTENDS.

4          THE COURT:  FOR THIS WITNESS?

5          MS. GARRIDO:  FOR ANY WITNESS, ANY DEFENSE WITNESS.

6     I HAVE NOT RECEIVED NOTICE FOR ANY OF THOSE.  I'M NOT AWARE OF

7     ANY IMPEACHMENT EVIDENCE AS TO ANY OF THOSE WITNESSES AND IF

8     THE GOVERNMENT HAS ANY, I WOULD ASK TO BE HEARD WITH RESPECT TO

9     THAT.

10          MR. FONDO:  IF WE BECOME AWARE OF CONVICTIONS, YOUR

11     HONOR, I'LL CERTAINLY LET THE DEFENSE KNOW.

12          THE COURT:  OKAY.

13          MS. GARRIDO:  THAT'S ALL I HAD, YOUR HONOR.

14          THE COURT:  ALL RIGHT.

15          MR. FAZIOLI:  YOUR HONOR, WE HAD SOME AREAS BASED ON

16     SOME OF THE REPORTS THAT WE HAD SEEN FROM SOME OF THE CHARACTER

17     WITNESSES, THERE WERE CERTAIN ISSUES WE WANTED TO RAISE.  AND I

18     DON'T KNOW IF NOW IS THE TIME TO DO IT, AND PERHAPS THE

19     WITNESSES ARE NOT GOING TO BE TAKING THE STAND TODAY.

20          BUT I DON'T KNOW IF THIS IS A GOOD TIME TO DO IT OR WE CAN

21     DO IT AT A LATER TIME.

22          THE COURT:  WELL, WHY DON'T YOU GO THROUGH THE

23     EXHIBITS AND THEN WE'LL HAVE OUR OWN LITTLE CONVERSATION HERE

24     ABOUT EVIDENCE.  AND ONCE WE HAVE GONE THROUGH EVERYTHING AND

25     THEN WE CAN TALK ABOUT ANY OTHER EVIDENTIARY ISSUES AND

```
 1        HOPEFULLY RESOLVE THOSE BEFORE 1:00 O'CLOCK BEFORE THE JURY

 2        COMES BACK AND WE'LL START EVIDENCE THEN.

 3             SO YOU CAN REVIEW -- IT'S NOW 10:00 O'CLOCK, A LITTLE

 4        AFTER.

 5             WHY DON'T I COME BACK AT 10:30 UNLESS YOU COME SOONER?

 6                  MR. FAZIOLI:  12:30.

 7                  THE COURT:  WELL, I THOUGHT WE WOULD COME BACK IN

 8        30 MINUTES TO SEE WHERE YOU ARE AT AND SEE IF THERE ARE ANY

 9        OTHER ISSUES WE NEED TO TAKE UP WHILE YOU'RE HERE.

10                  MR. FAZIOLI:  OKAY.

11                  THE COURT:  GREAT.

12        (RECESS FROM 10:05 A.M. UNTIL 10:38 A.M.)

13                  THE COURT:  ALL RIGHT.  WE'RE BACK ON THE RECORD IN

14        THE UNITED STATES VERSUS MYRA HOLMES.  COUNSEL AND THE

15        DEFENDANT IS PRESENT.

16             I JUST WANTED TO COME OUT AND CHECK ON THE UPDATE

17        REGARDING EXHIBITS AND OTHER ITEMS.

18                  MR. FAZIOLI:  YES, YOUR HONOR, WE'VE HAD AN

19        OPPORTUNITY IN THE LAST HALF HOUR TO REVIEW THE DISCOVERY THAT

20        WAS PRESENTED THIS MORNING.

21             I THINK THERE'S SOME EXHIBITS WHICH WOULD NOT BE AN ISSUE

22        IN LIGHT OF THE FACT THAT THEY'RE PORTIONS OF THE EXHIBIT THAT

23        HAVE BEEN INTRODUCED BY THE GOVERNMENT, AND I THINK THERE ARE

24        SOME THAT WOULD BE AN ISSUE AND WE SHOULD TALK ABOUT THEM NOW.

25                  THE COURT:  OKAY.  LET ME JUST GET MY BINDER.
```

1          OKAY.  YOU WANTED TO GO THROUGH THESE?

2               MR. FONDO:  GOING IN ORDER A THROUGH N.  THE

3    GOVERNMENT HAS NO OBJECTION TO EXHIBIT A.

4               MR. FAZIOLI:  NOW, THIS IS OBVIOUSLY SUBJECT TO A

5    POSSIBLE RELEVANCE OBJECTION BASED ON THE NATURE OF QUESTIONING

6    OR SOMETHING ELSE TO THAT EXTENT, BUT WE DON'T AS A THRESHOLD

7    MATTER OBJECT TO THE ADMISSIBILITY OF THAT.

8               THE COURT:  OKAY.

9               MS. LIE:  A HAS ALREADY BEEN ADMITTED, I BELIEVE.

10              MR. FONDO:  B WE DO NOT OBJECT TO;

11         C, WE DO NOT OBJECT TO C;

12         D, WE DO NOT OBJECT TO D;

13         E WE WANTED CLARIFICATION ON WHETHER IT WAS ADMITTED OR

14    NOT.  I THINK THERE'S A LITTLE BIT OF UNCERTAINTY ABOUT WHETHER

15    E WAS ADMITTED.

16              MS. LIE:  I BELIEVE THAT E WAS ADMITTED DURING THE

17    TESTIMONY OF MICHELLE GADKER.  IT WAS PROFFERED AT THE SAME

18    TIME AS F.  F WAS NOT ADMITTED AT THAT TIME.

19              MR. FONDO:  SO BASED ON THOSE REPRESENTATIONS E IS

20    IN.

21         AND THEN F WE WOULD OBJECT.  I THINK THEY TRIED TO GET IT

22    IN AT THE TIME OF THE WITNESS AND THEY WERE UNSUCCESSFUL AND

23    OUR POSITION HAS NOT CHANGED ON THAT.

24              MR. FAZIOLI:  AND IT'S ALSO UNCLEAR HOW ANY

25    POTENTIAL DEFENSE WITNESSES ARE GOING TO HAVE ANY PERSONAL

1    KNOWLEDGE ABOUT THE LOAN PROCEDURES THAT ARE REFERENCED IN

2    EXHIBIT F.

3            MS. LIE:  YOUR HONOR, THESE WERE -- YOU INCLUDED ON

4    THE DEFENSE EXHIBIT LIST BECAUSE THEY PREVIOUSLY HAD BEEN

5    IDENTIFIED, PREVIOUSLY HAD BEEN DISCUSSED WITH GOVERNMENT

6    WITNESSES.

7        THESE EARLY DOCUMENTS THAT WE'RE DISCUSSING RIGHT NOW ARE

8    NOT DOCUMENTS THAT I ANTICIPATE THAT THE DEFENSE WITNESSES ARE

9    GOING TO BE SPEAKING TO; HOWEVER, TO THE EXTENT THAT MANY OF

10   THEM ARE EXCERPTS OF EXHIBITS THAT HAVE ALREADY BEEN ADMITTED

11   BY THE GOVERNMENT, I WOULD THINK THERE SHOULD BE NO OBJECTION

12   TO THEIR BEING ADMITTED NOW, WHETHER THE WITNESS SPEAKS TO THEM

13   OR NOT.

14       SPECIFICALLY AS TO F, HOWEVER, I WOULD NOTE THAT F IS A

15   STATEMENT OF POLICY.  IT'S NOT A FACTUAL STATEMENT.  IT IS A

16   PAGE FROM THE WORLD SAVINGS BANK POLICIES THAT WERE PRODUCED TO

17   THE DEFENSE BY THE GOVERNMENT AND AS SUCH ARE NOT CONTINGENT

18   UPON MICHELLE GADKER, WHO WAS A WITNESS ON THE STAND AT THE

19   TIME I BROUGHT THIS UP, MICHELLE GADKER'S AWARENESS OF OR

20   RECOLLECTION OF THE SPECIFIC POLICIES THAT ARE AT ISSUE IN THIS

21   TESTIMONY.

22       SHE MADE A -- SHE TESTIFIED AS TO WHAT WORLD SAVINGS

23   BANK'S POLICY WAS, TO THE EXTENT THAT THE GOVERNMENT PRODUCED

24   TO THE DEFENSE THAT WORLD SAVINGS BANK POLICIES WERE, IN FACT,

25   DIFFERENT.  THIS IS RELEVANT.  I THINK THE ONLY OBJECTION TO

```
1    THIS IS AUTHENTICITY.

2        CONSIDERING THAT THE GOVERNMENT HAS PRODUCED THIS TO US,

3    HAVING OBTAINED IT IN THE COURSE OF THEIR INVESTIGATION INTO

4    THE WORLD SAVINGS BANK POLICIES THEMSELVES, I INQUIRED AFTER

5    MICHELLE GADKER'S TESTIMONY OF THE GOVERNMENT AND SUBMITTED A

6    DISCOVERY REQUEST TO THEM, EITHER FOR THE CUSTODIAN'S

7    DECLARATION WHO HAD PRODUCED THIS IN RESPONSE TO PRESUMABLY A

8    SUBPOENA, IF THERE HAD BEEN, BECAUSE I THINK THAT UNDER THE

9    RULES OF EVIDENCE REGARDING SELF-AUTHENTICATING DOCUMENTS, THAT

10   THAT COULD POTENTIALLY CURE THIS ISSUE TO THE EXTENT THAT THE

11   GOVERNMENT MIGHT BE TAKING THE INEXPLICABLE POSITION THAT

12   DOCUMENTS THAT THEY PRODUCED TO US IN THEIR INVESTIGATION WERE,

13   IN FACT, INAUTHENTIC AND IN THE ALTERNATIVE REQUESTED CHAIN OF

14   CUSTODY INFORMATION REGARDING EACH AND EVERY DEPARTMENT OF

15   JUSTICE EMPLOYEE WHO HAD HANDLED THIS DOCUMENT AND WHO COULD

16   HELP ESTABLISH ITS AUTHENTICITY IN TERMS OF HOW IT WAS

17   OBTAINED.

18       I HAD NOT GOTTEN A RESPONSE TO THAT OTHER THAN THE

19   GOVERNMENT'S ASSERTION THAT THERE WAS IN FACT, IN FACT, NO

20   CUSTODIAN'S DECLARATION.  BUT HEARSAY IS NOT A BARRIER TO THE

21   ADMISSIBILITY OF THIS PARTICULAR DOCUMENT BECAUSE IT'S NOT A

22   STATEMENT OF FACT BUT RATHER A STATEMENT OF DIRECTIVE OR POLICY

23   TO VARIOUS EMPLOYEES.

24       IT IS RELEVANT BECAUSE IT IMPEACHES MS. GADKER'S TESTIMONY

25   AND HER ASSERTED KNOWLEDGE OF THE BROKER AND WHAT THAT
```

1    CONSTITUTED TO THE EXTENT THAT IT CLEARLY LAYS OUT A DIFFERENT

2    PROCEDURE IN HANDLING REGULAR MORTGAGE APPLICATIONS VERSUS

3    PREFERRED MORTGAGE APPLICATIONS.

4        AND TO THE EXTENT THAT THERE IS ANY THEORETICAL

5    FOUNDATIONAL OBJECTION ON AUTHENTICITY GROUNDS I DO BELIEVE

6    THAT THE MANNER IN WHICH THIS CAME INTO THE DEFENSE POSSESSION

7    ADEQUATELY ADDRESSES THAT.

8        THE COURT:  SO YOU'RE NOT SEEKING TO HAVE A WITNESS

9    SPEAK TO THIS DOCUMENT?

10       MS. LIE:  NO, BUT I DO BELIEVE THAT IT IS A FAIR

11   SUBJECT FOR ARGUMENT AT THIS POINT.

12       THE COURT:  AND THIS IS A PORTION, THIS LOOKS LIKE

13   IT'S A PORTION OF THESE LOAN ORIGINATION APPLICATION MANUALS IT

14   LOOKS LIKE.

15       MS. LIE:  IT IS A PORTION OF THE REAL ESTATE LOAN

16   POLICY MATERIALS THAT WERE PROVIDED BY THE GOVERNMENT TO THE

17   DEFENSE SHORTLY BEFORE THE ACTUAL COMMENCEMENT OF TRIAL, AND I

18   WOULD NOTE THAT THE FORMAT IS IDENTICAL TO THAT OF EXHIBIT E

19   AND I -- WHICH WERE PREVIOUSLY ADMITTED; AND THAT MS. GADKER'S

20   SOLE RESERVATION ABOUT EXHIBIT F WAS THAT SHE DID NOT RECALL

21   THIS PARTICULAR POLICY.

22       SO THIS WAS PRODUCED TO THE DEFENSE, IT WAS BATES NUMBERED

23   AND MARKED ACCORDING TO, AS I UNDERSTAND IT, HOW IT HAD BEEN

24   COLLECTED AND PROCESSED BY THE GOVERNMENT AS PART OF ITS

25   PREVIOUS INVESTIGATION AND IT WAS THEN TURNED OVER TO THE

```
1    DEFENSE.
2         THE ONLY DIFFERENCE IS THAT WE HAVE REDACTED AT THE
3    GOVERNMENT'S REQUEST THE FOOTER INFORMATION THAT IDENTIFIED THE
4    LETTERS U.S.A.O. WERE VISIBLE IN THE BATES NUMBERING FROM THE
5    PREVIOUS INVESTIGATION AND THE WORDS "CONFIDENTIAL" AND I CAN'T
6    REMEMBER WHAT THE ACTUAL FOOTER WAS, WERE LIKEWISE REDACTED PER
7    THE GOVERNMENT'S REQUEST AS TO E -- I'M SORRY -- AS TO EXHIBITS
8    E AND I.
9              THE COURT:  OKAY.
10             MR. FONDO:  YOUR HONOR, IT'S NOT OUR DOCUMENT BUT
11   WE'RE NOT SAYING IT'S NOT A WORLD SAVINGS BANK DOCUMENT.  WE'RE
12   NOT SAYING IT'S AN AUTHENTICATION ISSUE.
13             WHAT WE'RE SAYING IS THAT THIS WITNESS DID NOT REMEMBER
14   THIS DOCUMENT AND DID NOT REMEMBER THIS, AND IT'S JUST A
15   ONE-PAGE DOCUMENT.  SO I'M NOT EVEN SURE IT SAYS EXACTLY WHAT
16   DEFENSE COUNSEL IS SAYING IT SAYS.
17             BUT IN ADDITION THE DATE IS MARCH 14TH, 2005.  I DON'T
18   KNOW WHETHER -- YOU KNOW, THERE'S NO EVIDENCE THAT THIS WAS THE
19   POLICY IN EFFECT AT THE TIME THAT MYRA HOLMES'S LOAN WAS
20   PROCESSED.  I DON'T KNOW ONE WAY OR THE OTHER, QUITE FRANKLY.
21             THE COURT:  WAS THE WITNESS ASKED THAT QUESTION?
22   DID SHE INDICATE ANYTHING ABOUT EXHIBIT F BEING A POLICY AT THE
23   TIME?
24             MS. LIE:  SHE HAD NO RECOLLECTION OF THAT PARTICULAR
25   POLICY, WHICH IS UNDERSTANDABLE GIVEN HER CONSTRUCTION OF THE
```

1    PREFERRED MORTGAGE BROKER PROGRAM.

2         HOWEVER, I'LL NOTE THAT EXHIBITS E AND I, I DID ASK HER

3    WHETHER THESE WERE THE POLICIES IN PLACE, AND I BELIEVE SHE DID

4    INDICATE THAT THEY WERE.

5         I WOULD ALSO NOTE THERE IS NOTHING FURTHER, ALTHOUGH THERE

6    ARE POLICIES FROM THE PRODUCTION BY THE GOVERNMENT AS PART OF

7    THIS UNITARY WHOLE, THERE ARE POLICIES THAT POST-DATE

8    MS. HOLMES'S LOAN.

9         THERE ARE -- NONE OF THOSE POLICIES THAT POST-DATE THE

10   LOAN DEAL WITH THIS SPECIFIC ISSUE AND THE LOAN PROCESSING

11   ISSUE.

12        I PROVIDED THE EXCERPT FROM THE ONE AND ONLY LOAN HANDLING

13   POLICY THAT THERE WAS IN THE ENTIRE PRODUCTION.  THAT

14   PRODUCTION CLEARLY CONTEMPLATED A DATE RANGE THAT WAS BOTH

15   BEFORE AND AFTER THE HOLMES LOAN AND THE ABSENCE OF ANY

16   ANALOGOUS POLICY WITH A SUBSEQUENT DATE I THINK BOLSTERS THE

17   CASE FOR THE ADMISSIBILITY OF THIS PARTICULAR ONE.

18        AND I WOULD ALSO NOTE THAT TO THE EXTENT THAT THE COURT

19   HAS ANY RESERVATIONS ABOUT THE FACT THAT I HAVE CHOSEN TO

20   SIMPLY EXCERPT IT, I WOULD BE HAPPY TO PROVIDE THE WHOLE OF

21   THAT PARTICULAR SECTION AS IT APPEARED IN THE PRODUCTION FROM

22   THE GOVERNMENT.

23             THE COURT:  MR. FONDO.

24             MR. FONDO:  I HAVE NOTHING FURTHER, YOUR HONOR.  I

25   DON'T KNOW WHETHER THIS WAS IN EFFECT IN OCTOBER OR SEPTEMBER

1    OF 2005.

2              THE COURT:  AND SHOULDN'T THAT BE A FOUNDATIONAL

3    ISSUE THAT NEEDS TO BE ESTABLISHED?  IF THAT'S WHAT YOU'RE

4    GOING TO ARGUE IN RE THIS DOCUMENT, SHOULDN'T THERE BE A

5    FOUNDATIONAL SHOWING THAT THIS WAS OR WAS NOT THE POLICY AT

6    THAT TIME?

7              MS. LIE:  YOUR HONOR, I THINK IF I WERE TO ADMIT

8    THIS AS A FREE STANDING, AS PART OF WHAT THE GOVERNMENT WOULD

9    CONSIDER THE DEFENSE CASE IN CHIEF, INDEPENDENT OF ANY WITNESS

10   TESTIMONY, THEN I WOULD THINK THAT THAT ARGUMENT WOULD HAVE

11   MERIT.

12        THE REASON THAT I THINK THIS IS AN ALTERNATIVE SITUATION

13   IS THAT MICHELLE GADKER, WHO WAS EMPLOYED BOTH BEFORE AND AFTER

14   THIS PERIOD, MADE A BLANKET STATEMENT ABOUT WORLD SAVINGS BANK

15   POLICIES REGARDING PREFERRED MORTGAGE BROKERS THAT WAS NOT

16   LIMITED TO TIME, AND IT WAS NOT TEMPORALLY CONTINGENT IN ANY

17   WAY THAT BASICALLY FOR ALL PURPOSES PREFERRED MORTGAGE BROKERS

18   WERE SIMPLY THE MORTGAGE BROKERS OF WHICH WORLD SAVINGS BANK

19   HAD ANY DEALINGS WHATSOEVER.

20        TO IMPEACH THAT TESTIMONY, IT'S FAIR TO INTRODUCE

21   DOCUMENTARY EVIDENCE THAT ESTABLISHES THAT SHE WAS WRONG ABOUT

22   THAT.

23        WHETHER IT WAS IN PLACE AT THE TIME OF MS. HOLMES OR NOT,

24   SHE WAS SIMPLY MISTAKEN ABOUT THE WORLD SAVINGS BANK POLICIES.

25   AND SO FOR IMPEACHMENT PURPOSES, IT IS APPROPRIATE TO ADMIT

1      THIS WHETHER OR NOT THE COURT IS SATISFIED THAT THIS HAD TO

2      HAVE BEEN THE POLICY IN PLACE AT THE TIME OF MS. HOLMES'S LOAN.

3           MOREOVER, I WOULD SUBMIT THAT EVEN IF THE COURT BELIEVES

4      THAT IT NONETHELESS MUST BE, EVEN FOR IMPEACHMENT PURPOSES, TO

5      IMPEACH HER GENERAL NON-TIME-LIMITED ABSOLUTE STATEMENT ABOUT

6      HOW WORLD SAVINGS BANK HAS ALWAYS DEFINED PREFERRED MORTGAGE

7      BROKER, EVEN LEAVING THAT ASIDE, IF THE COURT WERE TO CONCLUDE

8      THAT IT DOES NEED TO ESTABLISH THAT IT WAS IN PLACE AT THE TIME

9      OF MS. HOLMES'S LOAN, A PROPOSITION WHICH THE DEFENSE CONTINUES

10     TO DISPUTE, THE NATURE OF THE PRODUCTION BY THE GOVERNMENT

11     GIVEN THAT IT DOES SPAN A PERIOD OF TIME, AND THE ABSENCE OF

12     THAT PRODUCTION FROM ANY OTHER CONFLICTING POLICY, EITHER

13     BEFORE OR AFTER, DOES ESSENTIALLY GIVE RISE TO THE APPROPRIATE

14     INFERENCE THAT THIS WAS, IN FACT, THE POLICY IN PLACE.

15          THE COURT:  IS THIS, THIS DOCUMENT F, DOES THIS

16     REFERENCE SPECIFICALLY THE PREFERRED MORTGAGE LOAN

17     CIRCUMSTANCES, OR IS THIS A DIFFERENT TYPE OF A CIRCUMSTANCE

18     FOR LOANS?

19          MS. LIE:  WHAT EXHIBIT F DEALS WITH IS BASICALLY

20     DIRECTIONS TO LOAN ORIGINATORS AND HOW TO PROCESS THE FILE.

21          AND IT SPECIFICALLY INDICATES THAT THERE ARE DIFFERENT

22     PROCEDURES FOR HANDLING THE DOCUMENTATION FOR REGULAR BROKER

23     LOANS, PREFERRED BROKER LOANS OR PREFERRED MORTGAGE BROKER

24     LOANS AND THE DIFFERENT MANILA FOLDERS AND THE USE OF MANILA

25     FOLDERS FOR ONE AND BLUE FOLDERS FOR THE OTHER, WHICH CLEARLY

1        ESTABLISHES THAT THERE WERE LOANS THAT WORLD SAVINGS BANK

2        PROCESSED ON ITS WHOLESALE SIDE FROM BROKERS WHO WERE NOT, IN

3        FACT, PREFERRED MORTGAGE BROKERS.

4             AND SO FOR THAT REASON IT SPECIFICALLY REBUTS THE

5        TESTIMONY BY MS. GADKER AS WELL AS BY MS. GETER THAT THERE

6        WASN'T REALLY -- YOU KNOW, NO SIGNIFICANCE TO THE PREFERRED

7        MORTGAGE BROKER DESIGNATION.

8             AND THAT THE TESTIMONY BY MS. GADKER THAT THE WORLD

9        SAVINGS BANK, ALL OF THE MORTGAGE BROKERS WHO WORLD SAVINGS

10       BANK DID BUSINESS, WERE BY DEFINITION PREFERRED MORTGAGE

11       BROKERS.

12            BECAUSE COUNSEL ESSENTIALLY ELICITED FROM MS. GADKER THE

13       ASSERTION THAT THE CATEGORIZATION OR THE CHARACTERIZATION OF A

14       MORTGAGE BROKER AS PREFERRED HAD NO SIGNIFICANCE BECAUSE IT

15       SIMPLY MEANT THAT THEY WERE BROKERS WHO COULD DO BUSINESS WITH

16       WORLD SAVINGS AND THIS DIRECTLY REBUTS THAT.

17                 THE COURT:  AND WHAT IS THIS -- THIS SEEMS TO

18       SUGGEST THAT THEY USED DIFFERENT COLORED FOLDERS FOR THESE

19       DIFFERENT TYPES OF LOAN APPLICATIONS?

20                 MS. LIE:  IT DOES.  AND THE REASON THAT IS

21       SIGNIFICANT IS THAT THE LOAN ORIGINATOR, RATHER THAN BEING

22       DIRECTED TO SIMPLY DISCARD OR REJECT LOAN APPLICATIONS THAT

23       CAME IN, OTHER THAN THROUGH THE DIRECT RETAIL OR THE PREFERRED

24       MORTGAGE BROKER CHANNEL, WOULD, IN FACT, PROCESS THESE --

25       PROCESS LOANS FOR WHAT THEY CALLED REGULAR BROKERS AND

1    MS. GADKER IN HER TESTIMONY SPECIFICALLY DENIED THAT THERE WAS

2    ANY SORT OF WORLD SAVINGS BANK CATEGORIZATION FOR MORTGAGE

3    BROKERS.

4         COUNSEL ASKED HER THE DIRECT QUESTION IS THERE SUCH A

5    THING AS A MORTGAGE BROKER OR A PREFERRED MORTGAGE BROKERS AND

6    SHE SAID, NO.  THIS DIRECTLY CONTRADICTS THIS.

7              THE COURT:  SO THIS WOULD BE USED IN ARGUMENT.  YOU

8    WOULD SAY THAT THIS IS EVIDENCE THAT SHE WAS IN ERROR BECAUSE

9    WHAT THIS SHOWS IS THAT THE MANUAL SAYS REGULAR BROKER LOANS

10   EXISTED AND YOU USE A BLUE FOLDER.  PREFERRED BROKER LOANS

11   EXISTED, AND YOU WRITE PREFERRED BROKER LOAN ON THE FOLDER,

12   MANILA FOLDER, AND A PREFERRED MORTGAGE BROKER LOAN EXISTED AND

13   YOU USE A MANILA FOLDER.

14        IS THAT THE EXTENT OF IT?

15             MS. LIE:  THE EXTENT OF IT IS THAT ESSENTIALLY

16   PREFERRED MORTGAGE BROKERS ESSENTIALLY HAD A FAST TRACK WITH

17   WORLD SAVINGS BANK, AND I THINK THAT'S A FAIR INFERENCE FROM

18   THIS DOCUMENT.

19             THE COURT:  THAT'S WHAT I WANTED TO SEE IS WHERE

20   DOES THAT INFERENCE COME FROM THIS DOCUMENT?

21             MS. LIE:  I AGREE THAT DOESN'T COME FROM THIS

22   DOCUMENT, BUT I DON'T BELIEVE IT'S NECESSARY.  I DO BELIEVE

23   THAT THIS DOCUMENT IS A NECESSARY PREDICATE TO BE ABLE TO MAKE

24   THAT ARGUMENT.

25        AND I WOULD SUBMIT IT'S A FAIR ARGUMENT FROM THE

1    INFORMATION THAT IS PROVIDED HERE FROM THE FACT THAT MS. GETER

2    WAS, IN FACT, A PREFERRED MORTGAGE BROKER, AND FROM THE NATURE

3    OF THE HANDLING OF THE MORTGAGE BROKER DOCUMENTS AND, QUITE

4    FRANKLY, FROM THE FACT THAT IT APPEARS CLEAR FROM THE TITLE

5    COMPANY FILE THAT OAKLAND FUNDING WAS TREATING THIS AS A DONE

6    DEAL AS EARLY AS OCTOBER 12TH OF 2005.

7        SO I DON'T THINK IT'S ESSENTIAL FOR ANY GIVEN EXHIBIT BY

8    THE DEFENSE TO ENCAPSULATE THE WHOLE OF THE ARGUMENT.  I THINK

9    THIS IS A BUILDING BLOCK OF THAT ARGUMENT TOGETHER WITH OTHER

10   TESTIMONY THAT HAS BEEN PROFFERED AT THIS POINT.

11       AND IF THE COURT OR COUNSEL BELIEVE THAT THERE IS ANYTHING

12   INAPPROPRIATE ABOUT THE NATURE OF THE ARGUMENT THAT IS OFFERED

13   BASED UPON THIS DOCUMENT, THE COURT CAN SIMPLY ENTERTAIN AN

14   OBJECTION AT THIS POINT, BUT THIS DOCUMENT IS RELEVANT AND

15   ADMISSIBLE BECAUSE IT DOES IMPEACH MS. GADKER'S KNOWLEDGE OF

16   HER BANK'S OWN POLICIES AND PROCEDURES AT A MINIMUM.

17           THE COURT:  YEAH, I CAN UNDERSTAND THAT ARGUMENT AND

18   THAT HAS A LITTLE MORE CLARITY THAN THE OTHERS.  I THINK,

19   AGAIN, DRAWING INFERENCES FOR AN EXHIBIT MIGHT BE PROBLEMATIC.

20           MR. FONDO:  YOUR HONOR, I THINK DEFENSE COUNSEL

21   MISUNDERSTANDS THIS DOCUMENT.  IF YOU LOOK AT IT, AND I'M NOT

22   100 PERCENT SURE OF THIS, BUT THERE ARE TWO TYPES OF LOANS,

23   OUTSIDE BROKERS AND INSIDE BROKERS.

24       AND IT SAYS REGULAR BROKER LOAN IS BLUE AND THEN IT SAYS

25   DOWN BELOW, RETAIL BROKER BLUE.  AND I THINK A RETAIL BROKER, I

1      BELIEVE, MAY BE THE INTERNAL LOAN BROKERS.  I'M NOT CERTAIN OF

2      THAT, BUT I THINK IT GOES TO THE POINT OF THERE'S A WITNESS UP

3      THERE WHO WAS ASKED WHAT IS THIS DOCUMENT, AND SHE SAYS I DON'T

4      KNOW.  I'M NOT FAMILIAR WITH YOUR INTERPRETATION OF THIS

5      DOCUMENT.

6           AND SO I THINK TO BE ARGUING ON SOMETHING THAT JUST

7      DEFENSE COUNSEL IS SPECULATING AS TO WHAT CERTAIN THINGS MEAN,

8      I THINK, FURTHER SHOULD EXCLUDE IT.

9              THE COURT:  WELL, MS. LIE, THAT'S MY -- I UNDERSTAND

10     THE IMPEACHMENT PART OF IT, BUT THE SECONDARY PART IS WHAT DO

11     WE DO WITH IT?  AND THE ABILITY TO EXTRAPOLATE INFERENCES

12     BEFORE THAT FROM A DOCUMENT THAT IF IT IS RECEIVED IN EVIDENCE,

13     IT'S EVIDENCE.  BUT THEN TO BE ABLE TO COMMENT INFERENTIALLY

14     WHAT IT REALLY MEANS WHEN THERE'S BEEN NO TESTIMONY TO IT I

15     THINK IS A DIFFERENT ISSUE.

16             MS. LIE:  WELL, I THINK THAT SO DEALING WITH THOSE

17     TWO CONCEPTS IN ORDER, I THINK THE ADMISSIBILITY THEN -- I

18     THINK IT SHOULD -- IT COMES IN.  I THINK IT CERTAINLY COMES IN

19     TO IMPEACH MS. GADKER'S BLANKET STATEMENT THAT THERE WAS NO

20     SUCH THING AS A REGULAR MORTGAGE BROKER.

21          I WOULD DISPUTE ABSOLUTELY GOVERNMENT'S COUNSEL

22     CHARACTERIZATION OF RETAIL BROKERS OR REGULAR BROKERS AS BEING

23     WORLD SAVINGS BANK EMPLOYEES.

24          TO THE EXTENT THAT WE HAVE CLEAR EVIDENCE FROM MS. GADKER

25     FROM THE OTHER BANK EMPLOYEES THAT ESSENTIALLY THERE WERE LOAN

1353

1    REPRESENTATIVES WHO DID THE DIRECT RETAIL BUT THAT BROKERS WERE

2    OUTSIDE BROKERS AND NOT EMPLOYED BY WORLD SAVINGS BANK, AND

3    THAT WASN'T RESTRICTED TO PREFERRED OR ANYTHING LIKE THAT.

4        BROKERS WERE PEOPLE FROM THE OUTSIDE WHO WERE ESSENTIALLY

5    THIRD PARTIES.

6        AND I THINK THAT TO THE EXTENT THAT THE GOVERNMENT

7    BELIEVES THAT OUR ARGUMENT OR OUR INFERENCE IS FROM THIS ARE

8    INCORRECT, THEY'RE FREE TO RESPOND TO THAT.

9        BUT THE DOCUMENT SHOULD COME IN BECAUSE IT IMPEACHES

10   MS. GADKER'S VERY UNAMBIGUOUS TESTIMONY, AND I THINK THE NATURE

11   OF THE ARGUMENT IS THAT THERE IS A DISTINCTION MADE BY WORLD

12   SAVINGS BANK BETWEEN REGULAR BROKERS AND PREFERRED MORTGAGE

13   BROKERS AND THAT THE, THE -- MS. GETER CLEARLY BELONGING TO THE

14   LATTER CLASS GIVEN THE DOCUMENTATION THAT SHE SUBMITTED, THE

15   PREFERRED MORTGAGE BROKER STATEMENT AND DEMAND FOR FEES THAT

16   SHE SUBMITTED AND THE NATURE OF THE HANDLING OF THE LOAN

17   SUPPORTS THAT AS WELL.

18       AGAIN, I THINK THAT THE GOVERNMENT CAN OBJECT IF THEY FEEL

19   OR SHE CAN OFFER COUNTER INFERENCES AS THEY HAVE DONE TODAY IF

20   THEY FEEL THAT WAS INAPPROPRIATE.

21       BUT THE THRESHOLD QUESTION OF ADMISSIBILITY I THINK IS

22   RESOLVED OR SHOULD BE BY THE FOUNDATION, THE FOUNDATIONAL

23   TESTIMONY BY MS. GADKER THAT IS TOTALLY CONTRARY TO THE CLEAR

24   DELINEATION OF SEPARATE CATEGORIES IN THIS DOCUMENT.

25              THE COURT:  MR. FONDO?

1354

1           MR. FONDO:  I JUST DON'T FIND IT CLEAR.  I MEAN,

2     WE'RE TALKING ABOUT WHETHER SOMEBODY GETS A BLUE FOLDER OR

3     MANILA FOLDER AND, I MEAN, THAT'S WHAT IT SAYS.  AND I DON'T

4     SEE HOW IT IMPEACHES THE WITNESS.  AND I'M NOT SURE, AGAIN, THE

5     DEFENSE COUNSEL IS INTERPRETING THIS PROPERLY.

6           THEY CERTAINLY COULD HAVE ASKED THE QUESTION, WELL, WHAT

7     IS A RETAIL BROKER?  WHAT IS A PREFERRED MORTGAGE BROKER?  HOW

8     DO THEY DIFFER?  AND -- BUT THEY DIDN'T.

9           SO NOW TO BE ABLE TO TRY AND ASSERT THAT THIS DOCUMENT IS

10    MUCH MORE THAN IT IS I THINK IS INAPPROPRIATE, AND I THINK IT

11    SHOULD BE EXCLUDED.

12          THE COURT:  WELL, I CERTAINLY UNDERSTAND YOUR

13    ARGUMENT ABOUT IMPEACHMENT WHEN THE WITNESS TESTIFIED ABOUT SHE

14    HAD NO KNOWLEDGE OF OR THERE WERE NO OTHERS, THERE WERE NO

15    OTHER BROKERS OTHER THAN -- OR SHE WAS UNAWARE.

16          I SUPPOSE IT HAS SOME VALUE FOR IMPEACHMENT, BUT TO GO

17    FURTHER THOUGH, I THINK, IS WITHOUT ANYTHING MORE, MS. LIE, IF

18    THIS WAS ADMITTED, I DON'T THINK YOU WOULD THEN BE PERMITTED TO

19    ARGUE THAT SUCH LOANS EXISTED IN THEIR OPERATION OF HOW THEY

20    WORKED AND THOSE TYPES OF THINGS.

21          THE VALUE OF THIS, AS YOU INDICATE, IS TO IMPEACH YOUR

22    TESTIMONY, MS. GADKER'S TESTIMONY REGARDING HER KNOWLEDGE OF

23    OTHER REGULAR BROKERS, PREFERRED BROKERS, PREFERRED MORTGAGE

24    BROKERS OR RETAIL BROKERS.

25          THIS IS A DOCUMENT APPARENTLY FROM THEIR PROCEDURES MANUAL

1    DATED MARCH 14TH, 2005.  IT WAS -- IT EXISTED AND IT WOULD BE

2    ADMISSIBLE, IF AT ALL, FOR THAT PURPOSE, TO IMPEACH HER THAT

3    THE POLICIES AND PROCEDURES MANUAL SUGGESTED THAT THERE EXISTED

4    OTHER POSSIBILITIES.

5        BUT TO GO FURTHER AND EXTRAPOLATE THAT ANY OTHER INFERENCE

6    OTHER THAN THAT IS, I THINK, PROBLEMATIC.

7            MS. LIE:  WELL, THEN I WOULD ASK THE COURT TO ADMIT

8    THIS TO ALLOW THE JURY TO HAVE IT AND TO ALLOW THE JURY TO DRAW

9    THE INFERENCES THAT THEY CAN DRAW.  WHETHER COUNSEL WANTS TO

10   MAKE ARGUMENT ABOUT IT, I WILL LEAVE THAT TO THEM.

11       BUT AS A THRESHOLD MATTER, THE DOCUMENT, BECAUSE IT DOES

12   HAVE PROBATIVE VALUE AS IMPEACHMENT EVIDENCE, BECAUSE

13   MS. GADKER'S TESTIMONY AND HER VERACITY AND HER KNOWLEDGE OF

14   THE BANK PROCEDURES AND THE RELIABILITY OF HER TESTIMONY IS

15   ABSOLUTELY AN ISSUE PARTICULARLY GIVEN THE GOVERNMENT ELECTED

16   NOT TO CALL ANY OF THE OTHER BANK EMPLOYEES WHO PROCESSED THIS

17   LOAN.

18       I THINK SHE'S -- I THINK THAT THIS MUST COME IN.  WHETHER

19   OR NOT THE COURT IS SEEING FIT TO RESTRICT WHAT COMMENTS CAN BE

20   MADE REGARDING IT, AND SO I WOULD ASK --

21           THE COURT:  PARDON ME FOR INTERRUPTING YOU.

22       AND, MR. FONDO, I WOULD ADMIT THIS SOLELY FOR THE

23   IMPEACHMENT OF MS. GADKER AND REGARDING OTHER LOANS THAT

24   EXISTED.

25           HOWEVER, WITHOUT ANY FURTHER FOUNDATION AS TO WHAT THOSE

1        PROCEDURES WERE, WHAT THEY ENTAILED, I DON'T THINK THAT I'M

2        GOING TO ALLOW YOU TO GO INTO THAT UNLESS THERE'S OTHER

3        EVIDENCE THAT YOU CAN PROFFER OR SUGGEST SUCH A THING.

4            SO IT WILL BE ADMITTED OVER THE GOVERNMENT'S OBJECTION FOR

5        THE IMPEACHMENT VALUE THAT IT HAS TO IMPEACH MS. GADKER'S

6        PREVIOUS TESTIMONY REGARDING THE EXISTENCE OF DIFFERENT BROKER

7        LOANS OR PREFERRED MORTGAGE BROKERS LOANS.

8            TO DRILL DOWN FURTHER AS TO THE SPECIFICS OF EACH TYPE OF

9        THOSE LOANS, WHAT THEY ENTAIL, WHAT LOAN OFFICERS DO, WHAT THE

10       BANK DID AND VIS-A-VIS LOAN APPLICANTS DID WITHOUT FURTHER

11       FOUNDATION WON'T BE PERMITTED.

12               MS. LIE:  VERY WELL.

13               THE COURT:  OKAY.

14               MR. FONDO:  THANK YOU, YOUR HONOR.

15           SO, YOUR HONOR, EXHIBIT G.

16               THE COURT:  YES.

17               MR. FONDO:  NO OBJECTION.

18           EXHIBIT H WE WOULD HAVE AN OBJECTION.

19               THE COURT:  LET'S SEE.  THIS IS A PHOTOGRAPH IT

20       LOOKS LIKE?

21               MR. FONDO:  YES, YOUR HONOR.

22               THE COURT:  OKAY.  WHAT IS THE OBJECTION?

23               MR. FONDO:  RELEVANCE.

24               MS. LIE:  YOUR HONOR, I AGREE NO FOUNDATION HAS BEEN

25       LAID AT THIS POINT.

```
 1              THE COURT:  ARE YOU SUGGESTING THE OBJECTION IS
 2    PREMATURE?
 3              MS. LIE:  YES.
 4              THE COURT:  ALL RIGHT.  WE'LL WAIT ON H AND SEE IF A
 5    FOUNDATION IS LAID.
 6              MR. FONDO:  YOUR HONOR, ACCORDING TO DEFENSE COUNSEL
 7    EXHIBIT I HAS BEEN ADMITTED.  SO IF IT'S BEEN PREVIOUSLY
 8    ADMITTED OBVIOUSLY WHATEVER OBJECTIONS WE MAY OR MAY NOT HAVE
 9    ARE KIND OF MOOT.
10        IF FOR SOME REASON WE LEARN THAT DEFENSE COUNSEL IS WRONG,
11    AND I HAVE NO REASON TO BELIEVE THAT SHE IS, WE'LL RAISE IT AT
12    THAT TIME.
13              THE COURT:  ALL RIGHT.
14              MR. FONDO:  SO AS TO EXHIBIT J, I THINK J IS
15    ACTUALLY IN ONE OF OUR EXHIBITS.  SO WE HAVE NO OBJECTION.
16              THE COURT:  OKAY.
17              MS. LIE:  I HAD THOUGHT THAT THAT WAS ADMITTED
18    ALREADY BUT MS. GARCIA'S LIST DOES NOT REFLECT THAT.
19        SO I'LL SUBMIT IT ON -- I'LL SIMPLY ASK TO HAVE THAT
20    ADMITTED AT THIS TIME IF EVERYONE -- IF THAT IS THE CONSENSUS.
21              THE COURT:  WOULD THIS HAVE BEEN IN YOUR 16?
22              MS. LIE:  IT IS AN EXCERPT OF 16-291 TO 16-294.
23              THE COURT:  I THINK 16 WAS ADMITTED.
24              MS. LIE:  16 WAS DEFINITELY ADMITTED.
25              THE COURT:  OVER DEFENSE OBJECTION.
```

1          MS. LIE:  WE OBJECTED TO CERTAIN PORTIONS OF THEM

2     THAT WERE NOT PREPARED BY WORLD SAVINGS BANK.  THIS ONE CLEARLY

3     WAS AND THAT FOUNDATION WAS FURTHER LAID BY GOVERNMENT

4     WITNESSES.

5          THIS IS NOT AMONG THE DOCUMENTS THAT WE WERE OBJECTING TO.

6          THE COURT:  ALL RIGHT.  SO THERE'S NO OBJECTION TO

7     J?

8          MR. FONDO:  TO J?  NO OBJECTION TO J.

9          THE COURT:  OKAY.

10          MR. FONDO:  SO THE NEXT EXHIBIT IS K, YOUR HONOR, I

11     BELIEVE.

12          THE COURT:  YES.

13          MR. FONDO:  AND WE WOULD OBJECT TO THIS AS WELL.

14     THIS IS HEARSAY AND ALSO RELEVANCE.

15          MR. FAZIOLI:  THIS APPEARS ALSO TO AGAIN BE A

16     DOCUMENT THAT WAS WRITTEN BY LEONARD PAIGE.  THERE ARE THINGS

17     IN IT THAT ARE OBJECTIONABLE, AND WE'RE JUST LOOKING AT THIS

18     BUT LIKE ON PAGE 1 MR. PAIGE IS MAKING A STATEMENT THAT WE WILL

19     NEVER WAIVER FROM THE HONESTY.  AND MR. PAIGE INDICATES HERE ON

20     THIS DOCUMENT -- I'M NOT ENTIRELY CLEAR OF THE DATE ON THIS

21     DOCUMENT -- "AS WE CONTINUE TO EXPAND, WE WILL NEVER WAIVER

22     FROM THE HONESTY, PROFESSIONALISM, AND ATTENTION TO CUSTOMER

23     NEEDS THAT HAVE BEEN THE CORNERSTONES OF OUR SUCCESS FOR MORE

24     THAN A DECADE."

25          THIS IS HEARSAY, AND IT'S ALSO VOUCHING ABOUT THE ACTIONS

1        OF PAIGE SECURITY.

2                THERE'S MORE BACKGROUND INFORMATION ON MR. PAIGE.

3                AGAIN, THERE'S MORE ESSENTIALLY OUT-OF-COURT STATEMENTS ON

4        HERE ON WHAT APPEARS TO BE THE THIRD -- THE FOURTH PAGE.

5                THERE'S REFERENCES TO BACKGROUND CHECKS THAT HAVE TAKEN

6        PLACE ON THE OFFICERS.  TO THE EXTENT THAT THERE IS TESTIMONY

7        THAT MS. PAIGE IS A -- WAS AN OFFICER OR SOMEONE AFFILIATED AND

8        THERE WAS REFERENCES TO THE DEPARTMENT OF JUSTICE, WHICH I

9        THINK IS GOING TO RAISE AND BE JUST CONFUSING AND POSSIBLY LEND

10       AN INCORRECT OR POTENTIAL INFERENCE AND AGAIN JUST OTHER

11       STATEMENTS IN HERE WHICH WE JUST VIEW AS NOT APPROPRIATE.

12               THERE'S A REFERENCE TO A PRESIDENTIAL RECOGNITION.  IT'S

13       HEARSAY.  IT'S A STATEMENT BY LEONARD PAIGE.  IT'S ANOTHER FORM

14       OF A STATEMENT BY LEONARD PAIGE.  WE DON'T THINK IT SHOULD COME

15       IN, AND WE DON'T NECESSARILY THINK THAT GETTING IN A BROCHURE

16       FOR THE TRUTH OF THE MATTER IS APPROPRIATE.

17               THERE IS ALSO REFERENCES TO THE BANK ABOUT VARIOUS

18       CORPORATE SPONSORSHIPS AND FUNDRAISERS AND SPECIAL OLYMPICS AND

19       STUFF LIKE THAT.

20               IT'S HARD TO SEE WHAT THE RELEVANCE IS TO THIS CASE THAT

21       THE PAIGE SECURITY MAY HAVE SPONSORED THE SPECIAL OLYMPICS OR

22       DONE OTHER THINGS SUCH AS THAT.

23               AND THEN AGAIN THE DATE ON THIS IS UNCLEAR.

24                   MS. LIE:  YOUR HONOR, AT THIS POINT NO FOUNDATION

25       HAS BEEN LAID.  I'LL RESPOND TO SOME OF THE ANTICIPATORY

1      OBJECTIONS THAT HAVE BEEN RAISED BY COUNSEL.

2           AS TO THE HEARSAY COMPONENT OF THIS, THIS DOES NOT NEED TO

3      BE ADMITTED FOR THE TRUTH OF THE MATTER ASSERTED AND DEFENSE

4      WOULD HAVE NO OBJECTION TO A LIMITING INSTRUCTION TO THAT

5      EFFECT OR TO AN ADMONITION OF THE JURY THAT -- TO THE JURY THAT

6      THE SPECIFIC STATEMENTS CONTAINED HERE ARE NOT NECESSARILY

7      OFFERED FOR THE TRUTH OF THE MATTER ASSERTED.

8           I THINK WHERE THIS WILL BECOME RELEVANT IS TO ESTABLISH

9      THE NATURE OF THE EMPLOYMENT THAT MS. HOLMES HAD WITH PAIGE

10     SECURITY SERVICES.

11          THERE IS GOING TO BE THE TESTIMONY BY ANOTHER EMPLOYEE OF

12     PAIGE SECURITY SERVICES AS WELL.  AND TO THE EXTENT THAT THOSE

13     WITNESS'S CREDIBILITY MAY BE CHALLENGED AS TO THE SUBSTANTIVE

14     NATURE OF THE WORK AND WHETHER PAIGE'S SECURITY SERVICE WAS

15     ACTUALLY A BONA FIDE COMPANY THAT DID REAL WORK AND EMPLOYED

16     REAL EMPLOYEES DOING WORK SUCH AS THE KIND THAT MS. HOLMES DID,

17     THEN I BELIEVE THAT THIS IS GOING TO BECOME RELEVANT TO

18     ESTABLISH THE NATURE OF THEIR OUTREACH AT A MINIMUM TO

19     ESTABLISH -- ALSO THE NATURE OF MR. PAIGE'S ROLE IN THE

20     BUSINESS AND HIS PRIDE IN THE BUSINESS AS WELL AND HOW THAT

21     IMPACTED HIS RELATIONSHIP WITH MS. HOLMES, HIS INTERACTIONS

22     WITH HER AS WELL AS OTHER EMPLOYEES, THAT MAY BECOME RELEVANT

23     OVER THE COURSE OF THE DEFENSE EVIDENCE.

24               MR. FAZIOLI:  YOUR HONOR, WE'LL ALSO ADD TO THIS

25     THAT THE BACK -- NOTICE ON THE BACK OF THE DOCUMENT THERE'S

1    APPARENTLY A LETTER FROM FORMER PRESIDENT CLINTON, WHICH IS

2    INCLUDED WHICH INCLUDES A SENTENCE "YOU AND EVERYONE AT PAIGE'S

3    SECURE" -- IT LOOKS LIKE IT'S CUT OFF.

4         IT SAYS, "YOU AND EVERYONE AT PAIGE'S SECURITY SERVICES

5    SHOULD BE PROUD OF YOUR SUCCESS."  THIS IS ITSELF DOUBLE

6    HEARSAY STATEMENT, AND IT COULD BE READ AS SOME SORT OF

7    CHARACTER VOUCHING BY PRESIDENT CLINTON ON THE PART OF EVERYONE

8    AT PAIGE SECURITY.

9         IT'S PART OF THE REASON WHY WE SHOULDN'T -- THERE ARE

10   REASONS WHY WE SHOULDN'T BE ALLOWING A BROCHURE.  THE TOPIC

11   THAT --

12            THE COURT:  WELL, YOU CAN SUBPOENA HIM TO COME IN

13   AND TESTIFY, RIGHT?

14            MS. LIE:  I THINK WE'LL STIPULATE THAT THE U.S.

15   ATTORNEY'S OFFICE IS NOT GIVING CREDENCE TO THE LETTER BY

16   FORMER PRESIDENT CLINTON AND, AGAIN, WHY A CURING INSTRUCTION

17   WOULD CURE ALL OF THIS.

18            THE COURT:  SO, MR. FAZIOLI, I DO SEE SOME

19   PROBLEMS -- POTENTIAL PROBLEMS WITH THE DOCUMENT IN TOTO.

20        THE REASONS THAT YOU ARE ARTICULATING FOR ADVANCING ITS

21   ADMISSION MIGHT BECOME NECESSARY.  IT MAY BE THAT THIS DOCUMENT

22   OR PARTS OF IT MIGHT BE ADMISSIBLE, BUT I CAN CERTAINLY

23   UNDERSTAND, WE DON'T NEED TO PARSE OUT AND TAKE TIME RIGHT NOW

24   TO GO THROUGH EACH OF THESE.

25            I THINK -- I APPRECIATE THE GOVERNMENT POINTING OUT SOME

1       OF THE AREAS THAT IT WOULD HAVE DIFFICULTY.

2           IT MAY NOT BE RELEVANT IF THERE'S TESTIMONY ABOUT PAIGE

3       AND WITNESSES TESTIFY ABOUT THE LEGITIMACY OF THEIR -- OF THE

4       BUSINESS.  IT MAY NOT BE NECESSARY TO GET THIS IN.

5           SO I SUPPOSE THIS IS KIND OF A WAIT AND SEE, BUT I DO NOTE

6       THAT THERE ARE SOME PROBLEMS WITH SOME OF THE INFORMATION

7       CONTAINED HERE MIGHT NOT BE RELEVANT FOR THE PURPOSES THAT YOU

8       SUGGEST.  THERE MIGHT BE OTHER ALTERNATIVES TO -- WE KNOW THAT

9       PAIGE EXISTED.  I THINK THERE WERE W-2'S COMING IN BY PAIGES

10      SECURITY.  SO WE KNOW THERE WAS A GROWING CONCERN.

11              MS. LIE:  I THINK WHAT WAS ADMITTED AND TESTIFIED TO

12      WERE ABOUT OTHER SECURITY ORGANIZATIONS, AND SO I DON'T THINK

13      THERE HAS BEEN OTHER DOCUMENTS ADMITTED REGARDING THE EXISTENCE

14      OF PAIGES SECURITY SERVICES INCORPORATED, THE CORPORATION.

15          THERE'S BEEN TESTIMONIAL EVIDENCE REGARDING THE EXISTENCE

16      OF UNFUNDED PENSION OBLIGATIONS AND I THINK THAT -- BUT I DO

17      THINK THAT THE ADMISSIBILITY OF THIS DOCUMENT CAN BE RULED UPON

18      AS THE DEFENSE TESTIFIES.  AND EVEN IF THE DEFENSE TESTIFIES TO

19      THE BASIC PRECEPTS I HAVE ADVANCED HERE, I THINK THIS IS

20      CORROBORATION OF THEM.

21              THE COURT:  IT COULD BE CUMULATIVE ALSO.

22              MS. LIE:  AND THE DEFENSE WILL LET THE COURT RULE ON

23      THAT AS IT COMES UP, AND WE CONCEDE AT THIS POINT IT'S VERY

24      MUCH A CONTINGENT QUESTION.

25              THE COURT:  OKAY.

1          MR. FAZIOLI:  YOUR HONOR, I THINK THE DEFENSE IS

2     RIGHT THAT THE W-2'S THAT HAVE BEEN ADMITTED REGARDING THE

3     DEFENDANT DO RELATE TO EMPLOYERS THAT WERE NOT PAIGE SECURITY.

4     A1 SECURITY WAS ANOTHER ONE OF THEM AND THEN THERE WAS ANOTHER

5     EMPLOYER IN 2006.

6          HOWEVER, I DON'T KNOW IF IT'S GOING TO BE A DISPUTED ISSUE

7     THAT DEFENDANT WORKED FOR PAIGE SECURITY.  PAIGE SECURITY WAS A

8     BUSINESS AND THEN IT ULTIMATELY FAILED AND WENT INTO BANKRUPTCY

9     AND THE BANKRUPTCY TOOK PLACE IN 2002, WHICH IS SEVERAL YEARS

10    BEFORE THE OFFENSES THAT REALLY ARE AT ISSUE IN THIS CASE.

11         THERE MIGHT BE SOME ISSUES, I THINK, WITH GETTING INTO AN

12    EXTENDED DETAILED DISCUSSION ABOUT THE NATURE OF THE FAILURE OF

13    PAIGE'S SECURITY BUSINESS IN THE EARLY, YOU KNOW, FOUR OR FIVE

14    OR THREE YEARS BEFORE THE ACTIONS AT ISSUE IN THIS CASE.

15         AND, AGAIN, SOME OF THESE GENERAL TOPICS COULD BE TALKED

16    ABOUT WITHOUT NECESSARILY HAVING TO GET IN A BROCHURE THAT HAS

17    TO DO WITH THE ISSUES THAT THE COURT ALLUDED TO AS

18    POSSIBILITIES.

19         THE COURT:  ALL RIGHT.  SO THIS WILL BE A WAIT AND

20    SEE.

21         NEXT IS L.

22         MR. FONDO:  YOUR HONOR, CONCEPTUALLY WE DON'T HAVE

23    AN OBJECTION.  IT'S ONLY ONE PAGE OF A TEN PAGE DOCUMENT.  I

24    THINK THE FULL DOCUMENT IS ALREADY IN.  AND I APOLOGIZE THAT I

25    DID NOT RAISE THIS WITH DEFENSE COUNSEL BEFORE.  AND THIS JUST

```
 1      KIND OF OCCURRED TO ME.

 2           AND I DON'T HAVE A PROBLEM WITH THE DOCUMENT.  IT'S JUST

 3      AN EXCERPT FROM A FULL DOCUMENT.

 4               MS. LIE:  AND, YOUR HONOR, I APOLOGIZE.  I THOUGHT

 5      THAT WHAT I HAD REFERENCED AS L AND IDENTIFIED AS L ON THE

 6      RECORD WAS THE TOTALITY OF THE CLOSING INSTRUCTIONS, BUT I MAY

 7      VERY WELL HAVE BEEN INCORRECT ABOUT THAT.  AND SO WE COULD

 8      SIMPLY ADMIT THE TOTALITY OF THE CLOSING INSTRUCTIONS.

 9               THE COURT:  WELL, THIS IS PART OF EXHIBIT 16, I

10      THINK.

11               MS. LIE:  IT IS.  AND BECAUSE EXHIBIT 16 IS LIKE

12      THAT THICK, I DID THINK IT WAS USEFUL TO AT LEAST GIVE THE JURY

13      A MORE MANIPULATABLE EXCERPT THAT WAS A DISCRETE DOCUMENT.

14               THE COURT:  FOR THE RECORD YOU HAD YOUR HANDS ABOUT

15      TWO POUNDS (INDICATING).

16               MS. LIE:  YES.

17               THE COURT:  SO IT IS PART OF 16 AND I SUPPOSE -- I

18      THINK COUNSEL HAD DONE THIS WHEN OTHER EXHIBITS HAVE BEEN

19      INTRODUCED, YOU HAVE INDICATED THIS IS PART OF GOVERNMENT'S

20      EXHIBIT, FOR EXAMPLE, AND THE JURY CAN CERTAINLY UNDERSTAND.

21      AND WHEN YOU INTRODUCE THIS, REFERENCE IT, THAT MIGHT BE

22      HELPFUL TO THEM, IT'S DEFENSE L AND IT'S ALSO CONTAINED IN

23      GOVERNMENT'S 16, IT'S PAGINATED 131, WHICH I THINK IS ACCURATE

24      IN 16.

25               SO THERE'S NO OBJECTION TO THIS?
```

1365

```
1            MR. FONDO:  WELL, IF DEFENSE COUNSEL IS GOING TO PUT

2    IN THE ENTIRE DOCUMENT, THEN THERE'S NO OBJECTION.  IS THAT

3    YOUR INTENT?

4            MS. LIE:  IF THAT'S THE GOVERNMENT'S PREFERENCE THEN

5    WE CAN DO THAT, ALTHOUGH I DO THINK THAT THE ENTIRE DOCUMENT IS

6    ELSEWHERE ADMITTED IN THE GOVERNMENT'S EXHIBITS.

7            MR. FONDO:  IT PROBABLY IS.  AND, AGAIN, I'M NOT --

8    I HAVE NO PROBLEM WITH THE DOCUMENT, I JUST THINK IF THEY'RE

9    GOING TO SEE ONE PAGE, THEY SHOULD SEE THE ENTIRE DOCUMENT,

10   THAT'S ALL.

11           MS. LIE:  YOUR HONOR, AT THIS POINT I THINK THAT I

12   AM GOING TO HAVE TO GO BACK AND CHECK MY NOTES TO SEE WHETHER

13   THE TOTALITY OF THE LENDER'S CLOSING INSTRUCTIONS WAS ADMITTED.

14   AND IF IT HAD, I THINK THAT WOULD BE APPROXIMATELY A TEN-PAGE

15   DOCUMENT.

16           THE COURT:  I THINK IT IS A TEN-PAGE DOCUMENT THAT

17   BEGINS AT 16-121 AND RUNS THROUGH 16-131.

18           MS. LIE:  AND I BELIEVE THIS WAS MARKED AT LEAST BY

19   THE GOVERNMENT AS EXHIBIT 60 OR SOMETHING.

20           MR. FONDO:  CLOSE.  IT LOOKS LIKE IT'S EXHIBIT 50, A

21   SEPARATE DOCUMENT, JUST BASED ON THE BATES RANGE BECAUSE

22   EXHIBIT 50, WHICH WAS ADMITTED ON MARCH 4TH, HAS A BATES RANGE

23   OF 3142 THROUGH 3152 AND IT SAYS LENDER'S CLOSING INSTRUCTIONS.

24           MS. LIE:  SO TO THE EXTENT THAT EXHIBIT 50 HAS BEEN

25   ADMITTED THEN I'LL WITHDRAW L.
```

```
 1                    THE COURT:  OKAY.  M IS THE SAN FRANCISCO CUSTODIAN

 2       RECORDS.

 3                    MR. FONDO:  YOUR HONOR, WE WOULD LIKE TO

 4       CROSS-EXAMINE THIS WITNESS.

 5                    THE COURT:  IS THIS WITNESS GOING TO TESTIFY?

 6                    MS. LIE:  YOUR HONOR, WE HAD PROFFERED THE

 7       DECLARATION OF THE CUSTODIAN AS PART OF OUR POSITION THAT THIS

 8       IS A SELF-AUTHENTICATING DOCUMENT AND A SELF-AUTHENTICATING

 9       PUBLIC RECORD.

10            AND I THINK THAT THE RULES PERMIT THE GOVERNMENT, UPON

11       NOTICE FROM THE DEFENSE, TO SEPARATELY INQUIRE OF THE CUSTODIAN

12       AND MAKE A DETERMINATION OF WHETHER THERE'S A BASIS TO OPPOSE

13       ADMISSIBILITY OF THIS AS A SELF-AUTHENTICATING DOCUMENT.

14            BUT HAVING BEEN PROVIDED WITH THIS DOCUMENT AND THE

15       DEFENSE NOTICE OF ITS INTENTION TO UTILIZE IT PURSUANT TO RULE

16       902, I THINK IF THE GOVERNMENT HAS SOME BASIS TO QUESTION ITS

17       AUTHENTICITY AT THIS POINT, THEN I AM JUST NOT HEARING THAT AT

18       THIS POINT.

19                    AND SO WE'RE PROFFERING IT UNDER RULE 902.

20                    MR. FONDO:  YOUR HONOR, I'M NOT DISPUTING THE

21       AUTHENTICITY OF IT.  AND DEFENSE COUNSEL IS RIGHT, SHE DID

22       REFER US TO THIS EARLIER AND WE JUST FAILED TO GET BACK TO HER

23       AND THAT WAS MY OVERSIGHT, AND I APOLOGIZE TO DEFENSE COUNSEL

24       ABOUT THAT.

25                    BUT WE ALSO HAVE A QUESTION AS TO THE RELEVANCY OF IT.
```

1           MR. FAZIOLI:  APART FROM THE AUTHENTICATION, PUTTING

2     ASIDE AN AUTHENTICATION QUESTION, THERE IS A QUESTION ABOUT

3     WHAT IS THE PURPOSE OF THIS DOCUMENT AND WHETHER ANY OF THE

4     WITNESSES THAT THE DEFENSE ARE GOING TO PRESENT WOULD BE

5     QUALIFIED TO TALK ABOUT THIS PARTICULAR DOCUMENT.

6         SO TO THAT EXTENT WE CANNOT NECESSARILY ADMIT TO ITS

7     AUTHENTICITY.  PERHAPS ONE OF THE DEFENSE WITNESSES HAS SOME

8     CONNECTION WITH THE SAN FRANCISCO TAX COLLECTOR'S OFFICE AND

9     CAN EXPLAIN IT AND AS A BUSINESS RECORD MUCH LIKE THE I.R.S.

10    EXPLAINED THE TAX RETURNS, BUT AT THIS STAGE WE'RE JUST NOT

11    SURE WHAT THE PURPOSE OF THIS IS AND HOW IT'S RELEVANT.

12          MS. LIE:  YOUR HONOR, I THINK THE RELEVANCY CAN BE

13    ESTABLISHED THROUGH THE TESTIMONY OF THE WITNESSES.

14        THERE'S NOT GOING TO BE ANY TESTIMONY REGARDING ANY

15    RELATIONSHIP TO THE TAX COLLECTOR'S OFFICE.  IF THE GOVERNMENT

16    WISHES TO CROSS-EXAMINE REGARDING THAT, TO THE EXTENT THAT THEY

17    BELIEVE THERE IS ONE, THEN THAT'S THEIR OPTION CERTAINLY.

18          MR. FAZIOLI:  I THINK A QUESTION THOUGH IS WHAT DOES

19    THIS -- APART FROM THE FACT THAT IT MAY BE AUTHENTIC, PUTTING

20    THAT ASIDE, WHAT DOES THE INFORMATION ON THIS DOCUMENT MEAN?

21          THE COURT:  IS THIS -- AND I SUPPOSE YOU DON'T HAVE

22    TO ANSWER THIS QUESTION, MS. LIE, BUT I'M CURIOUS WHETHER OR

23    NOT IS THIS BEING OFFERED TO ESTABLISH THAT THE STAR PARTNERS

24    SECURITY, INCORPORATED, WAS A LEGITIMATE BUSINESS OR DID EXIST?

25          MS. LIE:  YES.

1           THE COURT:  I SEE.  IT LOOKS LIKE THAT'S THE

2     RELEVANCE THAT IT WOULD HAVE TO ESTABLISH THAT THERE WAS A

3     CONCERN WITH THAT TITLE AT THIS PARTICULAR DATE AND TIME.

4         HAS THERE BEEN EVIDENCE ABOUT THAT, THIS CONCERN ABOUT

5     STAR PARTNERS SECURITY, INCORPORATED?

6           MS. LIE:  I THINK THE EVIDENCE THAT THE GOVERNMENT

7     HAS INTRODUCED REGARDING THE NATURE OF THE FINANCES IN THE

8     YEARS PRIOR TO THE FILING OF THE MORTGAGE APPLICATION

9     ABSOLUTELY IS INTENDED TO CALL INTO QUESTION WHETHER THIS

10    BUSINESS IS ACTUALLY A LEGITIMATE ENTERPRISE AND WHETHER IT

11    HAS -- HAD ANY FUNCTION WHATSOEVER.

12        AND SO WE WOULD SUBMIT THE DEFENSE, AS PART OF ITS

13    REBUTTAL TO THOSE INFERENCES WE BELIEVE WOULD BE PERMITTED TO

14    TALK ABOUT THE INCEPTION OF THE BUSINESS AND THE INDICIA THAT

15    IS CONTEMPORANEOUS GENERATED INDICIA, THAT TENDS TO SUGGEST

16    THAT THIS WAS A BONA FIDE ENTERPRISE, REGARDLESS OF ITS

17    PARTICULAR FINANCIAL STANDING AT VARIOUS POINTS IN TIME, WHICH

18    I THINK IS A SEPARATE ISSUE, BUT A RELATED ONE.

19           THE COURT:  SO THIS DOCUMENT, IT LOOKS LIKE IT'S A

20    PHOTOCOPY, IT'S A TAX COLLECTORS TAX DATA SYSTEMS DATED MARCH

21    5, 2013.  I SUPPOSE THAT'S THE DATE THAT IT WAS PREPARED?

22           MS. LIE:  THAT WAS THE DATE THAT IT WAS PRODUCED TO

23    THE DEFENSE, BUT THESE, WHAT I BELIEVE IS THE -- YOU HAVE THE

24    THIRD PAGE IS THE TAX COLLECTOR'S BUSINESS SYSTEM WHICH

25    REFLECTS THE START DATE OF THE BUSINESS CERTIFICATION AS WELL

```
 1        AS THE LAST ISSUANCE DATE OF A RENEWAL CERTIFICATE.

 2               THE COURT:  IT SAYS UNPAID REGISTRATION FEES OR REG

 3        FEES.

 4               MS. LIE:  THAT WOULD BE THE TERMINATION OF THE

 5        LICENSE IN 2009.  AND I THINK THAT SOME OF THE DEFENSE

 6        TESTIMONY MAY SHED LIGHT ON THAT, BUT I THINK THAT THE

 7        EXISTENCE IN 2002 OF THE BUSINESS ENTERPRISE --

 8               THE COURT:  WELL, WHAT THIS SHOWS IS THAT SAN

 9        FRANCISCO TAX COLLECTORS SYSTEMS CREATED THIS ENTRY, PERHAPS,

10        FOR TAX COLLECTION PURPOSES.

11            IT DOESN'T SPEAK TO WHETHER OR NOT THIS IS AN ACTUAL

12        EXISTING CONCERN.  IT JUST SPEAKS THAT A RECORD WAS OPENED.

13               MS. LIE:  I UNDERSTAND THAT.  AND, ONCE AGAIN, I DO

14        BELIEVE THAT IT IS NOT A THRESHOLD QUESTION REQUIREMENT FOR

15        ADMISSIBILITY THAT THE DOCUMENT EXCULPATE THE WHOLE OF THE

16        DEFENSE THEORY OR TESTIMONY.

17            I THINK THAT IN CONJUNCTION WITH TESTIMONY THAT WILL BE

18        INTRODUCED LATER, I THINK THAT THIS IS GOING TO BE RELEVANT AND

19        ADMISSIBLE.  I'M HAPPY TO HAVE THE COURT RESERVE RULING IF IT

20        FEELS IT WAS NECESSARY.  IT WAS NOT THE DEFENSE MOTION TO ADMIT

21        THIS AT AN EARLY STAGE INDEPENDENT OF WITNESS TESTIMONY.

22               THE COURT:  I SEE.  SO YOU'RE GOING TO LAY A

23        FOUNDATION?

24               MS. LIE:  YES.

25               MR. FONDO:  THAT'S FINE.
```

```
1              THE COURT:  SO SUBJECT TO A FOUNDATION IT WOULD
2       OTHERWISE BE ADMISSIBLE.
3          OKAY.  N.
4              MR. FONDO:  YOUR HONOR, WE WOULD ALSO OBJECT TO N ON
5       MULTIPLE GROUNDS.  IT'S HEARSAY, RELEVANCE.  IT LOOKS LIKE
6       MR. PAIGE OR MR. PAIGE'S BIRTHDAY PARTY.  IT'S DATED 2007 AND
7       WELL BEYOND THE INCIDENTS RELEVANT IN THIS CASE.
8          SO, YOUR HONOR, WE WOULD OBJECT.
9              MS. LIE:  YOUR HONOR, FIRST OF ALL --
10             THE COURT:  EXCUSE ME.
11             MS. LIE:  -- IT IS NOT HEARSAY BECAUSE IT CONTAINS
12      NO FACTUAL ASSERTIONS OTHER THAN THE DATE OF BIRTH OF
13      MR. PAIGE, AND WE WOULD BE HAPPY TO REDACT THAT IF THE
14      GOVERNMENT FEELS -- BUT I'M OPEN TO THE POSSIBILITY THAT AN
15      ADEQUATE FOUNDATION MAY NOT BE LAID FOR THIS OR THIS THREADS
16      INTO AREAS THAT ARE THE SUBJECT OF THE, SUBJECT OF THE COURT'S
17      IN LIMINE MOTION.  HOWEVER, WE PRODUCED THIS OUT OF AN
18      ABUNDANCE OF CAUTION THAT THE GOVERNMENT DECIDES TO GO THERE.
19             THE COURT:  SO THIS IS SUBJECT TO FOUNDATION.
20             MR. FONDO:  THAT'S FINE.  EXHIBIT O THE GOVERNMENT
21      HAS NO OBJECTION TO.
22         THE ONLY THING I MIGHT ASK IS THAT I THINK THIS IS ANOTHER
23      EXAMPLE OF A DOCUMENT THAT WAS WITHIN A PRIOR GOVERNMENT
24      EXHIBIT.  AND SO FOR JUST LACK OF CONFUSION SAKE IT MIGHT MAKE
25      MORE SENSE TO HAVE THE EXHIBIT REFERENCED, YOU KNOW, PULL IT
```

1    FROM OUR EXHIBIT.  I'M ASSUMING THIS IS EXHIBIT 16, IS IT?

2              MS. LIE:  THIS WAS --

3              MR. FONDO:  EXHIBIT 58.

4              MS. LIE:  -- FROM EXHIBIT 58.

5              MR. FONDO:  YEAH.  SO THAT WOULD BE MY ONLY COMMENT,

6    YOUR HONOR.

7              THE COURT:  ARE YOU ABLE TO DO THAT, MS. LIE?

8              MS. LIE:  YOUR HONOR, I CAN.  IT'S GOING TO TAKE ME

9    A LITTLE TIME TO RECOVER THE PAGE NUMBERINGS FROM MY NOT

10   READILY DECIPHERABLE NOTES, BUT I CAN CERTAINLY DO THAT.

11             THE COURT:  OKAY.

12             MS. LIE:  CAN WE RETURN TO EXHIBIT L?  I WANTED TO

13   MAKE ONE CORRECTION FOR THE RECORD.

14             THE COURT:  YES.

15             MS. LIE:  YOUR HONOR, I BELIEVE EXHIBIT L, THE

16   TOTALITY OF THE CLOSING INSTRUCTIONS AS IT WAS DISCUSSED WITH

17   THE WITNESS ANCIETE HAD BEEN REFERENCED AS EXHIBIT 66, AND I

18   THINK AT THAT POINT I MOVED TO ADMIT GOVERNMENT'S EXHIBIT 66

19   AND THE GOVERNMENT HAD NO OBJECTION AT THAT POINT.

20        SO FOR THAT PURPOSE, IF I'M CORRECT ABOUT THAT, AND I'LL

21   STAND CORRECTED BY GOVERNMENT'S COUNSEL, IF 66 HAS BEEN

22   ADMITTED, THEN I WOULD WITHDRAW L, DOUBLE E OR TRIPLE E

23   BASICALLY.

24             MR. FONDO:  SO IT APPEARS TO BE -- I'M NOT SURE

25   WHETHER IT'S THE SAME DOCUMENT.  IT APPEARS TO BE.  IT APPEARS

```
1         TO BE.  BECAUSE IT'S A --

2                   MS. LIE:  IT WAS DISCUSSED WITH THE WITNESS.

3                   THE COURT:  ALL RIGHT.  IF IT'S 66, YOU'RE

4         WITHDRAWING YOUR L.

5                   MS. LIE:  YES, SUBJECT TO CONFIRMATION THAT

6         EXHIBIT 66 WAS ADMITTED.  I BELIEVE IT WAS.

7                   THE COURT:  OKAY.  P IS A FAX COVER SHEET.

8                   MS. LIE:  YES.  AND THIS WAS FROM EXHIBIT 58, WHICH

9         WAS ADMITTED INTO EVIDENCE AND IT'S AT PAGE 210.

10                  MR. FONDO:  NO OBJECTION, YOUR HONOR.

11                  THE COURT:  OKAY.  Q IS ANOTHER PHOTOGRAPH.

12                  MR. FAZIOLI:  THE SAME OBJECTION, YOUR HONOR.  IT'S

13        UNCLEAR WHAT THE RELEVANCE OF A FAMILY PHOTO WOULD BE.  IT

14        WOULD BE PREJUDICIAL.

15            AGAIN, AS A GENERAL POINT, OUR CASE IS TRIED TO BE LIMITED

16        TO THE TIMEFRAME -- I DON'T EVEN KNOW WHAT DATE THIS PICTURE

17        IS, BUT OUR CASE WAS LIMITED TO THE TIMEFRAME OF THE EVENTS AT

18        ISSUE OF THIS LOAN.

19                  THE COURT:  AND IS THIS MS. MYRA HOLMES IN THIS

20        PHOTOGRAPH?

21                  MS. LIE:  I DON'T BELIEVE SO, ALTHOUGH THERE'S A

22        FACE THAT IS HALF CUT OFF ON ONE SIDE OF IT.  I DON'T BELIEVE

23        SO AND THAT WASN'T THE PURPOSE FOR WHICH I WAS -- IT WAS

24        ANTICIPATED.

25            I THINK MUCH LIKE N, I THINK IT'S SUBJECT TO WHERE THE
```

```
 1    GOVERNMENT THINKS THAT WE HAVE OPENED DOORS AND WHAT THEY

 2    CHOOSE TO INQUIRE REGARDING.

 3         SO I WOULD BE HAPPY TO HAVE THE COURT RESERVE RULING

 4    SUBJECT TO AN APPROPRIATE FOUNDATION.

 5         I DO QUESTION, HOWEVER, THE GOVERNMENT'S ASSERTION THAT

 6    THE FAMILY PHOTO IS SOMEWHAT PREJUDICIAL.

 7              THE COURT:  WELL, THAT WAS ONE OF MY QUESTIONS, IF

 8    THE DEFENDANT IS IN IT OR NOT, MAYBE THAT DOESN'T MAKE A

 9    DIFFERENCE, BUT MAYBE IT WOULD.

10              MS. LIE:  I DON'T THINK IT MAKES A DIFFERENCE TO THE

11    PREJUDICE ARGUMENT.  YOU KNOW, I THINK THE ISSUE, I THINK THE

12    ISSUE REALLY IS GOING TO COME DOWN TO WHAT THE GOVERNMENT

13    THINKS THAT WE HAVE OPENED THE DOOR TO ULTIMATELY AND, AGAIN,

14    INCLUDED OUT OF AN ABUNDANCE OF CAUTION IN THE EVENT THAT THERE

15    IS SOME DISAGREEMENT FURTHER DOWN THE LINE ABOUT WHETHER

16    MR. PAIGE -- AND I WILL NOTE THAT THIS WAS, I BELIEVE, TAKEN AT

17    THE 80TH BIRTHDAY --

18              THE DEFENDANT:  YES.

19              MS. LIE:  -- THAT IS REFERENCED IN EXHIBIT N.  AND

20    SO WHETHER THE 80TH BIRTHDAY AND MR. PAIGE AND HIS

21    PARTICIPATION IN THAT EVENT BECOMES RELEVANT, THEN I THINK

22    THAT --

23              THE COURT:  IT SOUNDS LIKE IT'S TOUCHING ON THE

24    COMPETENCY OF MR. PAIGE AS OPPOSED TO THE ISSUE OF WHETHER OR

25    NOT MR. PAIGE WAS YOUR CLIENT'S FATHER OR NOT.
```

```
 1          MS. LIE:  EXACTLY.

 2          THE COURT:  IT SOUNDS LIKE THIS REALLY IS TOUCHING

 3     ON WHETHER OR NOT MR. PAIGE'S COMPETENCY, WHICH HAS

 4     PARTICULARLY BEEN THE ISSUE THROUGHOUT THIS CASE, IS DEMENTIA

 5     OR NOT.  AND THE COURT HAS MADE A RULING ON THAT.

 6        THESE ARE YOUR EXHIBITS?

 7          MS. LIE:  THEY ARE OUR EXHIBITS.  THEY'RE OVERLY

 8     INCLUSIVE ARGUABLY, AND AS I INDICATED BEFORE AS TO N AND AGAIN

 9     NOW AS TO Q, I THINK THAT THE ISSUE OF WHETHER WE ULTIMATELY

10     OFFER THESE MAY VERY WELL BE CONTINGENT UPON WHAT ARGUMENTS THE

11     GOVERNMENT MAKES IN THE COURSE OF THE DEFENSE CASE ABOUT -- TO

12     WHAT WE HAVE OPENED THE DOOR.

13          THE COURT:  OKAY.  Q IS -- IT'S R, PARDON ME.  R.

14        WHAT RELEVANCE IS A PHOTOGRAPH OF MR. PAIGE WITH MAGIC

15     JOHNSON TO JURORS WHO MIGHT BE GOLDEN STATE WARRIOR FANS?

16          MS. LIE:  YOUR HONOR, I'M NOT SURE THERE NECESSARILY

17     WILL BE, BUT I BELIEVE THAT ONE OF THE WITNESSES MAY LAY A

18     FOUNDATION FOR THIS ON THE GROUNDS THAT MR. PAIGE'S

19     PARTICIPATION IN AND THE NATURE OF HIS PARTICIPATION IN THE

20     OPERATION OF THE BUSINESS AND HIS BUSINESS AND HOW THAT

21     AFFECTED HIS INTERACTIONS WITH HIS CHILDREN AND SPECIFICALLY

22     MS. HOLMES.  I THINK THIS MAY BECOME RELEVANT TO CORROBORATE

23     THAT WITNESS'S TESTIMONY.

24        I THINK, AGAIN, IT'S SUBJECT TO HOW THE WITNESS ANSWERS

25     THOSE QUESTIONS.
```

```
1                    THE COURT:  ALL RIGHT.

2                    MS. LIE:  AND HOW THAT WITNESS IS SUBJECT TO

3     CROSS-EXAMINATION LATER.

4                    THE COURT:  ALL RIGHT.  S IS ANOTHER PHOTOGRAPH.

5                    MS. LIE:  AGAIN, YOUR HONOR, WE WOULD AGREE THAT NO

6     FOUNDATION HAS BEEN LAID AT THIS POINT.

7                    MR. FAZIOLI:  IS THIS MR. PAIGE IN THIS PICTURE?

8                    MS. LIE:  IT IS.

9                    MR. FAZIOLI:  WE WOULD -- IT'S A SIMILAR OBJECTION.

10    THIS IS ACTUALLY IN A WAY IT COULD BE CONSTRUED AS HEARSAY TO

11    SOME EXTENT AND TO THE EXTENT THAT THERE'S -- THERE'S A COUPLE

12    OF CERTIFICATES IN THIS PICTURE THAT ARE ARGUABLY THE

13    PRESENTATION OF THE PICTURE WITH THE INFORMATION THAT IS ON

14    THOSE CERTIFICATES IS ARGUABLY HEARSAY, THE CERTIFICATES

15    THEMSELVES ARE HEARSAY, AND MR. PAIGE HOLDING THEM.

16        AGAIN, THERE'S A NUMBER OF OBJECTIONS TO IT, BUT IT SOUNDS

17    LIKE THIS IS AN ISSUE THAT WE'RE GOING TO APPROACH DOWN THE

18    LINE.

19                    MR. FONDO:  AND OBVIOUSLY THE DATE OF THE PICTURE.

20    IT'S UNCLEAR WHEN THIS WAS.

21                    THE COURT:  THESE ARE ALL FOUNDATIONAL ISSUES THAT

22    ATTACH.

23                    MS. LIE:  THEY ARE FOUNDATIONAL ISSUES.  AND

24    ALTHOUGH I WOULD NOTE THAT THERE'S NO DATE ON THE PICTURES, I

25    WOULD CONCEDE THAT THE DATE ON THE CERTIFICATES IS AFTER THE
```

```
1    OFFENSE CONDUCT IN THIS CASE.  I WOULD DISPUTE THAT THE

2    CERTIFICATES ARE HEARSAY.  THEY'RE ESSENTIALLY NON-HEARSAY

3    ACTS.

4         TO THE EXTENT THAT THE GOVERNMENT IS CONCERNED THAT THERE

5    MIGHT BE INFERENCES DRAWN ABOUT THE JUDGMENT OF THE AWARDING

6    AUTHORITIES, THEN A LIMITING INSTRUCTION IF THE PHOTOGRAPH

7    BECOMES ADMISSIBLE, I THINK A LIMITING INSTRUCTION CAN

8    CERTAINLY CURE THOSE ISSUES.

9         BUT I DO THINK THAT THE RELATIONSHIP BETWEEN MR. PAIGE AND

10   HIS DAUGHTERS IS ABSOLUTELY GOING TO BE FRONT AND CENTER IN

11   THE -- BOTH THE DIRECT AND CROSS-EXAMINATIONS OF THE WITNESSES

12   AND HOW THAT MAY HAVE INFLUENCED THE CONDUCT OF PEOPLE

13   INVOLVED, I THINK THAT THIS PHOTOGRAPH, IRRESPECTIVE OF THE

14   DATE, TENDS TO CORROBORATE THE TESTIMONY OF SOME OF THOSE

15   WITNESSES OR WILL TEND TO CORROBORATE THE TESTIMONY OF SOME OF

16   THOSE WITNESSES.

17             THE COURT:  ALL RIGHT.  WE'LL WAIT AND SEE ON THIS.

18        U IS OFFICE OF THE PERSONNEL MANAGEMENT.

19             MS. LIE:  AGAIN, I WOULD SUBMIT THAT AT THIS POINT

20   THE FOUNDATIONAL ISSUES WILL BE ADDRESSED DURING TESTIMONY.

21             MR. FONDO:  AT THIS TIME WE WOULD OBJECT, YOUR

22   HONOR.  WE'LL JUST WAIT AND SEE.

23             THE COURT:  OKAY.  DOUBLE B.

24             MR. FONDO:  I THINK THIS WAS PREVIOUSLY SUBMITTED;

25   CORRECT?
```

```
 1                    THE COURT:  I THINK IT WAS.

 2                    MS. LIE:  YES, AS WAS TRIPLE E.

 3                    MR. FONDO:  I DON'T THINK TRIPLE E WAS ADMITTED.  I

 4      DON'T HAVE AN OBJECTION TO IT, BUT I DON'T THINK IT WAS

 5      ADMITTED.

 6                    THE COURT:  IS THIS PART OF 58?

 7                    MS. LIE:  YES, 58-72 TO 58-74.

 8                    MR. FONDO:  SO COUNSEL IS CORRECT.  IT WAS A

 9      SEPARATE EXHIBIT.

10                    MS. LIE:  I THINK IT HAD BEEN ADMITTED AS A SEPARATE

11      EXHIBIT, BUT I'LL DEFER TO THE COURT.

12                    MR. FAZIOLI:  IN ANY EVENT IT'S BIG BROTHER

13      EXHIBIT 58.  THE LARGER EXHIBIT SEEMS TO HAVE BEEN ADMITTED.

14                    THE COURT:  ALL RIGHT.  WELL, I THINK WE HAVE

15      EXHAUSTED OUR DISCUSSION ABOUT DEFENDANT'S EXHIBIT LIST.

16             ANYTHING ELSE WE SHOULD TAKE UP?

17                    MR. FAZIOLI:  I GUESS MY UNDERSTANDING IS THAT JUST

18      TO CONFIRM THAT THE DEFENDANT WILL BE TESTIFYING THIS

19      AFTERNOON?

20                    MS. GARRIDO:  YES.

21                    MR. FAZIOLI:  AND DOES THE DEFENSE HAVE ANY IDEA OF

22      HOW LONG THAT DIRECT EXAMINATION WILL TAKE BECAUSE IT COULD

23      INFORM JUST WHETHER THE ISSUE SHOULD BE FLUSHED OUT BEFORE OR

24      AFTERWARDS.

25                    MS. GARRIDO:  I'M VERY BAD AT ESTIMATING.  I CAN'T
```

```
1        GIVE AN ACCURATE ESTIMATE BUT --

2              THE COURT:  OKAY.

3              MR. FAZIOLI:  OKAY.

4              MS. LIE:  I THINK IT'S LIKELY THAT CROSS-EXAMINATION

5        WILL BEGIN TODAY.

6              MS. GARRIDO:  YES.

7              THE COURT:  AND IS MS. HOLMES YOUR FIRST WITNESS

8        THEN?

9              MS. GARRIDO:  YES.

10             THE COURT:  OKAY.  ALL RIGHT.  ANYTHING FURTHER?

11             MR. FAZIOLI:  NO, YOUR HONOR.

12             MR. FONDO:  NO, YOUR HONOR.

13             THE COURT:  JURY INSTRUCTIONS.  I THINK I RECEIVED

14       THE DEFENSE JURY INSTRUCTIONS, AND THESE WERE -- I THINK THERE

15       WERE THREE OF THEM PERHAPS.  I DON'T HAVE THEM AT MY

16       FINGERTIPS.  THESE WERE IN ADDITION TO THE STANDARD JURY

17       INSTRUCTIONS, THE MODEL JURY INSTRUCTIONS.

18             MS. LIE:  YOUR HONOR, THAT'S CORRECT.  THE COURT

19       WILL RECALL THAT IN A PREVIOUS UNRELATED CASE I HAD PROFFERED

20       THE DEVITT AND BLACKMAR IN LIEU OF A NUMBER OF THE PATTERN JURY

21       INSTRUCTIONS.

22          IN VIEW OF THE COURT'S RULING IN THAT CASE, WE CHOSE NOT

23       TO PROFFER THOSE SAME DEVITT AND BLACKMAR INSTRUCTIONS HERE.

24          HOWEVER, AS IN THAT PREVIOUS CASE, I WOULD BE REQUESTING

25       THE SAME MODIFICATION TO THE PRESUMPTION PATTERN INSTRUCTION
```

1    THAT THE COURT AGREED TO ADMINISTER IN THE GAMA CASE, AND I DID

2    NOT BRING WHAT THE COURT READ IN THAT CASE BUT I CAN DO SO

3    DURING THE RECESS.

4            THE COURT:  I WANTED TO GET A TIME WHEN WE SHOULD

5    SIT DOWN AND GO OVER THOSE INSTRUCTIONS.

6            MR. FONDO:  WE WILL TRY TO DO OURS TONIGHT.  DO YOU

7    WANT SOME THAT ARE NOT PART OF THE MODEL NINTH CIRCUIT OR DO

8    YOU WANT KIND OF ALL OF THE ONES WE WANT INCLUDING KIND OF

9    INTRODUCTORY?

10           THE COURT:  I THINK WHAT I'D LIKE COUNSEL TO DO IS

11   TO PREPARE INCLUDING THE MODEL TEMPLATES.  AND I HOPE IT'S NOT

12   GOING TO TASK YOU GREATLY TO DO THAT.  AND I DO THAT, TOO, SO

13   WE CAN ORGANIZE BETTER AS TO THE READING AND THE ORDER THAT

14   THEY WILL BE READ.

15       BUT, OF COURSE, THE SPECIFIC INSTRUCTIONS AS TO THE

16   OFFENSES, AND I'M EAGER TO SEE IF YOU HAVE ANY THAT ARE OUTSIDE

17   OF THE MODEL INSTRUCTION.

18           MR. FONDO:  YES, YOUR HONOR.  THANK YOU.

19           THE COURT:  OKAY.  WE'LL SEE YOU AT 1:00 O'CLOCK.

20           MR. FONDO:  THANK YOU, YOUR HONOR.

21           THE COURT:  THANK YOU.

22       (LUNCH RECESS TAKEN.)

23                          **AFTERNOON SESSION**

24   (JURY IN AT 1:08 P.M.)

25           THE COURT:  WE'RE BACK ON THE RECORD IN UNITED

```
 1        STATES VERSUS HOLMES.  ALL PARTIES PREVIOUSLY PRESENT ARE

 2        PRESENT ONCE AGAIN WITH OUR JURY AND ALTERNATES.

 3             THANK YOU, LADIES AND GENTLEMEN, FOR YOUR PATIENCE.  WE

 4        APPRECIATE THAT.

 5             I THINK WE'RE READY TO PROCEED.

 6             LET ME ASK THE GOVERNMENT, FIRST OF ALL, ANY ADDITIONAL

 7        WITNESSES OR EVIDENCE BY THE GOVERNMENT AT THIS TIME?

 8                  MR. FAZIOLI:  THE GOVERNMENT RESTS, YOUR HONOR.

 9                  THE COURT:  THE GOVERNMENT RESTS.

10             I'LL TURN TO THE DEFENSE.  DOES THE DEFENSE HAVE A WITNESS

11        IT WISHES TO CALL?

12                  MS. GARRIDO:  YES, YOUR HONOR.  THE DEFENSE CALLS

13        MYRA HOLMES.

14                  THE COURT:  ALL RIGHT.  MS. HOLMES.

15                  MADAM COURT REPORTER:  RAISE YOUR RIGHT HAND.

16             (DEFENDANT WITNESS, MYRA HOLMES, WAS SWORN.)

17                  THE WITNESS:  I AFFIRM.

18                  THE COURT:  PLEASE HAVE A SEAT HERE, MS. HOLMES.

19        ADJUST THE CHAIR AND MICROPHONE AS YOU NEED.  I'LL ENCOURAGE

20        YOU TO TESTIFY DIRECTLY INTO THE MICROPHONE AND IF YOU WOULD

21        PULL IT DOWN TOWARDS YOU.

22             AND WHEN YOU ARE COMFORTABLE, WOULD YOU PLEASE STATE YOUR

23        NAME AND THEN SPELL IT, PLEASE.

24                  THE WITNESS:  MYRA ANN HOLMES.  M-Y-R-A, A-N-N,

25        H-O-L-M-E-S.
```

```
 1              THE COURT:  COUNSEL.

 2                    DIRECT EXAMINATION

 3    BY MS. GARRIDO:

 4    Q.   GOOD AFTERNOON, MS. HOLMES.

 5    A.   HELLO.

 6    Q.   HOW OLD ARE YOU?

 7    A.   FIFTY-FIVE.

 8    Q.   AND WHERE WERE YOU BORN?

 9    A.   FORT MEADE, MARYLAND.

10    Q.   AND WHERE DID YOU GROW UP?

11    A.   I GREW UP ALL OVER THE UNITED STATES.  MY FATHER WAS IN

12    THE MILITARY.

13    Q.   AND WHO ARE YOUR PARENTS?

14    A.   LEONARD AND CARRIE PAIGE.

15    Q.   AND WHERE DID YOUR FATHER GROW UP?

16    A.   MY FATHER GREW UP IN EDWARDS, MISSISSIPPI.

17    Q.   AND WHAT WAS HIS OCCUPATION WHILE YOU WERE GROWING UP?

18    A.   HE WAS ENLISTED NCR MILITARY ARMY.

19    Q.   AND WHAT INFLUENCE DID YOUR FATHER HAVE ON YOU GROWING UP?

20    A.   HE HAD A GREAT INFLUENCE ON ME.

21    Q.   DID THAT INFLUENCE CONTINUE THROUGHOUT YOUR LIFE?

22    A.   YES, YES, MA'AM.

23    Q.   AND WHO ELSE IS IN YOUR FAMILY?  DO YOU HAVE ANY SIBLINGS?

24    A.   YES, I HAVE THREE OTHER SIBLINGS.

25    Q.   AND WHO ARE THEY?
```

```
1     A.   MY OLDEST SISTER IS GAINELL, AND THEN I HAVE A SISTER

2     JACQUIE, AND ALSO A SISTER MARILYNN.

3     Q.   AND IS YOUR FAMILY CLOSE?

4     A.   VERY CLOSE.

5     Q.   AS THE CHILD OF A MILITARY MAN, WERE YOU TAUGHT TO BE

6     OBEDIENT TO YOUR FATHER?

7     A.   YES.

8     Q.   AND WAS HE STRICT?

9     A.   YES.

10    Q.   AND DID HE HAVE A DOMINANCE IN THE FAMILY?

11    A.   VERY MUCH SO.

12    Q.   AND DID YOU QUESTION YOUR FATHER'S DECISIONS?

13    A.   NO.

14    Q.   IN YOUR FAMILY DID -- REGARDING FINANCIAL AFFAIRS, DID YOU

15    ENTER INTO WRITTEN CONTRACTS AMONG EACH OTHER?

16    A.   WHAT DO YOU MEAN BY "REGULAR CONTRACTS."

17            MR. FAZIOLI:  YOUR HONOR, SOME OF THESE QUESTIONS

18    ARE FAIRLY LEADING FOR DIRECT EXAMINATION.  SO WE WOULD OBJECT.

19            THE COURT:  I'LL SUSTAIN THE LEADING OBJECTION.  YOU

20    CAN ASK YOUR NEXT QUESTION.  PERHAPS YOU WANT TO REPHRASE YOUR

21    QUESTION.

22    BY MS. GARRIDO:

23    Q.   DID YOU ENTER INTO ANY CONTRACTS WITH YOUR FATHER AND

24    SPECIFICALLY REGARDING ANY FINANCIAL AFFAIR?

25    A.   YES, MY HOME.
```

1    Q.   OKAY.

2    A.   AND HE WOULD HELP OUT WITH OTHER CONTRACTS ALONG THE WAY

3    OR I WOULD ASK HIS OPINION.

4    Q.   OKAY.  DID YOU, REGARDING YOUR HOME, DID YOU AND YOUR

5    FATHER ACTUALLY WRITE OUT A CONTRACT AND SIGN IT?

6    A.   NO, MA'AM.

7    Q.   OKAY.

8    A.   NO.

9    Q.   AND SO IF YOU HAD AN AGREEMENT WITH YOUR FATHER, WOULD IT

10   BE WRITTEN OR ORAL?

11   A.   ORAL.

12   Q.   WAS THAT THE SAME WITH ALL OF YOUR FAMILY MEMBERS?

13   A.   AS FAR AS I KNOW.

14   Q.   AND IF YOU EVER LENT ANYONE IN YOUR FAMILY MONEY OR THEY

15   LENT YOU MONEY, WOULD YOU GIVE RECEIPTS?

16           MR. FAZIOLI:  OBJECTION, LEADING.

17           THE COURT:  WHY DON'T YOU REPHRASE THE QUESTION.

18   BY MS. GARRIDO:

19   Q.   HOW WOULD YOU KEEP TRACK OF MONEY YOU LENT TO FAMILY

20   MEMBERS?

21   A.   WE JUST SHARED AMONG EACH OTHER.  IF ANYONE HAD ANY, WE

22   HELPED OUT WITH EACH OTHER.

23   Q.   AND WOULD YOU KEEP RECEIPTS OF THAT?

24   A.   NO, NOT NECESSARILY.

25   Q.   I'D LIKE TO TALK TO YOU ABOUT YOUR WORK HISTORY AND PAIGES

1    SECURITY SERVICE.

2         DID YOUR FATHER HAVE A COMPANY?

3    A.   YES, HE DID.

4    Q.   AND WHEN DID HE ESTABLISH THAT?

5    A.   I BELIEVE AROUND 1986 OR '87.

6    Q.   AND WHAT WAS THAT COMPANY CALLED?

7    A.   PAIGES SECURITY SERVICES, INC.

8    Q.   AND HOW DID THAT COMPANY START?

9    A.   IT STARTED WITH MY FATHER ACTUALLY BEING A ONE PERSON --

10   ONE EMPLOYEE SECURITY OFFICER.

11   Q.   AND AT THE HEIGHT OF THE COMPANY'S -- AT THE HEIGHT OF THE

12   COMPANY, HOW MANY EMPLOYEES DID IT HAVE?

13   A.   I WOULD GUESS AT LEAST 1700 TO 2000 AND 2500.

14   Q.   WHAT KIND OF SERVICES DID PAIGES PROVIDE?

15   A.   THEY WERE A PRIVATE PATROL AND GUARD SERVICE.

16   Q.   AND DID YOU WORK THERE FOR SOME TIME?

17   A.   YES, I DID.

18   Q.   DID THE SECURITY SERVICE HAVE A CONTRACT TO PROVIDE

19   SECURITY EVEN FOR THIS BUILDING?

20   A.   YES, IT DID.

21   Q.   AND WHAT TYPES OF CONTRACTS DID -- OR WHAT TYPES OF EVENTS

22   DID PAIGES PROVIDE SECURITY FOR?

23   A.   EVENTS?  HE DID THE U.S. OPEN, AT & T GOLF TOURNAMENTS,

24   BLUES FESTIVAL MONTEREY, N.B.A. PLAYOFFS AND SEVERAL EVENTS

25   AROUND CALIFORNIA, BOTH SOUTHERN AND NORTHERN.

```
 1    Q.   I'D ASK YOU TO TAKE A LOOK AT THE BLUE BINDER IN FRONT OF

 2    YOU AND TURN TO EXHIBIT K.  DO YOU RECOGNIZE THAT DOCUMENT?

 3    A.   YES, I DO.

 4    Q.   AND WHAT IS THIS?

 5    A.   THIS IS A PAIGE BROCHURE REGARDING PAIGES SECURITY

 6    BUSINESS.

 7    Q.   AND DO YOU KNOW ABOUT ROUGHLY WHEN THAT WAS GENERATED?

 8    A.   NO, I DO NOT RECALL.

 9    Q.   WHAT YEAR DID YOU WORK FOR PAIGES?

10    A.   I WORKED PART-TIME PROBABLY APPROXIMATELY ABOUT IN THE

11    EARLY '90S LATE '80S.

12    Q.   OKAY.  WHEN DID YOU START WORKING THERE FULL TIME?

13    A.   FULL TIME IN THE END OF 1997 GOING INTO '98.

14    Q.   AND UNTIL WHAT YEAR DID YOU CONTINUE TO WORK THERE FULL

15    TIME?

16    A.   2002.

17    Q.   WHAT WAS YOUR WORK HISTORY PRIOR TO WORKING FOR YOUR

18    FATHER?

19    A.   I WORKED FOR THE DEPARTMENT OF THE ARMY.

20    Q.   HOW LONG DID YOU WORK THERE?

21    A.   APPROXIMATELY 24 YEARS.

22    Q.   AND WHAT WERE YOUR DUTIES THERE?

23    A.   I STARTED OUT AS A GS0 AS A CLERK TYPIST AND MOVED UP AS A

24    SECRETARY.  I MOVED TO TRANSPORTATION MANAGING CARGO WORLDWIDE

25    FOR OCEAN CARGO.
```

HOLMES DIRECT

1    Q.   AND DID YOU HAVE A PRIVATE PATROL LICENSE?

2    A.   YES, I DID.

3    Q.   AND WHAT DOES THAT MEAN?

4    A.   A PRIVATE PATROL LICENSE IS A CERTIFICATION TO BE A

5    QUALIFIED MANAGER FOR A SECURITY COMPANY.

6    Q.   AND WHEN DID YOU RECEIVE THAT LICENSE?

7    A.   1999.

8    Q.   AND WHAT DID YOU HAVE TO DO IN ORDER TO GET THAT LICENSE?

9    A.   I CERTIFIED WITH THE STATE OF CALIFORNIA AND WAS TESTED.

10   Q.   DID YOU START YOUR OWN COMPANY AT SOME POINT?

11   A.   YES, I DID.

12   Q.   AND WHAT WAS THAT COMPANY?

13   A.   STAR PARTNERS.  IT ORIGINALLY WAS PARTNERS SECURITY

14   SERVICES AND THEN AMENDED TO STAR PARTNERS SECURITY SERVICES.

15   Q.   DID YOU REGISTER YOUR BUSINESS ANYWHERE?

16   A.   YES, I DID.

17   Q.   AND SPECIFICALLY TURNING TO DEFENSE EXHIBIT M.  IF YOU CAN

18   TAKE A LOOK SPECIFICALLY AT THE THIRD PAGE.

19        DOES THIS APPEAR TO BE A RECORD OF YOUR BUSINESS

20   ADMINISTRATION?

21   A.   YES, MA'AM.

22   Q.   AND DOES IT ACCURATELY SHOW THE DATES THAT YOUR BUSINESS

23   WAS REGISTERED IN SAN FRANCISCO?

24   A.   YES, MA'AM.

25   Q.   AND THAT WAS SPECIFICALLY FROM SEPTEMBER 18TH, 2002 TO

```
 1    FEBRUARY 18TH, 2009?

 2    A.   YES, MA'AM.

 3              MS. GARRIDO:   AT THIS TIME I WOULD LIKE TO MOVE

 4    DEFENSE EXHIBIT M INTO EVIDENCE.

 5              MR. FAZIOLI:   NO OBJECTION.

 6              THE COURT:   IT'S RECEIVED.

 7         (DEFENDANT'S EXHIBIT M WAS RECEIVED IN EVIDENCE.)

 8    BY MS. GARRIDO:

 9    Q.   WHEN YOU BEGAN WORKING AT PAIGES SECURITY SERVICE, WHAT

10    WAS YOUR POSITION ORIGINALLY?

11    A.   I WAS -- ORIGINALLY STARTED OFF AS AN SPECIAL EVENTS

12    OFFICER PART-TIME, AND THEN I MOVED AS A CONTRACTOR FOR THE

13    VETERAN'S ADMINISTRATION ACROSS NORTHERN CALIFORNIA, AND THEN

14    TO THE DIRECTOR OF NORTHERN CALIFORNIA, AND THEN TO VICE

15    PRESIDENT OF OPERATIONS.

16    Q.   AND WAS THAT THE HIGHEST POSITION THAT YOU HELD?

17    A.   YES, MA'AM.

18    Q.   AND ABOUT HOW LONG DID YOU HOLD THAT POSITION?

19    A.   FROM APPROXIMATELY 1998 TO 2002.

20    Q.   WHAT WAS YOUR SALARY?

21    A.   I BELIEVE FROM MY RECOLLECTION IT STARTED AT 60,000 AND

22    THEN IT WAS REDUCED.

23    Q.   DO YOU KNOW APPROXIMATELY WHEN IT WAS REDUCED?

24    A.   I WOULD SAY SOME TIME IN THE TIMEFRAME OF 2001 TO MY

25    RECOLLECTION.
```

```
 1      Q.   WAS YOUR SALARY EQUIVALENT TO OTHER PEOPLE'S SALARY WITHIN

 2      THE COMPANY THAT WERE IN THE SAME POSITION AS YOU?

 3      A.   NO, NO.

 4      Q.   AND WAS IT LESS OR MORE?

 5      A.   IT WAS LESS.

 6      Q.   WERE YOU REQUIRED TO CONDUCT SOME WORK OUT OF YOUR HOME?

 7      A.   YES.

 8      Q.   AND WERE YOU PAID A HOUSING ALLOWANCE FOR THIS?

 9               MR. FAZIOLI:  OBJECTION, LEADING.

10               THE COURT:  SUSTAINED.

11      BY MS. GARRIDO:

12      Q.   WERE YOU PAID ANYTHING FOR THIS?

13      A.   YES.

14      Q.   FOR CONDUCTING WORK OUT OF YOUR HOME BEYOND YOUR SALARY?

15      A.   NO.  IT WAS WITHIN MY SALARY.

16      Q.   OKAY.

17      A.   INCLUDED.

18      Q.   WHY WAS YOUR SALARY LESS THAN THAT OF OTHER EMPLOYEES?

19      A.   BECAUSE OUR NEGOTIATION WITH MY FATHER WAS THE ASSISTANCE

20      WITH MY HOME AND THE TYPE OF WORK I DID AND ALLOWING OTHER

21      EMPLOYEES TO DO TRAINING OUT OF MY HOME.

22      Q.   OKAY.  DID YOU MIND THAT YOUR FATHER PAID YOU LESS THAN

23      OTHER EMPLOYEES?

24      A.   NO.

25      Q.   AND WHY NOT?
```

1     A.   BECAUSE OF OUR RELATIONSHIP.

2     Q.   YOUR FAMILIAL RELATIONSHIP?

3     A.   YES, MA'AM.

4     Q.   AND DID YOUR FATHER COMPENSATE IN SOME OTHER WAY FOR

5     PAYING YOU LESS SALARY?

6     A.   YES.

7              MR. FAZIOLI:  OBJECTION, LEADING.

8              THE COURT:  SUSTAINED.  THE ANSWER IS STRICKEN.

9     BY MS. GARRIDO:

10    Q.   WHAT, IF ANYTHING, DID YOUR FATHER DO IN ORDER TO

11    COMPENSATE YOU FOR PAYING YOU LESS?

12    A.   HE HELPED ME WITH MY HOUSE, THE PURCHASE OF MY HOME, AND

13    ALSO WITH MONTHLY MORTGAGES.

14    Q.   WAS THIS AN ACCEPTABLE AGREEMENT FOR YOU?

15    A.   YES, IT WAS.

16    Q.   DID YOU ASK FOR A CONTRACT?

17    A.   NO, I DID NOT.

18    Q.   DID YOU KEEP RECORDS, WRITTEN RECORDS OF ANY KIND

19    REGARDING THIS AGREEMENT?

20             MR. FAZIOLI:  OBJECTION, LEADING.

21             THE COURT:  SUSTAINED.  YOU CAN ASK ANOTHER

22    QUESTION.

23    BY MS. GARRIDO:

24    Q.   DID YOU MEMORIALIZE THIS AGREEMENT IN ANY WAY?

25             MR. FAZIOLI:  SAME OBJECTION.

1        THE COURT:  DO YOU WANT TO REPHRASE THE QUESTION?

2    BY MS. GARRIDO:

3    Q.   MS. HOLMES, WAS THERE -- IS THERE ANY PIECE OF PAPER THAT

4    YOU'RE AWARE OF TO DOCUMENT THIS TRANSACTION?

5    A.   NOT THAT I RECALL.

6    Q.   AND WAS THIS ORAL -- THE ORAL NATURE OF THIS AGREEMENT,

7    WAS THIS CONSISTENT WITH HOW YOUR FAMILY TYPICALLY DEALT WITH

8    ONE ANOTHER?

9    A.   YES.

10        MR. FAZIOLI:  SAME OBJECTION, YOUR HONOR.

11        THE COURT:  IT IS LEADING.  I'LL ALLOW IT.  COUNSEL,

12   YOU CAN ASK NON-LEADING QUESTIONS.

13   BY MS. GARRIDO:

14   Q.   DID ANYTHING AT ALL SEEM STRANGE ABOUT THIS ARRANGEMENT?

15   A.   NO.  IT WAS VERY NORMAL.

16   Q.   I'D LIKE TO ASK YOU TO TAKE A LOOK AT DEFENSE EXHIBIT H.

17   DO YOU RECOGNIZE THIS DOCUMENT?

18   A.   YES.

19   Q.   OR THIS PHOTOGRAPH?

20   A.   YES.

21   Q.   AND WHAT IS IT?

22   A.   THIS IS A PICTURE OF MYSELF AND MY SISTER JACQUIE WORKING

23   AT A TRADE SHOW FOR PAIGES SECURITY DOING MARKETING.

24   Q.   OKAY.  AND DO YOU KNOW APPROXIMATELY WHEN THAT PHOTOGRAPH

25   WAS TAKEN?

1    A.   TO MY RECOLLECTION IT WAS AROUND SOME TIME IN 1999.

2    Q.   DID YOUR SISTER JACQUIE ALSO WORK FOR PAIGES SECURITY

3    SERVICE AT THE TIME?

4    A.   YES.

5    Q.   AND DID MANY OF YOUR FAMILY MEMBERS WORK FOR PAIGES?

6    A.   MOST OF MY FAMILY MEMBERS.

7         MS. GARRIDO:  AT THIS TIME I WOULD ASK TO ADMIT

8    DEFENSE EXHIBIT H AS WELL AS DEFENSE EXHIBIT K, THE PAIGES

9    BROCHURE.

10        MR. FAZIOLI:  YOUR HONOR, WE OBJECT TO THE RELEVANCE

11   OF H.  EXHIBIT K WE DISCUSSED THIS MORNING -- EXHIBIT H WE

12   OBJECT TO THE RELEVANCE OF THE PICTURE ITSELF.  EXHIBIT K, AS

13   WE DISCUSSED THIS MORNING, THERE'S NUMEROUS GROUNDS OF US

14   OBJECTING TO THE RELEVANCE OF THE BROCHURE.

15        THE COURT:  ARE YOU ASKING THAT K IN ITS ENTIRETY BE

16   INTRODUCED?

17        MS. GARRIDO:  YES.

18        THE COURT:  I'LL SUSTAIN THE OBJECTION TO K IN ITS

19   ENTIRETY.

20      WHAT IS THE RELEVANCE OF THE PHOTOGRAPH?

21        MS. GARRIDO:  IT'S TO CORROBORATE MS. HOLMES'S

22   TESTIMONY AND TO SHOW FOR THE JURY THE PHOTOGRAPH THAT SHE JUST

23   AUTHENTICATED.

24        THE COURT:  AND WHAT IS THE RELEVANCE OF THE

25   PHOTOGRAPH?

1    MS. GARRIDO:  TO ESTABLISH THAT MS. HOLMES WORKED AT

2    PAIGES SECURITY SERVICE AND FOR PAIGES SECURITY SERVICE AS AN

3    AGENT OF HER FATHER.

4    THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION AT

5    THIS TIME.  IF YOU LAY A FOUNDATION, PERHAPS IT COULD COME IN,

6    BUT I'LL SUSTAIN THE OBJECTION AT THIS POINT.

7    BY MS. GARRIDO:

8    Q.   DID YOU PURCHASE A RESIDENCE AT 312 MOONRACKER DRIVE IN

9    VALLEJO, CALIFORNIA?

10   A.   YES.

11   Q.   AND WHEN DID YOU DO THAT?

12   A.   1999.

13   Q.   AND WAS YOUR FATHER INVOLVED WITH THE PURCHASE OF YOUR

14   HOME?

15   A.   COULD YOU REPEAT THE QUESTION.

16   Q.   WAS YOUR FATHER INVOLVED IN THE PURCHASE OF YOUR HOME?

17   A.   YES, HE WAS.

18   Q.   HOW?

19   A.   HE WAS A JOINT TENANT ON THE CONTRACT WITH ME AND HELPED

20   WITH THE PURCHASE OF THE HOME MONETARILY.

21   Q.   OKAY.  AND WHY WAS HE INVOLVED?

22   A.   BECAUSE MY FATHER WAS A PERSON THAT I TRUSTED AND LOOKED

23   TO, TO HELP ME AND ASSIST ME WITH ANY TYPE OF BUSINESS OR

24   ARRANGEMENTS.  I LOOKED TO HIM FOR TRUST AND ALSO I QUALIFIED

25   FOR $200,000 AND HE HELPED ME TO QUALIFY FOR MORE, A LITTLE BIT

```
 1    MORE WITHIN OUR VERBAL CONTRACT.

 2    Q.   AND WHAT WAS THE ORIGINAL PURCHASE PRICE OF THE HOME?

 3    A.   235 I BELIEVE.

 4    Q.   AND WAS YOUR FATHER ON THE LOAN AS WELL AS THE TITLE?

 5    A.   YES, HE WAS.

 6    Q.   DID YOUR FATHER EVER LIVE IN THAT HOME WITH YOU?

 7    A.   NO.

 8    Q.   YOUR FATHER?

 9    A.   NO.

10    Q.   WHO LIVED IN THE HOME?

11    A.   MY SON WHEN HE RETURNED FROM COLLEGE FOR A SHORT TIME.

12    Q.   DID YOU LIVE IN THE HOME?

13    A.   YES.

14    Q.   OTHER THAN YOUR SON, WERE YOU THE ONLY PERSON WHO EVER

15    LIVED IN IT DURING THE TIME THAT YOU OWNED IT?

16    A.   MY GRANDDAUGHTER HAS COME AND STAYED FROM TIME TO TIME.

17    Q.   DID YOUR FATHER EVER SAY ANYTHING ABOUT WHETHER OR NOT HE

18    WANTED TO MOVE IN THERE AT ANY POINT?

19    A.   NO.

20    Q.   DID HE SAY ANYTHING TO YOU ABOUT EVER WANTING TO USE IT AS

21    A RENTAL PROPERTY?

22    A.   NO.

23    Q.   DID HE GIVE YOU ANY INDICATION THAT HE WANTED THE HOME TO

24    BE FOR ANYONE OTHER THAN YOU?

25    A.   NO.
```

```
 1              MR. FAZIOLI:  OBJECTION, YOUR HONOR, LEADING AND

 2    HEARSAY.

 3              THE COURT:  SUSTAINED AS LEADING.  THE ANSWER IS

 4    STRICKEN.

 5    BY MS. GARRIDO:

 6    Q.   WHAT, IF ANYTHING, DID YOUR FATHER SAY TO YOU ABOUT THE

 7    HOUSE?

 8    A.   THAT VERBALLY IT WAS UNDER A MORE OR LESS A WORK CONTRACT

 9    IF I HAD -- IF HE HAD EMPLOYEES IN THE AREA AND I NEEDED TO DO

10    TRAINING, I MAY NEED TO USE THE HOME FOR TRAINING OR IF THERE

11    WERE POSSIBLY ONE OF MY PARTNERS THAT WORKED DOWN IN THE L.A.

12    AREA WOULD COME UP, SHE WOULD POSSIBLY STAY SOME TIME, OR IF I

13    NEEDED OTHER WORKERS TO HAVE A REST BREAK OR SOMETHING,

14    TRAVELLING BETWEEN AROUND NORTHERN CALIFORNIA.

15    Q.   ALL RIGHT.  NOW, WHAT, IF ANYTHING, DID HE TELL YOU ABOUT

16    WHOSE HOME HE BELIEVED IT TO BE?

17    A.   IT ALWAYS -- IT WAS ALWAYS PURCHASED FOR ME.

18              MR. FAZIOLI:  YOUR HONOR, I'M GOING TO OBJECT AND

19    MOVE TO STRIKE.  THIS IS HEARSAY TESTIMONY THAT WE'RE

20    ELICITING.

21              THE COURT:  IS THIS OFFERED FOR THE TRUTH OF THE

22    MATTER ASSERTED?

23              MS. GARRIDO:  NO, YOUR HONOR.  IT GOES TO THE EFFECT

24    OF MYRA HOLMES AND HER STATE OF MIND AS WELL AS HER INTENT.

25              THE COURT:  SO, LADIES AND GENTLEMEN, THE PREVIOUS
```

```
1      STATEMENT REGARDING MR. PAIGE'S INTENTION OF THE HOUSE IS

2      ADMITTED NOT FOR THE TRUTH OF THAT MATTER ASSERTED.  IT'S

3      ADMITTED SOLELY FOR THE IMPACT, IF ANY, ON THIS WITNESS'S STATE

4      OF MIND.

5      BY MS. GARRIDO:

6      Q.   DO YOU KNOW WHETHER THE FACT OF THE HOME BEING YOURS WAS

7      COMMON KNOWLEDGE WITHIN YOUR FAMILY?

8      A.   YES.

9      Q.   AND WHAT WAS THE COMMON KNOWLEDGE WITHIN YOUR FAMILY?

10     A.   EVERYONE IN THE FAMILY KNEW AND BELIEVED THAT IT WAS MY

11     HOME.

12     Q.   ARE YOU AWARE OF HOW YOUR PARENTS HELD TITLE IN THEIR

13     OTHER PROPERTIES?

14     A.   YES.

15     Q.   AND HOW DID THEY HOLD TITLE IN THEIR OTHER PROPERTIES?

16     A.   LEONARD AND CARRIE OWNED JOINT TITLE IN ALL OF THEIR OTHER

17     PROPERTIES.

18     Q.   AND IS THAT -- WHAT, IF ANY, DIFFERENCE IS THERE BETWEEN

19     HOW THEY HELD TITLE IN THOSE PROPERTIES AND HOW TITLE WAS HELD

20     IN YOUR HOME?

21     A.   ONLY MY FATHER AND MYSELF HELD TITLE IN MY HOME.

22     Q.   YOUR MOTHER WASN'T ON THAT TITLE?

23     A.   NO, MA'AM.

24     Q.   AND DID SHE TAKE ANY STEPS IN ORDER TO MAKE SURE THAT THAT

25     HAPPENED?
```

1     A.   YES.  AT THE TIME OF THE PURCHASE, SHE SIGNED OFF ON, I

2     DON'T KNOW WHAT YOU WOULD CALL IT, A GRANT DEED OR SOME KIND OF

3     A DEED TO ENSURE THAT SHE WAS NOT ON THE HOME.

4     Q.   OKAY.  AND SPECIFICALLY REFERRING YOU TO DEFENSE EXHIBIT A

5     THAT HAS ALREADY BEEN ENTERED INTO EVIDENCE.  IS THAT THE

6     DOCUMENT THAT YOU'RE REFERRING TO?

7     A.   YES, INTERSPOUSAL TRANSFER GRANT DEED.

8     Q.   AND, NOW, WHO PAID THE DOWN PAYMENT ON THE MOONRACKER

9     HOME?

10    A.   I PAID A PORTION OF IT, AND MY FATHER ALSO PAID A PORTION.

11    Q.   AND YOU'VE SEEN SOME EVIDENCE DURING THIS TRIAL OF A

12    $2,500 CHECK THAT YOU CONTRIBUTED AT THE BEGINNING?

13    A.   RIGHT.

14    Q.   AND WAS THAT FROM YOUR OWN FUNDS?

15    A.   YES, MA'AM.

16    Q.   AND DID YOU CONTRIBUTE MORE THAN THAT?

17    A.   YES, I DID.

18    Q.   AND HOW DID YOU DO THAT?

19    A.   I GAVE HIM MONEY -- UM, CASH.

20    Q.   AND WHEN -- WAS THAT UNUSUAL TO GIVE CASH TO YOUR FATHER?

21    A.   NO, NOT TO MY FATHER.

22    Q.   OKAY.

23    A.   NO.

24    Q.   AND WHAT FUNDS DID YOU USE TO GIVE HIM CASH?

25    A.   I HAD TOOK A BUYOUT FROM THE GOVERNMENT IN 1997 AND HELPED

1    HIM WITH SOME OF THAT MONEY HE USED.

2    Q.   AND WHEN YOU SAY YOU TOOK A BUYOUT, WHAT DO YOU MEAN BY

3    THAT?

4    A.   OAKLAND ARMY BASE WAS CLOSING AND, THEREFORE, I HAD ENOUGH

5    TIME TO QUALIFY FOR THE BUYOUT.

6    Q.   AND WHAT WERE YOU EXACTLY BEING BOUGHT OUT FOR?  WHAT DO

7    YOU MEAN BY THAT?

8    A.   I HAD A CHOICE TO EITHER TRANSFER TO VIRGINIA OR EITHER

9    TAKE A BUYOUT AND LEAVE THE GOVERNMENT.

10   Q.   I'D LIKE TO REFER YOU TO DEFENSE EXHIBIT U.  DO YOU

11   HAVE -- YOU'RE OPEN TO DEFENSE EXHIBIT U?

12   A.   YES, MA'AM.

13   Q.   AND DO YOU RECOGNIZE THAT DOCUMENT?

14   A.   YES, I DO.

15   Q.   AND WHAT IS THAT?

16   A.   THIS IS MY BUYOUT FROM WHEN I LEFT THE GOVERNMENT.

17   Q.   AND IS THIS LETTER A TRUE -- WELL, DID YOU RECEIVE THIS

18   LETTER?

19   A.   YES, MA'AM.

20   Q.   AND HOW DID YOU RECEIVE IT?

21   A.   THROUGH THE MAIL.

22   Q.   AND WHEN DID YOU RECEIVE IT?

23   A.   I DON'T RECALL.

24   Q.   AND IS IT A TRUE AND ACCURATE COPY OF THE LETTER THAT YOU

25   RECEIVED?

```
 1     A.   AS FAR AS I CAN TELL.

 2             MS. GARRIDO:  AT THIS TIME I WOULD ASK TO ADMIT

 3     DEFENSE EXHIBIT U.

 4             MR. FAZIOLI:  WE WOULD OBJECT ON HEARSAY AND

 5     RELEVANCE GROUNDS, YOUR HONOR.  THE DATE OF THE DOCUMENT --

 6             THE COURT:  I'M SORRY?

 7             MR. FAZIOLI:  THE DATE OF THE DOCUMENT MARCH 2009

 8     DATE GIVES US SOME PAUSE.

 9             THE COURT:  I'M SORRY?

10             MR. FAZIOLI:  THE MARCH 2009 DATE OF THE DOCUMENT

11     GIVES US SOME CONCERN AS TO THE RELEVANCE.

12             MS. GARRIDO:  THE REFUND DATE IS 1998.

13             THE COURT:  I DON'T BELIEVE THERE'S EVIDENCE OF THAT

14     YET.  SO WHY DON'T YOU LAY A FOUNDATION.

15     BY MS. GARRIDO:

16     Q.   DO YOU RECALL, MS. HOLMES, WHEN YOU RECEIVED THE BUYOUT?

17     A.   I LEFT THE GOVERNMENT IN DECEMBER OF '97 AND SHORTLY AFTER

18     THAT SOME TIME, AS THIS DOCUMENT SAYS, PROBABLY AROUND 1998,

19     MAY OF 1998.

20     Q.   AND DID YOU RECEIVE THIS LETTER SOME TIME AFTER THAT DATE?

21     A.   YES, I DID.

22     Q.   BUT YOU'RE NOT -- YOU DON'T RECALL SPECIFICALLY WHEN?

23     A.   NO, MA'AM.

24             MS. GARRIDO:  I'D MOVE TO ADMIT DEFENSE U.

25             MR. FAZIOLI:  NO OBJECTION.
```

HOLMES DIRECT

```
 1              THE COURT:  IT WILL BE RECEIVED.

 2          (DEFENDANT'S EXHIBIT U WAS RECEIVED IN EVIDENCE.)

 3     BY MS. GARRIDO:

 4     Q.   NOW, MS. HOLMES, THE AMOUNT YOU RECEIVED, IS THAT LISTED

 5     ON DEFENSE U?  AND IF YOU COULD JUST BLOW UP THAT SECTION.

 6     A.   YES, IT IS.

 7     Q.   AND WHAT WAS THAT AMOUNT?

 8     A.   $33,229.93.

 9     Q.   WHEN YOU RECEIVED THOSE FUNDS, WHAT DID YOU DO WITH THEM?

10     A.   I HELPED MY FATHER OUT WITH SOME OF THEM AND THEN I ALSO

11     HELPED SEND MY SON TO SCHOOL AND LIVED OFF -- USED SOME OF IT

12     FOR LIVING EXPENSES.

13     Q.   OKAY.  AND SO YOU SPENT SOME OF IT?

14     A.   YES.

15     Q.   OKAY.  AND THE PORTION THAT YOU USED TO HELP YOUR

16     FATHER --

17     A.   UH-HUH.

18     Q.   -- HOW MUCH WAS THAT?

19     A.   FROM MY RECOLLECTION BETWEEN $8,000 TO $10,000.

20     Q.   AND BY HELPING YOUR FATHER, WHAT DO YOU MEAN?

21     A.   HE NEEDED SOME ASSISTANCE WITH BUYING SOME EQUIPMENT AT

22     THE TIME AND SO I HELPED HIM.

23     Q.   WAS THAT A PERSONAL OR A BUSINESS EXPENSE THAT HE NEEDED

24     THE EQUIPMENT FOR?

25     A.   BUSINESS.
```

1    Q.   AND SO WHEN IT WAS TIME TO PAY THE DOWN PAYMENT ON YOUR

2    HOME AT MOONRACKER, DID YOU -- HOW DID -- WHAT WAS YOUR

3    UNDERSTANDING OF WHAT PORTION OF THE DOWN PAYMENT YOU WERE

4    PAYING?

5              MR. FAZIOLI:  OBJECTION, THIS IS LEADING.

6              THE COURT:  DO YOU WANT TO REPHRASE THE QUESTION.

7    BY MS. GARRIDO:

8    Q.   WHAT WAS YOUR UNDERSTANDING ABOUT HOW MUCH OF THE DOWN

9    PAYMENT YOU WERE CONTRIBUTING?

10   A.   AT LEAST THE MONEY I HAD ALREADY LOANED TO HIM AND WE

11   TALKED ABOUT MY WORKING CONDITIONS FOR PAIGES SECURITY THAT

12   WENT ALONG WITH THAT.

13   Q.   AND WHAT EXACTLY DID YOU DISCUSS REGARDING THAT?

14   A.   HIM NOT BEING ABLE TO PAY ME THE SALARY THAT HE THOUGHT

15   THAT I SHOULD RECEIVE.

16   Q.   AND SO DID YOU HAVE AN AGREEMENT ABOUT WHAT AMOUNT OF THE

17   DOWN PAYMENT WOULD CONSTITUTE SALARY?

18   A.   HE REQUIRED ME TO PAY $300 A MONTH ON THE MONTHLY

19   MORTGAGE.

20   Q.   OKAY.  AND WE'LL TALK ABOUT THE MORTGAGE IN A MINUTE.

21   A.   OKAY.

22   Q.   BUT JUST REGARDING THE DOWN PAYMENT, DID YOU HAVE AN

23   AGREEMENT WITH YOUR FATHER ABOUT HOW MUCH OF THE DOWN PAYMENT

24   WAS REPRESENTED OF THE SALARY?

25   A.   NO, WE DID NOT.

1    Q.   WHAT WAS YOUR UNDERSTANDING ABOUT HOW MUCH OF IT

2    REPRESENTED SALARY?

3    A.   AT LEAST HALF.

4    Q.   AND SO ANY CASH THAT YOU GAVE HIM TOWARD THE DOWN PAYMENT,

5    WHAT DID YOU DO WITH IT?

6    A.   WHAT DID I DO WITH IT?

7    Q.   YES.  WHERE DID YOU PUT THE CASH?

8    A.   TOWARDS THE DOWN PAYMENT.  I GAVE IT TO LEONARD PAIGE, MY

9    FATHER.

10   Q.   OKAY.  DID YOU KEEP ANY RECORDS OF THAT?

11   A.   NO, MA'AM.

12   Q.   THERE ARE NO CONTRACTS OR RECEIPTS OF THAT TRANSACTION?

13   A.   NO.

14   Q.   WHO PAID THE MORTGAGE AT FIRST?

15   A.   HE PAID ALL OF IT -- I PAID TWO MONTHS, I BELIEVE, IF I

16   RECALL AND THEN HE HAD IT TRANSFERRED TO HIS HOME.

17   Q.   DO YOU KNOW WHY HE DID THAT?

18   A.   BECAUSE HE WANTED TO BE RESPONSIBLE FOR AND HE REQUIRED ME

19   TO BE RESPONSIBLE WITH THE $300 THAT WE TALKED ABOUT.

20   Q.   OKAY.  SO TELL ME ABOUT THE $300.  WHAT AGREEMENT WAS

21   THIS?

22   A.   THIS WAS THAT HE WAS NOT ABLE TO PAY ME ALL OF MY SALARY

23   THAT HE FELT THAT I DESERVED FOR THE WORK THAT I WAS DOING AND

24   FOR ME TO PAY $300 AND HE WOULD TAKE CARE OF THE REST.

25   Q.   AND WHAT WAS YOUR UNDERSTANDING ABOUT THE PORTION THAT HE

```
1    WAS COVERING FOR THE MORTGAGE?

2    A.   THAT IT WAS MY SALARY AND TRAVELLING FOR THE COMPANY FOR

3    WORK AT PAIGE SECURITY.

4    Q.   AND HOW OFTEN WERE YOU TRAVELLING FOR THE COMPANY?

5    A.   OH, I WAS -- MY HOUSE WAS LOCATED IN VALLEJO.  MY OFFICE

6    WAS LOCATED IN MARINA, CALIFORNIA.  AND THEN HE HAD CONTRACTS

7    THROUGHOUT CALIFORNIA AND SO I WAS TRAVELLING WEEKLY, SOMETIMES

8    GONE AWAY FOR WEEKS AT A TIME.

9    Q.   OKAY.  HOW DID YOU CONTRACT THE $300 PER MONTH?

10   A.   I WOULD BE AT HIS OFFICE OR HE WOULD BE AT LUNCH AND I

11   WOULD GIVE IT TO HIM.

12   Q.   AND WAS THAT IN CASH?  CHECKS?

13   A.   YES, MA'AM, CASH.

14   Q.   AND DID YOU GET ANY RECEIPTS FROM HIM WHEN YOU GAVE IT TO

15   HIM?

16   A.   NO, MA'AM.

17   Q.   WHAT WAS THE CONDITION OF YOUR HOME WHEN YOU MOVED IN?

18   A.   IN 1999 IT WAS IN FAIRLY GOOD CONDITION BUT IT DID NEED

19   SOME WORK.

20   Q.   WHAT KIND OF WORK?

21   A.   IT NEEDED TO BE PAINTED, NEW GUTTERS, LANDSCAPING THAT I

22   RECALL.

23   Q.   AND WHO DID YOU HIRE FOR -- TO HELP YOU WITH THESE

24   IMPROVEMENTS?

25   A.   VARIOUS, VARIOUS PEOPLE.
```

1    Q.   AND DID -- FIRST OF ALL, WHO IS JEREMY HOLMES?

2    A.   MY SON.

3    Q.   AND DID HE DO ANY WORK ON THE HOUSE?

4    A.   YES, HE HELPED A LOT.

5    Q.   AND WHAT KIND OF WORK DID HE DO?

6    A.   HE HELPED WITH PUTTING IN A NEW TOILET, HE DID ELECTRICAL

7    WORK.  HE'S VERY GOOD WITH HIS HANDS AND HELPED ME.

8    Q.   AND WHAT KIND OF TRAINING, TO YOUR KNOWLEDGE, DOES HE HAVE

9    IN THE FIELD OF ELECTRIC?

10   A.   ELECTRIC?  HE WENT TO CONSTRUCTION SCHOOL IN FAIRFIELD,

11   CALIFORNIA AND BUILT SPEAKERS AND WORKED WITH HIS HANDS.  HE

12   WAS VERY GOOD WITH HIS HANDS.

13   Q.   AND DID YOU PAY HIM FOR HIS WORK?

14   A.   SOMETIMES.

15   Q.   SOMETIMES NOT?

16   A.   AND SOMETIMES NOT.  AND SOMETIMES NOT.

17   Q.   OKAY.  AND WHO IS CRAIG TORRES?

18   A.   HE PAINTED MY HOUSE.

19   Q.   AND DID HE DO OTHER WORK ON THE HOME?

20   A.   YES, AND HE DID SOME TERMITE WORK THAT HE SAW AND ALSO

21   REBUILT MY DECK?

22   Q.   AND DID YOU PAY HIM FOR HIS WORK?

23   A.   YES, I DID.

24   Q.   AND WHAT ABOUT TERRY ROBERTS?

25   A.   TERRY ROBERTS DID A LOT OF GARDENING AND LANDSCAPING WORK

HOLMES DIRECT

1    AROUND MY HOME.

2    Q.   AND DID YOU PAY HIM FOR HIS WORK?

3    A.   YES, I DID.

4    Q.   ALL OF THIS MAINTENANCE AND UPKEEP AND IMPROVEMENTS, DID

5    YOUR FATHER CONTRIBUTE TO THAT?

6    A.   NO, HE DID NOT.

7    Q.   AND WAS THAT 100 PERCENT OUT OF YOUR OWN FUNDS?

8    A.   YES.

9    Q.   I'D LIKE TO REFER YOU TO A GOVERNMENT EXHIBIT.  IT WILL BE

10   IN THE BINDER WITH EXHIBITS 160 TO 221.  IT'S BINDER 405.  AND

11   SPECIFICALLY EXHIBIT 186.  AND IF YOU COULD PULL UP

12   EXHIBIT 186-3.  THIS HAS ALREADY BEEN ADMITTED INTO EVIDENCE.

13        I'LL KEEP ASKING YOU ABOUT IT.  DO YOU RECOGNIZE THIS

14   DOCUMENT, NUMBER 186-3?

15   A.   YES, MA'AM.

16   Q.   IS THAT -- IS THAT SOMETHING THAT YOU CREATED?

17   A.   YES.

18   Q.   AND WHAT IS IT?

19   A.   IT WAS AN ITEMIZED LIST THAT WAS REQUESTED ON SOME OF THE

20   HOME IMPROVEMENTS AND PAINTING THAT WENT INTO MY HOME.

21   Q.   AND THE FIRST ITEM LISTED THERE IS DOWN PAYMENT.  IN

22   AUTHORING THIS ITEMIZED EXPENSE REPORT, WERE YOU REPRESENTING

23   THAT YOU HAD MADE THE DOWN PAYMENT?

24   A.   NO, NOT NECESSARILY.  IT WAS JUST THAT THE DOWN PAYMENT

25   WAS $50,000.

1    Q.   AND WAS IT SOMETHING THAT YOU FELT AT THAT TIME THAT YOU

2    HAD CONTRIBUTED TO THE HOUSE?

3    A.   YES.

4    Q.   WHY?

5    A.   BECAUSE OF THE ARRANGEMENT THAT MY FATHER AND I HAD.

6    Q.   AND SO BY INCLUDING THAT DID YOU MEAN TO SAY THAT YOU

7    SPECIFICALLY HAD WRITTEN THE CHECK FOR $50,000?

8            MR. FAZIOLI:  OBJECTION, LEADING.

9            THE COURT:  SUSTAINED.

10   BY MS. GARRIDO:

11   Q.   AND WHAT WERE YOU SAYING BY THIS?

12   A.   JUST THAT THERE WAS A DOWN PAYMENT OF $50,000 PLACED ON MY

13   HOME.

14   Q.   OKAY.

15   A.   AT THE TIME OF PURCHASE.

16   Q.   AND WERE YOU REPRESENTING -- WHAT, IF ANYTHING, WERE YOU

17   REPRESENTING ABOUT WHOSE FUNDS WERE RESPONSIBLE FOR THAT DOWN

18   PAYMENT?

19   A.   I DON'T RECALL REPRESENTING ANYONE, JUST THAT THE DOWN

20   PAYMENT WAS $50,000.

21   Q.   AND THE MORTGAGE PAYMENTS THAT ARE LISTED THERE, WHY DID

22   YOU INCLUDE THOSE?

23   A.   MORTGAGE?

24   Q.   THAT'S THE SECOND AND THE THIRD LINES?

25   A.   BECAUSE THOSE WERE THE MONTHLY MORTGAGE PAYMENTS PAID BY

1    MY FATHER AND MYSELF.

2    Q.   AND IN YOUR VIEW WHO WAS RESPONSIBLE -- WHOSE MONEY WAS

3    THAT THAT WAS GOING TOWARDS THE DOWN PAYMENTS?

4         MR. FAZIOLI:  AGAIN, OBJECTION, LEADING.

5         THE WITNESS:  BOTH OF OURS.

6         THE COURT:  EXCUSE ME.  I'LL ALLOW THE ANSWER TO

7    REMAIN.

8         COUNSEL, IF YOU'LL ASK NON-LEADING QUESTIONS, PLEASE.

9    BY MS. GARRIDO:

10   Q.   NOW, THE REST OF THE EXPENSES ON THE LIST.  DID YOU

11   ACTUALLY ATTACH RECEIPTS TO THIS LIST?

12   A.   FOR SOME I HAD RECEIPTS AND FOR OTHERS I DIDN'T.

13   Q.   OKAY.  DID YOU ATTACH ALL OF THE RECEIPTS THAT YOU HAD AT

14   THAT TIME?

15   A.   YES, MA'AM.

16   Q.   DID YOU LIST ALL OF THE MAJOR EXPENSES THAT YOU HAD BEEN

17   RESPONSIBLE FOR ON THE HOME?

18   A.   THAT I COULD RECALL AT THAT TIME.

19   Q.   OKAY.  AND TO YOUR KNOWLEDGE DID YOUR FATHER CONTRIBUTE

20   MONEY TOWARDS ANY OF THOSE OTHER EXPENSES?

21        MR. FAZIOLI:  OBJECTION, LEADING.

22        YOUR HONOR, MAY WE APPROACH?

23        THE COURT:  YES.

24        (SIDE-BAR CONFERENCE ON THE RECORD.)

25        MR. FAZIOLI:  YOUR HONOR, JUST ABOUT EVERY SINGLE

1    ONE OF THESE QUESTIONS ABOUT HER INTERACTIONS WITH THE FATHER

2    ARE LEADING, AND WE HAVE BEEN OBJECTING.  IT'S GETTING

3    SUSTAINED AND THEN IT'S BEING REPHRASED.

4         AND MY CONCERN IS THAT IT IS SLOWING IT UP AND I WONDER IF

5    THE DIRECT EXAMINATION CAN PROCEED IN A WAY THAT IT'S NOT

6    LEADING.

7              MS. GARRIDO:  I HAVE BEEN MAKING EVERY ATTEMPT TO

8    ASK OPEN ENDED QUESTIONS.  I HAVE NOT BEEN ASKING ANY QUESTIONS

9    THAT SUGGEST THE ANSWER.  I HAVE TO GIVE SOME CONTEXT FOR WHAT

10   I'M ASKING.  I CAN'T JUST ASK A COMPLETELY OPEN ENDED QUESTION

11   LIKE, MS. HOLMES, YOU ANSWER A QUESTION AND SO I HAVE TO

12   PROVIDE SOME DIRECTION.  I HAVE NEVER HAD SO MANY OBJECTIONS IN

13   MY LIFE, AND IT'S ACTUALLY LIKE AN OBSTRUCTIONIST AND IT'S

14   SLOWING THINGS DOWN.

15        IF THERE'S AN OBJECTION, I'M SURE IT WILL BE RAISED AT THE

16   APPROPRIATE TIME.  WE'RE NOW HAVING A SIDE-BAR ABOUT COUNSEL'S

17   CONCERNS, AND AS WE HAVE HAD MANY, MANY SIDE-BARS ABOUT

18   COUNSEL'S CONCERNS.

19              MR. FAZIOLI:  VIRTUALLY EVERY SINGLE ONE OF THESE

20   QUESTIONS IS LEADING AND ALMOST EVERY ONE OF THESE LEADING

21   OBJECTIONS HAVE BEEN SUSTAINED.  THERE'S A REASON WHY YOU'RE

22   NOT SUPPOSED TO ASK LEADING QUESTIONS ON DIRECT AND RATHER THAN

23   HAVE US OBJECT HOWEVER MANY MORE TIMES TO LEADING OBJECTIONS,

24   WE FIGURE THAT THIS IS SOMETHING THAT CAN BE RESOLVED

25   EFFICIENTLY NOW OR PERHAPS GET SOME ADDITIONAL GUIDANCE FROM

1      THE COURT.

2          AND ALMOST EVERY ONE OF THESE QUESTIONS IS DESIGNED TO GET

3      AN ANSWER OF YES AND IT'S THE FORM OF ARGUMENT IN A LEADING

4      QUESTION.

5              MS. GARRIDO:  THAT'S NOT A DEFINITION OF A LEADING

6      QUESTION AS TO WHETHER OR NOT IT'S A YES OR NO ANSWER.

7          THE DEFINITION OF A LEADING QUESTION IS WHETHER OR NOT IT

8      SUGGESTS THE ANSWER THAT YOU'RE LOOKING FOR.  SO I DISAGREE.

9              MR. FAZIOLI:  THEN WE DISAGREE.

10             THE COURT:  MS. LIE, DO YOU WISH TO BE HEARD?

11             MS. LIE:  YOUR HONOR, I WOULD JUST NOTE THAT BY

12     COUNSEL'S OWN STANDARDS THEIR EXAMINATION OF THE MAJORITY OF

13     THEIR WITNESSES WOULD HAVE BEEN LEADING TO THE EXTENT THAT THEY

14     CALLED FOR YES OR NO ANSWERS.

15         I WOULD AGREE WITH MS. GARRIDO'S ASSESSMENT TO THE EXTENT

16     THAT SHE'S NOT SUGGESTING AN ANSWER BUT MERELY PROVIDING A

17     CONTEXT FOR A QUESTION THAT IT'S MERELY PERMISSIBLE

18     EXAMINATION.

19             THE COURT:  THANK YOU.  COUNSEL WILL BE PERMITTED

20     SOME FOUNDATIONAL LEEWAY IN ASKING SOME FOUNDATIONAL QUESTIONS

21     BUT APPARENTLY LEADING QUESTIONS, WHATEVER THAT IS PERMITTED ON

22     DIRECT EXAMINATION.

23         SO I UNDERSTAND THAT YOU MAY HAVE SOME DIFFICULTY,

24     MS. GARRIDO, FORMULATING A QUESTION THAT IS NOT LEADING, AND

25     I'LL GIVE YOU SOME LEEWAY.  BUT I THINK LEADING QUESTIONS ARE

```
 1      NOT PERMITTED, AND I THINK I SUGGESTED THAT AND THE OBJECTIONS

 2      ARE WELL TAKEN AS TO THE PHRASING OF THE QUESTIONS.

 3          I UNDERSTAND THAT YOU NEED TO LAY SOME FOUNDATION AND

 4      CONTEXT, AND I'LL ALLOW THAT AS BEST YOU CAN.

 5          I TRUST THAT YOU'RE GOING TO DO THE BEST YOU CAN TO NOT

 6      LEAD THE WITNESS ON DIRECT.

 7              MR. FAZIOLI:  THANK YOU.

 8              THE COURT:  ANYTHING FURTHER?

 9              MS. GARRIDO:  NO.

10          (END OF DISCUSSION AT SIDEBAR.)

11      BY MS. GARRIDO:

12      Q.  MS. HOLMES -- YOU CAN PUT THAT DOWN.

13          WE HAVE HEARD SOME TESTIMONY THAT PAIGES SECURITY SERVICE

14      WAS UNABLE TO PAY THE EMPLOYEE'S THE CORPORATION'S SHARE OF THE

15      RETIREMENT ACCOUNTS.

16          WHAT, IF ANY, EFFECT DID THIS HAVE ON YOU?

17      A.  I DIDN'T RECEIVE ALL OF MY RETIREMENT, AND I WAS LAID OFF

18      IN 2002, PRIOR TO THE COMPANY CLOSING.

19      Q.  DID YOU DISCUSS THAT WITH YOUR FATHER AT ALL?

20      A.  REGARDING -- I DON'T QUITE UNDERSTAND WHAT YOU MEAN?

21      Q.  YOUR RETIREMENT?  DID YOU DISCUSS YOUR RETIREMENT PAYMENTS

22      AND YOU JUST TESTIFIED THAT YOU DIDN'T RECEIVE YOUR RETIREMENT.

23      DID YOU DISCUSS THAT WITH YOUR FATHER?

24      A.  RIGHT.  HE DID EXPLAIN -- YES.

25      Q.  AND WHAT WAS THE DISCUSSION THAT YOU HAD WITH YOUR FATHER
```

1    ABOUT THAT?

2    A.   THAT HE WAS NOT ABLE TO PAY ME WHEN I LEFT EVERYTHING THAT

3    WAS OWED TO ME BUT AS A FATHER HE WOULD CONTINUE TO DO WHAT HE

4    COULD DO.

5    Q.   OKAY.  AND WHEN HE SAID HE WOULD CONTINUE TO DO WHAT HE

6    COULD, DID HE SAY SPECIFICALLY WHAT HE WOULD DO?

7    A.   CONTINUE TO PAY THE MORTGAGE ON MY HOME AND ASSIST IN ANY

8    OTHER WAY THAT HE COULD FINANCIALLY.

9    Q.   NOW, WHEN YOU STOPPED WORKING FOR PAIGES, WAS THAT BECAUSE

10   YOU WERE LAID OFF?

11   A.   YES, MA'AM.

12   Q.   DID YOU HAVE ANY CONVERSATIONS WITH HIM ABOUT THAT, ABOUT

13   BEING LAID OFF?

14   A.   I RECEIVED A LETTER AS OTHER COMPANY EMPLOYEES RECEIVED

15   WHEN THEY WERE LAID OFF.

16   Q.   OKAY.  DID YOU TALK WITH YOUR FATHER ABOUT THAT?

17   A.   YES, WE DID HAVE A CONVERSATION ABOUT IT.

18   Q.   AND WHAT WAS THE CONVERSATION?

19   A.   THE CONVERSATION AS I RECALL WAS REGARDING PAIGES SECURITY

20   AND WHAT WAS GOING TO GO ON WITH HIS BUSINESS.

21   Q.   AND WERE YOU AWARE AS TO ANY FINANCIAL TROUBLE YOUR

22   PARENTS WERE HAVING?

23   A.   AT WHAT PARTICULAR TIME?  I'M UNSURE.

24   Q.   WELL, DID YOU FIND OUT AT ANY POINT THAT YOUR PARENTS HAD

25   DECLARED BANKRUPTCY?

1    A.   YES.

2    Q.   AND HOW DID YOU FIND OUT?

3    A.   THEY CAME TO MY SISTER MARILYN'S HOUSE AND HAD A FAMILY

4    MEETING.

5    Q.   AND WHAT DID THEY TELL YOU?

6    A.   THEY LET US KNOW THAT THEY WERE -- HAD FILED BANKRUPTCY.

7    I FOUND OUT AFTER.

8    Q.   AND PRIOR TO FINDING OUT THAT FROM THEM, DID YOU HAVE ANY

9    IDEA THAT THEY WERE HAVING FINANCIAL PROBLEMS?

10   A.   ONLY ONCE WHEN I TRIED TO DO AN EVENT, ONE OF HIS CREDIT

11   CARDS DID NOT WORK AND SO, THEREFORE, I USED MINE AND AT THAT

12   TIME HE ASSURED ME THAT THERE WAS NO PROBLEM.

13   Q.   WHAT, IF ANY, IDEA DID YOU HAVE ABOUT HOW YOUR HOME COULD

14   BE INVOLVED IN THE BANKRUPTCY?

15   A.   I DIDN'T HAVE ANY IDEA UNTIL LATE 2004 TO 2005 THAT IT WAS

16   INVOLVED.

17   Q.   WHAT, IF ANYTHING, DID THEY TELL YOU PRIOR TO THAT TIME

18   ABOUT LISTING YOUR HOME ON THEIR BANKRUPTCY SCHEDULES?

19   A.   I DIDN'T EVEN REALIZE THAT IT WAS LISTED ON THE BANKRUPTCY

20   SCHEDULE.  I WAS NOT INVOLVED IN THEIR BANKRUPTCY.

21   Q.   SO HOW DID YOU FIND OUT THAT YOUR HOME COULD BE AFFECTED?

22   A.   LATE IN -- AS I RECALL LATE IN 2004, 2005 MY PARENTS

23   MENTIONED TO ME.

24   Q.   WHAT DID THEY MENTION?

25   A.   THAT THEY WOULD NEED FOR, I BELIEVE HIS NAME WAS JOHN

1      RICHARDSON WAS THE TRUSTEE, TO COME BY TO LOOK AT THE HOME.

2      Q.   AND WHAT INTERACTION DID YOU HAVE WITH JOHN RICHARDSON?

3      A.   I WELCOMED HIM IN AND HE CAME IN AND LOOKED AROUND THE

4      HOUSE.  THE ONLY REAL THING THAT I RECALL IS THAT HE ASKED ME

5      SOME QUESTIONS REGARDING MY FATHER AND HIS BANKRUPTCY AND I

6      REFERRED HIM BACK TO MY FATHER.

7      Q.   OKAY.

8      A.   AND HE REVIEWED THE HOUSE.

9      Q.   AND DO YOU RECALL APPROXIMATELY WHEN THAT HAPPENED?

10     A.   ALL I CAN RECALL IS THAT IT WAS AROUND 2004 OR 2005

11     TIMEFRAME, OR IN THAT TIME.

12     Q.   OKAY.

13     A.   BUT TO THE BEST OF MY RECOLLECTION.

14     Q.   NOW, DID YOU KNOW WHY HE WAS THERE LOOKING AT YOUR HOME?

15     A.   NOT REALLY.  I WASN'T REALLY SURE AT THE TIME.  IT'S JUST

16     THAT HE WAS INVOLVED IN THE BANKRUPTCY.

17     Q.   WHEN HE CAME TO LOOK AT YOUR HOME, DID YOU -- WHAT, IF

18     ANYTHING, DID YOU THINK ABOUT WHETHER OR NOT HE WANTED TO SELL

19     YOUR HOME?

20     A.   NOT AT THAT TIME THAT I RECALL.

21     Q.   OKAY.  AT SOME POINT WAS THERE AN ADVERSARY PROCEEDING?

22     A.   AN ADVERSARY PROCEEDING?

23     Q.   LET ME ASK YOU, WHAT IS AN ADVERSARY PROCEEDING?

24     A.   I'M NOT REALLY SURE TO THIS DAY.

25     Q.   OKAY.

HOLMES DIRECT

```
1    A.   BUT I -- I'M NOT REALLY SURE TO THIS DAY.

2    Q.   WERE YOU INVOLVED IN AN ADVERSARY PROCEEDING?

3    A.   YES.

4    Q.   OKAY.  AND DID THAT HAVE TO DO WITH YOUR HOME?

5    A.   YES.

6    Q.   AND DID YOU GET A LAWYER?

7    A.   YES, I DID.

8    Q.   OKAY.  AND HOW DID YOU FIND YOUR LAWYER?

9    A.   FROM A FRIEND OF MY BROTHER-IN-LAW'S, JAMES HEARD.

10   Q.   AND WHAT KIND OF A LAWYER WERE YOU LOOKING FOR?

11   A.   BECAUSE IT WAS MY HOME, I LOOKED FOR A REAL ESTATE LAWYER.

12   Q.   DID YOU LOOK FOR A BANKRUPTCY LAWYER?

13   A.   NO, MA'AM.

14   Q.   AND WHAT LAWYER DID YOU GET REFERRED TO?

15   A.   PETER LIEDERMAN.

16   Q.   NOW, DID YOU KNOW WHETHER OR NOT MR. LIEDERMAN HAD ANY

17   EXPERIENCE IN BANKRUPTCY LAW?

18   A.   NO, MA'AM.

19   Q.   DID YOU KNOW WHETHER OR NOT HE HAD ANY EXPERIENCE IN REAL

20   ESTATE LAW?

21   A.   NO, MA'AM.

22   Q.   WHAT WAS YOUR UNDERSTANDING OF WHO JOHN RICHARDSON WAS?

23   A.   I WAS TOLD THAT HE WAS THE TRUSTEE.

24   Q.   OKAY.

25   A.   HE CAME TO MY HOME.
```

1   Q.   AND WHAT DID THAT MEAN TO YOU THAT HE WAS THE TRUSTEE?

2   A.   I WAS NOT REALLY SURE AT THAT -- SURE AT THAT TIME.

3   Q.   OKAY.  AND WHAT ABOUT CHARLES MAHER?

4   A.   I WAS NOT SURE WHO HE WAS AT THAT TIME.

5   Q.   AND WHAT WAS YOUR GOAL IN THE ADVERSARY PROCEEDING?

6   A.   TO KEEP MY HOME.

7   Q.   DID YOU BELIEVE THAT YOU OWED THE ESTATE ANY MONEY?

8   A.   NO.

9   Q.   WHY NOT?

10  A.   BECAUSE I WAS NOT INVOLVED IN THE BANKRUPTCY AND THE

11  PAYMENTS WERE BEING MADE AT THAT TIME.

12  Q.   DID YOU -- WHAT, IF ANY, DECISIONS DID YOU MAKE ABOUT

13  WHETHER TO OFFER THE ESTATE MONEY?

14  A.   BASED ON WORKING WITH THE ATTORNEY AND JUST HAVING THE

15  DISCUSSION WITH MY FATHER AND MOTHER.

16  Q.   LET ME REPHRASE THAT.

17  A.   OKAY.

18  Q.   DID YOU DECIDE TO GIVE THE ESTATE MONEY?

19  A.   YES, I DID.

20  Q.   OKAY.  AND DID YOU AUTHORIZE YOUR ATTORNEY TO MAKE AN

21  OFFER?

22  A.   YES, I DID.

23  Q.   FOR HOW MUCH?

24  A.   75,000.

25  Q.   AND DID YOU BELIEVE THAT THAT WOULD BE THE FINAL PRICE

1    THAT THE ESTATE WOULD SETTLE FOR?

2              MR. FAZIOLI:  OBJECTION, LEADING.

3              THE COURT:  SUSTAINED.

4    BY MS. GARRIDO:

5    Q.   WHAT, IF ANYTHING, DID YOU BELIEVE ABOUT WHAT THE ULTIMATE

6    SETTLE PRICE WOULD BE?

7    A.   I BELIEVED IT WOULD BE $75,000.

8    Q.   WHAT, IF ANYTHING, DID YOU BELIEVE ABOUT WHETHER OR NOT

9    THERE WAS A SETTLEMENT THAT WAS GOING TO HAPPEN?

10   A.   I BELIEVED THAT THERE WAS A SETTLEMENT THAT WAS GOING TO

11   HAPPEN.

12   Q.   HOW QUICKLY DID YOU THINK IT WOULD HAPPEN?

13   A.   I DON'T RECALL.  TO ME IMMEDIATELY WE WERE IN

14   NEGOTIATIONS.

15   Q.   DID YOU HAVE $75,000 ON HAND?

16   A.   NOT AT THAT MOMENT.

17   Q.   DID YOU HAVE ANY IDEAS ABOUT HOW TO GET IT?

18   A.   YES.

19   Q.   AND HOW DID YOU FORMULATE THOSE IDEAS?

20   A.   I BELIEVE THAT I WOULD BE ABLE TO REFINANCE MY HOME.

21   Q.   OKAY.  AND WHY DID YOU BELIEVE THAT?

22   A.   BASED ON MY ATTORNEY AND ALSO MY FATHER.

23   Q.   OKAY.  AND I'M GOING TO ASK YOU ONLY ABOUT YOUR

24   CONVERSATIONS WITH YOUR FATHER --

25   A.   OKAY.

1    Q.   -- AND NOT YOUR ATTORNEY.  WHAT CONVERSATION DID YOU HAVE

2    WITH YOUR FATHER ABOUT REFINANCING?

3    A.   HE LET ME KNOW THAT HE WAS SPEAKING WITH I GUESS HIS

4    COUNSEL REGARDING IT; AND WE ALSO SHARED THAT I WAS SPEAKING

5    WITH COUNSEL REGARDING IT.  AND HE FELT THAT WE HAD PAID THE

6    235 FOR THE HOUSE SO HE THOUGHT THAT MY ESTIMATE OF 75 WAS A

7    BIT HIGHER THAN IT SHOULD BE.

8    Q.   HOW MUCH HIGHER?

9    A.   25,000.

10   Q.   AND HOW DID -- DID HE TELL YOU HOW HE CAME UP WITH THAT

11   FIGURE?

12   A.   YES.

13   Q.   AND HOW -- WHAT DID HE TELL YOU?

14   A.   FROM MY RECOLLECTION I BELIEVE THAT HE FELT THAT WE PAID

15   235 FOR THE HOUSE AND I HAD PUT SOME WORK INTO THE HOUSE AND

16   MAINTAINED THE HOUSE AND THERE WAS PROBABLY A $5,000 DIFFERENCE

17   BETWEEN THE 235 THAT WE PAID AND THE $50,000 AND WE ONLY OWED

18   180 OR AROUND 180, 179 TO 180 AT THE TIME OF THE NEGOTIATIONS.

19   Q.   OKAY.  SO DID HE PROVIDE YOU -- WHAT NUMBER, IF ANY, DID

20   HE PROVIDE YOU WITH AS TO WHAT WAS A FAIR SETTLEMENT AMOUNT?

21   A.   50,000.

22        MR. FAZIOLI:  YOUR HONOR, I THINK THIS IS GETTING

23   INTO HEARSAY AND GETTING INTO SOME OF THE IN LIMINE TOPICS THAT

24   THE COURT PREVIOUSLY TALKED ABOUT.

25        MS. GARRIDO:  AND IT'S NOT OFFERED FOR THE TRUTH,

1      YOUR HONOR, BUT RATHER THE EFFECT ON MS. HOLMES AND THE INTENT.

2              THE COURT:  SO, LADIES AND GENTLEMEN, THE WITNESS'S

3      PREVIOUS ANSWER IS NOT OFFERED FOR THE TRUTH OF ANYTHING THAT

4      WAS ASSERTED.  IT'S SOLELY OFFERED FOR THE EFFECT, IF ANY, ON

5      THE WITNESS.

6              AND AS TO THE TOPIC AREA, MR. FAZIOLI.

7              MR. FAZIOLI:  COULD WE APPROACH BRIEFLY TO DISCUSS?

8              THE COURT:  SURE.

9          (SIDE-BAR CONFERENCE ON THE RECORD.)

10             MR. FAZIOLI:  YOUR HONOR, TWO AREAS.  ONE IS THAT IT

11     APPEARS THAT THERE HAS BEEN TESTIMONY ABOUT STATEMENTS THAT SHE

12     HAD WITH HER COUNSEL, AND SHE'S GETTING INTO THE

13     CLIENT-ATTORNEY COMMUNICATIONS THAT WE DISCUSSED AT LENGTH,

14     NUMBER ONE; AND,

15             NUMBER TWO, IT SEEMS THAT THEY'RE GETTING DIRECTLY INTO

16     THE STATEMENT THAT MR. PAIGE MADE TO HER AROUND THE TIME.  IT

17     HASN'T BEEN ESTABLISHED WHAT THE TIMEFRAME IS, BUT I'M ASSUMING

18     THIS IS THE OCTOBER 2005 TIMEFRAME, THE TIMEFRAME THAT HE'S

19     SUFFERING FROM DEMENTIA AND ALL OF THOSE ISSUES THAT WE TALKED

20     ABOUT WERE, I JUST THINK THAT THEY'RE OPENING THE DOOR BY THIS

21     LINE OF TESTIMONY AND ABOUT LEONARD PAIGE AND HOW SHE TOOK HIS

22     ADVICE AND IN CONSULTATION WITH THE ATTORNEY GIVEN THE ATTORNEY

23     SUBMITTED A SUBMISSION THAT SAID THAT THEY MIGHT HAVE TO SUE

24     LEONARD PAIGE BECAUSE HE HAS DEMENTIA.  I THINK THAT SEEMS TO

25     BE THE DIRECTION THAT THEY'RE GOING AND BEFORE WE CONTINUE, I

1        JUST WANTED TO RAISE IT TO THE COURT'S ATTENTION.

2                THE COURT:  OKAY.

3                MS. LIE:  WELL, I THINK AS FAR AS ANY STATEMENTS

4        REGARDING COMMUNICATIONS WITH HER LAWYER, SHE HAS CERTAINLY NOT

5        GIVEN ANY INDICATION ABOUT WHAT THE CONTENT AND SUBSTANCE OF

6        THOSE COMMUNICATIONS WERE.

7                AND I THINK THAT IF MS. GARRIDO WERE PERMITTED TO LEAD

8        SLIGHTLY, THEN WE COULD AVOID SOME OF THIS PROBLEM.

9                SEPARATELY, YOU KNOW, I THINK THE ISSUE OF WHERE THIS IS

10       GOING AND THE COURT'S IN LIMINE RULINGS REGARDING DEMENTIA AND

11       ALL OF THIS, YOU KNOW, I THINK THAT THE COURT IS GOING TO HAVE

12       TO MAKE A RULING AS WE HAVE DISCUSSED AFTER MS. HOLMES HAS

13       TESTIFIED ABOUT WHETHER WE OPENED THE DOOR AND TO WHAT.

14               BUT AS FAR AS THE GOVERNMENT'S HEARSAY OBJECTION, THIS IS

15       OFFERED FOR THE EFFECT ON THE HEARER.  WE WERE VERY UP-FRONT

16       WITH THE COURT THAT WE WERE GOING TO BE SEEKING TO ADMIT THIS

17       KIND OF INFORMATION TO THE EXTENT LEAVING ASIDE THE COURT'S

18       RULING ABOUT HIS DECLARATION AND HIS STATEMENTS TO PEOPLE BY

19       MR. PAIGE OUTSIDE OF MS. HOLMES.

20               WE DID INDICATE THAT IT WAS A STATEMENT MADE TO HER, THAT

21       IT WAS SOMETHING IRRESPECTIVE OF ITS TRUTH, THAT IT WAS

22       RELEVANT TO HER INTENT OR LACK OF INTENT TO DEFRAUD.

23               THE COURT:  SO I THINK THERE WAS SOME, REGARDING THE

24       ATTORNEY'S QUESTIONS, I THINK MS. GARRIDO SUGGESTED THAT SHE

25       WAS NOT ASKING ABOUT THOSE.  I SUPPOSE AN INFERENCE CAN BE

1    DRAWN THAT SOME OF THE COMMUNICATIONS AND ANSWERS THAT

2    MS. HOLMES GAVE WERE DERIVED FROM THE ATTORNEY CONVERSATION,

3    ALTHOUGH IT WASN'T SPECIFIC.

4         SO I APPRECIATE THAT YOU'RE MOVING AWAY FROM THAT, SO

5    THAT'S NOT GOING TO BE AN ISSUE ANY MORE, BUT IF IT DOES COME

6    UP, IT MAY, IT MAY INTRODUCE OTHER REASONS TO ALLOW FURTHER

7    INQUIRY.

8         IN REGARDS TO MR. PAIGE AND HIS DECLARATIONS, I HAVE

9    ALREADY TOLD THE JURY THAT IT'S NOT OFFERED FOR THE TRUTH OF

10   THE MATTER ASSERTED BUT FOR ANY IMPACT AT ALL ON THE WITNESS.

11        IF WE GET CLOSER TO WHETHER OR NOT ANY OF THOSE ISSUES ARE

12   GOING TO COME IN, WE'RE GETTING CLOSE, I SUPPOSE, SO IT DEPENDS

13   ON, I GUESS, THE NATURE OF THE QUESTIONS.

14        AND AS I SAID AT THE LAST BREAK, I DO AND WILL ALLOW SOME

15   CONTEXT AND THE ATTORNEYS TO PLACE THIS IN CONTEXT WITH THE

16   LATITUDE, I SUPPOSE, IF THAT'S WHAT YOU'RE TRYING TO KEEP AWAY

17   FROM AND TO BE MINDFUL OF THE COURT'S RULINGS, IN LIMINE

18   RULINGS IF THAT'S WHAT YOU'RE TRYING TO DO.

19        BUT I DON'T WANT TO STOP YOU FROM DOING THAT, BUT I'LL

20   GIVE YOU SOME LATITUDE BUT, OF COURSE, YOU CAN'T LEAD ON OTHER

21   TOPICS.

22        BUT WE TALKED ABOUT THIS IN LIMINE AND THIS IS ALWAYS THE

23   ELEPHANT IN THE ROOM.  IF THERE IS, YOU KNOW, SOME TYPE OF --

24   IF YOU'RE GOING TO PROBE AROUND THAT AREA, THEN THAT'S THE

25   DANGER IS IF THE ISSUE IS GOING TO BE RAISED AT THE TIME THAT

```
 1        MR. PAIGE SAID THIS AND HIS COMPETENCY COMES IN THEN THAT COULD

 2   OPEN THE DOOR FOR OTHER INQUIRY.

 3        SO I'M JUST SAYING THAT NOW TO ADVISE ALL COUNSEL TO

 4   PROCEED AS YOU WISH I SUPPOSE.  I CAN'T TELL YOU HOW TO

 5   PROCEED.

 6             MR. FAZIOLI:  THANK YOU.

 7             MS. GARRIDO:  THANK YOU.

 8             THE COURT:  THANK YOU, COUNSEL.

 9        (END OF DISCUSSION AT SIDEBAR.)

10   BY MS. GARRIDO:

11   Q.   MS. HOLMES, DO YOU RECALL WHEN IT WAS THAT YOU MADE AN

12   OFFER FOR $75,000?

13   A.   NO, I DON'T EXACTLY RECALL WHEN.

14   Q.   OKAY.  DO YOU THINK IT MIGHT REFRESH YOUR RECOLLECTION TO

15   LOOK AT A DOCUMENT THAT WAS WRITTEN BY YOUR LAWYER?

16   A.   YES, MA'AM.

17   Q.   OKAY.  AND IF YOU WOULD REFER TO GOVERNMENT'S EXHIBIT 184.

18   A.   IT APPEARS FROM THIS DOCUMENT AROUND OCTOBER 7TH.

19   Q.   LET ME STOP YOU THERE.

20   A.   OKAY.

21   Q.   HAVING HAD A CHANCE TO REVIEW GOVERNMENT'S EXHIBIT 184, IS

22   YOUR MEMORY OF WHEN YOU MADE THE OFFER REFRESHED?

23   A.   YES.

24   Q.   AND WHEN DID YOU MAKE THE OFFER?

25   A.   OCTOBER 7TH OR 6TH.
```

1     Q.   OF WHAT YEAR?

2     A.   2005.

3     Q.   DID YOU SAY OR 6TH?

4     A.   I'M JUST -- THIS IS WHEN THIS LETTER WENT OUT.  SO AROUND

5     THAT TIME OR EARLIER.

6     Q.   AND THE CONVERSATION THAT YOU HAD WITH YOUR FATHER ABOUT

7     $50,000, WAS THAT BEFORE OR AFTER YOU MADE THE OFFER FOR

8     $75,000?

9     A.   TO MY RECOLLECTION IT WAS EARLIER.

10    Q.   OKAY.  WHAT WAS EARLIER, THE $75,000 OFFER OR THE

11    CONVERSATION WITH YOUR FATHER?

12    A.   MY CONVERSATION WITH MY FATHER.

13    Q.   ABOUT HOW MUCH EARLIER?

14    A.   WITHIN THE SEPTEMBER OR MONTH OR SO EARLIER TO MY

15    RECOLLECTION.

16    Q.   DID YOU THINK THAT THERE WAS ANYTHING WRONG WITH GETTING A

17    REFINANCE?

18    A.   NO, I DID NOT.

19    Q.   AND WHAT DID YOU INTEND -- WHAT, IF ANYTHING, DID YOU

20    INTEND TO DO WITH PROCEEDS FROM A REFINANCE?

21    A.   I INTENDED -- I EXPECTED TO SETTLE THE NEGOTIATION.

22    Q.   HOW DID YOU GO ABOUT GETTING A REFINANCE?

23    A.   I WENT OUT AND LEARNED FROM MY NEPHEW REGARDING THE

24    MORTGAGE COMPANY.  I HAD NEVER DID A REFINANCE.

25    Q.   OKAY.  AND DID YOU GET A REFERRAL?

1    A.    YES.

2    Q.    FOR WHO?

3    A.    FOR OAKLAND FUNDING.

4    Q.    OKAY.  AND WAS THERE ANY PARTICULAR INDIVIDUAL THAT YOU

5    WERE REFERRED TO OR JUST THE COMPANY?

6    A.    VITA GETER.

7    Q.    AND DO YOU KNOW WHETHER OR NOT YOUR FATHER SPOKE WITH VITA

8    GETER?

9    A.    YES.

10   Q.    AND WHAT DO YOU KNOW ABOUT THAT?

11   A.    I -- FROM WHAT MY RECOLLECTION HE UNDERSTOOD THAT -- WE

12   BOTH UNDERSTOOD THAT WE NEEDED TO PAY OFF THIS THING AND HE

13   REQUESTED FOR ME TO FIGURE OUT IF I KNEW A LENDER OR WHATEVER

14   AND THEN WE BOTH PROVIDED, TO MY RECOLLECTION, INFORMATION.

15   Q.    OKAY.  NOW, YOU SPOKE WITH VITA GETER DIRECTLY; IS THAT

16   FAIR TO SAY?

17   A.    YES.

18   Q.    OKAY.  AND DO YOU KNOW HOW MANY TIMES?

19   A.    I'M NOT EXACTLY SURE, BUT I WOULD SAY AT LEAST THREE TO

20   SIX TIMES.

21   Q.    WAS SHE THE ONLY PERSON AT OAKLAND FUNDING GROUP THAT YOU

22   DEALT WITH?

23   A.    I DON'T REALLY RECALL EXACTLY IF IT WAS VITA ALL OF THE

24   TIME OR MAYBE HER ASSISTANT AT SOME POINT IN TIME CALLED.

25   Q.    OKAY.  THE FIRST CONVERSATION -- DO YOU RECALL THE FIRST

```
1     CONVERSATION THAT YOU HAD WITH VITA GETER?

2     A.   IN SOME RESPECTS.

3     Q.   OKAY.  WAS THAT IN PERSON?  ON THE PHONE?  HOW DID YOU

4     TALK WITH HER?

5     A.   ON THE PHONE.

6     Q.   AND DID YOU PROVIDE ANY INFORMATION TO HER?

7     A.   TO MY RECOLLECTION I DID.

8     Q.   AND DO YOU RECALL WHAT INFORMATION YOU PROVIDED?

9     A.   UM, I BELIEVE I GAVE HER MY NAME, THE ADDRESS OF MY

10    PROPERTY, PROBABLY MY SOCIAL SECURITY NUMBER, DRIVER'S LICENSE

11    NUMBER, AND MY OCCUPATION.

12    Q.   AND WHAT DID YOU TELL HER ABOUT YOUR OCCUPATION?

13    A.   I TOLD HER I WAS SELF-EMPLOYED.

14    Q.   AND WHAT DID SHE -- DID YOU DISCUSS THAT FURTHER WITH HER?

15    A.   TO MY RECOLLECTION SHE ASKED ME WHAT TYPE OF

16    SELF-EMPLOYMENT I WAS AND WE DISCUSSED THAT.

17    Q.   OKAY.  AND WHAT DID YOU TELL HER?

18    A.   I OWNED A PRIVATE PATROLLING GUARD SERVICE AND GAVE HER

19    THE NAME OF IT.

20    Q.   DID YOU GIVE HER ANY OTHER INFORMATION, LIKE A TAX

21    IDENTIFICATION NUMBER OR LICENSE NUMBER OR ANYTHING LIKE THAT?

22    A.   I DID.  I DON'T KNOW IF IT WAS ON THE FIRST CALL OR THE

23    SUBSEQUENT CALLS.

24    Q.   AND WHAT WAS YOUR UNDERSTANDING ABOUT WHAT MS. GETER WAS

25    GOING TO DO WITH THE INFORMATION THAT YOU WERE GIVING HER?
```

```
1    A.   SHE WAS GOING TO COMPILE THE INFORMATION, TO MY

2    RECOLLECTION, AND GET BACK WITH ME TO SEE IF I QUALIFY.

3    Q.   OKAY.  WHAT WAS THE MAIN GOAL THAT YOU HAD WITH REGARD TO

4    THE REFINANCE?

5    A.   TO GET -- DO SOME -- THE MAIN GOAL WAS TO PAY OFF THE --

6    PAY SECURITY OR CARRIE PAIGE, LEONARD PAIGE ESTATE AND TO DO

7    SOME HOME REPAIRS.

8    Q.   OKAY.

9    A.   AND TO DO SOME THINGS FOR MYSELF.

10   Q.   DID YOU DISCUSS THE TOTAL AMOUNT OF THE LOAN WITH

11   MS. GETER?

12   A.   NOT THAT I RECALL.

13   Q.   AND WHAT DO YOU RECALL TALKING WITH HER ABOUT IN TERMS OF

14   THE LOAN AMOUNT?

15   A.   I RECALL HER TAKING INFORMATION AND LETTING ME KNOW THAT

16   SHE WOULD RUN SOME NUMBERS AND GET BACK WITH ME.

17   Q.   OKAY.  AND DID YOU DISCUSS YOUR INCOME WITH HER?

18   A.   NOT THAT I RECALL.

19   Q.   DID YOU DISCUSS YOUR BANK ACCOUNT BALANCE WITH HER?

20   A.   NOT THAT I RECALL.

21   Q.   AND DID YOU DISCUSS YOUR BANK ACCOUNT NUMBER WITH HER?

22   A.   I BELIEVE THAT SHE ASKED FOR THAT.

23   Q.   DID YOU DISCUSS WITH HER WHETHER OR NOT YOU WERE A PARTY

24   TO A LAWSUIT?

25   A.   I DON'T REALLY RECALL DISCUSSING THAT WITH HER.
```

1    Q.   DID YOU BELIEVE AT THE TIME THAT YOU WERE A PARTY TO A

2    LAWSUIT?

3    A.   NO, MA'AM.

4    Q.   DID YOU DISCUSS WITH HER THE VALUE OF THE HOME?

5    A.   NO, MA'AM.

6    Q.   DID YOU DISCUSS WITH HER THE REASON WHY YOU WANTED CASH?

7    A.   I WOULD HAVE TO SAY, YES, I KNEW THAT I NEEDED TO -- I WAS

8    IN NEGOTIATIONS AND I DIDN'T KNOW WHAT THAT WOULD BE AND ALSO

9    THAT I NEEDED HOME REPAIR.

10   Q.   AND YOU HAVE SEEN THE DOCUMENT, THE UNIFORM RESIDENTIAL

11   LOAN APPLICATION THAT WAS DATED OCTOBER 15TH, 2005?

12   A.   YES.

13   Q.   AND DID YOU SIGN THAT APPLICATION?

14   A.   YES.

15   Q.   AND DID YOU READ IT BEFORE SIGNING IT?

16   A.   I DON'T RECALL IF I DID.

17   Q.   WHY NOT?

18   A.   I KNEW MY FATHER WAS INVOLVED IN ONE WAY WITH IT AND I

19   DON'T NORMALLY READ APPLICATIONS.  I'VE LEARNED THAT I NEED TO

20   PAY CLOSER ATTENTION.

21   Q.   DID YOU HAVE ANY REASON TO BELIEVE THAT MS. GETER DIDN'T

22   PREPARE YOUR PAPERWORK CORRECTLY?

23   A.   NO.  I TRUSTED IN LETTER HER.

24   Q.   IF YOU HAD NOTICED ANY ERRORS, WOULD YOU HAVE BROUGHT THEM

25   TO MS. GETER'S ATTENTION?

1    A.   MOST DEFINITELY.

2    Q.   DID YOU NOTICE THAT THE LOAN APPLICATION AS BEING MAILED?

3    A.   NO, MA'AM.

4    Q.   AND IF YOU HAD NOTICED THAT, WOULD YOU HAVE BROUGHT IT TO

5    HER ATTENTION?

6    A.   YES, DEFINITELY.

7    Q.   AND IF YOU HAD NOTICED THAT IT STATED YOUR INCOME AS

8    $15,000 A MONTH, WOULD YOU HAVE BROUGHT THAT TO HER ATTENTION?

9    A.   YES, MA'AM.

10   Q.   IF YOU HAD NOTICED THAT IT STATED YOUR BANK ACCOUNT

11   BALANCE AS $15,000, WOULD YOU HAVE BROUGHT THAT TO HER

12   ATTENTION?

13            MR. FAZIOLI:  YOUR HONOR, THESE ARE LEADING

14   QUESTIONS.

15            THE COURT:  THEY ARE LEADING QUESTIONS.  ARE YOU

16   ABOUT FINISHED WITH THEM?

17            MS. GARRIDO:  I HAVE ONE MORE.

18            THE COURT:  WHY DON'T YOU ASK YOUR NEXT QUESTION.

19            MS. GARRIDO:  OKAY.

20   Q.   MS. HOLMES, IF YOU HAD NOTICED ON THE APPLICATION THAT

21   YOUR BANK ACCOUNT NUMBER WAS INCORRECT, WOULD YOU HAVE BROUGHT

22   IT TO MS. GETER'S ATTENTION?

23   A.   YES, MA'AM.

24   Q.   NOW, WHEN YOU SIGNED THAT APPLICATION, DID YOU HAVE INTENT

25   TO DEFRAUD THE BANKRUPTCY ESTATE?

1    A.   NO, MA'AM.

2    Q.   DID YOU HAVE INTENT TO DEFRAUD WORLD SAVINGS BANK?

3    A.   NO, MA'AM.

4    Q.   DID YOU BELIEVE THAT ANYTHING YOU WERE DOING WAS ILLEGAL?

5    A.   NO, MA'AM.

6    Q.   AT SOME POINT DID MS. GETER ASK YOU FOR A LETTER?

7    A.   YES, MA'AM.

8    Q.   AND WHAT DID SHE ASK YOU FOR?

9    A.   INFORMATION REGARDING, TO MY RECOLLECTION, WHY I NEEDED

10   THE MONEY.

11   Q.   AND DID YOU WRITE ONE?

12   A.   YES, I DID.

13   Q.   DID ANYONE HELP YOU DRAFT THAT?

14   A.   TO MY RECOLLECTION MS. GETER LET ME KNOW WHAT I NEEDED TO

15   STATE AND I DRAFTED IT AND SIGNED IT.

16   Q.   AND THE FIRST LETTER THAT WAS DATED OCTOBER 6TH, 2005, DID

17   YOU SIGN THAT?

18   A.   CAN I SEE THAT LETTER?

19   Q.   SURE.  MY APOLOGIES FOR THE BREAK WHILE WE FOUND THAT.

20        CAN YOU REFER TO GOVERNMENT'S EXHIBIT 28.  IT'S IN BINDER

21   2 OF 5.

22        AND IF YOU'LL LOOK AT THE THIRD PAGE WITHIN EXHIBIT 28.

23   IS THAT THE LETTER THAT YOU WROTE IN RESPONSE TO MS. GETER'S

24   REQUEST?

25   A.   YES, MA'AM.

```
1    Q.   AND DID YOU SIGN THAT?

2    A.   YES, I DID.

3    Q.   IS THAT YOUR SIGNATURE ON IT?

4    A.   YES, I DID.

5    Q.   OKAY.  AND TURNING TO THE SECOND PAGE OF THAT EXHIBIT, THE

6    LETTER DATED NOVEMBER 9TH, 2005, DID YOU WRITE THAT LETTER?

7    A.   YES, I DID.

8    Q.   AND WHY DID YOU WRITE THAT?

9    A.   IT WAS FROM MY RECOLLECTION ANOTHER REQUEST FROM OAKLAND

10   FUNDING.

11   Q.   AND --

12   A.   -- OR VITA GETER.

13   Q.   AND DOES THIS LETTER NOW HAVE A SPECIFIC DOLLAR AMOUNT?

14   A.   YES, IT DOES.

15   Q.   AND WHAT IS THAT DOLLAR AMOUNT?

16   A.   $50,000.

17   Q.   AND WHERE DID THAT NUMBER COME FROM?

18   A.   MY FATHER.

19   Q.   WHAT, IF ANYTHING, WAS YOUR UNDERSTANDING AT THE TIME YOU

20   WROTE THAT AS TO WHAT YOU WERE ABOUT TO SETTLE WITH -- SETTLE

21   FOR WITH THE ESTATE?

22   A.   MY COUNSEL --

23   Q.   LET ME STOP YOU THERE.  I'M NOT GOING TO ASK YOU ABOUT

24   YOUR CONVERSATIONS WITH COUNSEL?

25   A.   OKAY.
```

```
1     Q.   AND SO ANSWER FROM YOUR OWN RECOLLECTION AND NOT BASED ON

2     YOUR CONVERSATIONS WITH YOUR COUNSEL.

3     A.   OKAY.

4     Q.   IF YOU CAN?

5     A.   WAS THAT --

6     Q.   LET ME ASK YOU AGAIN.

7     A.   OKAY.

8     Q.   WHAT, IF ANYTHING, WAS YOUR UNDERSTANDING AT THAT POINT

9     ABOUT WHY -- WHAT AMOUNT YOU WERE GOING TO SETTLE FOR WITH THE

10    ESTATE?

11    A.   BASED ON MY RECOLLECTION WITH MY FATHER, HE BELIEVED THAT

12    THE SETTLEMENT WOULD BE $50,000.

13    Q.   NOW, DID YOU, DID YOU SIGN A FINAL LOAN PACKAGE?

14    A.   YES, I DID.

15    Q.   OKAY.  AND WHERE DID THAT TAKE PLACE?

16    A.   TO MY RECOLLECTION IT TOOK PLACE AT P.F. CHANGS.

17    Q.   AND WHERE?

18    A.   IN STAN -- CLOSE TO STANFORD.

19    Q.   DID YOU PICK THAT LOCATION?

20    A.   NO.

21    Q.   AND WHO PICKED THAT LOCATION, IF YOU RECALL?

22    A.   MY PARENTS.

23    Q.   AND DID YOU PICK UP THE DOCUMENTS?

24    A.   NO, MA'AM.

25    Q.   AND DO YOU RECALL WHO PICKED UP THE DOCUMENTS?
```

1    A.   I BELIEVE CECILEE JOHNSON PICKED THEM UP.

2    Q.   AND WHO IS CECILEE JOHNSON?

3    A.   CECILEE JOHNSON IS MY NIECE.

4    Q.   AND WHAT WAS HER ROLE IN THIS PACKAGE SIGNING?

5    A.   SHE WAS A CERTIFIED NOTARY.

6    Q.   OKAY.  AND WHO WAS PRESENT?

7    A.   I CAN RECALL MY MOTHER AND MY FATHER, I BELIEVE ALL OF MY

8    SISTERS, SOME OF MY NIECES AND NEPHEWS.

9    Q.   DO YOU RECALL APPROXIMATELY HOW MANY PEOPLE IN TOTAL?

10   A.   NOT EXACTLY.  AT LEAST EIGHT TO TEN OR MORE.

11   Q.   OKAY.  AND WHAT WAS THE GENERAL MOOD OF THE DINNER?

12   A.   AS I RECALL IT WAS A GOOD DAY.

13   Q.   OKAY.  DID ANYONE ASK YOU TO SIGN DOCUMENTS?

14   A.   YES.

15   Q.   AND WHO?

16   A.   CECILEE JOHNSON.

17   Q.   AND HOW DID SHE GO ABOUT THAT?

18   A.   FROM MY RECOLLECTION THERE WERE TABS WITH SIGNATURE MARKS

19   ON THEM AND SHE JUST SAID SIGN HERE, SIGN HERE, SIGN HERE, SIGN

20   HERE.

21   Q.   OKAY.  DID YOU NOTICE WHETHER YOUR FATHER ALSO SIGNED

22   DOCUMENTS?

23   A.   TO MY RECOLLECTION HE DID.

24   Q.   OKAY.  AND DID YOU SIGN WHEREVER CECILEE TOLD YOU TO SIGN?

25   A.   TO MY RECOLLECTION.

1    Q.   DID YOU READ THOSE DOCUMENTS THAT YOU WERE SIGNING?

2    A.   I DON'T RECALL THAT I DID.

3    Q.   AND WHAT WAS YOUR UNDERSTANDING, IF ANY, ABOUT WHAT THOSE

4    DOCUMENTS WERE THAT YOU WERE SIGNING?

5    A.   I UNDERSTOOD THAT I WAS SIGNING FOR A REFINANCE OF 312

6    MOONRACKER, MY HOME.

7    Q.   DID YOU KNOW WHETHER OR NOT THERE WAS A GRANT DEED

8    INCLUDED IN THAT PACKAGE?

9    A.   I DON'T RECALL.

10   Q.   DID YOU HAVE ANY CONVERSATION WITH YOUR FATHER ABOUT A

11   GRANT DEED?

12   A.   NO.

13   Q.   AT THE TIME WHEN YOU SIGNED THOSE DOCUMENTS, DID -- WHAT,

14   IF ANY, BELIEF DID YOU HAVE ABOUT WHETHER YOU WERE TAKING THE

15   MONEY OF THE ESTATE?

16   A.   COULD YOU REASK THAT QUESTION, PLEASE.

17   Q.   SURE.  DID YOU HAVE ANY BELIEF AS TO WHETHER YOU WERE

18   TAKING ANY OF THE ESTATE'S MONEY BY REFINANCING?

19   A.   NO, I DIDN'T BELIEVE THAT I WAS.

20   Q.   AND WHY DID YOU BELIEVE THAT YOU WEREN'T TAKING THE

21   ESTATE'S MONEY?

22   A.   JUST BASED ON THE APPRAISAL.  I DO BELIEVE THAT I OWED

23   THIS THAT THROUGH NEGOTIATION I WOULD HAVE TO GIVE THEM SOME

24   MONEY.  SO, YES, I DID BELIEVE THEM.

25   Q.   OKAY.  AND THAT WAS A LITTLE CONFUSING?

1    A.   YEAH, I DON'T REALLY UNDERSTAND WHAT YOU MEANT.

2    Q.   YOU JUST MENTIONED THE APPRAISAL?

3    A.   UH-HUH.

4    Q.   AT SOME POINT DID YOU BECOME AWARE OF A MARKET VALUE FOR

5    YOUR HOME?

6    A.   ONLY WHAT VITA GETER HAD EXPRESSED.

7    Q.   OKAY.  AND WHAT DID SHE TELL YOU?

8    A.   THAT A PERSON HAD COME OUT -- SHE HAD SENT AN APPRAISER TO

9    MY HOME.

10   Q.   OKAY.  AND WHAT DID SHE TELL YOU ABOUT HOW MUCH IT WAS?

11   A.   I DON'T RECALL EXACTLY.

12   Q.   OKAY.  DID YOU AND SHE HAVE ANY MORE DISCUSSIONS?  DID YOU

13   TALK FURTHER ABOUT THE EQUITY THAT WAS STILL IN THE HOME?

14   A.   YES.

15   Q.   AND WHAT CONVERSATIONS DID YOU HAVE?

16   A.   FROM WHAT I RECALL.

17   Q.   AND WHAT DID YOU DISCUSS?

18   A.   SHE LET ME KNOW THAT THERE WAS A LOT MORE EQUITY IN THE

19   HOUSE.

20   Q.   AND DID YOU HAVE ANY DISCUSSIONS WITH HER ABOUT HOW TO

21   ACCESS THAT ADDITIONAL EQUITY?

22   A.   FROM WHAT I RECALL SHE TOLD ME AT THE TIME THAT, AND THIS

23   IS FROM RECOLLECTION, THAT YOU COULD REFINANCE A HOME EVERY

24   SIX MONTHS WITHIN ONE OF OUR CONVERSATIONS.

25   Q.   NOW, AT SOME POINT THE FUNDS FROM THE RESENTENCE REACHED

```
 1    YOUR ACCOUNT?

 2    A.   YES, MA'AM.

 3    Q.   OKAY.  AND, NOW, AT THAT TIME DID YOU CONSIDER -- WELL,

 4    WOULD YOU NOW CONSIDER YOURSELF TO HAVE BEEN FINANCIALLY

 5    RESPONSIBLE AT THAT TIME?

 6    A.   NO, MA'AM.

 7    Q.   OKAY.  HAD YOUR FATHER HISTORICALLY BEEN INVOLVED IN YOUR

 8    FINANCES?

 9    A.   YES.

10    Q.   WERE YOU FINANCIALLY DEPENDENT ON HIM INTO ADULTHOOD?

11    A.   YES.

12    Q.   AROUND THE TIME PERIOD END OF 2005, HAD YOU EVER BALANCED

13    YOUR CHECKBOOK?

14    A.   I NEVER WAS A -- NO.  NO.

15    Q.   OKAY.  DID YOU REGULARLY KEEP TRACK OF YOUR ACCOUNT

16    BALANCE?

17    A.   NO.

18    Q.   AND DID YOU MAINTAIN SAVINGS?

19    A.   NO.  I LIVED FROM PAYCHECK TO PAYCHECK.

20    Q.   AND DID YOU INVEST IN RETIREMENT?

21    A.   ONLY WHAT YOU SAW WITH THE GOVERNMENT FOR THEM.

22    Q.   AND -- BUT THEN YOU TOOK THAT OUT?

23    A.   YEAH, I TOOK THAT OUT.

24    Q.   AND HAD YOU -- HAD YOU RACKED UP SOME DEBT BEFORE YOU

25    REFINANCED?
```

1    A.   YES.

2    Q.   NOW, THE GOVERNMENT HAS INTRODUCED QUITE A BIT OF EVIDENCE

3    REGARDING THE CREDITORS THAT WERE PAID OFF WITH THE PROCEEDS

4    FROM THE REFINANCE.

5         DID THAT HAPPEN AT YOUR REQUEST?

6    A.   I DON'T RECALL.  I THINK IT WAS MORE A PART OF THE

7    REFINANCING.

8    Q.   OKAY.  AND BY PART OF THE REFINANCING, WHAT DO YOU MEAN BY

9    THAT?

10   A.   SPEAKING WITH VITA G. LETTING ME KNOW THE QUALIFICATIONS

11   THAT I WOULD HAVE TO MEET.

12   Q.   OKAY.  A CONDITION OF THE LOAN?

13   A.   YES.

14   Q.   WHY DID YOU GET INVOLVED PERSONALLY WITH THE REPAYMENT OF

15   YOUR CREDITORS?

16   A.   BECAUSE UPON -- AND I'M NOT SURE WHO IT WAS AT OAKLAND

17   FUNDING LETTING ME KNOW IF YOU COULD SELL, PLEASE DO THAT, AND

18   THAT WOULD ASSIST WITH THE PROCEEDS.

19   Q.   OKAY.  NOW, AFTER YOU RECEIVED THE PROCEEDS, DID YOU OPEN

20   ANY ADDITIONAL BANK ACCOUNTS?

21   A.   YES, I DID.

22   Q.   AND WHY DID YOU DO THAT?

23   A.   BECAUSE I DID NOT HAVE REALLY GAINFUL EMPLOYMENT BEFORE

24   THIS MONEY AND I OPENED UP A PERSONAL CHECKING I RECALL AND TWO

25   SAVINGS ON MY ATTEMPT TO TRY AND CONTROL MY MONEY.

```
 1      Q.   OKAY.  HAD YOU EVER HAD THAT MUCH MONEY BEFORE?

 2      A.   NO, MA'AM, NEVER, EVER.

 3      Q.   AND HAD YOU EVER EVEN HAD EVEN CLOSE TO THAT MUCH MONEY

 4      BEFORE?

 5      A.   NO, MA'AM.

 6      Q.   THERE WAS A TRANSFER THAT WAS BROUGHT UP THROUGHOUT THIS

 7      TRIAL WHERE THE BULK OF THE REMAINING MONEY FROM THE REFINANCE

 8      WAS MOVED INTO YOUR PERSONAL ACCOUNT?

 9      A.   YES, MA'AM.

10      Q.   AND DID YOU DO THAT?

11      A.   YES, I DID.

12      Q.   AND WHY DID YOU DO THAT?

13      A.   BECAUSE I -- IF -- I FELT THAT IT BELONGED TO MY PERSONAL

14      ACCOUNT RATHER THAN MY BUSINESS ACCOUNT --

15      Q.   OKAY.  NOW, AS SOON AS YOU GOT THOSE FUNDS, DID YOU BEGIN

16      SPENDING THEM?

17      A.   YES, I DID.

18      Q.   DID YOU GO TO THE CASINO?

19      A.   YES, I DID.

20      Q.   AND DID YOU GAMBLE?

21      A.   YES, I DID.

22      Q.   AND DID YOU SHOP?

23      A.   YES, I DID.

24      Q.   HOW LONG HAD YOU BEEN GAMBLING?

25      A.   EVERY NOW AND THEN I WOULD GAMBLE.  I DIDN'T REALLY HAVE
```

1    MUCH MONEY TO GAMBLE WITH SO EVERY NOW AND THEN I WOULD GAMBLE

2    AT DIFFERENT LOCATIONS AND THROUGHOUT THE TRAVELLING IN

3    SECURITY EVERY NOW AND THEN BUT NOT A GREAT DEAL.  IT WASN'T --

4    I DIDN'T HAVE MONEY TO DO IT WITH.

5    Q.   OKAY.  WELL, "EVERY NOW AND THEN" CAN MEAN DIFFERENT

6    THINGS TO DIFFERENT PEOPLE.

7    A.   UH-HUH.

8    Q.   SO FOR YOU, WERE YOU GOING ONCE A MONTH?  TWICE A MONTH,

9    MORE?  LESS?

10   A.   I WAS GOING QUITE A BIT ONCE I RECEIVED THE MONEY.

11   ACTUALLY LOOKING AT IT, IT'S SHAMEFUL AND TERRIBLE.  I WAS VERY

12   IRRESPONSIBLE.

13   Q.   AND GENERALLY WHEN YOU WOULD GO GAMBLING, WHO WOULD YOU GO

14   WITH?

15   A.   SOMETIMES MY PARENTS, SOMETIMES MY SISTERS, AND SOMETIMES

16   WITH FRIENDS, AND BY MYSELF SOMETIMES.

17   Q.   AND IF YOU WON MONEY, WOULD YOU SHARE IT WITH THEM?

18   A.   YES.

19   Q.   AND AFTER YOU RECEIVED THE PROCEEDS FROM THE REFINANCE,

20   WOULD YOU TAKE IT OUT AND SHARE IT WITH ANYONE?

21   A.   YES.

22   Q.   AND DOES THAT INCLUDE YOUR FATHER?

23   A.   YES.

24   Q.   WAS THERE ANY PARTICULAR DATE THAT YOU COULD TELL THAT YOU

25   WERE AT THE CASINOS WITH YOUR FATHER?

1     A.   I CAN RECALL A FEW TIMES, BUT I DO RECALL AROUND HIS

2     BIRTHDAY IN FEBRUARY I KNOW.

3     Q.   OKAY.  WHAT DATE WAS THAT?

4     A.   HIS BIRTHDAY IS FEBRUARY 17TH, AND THERE WERE OTHER

5     OCCASIONS.  I DON'T QUITE RECALL THE DATES OF EACH ONE.

6     Q.   AND DO YOU HAVE ANY BELIEF NOW ABOUT WHETHER OR NOT YOU

7     HAD A PROBLEM WITH GAMBLING AT THE TIME?

8     A.   I DO -- I DEFINITELY HAD A PROBLEM WITH GAMBLING AT THE

9     TIME AND IT'S SHAMEFUL.  IT'S VERY HARD TO EVEN LOOK AT AND

10    SEE.  I'M VERY REMORSEFUL FOR IT.

11    Q.   WHAT ABOUT SHOPPING?

12    A.   SHOPPING?  I HAD A PROBLEM WITH THAT, TOO.

13    Q.   DO YOU FEEL NOW THAT YOU HAD CONTROL OVER YOUR SPENDING AT

14    THE TIME?

15    A.   NOT AT THE TIME.

16    Q.   AND WHAT -- WHY WERE YOU GAMBLING AND SHOPPING SO MUCH?

17    A.   I -- LOOKING BACK ON IT NOW I FEEL THAT I WAS VERY

18    STRESSED OUT AFTER BEING LAID OFF IN 2002, LOOKING AT THE JOB

19    MARKET AND TRYING TO GET JOBS AND WORKING PART-TIME RECRUITING,

20    AND, UM, THE THINGS THAT MY PARENTS WERE GOING THROUGH THAT I

21    WAS NOT TOTALLY CLEAR OF.  JUST STRESSES IN LIFE.  I HAD GIVEN

22    UP A GOOD GOVERNMENT JOB TO GO TO PAIGE SECURITY AND IT'S

23    SHAMEFUL.

24    Q.   AND WHAT DID THE GAMBLING AND SHOPPING DO FOR YOUR STRESS?

25    A.   GAMBLING MADE ME FEEL LIKE MAYBE I COULD REACH THAT BIG

1    AMOUNT THAT I COULD LIVE ON AND HELP MY SON AND MY

2    GRANDDAUGHTER AND HELP MY FAMILY.

3    Q.   AND WHAT ABOUT SHOPPING?

4    A.   SHOPPING JUST GAVE ME A RELIEF FOR A FEW MOMENTS.

5    Q.   NOW, AS YOU WERE, I THINK IT COULD FAIRLY BE SAID, BURNING

6    THROUGH THE PROCEEDS OF THE REFINANCE, WERE YOU CHECKING YOUR

7    BALANCE?

8    A.   NO, I WAS NOT ON A NORMAL BASIS, NO.  VERY IRRESPONSIBLE.

9    Q.   AND WERE YOU KEEPING TRACK OF YOUR SPENDING?

10   A.   NO.

11   Q.   AT WHAT POINT DID YOU REALIZE THAT YOU WERE SPENDING THE

12   ENTIRE PROCEEDS OF THE REFINANCE?

13   A.   WHEN IT WAS GONE.

14   Q.   DID YOU SET ANY PORTION OF IT ASIDE TO PAY OFF THE ESTATE?

15   A.   NO.

16   Q.   AND WHY NOT?

17   A.   I BELIEVE THAT WHEN I STARTED GAMBLING THAT I FELT LIKE I

18   COULD WIN THAT MILLION OR WHATEVER, AND I JUST WAS STRESSED

19   OUT.

20   Q.   DID YOU USE SOME OF THE PROCEEDS TO REPAIR THE HOME?

21   A.   YES, I DID DO THAT RESPONSIBILITY.

22   Q.   OKAY.  BUT THE MAJORITY YOU SPENT ON GAMBLING AND SHOPPING

23   EXPENSES IS IT FAIR TO SAY?

24   A.   YES.

25   Q.   WERE YOU SPENDING THAT MONEY FOR THE PURPOSE OF KEEPING IT

1    FROM THE BANKRUPTCY ESTATE?

2    A.    NO, MA'AM.

3    Q.    DID YOU BELIEVE AT THE TIME THAT YOU WERE SPENDING THAT

4    MONEY THAT YOU WERE DOING SOMETHING WRONG OR ILLEGAL?

5    A.    NO, MA'AM.

6    Q.    AFTER IT BECAME COMMON KNOWLEDGE THAT YOU HAD HAD

7    REFINANCED YOUR HOME AND THAT THE TITLE WAS NOW IN YOUR NAME,

8    THERE WAS A SECOND ADVERSARY PROCEEDING.

9         DO YOU RECALL THAT?

10   A.    THERE WERE SO MANY LEGAL DOCUMENTS, I DON'T KNOW WHICH ONE

11   AND WHAT YOU'RE TALKING ABOUT.

12   Q.    OKAY.  DID IT APPEAR THAT THE CHANCES OF SETTLING MIGHT BE

13   AFFECTED?

14   A.    YES.

15   Q.    OKAY.  HOW?

16   A.    BECAUSE IT CONTINUED ON AND ON AND ON.

17   Q.    OKAY.  DID YOU CONTINUE NEGOTIATING?

18   A.    YES.

19   Q.    AND WERE THOSE NEGOTIATIONS IN GOOD FAITH?

20   A.    YES, AS FAR AS I WAS CONCERNED.

21   Q.    AND DID YOU HAVE ANY BELIEF ABOUT WHETHER YOU COULD STILL

22   GET ADDITIONAL EQUITY OUT OF THE HOME TO PAY OFF THE ESTATE?

23   A.    YES.

24   Q.    AND WHAT DID YOU BELIEVE?

25   A.    I BELIEVED THAT THERE WAS STILL MONEY IN THE HOME AND THAT

```
 1      AFTER SIX MONTHS WITH PAYING OFF THE CREDIT AND THEN EVERYTHING

 2      THAT I WOULD HAVE A HIGHER CREDIT BALANCE AND I WOULD BE ABLE

 3      TO REFINANCE.

 4      Q.   THANK YOU, MS. HOLMES.

 5      A.   YOU'RE WELCOME.

 6           THE COURT:  LET'S TAKE OUR AFTERNOON RECESS.  DO YOU

 7      HAVE CROSS-EXAMINATION?

 8           MR. FAZIOLI:  I DO, YOUR HONOR.

 9           THE COURT:  LET'S TAKE OUR AFTERNOON RECESS.

10      (RECESS FROM 2:46 P.M. UNTIL 3:03 P.M.)

11           THE COURT:  WE'RE BACK ON THE RECORD.  OUR JURY IS

12      PRESENT AND COUNSEL ARE PRESENT.  MS. HOLMES IS ON THE STAND.

13        DO YOU HAVE CROSS-EXAMINATION, MR. FAZIOLI?

14           MR. FAZIOLI:  WE DO, YOUR HONOR.

15           THE COURT:  YES, GO RIGHT AHEAD.

16                         CROSS-EXAMINATION

17      BY MR. FAZIOLI:

18      Q.   GOOD AFTERNOON, MS. HOLMES.

19      A.   GOOD AFTERNOON.

20      Q.   PREVIOUSLY -- I THINK IT WAS ACTUALLY YESTERDAY, YOU HEARD

21      TESTIMONY, THERE WAS TESTIMONY FROM AN F.B.I. ANALYST NAMED

22      JERRI JOHNSON.  DO YOU RECALL THAT?

23      A.   YES, I DO.

24      Q.   AND THERE WERE A NUMBER OF CHARTS THAT WERE PRESENTED

25      REGARDING SOME OF THE FINANCIAL ACTIVITIES IN THIS CASE.  DO
```

HOLMES CROSS

```
1      YOU RECALL THAT?

2      A.   YES, I DO.

3      Q.   AND I'M GOING TO ASK YOU A COUPLE OF QUESTIONS RELATED TO

4      SOME OF THE INFORMATION IN THOSE CHARTS.

5           IF YOU COULD BRING UP EXHIBIT 230.

6                THE COURT:  THAT'S IN BINDER 5 I THINK?

7                MR. FAZIOLI:  I BELIEVE SO.  IT SHOULD BE IN THE

8      LAST BINDER.

9      Q.   PLEASE TAKE A LOOK AT EXHIBIT 230 AND TAKE YOUR TIME.

10     A.   I HAVE IT.

11     Q.   HAVE YOU HAD AN OPPORTUNITY TO TAKE A LOOK AT EXHIBIT 230?

12     A.   YES.

13     Q.   AND, NOW, THERE WAS TESTIMONY YESTERDAY THAT EXHIBIT 230

14     RELATES TO CERTAIN FINANCIAL DOCUMENTS THAT HAVE BEEN PRESENTED

15     IN THIS CASE.  SPECIFICALLY IT RELATES TO CERTAIN BANK

16     ACCOUNTS, WESTAMERICA BANK ACCOUNTS; CORRECT?

17     A.   YES.

18     Q.   AND FOR THE TIME PERIOD THAT'S PUT FORWARD ON EXHIBIT 230,

19     WHICH IS PRETTY MUCH FOR MOST OF 2005, YOU SEE THAT THERE ARE

20     BLUE LINES; CORRECT?

21     A.   YES.

22     Q.   AND BARS AT THE BOTTOM.  AND THAT THOSE BARS, THERE WAS

23     TESTIMONY THAT THAT -- THAT THOSE BARS REFLECT THE TOTAL

24     MONTHLY DEPOSITS ON YOUR BANK ACCOUNTS.  DO YOU RECALL THAT?

25     A.   YES, I DO.
```

1    Q.   AND YOU HAVE NO REASON TO DISPUTE THE INFORMATION THAT IS

2    ON THIS CHART, ON EXHIBIT 230; CORRECT?

3    A.   NO, I DON'T.

4    Q.   AND THAT THE BANK ACCOUNTS THAT THIS FINANCIAL ANALYSIS

5    WAS TALKED ABOUT, THAT WAS DISCUSSED, MR. JOHNSON TALKED ABOUT

6    AND THERE WAS OTHER TESTIMONY FROM OTHER WITNESSES, THOSE WERE

7    BANK ACCOUNTS THAT YOU CONTROL; CORRECT?

8    A.   YES, I DID.

9    Q.   AND WHAT HAPPENED TO THE MONEY IN THOSE BANK ACCOUNTS WAS

10   WHAT YOU DECIDED WOULD HAPPEN TO THOSE BANK ACCOUNTS; CORRECT?

11   A.   YES.

12   Q.   AND THERE WERE STATEMENTS THAT WERE MAILED IN CONNECTION

13   WITH THOSE BANK ACCOUNTS; CORRECT?

14   A.   WHAT DO YOU MEAN "STATEMENTS MAILED"?

15   Q.   WELL, YOU HAD A VARIETY -- YOU HAD A WESTAMERICA BANK

16   ACCOUNT; CORRECT?

17   A.   YES.

18   Q.   AND IT WAS DOING BUSINESS AS STAR PARTNERS; CORRECT?

19   A.   YES.

20   Q.   AND THAT WAS THE BUSINESS THAT YOU WERE AFFILIATED WITH;

21   CORRECT?

22   A.   YES.

23   Q.   THE ONE YOU WERE THE CEO OF; CORRECT?

24   A.   YES.

25   Q.   AND AS PART OF HAVING A WESTAMERICA BANK ACCOUNT IN THE

```
1    NAME OF STAR PARTNERS, IS THAT WESTAMERICA WOULD MAIL YOU BANK

2    STATEMENTS; CORRECT?

3    A.   BANK STATEMENTS.

4    Q.   CORRECT?

5    A.   YES.

6    Q.   AND YOU WOULD RECEIVE THOSE BANK STATEMENTS?

7    A.   YES.

8    Q.   AND WOULD YOU READ THOSE BANK STATEMENTS?

9    A.   NOT NECESSARILY.

10   Q.   AND -- BUT YOU WOULD SOMETIMES READ THE BANK STATEMENTS?

11   A.   I CAN'T REALLY RECALL THAT I OPENED ALL OF THE BANK

12   STATEMENTS.

13   Q.   OKAY.  YOU DON'T RECALL?

14   A.   I DON'T RECALL.

15   Q.   IT'S POSSIBLE THAT YOU READ YOUR BANK STATEMENTS, IT'S

16   POSSIBLE YOU DIDN'T; IS THAT WHAT YOU'RE SAYING?

17   A.   CORRECT.

18   Q.   BUT YOU CONTROLLED WHAT HAPPENED TO THE MONEY IN THOSE

19   ACCOUNTS; CORRECT?

20   A.   CORRECT.

21   Q.   AND SO THROUGHOUT 2005 YOUR INCOME NEVER -- THE TOTAL

22   AMOUNT OF MONTHLY DEPOSITS PRIOR TO THE REFINANCING NEVER GOT

23   CLOSE TO $15,000; CORRECT?

24   A.   THAT'S CORRECT.

25   Q.   AND YOU NEVER HAD A --
```

```
1              THE COURT:  EXCUSE ME.  A JUROR HAS A --

2              JUROR:  JUDGE, THE CHAIR IS RIGHT ON THE EDGE OF

3       THAT STEP.  SHE'S ABOUT TO FALL RIGHT OFF.

4              THE COURT:  THANK YOU.

5              THE WITNESS:  THANK YOU.

6              JUROR:  YOU'RE WELCOME.

7              THE COURT:  WHY DON'T YOU MOVE OVER A LITTLE BIT IN

8       THAT CHAIR.

9              THE WITNESS:  OKAY.  OKAY.  THANK YOU.

10             THE COURT:  MR. FAZIOLI.

11      BY MR. FAZIOLI:

12      Q.  ALL RIGHT.  YOU HAD A ROUGH IDEA OF WHAT WAS IN YOUR BANK

13      ACCOUNT; CORRECT?

14      A.  AT WHAT TIME?

15      Q.  IN THE TIME PERIOD LEADING UP TO YOUR REFINANCING IN

16      NOVEMBER OF 2005?

17      A.  YES.

18      Q.  YOU UNDERSTOOD HOW MUCH MONEY WAS IN THE ACCOUNT; CORRECT?

19      A.  CORRECT.

20      Q.  AND YOU UNDERSTOOD THAT THE MONEY THAT WAS GOING IN AND

21      OUT OF THE ACCOUNT; CORRECT?

22      A.  YES.

23      Q.  OKAY.

24      A.  AND IN SOME RESPECTS.

25      Q.  IN SOME RESPECTS.  LET'S GO TO GOVERNMENT'S EXHIBIT 231,
```

1        PLEASE.  AND YOU RECOGNIZE THAT MR. JOHNSON TESTIFIED ABOUT

2        THIS CHART?  THIS IS EXHIBIT 231?

3        A.   YES, I DO.

4        Q.   AND THAT THE GREEN LINE HERE, THAT THAT ACTUALLY -- THAT

5        ACCURATELY REFLECTS WHAT YOUR DAILY ACCOUNT BALANCE WAS ON YOUR

6        WESTAMERICA ACCOUNT; CORRECT?

7        A.   I CAN'T RECALL.

8        Q.   OKAY.

9        A.   BUT BASED ON --

10       Q.   BUT YOU HAVE NO REASON TO DISPUTE THE INFORMATION THAT IS

11       ON THAT CHART, 231; CORRECT?

12       A.   NO, SIR.

13       Q.   OKAY.  YOUR ACCOUNT BALANCE FOR THAT TIME PERIOD WAS NEVER

14       CLOSE TO THE $15,000 FIGURE WHICH WAS INCLUDED ON THE

15       REFINANCING; CORRECT?

16       A.   THAT'S CORRECT.

17       Q.   AND YOU KNEW THAT YOUR BALANCE WAS NOT $15,000 AT ANY

18       POINT IN TIME IN 2005; CORRECT?

19       A.   CORRECT.

20       Q.   AND YOU KNEW THAT AT THE TIME THAT THE URLA APPLICATIONS

21       WERE SUBMITTED; CORRECT?

22       A.   YES.

23       Q.   WOULD YOU PLEASE GO TO THE NEXT CHART.  SO YOU SEE THIS

24       NEXT CHART.  THIS IS EXHIBIT NUMBER 232?

25       A.   UH-HUH.

1    Q.   AND DO YOU RECALL THAT MR. JOHNSON TESTIFIED ABOUT THIS

2    CHART; CORRECT?

3    A.   YES.

4    Q.   AND THIS CHART LAYS OUT HOW YOU USED SOME OF THE

5    REFINANCING PROCEEDS TO PAY OFF YOUR DEBTS?

6    A.   YES.

7    Q.   AND, AGAIN, YOU DON'T SEE ANYTHING THAT IS INACCURATE

8    ABOUT THIS CHART; CORRECT?

9    A.   NO, I DON'T.

10   Q.   OKAY.  SO I WOULD JUST LIKE TO WALK A LITTLE BIT THROUGH

11   SOME OF THESE TRANSACTIONS.

12        SO THERE WAS A REFINANCING THAT TOOK PLACE ON THE

13   MOONRACKER PROPERTY IN NOVEMBER 2005; CORRECT?

14   A.   CORRECT.

15   Q.   AND IT ACTUALLY FUNDED ON NOVEMBER -- ABOUT NOVEMBER 21ST,

16   2005; CORRECT?  AND YOU KNEW THAT AT THE TIME?

17   A.   CORRECT.

18   Q.   AND AS PART OF THE REFINANCING, A LOT OF YOUR DEBTS WERE

19   REPAID; CORRECT?

20   A.   YES.

21   Q.   AND, FOR EXAMPLE, THERE WAS A PAYMENT TO THE LAW GROUP,

22   VALLEJO CITY POLICE DEPARTMENT, ET CETERA, AND DO YOU SEE WHERE

23   IT SAYS TITLE COMPANY ACTION, PAID DEBT?  DO YOU SEE THAT?

24   A.   YES, I DO.

25   Q.   ALL RIGHT.  AND IF YOU -- I WON'T ASK YOU TO DO THE MATH

1    BUT IF YOU ADD UP THE NUMBERS FOR THE PAID DEBTS, IF YOU ADD UP

2    THE NUMBER OF BILLS THAT ARE PAID, THAT SIGNIFIES THAT ABOUT

3    $7,611 WAS PAID DIRECTLY BY THE TITLE COMPANY AS PART OF THE

4    REFINANCING FOR THAT PART OF IT; CORRECT?

5    A.   YES.

6    Q.   SO YOU BENEFITTED FROM THAT PART OF THE REFINANCING,

7    DIDN'T YOU?

8    A.   YES.

9    Q.   AND THE TITLE COMPANY PAID ABOUT $7,600 OF YOUR DEBT AT

10   LEAST IN THAT CHUNK; CORRECT?

11   A.   THAT IS CORRECT.

12   Q.   AND THEN FOR THE REMAINDER OF THIS CHART THERE IS A -- IT

13   SAYS TITLE COMPANY ACTION.  AND IT SAYS CHECK ISSUED AND

14   VOIDED.  DO YOU SEE THAT?

15   A.   YES, I DO.

16   Q.   AND THIS REFLECTS ANOTHER THING THAT TOOK PLACE DURING THE

17   REFINANCING PROCESS WHICH IS THAT YOU ACTUALLY PERSONALLY

18   NEGOTIATED SOME OF THE DEBTS THAT YOU HAD AT THE TIME; ISN'T

19   THAT CORRECT?

20   A.   YES, I DID.

21   Q.   SO, FOR EXAMPLE, YOU -- AROUND THE TIME OF THE

22   REFINANCING, YOU OWED SPIEGEL $7,058; IS THAT CORRECT?

23   A.   THAT'S CORRECT.

24   Q.   AND THE TITLE COMPANY INITIALLY ISSUED A CHECK IN THAT

25   AMOUNT TO PAY OFF SPIEGEL?

HOLMES CROSS

1    A.   YES, THEY DID.

2    Q.   AND THAT WAS PART OF THE PROCESS AND PART OF THE BENEFIT

3    YOU WERE GOING TO GET OUT OF THIS REFINANCING; CORRECT?

4    A.   THAT IS CORRECT.

5    Q.   BUT THEY ULTIMATELY DIDN'T PAY THAT CHECK OF $7,058;

6    CORRECT?

7    A.   THAT IS CORRECT.

8    Q.   AND THEY DIDN'T DO THAT BECAUSE YOU ACTUALLY HAGGLED WITH

9    SPIEGEL TO REDUCE THE AMOUNT; CORRECT?

10   A.   HAGGLED?

11   Q.   NEGOTIATED?

12   A.   YES, I NEGOTIATED.

13   Q.   YOU CALLED SPIEGEL; CORRECT?

14   A.   YES, I DID.

15   Q.   AND YOU WERE ABLE TO CONVINCE SPIEGEL TO TAKE ABOUT $0.50

16   ON THE DOLLAR OF WHAT YOU OWED THEM; CORRECT?

17   A.   CONVINCE?

18   Q.   WELL, DID --

19   A.   I MADE A SETTLEMENT.

20   Q.   OKAY.  AND HOW DID YOU GO ABOUT NEGOTIATING THAT

21   SETTLEMENT WITH SPIEGEL?

22   A.   I CALLED THEM AND SPOKE WITH THEM.

23   Q.   AND WHAT DID YOU SAY WHEN YOU SPOKE WITH THEM?

24   A.   THAT I WOULD LIKE TO MAKE A SETTLEMENT WITH THEM.

25   Q.   AND MEANING YOU WANTED TO NEGOTIATE?

HOLMES CROSS

1      A.   AS I RECALL.

2      Q.   AS YOU RECALL.  OKAY.  SO YOU CALLED SPIEGEL?

3      A.   UH-HUH.

4      Q.   AND YOU TOLD THEM THAT YOU WANTED TO MAKE A SETTLEMENT?

5      A.   YES.

6      Q.   AND THAT YOU WANTED TO PAY LESS THAN YOU OWED THEM;

7      CORRECT?

8      A.   YES.

9      Q.   AND YOU WERE ABLE TO CONVINCE SPIEGEL TO TAKE ABOUT $0.50

10     ON THE DOLLAR OF WHAT YOU OWED THEM; CORRECT?

11     A.   CONVINCE THEM?  THEY MADE AN AGREEMENT THE WAY I RECALL.

12     Q.   AND THEY MADE AN AGREEMENT BECAUSE OF WHAT YOU TOLD THEM?

13     YOU TALKED TO THEM; CORRECT?  YOU TALKED TO SPIEGEL?

14     A.   YES.

15     Q.   AND YOU WERE ABLE TO EVENTUALLY -- AT THE END OF THAT

16     PROCESS, SPIEGEL AGREED TO TAKE HALF OF WHAT YOU OWED THEM;

17     CORRECT?

18     A.   CORRECT.

19     Q.   AND THAT'S PRETTY IMPRESSIVE.  HOW ARE YOU ABLE TO

20     CONVINCE SPIEGEL, WHICH IS A BIG COMPANY, TO ACCEPT $0.50 ON

21     THE DOLLAR OF WHAT YOU OWED THEM?

22           MS. GARRIDO:  OBJECTION, CALLS FOR SPECULATION AND

23     ARGUMENTATIVE.

24           THE COURT:  OVERRULED.  YOU CAN ANSWER THE QUESTION.

25           THE WITNESS:  BASED ON INFORMATION FROM EITHER THE

```
 1      MORTGAGE COMPANY OR THE TITLE COMPANY OR BOTH FOR ME TO TRY TO

 2      SETTLE WITH THESE COMPANIES.

 3      BY MR. FAZIOLI:

 4      Q.   OKAY.  THEY WANTED YOU TO TRY TO SETTLE WITH THE COMPANY,

 5      BUT IT WAS YOU WHO SETTLED WITH SPIEGEL; IS THAT CORRECT?

 6      A.   I CERTAINLY DID.

 7      Q.   YOU WERE THE ONE WHO CONVINCED SPIEGEL TO TAKE A LESS

 8      AMOUNT THAN THEY WERE ENTITLED TO; CORRECT?

 9               MS. GARRIDO:  OBJECTION, ASKED AND ANSWERED.

10               THE COURT:  OVERRULED.  DID YOU HEAR HIS LAST

11      QUESTION?

12               THE WITNESS:  YEAH, THE WORD "CONVINCED."  I MADE A

13      SETTLEMENT OFFER WITH THEM AND THEY ACCEPTED.

14      BY MR. FAZIOLI:

15      Q.   OKAY.  AND THE SAME WITH A SIMILAR PROCESS WITH MACY'S;

16      CORRECT?

17      A.   CORRECT.

18      Q.   AND YOU OWED MACY'S $1,300?

19      A.   UH-HUH.

20      Q.   BUT ULTIMATELY YOU MADE A SETTLEMENT OFFER I TAKE IT TO

21      MACY'S; CORRECT?

22      A.   RIGHT.

23      Q.   AND BASED ON WHAT YOU TOLD THEM, MACY'S ULTIMATELY AGREED

24      TO TAKE LESS THAN WHAT YOU ORIGINALLY OWED THEM; CORRECT?

25      A.   CORRECT.
```

HOLMES CROSS

```
 1    Q.   OKAY.  AND THE SAME WITH SOME OF THESE OTHER VENDORS, NCO

 2    FIN, FOR EXAMPLE, THEY TOOK LESS THAN WHAT YOU OWED THEM;

 3    CORRECT?

 4    A.   CORRECT.

 5    Q.   AND BECAUSE YOU WERE ABLE TO MAKE A SETTLEMENT OFFER;

 6    CORRECT?

 7    A.   CORRECT.

 8    Q.   A SETTLEMENT OFFER THAT THEY ULTIMATELY ACCEPTED?

 9    A.   YES.

10    Q.   YOU CONVINCED THEM TO TAKE LESS?  YOU WERE VERY PERSUASIVE

11    WITH THESE COMPANIES, IS THAT FAIR TO SAY?

12    A.   I THINK THAT WAS THEIR NORMAL PRACTICE.  I DON'T KNOW HOW

13    CONVINCING I WAS.

14    Q.   BUT YOU WERE CONVINCING ENOUGH THAT YOU WERE ABLE TO GET

15    REDUCTIONS FROM THESE DEPARTMENT STORES AND OTHER ENTITIES ON

16    WHAT YOU OWED; CORRECT?

17    A.   I WAS ABLE TO GET A SETTLEMENT OFFER -- I MEAN A

18    SETTLEMENT.

19    Q.   AND THE SAME WITH LORD AND TAYLOR?

20    A.   EVERY LAST ONE OF THEM.

21    Q.   AND ROBINSON MAY.  YOU WERE ABLE TO PRESENT INFORMATION TO

22    THEM THAT WAS SUFFICIENT TO LEAD THEM TO TAKE LESS MONEY;

23    CORRECT?

24    A.   YES.

25    Q.   OKAY.  CAN WE MOVE ON TO THE NEXT CHART.  THIS IS 233.
```

1    NOW, THIS IS A CHART THAT TALKED ABOUT MONEY THAT YOU RECEIVED

2    AS A RESULT OF THE REFINANCING; CORRECT?

3    A.   YES, IT IS.

4    Q.   AND YOU DID, IN FACT, DIRECTLY RECEIVE $147,000.40 -- I'M

5    SORRY -- 147 -- ABOUT $147,000 FROM THE REFINANCING; CORRECT?

6    A.   THAT'S CORRECT.

7    Q.   AND THAT'S MONEY THAT YOU TOOK OUT OF THE HOUSE?

8    A.   YES.

9    Q.   AND YOU UNDERSTOOD THAT YOU WERE TAKING MONEY OUT OF THE

10   HOUSE; CORRECT?

11   A.   YES.

12   Q.   AND YOU UNDERSTOOD THAT BY TAKING MONEY OUT OF THE HOUSE,

13   THE DEBT ON THE HOUSE WOULD GO UP; CORRECT?

14   A.   YES.

15   Q.   AND, AGAIN, THE INFORMATION ON THAT CHART IS ACCURATE,

16   CORRECT?  YOU RECEIVED THE FIRST BATCH OF MONEY WAS $131,000

17   WIRE, ABOUT $131,000 THAT YOU RECEIVED ON NOVEMBER 21ST, 2005;

18   CORRECT?

19   A.   AS FAR AS I COULD RECALL.

20   Q.   AS FAR AS YOU COULD RECALL.  AND YOU SAW THAT THERE WERE

21   PRIOR FINANCIAL DOCUMENTS THAT TALK ABOUT THAT WIRE; CORRECT?

22   A.   CORRECT.

23   Q.   AND YOU HAVE NO REASON TO THINK THAT YOU DIDN'T RECEIVE A

24   WIRE OF $131,000 ON NOVEMBER 21ST, TO THAT ACCOUNT; CORRECT?

25   A.   NO.

```
 1     Q.   AND THAT ACCOUNT WAS THE STAR PARTNERS CHECKING ACCOUNT,

 2     THAT'S THE CHECKING ACCOUNT THAT WE TALKED ABOUT THAT YOU HAD

 3     CREATED AT WESTAMERICA BANK FOR YOUR BUSINESS STAR PARTNERS;

 4     CORRECT?

 5     A.   I OPENED IT.

 6     Q.   YOU OPENED IT?

 7     A.   I DIDN'T CREATE IT.

 8     Q.   YOU OPENED IT, YOU CONTROLLED IT, YOU CONTROLLED WHAT

 9     HAPPENED TO THAT MONEY; CORRECT?

10     A.   YES.

11     Q.   AND SO THAT MONEY HITS YOUR ACCOUNT, THERE'S A WIRE TO YOU

12     AND ABOUT $131,000 THAT TAKES PLACE ON NOVEMBER 21ST.

13          AND THEN THERE'S TWO ADDITIONAL PAYMENTS THAT RELATE TO

14     THE REFINANCING; RIGHT?

15     A.   YES.

16     Q.   OKAY.  AND ONE OF THEM TAKES PLACE ON DECEMBER 9TH, 2005.

17     AND THEN YOU GET A CHECK, AND THIS IS A CHECK PAYABLE TO YOU IN

18     THE AMOUNT OF $15,483; CORRECT?

19     A.   CORRECT.

20     Q.   OKAY.  AND THIS IS A CHECK THAT IS PAYABLE TO YOU AND IT

21     COMES IN A COUPLE OF WEEKS AFTER THE REFINANCE -- THE FIRST

22     WIRE HITS; RIGHT?

23     A.   YES.

24     Q.   AND IT GOES TO A NEW SAVINGS ACCOUNT, CORRECT, THE SAVINGS

25     ACCOUNT THAT IS LISTED THERE?
```

```
1    A.   YES.

2    Q.   AND THAT'S AN ACCOUNT THAT YOU CREATED AFTER THIS

3    FINANCIAL TRANSACTION; CORRECT?

4    A.   YES.

5    Q.   AND SO YOU HAD, BEFORE THE TRANSACTION, YOU HAD ONE

6    ACCOUNT, WHICH WAS THIS WESTAMERICA ACCOUNT THAT WAS THE STAR

7    PARTNERS ACCOUNT, AND AFTERWARDS YOU CREATED A COUPLE -- THERE

8    WERE A COUPLE OF NEW ACCOUNTS THAT YOU CREATED THAT WERE

9    CONTROLLED; CORRECT?

10   A.   YES.

11   Q.   AND ISN'T IT TRUE THAT YOU TOOK MOST OF THE MONEY THAT HAD

12   GONE TO THE FIRST ACCOUNT, YOU PRETTY QUICKLY MOVED TO THESE

13   OTHER ACCOUNTS THAT YOU HAD JUST CREATED; ISN'T THAT RIGHT?

14   A.   I DID MOVE MONEY.  I DON'T -- YES, I DID MOVE MONEY.

15   Q.   OKAY.  AND THEN THERE'S ONE MORE PAYMENT THAT YOU DIRECTLY

16   RECEIVED FROM THE REFINANCING AND THAT'S THE -- THAT WAS ON

17   FEBRUARY 17TH, 2006, AND THAT WAS A CHECK PAYABLE TO YOU IN THE

18   AMOUNT OF $147.10; CORRECT?

19   A.   YES.

20   Q.   AND THAT WENT TO ANOTHER ONE OF THESE NEWLY CREATED

21   ACCOUNTS.  IT DIDN'T GO TO THE SAVINGS ACCOUNT, IT WENT TO THE

22   CHECKING ACCOUNT; CORRECT?

23   A.   I DON'T KNOW IF IT WAS SAVINGS OR CHECKING.

24   Q.   OKAY.

25   A.   BUT IT DID GO TO ANOTHER ACCOUNT, CORRECT.
```

1    Q.   CAN QUESTION GO TO THE NEXT CHART, PLEASE.

2              THE COURT:  MS. HOLMES, MAKE SURE YOUR CHAIR DOES

3    NOT WANDER OVER.

4              THE WITNESS:  IT'S HERE.  IT'S JUST THE WAY THE BOOK

5    AND THE WATER ARE I CAN'T.

6    BY MR. FAZIOLI:

7    Q.   AS YOU MAY RECALL THIS WAS A CHART TALKING ABOUT HOW YOU

8    SPENT THE $147,000 IN REFINANCING PROCEEDS; CORRECT?

9    A.   CORRECT.

10   Q.   AND I THINK YOU TESTIFIED YOU WERE THE PERSON WHO SPENT

11   THAT $147,000; CORRECT?

12   A.   YES.

13   Q.   AND NO ONE ELSE WAS RESPONSIBLE FOR WHO SPENT THAT MONEY?

14   A.   NO.

15   Q.   OKAY.  AND DO YOU SEE HOW IT'S LAID OUT HERE IN A CERTAIN

16   PIE CHART THAT LAYS OUT HOW YOU SPENT THAT MONEY?

17             AND DO YOU HAVE ANY REASON TO THINK THAT THAT PIE CHART IS

18   NOT CORRECT HOW THAT INFORMATION IS LAID OUT?

19   A.   YES, I DO.

20   Q.   OKAY.  WHAT DO YOU THINK IS INCORRECT ABOUT IT?  LET ME

21   ASK YOU -- GO AHEAD AND ANSWER THE QUESTION.

22   A.   GO AHEAD.

23   Q.   NO, GO AHEAD.

24   A.   THE CASH PART OF IT.

25   Q.   THE CASH PART?

1      A.   UH-HUH.

2      Q.   OKAY.  YOU HEARD THE TESTIMONY THAT INDICATED THAT THAT

3      WAS ATM WITHDRAWALS THAT WERE TAKEN OUT AND CHECKS MADE TO

4      CASH?

5      A.   UH-HUH.

6      Q.   AND THAT AMOUNT PUT TOGETHER CAME UP TO THE $68,000

7      NUMBER; CORRECT?

8      A.   UH-HUH.

9              THE COURT:  IS THAT A YES?

10             THE WITNESS:  YES.

11     BY MR. FAZIOLI:

12     Q.   SO IS IT YOUR TESTIMONY THAT YOU DID NOT TAKE OUT $68,000

13     EITHER IN ATM WITHDRAWALS OR CHECKS TO CASH?

14     A.   MAYBE I DON'T RECALL YOUR QUESTION.  COULD YOU REASK THAT

15     QUESTION AGAIN ABOUT THIS PARTICULAR --

16     Q.   OKAY.  ISN'T IT CORRECT THAT OF THE $147,000 THAT YOU

17     RECEIVED IN REFINANCING PROCEEDS, THAT A LITTLE LESS THAN HALF

18     OF IT WOUND UP GETTING REDUCED TO CASH, EITHER IN THE FORM OF

19     ATM WITHDRAWALS FROM VARIOUS LOCATIONS OR CHECKS MADE OUT TO

20     CASH?

21     A.   THAT'S CORRECT.

22     Q.   SO YOU TURNED ABOUT $68,000 OF IT INTO CASH.  THEN THERE

23     WAS A NETWORK PURCHASE AT GLOBAL CALIFORNIA, 14455 HIGHWAY 16,

24     BROOKS, CALIFORNIA FOR ABOUT $3400; IS THAT CORRECT?

25     A.   THAT'S CORRECT.

HOLMES CROSS

```
1     Q.   AND THAT LOCATION IS A CASINO; CORRECT?

2     A.   CORRECT.

3     Q.   IT'S A CASINO IN BROOKS, CALIFORNIA?

4          MS. GARRIDO:  I HAVE AN OBJECTION.  MAY WE APPROACH?

5          THE COURT:  I THINK THIS WAS IN ONE OF THE OTHER

6     DOCUMENTS.

7          MR. FAZIOLI:  I THINK IT'S ALSO A TOPIC THAT HAS

8     BEEN DEALT WITH ON DIRECT EXAMINATION TO A GREAT DEGREE.

9          THE COURT:  IF YOU WANT TO APPROACH, SURE.

10         (SIDE-BAR CONFERENCE ON THE RECORD.)

11         MS. GARRIDO:  YOUR HONOR, IT'S TRUE THAT ON DIRECT

12    EXAMINATION SHE DID, FRANKLY, ACKNOWLEDGE AND TAKE

13    RESPONSIBILITY FOR GAMBLING DEBT THAT SHE RACKED UP BUT AT THE

14    SAME TIME THERE WAS STILL A RULING WITH REGARD TO THAT

15    PARTICULAR ADDRESS AND THAT IT WOULD NOT BE LINKED UP BY THE

16    GOVERNMENT TO BE A CASINO.

17         I THINK THAT QUESTION IS A VIOLATION.

18         THE COURT:  SO YESTERDAY WHEN WE WENT THROUGH SOME

19    OF THE EXHIBITS, THE TAX RETURNS, I THINK, I THINK THIS ADDRESS

20    WAS LISTED ON THE W-2G IF I'M NOT MISTAKEN.

21         MS. GARRIDO:  IT WAS, YOUR HONOR, AND THE COURT'S

22    SPECIFIC IN LIMINE RULING WAS THAT THE GOVERNMENT WAS NOT ABLE

23    TO LINK THOSE UP BECAUSE BASICALLY THE CASH WITHDRAWALS, THE

24    ATM WITHDRAWALS, THE FACT THAT THEY OCCURRED IN A CASINO, THAT

25    WAS NOT SOMETHING THAT THEY WERE TO GET INTO BECAUSE IT WAS NOT
```

```
 1        DETERMINED WHAT IT WAS SPENT ON AT THE CASINOS OR ELSEWHERE.

 2              THE COURT:  AND THAT WAS ON I THINK THE CHECK

 3        RETURNS OR THE BANK STATEMENTS.

 4              MS. GARRIDO:  AND THAT'S THE SOURCE OF THE DATA FOR

 5        THIS EXHIBIT.

 6              MR. FAZIOLI:  WELL, I MEAN, THE DEFENSE WENT AFTER

 7        PREVIOUSLY INDICATING THAT MS. HOLMES DID NOT HAVE A GAMBLING

 8        PROBLEM HAS NOW PRESENTED DIRECT TESTIMONY THAT SHE HAS A

 9        GAMBLING PROBLEM AND WENT INTO GREAT DETAILS THAT SHE FELT LIKE

10        SHE HAD A LACK OF CONTROL AND HOW SHE FELT SHE SPENT A LOT OF

11        MONEY AT CASINOS.

12           I MEAN, THIS WAS A MAJOR FOCAL POINT OF THEIR DIRECT

13        EXAMINATION.  IN LIGHT OF THAT, WE SHOULD BE ENTITLED TO

14        EXPLORE THAT TOPIC.  THEY'RE THE ONES THAT RAISED IT IN THEIR

15        DIRECT EXAMINATION.

16           IN THEIR PRIOR -- WHEN WE WENT THROUGH THE BANK RECORDS,

17        WE DID NOT HIGHLIGHT THE FACT THAT THAT LOCATION WAS A CASINO

18        BUT THEY'RE PRESENTING IT, AND I THINK IT'S UNCLEAR WHETHER

19        THIS IS SOME KIND OF DIMINISHED CAPACITY OR MENTAL HEALTH

20        DEFENSE THAT SHE HAD SOME SORT OF GAMBLING ISSUE AND SHE'S

21        PRESENTING THIS AS A JUSTIFICATION AND EXPLANATION FOR HER

22        BEHAVIORS.  I THINK THEY HAVE OPENED THE DOOR ON THE SUBJECT.

23              MS. GARRIDO:  AND I CAN CERTAINLY APPRECIATE

24        COUNSEL'S REPRESENTATION AS TO THE OPENING OF THE DOOR.

25        HOWEVER, WHEN THE DOOR GETS OPENED OR COUNSEL BELIEVES THAT THE
```

1    DOOR GETS OPENED, THE TYPICAL WAY TO HANDLE THAT IS TO APPROACH

2    AND ASK TO GET INTO IT.

3         THERE WAS A STANDING IN LIMINE ORDER, AND I BELIEVE

4    COUNSEL HAS VIOLATED IT.

5              THE COURT:  OKAY.  THANK YOU.  SO, MS. LIE, DO YOU

6    WISH TO BE HEARD?

7              MS. LIE:  NO.

8              THE COURT:  OKAY.  THANK YOU.

9         THIS ADDRESS I NOTICE CAME UP YESTERDAY ON SOME OF THE, I

10   THINK IT WAS TAX DOCUMENTS, AND THE SPECIFIC ADDRESS WAS LISTED

11   THERE WHEN THE IN LIMINE MOTION WENT TOWARDS THE DEFENSE ASKING

12   THAT THE ATM WITHDRAWALS IN THE BANK RECORDS OR STATEMENTS, I

13   GUESS THEY WERE, NOT BE IDENTIFIED.  WE HAD COLLOQUY ABOUT

14   WHETHER OR NOT THEY SHOULD BE REDACTED ENTIRELY OR NOT

15   IDENTIFIED.

16        AND I SAID THE STATEMENTS -- I ALLOWED THE STATEMENTS TO

17   COME IN, BUT I WOULD NOT ALLOW AN OTHERWISE UNINDICATED

18   ESTABLISHMENT, CASINOS, TO BE IDENTIFIED.

19        SO THIS ADDRESS HAS COME IN ALREADY.  I DON'T THINK

20   THERE'S ANY PREJUDICIAL EFFECT, PARTICULARLY IN LIGHT OF THE

21   FACT THAT ON DIRECT EXAMINATION SHE INDICATED THAT SHE GAMBLED.

22   I DON'T SEE HOW THIS PREJUDICES THE DEFENSE IN ANY WAY, AND THE

23   ISSUE HAS BEEN RAISED BY THE DEFENSE.

24        I'M STILL NOT GOING TO ALLOW IT -- I'M NOT OVERRULING THE

25   IN LIMINE OBJECTION, THE IN LIMINE ORDER INDICATING THAT YOU

1     COULDN'T IDENTIFY THOSE.

2          NOW, I THINK IT'S FAIR GAME NOW THAT YOU CAN TALK ABOUT

3     THOSE NOW.  I THINK YOU HAVE RAISED THE GAMBLING ISSUE.

4          THE IN LIMINE ORDER WAS TO PROTECT THE DEFENSE AT THAT

5     TIME FROM THE GOVERNMENT RAISING IN THEIR CASE IN CHIEF THE

6     IDENTITY OF ANY OF THESE LOCATIONS AS GAMBLING.  THIS ADDRESS,

7     AS I SAID, THE ADDRESS IS ON THE SCREEN NOW AND EXHIBIT 234-1

8     WAS ALSO ON ONE OF THE TAX RETURNS WHICH CLEARLY ESTABLISHED

9     THIS AS A GAMBLING ADDRESS.

10         SO I THINK IT'S IN EVIDENCE AND I PARTICULARLY NOW, SINCE

11    THE DEFENDANT ON DIRECT HAS INDICATED HER GAMBLING PROBLEM, I

12    DON'T SEE THAT THERE'S ANY PREJUDICE AT ALL TO ALLOWING FURTHER

13    EXAMINATION ON THIS TOPIC.

14             MS. LIE:  I JUST WANTED TO PLACE ONE THING ON THE

15    RECORD, AND I UNDERSTAND THE COURT'S RULING AS FAR AS THIS

16    ALREADY BEING IN EVIDENCE AND THE COURT'S PREVIOUS REFERENCE TO

17    THE INCOME TAX RETURNS THAT WERE ADMITTED INTO EVIDENCE

18    YESTERDAY.

19         I WILL SIMPLY NOTE FOR THE RECORD THAT THE DEFENSE HAD

20    OBJECTED IN LIMINE AND DURING OUR PRETRIAL CONFERENCE REGARDING

21    THE ADMISSIBILITY OF ALL OF THESE FINANCIAL RECORDS IN

22    UNREDACTED FORM AND WE HAD SPECIFICALLY REQUESTED THAT THE TAX

23    RETURNS, INCLUDING THE IDENTIFICATION OF THIS ADDRESS, BE

24    REDACTED.  AND I UNDERSTAND THE COURT'S RULING, BUT OUR

25    DECISION IS IN ACCORDANCE WITH IT.

HOLMES CROSS

```
 1                THE COURT:  ALL RIGHT.  ANYTHING FURTHER?

 2                MS. GARRIDO:  NO, YOUR HONOR.

 3                MR. FAZIOLI:  NO.

 4                THE COURT:  ALL RIGHT.  THANK YOU, COUNSEL.

 5           (END OF DISCUSSION AT SIDE-BAR.)

 6                THE COURT:  MR. FAZIOLI.

 7                MR. FAZIOLI:  THANK YOU.

 8      Q.   SO DRAWING YOUR ATTENTION BACK TO EXHIBIT 234.  THIS IS A

 9      DOCUMENT THAT LAYS OUT HOW YOU SPENT THE $147,000 IN

10      REFINANCING PROCEEDS.  ABOUT $4,500 YOU PAID TO CRAIG TORRES;

11      CORRECT?

12      A.   YES.

13      Q.   AND IN ADDITION TO THE $68,000 IN CASH, THERE'S ALSO

14      $28,400 TO JACQUIE PAIGE HEARD, JAMES HEARD, LISA HEARD, AND

15      JEREMY HOLMES; CORRECT?

16      A.   CORRECT.

17      Q.   AND THESE ARE ALL FAMILY MEMBERS OF YOURS?

18      A.   YES.

19      Q.   AND SO IT WOULD BE FAIR TO SAY THAT YOU REFINANCED THE

20      HOUSE, TOOK ABOUT $147,000 OF IT AND OF THAT ABOUT OVER $68,000

21      WENT TO CASH; CORRECT?

22      A.   CORRECT.

23      Q.   AND IT WAS ULTIMATELY SPENT; RIGHT?

24      A.   SPENT, YES.

25      Q.   AND ABOUT $28,400 WENT TO SOME OTHER FAMILY MEMBERS;
```

HOLMES CROSS

1    CORRECT?

2    A.   CORRECT.

3    Q.   AND NO MONEY WENT TO LEONARD PAIGE; CORRECT?

4    A.   CORRECT.

5    Q.   AND NO MONEY WENT TO LEONARD PAIGE'S BANKRUPTCY ESTATE?

6    A.   CORRECT.

7    Q.   LET ME DRAW YOUR ATTENTION TO THE DOCUMENT THAT HAS BEEN

8    MARKED AT EXHIBIT 235.  AND DO YOU SEE THAT THIS IS A CHART AND

9    THIS IS THE -- THIS CHART OF 235 LAYS OUT THE COMBINED DAILY

10   BALANCE OF ALL OF YOUR WESTAMERICA BANK ACCOUNTS FROM

11   JANUARY 1, 2005, THROUGH APRIL 5TH, 2006.

12       DO YOU SEE THAT?

13   A.   YES, I DO.

14   Q.   AND THIS CHART -- AND THIS CHART, BY THE WAY, AGGREGATES

15   ALL OF THE BANK ACCOUNTS, THE STAR PARTNERS ACCOUNT AT THE

16   BEGINNING, AND THEN THE MULTIPLE ACCOUNTS THAT YOU OPENED AND

17   ALL OF THOSE BALANCES ARE PUT TOGETHER TO COME UP WITH THIS

18   NUMBER.  AND THERE'S A BLUE LINE THERE THAT INDICATES THE

19   COMBINED DAILY BALANCE; CORRECT?

20   A.   CORRECT.

21   Q.   AND THAT WAS, IN FACT, IF YOU TOOK ALL OF THE MONEY THAT

22   YOU HAD IN YOUR WESTAMERICA BANK ACCOUNTS AND YOU PUT IT INTO A

23   POT, AND THEN YOU CHARTED THE BALANCE, THAT'S WHAT THE BLUE

24   LINE INDICATES; CORRECT?

25   A.   I WOULD ASSUME SO.

1    Q.   AND YOU HAVE NO REASON TO DISAGREE WITH THAT; CORRECT?

2    A.   NO.

3    Q.   OKAY.  AND SO THE BIG JUMP THAT TAKES PLACE ON

4    NOVEMBER 21ST, IS WHEN THAT $131,000 WIRE HITS YOUR ACCOUNT;

5    CORRECT?

6    A.   CORRECT.

7    Q.   AND WITHIN A WEEK, BY 11-28-2005, THE COMBINED DAILY

8    BALANCE HAS DROPPED TO ABOUT $71,495.75.  DO YOU SEE THAT?

9    A.   YES, I DO.

10   Q.   AND SO WITHIN A WEEK OF YOU RECEIVING THE LOAN REFINANCING

11   PROCEEDS YOU HAD SPENT OVER $65,000; RIGHT?

12   A.   CORRECT.

13   Q.   OKAY.  AND THEN BY JANUARY 23RD, 2006, THE COMBINED DAILY

14   BALANCE DROPS TO ABOUT $32,000; CORRECT?

15   A.   CORRECT.

16   Q.   SO -- AND THERE'S A LITTLE BUMP UP THAT TAKES PLACE IN

17   DECEMBER AND THAT'S ACTUALLY THAT -- THAT'S THE SECOND WIRE

18   THAT WE TALKED ABOUT AND YOU CAN TAKE A LOOK AT THE PRIOR

19   EXHIBIT.  THAT'S THE SECOND WIRE THAT HIT THE ACCOUNT.  THAT'S

20   WHY IT GOES UP.

21   A.   OKAY.

22   Q.   OKAY.  SO IT'S FAIR TO SAY THAT WITHIN A WEEK OF GETTING

23   THIS MONEY YOU HAD SPENT ABOUT $65,000, WHICH IS ALMOST HALF OF

24   THE REFINANCING PROCEEDS; RIGHT?

25   A.   YES.

1    Q.   AND THEN BY JANUARY 23RD, WHICH IS ABOUT A LITTLE MORE

2    THAN TWO MONTHS LATER, YOU HAD SPENT $100,000 OF THE PROCEEDS;

3    RIGHT?

4    A.   YES.

5    Q.   AND SO BY THAT POINT THERE WAS ONLY ABOUT $30,000 LEFT;

6    CORRECT?

7    A.   YES.

8    Q.   AND THEN OVER THE NEXT, YOU KNOW, THREE, MONTHS OR SO ALL

9    OF THE REST OF THE MONEY IS GONE?

10   A.   CORRECT.

11   Q.   SO I'D LIKE TO DRAW YOUR ATTENTION TO THE -- SOME

12   DOCUMENTS THAT WE TALKED ABOUT YESTERDAY RELATED TO YOUR TAXES.

13        AND IF YOU WOULDN'T MIND TAKING A LOOK AT THE FIRST

14   BINDER.  AND WHEN YOU HAVE A CHANCE TO TAKE A LOOK AT THAT

15   BINDER, I WOULD APPRECIATE IT.

16        THE COURT:  DO YOU WANT TO REFERENCE IT?

17   BY MR. FAZIOLI:

18   Q.   WHY DON'T WE REFERENCE EXHIBIT 7, WHICH IS THE

19   CERTIFICATION OF LACK OF RECORD.

20   A.   ALL RIGHT.

21   Q.   NOW, YOU DID NOT FILE A FEDERAL INCOME TAX RETURN IN 2004;

22   CORRECT?

23   A.   I DON'T RECALL.

24   Q.   YOU DON'T RECALL IF YOU DID?

25   A.   RIGHT NOW, NO.

1    Q.   YOU DON'T RECALL?

2            MS. GARRIDO:  OBJECTION, ASKED AND ANSWERED.

3            THE COURT:  ALL RIGHT.  WE CAN MOVE ON.

4    BY MR. FAZIOLI:

5    Q.   LET'S MOVE TO EXHIBIT 13.  AND THIS IS A U.S. CORPORATION

6    SHORT FORM INCOME TAX RETURN FOR 2004; CORRECT?

7    A.   YES, IT IS.

8    Q.   AND THIS IS THE CORPORATE INCOME TAX RETURN THAT YOU FILED

9    FOR YOUR COMPANY WHICH WAS THEN KNOWN AS PARTNERS SECURITY

10   SERVICES, INC., 312 MOONRACKER DRIVE, VALLEJO, CALIFORNIA;

11   RIGHT?

12   A.   YES.

13   Q.   AND THERE'S AN EMPLOYEE I.D. NUMBER THERE ON THE TOP

14   RIGHT.

15       AND LET ME JUST SAY, YOU PROVIDED THE INFORMATION THAT IS

16   ON THIS EXHIBIT 13; CORRECT?

17   A.   YES.

18   Q.   YOU FILLED OUT YOUR TAX RETURNS?

19   A.   I WENT THROUGH SOUTHWARD ASSOCIATION.

20   Q.   AND YOU PROVIDED THE INFORMATION THAT EVENTUALLY MADE ITS

21   WAY ONTO THESE TAX RETURNS; CORRECT?

22   A.   I -- FROM WHAT I RECALL.

23   Q.   FROM WHAT YOU RECALL.  AND YOU DOUBLE-CHECKED THEM BEFORE

24   YOU SENT THEM OUT?

25   A.   NOT NECESSARILY.

1    Q.   NOT NECESSARILY.  BUT YOU DID SIGN THEM UNDER PENALTY OF

2    PERJURY; CORRECT?

3    A.   YES, I DID.

4    Q.   YOU WOULDN'T LIE ON YOUR TAX RETURNS, RIGHT?

5    A.   NO.

6    Q.   AND YOU TOLD THE TRUTH ON YOUR TAX RETURNS, IN OTHER

7    WORDS?

8    A.   CORRECT.

9    Q.   AND THIS PARTNERS SECURITY SERVICE, THIS IS YOUR BUSINESS,

10   WHAT LATER BECAME STAR PARTNERS; CORRECT?

11   A.   CORRECT.

12   Q.   AND THAT EMPLOYER I.D. NUMBER, THAT'S THE EMPLOYER I.D.

13   NUMBER FOR THAT COMPANY STAR PARTNERS; RIGHT?

14   A.   FROM WHAT I CAN RECALL.

15   Q.   FROM WHAT YOU CAN RECALL.

16        AND STAR PARTNERS WAS INCORPORATED ON JANUARY 28TH, 2000?

17   A.   STAR PARTNERS OR PARTNERS?

18   Q.   WELL, THE PARTNERS SECURITY SERVICES YOU EVENTUALLY GAVE

19   IT A NEW NAME WHICH WAS STAR PARTNERS; CORRECT?

20   A.   RIGHT.

21   Q.   AND IT'S REALLY THE SAME COMPANY BUT IT HAD TWO NAMES?

22   A.   YES.

23   Q.   AND YOU INCORPORATED THAT COMPANY ON JANUARY 28TH, 2000?

24   A.   I BELIEVE SO.

25   Q.   ALL RIGHT.  SO PARTNERS SECURITY SERVICE HAD NO ASSETS IN

1    2004; CORRECT?

2    A.   NO.   ONLY WHAT IS SHOWN HERE ON THE TAX FORM.

3    Q.   OKAY.   BUT DO YOU SEE UP THERE IT SAYS TOTAL ASSETS AND

4    WHEN YOU WERE ASKED TO REPORT THE TOTAL ASSETS OF PARTNERS

5    SECURITY SERVICES, YOU REPORTED THEM AS ZERO; CORRECT?

6    A.   CORRECT.

7    Q.   AND YOU WERE TELLING THE TRUTH WHEN YOU WERE REPORTING THE

8    ASSETS OF THAT BUSINESS AS ZERO; CORRECT?

9    A.   YES, I WAS.

10   Q.   AND YOU WERE ALSO TELLING THE TRUTH WHEN YOU INDICATED

11   THAT THAT BUSINESS HAD NO GROSS RECEIPTS OR SALES IN 2004;

12   CORRECT?

13   A.   YES.

14   Q.   AND THEN YOU SIGNED THIS TAX RETURN AT THE BOTTOM;

15   CORRECT?

16   A.   YES, I DID.

17   Q.   THAT'S YOUR SIGNATURE?   YOU SIGNED IT ON APRIL 1ST, 2005.

18        NOW, IF YOU WOULD PLEASE JUMP TO PAGE 13-3.   IF YOU WOULD

19   BLOW UP THE TOP.   AND THESE ARE YOUR ITEMIZED DEDUCTIONS THAT

20   YOU -- THESE ARE DEDUCTIONS THAT YOU TOOK FOR PARTNERS SECURITY

21   SERVICE; CORRECT?

22   A.   CORRECT.

23   Q.   OKAY.   AND THESE ARE DEDUCTIONS THAT YOU TOOK FROM THE

24   I.R.S. AND YOU SUBMITTED TO THE I.R.S. IN CONNECTION WITH THIS

25   BUSINESS; CORRECT?

1    A.   CORRECT.

2    Q.   ALL RIGHT.  AND THEY ADDED UP TO ABOUT $22,000 IN TERMS OF

3    THEIR DEDUCTIONS?

4    A.   YES.

5    Q.   SO LET'S DRAW YOUR ATTENTION NOW TO EXHIBIT 11.  ALL

6    RIGHT.  THIS IS YOUR INDIVIDUAL INCOME TAX RETURN FOR 2005;

7    CORRECT?

8         ACTUALLY, I'M SORRY.  THERE'S A COUPLE OF PAGES.  SO WHY

9    DON'T I GIVE YOU A MINUTE AND WHY DON'T YOU JUST LOOK THROUGH

10   THE PAGES OF EXHIBIT 11, AND THEN, PLEASE, LET ME KNOW WHENEVER

11   YOU'RE READY TO PROCEED.

12   A.   YES, THEY ARE.

13   Q.   THIS IS YOUR TAX RETURN?

14   A.   YES.

15   Q.   YOU PROVIDED THE INFORMATION ON THIS TAX RETURN?

16   A.   YES, AS FAR AS I CAN RECALL.

17   Q.   YOU HAVE NO REASON TO THINK THAT YOU DIDN'T PROVIDE THE

18   INFORMATION ON THIS RETURN?

19   A.   CORRECT.

20   Q.   AND IT'S GOT YOUR NAME AT THE TOP AND THE -- AND YOUR

21   ADDRESS, WHICH IS 312 MOONRACKER DRIVE, VALLEJO, CALIFORNIA;

22   CORRECT?

23   A.   CORRECT.

24   Q.   AND YOU LIST YOUR WAGES, SALARIES, TIPS, AND ET CETERA, AS

25   6 -- ABOUT $6,000; CORRECT?

HOLMES CROSS

1    A.    THAT IS CORRECT.

2    Q.    AND THE WAGES, TIPS, AND SALARIES THAT YOU REPORTED WERE

3    THE MONEY THAT YOU MADE FROM I THINK IT WAS UCSF; CORRECT?

4    A.    YEAH.

5    Q.    OR THE U.C. SYSTEM; CORRECT?

6    A.    UCSF.

7    Q.    AND WHAT WERE YOU DOING FOR THE U.C. SYSTEM?

8    A.    I WAS A RECRUITER FOR HIV AIDS FOUNDATION.

9    Q.    AND YOU ALSO MADE ABOUT $175 FROM A1 SECURITY SERVICES;

10   CORRECT?

11   A.    CORRECT.

12   Q.    AND, NOW, A1 SECURITIES SERVICES IS NOT THE PAIGES

13   SECURITY SERVICE THAT YOUR FATHER ESTABLISHED; CORRECT?

14   A.    NO.

15   Q.    THEY'RE DIFFERENT COMPANIES?

16   A.    AS FAR AS I KNOW.

17   Q.    OKAY.  AND, NOW, YOU UNDERSTOOD -- YOU SEE AT THE BOTTOM

18   OF THIS RETURN ON THE SECOND PAGE IT INDICATES -- YOU SIGNED

19   THIS RETURN; CORRECT?

20   A.    YES, I DID.

21   Q.    THAT'S YOUR SIGNATURE ON IT.  AND THERE'S AN ADMONITION

22   THERE THAT SAYS, "UNDER PENALTY OF PERJURY YOU DECLARE THAT YOU

23   HAVE EXAMINED THIS RETURN AND ACCOMPANYING SCHEDULES AND TO THE

24   BEST OF YOUR KNOWLEDGE AND BELIEF THEY'RE TRUE, CORRECT, AND

25   COMPLETE, DECLARATION OF PREPARER OTHER THAN TAXPAYER IS BASED

1    ON ALL INFORMATION OF WHICH THE TAXPAYER HAS ANY KNOWLEDGE."

2        AND DO YOU SEE YOU SIGNED IT?

3    A.   YES, I DID.

4    Q.   AND YOU REPORTED YOUR INCOME FOR 2005 AS $6,097; CORRECT?

5    AND THAT'S ON LINE 7?

6    A.   YES.

7    Q.   AND THAT, IN FACT, WAS YOUR INCOME FOR 2005; CORRECT?

8    A.   YES.

9    Q.   AND YOU DIDN'T RECEIVE INCOME FROM ANY OTHER SOURCE THAT

10   YEAR?

11   A.   NOT THAT -- NO.

12   Q.   NO.  NOW, ON THE URLA APPLICATION, WHICH WE'LL GET TO,

13   THERE'S A LISTING THERE FOR YOUR MONTHLY EMPLOYMENT INCOME;

14   CORRECT?

15   A.   CORRECT.

16   Q.   AND IT IS LISTED, AND WE'LL GET TO THIS, BUT IT'S LISTED

17   AS $15,000 FOR MONTHLY EMPLOYMENT INCOME?

18   A.   CORRECT.

19   Q.   AND IF YOU WERE TO MULTIPLY THAT, YOU KNOW, 12 BY 15, I

20   THINK YOU WOULD GET $180,000 IN ANNUAL EMPLOYMENT INCOME;

21   CORRECT?

22   A.   CORRECT.

23   Q.   AND SO WHAT WAS YOUR EMPLOYMENT INCOME FOR 2005?  WAS IT

24   THE $6,097 THAT IS LISTED HERE ON YOUR INDIVIDUAL INCOME TAX

25   RETURN OR WAS IT THE $180,000 THAT WAS LISTED ON YOUR URLA?

1    A.   FROM MY RECOLLECTION IT WOULD BE WHAT WAS CITED ON MY

2    I.R.S. FORM.

3    Q.   OKAY.  SO THE NUMBER -- THE $15,000 MONTHLY EMPLOYMENT

4    INCOME FIGURE ON YOUR URLA WAS INCORRECT?

5    A.   VERY MUCH SO.

6    Q.   OKAY.  AND, IN FACT, YOU DIDN'T EVEN MAKE 15 -- YOU DIDN'T

7    EVEN MAKE $15,000 FOR THE ENTIRE YEAR OF 2005; CORRECT?

8    A.   CORRECT.

9    Q.   NOW, ON THIS INDIVIDUAL INCOME TAX RETURN, IT WAS IN YOUR

10   INTEREST FOR THIS NUMBER ABOUT YOUR INCOME TO BE LOW, WASN'T

11   IT?

12   A.   I BEG YOUR PARDON?

13   Q.   IT WAS -- YOU -- IT WAS GOOD FOR YOU IN TERMS OF WHAT YOU

14   WOULD HAVE TO PAY FOR YOUR INCOME ON THIS INCOME TAX RETURN TO

15   BE LOW; CORRECT?

16   A.   I DON'T UNDERSTAND THE QUESTION.

17   Q.   IF YOUR INCOME HAD BEEN HIGHER, IF YOU HAD REPORTED A

18   HIGHER INCOME ON YOUR INCOME TAX RETURN, THERE IS THE

19   POSSIBILITY THAT YOU MIGHT HAVE HAD TO PAY SOME TAXES THAT

20   YEAR; CORRECT?

21        MS. GARRIDO:  OBJECTION, RELEVANCE.

22        THE COURT:  OVERRULED.  YOU CAN ANSWER THE QUESTION.

23        THE WITNESS:  I ONLY KNOW WHAT TO REPORT WHAT YOU

24   MAKE YEARLY AND HONESTLY ON MY I.R.S. SO I DON'T QUITE

25   UNDERSTAND YOUR QUESTION.

1    BY MR. FAZIOLI:

2    Q.   WELL, IT WAS GOOD FOR YOU FINANCIALLY THAT THIS NUMBER WAS

3    LOW; CORRECT?

4    A.   NOT FINANCIALLY.

5    Q.   OKAY.

6    A.   IT WAS NOT GOOD.

7    Q.   BUT IT WAS GOOD FOR YOU IN TERMS OF THE TAXES THAT YOU

8    WOULD HAVE TO PAY; RIGHT?

9    A.   IT WAS HONEST THAT AMOUNT OF MONEY THAT I HAD MADE THAT

10   YEAR.

11   Q.   AND THEN ON THE URLA APPLICATION?

12   A.   UH-HUH.

13   Q.   THAT WAS SOMETHING THAT WAS SUBMITTED IN ORDER FOR YOU TO

14   GET A REFINANCING LOAN; CORRECT?

15   A.   SUBMITTED BY?  COULD YOU BE CLEARER WITH YOUR QUESTION?

16   Q.   THAT URLA APPLICATION?

17   A.   UH-HUH.

18   Q.   THAT WAS SUBMITTED, IT WAS A PROCESS THAT YOU WERE AWARE

19   OF; CORRECT?

20   A.   CORRECT.

21   Q.   AND THAT WAS A PROCESS THAT WAS SUBMITTED IN ORDER FOR YOU

22   TO GET A HOME REFINANCING; RIGHT?

23   A.   CORRECT.

24   Q.   OKAY.  AND IN THAT CONTEXT, ON THE URLA APPLICATION

25   PROCESS, YOU KNEW THAT IT WOULD HELP YOUR URLA APPLICATION IF

HOLMES CROSS

```
1     YOUR INCOME WAS HIGHER; CORRECT?

2     A.   THAT'S INCORRECT.

3     Q.   AND IT'S INCORRECT, YOU DIDN'T KNOW THAT?

4     A.   I DID NOT KNOW THAT.

5     Q.   YOU DID NOT KNOW THAT?

6     A.   NO.

7     Q.   SO YOU'RE SAYING THAT YOU DIDN'T KNOW THAT HIGHER INCOME

8     WOULD HELP YOU ON THAT URLA APPLICATION?

9     A.   NO, NO.  I KNEW THAT SUPPLYING TAX RECORDS -- I MEAN, MY

10    SOCIAL SECURITY NUMBER AND THE INFORMATION WOULD PROVIDE ME

11    WITH A LOAN OR NOT A LOAN.

12    Q.   ALL RIGHT.  GOING THROUGH HERE -- LET'S GET BACK TO YOUR

13    TAX RETURNS.  YOU HAVE OTHER INCOME AND YOU HAVE "SEE

14    STATEMENT."

15         AND IT'S LISTED AS 11,808.  DO YOU SEE THAT?  AND THIS IS

16    ON PAGE 11-4?

17    A.   RIGHT.  I HAVE IT HERE.

18    Q.   LET'S GO BACK TO SOMETHING.  WE WERE JUST TALKING ABOUT

19    YOUR HOUSE FOR A SECOND.

20    A.   OKAY.

21    Q.   WHEN YOU PURCHASED YOUR HOUSE BACK IN -- YOU PURCHASED THE

22    HOUSE BACK IN 1999; CORRECT?

23    A.   YES.

24    Q.   AND IT'S THROUGH AT THAT POINT THAT YOU SUBMITTED A LOAN

25    APPLICATION IN CONNECTION WITH THAT PURCHASE; RIGHT?
```

```
1    A.   YES, I DID.

2    Q.   AND YOU, IN FACT, SUBMITTED A UNIFORM RESIDENTIAL LOAN

3    APPLICATION ALSO KNOWN AS AN URLA; CORRECT?

4    A.   YES, I DID.

5    Q.   VERY SIMILAR TO THE URLA'S THAT ARE AT ISSUE IN THIS CASE?

6    A.   UH-HUH.

7    Q.   AND SO AT THE TIME OF THE LOAN APPLICATIONS IN THIS CASE

8    HAD TAKEN PLACE, THE 2005 TIME PERIOD TIMEFRAME, YOU HAD

9    ALREADY SUBMITTED AN URLA PREVIOUSLY; CORRECT?

10   A.   YES.

11   Q.   AND YOU UNDERSTOOD THE PROCESS OF WHAT AN URLA WAS FOR;

12   RIGHT?

13   A.   NOT NECESSARILY, NO.

14   Q.   AND YES OR NO, DID YOU UNDERSTAND THE PROCESS BY WHICH AN

15   URLA WAS FOR WHEN YOU SUBMITTED ONE IN 1999?

16   A.   NO.  THAT WAS MY FIRST HOME BUY, NO.

17   Q.   AND -- BUT YOU WENT THROUGH THE URLA PROCESS IN 1999;

18   CORRECT?

19   A.   YES, I DID.

20   Q.   AND THROUGH AFTER HAVING GONE THROUGH THAT PROCESS AFTER

21   HAVING GOTTEN THE HOME, WOULD IT BE FAIR AFTER HAVING GONE

22   THROUGH THAT PROCESS, AFTER GOING THROUGH THE URLA PROCESS THE

23   FIRST TIME, THAT YOU UNDERSTOOD HOW AN URLA WORKED?

24   A.   NOT NECESSARILY.

25   Q.   YOU WENT THROUGH THE PURCHASE PROCESS WITH AN URLA?
```

HOLMES CROSS

1    A.   RIGHT.

2    Q.   AND AT THE END OF THE PROCESS YOU DID NOT UNDERSTAND HOW

3    AN URLA WORKED; CORRECT?  IS THAT WHAT YOUR TESTIMONY IS?

4    A.   YES, IT IS.

5    Q.   YOU DIDN'T UNDERSTAND WHAT THE INCOME FIGURES MEANT ON

6    THAT URLA?

7    A.   NO.

8    Q.   OKAY.  WERE YOU CONFUSED WHEN YOU SUBMITTED THAT URLA BACK

9    IN 1999?

10   A.   NO.  I WAS ASSISTED WITH MY FATHER AND WELL AS -- WITH MY

11   FATHER.

12   Q.   AND, IN FACT, WHEN YOU PURCHASED THE HOUSE, THE ONE IN

13   1999, YOUR FATHER GOT INVOLVED AS PART OF THAT PROCESS;

14   CORRECT?

15   A.   CORRECT.

16   Q.   AND PART OF THE REASON HE GOT INVOLVED, DID YOU TESTIFY

17   THAT IT WAS FOR YOU TO BE ABLE TO GET A HIGHER LOAN AMOUNT?

18   A.   RIGHT.

19   Q.   AND YOU UNDERSTOOD THAT YOU NEEDED HIS ASSISTANCE IN ORDER

20   TO GET A HIGHER LOAN AMOUNT; CORRECT?

21   A.   I DID UNDERSTAND THAT.

22   Q.   AND PART OF THE REASON IN 1999 THAT YOU NEEDED YOUR

23   FATHER'S ASSISTANCE TO GET A HIGHER LOAN AMOUNT IS THAT YOU

24   UNDERSTOOD THAT INCOME WAS ONE OF THE FACTORS THAT PLAYED INTO

25   HOW -- WHAT KIND OF A LOAN YOU WOULD GET; ISN'T THAT RIGHT?

HOLMES CROSS

1    A.   QUALIFICATION.

2    Q.   QUALIFICATIONS.  ONE OF WHICH WAS INCOME; CORRECT?

3    A.   I DON'T KNOW WHETHER INCOME PLAYED A PART OR NOT.

4    Q.   YOU DON'T -- YOU DIDN'T KNOW.

5         SO BACK IN 1999 WHEN YOU WENT THROUGH THE URLA PROCESS AND

6    YOU PURCHASED THE HOUSE?

7    A.   YES.

8    Q.   YOU KNEW ABOUT SOME INFORMATIONS, BUT YOU SAY YOU DIDN'T

9    KNOW WHETHER INCOME WAS ONE OF THOSE QUALIFICATIONS?

10   A.   I SAID I DIDN'T SPECIFICALLY KNOW ABOUT URLA.

11   Q.   URLA.  BUT YOU KNOW YOU DID GO THROUGH AN URLA IN 1999?

12   A.   I KNOW THAT I WENT THROUGH --

13            MS. GARRIDO:  OBJECTION, ASKED AND ANSWERED.

14            THE COURT:  I'M SORRY.

15            THE WITNESS:  SORRY.

16            THE COURT:  OVERRULED.  YOU CAN CONTINUE WITH YOUR

17   ANSWER.

18            THE WITNESS:  I KNEW I WENT THROUGH A PROCESS TO

19   PURCHASE A HOME.  AS FAR AS THE DOCUMENTS, NO.

20   BY MR. FAZIOLI:

21   Q.   AND YOU KNEW THAT WHEN YOU PURCHASED THE HOUSE IN 1999

22   THAT YOU GOT YOUR FATHER INVOLVED; CORRECT?

23   A.   YES.

24   Q.   AND HE WAS INVOLVED IN ORDER TO HELP YOU TO GET A HIGHER

25   LOAN AMOUNT; CORRECT?

1    A.    YES.

2    Q.    SO LET'S JUMP BACK TO EXHIBIT 11.  AND CAN YOU PLEASE

3    BRING UP EXHIBIT 11-4.

4          AND THIS IS INFORMATION THAT YOU PROVIDED ABOUT YOUR

5    GAMBLING WINNINGS AND YOUR CANCELLATION OF DEBT; CORRECT?

6    A.    WHAT PAGE ARE WE LOOKING AT?

7    Q.    WE'RE LOOKING AT 11-4 IF YOU LOOK AT THE BOTTOM?

8    A.    OKAY.  YES.

9    Q.    ALL RIGHT.  AND THERE'S 2,256 AND IT IS CANCELLATION OF

10   DEBT?

11   A.    YES.

12   Q.    AND THERE'S 9552 WINNINGS?

13   A.    YES.

14   Q.    AND WE'RE GOING TO QUICKLY WORK THROUGH SOME OF THESE

15   W-2G'S THAT YOU SUBMITTED.  SO THE NEXT PAGE IS 11-5 AND THIS

16   IS A DOCUMENT, THIS IS CANCELLATION OF DEBT; CORRECT?  THIS IS

17   WHAT THE DOCUMENT INDICATES?

18   A.    YES.

19   Q.    AND THIS RELATES TO ONE OF THE DEBTS THAT YOU WERE ABLE TO

20   NEGOTIATE DOWN IN CONNECTION WITH THE MORTGAGE REFINANCING;

21   RIGHT?

22   A.    IT APPEARS TO.

23   Q.    AND THE DATE ON THIS IS 11-30-05.  THAT'S THE DATE THAT

24   THIS IS CANCELLED; CORRECT?

25   A.    CORRECT.

1      Q.   AND THAT'S ACTUALLY A COUPLE OF DAYS OR ABOUT A WEEK OR SO

2      AFTER THE FIRST WIRE HIT ON THE MORTGAGE REFINANCING; CORRECT?

3      A.   RIGHT.

4      Q.   SO LET'S QUICKLY GO THROUGH ON 11-6.  ALL RIGHT.  AND IF

5      YOU LOOK AT 11-6 AND 11-8, THESE ARE TWO WHAT ARE KNOWN AS

6      W-2G'S; CORRECT?

7      A.   YES.

8      Q.   AND WHAT ARE THESE DOCUMENTS?  YOU SUBMITTED THESE

9      DOCUMENTS IN CONNECTION WITH YOUR TAX APPLICATION; RIGHT?

10     A.   THESE WERE GROSS WINNINGS FROM CASINO SAN PABLO.

11     Q.   AND THERE'S TWO OF THEM AND THAT'S 11-6 AND 11-8, RIGHT?

12     AND THE FIRST ONE IS FOR $3,125; CORRECT?

13     A.   WHERE ARE YOU READING?

14     Q.   11-6, AND IT'S HARD BECAUSE THIS DOCUMENT IS -- IT'S KIND

15     OF ROTATED TO THE SIDE.  BUT DO YOU SEE IT SAYS W-2G AND THEN

16     IT SAYS GROSS WINNINGS AND IT SAYS 3125 AND THE VERY FIRST BOX?

17     A.   AND THEN I SEE 8-6-2005.

18     Q.   8-5-2005 OR 8-5?

19     A.   8 -5.

20     Q.   ALL RIGHT.  AND YOU SIGNED THIS DOCUMENT AT THE BOTTOM;

21     RIGHT?

22     A.   CORRECT.

23     Q.   AND THIS IS THE DOCUMENT THAT THE SAN PABLO GAVE YOU WHEN

24     YOU WON $3,125 ON AUGUST 5TH, 2005; RIGHT?

25     A.   YES.

1    Q.   AND THEN ON PAGE 11-8, WHICH IS TWO PAGES LATER, WERE MORE

2    WINNINGS ON THE SAME DATE; CORRECT?

3    A.   CORRECT.

4    Q.   AND SO THESE TWO WINNINGS OF 3125 AND THE 1426, THOSE ARE

5    THE GROSS WINNINGS BOTH OF THOSE ON AUGUST 5TH, 2005; CORRECT?

6    A.   YEAH.

7    Q.   AND THAT WAS BEFORE OR AFTER YOU FINISHED THE LOAN

8    REFINANCING; CORRECT?

9    A.   AUGUST?

10   Q.   YEAH, AUGUST 5, 2005.

11   A.   AND THE LOAN REFINANCES.

12   Q.   WAS IN NOVEMBER; CORRECT?

13   A.   CORRECT.

14   Q.   AND SO YOU WON THIS MONEY AHEAD OF TIME?

15   A.   YES.

16   Q.   AND THEN THE 11-7 IS THE -- YOUR GROSS WINNINGS AND THIS

17   IS A DIFFERENT CASINO; CORRECT?

18   A.   CACHE CREEK.

19   Q.   CACHE CREEK AND THAT'S THE P.O. BOX AND THE ADDRESS OF

20   BROOKS, CALIFORNIA; CORRECT?

21   A.   CORRECT.

22   Q.   AND WHEN DID YOU WIN THIS $5,000 FROM THE CACHE CREEK

23   CASINO RESORT?

24   A.   IT SAYS 11-23-2005.

25   Q.   AND THAT'S ACTUALLY TWO DAYS AFTER THE WIRE HIT YOUR

1    ACCOUNT; CORRECT?

2    A.    CORRECT.

3    Q.    OKAY.  SO MOVING ONTO EXHIBIT 14, THIS IS YOUR U.S.

4    CORPORATE INCOME TAX RETURN FOR THE YEAR 2005.  DO YOU SEE

5    THAT?

6    A.    YES, I DO.

7    Q.    AND THIS NOW IS FOR STAR PARTNERS SECURITY PLAN PARTNERS,

8    INC., CORRECT?

9    A.    CORRECT.

10   Q.    AND THIS IS THE ENTITY THAT IS LISTED ON THAT URLA,

11   CORRECT, AS YOUR BUSINESS, STAR PARTNERS; RIGHT?

12   A.    FROM WHAT I RECALL.

13   Q.    FROM WHAT YOU RECALL IT'S LISTED YOU OWN STAR PARTNERS;

14   CORRECT?

15   A.    YES.

16   Q.    AND THAT BUSINESS IS WORTH ABOUT -- THAT THAT BUSINESS

17   STAR PARTNERS IS LISTED AS BEING --

18   A.    CAN I SEE THAT DOCUMENT?

19   Q.    YES, YOU CAN.

20           THE COURT:  WHY DON'T YOU FINISH YOUR SENTENCE FOR

21   THE REPORTER.

22       DID YOU SAY THAT BUSINESS IS WORTH HALF A MILLION DOLLARS?

23           MR. FAZIOLI:  YES.

24           THE COURT:  CONTINUE.  DID YOU WANT TO SHOW HER THE

25   DOCUMENT?

```
 1                 MR. FAZIOLI:  YES.  LET'S GO TO EXHIBIT 18.

 2                 THE WITNESS:  THE AMOUNT I'M NOT SURE ABOUT.  IN THE

 3        SAME BOOK, 18?

 4                 MR. FAZIOLI:  YES.

 5        Q.   OKAY.  SO WE HAVE HEARD A LOT OF TESTIMONY ABOUT

 6        EXHIBIT 18.

 7        A.   OKAY.

 8        Q.   YOU HAVE SEEN EXHIBIT 18.  LET ME DRAW YOUR ATTENTION TO

 9        PAGE 18-4 AND THEN THERE'S A SIGNATURE AT THE BOTTOM.

10             THIS IS THE OCTOBER 2005 URLA; CORRECT?

11        A.   CORRECT.

12        Q.   AND YOU SIGNED THIS URLA?

13        A.   YES.

14        Q.   AND YOU SEE THERE'S AN ACKNOWLEDGEMENT AND AGREEMENT ABOVE

15        YOUR SIGNATURE; CORRECT?

16        A.   YES.

17        Q.   AND IN IT, IT SAYS THAT "EACH OF THE UNDERSIGNED

18        SPECIFICALLY REPRESENTS TO LENDER AND TO LENDER'S ACTUAL OR

19        POTENTIAL AGENTS, BROKERS, PROCESSORS, ATTORNEYS, INSURERS,

20        SUCCESSORS, AND ASSIGNS AND AGREES AND ACKNOWLEDGES THAT, ONE,

21        THE INFORMATION PROVIDED IN THIS APPLICATION IS TRUE AND

22        CORRECT AS TO THE DATE SET FORTH OPPOSITE MY SIGNATURE AND THAT

23        ANY INTENTIONAL OR NEGLIGENT MISREPRESENTATION OF THIS

24        INFORMATION CONTAINED IN THIS APPLICATION WILL RESULT IN CIVIL

25        LIABLE LIABILITY, INCLUDING MONETARY DAMAGES TO ANY PERSON WHO
```

```
 1        MAY SUFFER ANY LOSS AS TO THE RELIANCE OF THE REPRESENTATIONS

 2        THAT I HAVE MADE IN THIS APPLICATION."

 3            AND IT GOES ON ABOUT OTHER THINGS.

 4            SO THAT'S WHAT IT SAID ON THE DOCUMENT YOU SIGNED;

 5        CORRECT?

 6        A.   CORRECT.

 7        Q.   SO LET'S JUMP TO THE FIRST PAGE OF THIS URLA.  DO YOU MIND

 8        BLOWING UP THE TOP PART AND SEE IF WE CAN MAKE IT CLEAR.

 9            SO IF YOU COULD TAKE A LOOK AT YOUR COPY OF EXHIBIT 18-2.

10        THIS WAS AN URLA THAT WAS SUBMITTED ON YOUR BEHALF TO REFINANCE

11        YOUR HOME; CORRECT?

12        A.   CORRECT.

13        Q.   AND YOU SEE THAT THE AMOUNT OF THE LOAN IS $450,000?

14        A.   YES, I DO.

15        Q.   AT THE TOP.  AND DID YOU PROVIDE THE INFORMATION ON THIS

16        URLA?

17        A.   NO, I DID NOT.

18        Q.   YOU DID NOT?

19        A.   NO.

20        Q.   AND SO YOU DID NOT INDICATE THAT YOU WANTED A LOAN OF

21        $450,000?

22        A.   NO, I DID NOT.

23        Q.   AND DID YOU KNOW WHEN THIS URLA WAS SUBMITTED THE AMOUNT

24        OF THE LOAN THAT YOU WERE ASKING FOR?

25        A.   NO, I DON'T RECALL.
```

1    Q.   AND YOU DON'T RECALL.  AND DO YOU KNOW WHO SUBMITTED THIS

2    INFORMATION, THE $450,000?

3    A.   I CAN ONLY SPECULATE.

4    Q.   SO THIS LOAN APPLICATION WAS SUBMITTED WITH YOUR SIGNATURE

5    BUT YOU DID NOT KNOW -- WHEN THIS WAS SUBMITTED -- OKAY.

6         LET ME ASK THIS QUESTION:  WHEN THIS LOAN APPLICATION WAS

7    SUBMITTED, DID YOU KNOW THAT THIS WAS EVEN A LOAN FOR $450,000?

8    A.   I DON'T RECALL.

9    Q.   YOU DON'T RECALL?

10   A.   IT'S BEEN 2005, I BELIEVE.  YEAH, I DON'T RECALL.

11   Q.   YOU DON'T REMEMBER.  OKAY.  AND THEN IT INDICATES NUMBER

12   OF MONTHS 48 -- THAT'S PROBABLY 40 YEARS.  DID YOU KNOW WHEN

13   THIS URLA -- DID YOU PROVIDE THIS INFORMATION, THE NUMBER OF

14   MONTHS?

15   A.   NO, SIR.

16   Q.   YOU DID NOT?

17   A.   WHAT BLOCK ARE WE TALKING ABOUT?

18   Q.   WE'RE TALKING ABOUT THE BLOCK RIGHT NEXT TO INTEREST RATES

19   WHERE IT SAYS THE NUMBER OF MONTHS.

20        HOW ABOUT THE ADDRESS, THE PROPERTY ADDRESS.  DID YOU

21   PROVIDE THAT INFORMATION?

22   A.   FROM WHAT I RECALL.

23   Q.   SO YOU RECALL PROVIDING THE PROPERTY ADDRESS THAT IS ON

24   THIS LOAN APPLICATION?

25   A.   IF IT'S 312 MOONRACKER, YES.

1    Q.   OKAY.  BUT YOU SPECIFICALLY RECALL PROVIDING THAT

2    INFORMATION; CORRECT?

3    A.   RIGHT.

4    Q.   AND SO YOU DID PROVIDE SOME INFORMATION THAT IS ON THIS

5    FORM?

6    A.   YES.

7    Q.   OKAY.  AND THEN IT SAYS, "PURPOSE OF REFINANCE, CASHOUT

8    DEBT CONSOLIDATION."  DID YOU PROVIDE THAT INFORMATION?

9    A.   I BELIEVE I -- NO, I DON'T RECALL.

10   Q.   YOU DON'T.  SO YOU -- DID YOU KNOW WHEN THIS URLA WAS

11   SIGNED THAT IT WAS FOR A CASHOUT OR FOR A DEBT CONSOLIDATION?

12   A.   I DON'T RECALL.

13   Q.   SO WHEN, WHEN THIS URLA WAS SUBMITTED ON YOUR BEHALF, DID

14   YOU KNOW IF YOU WERE EVEN PROCEEDING WITH A CASHOUT OR A DEBT

15   CONSOLIDATION?

16   A.   YES.

17   Q.   YOU DID?

18   A.   YES.

19   Q.   AND THEN YOU JUST DIDN'T KNOW THAT THIS URLA HAD BEEN

20   FILED THAT HAD INDICATED THAT?

21   A.   THE AMOUNT.

22   Q.   THE AMOUNT.  WELL, ACTUALLY I WAS SAYING THE PURPOSE.  DID

23   YOU KNOW THAT YOU WERE SUBMITTING AN URLA FOR A CASHOUT?

24   A.   FOR A REFINANCING, YES.

25   Q.   AND THEN THE BORROWER ERROR'S NAME AND IT HAS YOUR SOCIAL

```
 1     SECURITY NUMBER AND HOME PHONE NUMBER.  AND DID YOU PROVIDE

 2     THIS INFORMATION?

 3     A.   THE BORROWER'S NAME, YES.

 4     Q.   AND THE SOCIAL SECURITY NUMBER AND HOME PHONE NUMBER?

 5     A.   YES.

 6     Q.   AND WHAT ABOUT THE PRESENT ADDRESS?

 7     A.   YES.

 8     Q.   AND THEN IT SAYS NAME OF ADDRESS OF EMPLOYER FOR STAR

 9     PARTNERS SECURITY SERVICES AND THEN IT SAYS YEARS ON THE JOB,

10     FIVE YEARS?

11     A.   YES.

12     Q.   AND DID YOU PROVIDE THAT INFORMATION?

13     A.   YES.

14     Q.   AND THE TITLE OF OWNER, YOU PROVIDED THAT INFORMATION,

15     TOO, CORRECT?

16     A.   YES.

17     Q.   AND YOU INITIALED THIS DOCUMENT AT THE BOTTOM?

18     A.   ARE WE ON 18-4 OR --

19     Q.   18-2, DO YOU SEE AT THE BOTTOM THOSE ARE YOUR INITIALS,

20     CORRECT?

21     A.   YES.

22     Q.   AND -- OKAY.  SO LET'S JUMP TO THE SECOND PAGE.  DO YOU

23     SEE AT THE TOP LEFT --

24     A.   UH-HUH.

25     Q.   -- OF 18.  THIS IS ACTUALLY 18-3, THE SECOND PAGE OF THE
```

1    URLA.  AND IT'S HARD TO -- IT'S CLEAR ON YOUR COPY, BUT IT SAYS

2    GROSS MONTHLY INCOME AND THEN BASE EMPLOYMENT INCOME AND THEN

3    IT SAYS BORROWER.

4         WHO WAS THE BORROWER ON THIS URLA?  YOU WERE THE BORROWER

5    ON THIS URLA; CORRECT?

6    A.   CORRECT.

7    Q.   AND DO YOU SEE THE NUMBER THAT IS LISTED THERE FOR BASE

8    EMPLOYMENT INCOME AND IT SAYS $15,000?

9    A.   YES, I DO.

10   Q.   YOU PROVIDED THAT INFORMATION, THE $15,000 NUMBER?

11   A.   NO, NOT THAT I RECALL.

12   Q.   YOU DON'T RECALL.

13   A.   NO.

14   Q.   OKAY.  IS THAT NUMBER CORRECT?

15   A.   NO.

16   Q.   THAT'S AN INCORRECT NUMBER, THE NUMBER OF THE $15,000

17   NUMBER OF THE GROSS NUMBER IS INCORRECT?

18   A.   DEFINITELY.

19   Q.   AND YOU DIDN'T HAVE ANNUAL INCOME OF $15,000 DURING THE

20   TIME THAT THIS URLA WAS SUBMITTED?

21   A.   NO, SIR.

22   Q.   AND DO YOU SEE BELOW THEN THERE'S A SECTION THAT SAYS THAT

23   LISTS THE CHECKING AND ACCOUNT BALANCE.

24   A.   WHERE IT SAYS WESTAMERICA?

25   Q.   YEAH, IT SAYS WESTAMERICA.

HOLMES CROSS

1    A.  YES, I DO.

2    Q.  AND DO YOU SEE HOW IT LISTS THE NAME AND ADDRESS OF BANK

3    AND IT SAYS WESTAMERICA THERE, DO YOU SEE THAT?

4    A.  YES.

5    Q.  AND DID YOU PROVIDE THAT INFORMATION WESTAMERICA?

6    A.  YES.

7    Q.  AND YOU DID.  SO YOU -- SO THAT YOU RECALL THAT YOU

8    COMMUNICATED TO OAKLAND FUNDING THAT YOU HAD A BANK ACCOUNT AT

9    WESTAMERICA, IS THAT WHAT YOU'RE SAYING?

10   A.  I RECALL THAT.

11   Q.  YOU RECALL THAT.  AND WHAT ABOUT THE ACCOUNT NUMBER, DO

12   YOU RECALL COMMUNICATING AN ACCOUNT NUMBER?

13   A.  IT APPEARS THAT I WOULD HAVE.

14   Q.  YOU DID.  OKAY.

15   A.  YEAH.

16   Q.  BUT, IN FACT, YOU DID NOT HAVE AN ACCOUNT NUMBER IN

17   THAT -- YOU DIDN'T HAVE SUCH AN ACCOUNT NUMBER AT THAT TIME; IS

18   THAT CORRECT?

19   A.  I DON'T KNOW THAT I RECALL THAT ACCOUNT NUMBER, BUT I DID

20   HAVE A WESTAMERICA ACCOUNT NUMBER.

21   Q.  AND THEN IT SAYS LIST CHECKING AND SAVINGS ACCOUNT

22   BALANCES, AND THEN THERE'S A NUMBER FOR CASH OR MARKET VALUE

23   AND IT LISTED $15,000.  DO YOU SEE THAT?

24   A.  YES.

25   Q.  AND DID YOU PROVIDE THAT INFORMATION TO THE BANK, TO THE

1    BROKER?

2    A.   NOT THAT I RECALL.

3    Q.   AND IS THAT INFORMATION CORRECT?

4    A.   NO.

5    Q.   AND THAT WASN'T CORRECT AT THE TIME?

6    A.   NO.

7    Q.   OKAY.  AND YOU INITIALED THIS BOTTOM PAGE HERE ON PAGE

8    18-3; CORRECT?

9    A.   CORRECT.

10   Q.   LET'S GO TO THE NEXT PAGE.  AND LET'S BRING UP THE TOP.

11   AND IT SAYS ASSETS AND LIABILITIES.

12        AND CAN YOU READ WHAT IT SAYS UNDER ASSETS AND

13   LIABILITIES?

14   A.   ARE WE ON 18-4?

15   Q.   WE'RE ON 18-4, YEAH, RIGHT AT THE TOP WHERE IT SAID

16   SCHEDULE OF REAL ESTATE OWNED?

17   A.   IT APPEARS TO HAVE -- LET ME SEE.  ASSETS AND LIABILITIES.

18   THIS 600,000 OR 800,000.

19   Q.   WELL, THERE'S AN ADDRESS THERE UNDER PROPERTY ADDRESS,

20   ISN'T THERE?

21   A.   UH-HUH.

22   Q.   AND WHAT IS THE ADDRESS THAT IS LISTED THERE?

23   A.   312 MOONRACKER DRIVE.

24   Q.   AND WHAT IS THE CITY ADDRESS?

25   A.   VALLEJO, CALIFORNIA.

1    Q.   AND DID YOU PROVIDE THAT INFORMATION?

2    A.   I -- FROM WHAT I RECALL.

3    Q.   YOU RECALL PROVIDING THAT INFORMATION ABOUT THE ADDRESS OF

4    THE PROPERTY?

5    A.   YES.

6    Q.   AND THEN IT SAYS PRESENT MARKET VALUE AND IT SAYS WELLS

7    FARGO $600,000.  DO YOU SEE THAT?

8    A.   YES, I DID.

9    Q.   AND DID YOU PROVIDE THAT INFORMATION?

10   A.   NOT FROM WHAT I RECALL.  I KNOW -- I DON'T KNOW MARKET

11   VALUE.

12   Q.   YOU DON'T KNOW WHAT?

13   A.   MARKET VALUE.

14   Q.   WHAT ABOUT AT THE TIME?

15   A.   I DIDN'T KNOW IT AT THE TIME.

16   Q.   SO YOU'RE SAYING THAT AT THE TIME YOU DIDN'T KNOW WHAT THE

17   MARKET VALUE OF THE HOUSE WAS?

18   A.   NO.

19   Q.   AND HAD ANYONE AT THAT TIME TOLD YOU PRIOR TO SUBMITTING

20   THIS APPLICATION THAT THE MARKET VALUE OF YOUR HOUSE WAS

21   $600,000?

22   A.   NOT THAT I RECALL.

23   Q.   AND THERE'S -- DO YOU SEE UNDER DECLARATIONS IT SAYS, "ARE

24   YOU A PARTY TO A LAWSUIT"?

25   A.   IS THAT OVER HERE ON THE RIGHT-HAND SIDE?

1    Q.   IT'S ON THE RIGHT-HAND SIDE UNDER DECLARATIONS.

2    A.   YES.

3    Q.   AND DO YOU SEE UNDER SUBPOINT A IT SAYS, "ARE THERE ANY

4    OUTSTANDING JUDGMENTS AGAINST YOU"?  AND IT SAYS, YES OR NO?

5    A.   RIGHT.

6    Q.   AND IT SAYS, "NO"?

7    A.   YES.

8    Q.   AND YOU PROVIDED THAT INFORMATION?

9    A.   YES, FROM WHAT I RECALL.

10   Q.   AND THE NEXT ONE, "HAVE YOU BEEN DECLARED BANKRUPT WITHIN

11   THE PAST SEVEN YEARS?"  AND IT SAYS, "NO."

12        DID YOU PROVIDE THAT INFORMATION THAT MADE ITS WAY UNDER

13   THIS URLA?

14   A.   FROM WHAT I RECALL.

15   Q.   AND THEN THE NEXT ONE SAYS, "HAVE YOU HAD PROPERTY

16   FORECLOSED UPON OR GIVEN TITLE OR DEED OR LIEU THEREOF IN THE

17   LAST SEVEN YEARS?"  AND DO YOU SEE THAT THE ANSWER SAYS, "NO"?

18        DO YOU SEE THAT?

19   A.   YES.

20   Q.   AND IS THAT ANSWER, "NO," IS THAT INFORMATION THAT YOU

21   PROVIDED ON THAT URLA?

22   A.   FROM WHAT I RECALL.

23   Q.   OKAY.

24   A.   IT'S BEEN SUCH A LONG TIME.

25   Q.   I UNDERSTAND.  BUT IT ALSO SAYS THAT "ARE YOU A PARTY TO A

HOLMES CROSS

1    LAWSUIT?"  AND THEN THAT ANSWER IS, "NO"?

2    A.   CORRECT.

3    Q.   AND DID YOU SUBMIT THAT INFORMATION, "ARE YOU A PARTY TO A

4    LAWSUIT"?

5    A.   FROM WHAT I RECALL, BUT I'M NOT QUITE SURE.  THE MAIN

6    INFORMATION I SHARED WITH YOU.

7    Q.   WELL, DID YOU --

8    A.   THAT I RECALL.

9    Q.   I'M SORRY.  THE QUESTION IS DID YOU PROVIDE THE

10   INFORMATION -- THE ANSWER "NO" TO THIS QUESTION "ARE YOU A

11   PARTY TO A LAWSUIT?" THAT IS REFLECTED HERE ON THIS

12   DECLARATIONS FORM?

13   A.   I DON'T KNOW.  I CAN'T RECALL ANY OF THE INFORMATION

14   EXCEPT FOR WHAT I HAVE GIVEN YOU ALREADY, SOCIAL SECURITY.

15   Q.   SO I JUST WANT TO BE CLEAR.

16   A.   OKAY.

17   Q.   SO FOR A THROUGH C, AND CORRECT ME IF I'M WRONG, YOUR

18   TESTIMONY IS THAT YOU RECALL ANSWERING -- GIVING THE

19   INFORMATION NO; ISN'T THAT CORRECT?

20   A.   THAT I CAN'T RECALL CERTAIN, BE CERTAIN OF ALL OF THE

21   INFORMATION THAT I HAVE GIVEN HERE.

22   Q.   OKAY.  I THOUGHT YOU HAD JUST TESTIFIED THAT FOR, YOU

23   KNOW, "ARE THERE ANY OUTSTANDING JUDGMENTS AGAINST YOU?"  AND

24   CORRECT ME IF I'M WRONG, DID I ASK, "DID YOU PROVIDE THAT

25   INFORMATION"?  AND I THOUGHT YOU SAID AS YOU RECALLED "NO"?

HOLMES CROSS

1    A.   AS I RECALL, NO.

2    Q.   AND AGAIN FOR B, DO YOU RECALL PROVIDING THE INFORMATION

3    NO AS TO QUESTION B, "HAVE YOU BEEN DECLARED BANKRUPT FOR THE

4    PAST SEVEN YEARS"?

5         DO YOU RECALL THAT YOU ANSWERED "NO" TO THAT QUESTION?

6    A.   YES.   IT'S BEEN A LONG TIME, BUT, YES, I PROBABLY DID

7    ANSWER "NO" TO ALL THREE OF THOSE QUESTIONS.

8    Q.   BUT THE FOURTH QUESTION IS "ARE YOU A PARTY TO A LAWSUIT?"

9    YOUR TESTIMONY IS YOU DON'T REMEMBER WHETHER YOU ANSWERED YES

10   OR NO TO THAT QUESTION?

11   A.   IF I DID ANSWER IT, I ANSWERED NO.

12   Q.   SO LET'S MOVE ON TO THE NEXT URLA, WHICH IS EXHIBIT 43.

13   A.   IN THE SAME BINDER?

14   Q.   NO, WE HAVE A NEW BINDER.   THIS IS THE SECOND BINDER, THE

15   ONE THAT SAYS ON THE OUTSIDE TRIAL EXHIBITS 22 TO 100.

16   A.   OKAY.

17   Q.   ALL RIGHT.   HAVE YOU HAD A CHANCE TO TAKE A LOOK AT

18   EXHIBIT 43?

19   A.   YES.

20   Q.   AND DO YOU SEE AT THE TOP IT SAYS UNIFORM RESIDENTIAL LOAN

21   APPLICATION.   WE'VE BEEN CALLING THIS THE URLA; CORRECT?

22   A.   CORRECT.

23   Q.   AND THIS IS THE FINAL STEP IN THAT PROCESS THAT ULTIMATELY

24   RESULTED IN YOUR TAKING $147,000 OUT OF THE HOUSE; CORRECT?

25   A.   CORRECT.

1    Q.   AND YOU SIGNED THIS URLA?

2    A.   YES, THAT IS MY SIGNATURE.

3    Q.   AND DO YOU SEE AT THE TOP IT INDICATES THAT THE AMOUNT OF

4    THE LOAN AND YOU SEE THAT THE LOAN IS $338,000?

5    A.   YES.

6    Q.   AND THAT'S BECAUSE THERE WAS A NEGOTIATION THAT TOOK PLACE

7    BETWEEN YOU AND THE BANK AND ULTIMATELY THE AMOUNT OF THE LOAN

8    WENT DOWN FROM 450 TO 338; CORRECT?

9    A.   BETWEEN ME AND THE BANK.

10   Q.   WELL, YOU WERE INVOLVED IN THAT PROCESS; CORRECT?

11   A.   YES.

12   Q.   AND YOU UNDERSTOOD WHAT WAS THE AMOUNT OF THE LOAN, THE

13   REFINANCING LOAN THAT YOU WERE TAKING ON YOUR HOUSE; CORRECT?

14   A.   YES.

15   Q.   AND YOU KNOW THAT IT WAS $338,000?

16   A.   YES.

17   Q.   AND THAT INFORMATION, THE $338,000, DID YOU PROVIDE THAT

18   INFORMATION THAT WAS ON THIS URLA?

19   A.   NO.

20   Q.   AND THE SUBJECT PROPERTY ADDRESS IS 312 MOONRACKER DRIVE,

21   VALLEJO, CALIFORNIA.  DID YOU PROVIDE THE INFORMATION ON THIS

22   URLA?

23   A.   YES.

24   Q.   AND YOU PROVIDED THAT INFORMATION?

25   A.   YES.

1      Q.   AND WHAT ABOUT AT THE BOTTOM WHERE IT SAYS THE NAME AND

2      ADDRESS OF EMPLOYER, STAR PARTNERS SECURITY SERVICES?

3      A.   YES.

4      Q.   AND THEN IT'S GOT YEARS ON THE JOB, FIVE YEARS.

5           AND DID YOU PROVIDE THAT INFORMATION?

6      A.   I'M NOT SURE EXACTLY ALL OF THE INFORMATION ON THE URLA

7      THAT WAS PROVIDED BY ME OR PROVIDED BY THE LENDER OR THE

8      MORTGAGE COMPANY THAT FILLS THIS OUT.

9      Q.   SO YOU CAN'T RULE OUT THAT YOU PROVIDED ALL OF THE

10     INFORMATION ON THE URLA?

11     A.   I CAN RULE OUT THAT I DID NOT PROVIDE ALL OF THE

12     INFORMATION ON URLA.

13     Q.   SO YOU CAN RULE OUT THAT YOU PROVIDED ALL OF THE

14     INFORMATION ON THE URLA?

15     A.   I SAID I CAN RULE OUT THAT I DID NOT PROVIDE ALL OF THE

16     INFORMATION ON THE URLA.

17     Q.   OKAY.  AND YOU SEE THAT YOU INITIALED THIS DOCUMENT AT THE

18     BOTTOM; CORRECT?

19     A.   YES.

20     Q.   ALL RIGHT.  THEN JUMPING TO PAGE 2 AND YOU SEE AT THE TOP

21     IT SAYS MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

22     AND IT SAYS BORROWER THERE.

23     A.   RIGHT.

24     Q.   AND YOU WERE THE BORROWER ON THIS URLA; CORRECT?

25     A.   YES.

1    Q.   AND THERE'S INFORMATION IN THERE.  YOUR INCOME IS LISTED

2    AS $15,000 BASE EMPLOYMENT INCOME?

3    A.   YES.

4    Q.   AND, NOW, FOR THIS NOVEMBER 14TH, 2005, DID YOU PROVIDE

5    THAT INFORMATION, THAT $15,000?

6    A.   I DID NOT PROVIDE INCOME ON EITHER ONE OF THESE DOCUMENTS.

7    Q.   AND YOU RECALL THAT YOU DID NOT PROVIDE INFORMATION, THAT

8    INFORMATION ON EITHER ONE OF THESE DOCUMENTS.

9    A.   YES.

10   Q.   AND IS THAT -- PUTTING ASIDE THAT QUESTION, IS THAT

11   NUMBER -- IS THAT INFORMATION CORRECT ON THAT URLA?

12   A.   NO, SIR.

13   Q.   AND THEN MOVING DOWN AGAIN DO YOU SEE IT SAYS CHECKING AND

14   SAVINGS ACCOUNTS BELOW?  LET ME BLOW UP, IT SAYS WESTAMERICA.

15   A.   WHAT PAGE ARE WE ON?

16   Q.   WE'RE ON THE SAME PAGE 43-2.  AND IT SAYS CHECKING AND

17   SAVINGS ACCOUNTS BELOW?

18   A.   UH-HUH.

19   Q.   AND IT'S GOT WESTAMERICA AND IT HAS AN ACCOUNT NUMBER AND

20   THEN IT HAS A CASH OR MARKET VALUE.  AND THE CHECKING

21   ACCOUNT -- THE ACCOUNT BALANCE THAT IS LISTED THERE IS $15,000.

22   DO YOU SEE THAT?

23   A.   YES.

24   Q.   NOW, THIS URLA CONTAINS THE INFORMATION THAT YOU HAD A

25   WESTAMERICA ACCOUNT.  DID YOU PROVIDE THAT INFORMATION?

1    A.   THAT I HAD A WESTAMERICA ACCOUNT, YES.

2    Q.   THAT YOU DID.  YOU PROVIDED THE FACT THAT YOU HAD A

3    WESTAMERICA ACCOUNT.  WHAT ABOUT THE BALANCE ON THAT

4    WESTAMERICA ACCOUNT?

5    A.   I CAN BE MOST POSITIVE THAT I DID NOT PROVIDE THAT

6    INFORMATION.

7    Q.   SO YOU HAVE A SPECIFIC RECOLLECTION THAT ALTHOUGH YOU

8    PROVIDED THE NAME OF THE BANK, YOU DID NOT PROVIDE THE ACCOUNT

9    BALANCE.  IS THAT WHAT YOU'RE SAYING?

10   A.   YES.

11   Q.   AND WHAT ABOUT THE ACCOUNT NUMBER?

12   A.   POSSIBLY.  I CAN'T RECALL THAT I PROVIDED THE ACCOUNT

13   NUMBER.  I CAN RECALL THAT I -- THAT THAT WAS MY BANK AND THAT

14   THERE WAS SPECIFIC QUESTIONS THAT THE LENDER ASKED.

15   Q.   AND THAT YOU RESPONDED TO THOSE QUESTIONS?

16   A.   YES.

17   Q.   AND THAT YOU PUT THE INFORMATION THAT MADE IT ONTO THIS

18   FORM?

19   A.   I DIDN'T PUT THE INFORMATION ON THE FORM, NO.  I DIDN'T

20   FILL OUT THIS FORM.

21   Q.   OKAY.  AT ALL?

22   A.   NO.  I DIDN'T TYPE ANY OF THIS -- IT'S TYPED IN.  I DIDN'T

23   TYPE ANY OF IT IN.

24   Q.   DID YOU PROVIDE ANY OF THE INFORMATION THAT IS ON THIS

25   FORM?

```
 1    A.   SOME OF THE INFORMATION SUCH AS MY -- WHAT I HAVE STATED

 2    BEFORE.

 3    Q.   OKAY.  AND JUST NOT THAT THE OTHER TOPICS THAT WE TALKED

 4    ABOUT?

 5    A.   NOT THAT I RECALL, NO.

 6    Q.   DO YOU SEE WHERE IT SAYS REAL ESTATE OWNED, INTERMARKET

 7    VALUE FROM SCHEDULE OF REAL ESTATE OWNED AND IT SAYS $600,000?

 8    A.   RIGHT.

 9    Q.   AND DID YOU PROVIDE THAT INFORMATION?

10    A.   NO, I HAVE NO KNOWLEDGE OF REAL ESTATE APPRAISAL

11    INFORMATION, NO, THAT I PROVIDED.

12    Q.   AND PUTTING ASIDE YOUR KNOWLEDGE OF REAL ESTATE, DID YOU

13    TELL THE BANK OR TELL -- COMMUNICATE THAT YOU OWNED $600,000 OF

14    REAL ESTATE?

15    A.   NO.

16    Q.   AND PRIOR TO SUBMITTING THIS URLA, HAD ANYONE TOLD YOU

17    THAT THE MOONRACKER PROPERTY WAS WORTH $600,000?

18    A.   I BELIEVE FROM MY RECOLLECTION THERE WAS A LETTER FROM A

19    TRUSTEE THAT STATED THAT.

20    Q.   OKAY.  AND HE TOLD YOU THAT THE PROPERTY WAS WORTH

21    $600,000?

22    A.   I BELIEVE.

23    Q.   AND SO YOU KNEW AT THE TIME THAT THIS -- OR THAT IT MAY --

24    YOU WERE TOLD BY THE TRUSTEE --

25    A.   UH-HUH.
```

HOLMES CROSS

1    Q.   -- THAT THIS PROPERTY WAS WORTH $600,000; CORRECT?

2    A.   YES.

3    Q.   BUT IT'S YOUR TESTIMONY THAT YOU WERE NOT THE INDIVIDUAL

4    WHO PROVIDED THE INFORMATION THAT THE PROPERTY WAS WORTH

5    $600,000 THAT IS ON THIS FORM?

6    A.   NO, I WOULD NOT KNOW OF THE MARKET VALUE OF THE PROPERTY.

7    Q.   AND IT SAYS NET WORTH OF BUSINESS OWNED.  AND WHAT IS THE

8    BUSINESS THAT IS LISTED ON THIS URLA THAT YOU OWNED, STAR

9    PARTNERS?

10   A.   STAR PARTNERS SECURITY.

11   Q.   AND THE NET LISTED IS WORTH HALF A MILLION DOLLARS;

12   CORRECT?

13   A.   ON THIS URLA, YES.

14   Q.   ON THE URLA.  DID YOU PROVIDE THE INFORMATION OF THE NET

15   WORTH OF YOUR BUSINESS?

16   A.   NO, IT HAS NEVER BEEN WORTH THAT.

17   Q.   OKAY.  AND YOU DIDN'T HAVE TOTAL ASSETS OF $1.15 MILLION

18   AS LISTED AT THE BOTTOM; CORRECT?

19   A.   NO, SIR.

20   Q.   AND THEN IT'S INITIALED THERE FOR BORROWER THERE AT THE

21   BOTTOM?  AND YOU INITIALED THAT; CORRECT?

22   A.   YES, THAT IS MY INITIALS.

23   Q.   AND THEN JUMPING ONTO THE NEXT PAGE FOR ASSETS AND

24   LIABILITIES DO YOU SEE HOW THERE'S A PROPERTY ADDRESS THAT IS

25   LISTED THERE 312 MOONRACKER DRIVE?

HOLMES CROSS

1     A.   YES.

2     Q.   AND VALLEJO, CALIFORNIA?

3     A.   YES.

4     Q.   AND THEN MARKET VALUE IS LISTED AS $600,000.  DID YOU

5     PROVIDE THAT INFORMATION?

6     A.   NOT THAT -- NO.  I RECALL I PROVIDED MY ADDRESS.

7     Q.   YOU PROVIDED YOUR ADDRESS?

8     A.   I KNOW NO MARKET VALUE.

9     Q.   AND, AGAIN, THERE'S A SERIES OF DECLARATIONS HERE AND IT

10    SAYS, "ARE THERE ANY OUTSTANDING JUDGMENTS AGAINST YOU?"  AND

11    THE ANSWER IS "NO."

12         AND DID YOU PROVIDE THAT INFORMATION -- DID YOU PROVIDE

13    THAT "NO" ANSWER TO QUESTION A?

14    A.   I DON'T RECALL, BUT POSSIBLY I COULD HAVE, BUT I DON'T

15    RECALL.

16    Q.   AND WHAT ABOUT QUESTION B, THE NO ANSWER TO QUESTION B?

17    A.   WHAT IS THAT?

18    Q.   "HAVE YOU BEEN DECLARED BANKRUPT WITHIN THE PAST

19    SEVEN YEARS"?

20    A.   I DON'T RECALL BUT POSSIBLY.

21    Q.   AND WHAT ABOUT QUESTIONS D, "ARE YOU A PARTY TO A

22    LAWSUIT"?  DID YOU PROVIDE THAT INFORMATION?

23    A.   I DON'T RECALL BUT POSSIBLY.

24    Q.   AND THEN THERE'S A SIGNATURE AT THE BOTTOM AND THE SAME

25    ACKNOWLEDGEMENT AND YOU SIGNED THAT DOCUMENT; CORRECT?

```
 1      A.   YES.

 2               THE COURT:  FOLKS, IF YOU WANT TO STAND AND STRETCH.

 3           (PAUSE IN PROCEEDINGS.)

 4      BY MR. FAZIOLI:

 5      Q.   SO I THINK YOUR TESTIMONY ABOUT THE -- WHERE DID YOU SIGN

 6      THE FIRST URLA, THE ONE WE TALKED ABOUT, EXHIBIT 18?

 7      A.   I DON'T RECALL.  POSSIBLY -- I DON'T RECALL.

 8      Q.   DID YOU SIGN IT AT HOME?

 9      A.   NO.

10      Q.   AND DID YOU LOOK AT IT BEFORE YOU SIGNED IT?

11      A.   PROBABLY NOT.

12      Q.   DID YOU READ IT BEFORE YOU SIGNED IT?

13      A.   MOST LIKELY NOT.

14      Q.   AND WHAT ABOUT THE SECOND URLA, DID YOU READ THAT BEFORE

15      YOU SIGNED IT?

16      A.   NOT THAT I RECALL, NO.

17      Q.   I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT'S

18      EXHIBIT 236, 237, AND 238.

19           MAY I APPROACH?

20               THE COURT:  YES.  MR. FAZIOLI, THESE ARE NOT IN THE

21      BINDERS?

22               MR. FAZIOLI:  THEY ARE NOT, AND I HAVE A COPY FOR

23      THE COURT.

24      Q.   CAN YOU PLEASE TAKE A LOOK AT GOVERNMENT'S EXHIBIT 236,

25      237, AND 238.
```

```
 1              HAVE YOU HAD AN OPPORTUNITY TO TAKE A LOOK AT GOVERNMENT'S

 2     EXHIBIT 236, 237 --

 3     A.   YES, I HAVE.

 4     Q.   -- AND 238?  WHAT IS GOVERNMENT'S EXHIBIT 236?

 5     A.   IT APPEARS IT'S A UNIFORM RESIDENTIAL LOAN APPLICATION.

 6     Q.   IS THIS THE UNIFORM RESIDENTIAL LOAN APPLICATION THAT YOU

 7     SIGNED ON OCTOBER 30TH, 2009?

 8     A.   IT APPEARS TO BE MY SIGNATURE, AND I COULD ONLY IMAGINE

 9     THAT I SIGNED IT.  IT'S BEEN SO LONG AGO.  THIS IS MY

10     SIGNATURE.

11              MS. LIE:  YOUR HONOR, I'M GOING TO OBJECT BRIEFLY.

12     IF WE COULD HAVE THE CHARACTERIZATION OF THE YEAR.  THE COPY I

13     HAVE IS 1999.

14              THE WITNESS:  THAT'S WHAT I HAVE.

15              MR. FAZIOLI:  I'M SORRY.  I MISSPOKE.

16     Q.   YOU SIGNED THIS DOCUMENT ON OCTOBER 30TH, 1999; CORRECT?

17     A.   YES.

18     Q.   AND IT RELATES TO A MORTGAGE APPLIED FOR 312 MOONRACKER

19     DRIVE, VALLEJO, CALIFORNIA?

20     A.   YES, IT DOES.

21     Q.   AND IN THE AMOUNT OF $184,000?

22     A.   AND HOW MUCH?

23     Q.   THE AMOUNT OF $184,000?

24     A.   YES.

25              MR. FAZIOLI:  YOUR HONOR, AT THIS TIME WE WOULD MOVE
```

HOLMES CROSS

```
 1        GOVERNMENT'S EXHIBIT 236 INTO EVIDENCE.

 2                MS. GARRIDO:  SUBMIT IT.

 3                THE COURT:  IT'S RECEIVED.

 4            (GOVERNMENT'S EXHIBIT 236 WAS RECEIVED IN EVIDENCE.)

 5       BY MR. FAZIOLI:

 6       Q.   WE DON'T HAVE THIS LOADED ON THE COMPUTER YET SO I'M JUST

 7       GOING TO ASK YOU A COUPLE OF QUESTIONS?

 8       A.   OKAY.

 9       Q.   WHO SIGNED OR WHO WAS ON THIS UNIFORM RESIDENTIAL LOAN

10       APPLICATION?

11       A.   MY FATHER, LEONARD PAIGE.

12       Q.   AND GOVERNMENT'S EXHIBIT 237?

13       A.   MY FATHER LEONARD PAIGE.

14       Q.   AND LET'S TAKE IT A STEP AT A TIME.  WHAT IS GOVERNMENT'S

15       EXHIBIT 237?

16       A.   IT'S A UNIFORM RESIDENTIAL LOAN APPLICATION.

17       Q.   AND IT'S ANOTHER URLA; CORRECT?

18       A.   CORRECT, IF THAT'S THE TERM FOR IT.

19       Q.   YEAH, IT'S VERY SIMILAR TO THE TWO URLA'S THAT WE TALKED

20       ABOUT THAT WERE SUBMITTED IN 2005; CORRECT?

21       A.   YES.

22       Q.   AND THIS ONE IS ALSO FOR 1999, CORRECT, GOVERNMENT'S

23       EXHIBIT 237?

24       A.   THESE ARE FROM 1999, YES.

25       Q.   AND IT ALSO RELATES TO A MORTGAGE LOAN THAT YOU APPLIED
```

1       FOR, FOR THE 312 MOONRACKER DRIVE IN VALLEJO, CALIFORNIA;

2       CORRECT?

3       A.   CORRECT.

4       Q.   AND YOU WERE ONE OF THE BORROWERS ON THAT LOAN?

5       A.   YES.

6            MR. FAZIOLI:  YOUR HONOR, AT THIS TIME THE UNITED

7       STATES WOULD MOVE GOVERNMENT'S EXHIBIT 237 INTO EVIDENCE.

8            MS. GARRIDO:  SUBMIT IT.

9            THE COURT:  RECEIVED.

10      (GOVERNMENT'S EXHIBIT 237 WAS RECEIVED IN EVIDENCE.)

11      BY MR. FAZIOLI:

12      Q.   AND THEN DRAWING YOUR ATTENTION TO GOVERNMENT'S

13      EXHIBIT 238, IS THIS ANOTHER URLA THAT YOU SUBMITTED IN

14      CONNECTION WITH THE PURCHASE OF YOUR PROPERTY?

15      A.   YES, IT'S MY SIGNATURE.

16      Q.   AND WHAT IS THE AMOUNT THAT IS LISTED AT THE TOP?

17      A.   OF 238?

18      Q.   YES.

19      A.   THAT IS 250 -- THAT IS 2000 -- 250K.

20      Q.   AND WHAT WAS THE ULTIMATE AMOUNT OF THE LOAN THAT YOU

21      RECEIVED ON THE 312 MOONRACKER PROPERTY WHEN YOU PURCHASED IT

22      BACK IN --

23      A.   I DON'T QUITE RECALL.

24      Q.   AND -- BUT THAT'S YOUR SIGNATURE AT THE BOTTOM OF

25      EXHIBIT 238 OR, YEAH, 238?

1    A.   YES.  SO THIS IS WHERE THE LOAN AMOUNT?

2              MR. FAZIOLI:  YOUR HONOR, WE MOVE EXHIBIT 238 INTO

3    EVIDENCE.

4              MS. GARRIDO:  SUBMIT IT.

5              THE COURT:  IT'S RECEIVED.

6         (GOVERNMENT'S EXHIBIT 238 WAS RECEIVED IN EVIDENCE.)

7    BY MR. FAZIOLI:

8    Q.   NOW, I THINK YOU PREVIOUSLY TESTIFIED ON DIRECT

9    EXAMINATION THAT YOU WORKED FOR YOUR FATHER AT PAIGE SECURITY;

10   IS THAT CORRECT?

11   A.   YES.

12   Q.   AND WHAT WAS YOUR STARTING POSITION AT PAIGE SECURITY IN

13   TERMS OF YOUR TITLE OR POSITION?

14   A.   I WORKED AS A SECURITY SPECIAL EVENT OFFICER.

15   Q.   AND DID YOU SUBSEQUENTLY GET PROMOTED -- AND THEN WHEN DID

16   YOU START -- I THINK YOU SAID YOU STARTED WORKING PART-TIME AT

17   PAIGE SECURITY; IS THAT CORRECT?

18   A.   MORE OR LESS, YES.

19   Q.   AND YOU STARTED WORKING PART-TIME I THINK IT WAS THE LATE

20   '90S, EARLY 1990'S; IS THAT CORRECT?

21   A.   THE '80S.

22   Q.   WHEN DID YOU START?

23   A.   WHEN I STARTED APPROXIMATELY '86 OR '87, I BELIEVE, AND

24   THEN I MOVED FORWARD.

25   Q.   AND THEN YOU STARTED WORKING AND THEN YOU EVENTUALLY

```
1      STARTED WORKING FULL TIME; CORRECT?

2      A.   YES.

3      Q.   AND WHEN WAS IT, AGAIN, THAT YOU STARTED WORKING FULL TIME

4      FOR PAIGE SECURITY SERVICE?

5      A.   I BELIEVE AROUND THE TIME OF '97 OR '99.

6      Q.   AND THEN WHEN WAS IT THAT YOU WERE LAID OFF?

7      A.   IN 2002.

8      Q.   OKAY.  WHAT WAS THE HIGHEST POSITION THAT YOU REACHED AT

9      PAIGE SECURITY?

10     A.   VICE PRESIDENT OF OPERATIONS.

11     Q.   AND WHAT WERE SOME OF YOUR PROFESSIONAL RESPONSIBILITIES

12     AS VICE PRESIDENT OF OPERATIONS AT PAIGE SECURITY?

13     A.   I WAS RESPONSIBLE FOR DAY-TO-DAY OPERATIONS OF MANAGING OF

14     ALL SECURITY PROFESSIONALS THROUGHOUT NORTHERN CALIFORNIA,

15     SOUTHERN CALIFORNIA, COSTA RICA, AND SOME PARTS OF SOUTH AFRICA

16     THAT HE HAD.

17     Q.   AND HOW MANY PEOPLE DID YOU MANAGE AT THAT TIME?

18     A.   I WOULD SAY ANYWHERE BETWEEN 175 TO 2500 OR MORE.

19     Q.   YOU MANAGED 2500 PEOPLE?

20     A.   YES, 2,500.  YES.

21     Q.   SO 2500 -- SO IN YOUR POSITION AS VP OF OPERATIONS YOU

22     MANAGED 2500 PEOPLE.  WAS THAT ALL OF THE PEOPLE FOR PAIGE

23     SECURITY OR WAS YOUR JOB AS VP OF OPERATIONS YOU WERE A CERTAIN

24     SUBSECTION WITHIN PAIGE SECURITY?

25     A.   NO, I WAS THE VICE PRESIDENT OF OPERATIONS FOR PAIGE
```

```
 1    SECURITY.

 2    Q.   THE ENTIRETY?

 3    A.   THE ENTIRE.

 4    Q.   AND YOU SUPERVISED 2500 PEOPLE?

 5    A.   AT LEAST OR AROUND THAT FIGURE, BETWEEN 17 TO 25.  I DON'T

 6    HAVE THE EXACT NUMBER.

 7    Q.   AND WHO DID YOU REPORT TO?  WHO WAS YOUR SUPERVISOR AT

 8    PAIGE SECURITY?

 9    A.   LEONARD PAIGE.

10    Q.   AND HE WAS THE HEAD OF PAIGE SECURITY AT THE TIME;

11    CORRECT?

12    A.   YES.

13    Q.   AND YOU KNEW AT THE TIME YOU WERE WORKING AT PAIGE

14    SECURITY ABOUT YOUR FATHER'S DECISION-MAKING PROCESS WITH HIS

15    BUSINESS; IS THAT CORRECT?

16    A.   NO, NOT NECESSARILY.

17    Q.   THAT NEVER CAME UP IN YOUR CONTEXT OF BEING THE VP OF

18    OPERATIONS?

19    A.   NO.  I WAS MAINLY OUT IN THE FIELD WORKING WITH SECURITY

20    PROFESSIONALS OUT IN THE FIELD WITH THIS CONTRACT.  SO I DID

21    NOT HAVE VERY MUCH DAY-TO-DAY INTERACTION WITHIN THE OFFICE

22    WITH HIM.

23    Q.   AND WHAT ABOUT INTERACTION THROUGH OTHER WAYS?  E-MAIL?

24    PHONE?  YOU INTERACTED -- YOUR FATHER WAS YOUR SUPERVISOR AT

25    PAIGE SECURITY; CORRECT?
```

1    A.   RIGHT.

2    Q.   AND THERE WAS NO ONE BETWEEN YOU AND YOUR FATHER IN TERMS

3    OF DOING YOUR DAY-TO-DAY OPERATIONS; CORRECT?

4    A.   NO.

5              THE COURT:  I'M SORRY.  NO, THAT'S NOT CORRECT?

6              THE WITNESS:  THERE WAS NO OTHER PERSON.

7    BY MR. FAZIOLI:

8    Q.   YOU REPORTED DIRECTLY TO YOUR FATHER?

9    A.   I REPORTED DIRECTLY TO HIM.

10   Q.   AND HOW MANY OTHER VICE PRESIDENTS WERE THERE AT PAIGE

11   SECURITY AT THE POINT THAT YOU WERE VICE PRESIDENT OF

12   OPERATIONS?

13   A.   I BELIEVE THERE WERE THREE -- TWO, TWO MORE BESIDES

14   MYSELF.

15   Q.   OKAY.  WHO WERE THE OTHER TWO?

16   A.   JASON HEARD, WHO MANAGED THE NORTHERN REGION, AND GAINELL

17   PAIGE JOHNSON, WHO WAS OVER IN ADMINISTRATION.

18   Q.   SO THEY'RE ONLY -- IS THAT ALL OF THE VICE PRESIDENTS THAT

19   ARE AT -- WERE AT PAIGE SECURITY AT THAT TIME?

20   A.   AT THAT TIME THAT I COULD RECALL.

21   Q.   AND IT'S YOU AND I THINK IT WAS JASON HEARD; CORRECT?

22   A.   CORRECT.

23   Q.   AND WHO IS ALSO A FAMILY MEMBER; CORRECT?

24   A.   YES.

25   Q.   AND GAINELL, WHO IS ALSO A FAMILY MEMBER; CORRECT?

```
 1      A.   YES.

 2      Q.   AND THIS WAS A FAMILY BUSINESS?

 3      A.   YES.

 4      Q.   AND YOU SHARED INFORMATION AS A FAMILY ABOUT WHAT WAS

 5    GOING ON WITH THE BUSINESS; CORRECT?

 6      A.   NOT NECESSARILY, NO.

 7      Q.   NOT NECESSARILY.  YOUR FATHER DIDN'T SHARE INFORMATION

 8    ABOUT WHAT WAS GOING ON WITH THIS BUSINESS?

 9      A.   NO.  I WAS OUT IN THE FIELD.  I WAS RARELY IN THE OFFICE.

10      Q.   OKAY.  DID YOU EVER HAVE COMMUNICATIONS WITH YOUR FATHER

11    ABOUT WHAT WAS GOING ON WITH THE BUSINESS?

12      A.   WHAT WAS GOING ON WITH HIS PARTICULAR CLIENT WITHIN THE

13    BUSINESS.

14      Q.   HE TOLD YOU WHAT WAS GOING ON?

15      A.   NO.  I CALLED HIM REGARDING CERTAIN ISSUES OR WHEN WE

16    WOULD HAVE TO BID OR ON A PROPOSAL WE WOULD DISCUSS THAT.

17      Q.   MEANING THAT IF YOU BID ON A PROPOSAL, THAT MEANS YOU

18    WOULD HAVE TO MAKE A FINANCIAL OFFER TO A POTENTIAL CLIENT, YOU

19    WERE INVOLVED WITH THAT PROCESS?

20      A.   NOT IN THE FINANCIAL PART OF IT, NO.

21      Q.   WHAT PART WERE YOU INVOLVED WITH?

22      A.   I WAS INVOLVED IN THE CONTRACT ADMINISTRATION OF INSURING

23    THAT WE HAD ENOUGH OFFICERS TO COVER THAT EVENT OR TO HANDLE

24    SCHEDULING, BUT I NEVER WAS INVOLVED IN THE FINANCIAL PROSPECTS

25    OF PAIGE SECURITY, NO.
```

1    Q.   AND YOU WERE NOT INVOLVED?

2    A.   NO, SIR.

3    Q.   DID YOUR FATHER TELL YOU ABOUT THE FINANCIAL ASPECTS OF

4    PAIGE SECURITY?

5    A.   VERY LITTLE, NO.

6    Q.   AND DID YOU ASK?

7    A.   NO, I DID NOT.

8    Q.   NOW, YOU'RE AWARE OF THE FACT THAT YOUR FATHER FAILED TO

9    FUND PENSION BENEFITS OF HIS EMPLOYEES OF PAIGE SECURITIES;

10   CORRECT?

11   A.   AFTER I WAS LAID OFF, NO, I WAS NOT AWARE OF THAT.

12   Q.   BUT YOU'RE AWARE NOW THAT HE FAILED TO FULLY FUND THE

13   PENSION BENEFITS OF HIS EMPLOYEES OF PAIGE SECURITY?

14   A.   YES, I WAS AWARE OF THAT AFTER I HAD LEFT PAIGE SECURITY.

15   Q.   ALL RIGHT.  AND DID YOU PLAY A PART IN THE DECISION NOT TO

16   FULLY FUND THE PENSION OF PAIGES SECURITY EMPLOYEES?

17   A.   NO, SIR, I HAD NOTHING TO DO WITH THE FINANCES IN PAIGES

18   SECURITY.

19   Q.   AND DO YOU THINK IT'S IMPORTANT FOR AN EMPLOYER TO FUND

20   THE PENSION OBLIGATIONS OF ITS EMPLOYEES?

21          MS. GARRIDO:  OBJECTION, RELEVANCE.

22          THE COURT:  SUSTAINED.

23   BY MR. FAZIOLI:

24   Q.   IT'S TRUE THAT LEONARD PAIGE DID NOT FUND THE PENSION

25   BENEFITS OF HIS EMPLOYEES; CORRECT?

HOLMES CROSS

```
1              MS. GARRIDO:  OBJECTION, ASKED AND ANSWERED.

2              THE COURT:  ARE YOU MOVING INTO A NEW AREA?

3              MR. FAZIOLI:  I AM.

4              THE COURT:  IS THIS FOUNDATION FOR YOUR NEXT.

5              MR. FAZIOLI:  YES, IT IS FOUNDATION.

6              THE WITNESS:  WHAT ARE YOU ASKING?

7     BY MR. FAZIOLI:

8     Q.   LEONARD PAIGE DID NOT FULLY FUND THE PENSION BENEFITS OF

9     HIS EMPLOYEES OF PAIGE SECURITY; CORRECT?

10    A.   THAT COULD BE HEARSAY FROM ME.

11    Q.   WELL, HE TOLD YOU THAT, CORRECT?

12    A.   NO, HE DIDN'T TELL ME THAT.

13    Q.   SO YOU DON'T KNOW WHETHER HE FULLY FUNDED THE PENSION

14    BENEFITS OF HIS EMPLOYEES OR NOT?

15    A.   NO, I DON'T KNOW.

16    Q.   OKAY.  BUT I THOUGHT YOU TESTIFIED THAT YOUR PENSION

17    BENEFITS WEREN'T FULLY FUNDED; ISN'T THAT CORRECT?

18    A.   THAT WAS ME.  YOU ASKED ME ABOUT THE EMPLOYEES, OTHER

19    EMPLOYEES.

20    Q.   OKAY.  SO YOU KNEW THAT YOUR PENSION BENEFITS WERE NOT

21    FULLY FUNDED BUT YOU DIDN'T KNOW WHETHER OTHER --

22    A.   I DIDN'T KNOW THAT UNTIL I LEFT THE COMPANY.

23    Q.   SO WHAT WAS THE TIMEFRAME THAT YOU KNEW THAT OTHER

24    EMPLOYEE'S PENSIONS WERE NOT BEING FULLY FUNDED?

25    A.   PROBABLY WHEN I GOT INVOLVED MORE SO IN THE BANKRUPTCY
```

1      BETWEEN 2004 AND 2005.

2      Q.   OKAY.  AND DURING THAT PERIOD OF TIME --

3      A.   AND WITH THE SITUATION WITH MY HOME.

4      Q.   I'M SORRY?

5      A.   WITH THE SITUATION WITH MY HOME.

6      Q.   AND AT THAT TIME MR. PAIGE WAS MAKING MORTGAGE PAYMENTS ON

7      THE PROPERTY AT 312 MOONRACKER; IS THAT CORRECT?

8      A.   YES, HE WAS.

9      Q.   HE WAS MAKING MORTGAGE PAYMENTS USING FUNDS THAT ACTUALLY

10     BELONGED TO THE BANKRUPTCY ESTATE; IS THAT CORRECT?

11     A.   I DON'T KNOW --

12          MS. GARRIDO:  OBJECTION.  IT CALLS FOR SPECULATION,

13     ARGUMENTATIVE.

14          THE COURT:  I THINK THE ANSWER WAS I DON'T KNOW.

15     WAS THAT YOUR ANSWER?

16          THE WITNESS:  YES.

17          THE COURT:  I'LL ALLOW THAT TO REMAIN.

18          THE WITNESS:  YES, YOUR HONOR.

19     BY MR. FAZIOLI:

20     Q.   SO WHEN YOU BECAME AWARE OF THE FACT IN THE 2004

21     TIMEFRAME --

22     A.   UH-HUH.

23     Q.   -- THAT YOUR FATHER WAS NOT FULLY FUNDING THE PENSION

24     BENEFITS OF HIS EMPLOYEES?

25          MS. GARRIDO:  YOUR HONOR, I'M GOING TO OBJECT.  MAY

```
1    WE APPROACH?

2              THE COURT:  YES.

3         (SIDE-BAR CONFERENCE ON THE RECORD.)

4              MS. GARRIDO:  IT APPEARS TO ME THAT MR. FAZIOLI IS

5    ATTEMPTING TO NOW CHARACTERIZE MS. HOLMES AS STEALING MONEY

6    FROM THE PENSIONERS AT PAIGES SECURITY SERVICE BY KNOWINGLY

7    TAKING MORTGAGE PAYMENTS THAT COULD HAVE BEEN PAID FOR THE

8    PENSIONS.

9         THIS IS A RIDICULOUS LINE OF QUESTIONING.  IT'S COMPLETELY

10   IRRELEVANT TO THE CASE AT HAND.  IT'S FAR AFIELD.  IT'S

11   PREJUDICIAL, AND I WOULD ASK FOR A RULING TO HAVE MR. FAZIOLI

12   MOVE ON.

13             MR. FAZIOLI:  ONCE SHE BECOMES AWARE ABOUT THE

14   BANKRUPTCY AND BECOMES AWARE THAT THE PENSION OBLIGATIONS ARE

15   NOT BEING PAID FOR, IT'S PROBATIVE OF THE FACT THAT SHE IS

16   RECEIVING MORTGAGE PAYMENTS THAT COULD BE GOING TO PAY THE

17   PENSION BENEFITS THAT ARE THE SUBJECT OF THE BANKRUPTCY ESTATE.

18        HER KNOWLEDGE OF THAT IS RELEVANT AS TO WHETHER HER

19   SUBSEQUENT ACTIONS WERE DONE WITH AN INTENTION THAT SHE GET

20   PAID OR HER FAMILY MEMBERS GET PAID AS OPPOSED TO THE PEOPLE

21   AND THE CREDITORS WHO HER FATHER OWED MONEY, AND THAT'S PART OF

22   THE PROOF OF SHOWING THAT SHE HAD AN INTENT TO DEFEAT THE

23   PURPOSES OF THE BANKRUPTCY CODE.  IT'S PROBATIVE OF HER

24   KNOWLEDGE AND HER STATE OF MIND AND HER PRIORITIES BUT REALLY

25   MRS. HOLMES'S PRIORITY IN TERMS OF WHO IS GOING TO GET PAID.
```

1    THE COURT:  YOU'RE INCHING TOWARDS THE MICROPHONE,

2    MS. LIE.

3    MS. LIE:  I GOT THE IMPRESSION THAT MR. FAZIOLI WAS

4    DONE.  SO EITHER THE GOVERNMENT IS AT THIS POINT IMPROPERLY

5    SEEKING A VARIANCE FROM THE INDICTMENT OR THEY'RE SEEKING TO

6    ADMIT PROPENSITY EVIDENCE THAT HAS NO BEARING ON ANY OF THE

7    ACTUAL ELEMENTS AND IS DISFAVORED UNDER 404(A).

8    MR. FAZIOLI:  IT'S ALSO RELEVANT AS TO THE EXTENT

9    THAT THEY WANT TO MAKE LEONARD PAIGE AND HIS BUSINESS AND HIS

10   RELATIONSHIP WITH HER AND HOW THIS IS A TIGHT-KNIT FAMILY

11   BUSINESS, HIS BUSINESS PRACTICES, HIS PRIORITIES, WHAT HE DID

12   IS RELEVANT AND THEN INFORMS ABOUT THIS TRANSFER AND WHETHER

13   THAT TRANSFER WAS DONE WITH AN INTENTION TO EVADE THE

14   OBLIGATIONS THAT HE HAD TO THE BANKRUPTCY ESTATE AND TO THE

15   CREDITORS AND WHETHER MS. HOLMES KNEW ABOUT THAT.

16   MS. GARRIDO:  LEONARD PAIGE'S INTENTIONS ARE NOT AT

17   ISSUE IN THIS CASE.  ONLY MS. HOLMES INTENTIONS ARE AT ISSUE.

18   I THINK THIS IS BAD CHARACTER EVIDENCE AND IT'S PROPENSITY

19   EVIDENCE AND I THINK IT'S MORE PREJUDICIAL THAN PROBATIVE, IN

20   FACT, I DON'T THINK IT'S PROBATIVE OF ANYTHING.

21   MR. FAZIOLI:  IT WAS THE DEFENSE THAT ASKED

22   QUESTIONS ABOUT THE CREDITORS AND GOT INTO THE QUESTIONS ABOUT

23   THE -- AND IN THEIR EXAMINATION OF MR. MAHER, THEY'RE THE SIDE

24   THAT WANTS TO MAKE AND SPEAK AT LENGTH ABOUT LEONARD PAIGE, HIS

25   BUSINESS, HIS INTERACTIONS.

1      IT'S PART OF THE INFORMATION THAT THE JURY CAN TAKE INTO

2    ACCOUNT IN ASSESSING THESE ACTIONS AND THE MOTIVATIONS OF THE

3    ACTORS AND THEY HAVE MADE LEONARD PAIGE'S MOTIVATIONS AN ISSUE.

4          MS. GARRIDO:  THAT'S AN OUTRAGE COMING FROM THE

5    GOVERNMENT WHO SO VIGOROUSLY OBJECTED ABOUT THE PAIGE BROCHURE

6    COMING INTO EVIDENCE TO ILLUMINATE THE NATURE OF THE BUSINESS.

7    I THINK IT'S COMPLETELY IMPROPER.

8          THE COURT:  ALL RIGHT.  THANK YOU.  ALL RIGHT.  SO

9    I'LL ALLOW SOME PROBING OF THIS, BUT IF YOU'RE SEEKING TO

10   INTRODUCE A WHOLE NEW THEORY, THAT'S NOT APPROPRIATE TO GET A

11   WHOLE NEW THEORY OF LIABILITY IN.  I DON'T THINK YOU CAN DO

12   THAT AT THIS STAGE OF THE GAME.

13     TO THE EXTENT THAT THIS TOPIC WAS RAISED DURING

14   CROSS-EXAMINATION ABOUT MR. PAIGE AND HIS BUSINESS, YOU CAN

15   PROBE AS TO HER KNOWLEDGE ABOUT THAT.

16     THE THEORY ABOUT WHETHER OR NOT SHE WAS COMPLICIT IN

17   KEEPING MONIES FROM THE PENSION FUNDS AND THAT, I THINK THAT

18   STRETCHES IT A BIT.

19         MR. FAZIOLI:  AND I WOULD SAY THAT TO THE EXTENT

20   THAT WE'RE ARGUING THAT SHE KNOWINGLY RECEIVED AN INTEREST IN

21   THE ESTATE -- AN INTEREST IN THE MOONRACKER PROPERTY, THAT SHE

22   KNEW BELONGED TO THE BANKRUPTCY ESTATE, THAT IS NOT A NEW

23   THEORY AND THIS IS EVIDENCE THAT IS RELEVANT TO THE

24   DETERMINATION ABOUT HER STATE OF MIND.

25         THE COURT:  WELL, YOU CAN CERTAINLY PROBE WHETHER OR

```
 1      NOT SHE HAD THAT KNOWLEDGE ABOUT WHETHER OR NOT THE PROPERTY

 2      WAS PART OF THE ESTATE AND SHE MAY HAVE ANSWERED THAT QUESTION

 3      ONE TIME ALREADY, BUT YOU CAN CERTAINLY PROBE THAT.

 4           YOU MIGHT BE PERMITTED TO ARGUE THAT SHE KNEW ABOUT THAT,

 5      AND, THEREFORE, IF THE EVIDENCE ESTABLISHES THAT SHE DID KNOW

 6      ABOUT THAT I SUPPOSE AN ARGUMENT CAN BE MADE THAT SHE KNEW

 7      ABOUT THAT AND SHE KNEW ABOUT THE BANKRUPTCY AND SHE WAS TAKING

 8      MONEY THAT OTHERWISE SHOULD HAVE GONE TO THE PENSIONERS.

 9           ALTHOUGH I THINK IT'S A BIT -- IT IS A BIT OF A STRETCH

10      FROM THE FACTS THAT WE HAVE HERE.  SO I'LL ALLOW YOU TO PROBE A

11      LITTLE, BUT I REALLY DON'T THINK THAT'S AS PERTINENT AS YOU

12      MIGHT THINK IT IS FOR THESE ISSUES.

13           CANDIDLY JUST BASED ON HER RESPONSES, I DON'T THINK YOU'RE

14      GOING TO GET THAT FAR WITH HER ON THAT THEORY, JUST BASED ON

15      HER ANSWERS SO FAR BUT YOU MIGHT BE ABLE TO REHABILITATE HER

16      AND SOMETHING MAY COME UP AND IF THERE'S REDIRECT THAT ALLOWS

17      THAT.

18           MR. FAZIOLI:  OKAY.  IN TERMS OF SCHEDULING, I THINK

19      WE'RE KIND OF --

20           THE COURT:  I THINK WE'LL PROBABLY COME BACK AT 9:00

21      TOMORROW MORNING.

22           AND DO YOU HAVE ANOTHER WITNESS AFTER THAT?

23           MS. LIE:  WE DO AND THAT OTHER WITNESS -- WE HAVE A

24      FEW OTHER WITNESSES, ONE IN PARTICULAR HAS A SCHEDULING

25      DIFFICULTY THAT WE WERE HOPING TO RESOLVE BY HAVING HIM TESTIFY
```

1    TODAY, BUT WE UNDERSTAND WE COULDN'T DO THAT BECAUSE OF THE

2    GOVERNMENT'S DESIRE TO INSPECT THE PHOTOGRAPHS.

3         BUT I WOULD LIKE TO BE ABLE TO CALL AMMAR SAHELI OUT OF

4    ORDER IF AT ALL POSSIBLE, AND I WOULD ASK FOR LEAVE TO PUT HIM

5    ON FIRST THING TOMORROW MORNING TO ADDRESS THE CHARACTER.  I

6    THINK HE'LL BE VERY, VERY SHORT.  I DON'T THINK IT WILL

7    PREJUDICE THE GOVERNMENT'S EXAMINATION OR THE REDIRECT

8    EXAMINATION OF MS. HOLMES.

9         AND HE IS WORKING FOR THE OAKLAND SCHOOL DISTRICT, AND HE

10   CANCELLED A NUMBER OF MEETINGS.  AND HE HAS TO GET ON THE ROAD.

11             THE COURT:  HE'S A CHARACTER WITNESS?

12             MS. LIE:  HE'S A CHARACTER WITNESS.  HE'S GOING TO

13   TAKE A COUPLE OF MINUTES.

14             THE COURT:  HE'S GOING TO SAY HE KNOWS MS. HOLMES,

15   AND HE'S GOING TO SPEAK TO HER REPUTATION IN THE COMMUNITY.

16             MS. LIE:  FOR HONESTY AND FAIR DEALINGS.  AND HE'LL

17   BE VERY SHORT AND BECAUSE OF THE REASONS THIS MORNING, I THINK

18   WE WERE NOT ABLE TO GET TO HIM AND I'D LIKE TO GET HIM ON HIS

19   WAY.  SO I WOULD PUT THAT REQUEST OUT THERE.

20             MR. FAZIOLI:  I NEED TO CONFER WITH COUNSEL.

21             THE COURT:  WE COULD HAVE DONE THAT BEFORE WE PUT

22   MS. HOLMES ON THIS AFTERNOON.

23        SO WE'RE GOING TO BREAK IN ABOUT TEN MINUTES.  I'LL ASK

24   THEM TO COME BACK AT 9:00 O'CLOCK, AND IT SOUNDS LIKE WE'LL GO

25   ALL DAY TOMORROW.

HOLMES CROSS

1          MS. GARRIDO:  AT THIS RATE, YES.

2          MR. FAZIOLI:  THERE ARE SOME MATTERS WE SHOULD

3    DISCUSS ABOUT THE CHARACTER WITNESSES AND WE CAN BREAK NOW AND

4    TALK ABOUT THAT AND --

5          MS. GARRIDO:  YOUR HONOR, I DON'T THINK WE NEED TO

6    HAVE A DISCUSSION ABOUT THAT.  IT'S A STRAIGHTFORWARD ISSUE.

7    WE'RE GOING TO PUT ON EVIDENCE AS TO HONESTY AND INTEGRITY AND

8    ANY RELEVANT FACTS.

9          IF THEY BELIEVE IT'S GOING BEYOND THE SCOPE OF WHAT IS

10   PERMISSIBLE, THEY CAN OBJECT.  I DON'T THINK IT'S APPROPRIATE

11   TO GO THROUGH EACH WITNESS BEFOREHAND STEP BY STEP OF

12   EVERYTHING THAT THEY MAY POSSIBLY SAY ON THE STAND AND GET A

13   RULING ON IT BEFOREHAND.

14         IT'S A HUGE WASTE OF TIME.

15         THE COURT:  WE'LL DO IT TOMORROW WHEN THE JURY IS

16   NOT HERE, AND WE'LL GET TOGETHER AT QUARTER TILL AND GO OVER

17   THAT.

18         OKAY.  THANK YOU.

19         (END OF DISCUSSION AT SIDE-BAR.)

20         THE COURT:  THANK YOU, COUNSEL.  LADIES AND

21   GENTLEMEN, MR. FAZIOLI IS GOING TO CONTINUE WITH HIS

22   EXAMINATION.  WE'LL PROBABLY BREAK IN ABOUT TEN MINUTES FOR OUR

23   EVENING RECESS, AND I'LL ASK YOU TO COME BACK AT 9:00 O'CLOCK

24   TOMORROW MORNING, 9 :00 O'CLOCK.

25         MR. FAZIOLI.

```
 1              MR. FAZIOLI:  YES.

 2    Q.   NOW, WHEN YOU PURCHASED THE MOONRACKER PROPERTY IN 1999 --

 3    A.   YES.

 4    Q.   -- YOU KNEW THAT YOU CO-OWNED THAT PROPERTY WITH YOUR

 5    FATHER; CORRECT?

 6    A.   YES.

 7    Q.   AND YOU KNEW THAT IN 1999?

 8    A.   UH-HUH.

 9    Q.   AND THEN YOUR FATHER DECLARED BANKRUPTCY IN 2002; CORRECT?

10    A.   THAT'S WHAT I RECALL.

11    Q.   AND DID YOU FIND OUT ABOUT THAT BANKRUPTCY IN 2002?

12    A.   AFTER.  AROUND MAY TIME.

13    Q.   AROUND WHAT?

14    A.   AROUND MAY OF 2002 WHEN I WAS LAID OFF.

15    Q.   OKAY.  YOU WERE LAID OFF FROM PAIGE SECURITY AND YOU

16    BECAME AWARE IN MAY OF 2002 THAT YOUR FATHER HAD DECLARED

17    BANKRUPTCY.

18         AND I THINK YOU MENTIONED THAT THERE WAS A MEETING, A

19    FAMILY MEETING; IS THAT CORRECT?

20    A.   YES.

21    Q.   AND THAT YOUR PARENTS WERE AT THAT MEETING, CORRECT?

22    A.   THEY CALLED THE MEETING.

23    Q.   AND THEN THERE WAS A FAMILY MEMBER THAT WAS ALSO -- YOUR

24    OTHER FAMILY MEMBERS WERE ALSO AT THE MEETING; CORRECT?

25    A.   CORRECT.
```

1    Q.   AND YOUR FATHER'S BANKRUPTCY ATTORNEY WAS ALSO AT THE

2    MEETING; CORRECT?

3    A.   NO, SIR.

4    Q.   AND DO YOU KNOW -- DO YOU RECOGNIZE THE NAME BILL

5    MCLAUGHLIN?

6    A.   I HAVE HEARD HIS NAME, BUT HE WAS NOT AT THE FAMILY

7    MEETING AT MY SISTER'S HOME.

8    Q.   AND THAT MEETING THAT TOOK PLACE, THAT FAMILY MEETING, YOU

9    TALKED ABOUT THE FACT, ABOUT THE FACT THAT YOUR PARENTS WERE

10   DECLARING BANKRUPTCY; CORRECT?

11   A.   OR HAD.

12   Q.   OR HAD DECLARED BANKRUPTCY; CORRECT?

13   A.   YES.

14   Q.   AND I THINK YOU MENTIONED THAT YOU TALKED ABOUT THE IMPACT

15   ON PAIGES SECURITY BUSINESS, TOO, CORRECT?

16   A.   NO, WE DID NOT.  I DON'T RECALL SAYING THAT.

17   Q.   SO THE CONVERSATION WAS JUST ABOUT THE IMPACT ON YOUR

18   PARENTS OF THE BANKRUPTCY?

19   A.   JUST NOTIFYING US THAT THAT'S WHAT THEY HAD DONE.

20   Q.   AND WHEN YOU -- I THINK YOU PREVIOUSLY TALKED ABOUT THE

21   DOWN PAYMENTS ON THE MOONRACKER PROPERTY.  DO YOU RECALL THAT?

22   A.   YES.

23   Q.   AND THESE ARE THE DOWN PAYMENTS THAT WERE MADE BACK IN,

24   BACK IN 1999; CORRECT?

25   A.   YES.

1    Q.   WHEN YOU PURCHASED THE HOME?

2    A.   YES.

3    Q.   AND YOUR FATHER PAID THE MAJORITY OF THAT DOWN PAYMENT;

4    CORRECT?

5    A.   YES.

6    Q.   AND THEN HE ALSO MADE THE MORTGAGE PAYMENTS ON THAT

7    PROPERTY, THE MAJORITY OF THE MORTGAGE PAYMENTS ON THAT

8    PROPERTY; CORRECT?

9    A.   ALL BUT THE $300.

10   Q.   THE $300.  BUT YOU INDICATED THAT YOU DIDN'T MEMORIALIZE

11   THE $300; CORRECT?

12   A.   WHAT DO YOU MEAN "MEMORIALIZE"?

13   Q.   DID YOU WRITE IT DOWN?

14   A.   NO, SIR.

15   Q.   AND WHO PAID THE INSURANCE ON THE MOONRACKER PROPERTY?

16   A.   I BELIEVE HE DID FROM WHAT I RECALL, HE JOINED IT WITH HIS

17   OTHER PROPERTIES.

18   Q.   AND, NOW, THERE CAME A POINT, I THINK YOU INDICATED, THAT

19   YOU BECAME AWARE OF THE FACT THAT YOUR FATHER DECLARED

20   BANKRUPTCY AND THE IMPACT THAT IT HAD ON THE PROPERTY; CORRECT?

21   A.   YES.

22   Q.   AND THAT YOU BECAME AWARE OF THE FACT THAT YOU NO LONGER

23   CO-OWNED THE BANKRUPTCY, YOU -- YOU BECAME AWARE AT SOME POINT

24   THAT YOU NO LONGER CO-OWNED THE PROPERTY WITH YOUR FATHER;

25   CORRECT?  YOU CO-OWNED IT WITH THE BANKRUPTCY ESTATE?

```
1              LET ME REPHRASE THAT.

2    A.   YES, PLEASE DO.

3    Q.   DID THERE BECOME A POINT THAT YOU BECAME AWARE THAT YOU

4    CO-OWNED YOUR 312 MOONRACKER PROPERTY WITH THE BANKRUPTCY

5    ESTATE FOR YOUR FATHER?

6    A.   FROM MY RECOLLECTION I RECALL THAT LEONARD PAIGE,

7    CARRIE PAIGE, AND THE BANKRUPTCY COURT SO I INCLUDED THEM ALL

8    AS ONE UNIT.  THAT'S THE ANSWER.

9    Q.   AND WHEN DID YOU BECOME AWARE OF THAT, THE FACT OF HOW THE

10   BANKRUPTCY AFFECTED YOUR HOUSE?

11   A.   BETWEEN 2004 TO 2005.

12   Q.   SO 2004 TO 2005 YOU KNEW THAT THE BANKRUPTCY HAD AFFECTED

13   THE INTEREST IN YOUR HOUSE?

14   A.   YES.

15   Q.   AND YOU KNEW AT THAT POINT THAT YOU CO-OWNED THE HOUSE

16   WITH THE BANKRUPTCY ESTATE?

17   A.   I WASN'T SURE.  EVERYTHING SAID LEONARD AND CARRIE'S

18   ESTATE.  SO I DON'T HAVE THAT LEGAL KNOWLEDGE.

19   Q.   YOU DON'T HAVE IT NOW OR YOU DIDN'T HAVE IT THEN?

20   A.   I DIDN'T HAVE IT THEN.

21   Q.   SO YOUR TESTIMONY IS THAT YOU WERE NOT AWARE AT ANY POINT

22   THAT YOU CO-OWNED THE PROPERTY, THE MOONRACKER PROPERTY WITH

23   THE BANKRUPTCY ESTATE?

24   A.   NO, I'M NOT SAYING AT ANY POINT.  YOU WERE ASKING ABOUT

25   2004, 2005 TIMEFRAME IF I RECALL.
```

1    Q.   IN THAT 2004 -- AND I'M JUST TRYING TO UNDERSTAND.  2004

2    AND 2005, AT THAT POINT, DID YOU KNOW AT THAT POINT THAT YOU

3    CO-OWNED THE PROPERTY WITH THE BANKRUPTCY ESTATE?

4    A.   I ASSUMED THE BANKRUPTCY ESTATE WAS LEONARD, CARRIE, AND

5    THE BANKRUPTCY ESTATE ALL IN ONE.

6    Q.   AND YOU ASSUMED --

7    A.   SO I DIDN'T CALCULATE THAT IN ANY WAY.

8    Q.   DID THERE COME A POINT WHERE YOU REALIZED THAT YOU WOULD

9    NEED TO BUY OUT THE BANKRUPTCY ESTATE AS PART OF YOUR PROPERTY?

10   A.   BUY OUT?

11   Q.   DID THERE COME A POINT WHERE YOU REALIZED THAT THE

12   BANKRUPTCY ESTATE OWNED A PIECE OF YOUR HOUSE?

13   A.   YES.

14   Q.   AND THAT WAS IN THIS 2004, 2005 TIMEFRAME?

15   A.   2005 OR WHENEVER I RECEIVED THE LETTER FROM THE TRUSTEE.

16   Q.   AND THE LETTER FROM MR. RICHARDSON?

17   A.   YES.

18   Q.   AND WHENEVER YOU RECEIVED THAT LETTER, AT THAT POINT YOU

19   UNDERSTOOD THAT THE TRUSTEE -- THAT THE BANKRUPTCY ESTATE OWNED

20   A PORTION OF THE HOUSE -- OF YOUR HOUSE?

21   A.   NOT NECESSARILY.  I STILL CONSIDERED IT LEONARD PAIGE AND

22   THE ESTATE.

23   Q.   AND YOU UNDERSTOOD AT THAT POINT THAT LEONARD PAIGE HAD

24   DECLARED BANKRUPTCY; CORRECT?  AND WE'RE TALKING ABOUT WHEN YOU

25   RECEIVED THE LETTER FROM MR. RICHARDSON?

```
 1    A.   YES.

 2    Q.   AND YOU UNDERSTOOD THAT THERE WERE CREDITORS FOR HIS

 3    BANKRUPTCY; CORRECT?

 4    A.   I CAN'T -- YES, I UNDERSTOOD THAT'S WHAT THE BANKRUPTCY

 5    WOULD BE ABOUT, YES.

 6    Q.   AND ABOUT THE FACT THAT YOUR FATHER OWED MONEY?

 7    A.   OWED MONEY.

 8    Q.   HE OWED MONEY TO A LOT OF PEOPLE; CORRECT?

 9    A.   RIGHT.

10    Q.   AND THAT BACK IN 2002, HE HAD DECLARED BANKRUPTCY,

11    CORRECT?  YOU UNDERSTOOD THAT?

12    A.   YES.

13    Q.   AND YOU UNDERSTOOD THAT WHAT THE BANKRUPTCY TRUSTEE WAS

14    GOING TO DO WAS GOING TO BE TO GET MONEY TO PAY THE CREDITORS

15    OF YOUR FATHER?

16    A.   NO, I DIDN'T UNDERSTAND.

17    Q.   YOU DIDN'T UNDERSTAND?

18    A.   NO, I DID NOT.

19    Q.   NOW, WHEN YOU -- WHEN MR. RICHARDSON REACHED OUT TO YOU

20    AND TALKED ABOUT THE LETTER ABOUT THE INTEREST IN THE PROPERTY,

21    YOUR FATHER WAS STILL MAKING PAYMENTS ON THE HOUSE; CORRECT?

22    A.   CORRECT.

23    Q.   AND HE WAS STILL MAKING MORTGAGE PAYMENTS, FOR EXAMPLE,

24    CORRECT?

25    A.   CORRECT.
```

1    Q.  AND THAT WASN'T -- YOU DIDN'T HAVE A PROBLEM WITH THAT AT

2    THE TIME?

3    A.  NO.

4    Q.  DID YOU HAVE ANY CONCERNS AT THE TIME FOR THE CREDITORS

5    WHOM YOUR FATHER OWED MONEY?

6    A.  I WASN'T INVOLVED IN THAT.  I DIDN'T EVEN REALLY KNOW WHO

7    HE OWED MONEY TO.

8    Q.  OKAY.  BUT YOU KNEW THAT HE OWED PEOPLE MONEY AT THE TIME;

9    CORRECT?

10    A.  CORRECT.

11    Q.  AND YOU BECAME AWARE OF THE FACT THAT THE BANKRUPTCY

12    ESTATE OWNED A PORTION OF YOUR HOUSE; CORRECT?

13          MS. GARRIDO:  I'M GOING TO OBJECT AS TO ASKED AND

14    ANSWERED MULTIPLE TIMES.

15          THE WITNESS:  LEONARD PAIGE --

16          MR. FAZIOLI:  AT ANY TIME?

17          THE COURT:  YOU'RE GOING TO WITHDRAW AND ASK A NEW

18    QUESTION?

19          MR. FAZIOLI:  I'LL ASK A NEW QUESTION.

20    Q.  DID YOU HAVE ANY CONCERNS AT ALL IN 2005 FOR THE PEOPLE

21    WHO YOUR FATHER OWNED MONEY AS PART OF THE BANKRUPTCY?

22          MS. GARRIDO:  OBJECTION AS TO ASKED AND ANSWERED AND

23    ALSO UNDER 403 GROUNDS.  RELEVANCE.

24          THE COURT:  OVERRULED.

25          DO YOU UNDERSTAND THE QUESTION?

```
 1                 THE WITNESS:  SOMEWHAT.  NOT TOTALLY, NO.

 2      BY MR. FAZIOLI:

 3      Q.   IN THIS 2005 TIMEFRAME, WHAT CONCERN, IF ANY, DID YOU HAVE

 4      FOR THE PEOPLE WHO WERE OWED MONEY BY YOUR FATHER AS A RESULT

 5      OF HIS BANKRUPTCY?

 6      A.   I HAD CONCERN FOR MY PARENTS LEONARD AND CARRIE WHO WERE

 7      IN THEIR LATE 70'S, GOING INTO 80'S.  THAT'S WHERE MY MAJOR

 8      FOCUS WAS.

 9      Q.   AND DID YOU HAVE ANY CONCERN FOR THE PEOPLE WHOM YOUR

10      PARENTS OWED MONEY AS PART OF THE BANKRUPTCY?

11      A.   YES, I WAS -- YES, I HAVE CONCERN FOR PEOPLE -- COMPASSION

12      FOR ANYBODY OUT OF WORK.  I WAS OUT OF WORK, YES.  I HAD GREAT

13      CONCERN.

14      Q.   AND DID YOU WANT THOSE PEOPLE TO BE PAID BACK?

15      A.   I DIDN'T RATIONALIZE THAT.

16                 MS. GARRIDO:  OBJECT AS TO THE RELEVANCE, YOUR

17      HONOR.

18                 THE WITNESS:  THAT --

19                 THE COURT:  EXCUSE ME.  WHEN THERE'S AN OBJECTION,

20      YOU NEED TO WAIT --

21                 THE WITNESS:  YES, SIR.

22                 THE COURT:  -- UNTIL THE COURT RULES.

23                 THE WITNESS:  YES, SIR.

24                 THE COURT:  I'LL SUSTAIN THE OBJECTION, AND YOU CAN

25      ASK ANOTHER QUESTION.
```

HOLMES CROSS

```
1              DO YOU WANT TO TAKE A RECESS?

2                   MR. FAZIOLI:  THAT'S FINE.

3                   THE COURT:  I'LL REMIND YOU OF THE ADMONITION STILL

4         IN PLACE AND 9:00 O'CLOCK.  THANK YOU.

5              (COURT CONCLUDED.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3                          CERTIFICATE OF REPORTER

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8     STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9     280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10    CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16          _____
            IRENE RODRIGUEZ, CSR, CRR
            CERTIFICATE NUMBER 8076
17

18
            DATED:  OCTOBER 29, 2013
19

20

21

22

23

24

25